No. 24-2510

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

────────────────

NOVO NORDISK INC.;
NOVO NORDISK PHARMA, INC.,

*Appellants,*

v.

SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID
SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES.

────────────────

On Appeal from the United States District Court for the District of
New Jersey, No. 3:23-cv-20814, Hon. Zahid N. Quraishi

────────────────

## JOINT APPENDIX
## Volume II of II: Appx23 – Appx573

────────────────

Ashley C. Parrish
John D. Shakow
Amy R. Upshaw
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-3945
aparrish@kslaw.com

Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas
34th Fl.
New York, NY 10036

*Counsel for Appellants*

Michael S. Raab
Lindsey Powell
Catherine Padhi
Maxwell A. Baldi
*Attorneys, Appellate Staff*
Civil Division, Room 7712
UNITED STATES
DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-5091

*Counsel for Appellees*

October 15, 2024

# TABLE OF CONTENTS

**Page**

### Volume I

Notice of Appeal to the United States Court of Appeals for the
Third Circuit (Aug. 14, 2024), Dkt. 95 ........................................ Appx1

Order (July 31, 2024), Dkt. 94 ......................................... Appx4

Opinion (July 31, 2024), Dkt. 93 ................................................. Appx5

### Volume II

District Court Docket Sheet, *Novo Nordisk Inc., et al. v.
Becerra, et al.*, No. 3:23-cv-20814-ZNQ-JBD (D.N.J.) ............... Appx23

Complaint (Sept. 29, 2023), Dkt. 1 ................................... Appx41

Declaration of Karen M. Hauda, Dkt. 29 ................................... Appx101

Exhibit A – Meeting Minutes, Dkt. 29-1 ................................. Appx126

Exhibit B – Industry Guidance, Dkt. 29-2 ............................. Appx143

Exhibit C – Draft Industry Guidance, Dkt. 29-3 ..................... Appx159

Exhibit D – Medicare Drug Price Negotiation Program
Sheet, Dkt. 29-4 .................................................................. Appx171

Exhibit E – Medicare Drug Price Negotiation Program
Agreement, Dkt. 29-5 ......................................................... Appx175

Exhibit F – Letter re Inflation Reduction Act, Dkt. 29-6 ........ Appx180

Declaration of Dr. Nathan Laney, Dkt. 30 ................................. Appx183

Exhibit A – Nuha A. ElSayed et al., *Pharmacologic
Approaches to Glycemic Treatment: Standards of
Care in Diabetes—2023*, 46 Diabetes Care S140 (2023),
Dkt. 30-1 ............................................................................ Appx202

# TABLE OF CONTENTS

**Page**

Exhibit B – Nuha A. ElSayed et al., *Glycemic Targets: Standards of Care in Diabetes—2023*, 46 Diabetes Care S97 (2023), Dkt. 30-2 ........................................................... Appx221

Exhibit C – Louis Monnier & Claude Colette, *Contributions of Fasting and Postprandial Glucose to Hemoglobin A1c*, 12 Endocrine Prac. (Supp.) 42 (2006), Dkt. 30-3 ................ Appx236

Exhibit D – Susan L. Samson et al., *American Association of Clinical Endocrinology Consensus Statement: Comprehensive Type 2 Diabetes Management Algorithm—2023 Update*, 29 Endocrine Prac. 305 (2023), Dkt. 30-4 ............................................................................... Appx242

Exhibit E – Wendy Lane et al., *Exploring the Burden of Mealtime Insulin Dosing in Adults and Children with Type 1 Diabetes*, 39 Clinical Diabetes Js. 347 (2021), Dkt. 30-5 ............................................................................... Appx280

Exhibit F – Kenneth S. Herson et al., *Importance of Postprandial Glucose in Relation to A1C and Cardiovascular Disease*, 37 Clinical Diabetes Js. 250 (2019), Dkt. 30-6 ................................................................. Appx292

Exhibit G – David Russell-Jones et al., *Fast-Acting Insulin Aspart Improves Glycemic Control in Basal-Bolus Treatment for Type 1 Diabetes: Results of a 26-Week Multicenter, Active-Controlled, Treat-to-Target, Randomized, Parallel-Group Trial (onset 1)*, 40 Diabetes Care 943 (2017), Dkt. 30-7 ................................................... Appx303

Exhibit H – Keith Bowering et al., *Faster Aspart Versus Insulin Aspart as Part of a Basal-Bolus Regimen in Inadequately Controlled Type 2 Diabetes: The onset 2 Trial*, 40 Diabetes Care 951 (2017), Dkt. 30-8 .................... Appx312

# TABLE OF CONTENTS

**Page**

Exhibit I – Wendy S. Lane et al., *A Randomized Trial Evaluating the Efficacy and Safety of Fast-Acting Insulin Aspart Compared with Insulin Aspart, Both in Combination with Insulin Degludec with or Without Metformin, in Adults with Type 2 Diabetes (ONSET 9)*, 43 Diabetes Care 1710 (2020), Dkt. 30-9 ............................ Appx320

March 7, 2024 Oral Argument Transcript (filed Mar. 14, 2024), Dkt. 91 ..................................................................................... Appx328

**Query** **Reports** **Utilities** **Help** **Log Out**

APPEAL,CLOSED

# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
## CIVIL DOCKET FOR CASE #: 3:23-cv-20814-ZNQ-JBD

NOVO NORDISK INC. et al v. BECERRA et al
Assigned to: Judge Zahid N. Quraishi
Referred to: Magistrate Judge J. Brendan Day
Related Cases: 3:23-cv-03335-ZNQ-JBD
                3:23-cv-14221-ZNQ-JBD
                3:23-cv-03818-ZNQ-JBD
Case in other court: Third Circuit, 24-02510
Cause: 05:551 Administrative Procedure Act

Date Filed: 09/29/2023
Date Terminated: 07/31/2024
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NOVO NORDISK INC.**

    represented by  **ISRAEL DAHAN**
KING & SPALDING LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
212-556-2114
Fax: 212-556-2222
Email: idahan@kslaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NOVO NORDISK PHARMA, INC.**

    represented by  **ISRAEL DAHAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**XAVIER BECERRA**
*in his official capacity as Secretary of the*
*U.S. Department of Health and Human*
*Services*

    represented by  **ALEXANDER V SVERDLOV**
DOJ-CIV
POC AGOSTINHO, JEAN
1100 L ST., N.W.
WASHINGTON, DC 20530
202-305-8550
Email: alexander.v.sverdlov@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**BRIAN DAVID NETTER**
DOJ-CIV
CIVIL DIVISION
950 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20530

202-514-2000
Email: brian.netter@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN MICHAEL PEZZI**
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL
PROGRAMS BRANCH
1100 L STREET NW
WASHINGTON, DC 20005
202-305-8576
Email: stephen.pezzi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CASSANDRA SNYDER**
DOJ-CIV
DEPARTMENT OF JUSTICE
1100 L STREET NW
WASHINGTON, DC 20005
202-451-7729
Email: cassandra.m.snyder@usdoj.gov
*ATTORNEY TO BE NOTICED*

**CHRISTINE L. COOGLE**
DOJ-CIV
FEDERAL PROGRAMS BRANCH, CIVIL
DIVISION
1100 L ST. NW
WASHINGTON, DC 20005
202-880-0282
Email: christine.l.coogle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**HEATHER CARNEY COSTANZO**
DOJ-USAO
DISTRICT OF NEW JERSEY
401 MARKET STREET
P.O. BOX 2098
CAMDEN, NJ 08101
856-757-5031
Fax: 856-757-5416
Email: heather.costanzo@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HEALTH AND**         represented by   **ALEXANDER V SVERDLOV**
**HUMAN SERVICES**                                        (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **BRIAN DAVID NETTER**
                                                          (See above for address)

Appx24

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN MICHAEL PEZZI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CASSANDRA SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTINE L. COOGLE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**HEATHER CARNEY COSTANZO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHIQUITA BROOKS-LASURE**
*in her official capacity as Administrator of the Centers for Medicare and Medicaid Services*

represented by **ALEXANDER V SVERDLOV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**BRIAN DAVID NETTER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN MICHAEL PEZZI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CASSANDRA SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTINE L. COOGLE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**HEATHER CARNEY COSTANZO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**

represented by **ALEXANDER V SVERDLOV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appx25**

CM/ECF LIVE - U.S. District Court for the District of New Jersey

**BRIAN DAVID NETTER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN MICHAEL PEZZI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CASSANDRA SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTINE L. COOGLE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**HEATHER CARNEY COSTANZO**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Intellectual Property Law and Health Law Scholars**                     represented by   **DONALD A. ECKLUND**
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
5 BECKER FARM ROAD
ROSELAND, NJ 07068
(973) 994-1700
Fax: (973) 994-1744
Email: decklund@carellabyrne.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMES E. CECCHI**
CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.
5 BECKER FARM ROAD
ROSELAND, NJ 07068
(973) 994-1700
Fax: (973) 994-1744
Email: jcecchi@carellabyrne.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Center for American Progress**                     represented by   **JAMES E. CECCHI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NAACP**                     represented by   **JAMES E. CECCHI**
(See above for address)

**Appx26**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**UnidosUS**                              represented by   **JAMES E. CECCHI**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**The Century Foundation**                represented by   **JAMES E. CECCHI**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**AARP, AARP Foundation**                 represented by   **GLEN D. SAVITS**
601 E Street NW                                            GREEN SAVITS, LLC
Washington, DC 20046                                       25B VREELAND ROAD
202-434-2064                                               SUITE 207
                                                           FLORHAM PARK, NJ 07932
                                                           (973) 695-7777
                                                           Fax: (973) 695-7788
                                                           Email: gsavits@greensavits.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**Public Citizen**                        represented by   **ANDREW M. MILZ**
                                                           FLITTER MILZ, P.C.
                                                           1814 EAST ROUTE 70
                                                           SUITE 350
                                                           CHERRY HILL, NJ 08003
                                                           856-396-0600
                                                           Fax: 833-775-3450
                                                           Email: amilz@consumerslaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**Patients for Affordable Drugs Now**     represented by   **ANDREW M. MILZ**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**Doctors for America**                   represented by   **ANDREW M. MILZ**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Amicus**

**Appx27**

| | | |
|---|---|---|
| **Protect Our Care** | represented by | **ANDREW M. MILZ**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Families USA** | represented by | **ANDREW M. MILZ**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American Public Health Association** | represented by | **MADELINE GITOMER**<br>Democracy Forward<br>P.O. Box 34553<br>Washington, DC 20043<br>202-448-9090<br>Email: mgitomer@democracyforward.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American College of Physicians** | represented by | **MADELINE GITOMER**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Society of General Internal Medicine** | represented by | **MADELINE GITOMER**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American Geriatrics Society** | represented by | **MADELINE GITOMER**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American Society of Hematology** | represented by | **MADELINE GITOMER**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Nationally Recognized Healthcare and Medicare Experts** | represented by | **JOHN W. LEARDI**<br>BUTTACI LEARDI & WERNER LLC<br>212 CARNEGIE CENTER<br>SUITE 202<br>PRINCETON, NJ 08540<br>609-799-5150<br>Fax: 609-799-5180 |

Appx28

Email: jwleardi@buttacilaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Economists and Scholars of Health Policy**   represented by   **ESTHER EVA BEREZOFSKY**
MOTLEY RICE NEW JERSEY, LLC
WOODLAND FALLS CORPORATE
CENTER
210 LAKE DRIVE EAST
SUITE 101
CHERRY HILL, NJ 08002-1163
(856) 667-0500
Fax: 856-667-5133
Email: eberezofsky@motleyrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Law Scholars**   represented by   **DONALD A. ECKLUND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**THE CENTER FOR AMERICAN PROGRESS**   represented by   **DONALD A. ECKLUND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**THE NAACP**   represented by   **DONALD A. ECKLUND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**THE CENTURY FOUNDATION**   represented by   **DONALD A. ECKLUND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**UNIDOSUS ACTION FUND**   represented by   **DONALD A. ECKLUND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Abrams Institute for Freedom of Expression**   represented by   **FLAVIO L. KOMUVES**
WEISSMAN & MINTZ LLC
220 DAVIDSON AVENUE
SUITE 410

**Appx29**

SOMERSET, NJ 08873
732-563-4565
Email: fkomuves@weissmanmintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Alliance for Aging Research**                    represented by    **STEPHEN M. BALDINI**
AKIN, GUMP, STRAUSS, HAUER &
FELD, L.L.P.
ONE BRYANT PARK
NEW YORK, NY 10036
212-872-1000
Email: sbaldini@akingump.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/29/2023 | 1 | COMPLAINT against XAVIER BECERRA, CHIQUITA BROOKS-LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ( Filing and Admin fee $ 402 receipt number ANJDC-14750280), filed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Certification)(DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 2 | NOTICE of Appearance by ISRAEL DAHAN on behalf of NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 3 | Corporate Disclosure Statement by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. identifying NOVO NORDISK US COMMERCIAL HOLDINGS, INC. as Corporate Parent.. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 4 | Request for Summons to be Issued by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. as to XAVIER BECERRA. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 5 | Request for Summons to be Issued by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. as to U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 6 | Request for Summons to be Issued by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. as to CHIQUITA BROOKS-LASURE. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 7 | Request for Summons to be Issued by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. as to CENTERS FOR MEDICARE AND MEDICAID SERVICES. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 8 | Request for Summons to be Issued by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. as to XAVIER BECERRA, CHIQUITA BROOKS-LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | 9 | Request for Summons to be Issued by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. as to XAVIER BECERRA, CHIQUITA BROOKS-LASURE, CENTERS |

**Appx30**

| | | |
|---|---|---|
| | | FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (DAHAN, ISRAEL) (Entered: 09/29/2023) |
| 09/29/2023 | | Judge Georgette Castner and Magistrate Judge J. Brendan Day added. (jjc, ) (Entered: 10/02/2023) |
| 10/02/2023 | 10 | SUMMONS ISSUED as to XAVIER BECERRA, CHIQUITA BROOKS-LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (jjc, ) (Entered: 10/02/2023) |
| 10/02/2023 | | Notice of Judicial Preferences. Click here for the Judge's Individual Procedure Requirements. (jjc, ) (Entered: 10/02/2023) |
| 10/16/2023 | 11 | SUMMONS Returned Executed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. XAVIER BECERRA served on 10/3/2023, answer due 12/4/2023; CHIQUITA BROOKS-LASURE served on 10/3/2023, answer due 12/4/2023; CENTERS FOR MEDICARE AND MEDICAID SERVICES served on 10/3/2023, answer due 12/4/2023; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES served on 10/3/2023, answer due 12/4/2023. (DAHAN, ISRAEL) (Entered: 10/16/2023) |
| 10/20/2023 | 12 | SUMMONS Returned Executed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. XAVIER BECERRA served on 10/11/2023, answer due 12/11/2023. (DAHAN, ISRAEL) (Entered: 10/20/2023) |
| 10/20/2023 | 13 | SUMMONS Returned Executed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES served on 10/11/2023, answer due 12/11/2023. (DAHAN, ISRAEL) (Entered: 10/20/2023) |
| 10/25/2023 | 14 | NOTICE of Appearance by STEPHEN MICHAEL PEZZI on behalf of All Defendants (PEZZI, STEPHEN) (Entered: 10/25/2023) |
| 10/25/2023 | 15 | Letter from Defendants re: Reassignment Under Local Rule 40.1. (PEZZI, STEPHEN) (Entered: 10/25/2023) |
| 11/01/2023 | 16 | Joint MOTION TO ESTABLISH BRIEFING SCHEDULE AND FOR RELATED RELIEF by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. (Attachments: # 1 Text of Proposed Order)(DAHAN, ISRAEL) (Entered: 11/01/2023) |
| 11/01/2023 | 17 | TEXT ORDER REASSIGNING CASE. Case reassigned to Judge Zahid N. Quraishi for all further proceedings. Judge Georgette Castner no longer assigned to case. So Ordered by Chief Judge Renee Marie Bumb on 11/1/2023. (gxh) (Entered: 11/01/2023) |
| 11/02/2023 | | Set Deadlines as to 16 Joint MOTION TO ESTABLISH BRIEFING SCHEDULE AND FOR RELATED RELIEF . Motion set for 12/4/2023 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no arguments are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 11/02/2023) |
| 11/03/2023 | 18 | MOTION for Leave to Appear Pro Hac Vice *Ashley C. Parrish, John D. Shakow, and Eva Temkin* by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. (Attachments: # 1 Certification of Ashley C. Parrish, # 2 Certification of John D. Shakow, # 3 Certification of Eva Temkin, # 4 Text of Proposed Order)(DAHAN, ISRAEL) (Entered: 11/03/2023) |
| 11/06/2023 | 19 | SUMMONS Returned Executed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. XAVIER BECERRA served on 10/10/2023, answer due 12/11/2023; CHIQUITA BROOKS-LASURE served on 10/10/2023, answer due 12/11/2023; CENTERS FOR MEDICARE AND MEDICAID SERVICES served on 10/10/2023, |

Appx31

| | | |
|---|---|---|
| | | answer due 12/11/2023; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES served on 10/10/2023, answer due 12/11/2023. (DAHAN, ISRAEL) (Entered: 11/06/2023) |
| 11/06/2023 | 20 | SUMMONS Returned Executed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. CENTERS FOR MEDICARE AND MEDICAID SERVICES served on 10/6/2023, answer due 12/11/2023. (DAHAN, ISRAEL) (Entered: 11/06/2023) |
| 11/06/2023 | 21 | SUMMONS Returned Executed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. CHIQUITA BROOKS-LASURE served on 10/6/2023, answer due 12/11/2023. (DAHAN, ISRAEL) (Entered: 11/06/2023) |
| 11/06/2023 | | Set Deadlines as to 18 MOTION for Leave to Appear Pro Hac Vice *Ashley C. Parrish, John D. Shakow, and Eva Temkin*. Motion set for 12/4/2023 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 11/06/2023) |
| 11/21/2023 | 22 | NOTICE of Appearance by CHRISTINE L. COOGLE on behalf of All Defendants (COOGLE, CHRISTINE) (Entered: 11/21/2023) |
| 11/21/2023 | 23 | ORDER granting 18 Motion for Leave to Appear Pro Hac Vice as to, ASHLEY C. PARRISH, JOHN D. SHAKOW, AND EVA A. TEMKIN. Signed by Magistrate Judge J. Brendan Day on 11/21/2023. (jdg) (Entered: 11/21/2023) |
| 11/27/2023 | | Pro Hac Vice fee received for Ashley C. Parrish, John D. Shakow and Eva A. Temkin: $ 450, receipt number 135762 (jjc, ) (Entered: 11/27/2023) |
| 11/28/2023 | 24 | ORDER granting 16 Joint MOTION. Plaintiff shall file a memorandum in support of their forthcoming motion for summary judgment, not to exceed 60 pages by 12/8/2023. Signed by Judge Zahid N. Quraishi on 11/28/2023. (jdg) (Entered: 11/28/2023) |
| 11/29/2023 | 25 | Notice of Request by Pro Hac Vice Ashley C. Parrish to receive Notices of Electronic Filings. (DAHAN, ISRAEL) (Entered: 11/29/2023) |
| 11/29/2023 | 26 | Notice of Request by Pro Hac Vice John D. Shakow to receive Notices of Electronic Filings. (DAHAN, ISRAEL) (Entered: 11/29/2023) |
| 11/29/2023 | 27 | Notice of Request by Pro Hac Vice Eva A. Temkin to receive Notices of Electronic Filings. (DAHAN, ISRAEL) (Entered: 11/29/2023) |
| 11/30/2023 | | Pro Hac Vice counsel, ASHLEY C. PARRISH, JOHN D. SHAKOW and EVA A. TEMKIN, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (kht) (Entered: 11/30/2023) |
| 12/08/2023 | 28 | MOTION for Summary Judgment by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. Responses due by 1/26/2024. (Attachments: # 1 Memorandum in Support of Motion for Summary Judgment, # 2 Text of Proposed Order)(DAHAN, ISRAEL) (Entered: 12/08/2023) |
| 12/08/2023 | 29 | Exhibit to 28 Motion for Summary Judgment *[Declaration of Karen M. Hauda]* by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(DAHAN, ISRAEL) (Entered: 12/08/2023) |
| 12/08/2023 | 30 | Exhibit to 28 Motion for Summary Judgment *[Declaration of Dr. Nathan Laney]* by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. (Attachments: # 1 Exhibit |

| | | |
|---|---|---|
| | | A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(DAHAN, ISRAEL) (Entered: 12/08/2023) |
| 12/11/2023 | | Set Deadlines as to 28 MOTION for Summary Judgment . Motion set for 1/2/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 12/11/2023) |
| 01/18/2024 | 31 | MOTION for Leave to Appear Pro Hac Vice by Intellectual Property Law and Health Law Scholars. (Attachments: # 1 Declaration OF DONALD A. ECKLUND, # 2 Declaration OF HANNAH W. BRENNAN, # 3 Declaration OF SOPHIA KATHERINE WEAVER, # 4 Declaration OF CLAUDIA MORERA, # 5 Declaration OF REBEKAH GLICKMAN-SIMON, # 6 Text of Proposed Order)(ECKLUND, DONALD) (Entered: 01/18/2024) |
| 01/19/2024 | | Set Deadlines as to 31 MOTION for Leave to Appear Pro Hac Vice . Motion set for 2/20/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 01/19/2024) |
| 01/19/2024 | 32 | NOTICE of Appearance by CASSANDRA SNYDER on behalf of All Defendants (SNYDER, CASSANDRA) (Entered: 01/19/2024) |
| 01/23/2024 | 33 | ORDER Granting 31 Motion for Leave to Appear Pro Hac Vice as to HANNAH W. BRENNAN, CLAUDIA MORERA, REBEKAH GLICKMAN-SIMON and SOPHIA KATHERINE WEAVER. Signed by Magistrate Judge J. Brendan Day on 1/23/2024. (amv) (Entered: 01/23/2024) |
| 01/23/2024 | 34 | Amended MOTION for Leave to Appear Pro Hac Vice by Intellectual Property Law and Health Law Scholars. (Attachments: # 1 Declaration OF JAMES E. CECCHI (AMENDED), # 2 Declaration of Hannah Brennan (AMENDED), # 3 Declaration OF CLAUDIA MORERA (AMENDED), # 4 Declaration OF REBEKAH L. GLICKMAN-SIMON(AMENDED), # 5 Text of Proposed Order AMENDED PROPOSED ORDER) (CECCHI, JAMES) (Entered: 01/23/2024) |
| 01/23/2024 | 35 | Amended MOTION for Leave to Appear Pro Hac Vice by Center for American Progress, NAACP, UnidosUS, The Century Foundation. (Attachments: # 1 Declaration AMENDED DECLARATION OF JAMES CECCHI - NOVO NORDISK, # 2 Declaration of Hannah Brennan (AMENDED), # 3 Declaration OF SOPHIA K. WEAVER (AMENDED), # 4 Text of Proposed Order PROPOSED ORDER (AMENDED) NOVO NORDISK)(CECCHI, JAMES) (Entered: 01/23/2024) |
| 01/24/2024 | | Set Deadlines as to 34 Amended MOTION for Leave to Appear Pro Hac Vice . Motion set for 2/20/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 01/24/2024) |
| 01/24/2024 | | Set Deadlines as to 35 Amended MOTION for Leave to Appear Pro Hac Vice . Motion set for 2/20/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (kht) (Entered: 01/24/2024) |
| 01/24/2024 | 36 | NOTICE of Appearance by ALEXANDER V SVERDLOV on behalf of All Defendants (SVERDLOV, ALEXANDER) (Entered: 01/24/2024) |

| 01/26/2024 | 37 | Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* by All Defendants. Responses due by 2/23/2024. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(SVERDLOV, ALEXANDER) (Entered: 01/26/2024) |
|---|---|---|
| 01/29/2024 | | Set Deadlines as to 37 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*. Motion set for 2/20/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 01/29/2024) |
| 01/30/2024 | 38 | Amicus Curiae APPEARANCE entered by GLEN D. SAVITS on behalf of AARP, AARP Foundation. (SAVITS, GLEN) (Entered: 01/30/2024) |
| 01/31/2024 | 39 | MOTION for Leave to Appear Amicus Curiae by Public Citizen, Patients for Affordable Drugs Now, Doctors for America, Protect Our Care, Families USA. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(MILZ, ANDREW) (Entered: 01/31/2024) |
| 01/31/2024 | 40 | Corporate Disclosure Statement by Doctors for America, Families USA, Patients for Affordable Drugs Now, Protect Our Care, Public Citizen identifying None as Corporate Parent.. (MILZ, ANDREW) (Entered: 01/31/2024) |
| 01/31/2024 | 41 | MOTION for Leave to Appear Pro Hac Vice by Doctors for America, Families USA, Patients for Affordable Drugs Now, Protect Our Care, Public Citizen. (Attachments: # 1 Certification of Wendy Liu, # 2 Certificate of Service)(MILZ, ANDREW) (Entered: 01/31/2024) |
| 01/31/2024 | 42 | MOTION for Leave to Appear Pro Hac Vice *Notice of Unopposed Motion for Pro Hac Vice Admission* by AARP, AARP Foundation. (Attachments: # 1 Declaration of Glen D. Savits, # 2 Declaration of Daniel B. Kohrman, # 3 Declaration of Kelly Bagby, # 4 Text of Proposed Order, # 5 Certificate of Service)(SAVITS, GLEN) (Entered: 01/31/2024) |
| 01/31/2024 | 43 | Notice of Request by Pro Hac Vice HANNAH W. BRENNAN to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-15053049.) (CECCHI, JAMES) (Entered: 01/31/2024) |
| 01/31/2024 | 44 | Notice of Request by Pro Hac Vice SOPHIA KATHERINE WEAVER to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-15053066.) (CECCHI, JAMES) (Entered: 01/31/2024) |
| 01/31/2024 | 45 | Notice of Request by Pro Hac Vice CLAUDIA MORERA to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-15053089.) (CECCHI, JAMES) (Entered: 01/31/2024) |
| 01/31/2024 | 46 | Notice of Request by Pro Hac Vice REBEKAH L. GLICKMAN-SIMON to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-15053108.) (CECCHI, JAMES) (Entered: 01/31/2024) |
| 01/31/2024 | 47 | Letter from KEVIN G. COOPER. (CECCHI, JAMES) (Entered: 01/31/2024) |
| 01/31/2024 | | Set Deadlines as to 39 MOTION for Leave to Appear Amicus Curiae . Motion set for 3/4/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 01/31/2024) |
| 01/31/2024 | 48 | Letter from DONALD A. ECKLUND. (CECCHI, JAMES) (Entered: 01/31/2024) |

Appx34

| | | |
|---|---|---|
| 02/01/2024 | | Pro Hac Vice counsel, SOPHIA KATHERINE WEAVER, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (mlh) (Entered: 02/01/2024) |
| 02/01/2024 | | Set Deadlines as to 41 MOTION for Leave to Appear Pro Hac Vice , 42 MOTION for Leave to Appear Pro Hac Vice *Notice of Unopposed Motion for Pro Hac Vice Admission*. Motion set for 3/4/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg, ) (Entered: 02/01/2024) |
| 02/01/2024 | | Pro Hac Vice counsel, HANNAH W. BRENNAN, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jdg) (Entered: 02/01/2024) |
| 02/01/2024 | | Pro Hac Vice counsel, CLAUDIA MORERA and REBEKAH L. GLICKMAN-SIMON, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jal, ) (Entered: 02/01/2024) |
| 02/01/2024 | 49 | ORDER granting 34 Motion for Leave to Appear Pro Hac Vice admission as to HANNAH BRENNAN, CLAUDIA MORERA, and REBEKAH GLICKMAN-SIMON. Signed by Magistrate Judge J. Brendan Day on 2/1/2024. (kht) (Entered: 02/01/2024) |
| 02/01/2024 | 50 | ORDER granting 35 Motion for Leave to Appear Pro Hac Vice admission as to HANNAH W. BRENNAN and SOPHIA K. WEAVER. Signed by Magistrate Judge J. Brendan Day on 2/1/2024. (kht) (Entered: 02/01/2024) |
| 02/01/2024 | 51 | MOTION for Leave to Appear Amicus Curiae by AARP, AARP Foundation. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(SAVITS, GLEN) (Entered: 02/01/2024) |
| 02/02/2024 | | Set Deadlines as to 51 MOTION for Leave to Appear Amicus Curiae . Motion set for 3/4/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 02/02/2024) |
| 02/02/2024 | 52 | MOTION for Leave to Appear Amicus Curiae by American Public Health Association, American College of Physicians, Society of General Internal Medicine, American Geriatrics Society, American Society of Hematology. (Attachments: # 1 Proposed Amicus Brief, # 2 Proposed Order)(GITOMER, MADELINE) (Entered: 02/02/2024) |
| 02/02/2024 | 53 | Corporate Disclosure Statement by American College of Physicians, American Geriatrics Society, American Public Health Association, American Society of Hematology, Society of General Internal Medicine. (GITOMER, MADELINE) (Entered: 02/02/2024) |
| 02/02/2024 | 54 | MOTION for Leave to Appear Pro Hac Vice by American College of Physicians, American Geriatrics Society, American Public Health Association, American Society of Hematology, Society of General Internal Medicine. (Attachments: # 1 Declaration of Sponsoring Attorney Madeline Gitomer, # 2 Declaration of Ananda Burra, # 3 Declaration of Benjamin Seel, # 4 Declaration of Robin Thurston, # 5 Proposed Order)(GITOMER, MADELINE) (Entered: 02/02/2024) |
| 02/02/2024 | 55 | MOTION for Leave to Appear Amicus Curiae by Nationally Recognized Healthcare and Medicare Experts. (Attachments: # 1 Proposed Amici Curiae Brief in Support of |

| | | |
|---|---|---|
| | | Defendants' Cross Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, # 2 Text of Proposed Order)(LEARDI, JOHN) (Entered: 02/02/2024) |
| 02/02/2024 | 56 | Consent MOTION for Leave to Appear Amicus Curiae by Economists and Scholars of Health Policy. (Attachments: # 1 Brief of Economists and Scholars of Health Policy as Amici Curiae in Support of Defendants' Cross-Motion for Summary Judgment, # 2 Text of Proposed Order(BEREZOFSKY, ESTHER) (Entered: 02/02/2024) |
| 02/02/2024 | 57 | MOTION for Leave to Appear Amicus Curiae by Law Scholars. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(ECKLUND, DONALD) (Entered: 02/02/2024) |
| 02/02/2024 | 58 | MOTION for Leave to Appear Amicus Curiae by THE CENTER FOR AMERICAN PROGRESS, THE NAACP, THE CENTURY FOUNDATION, UNIDOSUS ACTION FUND. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order) (ECKLUND, DONALD) (Entered: 02/02/2024) |
| 02/02/2024 | 59 | MOTION for Leave to Appear Pro Hac Vice by Nationally Recognized Healthcare and Medicare Experts. (Attachments: # 1 Certification of John W. Leardi, # 2 Certification of William B. Schultz, # 3 Certification of Margaret M. Dotzel, # 4 Certification of Alyssa M. Howard, # 5 Text of Proposed Order, # 6 Certificate of Service)(LEARDI, JOHN) (Entered: 02/02/2024) |
| 02/02/2024 | 60 | MOTION for Leave to Appear Amicus Curiae by Abrams Institute for Freedom of Expression. (Attachments: # 1 Memorandum in support of motion, # 2 Exhibit A - proposed amicus brief, # 3 Text of Proposed Order)(KOMUVES, FLAVIO) (Entered: 02/02/2024) |
| 02/05/2024 | 61 | MOTION for Leave to Appear Pro Hac Vice *of David A. Schulz* by Abrams Institute for Freedom of Expression. (Attachments: # 1 Declaration of David A. Schulz, # 2 Declaration of Flavio L. Komuves, # 3 Text of Proposed Order)(KOMUVES, FLAVIO) (Entered: 02/05/2024) |
| 02/05/2024 | 62 | TEXT ORDER GRANTING Motions to Appear Amicus Curiae 39 , 51 , 52 , 55 , 56 , 57 , 58 , and 60 . Amici are to file their proposed briefs by 02/09/2024. So Ordered by Judge Zahid N. Quraishi on 02/05/2024. (Gonzalez, P) (Entered: 02/05/2024) |
| 02/05/2024 | | Set Deadlines as to 54 MOTION for Leave to Appear Pro Hac Vice . Motion set for 3/4/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 02/05/2024) |
| 02/05/2024 | | Set Deadlines as to 61 MOTION for Leave to Appear Pro Hac Vice *of David A. Schulz*. Motion set for 3/4/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 02/05/2024) |
| 02/05/2024 | | Set Deadlines as to 59 MOTION for Leave to Appear Pro Hac Vice . Motion set for 3/4/2024 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (kht) (Entered: 02/05/2024) |

| 02/05/2024 | 63 | BRIEF *OF NATIONALLY RECOGNIZED HEALTHCARE AND MEDICARE EXPERTS AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT* (LEARDI, JOHN) (Entered: 02/05/2024) |
| --- | --- | --- |
| 02/05/2024 | 64 | BRIEF *OF AMICI CURIAE AARP AND AARP FOUNDATION* (SAVITS, GLEN) (Entered: 02/05/2024) |
| 02/05/2024 | 65 | BRIEF *OF AMICI CURIAE PUBLIC CITIZEN, PATIENTS FOR AFFORDABLE DRUGS NOW, DOCTORS FOR AMERICA, PROTECT OUR CARE, AND FAMILIES USA IN SUPPORT OF DEFENDANTS OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION* (MILZ, ANDREW) (Entered: 02/05/2024) |
| 02/05/2024 | 66 | BRIEF *of Economists and Scholars of Health Policy as Amici Curiae in Support of Defendants' Cross-Motion for Summary Judgment* (BEREZOFSKY, ESTHER) (Entered: 02/05/2024) |
| 02/05/2024 | 67 | BRIEF *of the American Public Health Association, the American College of Physicians, the Society of General Internal Medicine, the American Geriatrics Society, and the American Society of Hematology as amici curiae in support of Defendants' motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment* (GITOMER, MADELINE) (Entered: 02/05/2024) |
| 02/06/2024 | 68 | ORDER granting 54 Motion for Leave to Appear Pro Hac Vice as to ANANDA V. BURRA, BENJAMIN SEEL, and ROBIN F. THURSTON. Signed by Magistrate Judge J. Brendan Day on 2/6/2024. (mlh) (Entered: 02/06/2024) |
| 02/06/2024 | 69 | ORDER granting 59 Motion for Leave to Appear Pro Hac Vice admission as to WILLIAM B. SCHULTZ, MARGARET M. DOTZEL, and ALYSSA M. HOWARD. Signed by Magistrate Judge J. Brendan Day on 2/6/2024. (kht) (Entered: 02/06/2024) |
| 02/06/2024 | 70 | ORDER Granting 42 Motion for Leave to Appear Pro Hac Vice as to KELLY BAGBY and DANIEL B. KOHRMAN. Signed by Magistrate Judge J. Brendan Day on 2/6/2024. (amv) (Entered: 02/06/2024) |
| 02/06/2024 | 71 | BRIEF *of Amicus Curiae Abrams Institute for Freedom of Expression in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion* (KOMUVES, FLAVIO) (Entered: 02/06/2024) |
| 02/07/2024 | 72 | Order to Refund Fees (Finance notified). Signed by Melissa Connolly, Management Analyst on 02/07/2024. (mls) (Entered: 02/07/2024) |
| 02/07/2024 | 73 | TEXT ORDER that the Court will conduct oral argument for the pending Motions for Summary Judgment in related cases 23-cv-3335, 23-cv-3818, 23-cv-14221, 23- cv-20814. Argument will be heard from the parties only. The Court has availability from 03/05/2024 through 03/08/2024 from 10:00 a.m. through 2:00 p.m. By 02/16/2024, counsel are to meet and confer and file a letter proposing: (1) dates for argument; and (2) a schedule for argument. So Ordered by Judge Zahid N. Quraishi on 2/7/2024. (kas) (Entered: 02/07/2024) |
| 02/08/2024 | 74 | Notice of Request by Pro Hac Vice Ananda Burra to receive Notices of Electronic Filings. (GITOMER, MADELINE) (Entered: 02/08/2024) |
| 02/08/2024 | 75 | Notice of Request by Pro Hac Vice Robin Thurston to receive Notices of Electronic Filings. (GITOMER, MADELINE) (Entered: 02/08/2024) |

| | | |
|---|---|---|
| 02/08/2024 | 76 | Notice of Request by Pro Hac Vice Benjamin Seel to receive Notices of Electronic Filings. (GITOMER, MADELINE) (Entered: 02/08/2024) |
| 02/08/2024 | | Pro Hac Vice fee received for Ananda V. Burra, Benjamin Seel and Robin F. Thurston: $ 450, receipt number 136934 (jjc, ) (Entered: 02/08/2024) |
| 02/13/2024 | | Pro Hac Vice counsel, ANANDA BURRA, ROBIN F. THURSTON and BENJAMIN SEEL, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jal, ) (Entered: 02/13/2024) |
| 02/14/2024 | | Pro Hac Vice fee for KELLY BAGBY and DANIEL B. KORHMAN: $ 300, receipt number 49709 (jr) (Entered: 02/14/2024) |
| 02/14/2024 | 77 | Notice of Request by Pro Hac Vice Daniel B. Kohrman to receive Notices of Electronic Filings. (SAVITS, GLEN) (Entered: 02/14/2024) |
| 02/14/2024 | 78 | Notice of Request by Pro Hac Vice Kelly Bagby to receive Notices of Electronic Filings. (SAVITS, GLEN) (Entered: 02/14/2024) |
| 02/15/2024 | | Pro Hac Vice counsel, DANIEL KOHRMAN and KELLY BAGBY, have been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (amv) (Entered: 02/15/2024) |
| 02/20/2024 | 79 | TEXT ORDER that the Court has reviewed the parties' letter regarding oral argument that was filed in 23-cv-3818 Janssen v. Becerra at ECF No. 87 . The Court adopts Plaintiffs' position. Oral argument for the four related matters (23-cv-3335, 23-cv-3818, 23-14221, and 23-20814) will be heard on 03/07/2024 beginning at 10:00 a.m., tentatively scheduled to conclude by 2:30 p.m. As previously noted, only the parties will be arguing. So Ordered by Judge Zahid N. Quraishi on 2/20/2024. (kas) (Entered: 02/20/2024) |
| 02/22/2024 | 80 | ORDER Granting 41 Motion for Leave to Appear Pro Hac Vice as to WENDY LIU, ESQ. Signed by Magistrate Judge J. Brendan Day on 2/22/2024. (amv) (Entered: 02/22/2024) |
| 02/22/2024 | 81 | ORDER granting 61 Motion for Leave to Appear Pro Hac Vice as to DAVID A. SCHULZ. Signed by Magistrate Judge J. Brendan Day on 2/22/2024. (mlh) (Entered: 02/22/2024) |
| 02/23/2024 | 82 | REPLY to Response to Motion filed by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. re 28 MOTION for Summary Judgment *and Response to Defendants' Cross-Motion for Summary Judgment* (DAHAN, ISRAEL) (Entered: 02/23/2024) |
| 02/29/2024 | 83 | NOTICE of Appearance by HEATHER CARNEY COSTANZO on behalf of All Defendants (COSTANZO, HEATHER) (Entered: 02/29/2024) |
| 03/04/2024 | 84 | NOTICE by All Defendants *of Supplemental Persuasive Authority* (Attachments: # 1 Exhibit A - AstraZeneca Opinion)(SNYDER, CASSANDRA) (Entered: 03/04/2024) |
| 03/04/2024 | 85 | NOTICE of Appearance by BRIAN DAVID NETTER on behalf of All Defendants (NETTER, BRIAN) (Entered: 03/04/2024) |
| 03/05/2024 | 86 | MOTION for Leave to Appear Amicus Curiae by Alliance for Aging Research. (Attachments: # 1 Memorandum in Support, # 2 Proposed Amicus Brief, # 3 Text of Proposed Order)(BALDINI, STEPHEN) (Entered: 03/05/2024) |

| | | |
|---|---|---|
| 03/06/2024 | | Set Deadlines as to 86 MOTION for Leave to Appear Amicus Curiae . Motion set for 4/1/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (kht) (Entered: 03/06/2024) |
| 03/06/2024 | 87 | TEXT ORDER granting 86 Motion to Appear Amicus Curiae. Amicus Curiae shall file their proposed briefs within 7 days. So Ordered by Judge Zahid N. Quraishi on 3/6/2024. (kas) (Entered: 03/06/2024) |
| 03/06/2024 | | Pro Hac Vice fee: $150.00, receipt number NEW49835 for WENDY LIU. (ps) (Entered: 03/06/2024) |
| 03/07/2024 | 88 | BRIEF *of Amicus Curiae Alliance for Aging Research* (BALDINI, STEPHEN) (Entered: 03/07/2024) |
| 03/07/2024 | 89 | Minute Entry for proceedings held before Judge Zahid N. Quraishi: Oral Argument on Motion for Summary Judgment 30 and Cross-Motion for Summary Judgment 33 in 23-3818 heard with related cases, 23-20814 MSJ 28 and Cross- MSJ 37 , 23-3335 MSJ 36 and Cross-MSJ 38 and 23-14221 MSJ 18 and Cross- MSJ 24 held on 3/7/2024. Court Reserves Decision. (Court Reporter, Megan McKay-Soule (609-815-2319) (kas, ) (Entered: 03/07/2024) |
| 03/08/2024 | | Pro Hac Vice fee received for David Schulz: $ 150, receipt number 137466 (jjc, ) (Entered: 03/11/2024) |
| 03/11/2024 | 90 | Notice of Request by Pro Hac Vice David A. Schulz to receive Notices of Electronic Filings. (KOMUVES, FLAVIO) (Entered: 03/11/2024) |
| 03/12/2024 | | Pro Hac Vice counsel, DAVID A. SCHULZ, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jdg) (Entered: 03/12/2024) |
| 03/14/2024 | 91 | Transcript of Oral Argument held on 3/7/2024, before Judge Judge ZAHID N. QURAISHI. Court Reporter/Transcriber Megan McKay-Soule (609-815-2319). **NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 4/4/2024. Redacted Transcript Deadline set for 4/15/2024. Release of Transcript Restriction set for 6/12/2024. (jal, ) (Entered: 03/14/2024) |
| 03/18/2024 | 92 | Letter from Counsel for Defendants re Reply Brief. (PEZZI, STEPHEN) (Entered: 03/18/2024) |
| 07/31/2024 | 93 | OPINION filed. Signed by Judge Zahid N. Quraishi on 7/31/2024. (mlh) (Entered: 07/31/2024) |
| 07/31/2024 | 94 | ORDER granting 37 Cross MOTION for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment and denying 28 Motion for Summary Judgment. Judgment is hereby entered for Defendants and against Plaintiffs as to all claims; and it is further ORDERED that the Clerk is instructed to mark this matter CLOSED. ***CIVIL CASE TERMINATED. Signed by Judge Zahid N. Quraishi on 7/31/2024. (mlh) (Entered: 07/31/2024) |

Appx39

| 08/14/2024 | 95 | NOTICE OF APPEAL as to 94 Order on Motion for Summary Judgment,,, 93 Opinion by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC.. Filing fee $ 605, receipt number ANJDC-15589591. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. Appeal Record due by 8/28/2024. (DAHAN, ISRAEL) (Entered: 08/14/2024) |
| --- | --- | --- |
| 08/19/2024 | 96 | USCA Case Number 24-2510 for 95 Notice of Appeal (USCA), filed by NOVO NORDISK PHARMA, INC., NOVO NORDISK INC.. USCA Case Manager Alicia (AMR) (Document Restricted - Court Only) (ca3cjg ) (Entered: 08/19/2024) |
| 09/03/2024 | 97 | TRANSCRIPT REQUEST by NOVO NORDISK INC., NOVO NORDISK PHARMA, INC. (DAHAN, ISRAEL) (Entered: 09/03/2024) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 10/11/2024 05:24:14 | | |
| **PACER Login:** | StacyLimaKnh | **Client Code:** | 14089-190015-007877 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-20814-ZNQ-JBD Start date: 1/1/1980 End date: 10/11/2024 |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

Appx40

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NOVO NORDISK INC.,<br>800 Scudders Mill Road,<br>Plainsboro, NJ 08536<br><br>NOVO NORDISK PHARMA, INC.,<br>800 Scudders Mill Road, Suite 1A-108<br>Plainsboro, NJ 08536<br><br>                Plaintiffs,<br><br>    v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services<br>    200 Independence Avenue SW<br>    Washington, DC 20201;<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>    200 Independence Avenue SW<br>    Washington, DC 20201;<br><br>CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services<br>    7500 Security Boulevard<br>    Baltimore, MD 21244;<br><br>CENTERS FOR MEDICARE AND MEDICAID SERVICES<br>    7500 Security Boulevard<br>    Baltimore, MD 21244,<br><br>                Defendants. | No. 3:23-cv-20814<br><br>**COMPLAINT** |

Plaintiffs Novo Nordisk Inc. and Novo Nordisk Pharma, Inc. (collectively, "Novo"), by and through their undersigned attorneys, bring this action for declaratory and injunctive relief against the Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and the heads of those agencies in their official capacities (collectively, "Defendants"), alleging as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit challenges the prescription drug price control program established by the "Inflation Reduction Act of 2022" ("IRA"), 42 U.S.C. § 1320f *et seq.*, and the guidance and other final agency actions that CMS has taken purporting to implement the statute.

2.      The statute violates the Constitution because it eliminates essential procedural and substantive safeguards required to (a) hold Congress accountable for the legislative policy decisions it makes, (b) protect the important public and private interests at stake when price controls are imposed on a major sector of the economy, and (c) ensure that CMS acts within the proper scope of any lawfully delegated authority.

3.      The statute's serious constitutional infirmities have been exacerbated by CMS's unlawful and ultra vires actions.  CMS has violated multiple express statutory mandates, failed to comply with necessary procedures, and sought to impose new substantive obligations that far exceed the lawful bounds of any authority granted by Congress.  CMS has also unlawfully deemed six different Novo products a single "biologic product" and subjected all of them to price controls, even though the products do not satisfy the statutory criteria.  Imposing price controls on these different products violates multiple specific and unambiguous statutory commands.

## The IRA Is Unconstitutional

4.      In recent decades, the federal government has taken control over large segments of the nation's healthcare markets, regulating the sale of drugs to the millions of patients who participate in federal healthcare programs, including Medicare.  But Congress has historically prohibited government officials from interfering with the prices of manufacturers' drugs.  Congress has instead recognized that government price setting undermines the productive and predictable regulatory environment that is essential to fostering the massive investments necessary to bring to

**Appx42**

market new and innovative drugs (and improvements to existing drugs), while also avoiding drug shortages and ensuring that patients have access to the medications they need.

5.     The IRA ignores that reality and, for the first time ever, seeks to compel manufacturers to sell their products to federal healthcare beneficiaries at whatever price CMS unilaterally imposes.  The statute's unprecedented price-setting provisions, which are structured to impact pricing in both the federal and private commercial markets, depart from more than a century of precedent governing the imposition of price controls on other regulated industries.

6.     When erecting a government-run price-control regime, particularly one that delegates significant power to an executive agency, Congress is required to take account of the important public interests and private rights at stake by establishing procedures sufficient to ensure accountability and to protect against unreasonable and confiscatory prices.  It also must provide clear instructions to guide the agency's price-setting decisions, allow meaningful opportunities for public input, and provide for judicial review to ensure that the agency acts in accordance with Congress's instructions and within the scope of its delegated authority.

7.     Instead of complying with these essential requirements, Congress in the IRA eliminated multiple layers of constitutional safeguards.  The statute provides a sweeping delegation of power to CMS with no intelligible principle to guide the agency's price-setting decisions.  The statute directs the agency to impose nearly any price it chooses for any reason it chooses, with no mechanism to ensure that CMS acts predictably and consistently, or that the prices it sets are not confiscatory or unduly discriminatory.  The statute provides no meaningful opportunity for public input.  And, most astonishingly, it contains sweeping judicial review bars designed to insulate many of CMS's most important decisions from any judicial scrutiny or oversight.

8.     The constitutional concerns raised by these unprecedented provisions are reinforced by the statute's other features.  Although labeled a "drug price negotiation program," the statute does not allow for anything that could be remotely characterized as an actual negotiation between pharmaceutical manufacturers and CMS; instead, the statute permits CMS to act by fiat and impose any below-market prices CMS unilaterally dictates.  The statute also threatens manufacturers with astronomical penalties—or being barred from selling *any* of their products in federal healthcare programs (not only the products subject to CMS's price controls)—if they do not accept the unilaterally imposed prices.  Moreover, in a clear violation of the First Amendment, the statute compels speech, forcing manufacturers to agree with the government and express the view that the unilaterally imposed prices are "maximum *fair* prices."

9.     Through these provisions, the statute is intended to have spillover effects that influence the prices paid in the nation's commercial markets.  The terms "fair" and "negotiation" are intended to suggest that manufacturers have had a meaningful say in determining what prices should be charged for their drugs when, in reality, manufacturers have no say at all.  CMS's unilaterally imposed price is an offer that manufacturers cannot refuse.  There is no realistic opportunity for manufacturers to avoid the "negotiation" process, and the government-imposed prices apply no matter how unfair or misguided the process and prices might be.  Commercial purchasers and payors will leverage the "negotiated" prices to extract discounts in the non-Medicare markets.  *See* Press Release, White House, Fact Sheet: President Biden Calls on Congress to Lower Prescription Drug Prices (Aug. 12, 2021) ("And it's not just Medicare beneficiaries that would benefit.  If Medicare makes the prices it negotiates available to commercial payors, too, costs for employer health insurance would fall ….").

Appx44

10.     No court has ever upheld a price-control regime comparable to the IRA's extreme and unprecedented provisions.

**CMS's Actions Implementing the
Statute Are Unlawful and Ultra Vires**

11.     CMS's actions have compounded the IRA's grave constitutional problems.

12.     CMS has violated clear and mandatory statutory requirements, and it has exceeded its lawful authority, extending the IRA's already unprecedented price controls far beyond what Congress authorized.  CMS has taken advantage of the IRA's open-ended and improper provisions to impose new and onerous substantive obligations that have no basis in the statute.

13.     Given the consequences that price controls will have on the nation's drug markets and patients' ability to access the medications they need, CMS should have followed the statute's clear and express mandates.  In particular, CMS was duty bound to follow Congress's explicit direction to select *only* 10 products for price controls at first, and then gradually expand the number over time.  CMS was also required to heed Congress's clear direction that price controls are *not* to be imposed on any drug or biological product until *that product* has been approved and marketed for the requisite 7- or 11-year period.  That timing is critical for manufacturers to have any hope of recovering fair compensation for their investments, and thereby continue innovation, research, and development of novel drug therapies.

14.     CMS was also obligated to adhere to administrative law requirements and honor the constitutional principles they protect.  Congress directed the agency to proceed by guidance for the program's first three years; Congress did not grant the agency any authority to impose new substantive and coercive obligations during that three-year period.  Nor did it exempt CMS from the essential rulemaking requirements of the Administrative Procedure Act and the Medicare Act. Disregarding Congress's directives, CMS has rewritten the law to seize more powers than

Congress authorized, violating the statute's plain language and refusing to comply with proper notice-and-comment rulemaking procedures.

15.    In an extreme departure from and violation of the statute's plain text and structure, CMS has substantially increased the number of drug and biological products subject to price controls, including products that do not satisfy the selection criteria dictated by Congress.  In particular, CMS has ignored the IRA's definitions of "drug product" and "biological product," changing how those terms of art are used in the IRA and how they have long been interpreted under the Federal Food, Drug, and Cosmetic Act ("FDCA") and the Public Health Service Act ("PHSA").  CMS has rewritten "drug product" to mean any aggregated grouping of products with the same "active moiety." And it has rewritten "biological product" to mean any aggregated grouping of products with the same "active ingredient."  Neither the explicit IRA definitions nor longstanding interpretations of those terms can be read to permit the aggregation imposed by CMS in its guidance.  *See* 42 U.S.C. § 1320f-1(e)(1).

16.    These statutory rewrites violate the statute's plain text and are at odds with Congress's intent, as they subject more products to price controls than the statute permits, and they impermissibly reorder which products are appropriately subject to price controls in the first place. Instead of setting prices on a limited number of *identifiable drugs* and *biological products*, as Congress directed, CMS has imposed price controls on entire groupings of products with the same *active moieties* or *ingredients*, with no regard to where, when, and how those active moieties or ingredients may be used in current or future clinical development or for what uses they might be approved (or even which products will be identified as containing the same active moieties or ingredients).

17.    As a result, while Congress expressly limited CMS to imposing price controls on no more than 10 drug or biological products in the first year of the program, CMS has substantially increased the number of drug and biological products swept into its price-control regime. Moreover, while Congress forbade CMS from imposing price controls on drug and biological products that were approved for less than 7 or 11 years, CMS has violated that clear command, subjecting numerous products to price controls that have been approved for far less than the minimum time period required by the statute.

18.    In addition, CMS has imposed arbitrary and extra-statutory limits on the information that the agency will consider when setting prices, restricting what information manufacturers may provide as part of the "negotiation" process and refusing to consider categories of costs that manufacturers have incurred when researching and developing their products. Manufacturers spend massive amounts each year on research and development to discover new life-saving and life-improving drug and biologic products, including incurring substantial costs developing products that are ultimately unsuccessful. Most research and development efforts fail and, even when they are successful, many drugs will not be approved by regulators. The revenues generated by the few drug and biological products that make it to market are essential to being able to fund research and development for new products, but CMS has decided that it will take none of these important considerations into account.

19.    CMS has also ensured that the new substantive requirements it has adopted through mere guidance—and others it may seek to impose in the future—will be binding on Novo and other manufacturers. The statute requires that all manufacturers whose drugs are selected for price controls sign an "agreement" under threat of massive penalties—or lose access to federal programs for their entire product portfolio and deprive the millions of patients who depend on accessing

manufacturers' products through those programs from critical treatments. Abusing and exceeding this statutory mandate, CMS's template agreement compels manufacturers to agree that they will comply with and be bound by the requirements of any "guidance" that CMS might issue now or in the future. But neither CMS's guidance nor the agreement was promulgated through proper notice-and-comment procedures, as the law requires. CMS has thus used the statute's contracting process to grant itself new rulemaking powers that Congress has never authorized and without complying with its basic obligations under the Administrative Procedure Act and Medicare Act.

20.    Novo and the patients who rely on its medicines and its efforts to innovate face substantial harm as a result of the IRA and CMS's unlawful and extra-statutory actions. As set forth below, no fewer than *six* of Novo's different insulin products have been aggregated together and selected *as a group* by CMS for "negotiation." These six products will be subject to CMS-imposed price controls merely because they contain the same active ingredient, even though many of these biological products have not been marketed for the requisite 11-year period. Moreover, on their own, none of the products would have been selected for price controls under the IRA (because their cost to Medicare is among the top 10 only if they are improperly aggregated).

21.    Novo objects to being directly regulated by an unconstitutional statute and being the target of CMS's unlawful, ultra vires actions. Novo should not be required to participate in CMS's one-sided "negotiation" process and objects to being required to submit highly sensitive and confidential data to the government, which is causing and will continue to cause Novo irreparable harm. Novo likewise should not be required to sign an "agreement" that permits CMS to make any unilateral changes it desires and to provide notice of such changes only when it deems such notice to be appropriate.

22.     Novo is concerned that, unless this Court grants relief, it will be prevented from challenging CMS's price-setting decision and will be deprived of any reasonable opportunity to be heard.  In addition, Novo is concerned that CMS will impose a "maximum fair price" on an aggregated grouping of Novo's products that causes competitive harm and deprives Novo of a reasonable return on its investments, including because CMS has decided—in the teeth of the statute's plain language—to subject multiple of Novo's biological products to price controls.  That will make it more difficult for Novo to continue to invest in new and innovative drug research and development efforts, harming both Novo and patients.

23.     This Court should declare that the IRA's drug price control program is unconstitutional and strike down CMS's unlawful and ultra vires actions.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346 because this action arises under the laws of the United States, including the Constitution.

25.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 703–706.

26.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this action is brought against officers and agencies of the United States, at least one plaintiff resides in this district, and no real property is involved in this action.

## THE PARTIES

27.     Novo Nordisk Inc. is the U.S.-based affiliate of a global healthcare company, founded in 1923, with the purpose to drive change to defeat diabetes and other serious chronic diseases, such as obesity, and rare blood and rare endocrine diseases.  Novo Nordisk Inc.'s headquarters are located in Plainsboro, New Jersey.

28.     Novo Nordisk Pharma, Inc. supplies unbranded biologic versions of Novo Nordisk insulin products.  Novo Nordisk Pharma, Inc.'s headquarters are located in Plainsboro, New Jersey.

29.     Novo Nordisk Inc. and Novo Nordisk Pharma, Inc. are part of a global health care company committed to improving the lives of people living with serious chronic conditions, including diabetes, bleeding disorders, growth disorders, and obesity.  The Novo Nordisk Foundation, Novo Nordisk's majority stakeholder, is among the top five largest charitable foundations in the world.  The company's mission and actions reflect the Foundation's vision to contribute significantly to research and development that improves the lives of people and sustainability of society.

30.     Xavier Becerra is the Secretary of the Department of Health and Human Services ("the Secretary").  He oversees the Medicare program and is responsible for administering the statutory provisions challenged here.  He is sued in his official capacity only.

31.     HHS is an executive department of the United States government headquartered in Washington, D.C.  HHS is responsible for administering the Medicare program and the statutory provisions challenged here.

32.     CMS is an administrative agency within HHS headquartered in Baltimore, MD, and that administers the Medicare program and the statutory provisions challenged here.

33.     Chiquita Brooks-LaSure is the CMS Administrator.  She administers the Medicare program and the statutory provisions challenged here on behalf of the Secretary.  She is sued in her official capacity only.

**STANDING**

34.     Novo holds multiple New Drug Applications ("NDAs") and Biologics License Applications ("BLAs").  The company manufactures several different products that CMS included together as a single product in the agency's List of Selected Drugs for Initial Price Applicability

Year 2026: NovoLog®, NovoLog® FlexPen®, NovoLog® PenFill® (insulin aspart, BLA 020986) (collectively, the aggregated "NovoLog® Products"), FIASP®, FIASP® Flextouch®, and FIASP® Penfill® (insulin aspart, BLA 208751) (collectively, the aggregated "FIASP® Products"). A copy of CMS's selected drugs list is attached as Exhibit A to this Complaint. (Significantly, CMS has aggregated together some, but not all, of the various insulin aspart products that Novo manufacturers and targeted them for price controls, but it has provided no reasoned explanation why it has chosen to include some insulin aspart products and to exclude others from the aggregated grouping.)

35.     The NovoLog® Products are some of Novo's most used products. NovoLog® is a rapid-acting insulin that helps lower mealtime blood sugar spikes in people with diabetes. NovoLog® helps with glycemic control in people with diabetes mellitus. It is typically used in conjunction with a long-acting insulin, and numerous Medicare and Medicaid beneficiaries rely on it to treat their chronic battle against diabetes. It is administered via subcutaneous injection, pump, pen, or intravenous infusion, 5–10 minutes before a meal. Dosage must be individualized, and the duration of action will vary according to dose, injection site, blood flow, temperature, and level of physical activity.

36.     The Food and Drug Administration ("FDA") first approved NovoLog® and NovoLog® PenFill® in 2000 in New Drug Application ("NDA") 020986 to treat adult patients with diabetes mellitus, for the control of hyperglycemia. NovoLog® FlexPen® was approved the following year. The active ingredient in the NovoLog® Products is "insulin aspart," a rapid-acting human insulin analog.

37.     Because NovoLog® is a biological product, the NDA for the NovoLog® Products was subsequently "deemed" to be a biologics license application ("BLA") in 2020 by operation of

section 7002(e)(4) of the Biologics Price Competition and Innovation Act, which provided that "[a]n approved application for a biological product under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355) shall be deemed to be a license for the biological product under such section 351 on the date that is 10 years after the date of enactment of this Act." Accordingly, the NovoLog® Products were never licensed under the Public Health Services Act; instead, they were approved in an NDA and transitioned to a biologics license as a result of the Biologics Price Competition and Innovation Act.

38.     Novo also manufactures other, different insulin aspart products, including the FIASP® Products.  FIASP® is an ultra-fast-acting insulin that controls blood sugar around mealtimes for patients with diabetes mellitus; it can be administered via subcutaneous injection, pump, pen, or intravenous infusion, at first bite or within 20 minutes after starting a meal.  FIASP® and FIASP® Flextouch® were approved in 2017 in NDA 208751; FIASP® Penfill® was approved in 2018.

39.     Because FIASP® is a biological product, the FIASP® Products were deemed to be licensed under BLA 208751 on March 23, 2020.  FIASP® Pumpcart® Cartridge, a unique 1.6 mL strength, was approved just this year, in June 2023.  It does not appear by name on CMS's selected drugs list, but CMS has required Novo to submit confidential business information regarding this product and may attempt to sweep this new product into its price control regime.

40.     FIASP® is not the same drug as NovoLog®; the FIASP® Products are not the same drugs as the NovoLog® Products.  The FIASP® Products contain vitamin B3 and L arginine, in addition to insulin aspart, which results in a faster-acting insulin aspart with a more rapid onset than NovoLog®.  FIASP® appears in the bloodstream faster than NovoLog®; while NovoLog® is approved for use within 5-10 minutes immediately before a meal, FIASP® is approved for use

**Appx52**

within 20 minutes after starting a meal. Failure to follow each product's specific dosing instructions can increase the risk of hypoglycemia. *See United States v. Generix Drug Corp.*, 460 U.S. 453, 454–55 (1983) (explaining the importance of excipients in determining that the term "drug" is "broader" than just the active ingredient, including because "[e]xcipients may affect the rate at which the active ingredient is delivered" and "[i]f delivery is too fast, the patient may be harmed just as if he received an overdose; if delivery is too slow, the treatment of the disease may be ineffective.").

41.    None of these biological products, standing alone, would have been among the most widely reimbursed drugs for Medicare Part D patients. Nor would the NovoLog® Products or FIASP® Products separately have been. Accordingly, none of them would have been subject to or eligible for price controls under the requirements set by Congress in the IRA.

42.    On August 29, 2023, CMS aggregated these six different insulin aspart products, including both the NovoLog® Products and the FIASP® Products, and deemed them to be a single "selected drug" merely because they share the same active ingredient. Underscoring that CMS is improperly imposing price controls on more products than Congress authorized, CMS listed each of the NovoLog® Products and the FIASP® Products—six distinct biological products—as a single entry on its selected drugs list.

43.    As a result of CMS's ultra vires conduct, Novo will be forced to enter "negotiations" with CMS; reveal competitively sensitive proprietary information about the NovoLog® Products, the FIASP® Products, and other insulin products to CMS; and "agree" to CMS's unilaterally imposed "maximum fair price," which is statutorily guaranteed to be substantially lower than different current market prices for any of the different NovoLog® or FIASP® products. CMS's unlawful and ultra vires actions are also diverting resources that Novo

would otherwise deploy differently, and they are causing immediate and ongoing financial and competitive harm to Novo.

44.     Novo objects to being the target of regulation under the IRA and CMS's ultra vires actions.  Novo's products should not be subject to price controls, and Novo objects to having CMS dictate the prices at which Novo is permitted to sell its products.  Novo also objects to disclosing proprietary and confidential information to CMS.  CMS should not be permitted to use or retain that proprietary and confidential information.

45.     Novo also should not be forced to sign an agreement with CMS (which CMS claims it can unilaterally change) as a condition of selling its products to patients who participate in the federal Medicare program or to patients who participate in the federal/state Medicaid program.  Novo also should not be forced to participate in a misnamed "negotiation" process, which is diverting essential resources and employees that Novo would otherwise be using to run its business, develop new medications, and help patients.  Nor should Novo be compelled to agree and state that whatever price CMS unilaterally imposes on Novo's six different drugs qualifies as a "maximum fair price."

46.     Novo is suffering and will continue to suffer concrete injury and irreparable harm as a result of the IRA and CMS's unlawful actions.  That irreparable harm includes being subject to an unconstitutional statute and ultra vires regulation; being forced to sign an agreement as a condition of selling its products to two of the largest segments of the nation's healthcare markets; being forced to engage in compelled speech at the government's direction; being forced to collect, aggregate, and disclose propriety and confidential information that Novo would not otherwise share; being coerced into participating in an unlawful "negotiation" process; and having the

government unilaterally dictate the prices at which Novo is entitled to sell its products, which will make it more difficult for Novo to continue to invest in new and cutting-edge medications.

## GENERAL ALLEGATIONS

### A.     The Constitution and the Proper Exercise of Administrative Powers

47.     The Constitution divides power between the three branches of government and vests all legislative powers in the Congress of the United States.

48.     Congress is prohibited from transferring its powers to any other branch of government, which ensures that Congress remains accountable for the legislative policies it enacts.

49.     Although Congress may delegate *rulemaking* powers to officials within the executive branch, the Constitution imposes limits and requirements to ensure that any exercise of such powers follows constitutional demands for lawful and accountable government.  Congress is thus required to make the legislative *policy decisions* in the first instance and to legislate *intelligible principles* that guide the actions of executive agencies.  In turn, Congress may authorize an executive agency to promulgate substantive rules that implement, interpret, or prescribe law or policy, but only if the agency complies with notice-and-comment rulemaking procedures, and only if the agency's exercise of rulemaking authority is subject to judicial review.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015).

50.     These procedures and safeguards are essential parts of the compromise—under both the Constitution and the Administrative Procedure Act—that has allowed executive agencies to wield rulemaking powers while taking account of the significant separation-of-powers concerns that arise when Congress delegates such authority to executive branch officials.  While there are narrow exceptions to notice-and-comment rulemaking that apply in limited circumstances, those exceptions do not apply here and must be "narrowly construed and only reluctantly countenanced." *New Jersey, Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).

51.     Complying with proper procedures and safeguards is of particular importance when the government seeks to impose price controls on products manufactured by a targeted group of regulated parties (as opposed to on an industry as a whole).  Price controls raise heightened constitutional concerns because of the risks they pose both to the broader public interest and to private rights, and because of the risk that they will be applied unfairly.  When prices are imposed, they not only risk denying regulated parties their rights to obtain a reasonable return on their investments, they can also undermine innovation, inhibit capacity building, cause competitive harms, and create shortages that deprive consumers of the products and services they need.  The risk that government will overstep its lawful authority is amplified when executive agencies are not only purchasing products for the government itself (exercising procurement authority), but also regulating prices for the benefit of consumers or other third parties (exercising regulatory authority).

52.     Courts have long held that a government agency cannot dictate prices on goods and services unless there are adequate procedures in place to ensure that the prices imposed are set at reasonable and non-confiscatory levels that allow a reasonable return on investment.  Moreover, unless Congress specifically dictates the prices to be imposed or the formula to be used when calculating a price, an agency must follow exacting rulemaking procedures to develop such prices or formulas, and its price-setting decisions must be subject to meaningful judicial review.

53.     The Supreme Court has made clear that while Congress may occasionally exempt its programs from one or another of these protections, Congress may not *simultaneously* remove *multiple* layers of constitutional safeguards necessary to ensure lawful and accountable government.  *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010).  Those safeguards are necessary

to protect separation of powers, to ensure that agencies act within the proper scope of their delegated authority, and to protect public interests and private rights, including essential due process rights.

54.    Moreover, while Congress is permitted to shield certain agency actions from judicial review, statutory review bars must be interpreted narrowly.  Statutory bars on judicial review do not apply to constitutional claims, absent particularly clear language that is not present in the IRA.  They also do not apply where, as here, an agency has violated clear and express statutory mandates, disregarded unambiguous congressional commands, or otherwise acted in ultra vires fashion.  Because an agency's powers to act and how it acts are authoritatively prescribed by Congress, *see City of Arlington v. FCC*, 569 U.S. 290 (2013), agency action that is outside the scope of the agency's delegated authority remains subject to judicial review.

55.    A judicial review bar is not an invitation for an agency to go off the rails and, ignoring Congress's express directives, extend its regulatory powers far beyond the scope of any lawfully delegated authority.  *See Leedom v. Kyne,* 358 U.S. 184, 188 (1958) (judicial review proper despite statutory preclusion of judicial review, where an agency acts "in excess of its delegated powers and contrary to a specific prohibition" in the statute).  Courts remain available to enforce the rule of law, to serve as a check against administrative tyranny through executive fiat, and to reestablish the limits on an agency's authority.  *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (noting that despite statutory review bar, "judicial review remains available" when an agency has "engaged in 'shenanigans' by exceeding its statutory bounds").

56.    As described in more detail below, the IRA's unprecedented provisions, and CMS's attempts to rewrite the statute through mere guidance and to exercise rulemaking powers that Congress never delegated, violate numerous constitutional requirements and are contrary to the

basic requirements of lawful and accountable government. Any one of them (let alone the multiple concurrent violations that have occurred here) provides a sufficient basis on which to declare the IRA invalid and to strike down CMS's extra-statutory price control program, including CMS's unlawful and improper actions with respect to Novo's six insulin aspart products.

### B.   The Inflation Reduction Act

57.   Medicare and Medicaid have historically reimbursed providers for manufacturers' drugs, including biologics, using formulae tied to market prices.

58.   Medicare Part B covers various types of outpatient healthcare for beneficiaries, including physician-administered drugs. *See* 42 U.S.C. § 1395k(a)(1); *id.* § 1395x(s)(2)(A). Since 2005, Medicare Part B has reimbursed providers 106% of a drug's Average Sales Price ("ASP")— the average price paid by U.S. commercial purchasers inclusive of rebates and other discounts.

59.   Medicare Part D provides coverage for self-administered prescription drugs. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066. Under the pre-IRA legal framework, CMS would contract with private insurance plans to provide Part D prescription drug benefits, and those private plans (acting under contract with the government), would negotiate drug prices with manufacturers.

60.   Under that framework, the Secretary could "not interfere with the negotiations between drug manufacturers and pharmacies and [prescription drug plan] sponsors," nor "require a particular formulary" or "institute a price structure for the reimbursement of covered part D drugs." CMS was precluded from setting drug prices directly or interfering in the market-based negotiations between plan sponsors and pharmaceutical manufacturers. 42 U.S.C. § 1395w-111(i).

61.   That longstanding prohibition recognized the government's significant market power—namely, that Medicare, Medicaid, and other federal healthcare programs account for

nearly half of the nation's total healthcare expenditures.  It also recognized the unique risk-taking and up-front costs entailed in the drug development and approval process.

62.     Congress enacted the IRA in August 2022 through a rushed budget reconciliation process without debate and on a party-line vote.  The statute is a novel and unprecedented attempt to impose price controls on the drug manufacturing industry while simultaneously avoiding accountability for the reductions in access, innovation, and supply that will inevitably occur, and indeed have already occurred, as a predictable consequence of those controls.

63.     The statute eliminates the Medicare Part D "non-interference clause" and delegates unprecedented authority to CMS to erect a misleadingly named "Drug Price Negotiation Program." 42 U.S.C. § 1320f(a).  More specifically, the statute authorizes CMS to impose "maximum fair prices" on certain drugs available through Medicare, setting the price that a manufacturer may charge for the selected drug.  *Id.* § 1320f-2(a).  Through this open-ended delegation to CMS, the statute unfairly and arbitrarily targets certain products for price controls—many of which have been developed to treat costly and burdensome chronic diseases—and upends market competition within classes of drugs, with detrimental consequences for patient access and treatment.

64.     This year, the first year of the program, CMS was required to identify the "50 qualifying single source drugs with the highest total expenditures under [Medicare] [P]art D" and to identify the 10 most costly from among that list to subject to price controls.  *Id.* § 1320f-1(a)(1), (d)(1)(A).  Because total expenditures reflects both volume and price, the statute directs CMS to include in its ranking many of the most widely used drugs in the country, without considering whether those drugs are actually "overpriced" and despite the potential impacts on patients and their ability to access essential medications.

65.     CMS announced the 10 "negotiation eligible" "drugs" it selected on August 29, 2023. *Id.* § 1320f-1(d)(1).

66.     Now that CMS has selected these products, the statute requires that each drug's manufacturer "shall enter into [an] agreemen[t]" with CMS by October 1, 2023, to "negotiat[e]" a "maximum fair price" for the drug. *Id.* §§ 1320f(d)(2)(A), 1320f-2(a)(1).

67.     As part of the "negotiation" process, manufacturers of selected drugs must submit highly sensitive and confidential trade secret and commercial information to CMS by October 2, 2023. *Id.* §§ 1320f(d)(5)(A), 1320f-2(a)(4), 1320f-3(b)(2)(A).  That information includes (among other things) certain aspects of drug research and development costs, current unit costs of production and distribution of selected drugs, patent and regulatory exclusivity information, and market data and sales volume data for the selected drugs.  *See id.* § 1320f-3(e).

68.     The agency will make an initial "offer" of a "maximum fair price" for the drug (below a statutory ceiling), and the manufacturer may make a "counteroffer" within 30 days.  *Id.* § 1320f-3(b)(2)(B)–(D).  Under the statute, however, CMS is free to disregard the manufacturer's counteroffer and unilaterally impose *any* price it chooses (below the price ceiling) with no lower limit.  *See id.* §§ 1320f-3(b)(2)(E), 1320f-4(a).  The statute directs CMS to "ai[m] to achieve the lowest maximum fair price for each selected drug."  *Id.* § 1320f-3(b)(1).

69.     The statutory ceiling price is the lowest number yielded by calculations set by the IRA.  The IRA sets the ceiling for "negotiation" at the lower of (a) the plan-specific enrollment weighted amount, and (b) between just 40% and 75% of a drug's Non-Federal Average Manufacturer Price (Non-FAMP). 42 U.S.C. § 1320f-3(c)(1)(C), (b)(2)(F).  Non-FAMP measures a drug's average net sales price to commercial purchasers, including any price concessions obtained through wholesalers. 38 U.S.C. § 8126(h)(5).  Because it is a *net* price—the amount a

manufacturer realizes after most discounts—40% to 75% of the Non-FAMP is far below any reasonable price that would be set through market forces.

70.     Although the statute directs CMS to "consider" certain factors when "negotiating" the "maximum fair price," *id.* § 1320f-3(e), the statute does not require CMS to base the price it imposes on any specific factor or set of factors; nor does it direct the agency as to how it should consider any particular factors. Although the statute sets a ceiling price, it includes no standards to govern CMS's ultimate price-setting decisions. The statute authorizes CMS to unilaterally select the drug and biological products that will be subject to price controls and to dictate the price that will apply to each of those "selected drugs." *See id.* § 1320f-4(a).

71.     Nor is the "maximum fair price" established through proceedings before a neutral adjudicator. Because CMS pays for drug and biological products through Medicare and has a statutory duty to seek the lowest permissible price, the statute creates an obvious conflict of interest, with CMS serving as a market participant, the purchaser of selected drugs, and as the market regulator.

72.     By September 1, 2024, CMS will publish its chosen "maximum fair price" for each selected drug for the 2026 initial price applicability year ("IPAY"). *Id.* §§ 1320f(d)(6), 1320f-4.

73.     The "maximum fair price[s]" imposed by CMS for the first IPAY will take effect on January 1, 2026. *Id.* §§ 1320f(d)(1), 1320f-2(a)(1), 1320f-3(g). Beginning on that date, the manufacturer must "provide" hospitals, physicians, and other service providers who treat Medicare beneficiaries "access" to the drug at the "maximum fair price." *Id.* § 1320f-2(a).

74.     Manufacturers that violate the statute face civil monetary penalties equal to *ten times* the difference between the market price and the "maximum fair price." As described in more detail below, manufacturers' only option to avoid price controls is to exit *all* of their products (not

just those subject to price controls) from federal healthcare programs and to deny access to those products to the millions of patients who depend on those programs to access their medications. *Id.* § 1320f-6(a). But that is not a meaningful choice—both because it is almost impossible as a practical matter to exit the program and because the statute's extreme penalties would be imposed before any manufacturer could exit the program under the statute's plain terms.

75. The "negotiation" process established by the statute is not a fair or meaningful "negotiation" because manufacturers of selected drugs have no alternative but to participate in the one-sided "negotiation" and to accept the prices and other terms and conditions unilaterally imposed by CMS. Nor is there any reasonable possibility that the regime of unilaterally imposed prices will lead to the establishment of a "fair" price.

76. When two contracting parties engage in genuine negotiations, they can walk away and end negotiations if they cannot reach mutually agreeable terms and pricing. In contrast, Congress designed the IRA's price control program to be coercive and mandatory—it leaves manufacturers with no choice but to accept the prices that CMS unilaterally imposes.

77. The IRA levies a debilitating penalty—mislabeled an "excise tax"—on manufacturers that do not (a) "agree" to enter into "negotiation," (b) submit the information demanded by the Secretary, or (c) "agree" to a "maximum fair price" set by the Secretary within the timeframe set by the statute. 26 U.S.C. § 5000D(b)(1)–(4).

78. The "excise tax" penalty is calculated based on total sales revenues. *Id.* § 5000D(d). If a manufacturer refuses to "agree" to the government's demands, the government assesses penalties up to *19 times* the drug's total sales revenue. *See* Cong. Rsch. Serv., No. R47202, Tax Provisions in the Inflation Reduction Act of 2022 (H.R. 5376), at 4 tbl. 2 (Aug. 10, 2022). Even the lowest possible excise tax penalty fines a manufacturer nearly double its daily

sales revenue from the drug. *See id.* ("The excise tax rate would range from 185.71% to 1,900% of the selected drug's price depending on the duration of noncompliance.").

79.     Those penalties accrue every day until the manufacturer enters into the "agreement" with CMS, the manufacturer's drug is no longer eligible for "negotiation," or the manufacturer successfully withdraws *all* of its drugs from Medicare Part D and Medicaid.  26 U.S.C. § 5000D(c); *see id.* § 5000D(c)(1); 42 U.S.C. § 1396r-8(a)(1); 42 U.S.C. §§ 1395w-114a(b)(4)(B)(ii), 1395w-114c(b)(4)(B)(ii).

80.     In addition to imposing excessive penalties on manufacturers that do not wish to have their drugs subject to price controls, Congress also took extreme measures to insulate CMS's price control program from judicial review.  Section 1320f-7 provides that there shall be "no administrative or judicial review" of the agency's key determinations regarding which products will be swept into the price control program or of the prices set by the agency.

81.     The judicial review bars purport to prohibit a court from reviewing (a) "[t]he determination of a unit, with respect to a drug or biological product," (b) "[t]he selection of drugs under section 1320f-1(b)," (c) "the determination of negotiation-eligible drugs under section 1320f-1(d)," (d) "the determination of qualifying single source drugs under section 1320f-1(e)," (e) "[t]he determination of a maximum fair price under subsection (b) or (f) of section 1320f-3," (f) "[t]he determination of renegotiation-eligible drugs under section 1320f-3(f)(2)," and (g) "the selection of renegotiation-eligible drugs under section 1320f-3(f)(3)."  42 U.S.C. § 1320f-7.

**C.     CMS's Final Guidance**

82.     Congress directed CMS to implement the IRA through guidance for the first three years of implementation.  That statutory mandate is a clear and express indication that Congress did not authorize the agency during the first three years of the program exercise rulemaking powers, which are necessary if an agency wants to impose new substantive obligations not

expressly articulated in the statute. The statute also includes no indication that Congress exempted CMS or the IRA's drug pricing program from the ordinary requirements of the Administrative Procedure Act.

83.     On March 15, 2023, CMS issued its initial guidance describing how the agency intends to implement sections 11001 and 11002 of the IRA. *See* CMS, Medicare Drug Price Negotiation Program: Initial Memorandum, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026, and Solicitation of Comments (Mar. 15, 2023) ("Initial Guidance"). In this initial guidance, CMS went far beyond the statute, rewriting express statutory provisions to sweep in as many products as possible, while providing virtually no guidance as to CMS's actual price-setting process.

84.     Although CMS provided a short, 30-day window for comment on some aspects of its initial guidance, CMS stated that it would not accept comments on certain critical sections of its guidance, including section 30, which addressed the selection of products for "negotiation" and assignment of price controls for IPAY 2026 (with one exception not relevant here).

85.     Numerous stakeholders, including Novo, expressed their concerns to CMS. Novo urged CMS to undertake proper rulemaking proceedings, including allowing public comment and responding to those comments. CMS cannot pick and choose when it will comply with the required notice-and-comment rule making process, and when it will abandon such requirements in favor of its own unilateral and substantive decision-making.

86.     CMS issued a final, revised guidance on June 30, 2023. *See generally* CMS, Medicare Drug Price Negotiation Program: Revised Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026 (June 30, 2023) ("Final

Guidance"). The final guidance doubled down on many of the initial guidance's most problematic provisions and rejected commenters' requests for proper procedures.

87. With its guidance, CMS issued its Information Collection Request (ICR) Form for Negotiation Data Elements under Sections 11001 and 11002 of the Inflation Reduction Act (IRA), expanding the amount of information that manufacturers must collect and share with the agency as part of the "negotiation" process. The Information Collection Request imposed new substantive obligations on manufacturers but was not promulgated using proper notice-and-comment rulemaking procedures.

88. With its guidance, CMS also issued a template "agreement" that each affected manufacturer is required to sign. The template agreement states that the manufacturer "shall comply with requirements determined by CMS to be necessary for purposes of administering the Negotiation Program and monitoring compliance with the Negotiation Program, including in accordance with applicable guidance and regulations." CMS, Medicare Drug Price Negotiation Program Agreement Template ("Template Agreement"), at 3.

89. The template agreement also ties the terms used in the agreement, including "Selected Drug," to its guidance, and it states that "CMS retains authority to amend this Agreement to reflect changes in law, regulation, or guidance"—whether or not any notice of such amendments is provided. See Template Agreement at 4.

### 1.    CMS's Redefinition of Drug and Biological Products

90. Under the IRA, Congress directed CMS to select and impose price controls on a total of "10" "drug products" or "biological products" for IPAY 2026, each of which is "a covered part D drug" that has been approved or licensed for at least 7 years (in the case of a drug product) or 11 years (in the case of a biologic product) and is not subject to any marketed competition. See 42 U.S.C. § 1320f-1(e). Congress did not define the terms "10," "drug product," or "biological

product," but there was no need to.  The reference to the number "10" is unambiguous.  And the terms "drug product" and "biological product" have well-established and commonly accepted meanings.  Congress was undoubtedly aware of these settled definitions when it enacted the IRA and there is no indication that Congress authorized or intended CMS to depart from them.

91.    Ignoring the statute's plain language, CMS's guidance re-defines "drug product" to mean an aggregated grouping of multiple products, even across multiple NDAs, with the same "active moiety," and it redefines "biological product" to mean an aggregated grouping of multiple products with the same "active ingredient," even across multiple BLAs.  Final Guidance § 30.

92.    The terms "active moiety" and "active ingredient" are themselves defined regulatory terms.  They do not mean the same thing as each other, and they do not mean the same thing as "drug product" or "biological product."  An "active moiety" is the "molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt (including a salt with hydrogen or coordination bonds), or other noncovalent derivative (such as a complex, chelate, or clathrate) of the molecule, responsible for the physiological or pharmacological action of the drug substance."  21 C.F.R. § 314.3.  An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals."  *Id*.  The latter term, but not the former, includes "those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect."  *Id*.

93.    CMS's guidance also ignores the definition of "drug substance," as well as the very idea that drug substances are distinct from drug products.

94.     "Drug substance" includes the "active ingredient that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the human body," but does *not* include "intermediates used in the synthesis of such ingredient." *Id.*

95.     Encompassing all of these carefully calibrated definitions, "[d]rug product[]"— which is the precise term that Congress used in the IRA, *see* 42 U.S.C. § 1320f-1(e)(1)(A)—refers to "[t]he finished dosage form that contains a drug substance, generally, but not necessarily in association with other active or inactive ingredients." *Drugs@FDA Glossary of Terms*, FDA.gov (Nov. 14, 2017), https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms; *see also* 21 U.S.C. § 355; 21 C.F.R. § 314.3. Similarly, "biological product"—also the precise term Congress used in the IRA *see* 42 U.S.C. § 1320f-1(e)(1)(B)—refers to a unique biological product in finished dosage form. *See* 42 U.S.C. § 262(a)(1), (a)(2)(C); 21 C.F.R. § 600.3.

96.     By ignoring these well-settled definitions and instead fashioning its own concept of "drug product" that is both contrary to basic English usage and never before used in the regulation and approval of pharmaceutical and biopharmaceutical products, CMS's guidance— and thereby its implementation of the IRA's price control provisions—violates the IRA's clear and express mandates and sets up conflicts with longstanding regulatory definitions and programs, which form the regulatory backdrop against which Congress legislated.

97.     ***First***, CMS's re-definition radically changes the scope of the statute, dramatically increasing the number of medications subject to price controls. The statute limits CMS to imposing price controls on 10 "selected drugs" in the first year of the price control program. The statute also expressly provides that drug and biological products are not subject to price controls unless

they have been approved and marketed for at least 7 years (in the case of a drug product) or 11 years (in the case of a biologic product).

98.    CMS has violated these clear and express mandates by treating all of a manufacturer's drug or biologic products containing the same active ingredient or active moiety as a single "product" and sweeping them together into the price "negotiation" process—regardless of whether the individual products meet the necessary statutory requirements set forth by Congress, and irrespective of whether development of second and subsequent products required further research and whether such products were approved or may be approved in the future for different therapeutic disease states or modes of administration.  As a result, the list of first year drugs required to be subject to price controls, published by CMS on August 29, 2023, identifies far more than 10 drug and biological products, and includes numerous products that have not been approved or market for at least 7 or 11 years.

99.    CMS's approach will have disastrous consequences for the public interest and, in particular, the public's interest in balancing any price controls against the need to encourage innovation and ensure that manufacturers have proper incentives to improve and expand existing products and to develop new, ground-breaking products, including those needed to treat rare and chronic diseases.  If a biological product is subject to CMS-imposed price controls, and a different biological product containing the same active ingredient is in clinical development for a different disease or therapeutic area, the second biological product would be subject to the first biological product's "maximum fair price" *on the very first day* after it receives FDA approval—flatly contrary to Congress's express command that price controls can be applied only on products that have been marketed for 11 years without any marketed competition.  CMS's approach violates the

statute command that price controls shall not be imposed on newer products given the costs associated with continuous innovation and improvement.

100.    CMS has thus acted in ultra vires fashion to transform the IRA's product selection and price control process to an active ingredient/moiety selection and price control process, capturing all of the NovoLog® Products and all of the FIASP® Products based on their active ingredient alone.  That is far afield from what Congress intended and directed in creating a price negotiation process for 10 drug or biological products that have been approved and marketed for 7 or 11 years, respectively.  CMS cannot through mere guidance alter the substantive balance between controlling costs and encouraging innovation.  CMS cannot adopt an extreme, ultra vires interpretation of the IRA and, in doing so, take on the legislative function reserved for Congress.  Nor can CMS unilaterally deviate from Congress's express mandate to capture the top 10 drug and biological products according to Medicare spend by aggregating multiple products that each independently would not qualify for price controls but that in the aggregate may rise to the top 10.

101.    ***Second***, by subjecting aggregated clusters of products instead of individual products to price controls, CMS has rendered the statutory scheme incoherent.  For example, Congress directed CMS to impose price controls only on "drug products," 42 U.S.C. § 1320f-1(e)(1)(A), that were "approved" under section 505(c) of the Federal Food, Drug, and Cosmetic Act, *id*. § 1320f-1(e)(1)(A)(i), or on "biological products," *id*. § 1320f-1(e)(1)(B), that were "licensed" under section 351(a) of the PHSA, *id*. § 1320f-1(e)(1)(B)(i).  But approvals under section 505(c) and licensures under section 351(a) are specific to the approved drug or biological *product*.  They are not predicated on "active moiety" or "active ingredient."  *See* 21 U.S.C. § 355(c); 21 C.F.R. § 314.200; 21 C.F.R. § 314.50 (requiring applications to include data and information pertaining to the "drug product"); 42 U.S.C. § 262(a)(2)(C) (approving an application

**Appx69**

based on a demonstration that the "biological product that is the subject of the application is safe, pure, and potent"); *see also* 21 C.F.R. §§ 314.70, 601.12 (requiring applicants to report to FDA changes to an approved drug product or biological product).

102.    Similarly, by defining "drug," as that term is used in section 1320f-1(e)(1)(A)(i) and (ii) to mean "active moiety," CMS's guidance creates an irreconcilable conflict with the same term—"drug"—in section 1320f-1(e)(1)(A)(iii), where it necessarily means drug *product*, since that is how reference listed drugs are defined.  By defining "biological product" as that term is used in section 1320f-1(e)(1)(B)(i) and (ii) to mean "active ingredient," CMS's guidance also creates an irreconcilable conflict with the same term—"biological product"—in section 1320f-1(e)(1)(B)(iii), where it necessarily means a single biological *product*, since that is how reference products are defined.

103.    CMS's interpretation is also at odds with—and indeed may impermissibly render superfluous—the IRA's orphan drug exclusion provision.  Recognizing the importance of orphan drug development, Congress expressly excluded certain orphan drugs from price controls.  *See* 42 U.S.C. § 1320f-1(e)(3)(A).  By aggregating "drug products" and "biological products," however, CMS ensures that the IRA's orphan drug exclusion applies only if the entire aggregate grouping of products with the same active ingredient or active moiety is devoted to treatment of a single orphan-designated disease or condition.  *See id.* § 1320f-1(e)(3)(A); Final Guidance § 30.1.1.  A special pediatric formulation for use in treating a rare pediatric disease, for example, would not meet the exclusion criteria.  *See* Guidance § 30.1.1.  CMS's approach thus undermines the incentives that Congress has provided for orphan drug development, truncating the value of orphan drug exclusivity.

104.    **Third**, CMS's approach renders other provisions of the IRA superfluous, *see* 42 U.S.C. §§ 1320f-1(d)(3)(B), 1320f-5(a)(2), and it makes the IRA's price control provisions unworkable and unconstitutionally arbitrary.

105.    By setting a price for an aggregation of products with the same "active moiety" and "active ingredient," CMS must address therapeutic alternatives, clinical effectiveness, and unmet medical needs for whole groups of products, many of which will have vastly divergent clinical benefits and therapeutic uses—and in a way that deviates from the product-specific way that FDA addresses these same issues.  CMS will also have to consider research and development costs of a wide swath of drug or biological products simultaneously—and whether a manufacturer has recouped those costs.  *Id.* § 1320f-3(e)(1)(A).  And the agency must ultimately create a single "offer" price applicable to multiple products with different indications, device presentations, and routes of administration (e.g., a subcutaneous injection versus an oral tablet), in different NDAs and BLAs, and even with different clinical impacts merely because they share the same "active moiety" or "active ingredient."  Indeed, that price will even apply to *future* products with the same active moiety or active ingredient.

106.    CMS's ultra vires approach allows the agency to consolidate distinct groups of products that Congress expressly kept separate and condemns all future products that rely on the same active moiety or ingredient to the same government-imposed price controls, even though they are not yet on the market.  The resulting inability to recoup development costs for these drug development programs, including the costs of related programs for products that may never have made it to market, will deter manufacturers from pursing expensive innovation, at a great expense to public health and patients (especially those living with chronic diseases).

107.   *Fourth*, CMS's ultra vires approach conflates the statute's careful distinctions between products reimbursed under Part B (including the FIASP® Penfill® and FIASP® Pumpcart Cartridge), and products reimbursed under Part D (including other FIASP® and NovoLog® Products).  Congress directed that the latter can be captured by the IRA's price controls beginning in IPAY 2026, but the former must not be "negotiated" until IPAY 2028.  42 U.S.C. § 1320f-1(a)(1)–(2).  But in some cases, as with the FIASP® and NovoLog® Products, Part D will cover certain of a manufacturer's drug or biological products, while Part B may cover others— even though they share the same active moiety or active ingredient.  A drug product that is packaged in a pre-filled syringe for patient self-administration, for example, would be Part D, while a lyophilized drug product for physician (office) administration would be Part B—even though both had the same active ingredient or active moiety.  CMS's aggregation of Novo's products explicitly invites this contradiction.

108.   *Fifth*, CMS's distinction between "active moiety" and "active ingredient" creates an irreconcilable conflict with FDA's definition of those terms and with the way that agency regulates approves drugs and biological products.

109.   Congress has delegated to FDA oversight over whether and under what conditions drug and biologic products should be made available; that agency has decades of experience regulating drug and biologic products.  In contrast, CMS has no experience or expertise regarding the technical ways in which drug and biological products (and generic and biosimilar products) are regulated.  By directing CMS to proceed only by guidance for the first three years, Congress made clear that CMS would have no authority to reinvent the meaning of well-settled regulatory definitions of the critical terms that Congress used in the IRA.

110.    FDA has carefully and deliberately defined "active moiety" to mean one thing and "active ingredient" to mean another.  *See* 21 C.F.R. § 314.3; *see also Amarin Pharms. Ir. Ltd. v. FDA*, 106 F. Supp. 3d 196, 212 (D.D.C. 2015).  Under FDA's accepted definition, drug products may share an active moiety but differ in active ingredients, and active ingredients may contain multiple active moieties.  These differences matter.  For example, a generic drug generally must have the same active ingredient(s) as its listed drug—sameness in active moiety will not suffice.  *See* 21 C.F.R. § 314.92(a)(1).  Biological product active ingredients may not even always be readily discernable or easily evaluated for "sameness" with other products.  *See* 42 U.S.C. § 262(k) (discussing evaluation of "high[] similar[ity]" in the context of biosimilars).  CMS's guidance results in a regime under which market *access* is determined on a per-product basis but prices are assigned based solely on active moiety or active ingredient.

111.    As noted above, approvals under section 505(c) of the FDCA and licensure under section 351(a) of the PHSA are specific to an approved drug or biological *product*.  That is different from approval of an active moiety or an active ingredient.  Instead, and as Congress undoubtedly was aware when it implemented the IRA, "a product-specific interpretation of 'new drug' underpins FDA's drug regulatory system."  86 Fed. Reg. 28,605, 28,606 (May 27, 2021).  As FDA recently explained:

> For decades, FDA has interpreted the word "drug" in the term "new drug" to refer to the entire drug product and not just its active ingredient.  This interpretation has significant implications for public health.  An active ingredient can have different effects on the body depending on the formulation of the drug and its route of administration (*e.g.*, topical vs. intravenous), among other things.  That is why when it reviews an application, FDA carefully evaluates, *for each drug product*, not only the active ingredient but also information about the drug's formulation, route of administration, labeling, inactive ingredients, bioavailability, and manufacturing processes.  In accordance with this approach, FDA has consistently argued in the courts that the term "drug" in "new drug" means

> the entire drug product and not only an active ingredient, and courts,
> including the U.S. Supreme Court, have agreed with FDA's interpretation.

*Id.* (emphasis added) (footnote omitted) (citing *United States v. Generix Drug Corp.*, 460 U.S. 453, 458–59 (1983); *Premo Pharm. Labs., Inc. v. United States*, 629 F.2d 795 (2d Cir. 1980)).

112.    Similarly, generic drug and biosimilar approvals are specific to reference listed drugs and reference products, which in turn are limited to specific FDA-approved drug or biological products.  While a manufacturer can have several different drug or biological products with the same active moiety or active ingredient, the generic or biosimilar drug must match the specific drug product, including the strength, dosage form, route of administration, and conditions of use of the reference listed drug or reference product.  CMS's interpretation means that multiple drug and biological products are aggregated even if only one such product could have a generic or biosimilar on the market and the others could not.

113.    CMS's extra-statutory approach creates significant and irreconcilable conflicts with FDA's treatment of drug and biological products under the FDCA and the PHSA.  The structure and language of those statutes' exclusivity provisions are drug- and biological-product specific, requiring FDA to determine whether exclusivity is available for any given drug product or biological product, including those submitted in certain supplements or subsequent applications.

114.    For example, FDA makes drug product-specific exclusivity determinations pursuant to the FDCA.  If Novo developed a new route of administration and conducted a clinical trial essential to obtaining FDA approval for that route of administration, that drug product with its new route of administration would be eligible for three years of exclusivity (and the ability to set prices during the exclusivity period without competition).  *See* 21 U.S.C. § 355(c)(3)(E)(iii)–(iv), (j)(5)(F)(iii)–(iv); *see also* FDA, Approved Drug Products with Therapeutic Equivalence Evaluations, ADB 1 (43d ed. 2023).  Yet under CMS's approach, that new product would be

assigned price controls upon approval, undermining the value of this exclusivity and rendering FDA's careful analysis meaningless.

115.    To determine whether a biological product submitted by the same sponsor in a subsequent application under the PHSA is eligible for reference-product exclusivity, FDA looks at the specific biological product—not just the active ingredient.  This determination requires evaluating whether the subsequent application is for "a change (not including a modification to the structure of the biological product) that results in a new indication, route of administration, dosing schedule, dosage form, delivery system, delivery device, or strength" or for "a modification to the structure of the biological product that does not result in a change in safety, purity, or potency." *See* 42 U.S.C. § 262(k)(7)(C).  Only a biological product that makes a structural modification resulting in a "change in safety, purity, or potency" will be eligible for its own exclusivity period.

116.    The PHSA defines a biosimilar's reference product as the "*single* biological product licensed under subsection (a) against which" the biosimilar is evaluated.  *Id*. § 262(i)(4) (emphasis added).  As a result, a proposed biosimilar insulin aspart product could not reference both NovoLog® and another insulin aspart product, such as FIASP®, at the same time; it would have to choose one insulin aspart biological product to reference.  Moreover, the application would need to demonstrate that the biosimilar is highly similar to and has no clinically meaningful differences with the reference product (either a NovoLog® Product or a FIASP® Product). *See id*. § 262(i)(2), (k)(2)(A).  That is the case no matter the active ingredient or ingredients of the reference biological product.

117.    CMS's approach takes no account of the fact that different drug and biological products, often in different NDAs and BLAs, can have widely divergent clinical profiles, as well

as research and development costs and recoupment of such costs, regardless of whether they share an active moiety or active ingredient.

118.    CMS's ultra vires approach consolidates distinct groups of products that Congress kept separate and condemns all future products that rely on the same active moiety or ingredient to the same government-imposed price controls, even though they are not yet on the market.  The resulting inability to recoup development costs for these drug development programs will deter manufacturers from pursing these expensive endeavors, at a great cost to patients and public health.

119.    CMS's approach also vitiates Congress's clear intent that certain drug products remain outside of the IRA's price control scheme—those that are excluded from coverage or otherwise restricted from coverage under § 1860D-2(e)(2) of the Social Security Act.  Seemingly recognizing the conundrum of including products that the statute expressly and unambiguously prohibits, CMS has suggested that such excluded indications will not be considered in identifying therapeutic alternatives.  *See* Final Guidance § 60.3.1.  But that approach is particularly nonsensical for a product that has no other approved indications.  CMS's interpretive pretzel-twisting highlights how its grouping of drug and biological products by active moiety and active ingredient is incompatible with a statute—and an overall regulatory paradigm—that demands decision making on a drug product- and biological product-specific basis.

### 2.    CMS's Redefinition of Qualifying Single Source Drugs

120.    In addition to transforming the meaning of drug product and biological product to impose price controls on more products than Congress authorized, CMS's guidance also uses its new ultra vires definitions to capture drug and biological products that, standing alone, could not possibly qualify as a "qualifying single source drug" ("QSSD") under the express language set forth by Congress in the statute.

121.    CMS's approach of joining together all drug products or biological products with the same active moiety or active ingredient means that it is consolidating drug products approved more than 7- and 11-years earlier with those that have not been approved for the required period of time.  *See* Final Guidance § 60.5.1.  It also means that CMS is aggregating products approved in more than one NDA or licensed in more than one BLA.

122.    As described above, CMS has included all of the FIASP® Products in an insulin aspart QSSD alongside the NovoLog® Products, even though the FIASP® Products were approved under BLA 208751, not BLA 020986 (like the NovoLog® Products) and even though **none** of those products have been licensed for more than 7 years, let alone the required 11.  Under CMS's regime, any new, innovative medicine subsequently approved (even many years later) after a selected drug is assigned price controls will effectively be grandfathered into an MFP as of its approval date—just because it shares an active ingredient or active moiety with an older "selected" aggregation of products.  That would be the case despite the novelty of the new product, including improvements that can make significant contributions to patient care (for example, by developing a tablet rather than an injection) or extend a medicine's use to a whole new disease area.

123.    To be selected for price controls under the IRA, Congress made clear that a drug or biological product must first be determined to be a QSSD.

124.    Under the IRA, a "drug product" or "biological product" must satisfy several criteria to fall within the statutory definition of QSSD: (a) it must be "a covered part D drug … or a drug or biological product for which payment may be made under part B," (b) it must be FDA approved (for a drug) or licensed (for a biologic), (c) it must have been approved or licensed for at least 7 years (for a drug) or 11 years (for a biologic), and (d) it must not be the reference listed

drug for an approved and marketed generic drug or the reference product for an approved and marketed biosimilar.  42 U.S.C. § 1320f-1(e).

125.    CMS's guidance redefines "QSSD" to be an aggregation of all products with an active moiety or active ingredient based on the date on which the *earliest* single drug or biological product within that group was approved or licensed.

126.    In this way, the agency's ultra vires approach sets up the entire family of "insulin aspart" products as a QSSD—rather than each individual insulin aspart-containing *product*, as Congress intended.  And it does so based on the first licensure date of any insulin aspart product.

127.    FIASP® was first approved on September 29, 2017.  Under any reading of the statute's plain language, these biological products are therefore ineligible for price controls until the first initial price applicability year the selected drug list for which will be published after September 29, 2028.  Yet CMS has aggregated the NovoLog® Products together, and has aggregated the FIASP® Products together, and has then further aggregated the NovoLog® and FIASP® Products together, across different BLAs, even though *none* of the FIASP® Products has been approved for the 11 years required under the statute (and even though *some* of the FIASP® Products are part *B* drugs, not eligible for negotiation for two more years).

128.    Had CMS complied with the statute and Congress' express directives, Novo's insulin aspart drugs would not have been aggregated into one QSSD, and, standing alone, they would not have achieved the Medicare spend levels necessary to qualify as a top-10 spend and eligible for selection and price negotiations in IPAY 2026.  Instead, under CMS's ultra vires approach, if a new product is launched, no matter the innovation, no matter the unmet need it serves—and, critically, no matter whether that product meets the statutory criteria—if it contains

**Appx78**

the same active moiety or active ingredient as a drug subject to negotiation (owned by the same manufacturer), CMS's guidance dooms that product to its assigned "maximum fair price."

### 3.    CMS's Extra-Statutory "Bona Fide Marketing" Standard

129.    The IRA contains a clear and mandatory command that a drug or biologic product does not fit within the definition of QSSD and must be exited from the drug negotiation process whenever a generic drug or biosimilar product is "approved" or "licensed" and "marketed." 42 U.S.C. § 1320f-1(c) (noting that products that are subject to approved and marketed competition "shall not be subject to the negotiation process"). That requirement reflects Congress's clear intention that CMS has no authority to impose or maintain price controls on any products that are (or become subject to) generic or biosimilar marketed competition.

130.    Rather than comply with that clear and express mandate, CMS's guidance states that it will still consider a reference listed drug or biological reference product to be a QSSD and will not exit it from the "negotiation" process, until a generic or biosimilar competitor has engaged in what CMS deems by its own lights to be "bona fide" marketing. The guidance further asserts that CMS will "continuously monitor" such marketing to determine whether ongoing "bona fide" marketing warrants continued treatment of the reference listed drug or reference product as not a QSSD. Final Guidance § 90.4. According to the guidance, CMS will review generic drugs and biosimilars "holistically" based on a "totality of the circumstances" to determine if "meaningful competition" exists before considering a generic or biosimilar to be "marketed." *Id.*

131.    By changing the statutory test and expanding its powers to determine when a competitor has engaged in "bona fide" marketing of a biosimilar insulin aspart product, or whether such competitor continues to engage in such marketing on an ongoing basis—both functions that Congress did not assign to CMS and for which CMS lacks expertise—CMS's guidance exceeds the agency's statutory authority and violates the statute's mandatory commands.

**Appx79**

132.    "Commercial marketing" is a well-established term that refers to the introduction or delivery for introduction into interstate commerce of a drug product.  Indeed, in Appendix C of its initial guidance, CMS defined marketing as "the introduction or delivery for introduction into interstate commerce of a drug product" (only to remove that definition in its final guidance).  *See* Final Guidance, Appendix C at 194.  "Marketing" is also defined in this way elsewhere in regulations.  *See* 21 C.F.R. § 314.3 (defining "commercial marketing" as "the introduction or delivery for introduction into interstate commerce of a drug product described in an ANDA, outside the control of the ANDA applicant"); 21 C.F.R. § 330.14(b)(2) (describing market history requirements for inclusion in the OTC drug monograph system).  CMS itself has embraced this understood meaning of "marketing" in other contexts.  *See* CMS, Medicare Part B Inflation Rebates Paid by Manufacturers: Initial Memorandum § 50.3 (Feb. 9, 2023) (proposing that a product is "marketed" upon the "date of first sale" that a manufacturer must report).

133.    The timing and specific data identified in the guidance that CMS intends to use to calculate "bona fide marketing" also violates the statute and far exceeds what the statute authorizes.  CMS has indicated that it will look at the "totality of the circumstances," including both Prescription Drug Event ("PDE") data and Average Manufacturer Price ("AMP") data reported by manufacturers, to determine whether and when a biosimilar is marketed—and that it will consider data only from August 16, 2022, to August 16, 2023.  But AMP data may not even exist for a generic or biosimilar competitor, for example if it is not a participant in the Medicaid Drug Rebate Program.  The statute does not require that the biosimilar have been marketed only during that window, and there is often a lag with PDE data, as formulary access can take months and mid-year formulary changes for biosimilars are often delayed.  *See* CMS,  Part D Requirements

for Biosimilar Follow-On Biological Products, at 1–2 (Mar. 30, 2015); Medicare Prescription Drug Benefit Manual, ch. 6, § 30.3.3 (rev. Jan. 15, 2016) (regarding midyear formulary changes).

134.    In any event, how CMS will apply this ambiguous and made-up standard is fatally unclear.  And because CMS has refused to follow proper notice-and-comment procedures, it has not responded adequately to comments or provided any meaningful indication of how it intends to evaluate when a product is subject to bona fide competition.  The lack of transparency and accountability only further underscores the problems with CMS's extreme statutory violations and departures.

135.    The consequences of CMS's extra-statutory approach will be to destabilize the regulatory landscape and strip away predictability with the threat that a product may or may not be subjected to price controls, year in and year out, depending on the whims of the agency.  With competition from biosimilars to NovoLog® anticipated imminently, these challenges are particularly acute for Novo.

### 4.    CMS's Extra-Statutory Information Requirements

136.    CMS's guidance is also unlawful and far in excess of CMS's statutory authority because it seeks to impose new substantive obligations on manufacturers without complying with required notice-and-comment rulemaking procedures.

137.    The IRA is constitutionally problematic because it includes inadequate processes to protect the line between CMS as a regulator and CMS as a market participant.  That concern is particularly acute with respect to the extensive data and information that manufacturers must disclose to CMS, including trade secret and other confidential and proprietary information that Novo would not ordinarily reveal publicly or share with another market participant or potential contracting counterparty, all "in a form and manner specified by the Secretary."  *Id.* § 1320f-2(a)(4).  Manufacturers must provide this information under the threat of *one million dollar-per-*

*day* penalties if CMS believes that they have not timely provided all the information that the government has demanded. *Id.* §§ 1320f-2(a)(4)–(5), 1320f-6(b).

138.    CMS's guidance exacerbates these problems by, on one hand, imposing additional data-sharing requirements that are not included in the statute, are internally inconsistent, and often are borderline nonsensical, while on the other hand, refusing to consider relevant costs incurred by manufacturers and limiting what information manufacturers may provide.    CMS's additional requirements are set forth both in 11 pages of the guidance (appendix C) and as an information request.

139.    For example, CMS has broken the statutory requirement to report "research and development costs of the manufacturer for the [selected] drug and the extent to which the manufacturer has recouped research and development costs" into five unique sub-elements (e.g., "R&D: Basic Pre-Clinical Research Costs"), all of which include additional definitions, instructions, and de-facto sub-requirements.    "Costs of production" are divided into four sub-elements; "costs of distribution" into four sub-elements; and "unit costs of production and distribution" an additional five sub-elements.    In addition, CMS proposes to require that manufacturers report eight distinct product price points, not all of which are defined by the IRA, any other law, or otherwise required to be devised or reported by manufacturers (e.g., "U.S. commercial average net unit price ─ without patient assistance program").    *See* Final Guidance Appendix C.

140.    CMS's guidance also creates distinctions between manufacturers that are found nowhere in the statute.    For instance, if a so-called Secondary Manufacturer markets a selected drug, the so-called Primary Manufacturer must gather from its competitor this sensitive information and provide it to the government.

**Appx82**

141.    CMS's guidance also limits what information and in what form manufacturers are permitted to provide as part of the "negotiation," CMS has claimed that it is free to ignore costs that manufacturers have incurred in developing their medications, and CMS has indicated that when deciding what drugs to include on its list, it will consider only gross prices, without taking into account the actual discounts that manufacturers provide.

**D.    CMS's New Price Control Regime Is Not Voluntary**

142.    CMS has asserted that manufacturers, like Novo, have no basis to object to the statute and the extra-statutory requirements that CMS has invented and imposed on the view that the "negotiation" process and price-control program is purportedly "voluntary."    That is not correct.

143.    Even if the program were voluntary, manufacturers cannot be required to relinquish their constitutional rights—including their rights to due process and free speech—as a condition of participating in government programs.

144.    Nor may the government take over a large segment of the market, displacing private market participants, and then demand that parties relinquish their constitutional rights as a condition of continuing to sell their products in interstate commerce.    While the government has limited authority under its procurement powers when serving as a market participant to decide what price it will pay for products purchased by the government for the government itself, the government has no authority to abuse those powers to regulate the sale of products across markets and impose regulatory burdens on private parties that would otherwise be constitutionally impermissible.    Executive agencies cannot escape the bounds of the Constitution by legally or economically coercing private parties into participating in government programs.

145.    Withdrawing *all* of a manufacturer's drugs from federal healthcare programs is neither a practical nor viable option.  Because Medicare and Medicaid dominate the healthcare market, no major manufacturer could afford to withdraw all of its drugs from the federal programs.

146.    Nor would the government actually want manufacturers to do so.  Withdrawal of the entirety of a manufacturer's portfolio of drugs from the federal healthcare programs would place vulnerable patients at risk, as access to important medications by those patient populations would be greatly inhibited or eliminated.  If enough manufacturers were to withdraw, Medicare and Medicaid patients would quickly run out of therapeutic options.  Withdrawing from the federal healthcare programs would also dramatically impact manufacturers' financial ability to invest in researching and developing innovations on existing therapies, as well as wholly new therapies and other life-saving medications.

147.    Even if a manufacturer wanted to withdraw, it has no ability under the statute to do so in a timely fashion to avoid the excessive "excise tax" penalty.  For example, it takes 11 to 23 months, depending on the timing during the calendar year, for a notice of withdrawal from a Medicare Part D Coverage Gap agreement to take effect.  Under the statute, the manufacturer has no way of avoiding this debilitating penalty—other than by "agreeing" to "negotiate"—confirming the involuntary nature of the "agreement."

148.    CMS's guidance asserts that the agency will permit a manufacturer to withdraw from Medicare Part D within 30 days.  *See* Final Guidance § 40.1.  But that also rewrites the statute—confusing when CMS has authority to exit a manufacturer for good cause, and when a manufacturer is entitled to leave the program at its own discretion.  The agency has no statutory basis to make that change, and even if it could, manufacturers cannot rely on CMS's assertions

since they are reflected only in guidance without following the procedures necessary to create binding rules and regulations.

### BASIS FOR INJUNCTIVE RELIEF

149.    Harm is irreparable when it cannot be undone through monetary remedies.  "[I]n instances where the injured parties cannot recover monetary damages after the fact, even purely economic harm is considered irreparable." *N.J. Staffing All. v. Fais,* No. 1:23-cv-02494, 2023 WL 4760464, at *6 (D.N.J. July 26, 2023) (quoting *ITServe All., Inc. v. Scalia*, No. 20-14604, 2020 WL 7074391, at *9 (D.N.J. Dec. 3, 2020)).  Accordingly, when damages are not recoverable because a government defendant enjoys sovereign immunity from monetary damages, irreparable harm generally exists. *See Temple Univ. v. White*, 941 F.2d 201, 214 (3d Cir. 1991); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ("The moratorium [on collecting rent during COVID-10 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery.").  In addition, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Amalgamated Transit Union Loc. 85 v. Port Auth.*, 39 F.4th 95, 107–08 (3d Cir. 2022) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

150.    Forcing Novo to be subjected to an unconstitutional and one-sided "negotiation" process for drug products that are not properly subject to price controls under the plain terms of the statute enacted by Congress would impose irreparable harm.  Moreover, if CMS's unlawful price-control scheme is not enjoined as applied to Novo, Novo faces potential devastating unrecoverable economic harms as a result of having its six insulin aspart products subject to government-imposed price controls.

151.    Granting an injunction would not harm CMS.  CMS has no interest in violating the statute or violating constitutional requirements.  The balance of interests strongly weighs in favor of Nov because the hardship imposed on CMS by an injunction is only that it "obey the law," including complying with constitutional requirements and the limits that Congress imposed in the statute.  *See ARCHforensic, LLC v. Arch Eng'g, LLC*, No. 21-16022, 2023 WL 2662584, at *5 (D.N.J. Mar. 28, 2023) (quoting *Malibu Media, LLC v. Toshi Yamada*, No. 17-1183, 2019 WL 1586813, at *3 (D.N.J. Apr. 12, 2019)).  The public interest also weighs strongly in favor of maintaining the status quo, enforcing the Constitution, and striking down ultra vires agency action that violates clear and express statutory mandates

## CLAIMS FOR RELIEF

### COUNT I

### (Challenge to the Statute: Separation of Powers and Due Process)

152.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

153.    The first three articles of the Constitution provide for the separate roles of each branch of the federal government. Article I vests "[a]ll legislative Powers" in the "Congress of the United States."  U.S. Const. art. I, § 1.  Article II vests the power to implement the laws in the President.  Article III vests the power to interpret the laws in the courts.

154.    This separation of powers is critical to the systems of checks and balances that is an essential part of our constitutional democracy.  When Congress fashions statutory programs, in order to comply with separation of powers principles, it must articulate "intelligible principle[s]" to guide and constrain the executing agency administering such programs.  *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

155.    The Supreme Court has invalidated statutes that confer "virtually unfettered" discretion on the executive branch—including by creating massive new regulatory schemes without appropriate guidance, standards, or guardrails.  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 542 (1935); *see also Pan. Refining Co. v. Ryan*, 293 U.S. 388 (1935).

156.    The Supreme Court has also made clear that Congress may not remove multiple layers of constitutional safeguards necessary to protect separation of powers.  *See Seila Law*, 140 S. Ct. 2183; *Free Enter. Fund*, 561 U.S. 477.  A very broad delegation of powers to an executive branch agency might be constitutionally permissible if the agency operates with tolerably fair procedures and there are meaningful opportunities for regulated parties to obtain judicial review. But Congress cannot—as it does in the case of the IRA's price control provisions—delegate sweeping powers to an agency and then remove the time-tested procedural safeguards necessary to ensure that those powers are appropriately exercised, including the essential requirements of complying with public notice and comment rulemaking procedures and ensuring adequate opportunities for judicial review.

157.    Separation of powers is fundamental because it protects the public interest and the private rights of individuals, including their essential rights to due process of law.

158.    Under the Fifth Amendment's Due Process Clause the government may not deprive a person of property without first following constitutionally sufficient procedures.  *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  Those procedures include notice and an opportunity to be heard "at a meaningful time and in a meaningful manner," *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), as well as other procedural protections that work to prevent, to the extent possible, an erroneous deprivation of property.  *See Gilbert v. Homar*, 520 U.S. 924, 930–32 (1997).

Appx87

159.    A price-control statute violates the Due Process Clause if it does not "adequately safeguard[] against confiscatory rates, and therefore, ensure[] a constitutional rate of return," which includes "a fair and reasonable rate of return on investment." *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 593 (6th Cir. 2001); *see also Guar. Nat'l Ins. Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990), *as amended* (Nov. 8, 1990) (invalidating statute freezing insurance rates).  "[D]ue process *guarantees* a fair and reasonable regulatory rate, not just the *possibility* of acquiring such a rate from an authority selecting rates within a prescribed range containing confiscatory and fair rates." *Michigan Bell*, 257 F.3d at 595 n.4 (emphasis added).

160.    In the context of price-control laws, the Supreme Court has long held that a "[p]rice control is 'unconstitutional ... if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.'" *In Re Permian Basin Area Rate Cases*, 390 U.S. 747, 769–70 (1968) (quoting *Nebbia v. New York*, 291 U.S. 502, 539 (1934)).  Government-set prices must at least be "just and reasonable." *Id.* (citing *Fed. Power Comm'n v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942)).  Absent "adequate safeguards"—statutory standards, notice-and-comment procedures, and judicial review—there is not just insufficient protection against the "imposition of confiscatory rates," *Michigan Bell*, 257 F.3d at 594, there is no protection at all.

161.    The IRA is a massive new price-setting scheme and an exercise of significant "policy discretion," with potentially massive consequences for industry, patients, and innovation. *See DOT v. Ass'n of Am R.Rs.*, 575 U.S. 43, 78–81 (2015) (Thomas, J., concurring) (discussing *Marshall & Field & Co. v. Clark*, 143 U.S. 649 (1892)).  It centralizes vast power over our nation's healthcare system in the hands of an administrative agency, but it provides none of the safeguards necessary to ensure separation of powers or to protect due process.  It includes no statutory standard requiring just and reasonable prices, delegating all critical decisions to CMS; it lacks

adequate procedures for implementing the statutory price controls; and it expressly prohibits judicial review of CMS's unilateral price determinations.

162.    The Secretary's price controls will have a profound effect on private interests. Medicare and Medicaid patients may be deprived of access to life-saving medications and the program will have significant consequences for all patients who depend on research and development necessary for identifying new and innovative treatments, especially for rare and chronic diseases.  Manufacturers *have and will* suffer significant losses—even the IRA's ceiling for "negotiations" is well below market prices, and the IRA directs the Secretary to go lower than that "to achieve the lowest maximum fair price for each selected drug." 42 U.S.C. § 1320f-3(b)(1). Manufacturers have constitutionally protected property interests in their patent rights and their investment-backed expectations to be free from price controls that are "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." *In re Permian Basin Area Rate Cases*, 390 U.S. at 769–70 (quoting *Nebbia*, 291 U.S. at 539).  The IRA takes away those property interests, without affording manufacturers a meaningful opportunity to be heard, and does so without putting in place any safeguards to prevent CMS from imposing confiscatory rates.

163.    Moreover, while it is misleadingly labeled a "negotiation" process, suggesting that the prices should be seen as the result of open negotiations between the government and manufacturers, that is a lie.  The IRA's "negotiation" process is a sham.  The statute forces manufacturers to agree to whatever "maximum fair prices" that CMS unilaterally imposes and, if they do not agree, saddles them with massive penalties that are so large that no manufacturer could ever afford to pay them (as even the Congressional budget office has acknowledged, forecasting that the statute's "excise tax" will generate exactly zero dollars in revenues, *see* CBO, How CBO Estimated the Budgetary Impact of Key Prescription Drug Provisions in the 2022 Reconciliation

Act (Feb. 2023), https://www.cbo. gov/system/files/2023-02/58850-IRA-Drug-Provs.pdf.).  The government cannot seize control of almost half of the nation's healthcare markets, force market participants to relinquish their constitutional rights as a condition of selling their products or else face excessive debilitating penalties, and then pretend that manufacturers can simply avoid that "gun to the head" by withdrawing completely from the federal markets and leaving millions of Americans deprived of critical, life-saving medications.

164.    If that were not enough, the IRA guarantees no return at all—let alone requires the agency to meet the constitutional minimum of a "fair and reasonable return on investment." *Michigan Bell*, 257 F.3d at 595 n.3 (quotation marks omitted).  Instead of reasonable procedures, the IRA deprives drug manufacturers of their constitutionally protected property interests in and their investment-backed expectations without procedural safeguards, directing the Secretary to fix prices at the "lowest" level.  While the agency is supposed to "consider," among other unspecified "factors," information from the manufacturer such as "unit costs"; "[r]esearch and development costs ... for the drug" (including "the extent to which the manufacturer has recouped [them]"); and "revenue and sales volume data," 42 U.S.C. § 1320f-3(e), the agency has acknowledged that the statute does not tell it *how* it should consider those factors.  While trying to create an illusion of fairness with the label "maximum fair price," the IRA grants CMS authority to choose any price it likes and to call it the "maximum fair price."  The IRA establishes an across-the-board *ceiling* well below market prices, *see id*. § 1320f-3(c)(1)(C), (b)(2)(F), and directs CMS to aim for "the lowest" price below that ceiling, *id.* § 1320f-3(b)(1).

165.    In addition to undermining manufacturers' ability to set their own prices, the IRA also undermines manufacturers' ability to recoup investments and meet their reasonable investment-backed expectations that they will be able to sell their drugs at a reasonable price.

166.    CMS's implementation exacerbates these problems, adding administrative insult to the statute's constitutional injuries.  The agency's approach prevents manufacturers from recouping the large investments made in drug and biologic products that were not ultimately brought to market or were related to improving patients' lives beyond the minimum required for FDA approval.  In addition, the agency's extra-statutory aggregation of all drug products with the same active moiety and biological products with the same active ingredient means that manufacturers will not recoup marginal costs for innovations made to existing products, nor even reap the statutorily conferred benefits of regulatory exclusivity.  Indeed, a drug product that is not yet approved and is currently being subjected to substantial research and development costs in a company's clinical program may be unable to achieve the recovery of virtually any of these costs if it contains the same active ingredient or moiety as a previously selected QSSD and will be subjected to a previously set MFP right out of the gate.

167.    Because the overall arrangement results in a violation of the separation of powers and due process, the IRA is unconstitutional and should be enjoined.

## COUNT II
### (Challenge to the Statute: First Amendment)

168.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

169.    The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech."  U.S. Const. amend. 1.

170.    The First Amendment protects not only the right to speak but it also protects the right to refrain from speaking.  *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

171.    Compelled speech may be even more objectionable than censorship. Forced speech coerces the speaker "into betraying their convictions."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018).

172.     The First Amendment prohibits the government from compelling private businesses to espouse the government's favored viewpoints.  Yet that is precisely what the IRA does.  The IRA requires manufacturers not only to submit to government-set confiscatory prices, but it also requires manufacturers to say that they entered into "negotiations" and "agreed" to those prices and to endorse those prices as the "maximum fair price."  These requirements compel manufacturers to express their agreement that the Secretary's confiscatory price is "fair" and that no price higher could also be fair.  That "involuntary affirmation" is compelled speech.

173.     Laws that compel private speech are presumptively unconstitutional and may stand only if narrowly tailored to serve compelling interests.

174.     The IRA's speech provisions do not serve a compelling state interest.  The government has no compelling reason to mandate this speech other than to shield itself from criticism by obscuring this confiscatory pricing regime as voluntary negotiations.

175.     Nor are these requirements narrowly tailored.  Congress could have authorized CMS to set prices without dictating that the process be called a "negotiation" whereby the parties "agree" to a "maximum fair price."

176.     The IRA's compelled-speech provisions are therefore unconstitutional under the First Amendment and should be enjoined.

### COUNT III

**(Challenge to CMS's Actions:
Violation of the Administrative Procedure Act
and Social Security Act)**

177.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

178.     The procedures required by both the APA and the Social Security Act are grounded in the Constitution.  They protect citizens' due process and equal protection rights, by ensuring that citizens have fair notice of what the law requires, and that agency decision-making is not

Appx92

arbitrary or capricious. In short, the "fundamental notions of fairness implicit in due process and with the ideal of reasoned decisionmaking … undergird[] all of our administrative law." *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 56 (D.C. Cir. 1977).

179.   Under the APA, an agency may not employ guidance to impose new substantive obligations on regulated parties. Courts have characterized agency guidance and policy statements as "musings"—agency statements about how the agency may act in the future that are "no more subject to review than a press release." *Columbia Broad. Sys., Inc. v. United States,* 316 U.S. 407, 422 (1942) *see also Nat'l Mining Ass'n v. McCarthy,* 758 F.3d 243, 252 (D.C. Cir. 2014). Guidance documents, like other policy statements and interpretive rules, are "not supposed to 'have the force and effect of law'—or, otherwise said, to bind private parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)). They "are meant only to 'advise the public' of how the agency understands, and is likely to apply, its binding statutes and legislative rules." *Id.* (quoting *Perez*, 575 U.S. at 97).

180.   The D.C. Circuit has reasoned that "it is a considerable leap from concluding that [CMS] has considerable contractual discretion to concluding that the agency has received a blank check from Congress to adopt any contractual provision whatsoever without undertaking notice and comment review ... any contract provisions that are legislative are subject to § 553's notice and comment requirements." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1053–54 (D.C. Cir. 1987); *Cal-Almond, Inc. v. Dep't of Agric.*, 14 F.3d 429, 446–47 (9th Cir. 1993); *see also Nat'l Ass'n of Psychiatric Treatment Ctrs. for Child. v. Weinberger*, 658 F. Supp. 48, 54 (D. Colo. 1987) (holding APA applied to agency attempt to make "prescriptive changes in overall contents of all participation agreements … [that] amount[ed] to policy changes of significant import").

181.    When an agency imposes substantive obligations that go beyond a statute's express requirements—that is, when an agency seeks to adopt "legislative rules"—the agency must comply with rulemaking procedures with an opportunity for public notice and comment. *See Metro. Sch. Dist. v. Davila*, 969 F.2d 485, 489 (7th Cir. 1992) (explaining that "legislative rules" are those agency actions that "'create new law, rights, or duties'" (quoting *United Techs. Corp. v. EPA*, 821 F.2d 714, 718 (D.C. Cir. 1987))).    As courts have explained, those bedrock procedural requirements are essential to avoiding arbitrary decision-making when an agency is exercising a quasi-legislative rulemaking function. *See Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 170–71 (7th Cir. 1996); *see also Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010).    These requirements—as reflected in both the APA, *see* 5 U.S.C. § 553 *et seq.*, and the Social Security Act, *see* 42 U.S.C. § 1395hh(a)(2)—are designed to help "secure the values of government transparency and public participation," *Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013), by ensuring that agencies provide reasoned explanations for their decisions after evaluating and responding to comments. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

182.    The IRA directs CMS to implement the statute's unprecedented provisions on a gradual basis, first through program instruction and policy guidance, *see* IRA, Pub. L. No. 117-169, §§ 11001(c), 11002(c), 136 Stat. 1818, 1833–62.    Congress thus expressed its intent that CMS would hew very closely to the statute's provisions and issue guidance that does not impose new substantive obligations on regulated parties.    Nothing in the IRA indicates that Congress relieved CMS of its obligations to comply with proper rulemaking procedures if it seeks to impose obligations on regulated parties that go beyond the statute and bear the force and effect of law.

183.    Where (as here) private rights are at stake, an agency cannot exercise rulemaking powers and simultaneously escape the constitutional procedures required to promulgate rules

through proper procedures. That is true no matter what political exigencies might have driven Congress to favor a rapid implementation of its policies. An agency cannot avoid rulemaking procedures by "the simple expedient of call[ing]" its actions "mere statements of policy." *Allina*, 139 S. Ct. at 1811 (quotation marks omitted); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–24 (D.C. Cir. 2000). Nor do statutory deadlines on their own qualify as "good cause" for avoiding public notice-and-comment procedures. *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1381 (Fed. Cir. 2017). Especially in light of the constitutional concerns that arise whenever an agency engages in a legislative rulemaking function, notice and comment procedure may be waived only when a delay would result in "real harm." *Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 911 (9th Cir. 2003) (quoting *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995)).

184. These concerns are particularly acute where, as here, an agency makes clear that its new substantive rules will bind regulated parties. CMS's template agreement turns its already impermissible guidance into a hammer: it is a unilateral contract that binds one party (the manufacturer) to open-ended terms that the other party (CMS) can change on a whim, without notice and comment and without judicial review. As provided in the Template Agreement, a manufacturer must agree that it "shall comply with requirements determined by CMS to be necessary for purposes of administering the Negotiation Program and monitoring compliance with the Negotiation Program, including in accordance with applicable guidance and regulations." Template Agreement at 3. In the Agreement, CMS states that it "retains authority to amend this Agreement to reflect changes in law, regulation, or guidance" at any time. *Id.* at 4. Offering little more than cold comfort, CMS provides that it will give a manufacturer 60-day notice of such a change "[w]hen possible." *Id.*

185.    Manufacturers should not be required to sign an Agreement that requires them to adhere to otherwise non-binding guidance, particularly non-binding *future* guidance.  These sorts of form agreements should "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them ...[; they] contain no negotiable terms." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011).

186.    CMS's final guidance and template agreement are unlawful because they impose substantive requirements in addition to the statute's requirements and make plain CMS's intent to bind manufacturers to substantive obligations not subject to notice and comment rulemaking, and they should be enjoined.

## <u>COUNT IV</u>

### (Challenge to CMS's Actions:
### Ultra Vires and Unlawful Conduct)

187.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

188.    An executive agency's powers are limited to those delegated by Congress.  Because an agency has no power to act unless Congress confers power upon it, an agency's actions are ultra vires whenever it exceeds the scope of its delegated powers.  *See City of Arlington*, 569 U.S. at 299; *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that "an agency literally has no power to act … unless and until Congress confers power upon it"); *United States v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2009) (noting that "*any* 'improper[]' agency action is 'ultra vires'" (quoting *City of Arlington*, 569 U.S. at 297).  An agency's actions are ultra vires when it "patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute." *Hunter v. FERC*, 569 F. Supp. 2d 12, 16 (D.D.C. 2008) (citing *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

189.    That is precisely what CMS has done here.  Despite the IRA's already unprecedented price-control provisions (which on their own violate multiple constitutional requirements), CMS has ignored even those provisions and has rewritten the statute to reach more drug and biological products and to acquire more authority than the statute permits.

190.    There are many examples where CMS's final guidance and template agreement not only impose substantive obligations on manufacturers without complying with proper procedures, but also impose requirements far outside the scope of any authority granted by Congress.

191.    Chief among them is CMS's approach to defining "drug product" and "biological product" in order to vastly expand the reach and breadth of products subject to price controls. CMS's guidance rewrites the definitions of "QSSD," and, in turn, "negotiation-eligible drug," in ways that violate express statutory commands, while simultaneously refusing to consider any public comment on its new definitions.

192.    The IRA imposes a discrete limit on the number of "drug products" and "biological products" subject to price controls, with a slow and deliberate escalation over time.  Under CMS's aggregation approach, however, many more than the 10 drug and biological products permitted by the statute are subject to price controls beginning in IPAY 2026, including six from Novo alone. Many of those products would not otherwise be eligible for negotiation, including because they have not been marketed for the requisite 7- or 11-year period.  *See* Final Guidance §§ 30.1, 60.5.1.

193.    The statute does not permit groupings of products by active moiety or active ingredient.  It also does not permit selection of all insulin aspart products as a single product, nor does it authorize CMS to undertake the definitional gymnastics necessary to make sense of such a formulation.  The NovoLog® Products and the FIASP® Products are different, with distinct biological products approved in a different BLAs, and developed with separate formulations at

different times and with different sets of development and production costs. These individual products do not satisfy the statutory criteria for being subject to the IRA's price controls.

194.    CMS has no authority to combine Novo's six different insulin aspart products and subject them to price controls under the IRA. Because CMS's guidance and its decision to select Novo's products for price controls violate express statutory mandates and exceed the scope of its authority granted by Congress, CMS's actions are manifestly contrary to law and ultra vires, and should be enjoined.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A.    Declare that the IRA's drug price control program violates the Constitution's separation of powers;

B.    Declare that the IRA's drug price control program violates the Due Process Clause of the Constitution's Fifth Amendment;

C.    Declare that CMS's Guidance and Template Agreement, finalized on June 30, 2023, violate the APA and SSA;

D.    Declare that the CMS's final revised guidance is invalid, unconstitutional, ultra vires, and/or unenforceable;

E.    Declare that Novo's products have been improperly aggregated and are not properly subject to price controls under the statute;

F.    Enjoin CMS from implementing the IRA's drug price control program;

G.    Enjoin CMS from extending the scope of the IRA's drug price control program by considering multiple drug products or multiple biological products to be a single "drug," QSSD, or negotiation-eligible drug;

H.    Enjoin CMS from applying price controls to any of Novo's products that are improperly aggregated and as individual products do not meet the statutory requirements to be subject to price controls;

I.    Award Plaintiffs reasonable attorneys' fees and costs, plus interest accruing thereon, under 28 U.S.C. § 2412; and

J.    Grant such other and further relief as the Court may deem appropriate.

Dated:  September 29, 2023

Respectfully submitted,

*/s/ Israel Dahan*
Israel Dahan (NJ Bar No. 042701997)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone: (212) 556-2114
Facsimile: (212) 556-2222
idahan@kslaw.com

Ashley C. Parrish
 (application for *pro hac vice* forthcoming)
John D. Shakow
 (application for *pro hac vice* forthcoming)
Eva A. Temkin
 (application for *pro hac vice* forthcoming)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 737-3945
Facsimile: (202) 626-3737
aparrish@kslaw.com
jshakow@kslaw.com
etemkin@kslaw.com

*Counsel for*
*Novo Nordisk Inc. and Novo Nordisk Pharma, Inc.*

**Appx100**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**Trenton**

| | |
|---|---|
| NOVO NORDISK INC., *et al.*, | |
| *Plaintiffs*, | No. 3:23-cv-20814-ZNQ-JBD |
| v. | |
| XAVIER BECERRA, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF KAREN M. HAUDA**

I, Karen M. Hauda, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a resident of Virginia.  I am over the age of eighteen, and I am competent to provide this declaration.

2.      I am the Senior Director for Regulatory Policy at Novo Nordisk Inc.  In my role, I oversee regulatory policy strategies and outreach initiatives for Novo Nordisk products, including insulin products.  I am integrally involved in the Company's consideration of issues related to the Inflation Reduction Act and its impact on Novo Nordisk Inc.'s regulatory policy.

3.      Novo Nordisk Inc. is the U.S.-based affiliate of Novo Nordisk A/S, a global healthcare company founded in 1923 and headquartered in Plainsboro, New Jersey.

4.      The Novo Nordisk Foundation, Novo Nordisk A/S's majority stakeholder, is among the top five largest charitable foundations in the world.  The

company's mission and actions reflect the Foundation's vision to contribute significantly to research and development that improves the lives of people and sustainability of society.

5.    Novo Nordisk Pharma, Inc. supplies unbranded biologic versions of Novo Nordisk insulin products. Novo Nordisk Pharma, Inc.'s headquarters are located in Plainsboro, New Jersey.

6.    Novo Nordisk Inc. and Novo Nordisk Pharma, Inc. (collectively "Novo") are committed to improving the lives of people living with serious chronic conditions, including diabetes, bleeding disorders, growth disorders, and obesity.

7.    Novo's participation in the Medicare and Medicaid programs accounts for more than one third of the company's sales in the United States.

8.    The Centers for Medicare & Medicaid Services ("CMS") has selected six of Novo's different biological products—FIASP® vial; FIASP® FlexTouch®; FIASP® PenFill®; NovoLog® vial; NovoLog® FlexPen®; and NovoLog® PenFill®—for price controls under the Inflation Reduction Act. CMS listed all six of these Novo products as a single "selected drug" solely because they contain the same active ingredient (insulin aspart).

**Regulatory Paradigm of Active Ingredients, BLAs, and Biological Products**

9.    When Congress enacted the Inflation Reduction Act, it expressly referenced the regulatory provisions and framework that have long governed the Food and Drug Administration's ("FDA's") approval and licensure of drug products and

biological products.  In the context of that regulatory framework, there are meaningful and well-established differences between "active ingredients," "biologics license applications" ("BLAs"), and individual "biological products."

10.    In this declaration, I focus on active ingredients and biological products, as relevant to the six different biological products manufactured by Novo that CMS has subjected to price controls.  It is important to note, however, that just as an active ingredient is considerably different from a biological product, an active moiety is considerably different from a drug product.  Moreover, active ingredients and active moieties themselves are not the same things; there are complex and critical differences between the two.

11.    It is also important to recognize that the regulations governing drug development in this country are complex, and there are a variety of nuances and exceptions that make any general description difficult.  With that said, there are important distinctions between a biological product and its active ingredient.

12.    *Active Ingredient.* An active ingredient is the component of a biological product that provides pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or that affects the structure of any function of the body of man or animals.  In contrast, "inactive ingredients"—such as excipients—are added to a product for other reasons, such as coloring or preserving the product.  They may or may not affect the functioning of the product.

13.    *Biologics License Application*.  In order to market a biological product, a manufacturer must have an approved BLA and an effective biologics license.  The manufacturer obtains this marketing authorization from FDA by submitting an original BLA, or a supplement to an existing BLA.  The submission must contain (among other things) specific information addressing the safety, purity, and potency, as well as the manufacturing establishment(s) and chemistry, manufacturing, and controls ("CMC"), of *each* biological product included or added to the BLA.  FDA will grant approval for each product included in or added to the BLA if the manufacturer demonstrates (among other things) that the product meets applicable requirements to ensure its continued safety, purity, and potency.

14.    A BLA typically includes multiple products from the same "family" of products—that is products produced by the same manufacturer that share the same core trade name and use the same active ingredient made through the same manufacturing process.  In contrast, products representing different families of products and/or sponsored by different manufacturers will be licensed in different BLAs.  They will generally have different trade names, use different manufacturing processes, and may treat different diseases, even if the products across the different BLAs might contain the same active ingredient(s).

15.    Each product in a family of products covered by a single BLA can be approved and licensed on a different date.  For instance, if a manufacturer seeks approval to market a new product within a family of products, FDA will expect that

product to be submitted for approval in a supplement to the same BLA that the manufacturer has used to seek approval and licensure for other products previously approved and licensed using the same BLA number.  The date of approval for that product will not be tied to the date on which FDA previously licensed other products under the same BLA.

16.    *Biological Product*.  Although each BLA typically includes a family of products that contain the same active ingredient, each product within the family is different because it typically has its own approved characteristics and conditions of use.  Biological products will differ across strengths, dosage forms and dosing regimens, routes of administration, indications, and delivery device presentations, among other things.

17.    In considering the approvability of any given insulin product, FDA considers not only the active ingredient and the specific manufacturer's BLA, but also the safety and effectiveness of the product as it will be used by the patient—including final formulation, strength, delivery mode and device, and other aspects of the insulin product in its finished dosage form.

18.    Each approved biological products is listed in FDA's Purple Book database, which lists the specific trade name, proper name, strength, dosage form, route of administration, and product presentation for each FDA-licensed biological product.

19.    The Purple Book lists four different FIASP® products.

**Product Details for: _Fiasp_**    ‹ RETURN TO SEARCH RESULTS

■ Product Label                                    *Grayed out Product Label links indicate that there is no product label available for the product.*

| Product Number | Dosage Form | Route of Administration | Strength | Product Presentation | License Type | Proprietary Name | Marketing Status |
|---|---|---|---|---|---|---|---|
| 001 | Injection | Intravenous, Subcutaneous | 1000UNITS/10ML (100UNITS/ML) | Multi-Dose Vial | 351(a) | Fiasp | Rx |
| 002 | Injection | Subcutaneous | 300UNITS/3ML (100UNITS/ML) | Autoinjector | 351(a) | Fiasp | Rx |
| 003 | Injection | Subcutaneous | 300UNITS/3ML (100UNITS/ML) | Multi-Dose Cartridge | 351(a) | Fiasp | Rx |
| 004 | Injection | Subcutaneous | 160UNITS/1.6ML (100UNITS/ML) | Multi-Dose Cartridge | 351(a) | Fiasp | Rx |

20.    The Purple Book lists five different NovoLog® products, two of which have been discontinued.

**Product Details for: _Novolog_**    ‹ RETURN TO SEARCH RESULTS

■ Product Label                                    *Grayed out Product Label links indicate that there is no product label available for the product.*

| Product Number | Dosage Form | Route of Administration | Strength | Product Presentation | License Type | Proprietary Name | Marketing Status |
|---|---|---|---|---|---|---|---|
| 001 | Injection | Intravenous, Subcutaneous | 1,000UNITS/10ML (100UNITS/ML) | Multi-Dose Vial | 351(a) | Novolog | Rx |
| 002 | Injection | Subcutaneous | 300UNITS/3ML (100UNITS/ML) | Multi-Dose Cartridge | 351(a) | Novolog | Rx |
| 003 | Injection | Subcutaneous | 300UNITS/3ML (100UNITS/ML) | Autoinjector | 351(a) | Novolog | Rx |
| 004 | Injection | Subcutaneous | 300UNITS/3ML (100UNITS/ML) | Autoinjector | 351(a) | Novolog | Disc |
| 005 | Injection | Subcutaneous | 300UNITS/3ML (100UNITS/ML) | Autoinjector | 351(a) | Novolog | Disc |

21.    To change a product's dosage form or device presentation, a manufacturer will create a new product that must be evaluated approved and licensed by FDA—after an evaluation of the safety and efficacy of that specific product for patient use—before it can be marketed and sold in interstate commerce.  In other words, changing essential characteristics results in a different product that must be separately approved by FDA

before the product may be marketed, and typically must be based on additional clinical and other data submitted to FDA to support that approval.

22.     Different biological products can and do share the same active ingredient(s), but they are not by virtue of that shared characteristic the same biological product. Rather, as shown in Figure 1 below, the active ingredient in a product applies to more products than just those in the individual manufacturer's BLA; each BLA in turn is broader than any specific biological product; and each biological product has its own relevant characteristics and conditions of use.



*Figure 1*

23.     The distinct biological products in Figure 1 are represented by the small shapes housed inside the individual BLAs, which are represented by light blue circles within each manufacturer's individual portfolio (the larger dark blue circle). Although each BLA fits within the backdrop of the active ingredient, each contains multiple

individual products.

24.   *Reimbursement for Biological Products*.   Coverage of a biological product approved under section 351(a) of the Public Health Service Act (42 U.S.C. § 262(a)) can be under Medicare Part B or Part D.   Physician-administered drugs and outpatient drugs self-administered through durable medical equipment will generally be covered by Part B.   Other self-administered drugs will generally be covered by Part D. So a biological product that is packaged in a pre-filled syringe for patient self-administration, for example, would be expected to be Part D, while an IV formulation for physician (office) administration would be expected to be Part B.

25.   Novo holds multiple BLAs that provide authorization to market dozens of individual biological products.   As a general matter, Novo's insulin products that are intended for self-administration through pen injectors and vial/syringes are reimbursed under Part D.   Novo's insulin products that are self-administered through durable delivery devices such as insulin pumps are reimbursed under Part B.   For instance, FIASP® PumpCart®, which FDA approved earlier this year, is expected to be reimbursed under Part B.

## The NovoLog® Family of Products

26.   NovoLog® is the trade name for Novo's rapid-acting mealtime insulin that helps with glycemic control in people with diabetes mellitus by lowering mealtime blood sugar spikes.   NovoLog® products are administered 5–10 minutes before a meal

and are considered to be "rapid-acting" by the American Diabetes Association ("ADA") and the American Association of Clinical Endocrinology ("AACE").

27.    As reflected in the current FDA-approved label, the different products that fall within the NovoLog® family of products are indicated to improve glycemic control in adults and pediatric patients with diabetes mellitus.  NovoLog® products are typically used in conjunction with a basal insulin—but not in conjunction with another mealtime insulin.

28.    The NovoLog® family of products includes:

- NovoLog® 10 mL (100 units/mL, or "U100") vial;

- NovoLog® PenFill® 3 mL (U100) cartridges, for use with a reusable insulin pen; and

- NovoLog® FlexPen® 3 mL (U100), a single-patient-use prefilled insulin pen.

29.    Each of these products is a distinct product that is used for different purposes.  For ease of reference, however, I will refer to these three products collectively as the "NovoLog® products."

30.    The NovoLog® products are marketed pursuant to an approved BLA held by Novo.  The NovoLog® 10 mL vial and the NovoLog® PenFill® 3 mL cartridges were approved by the Food and Drug Administration ("FDA") on June 7, 2000, in New Drug Application ("NDA") 020986.  The NovoLog® FlexPen® 3 mL was approved by FDA on January 19, 2001, also in NDA 020986.  (On March 23, 2020,

NDA 020986 was "deemed" to be a BLA by operation of section 7002(e)(4) of the Biologics Price Competition and Innovation Act.)

31.     Each of the individual FDA approvals of each of the products in the NovoLog® family of products required further clinical and/or human factor studies and new data even though the products are all in the same BLA.  Each product within the NovoLog® family provides different advantages to patients.

32.     Novo has continued to invest in developments that have allowed for product innovations.  For example, Novo received FDA approval of new routes of administration for the NovoLog® 10 mL vial: continuous subcutaneous infusion with an insulin pump was added in 2001, and intravenous use was added in 2005.  Similarly, all of the products within the NovoLog® family were approved by FDA for pediatric use in 2005 and 2008 after Novo conducted independent, pediatric-specific clinical studies.

33.     Novo makes all of the different NovoLog® products available through Medicare and Medicaid.  Covered NovoLog® products are generally reimbursed under Part D.

### The FIASP® Family of Products

34.     FIASP® is the trade name for Novo's *ultra*-rapid-acting mealtime insulin that controls blood sugar around mealtimes for patients with diabetes mellitus.  FIASP® products are administered at first bite or within 20 minutes after starting a meal and are considered to be "ultra-rapid-acting" by the ADA and the AACE.  The

ADA and the AACE provide different prescribing guidance for the FIASP® family of products than they do for the NovoLog® family of products.

35.    As reflected in the FDA-approved label, the different products that fall within the FIASP® family of products are indicated to improve glycemic control in adults and pediatric patients with diabetes mellitus.  FIASP® products are typically used in conjunction with a basal insulin—but not in conjunction with another mealtime insulin.

36.    The FIASP® family of products includes:

- FIASP® 10 mL (U100) vial;

- FIASP® FlexTouch® 3 mL (U100), a single-patient-use prefilled insulin pen;

- FIASP® PenFill® 3 mL (U100) cartridges, for use with a reusable insulin pen; and

- FIASP® PumpCart®, a 1.6 mL (U100) cartridge for use with insulin pumps.

37.    Each of these products is a distinct product that is used for different purposes.  For ease of reference, however, I will refer to these four products collectively as the "FIASP® products."

38.    The FIASP® products are marketed pursuant to an approved BLA held by Novo.  The first FIASP® products (the 10 mL vial and FIASP® FlexTouch® 3 mL products) were approved by FDA on September 29, 2017, in NDA 208751, after 17 formulation attempts.  The FIASP® PenFill® 3 mL cartridge product was separately approved by FDA on September 24, 2018, also in NDA 208751.  (On March 23, 2020,

**Appx111**

NDA 208751 was "deemed" to be a BLA by operation of section 7002(e)(4) of the Biologics Price Competition and Innovation Act.)

39.    The FIASP® family of products prescribing information differs from that of the NovoLog® family of products due to its different response rate of biological activity.

40.    Novo has continued to invest in developing new and innovative products in the FIASP® family of products. For example, Novo received FDA approval of the FIASP® 10 mL vial for continuous subcutaneous infusion with an insulin pump in 2019. FDA approved pediatric use (including pump use) in 2019. And *just this year*, on June 21, 2023, FDA approved the FIASP® PumpCart®, a 1.6 mL cartridge. The FIASP® PumpCart® represents a significant advancement for patients, who will no longer need to manually fill pump cartridges.

41.    Novo makes all of the different FIASP® products available through Medicare and Medicaid. The FIASP® products are generally reimbursed under Part D; however, some of the FIASP® products are reimbursed under Part B, including FIASP® PenFill® and FIASP® PumpCart®.

### FDA Regulation

42.    The "active ingredient" in the NovoLog® products and FIASP® products is insulin aspart, but each NovoLog® product and each FIASP® product is a distinct biological product. Each FDA approval for each of the products was specific to that individual product, in its finished dosage form, based on product-specific CMC

data as well as data from individual clinical studies and human factors studies that supported the marketing application for that specific product.

43.    FDA did not approve an independent active ingredient of "insulin aspart" when it approved any of the NovoLog® or FIASP® products.  FDA did not approve "NovoLog®"; it separately approved the NovoLog® vial, the NovoLog® FlexPen®, and the NovoLog® PenFill®.  FDA also did not approve "FIASP®"; it separately approved each of the FIASP® products—and each independently and separately from (and in a wholly different marketing application from) the NovoLog® products.

44.    FDA required different marketing applications and different proprietary names for the NovoLog® products and the FIASP® products.  Novo consulted with FDA regarding the development of the first FIASP® products.  FDA was clear that a separate NDA was needed and that a supplement to the NDA for the NovoLog® products would not suffice.  FDA explained that the agency understood the new product "to be a standalone insulin product, not in the same line as Novolog and the Novolog pre-mixes."  FDA, End of Phase 2 Meeting Minutes, at 5 (Mar. 2, 2011) (publicly available version) (attached as Exhibit A).

45.    FDA has generally recognized the importance of distinguishing biological products that share a nonproprietary name—like "insulin aspart" for NovoLog® and FIASP®.  In the context of the NovoLog® products and the FIASP® products, FDA explained that product differentiation is necessary to appropriately track adverse events and facilitate effective pharmacovigilance for biological products.

46.     For new biological products, FDA assigns a unique, meaningless, four-letter suffix to the nonproprietary name of newly approved biological products.  *See* FDA, Guidance for Industry: Nonproprietary Naming of Biological Products (Jan. 2017) (attached as Exhibit B).  While insulin products approved in NDAs generally were not assigned suffixes, insulin products approved in BLAs after March 23, 2020 have been assigned unique suffixes, regardless of common active ingredients.  As FDA has explained, such treatment differentiation is necessary for safe use and pharmacovigilance of biological products.  *See* FDA, Draft Guidance for Industry: Nonproprietary Naming of Biological Products: Update (Mar. 2019) (attached as Exhibit C).  For example, FDA assigned the nonproprietary name "insulin lispro" to Humalog, a fast-acting product with insulin lispro as its active ingredient—but when FDA approved the BLA for Lyumjev, an ultra-rapid-acting insulin lispro made by the same manufacturer, it assigned the nonproprietary name "insulin lispro-aabc" to differentiate between the different products.

### CMS's Selected Drug List

47.     On August 29, 2023, CMS aggregated each of the NovoLog® products and each of the FIASP® products approved and marketed at the time, and the Agency deemed them all to be a *single* "selected drug" because they share the same active ingredient.  CMS listed six different NovoLog® products and FIASP® products as a single entry on its list of drugs selected for price controls: "Fiasp; Fiasp FlexTouch; Fiasp PenFill; NovoLog; NovoLog FlexPen; NovoLog PenFill."  (CMS did not include

the FIASP® PumpCart® cartridge.)  CMS, Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026, at 1 (Aug. 2023) (attached as Exhibit D).

48.    CMS did not aggregate any of the NovoLog® Mix products (*e.g.*, the NovoLog® Mix 70/30 FlexPen®), even though those products have been approved and marketed for more than the requisite amount of time required by the statute. Insulin aspart is the primary active ingredient in the NovoLog® Mix 70/30 products, making CMS's aggregation of the FIASP® and NovoLog® products, but not the NovoLog® Mix 70/30 products, entirely arbitrary and illogical.

49.    CMS listed the "Total Part D Gross Covered Prescription Drug Costs from June 2022-May 2023" for the aggregated insulin aspart "selected drug" at $2,576,586,000.  Even if the NovoLog® FlexPen® (which had the highest total part D gross covered costs of any NovoLog® product during the relevant time period) were aggregated consistent with the IRA's "use of data" provision to evaluate total expenditures, the total would still be less than $2,576,586,000.  Given the total Part D expenditures for other drug products and biological products, one of those other products would likely have been selected instead of the aggregated NovoLog® and FIASP® products.

## The "Agreement" Novo Was Required to Sign

50.    No later than October 1, 2023, Novo was required, under threat of usurious penalties, to sign the "Manufacturer Agreement" provided by CMS (attached

as Exhibit E).  That "Agreement" states that Novo "agrees" to participate in the "negotiation" with CMS to set a "maximum fair price" for the six different NovoLog® and FIASP® products.

51.    The "Agreement" also states that Novo "agrees" to the terms used in the agreement including "Selected Drug," to CMS's guidance, and that "CMS retains authority to amend this Agreement to reflect changes in law, regulation, or guidance"— whether or not any notice of such amendments is provided.

52.    Novo was not permitted to negotiate the terms or conditions of the "Agreement"—including those to which Novo does not agree and would have modified if negotiation had been permitted.  As stated in the cover letter included in Novo's "Agreement," sent to CMS on September 29, 2023, Novo did not agree with CMS's assertions, requirements, or characterizations concerning the statute or CMS's actions, including CMS's characterizations of Novo's actions in, for example, signing the "Medicare Drug Price Negotiation Program Agreement."  A copy of that letter is attached as Exhibit F.

53.    Novo does not agree that CMS's drug pricing program involves a genuine "negotiation" or that the prices imposed by CMS are or will be "fair" as they relate to any of the individual products or the aggregated "insulin aspart" products listed by CMS as a selected drug.  Novo also does not agree to any terms set by CMS in the future, nor does it want to permit CMS to make any unilateral changes it desires to the

"Agreement" and provide notice of such changes to Novo only when it deems such notice to be appropriate.

54.    Novo does not wish to participate in CMS's drug price control program. It would not have signed the Agreement but for the draconian penalties threatened for noncompliance with CMS's commands.

## Information Collection Requirements

55.    By October 2, 2023, Novo was required to submit an unprecedented and voluminous amount of information to CMS, including highly sensitive and confidential trade secret and commercial information about the NovoLog® products, the FIASP® products, and other Novo products in development.  *See* CMS, Medicare Drug Price Negotiation Program: Revised Guidance ("Final Guidance"), at App. C (June 30, 2023). This information included, among other things, certain aspects of research and development costs, current unit costs of production and distribution, patent and regulatory information, and market data and sales volume.  At the same time, CMS restricted the information Novo could submit (*e.g.*, CMS's narrow conception of costs associated with failed or abandoned products).  *See id.*

56.    Novo was required by CMS to submit a single submission related to therapeutic alternatives for the six different NovoLog® and FIASP® products, even though the alternatives differ between rapid-acting and ultra-rapid-acting insulins. Novo was required to submit information related to certain aspects of the research and development costs for six different NovoLog® and FIASP® products in a single

submission as well, even though each product has a different research and development history and set of costs. For example, the development of the FIASP® products underwent testing of seventeen different formulations.

57.    FIASP® Pumpcart® does not appear by name on CMS's selected drugs list, but CMS has required Novo to submit confidential business information regarding this product too.

58.    Novo did not want to submit this highly sensitive, valuable, and confidential data to the government. Novo would not share this information with contracting partners in the ordinary course.

59.    Any information that was shared with a contracting party in the normal course of contracting would be governed by confidentiality provisions created and approved by Novo. Here, however, Novo had no choice but to accede to CMS's demands in light of the massive penalties described below and no opportunity to build appropriate confidentiality protections.

60.    Novo does not contract with other manufacturers in the way envisioned by CMS's guidance, *i.e.*, as a "Primary Manufacturer" with the ability to demand sensitive information from—and impose specific sales prices on—a "Secondary Manufacturer."

61.    Novo incurred substantial costs to collect this information and disclose it to CMS. Moreover, Novo has incurred opportunity costs, as its employees are being diverted from other tasks, including more than several thousand full-time employee hours spent preparing Novo's submission to CMS.

### **"Negotiation" of the NovoLog® Products and FIASP® Products**

62.     Although labeled a "drug price negotiation program," the statute does not allow for anything that could be remotely characterized as an actual negotiation between CMS and Novo.  Novo has not had—and does not anticipate having—any genuine negotiations with CMS.

63.     Novo does not wish to be a party to these "negotiations" nor to have a "maximum fair price" assigned to any of its products (and any other "insulin aspart product" that CMS may decide to include).  But the statute's debilitating penalties mean that Novo does not have a choice.  Novo therefore continues to incur substantial costs related to this "negotiation" with CMS.

64.     In particular, a failure to sign the "Agreement" would have subjected Novo to one of two penalties: (1) an exorbitant daily penalty of up to 1900% of the drug's sales revenue of each of the NovoLog® and FIASP® products (not just those on sales for use by Medicare beneficiaries); or (2) forced withdrawal of *all* of Novo's products from both Medicare and Medicaid (including those that are not under selection for "negotiation") *after* paying the daily penalty for months.

65.     If Novo declined to participate in the "negotiation" and continued to sell its NovoLog® and FIASP® products, based on 2022 sales, the penalty start at tens of millions of dollars per day and would grow rapidly.  If Novo did not comply for longer than 270 days, the 1900% daily penalty would apply, meaning that Novo would be liable to pay a penalty of more than $400 million dollars per day— for a total approaching

$60 billion over the course of a single year.  Paying these crippling penalties is not an option and Novo could not realistically do so.

66.    Exiting from Medicare and Medicaid would mean that patients would lose their insurance coverage for the six different NovoLog® and FIASP® products—as well as for *all* of Novo's other products in these government programs.  Different estimates suggest that there are at least 100 million patients in the Medicare and Medicaid programs, combined.  Millions of those patients, who depend on Novo's products, would be without treatment at the end of an exit process.  That is an intolerable result from Novo's perspective, particularly as it means that patients would have to transition to other, potentially less safe or less effective, treatments.  For instance, as reflected in the FDA-approved labeling for the NovoLog® products and the FDA-approved labeling for the FIASP® products, changes in insulin regimens, including switching to insulins from different manufacturers, can affect glycemic control.

67.    Exiting all of its products from Medicare and Medicaid would also mean result in a loss of more than one third of Novo's U.S. sales, which would undermine Novo's financial ability to continue improving existing treatments and developing new ones.  It would also damage Novo's reputation as a longstanding and reliable provider of life-saving insulin products to patients.

## The "Maximum Fair Price"

68.     Novo expects CMS to make an initial "offer" of a "maximum fair price" for its insulin aspart products (below a statutory ceiling), and then to impose any price it chooses (below the price ceiling) with no lower limit.

69.     The statutory ceiling price does not account for investments in manufacturing to ensure capacity and broad access for patients, for example, nor for costs related to general diabetes research and diabetes education.  In just the last five years, the Novo Nordisk Foundation has funded 31 projects totaling $111 million, providing opportunities for grantees to collaborate with U.S.-based universities, university hospitals, biotechnology companies and smaller employers.  It also does not account for forward-looking research conducted with a focus on the next therapeutic advance—things like once-weekly basal insulin, glucose sensitive insulin, diabetes cell therapy, and, critically, a cure.

70.     The provisions of the Inflation Reduction Act and the terms of the "Manufacturer Agreement" require Novo to convey that it entered into "negotiations" with CMS, that it "agreed" to the CMS-mandated price, and that it endorses this price as the "maximum fair price."  For the reasons described above, Novo does not agree that there is a genuine "negotiation."  Nor does Novo "agree" to the price or that the confiscatory price should be considered "fair," much less the "maximum fair price" for the different products.

**Appx121**

**Biosimilar Competition**

71.     Novo is aware of at least four development programs for biosimilars referencing NovoLog® products that have been publicly announced.  I expect that one or more of these biosimilars will be approved and marketed before the end of the negotiation period and/or implementation of the "maximum fair price" for initial price applicability year 2026.

72.     Despite the statute's express provisions, CMS's guidance states that the agency will not exit Novo from the "negotiation" process, even after a biosimilar insulin aspart is approved and marketed, unless CMS determines that such marketing is "bona fide."

73.     CMS has indicated in guidance that it will make this decision according to an extra-statutory standard that differs from the well-established definition of "commercial marketing" as the introduction or delivery for introduction into interstate commerce of a drug or biological product.

74.     In determining whether and when a biosimilar is "bona fide" marketed, CMS intends to consider both Prescription Drug Event ("PDE") data and Average Manufacturer Price ("AMP") data reported by manufacturers.  PDE data, however, is insufficiently time-sensitive, as formulary access can take months and mid-year formulary changes for biosimilars are often delayed.  AMP data is similarly limited, as it may not exist for a biosimilar competitor if, for example, the biosimilar applicant is not a participant in the Medicaid Rebate Drug Program.  CMS's calculation of "bona

fide marketing" is based on incomplete data that itself often lags behind commercial realities.

### The Impact of CMS's Approach

75.    Novo spends massive amounts each year to develop new targets, formulations, and indications, as well as new therapies—continuously updating its pipeline to reflect evolving science and research into areas of unmet patient need. In the past 5 years alone, Novo has spent $12 billion on research and development. But most research and development efforts fail over the course of development. For example, as mentioned, the development of the FIASP® products underwent testing of seventeen different formulations. Similarly, an early program to develop the first rapid-acting insulin analog, known as insulin x10 was underway for about 5 years until we stopped the program in the pre-clinical phase. Other programs, in the 1990s and 2000s, attempted without success to develop an injection free insulin to respond to patient concerns and fears when using needles, including attempts to develop an inhaled insulin product known as AERx.

76.    Novo has been serving patients with diabetes for 100 years. The company invests substantial amounts in research and development of new and improved insulin products that make a difference in patients' lives, and continues to research and seek a cure. Given the low success rates for progressing a drug from target identification to approval, Novo's ability to pursue such innovations, including in new areas of unmet

**Appx123**

need, depends on the company's ability to recoup costs from its marketed products and reinvest in development and educational programs.

77.    In addition, Medicare and Medicaid comprise a substantial portion of the marketplace.  If Novo withdrew all of its products from these federal programs, it would negatively impact the available resources to the company in order to innovate, improve and further develop its existing products—to the detriment of patients and Novo Nordisk's longstanding reputation of services to the diabetes community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____07_____ day of _December_ , 2023.

By: _____

Declaration of Karen M. Hauda

# Exhibit A



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

IND 106878

**MEETING MINUTES**

Novo Nordisk Inc.
Attention: Mary Ann McElligott, Ph.D.
Associate Vice President, Regulatory Affairs
100 College Road West
Princeton, NJ 08540

Dear Dr. McElligott:

Please refer to your Investigational New Drug Application (IND) submitted under section 505(i) of the Federal Food, Drug, and Cosmetic Act (FDCA) for NN1218 FIA (faster-acting insulin aspart).

We also refer to the End-of-Phase 2 meeting between representatives of your firm and the FDA on March 2, 2011.

A copy of the official minutes of the meeting is attached for your information.  Please notify us of any significant differences in understanding regarding the meeting outcomes.

If you have any questions, call me at (301) 796-0331.

Sincerely,

*{See appended electronic signature page}*

Rachel Hartford
Regulatory Project Manager
Division of Metabolism and Endocrinology Products
Office of Drug Evaluation II
Center for Drug Evaluation and Research

ENCLOSURE:
Meeting Minutes

**Appx127**



**FOOD AND DRUG ADMINISTRATION**
CENTER FOR DRUG EVALUATION AND RESEARCH

_____

## MEMORANDUM OF MEETING MINUTES

| | |
|---|---|
| **Meeting Type:** | **B** |
| **Meeting Category:** | **End of Phase 2** |
| | |
| **Meeting Date and Time:** | **March 2, 2011 (12:00 – 1:00pm)** |
| **Meeting Location:** | **10903 New Hampshire Avenue** |
| | **White Oak Building 22, Conference Room: 1309** |
| | **Silver Spring, Maryland 20903** |

| | |
|---|---|
| **Application Number:** | **IND 106878** |
| **Product Name:** | **NN1218 FIA (faster-acting insulin aspart).** |
| **Indication:** | **treatment of diabetes mellitus** |
| **Sponsor/Applicant Name:** | **Novo Nordisk** |
| | |
| **Meeting Chair:** | **Mary H. Parks, M.D.** |
| **Meeting Recorder:** | **Rachel Hartford** |

**CDER participants: (tentative) (alphabetic)**

| | |
|---|---|
| Jeanine Best, MSN, RN, PNP | Senior Clinical Analyst, Pediatric and Maternal Health Staff |
| Sally Choe, Ph.D. | Clinical Pharmacology Team Leader, Division of Clinical Pharmacology II (DCP II) |
| Samantha Cotter | Division of Medication Error Prevention and Analysis (DMEPA), Office of Surveillance and Epidemiology (OSE) |
| Karen Davis Bruno, Ph.D. | Supervisory Pharmacologist, Division of Metabolism and Endocrinology Products (DMEP) |
| Rachel Hartford | Regulatory Health Project Manager, DMEP |
| Ilan Irony, M.D. | Diabetes Team II Leader, DMEP |

IND 106878
End-of-Phase 2 Meeting Minutes

| | |
|---|---|
| Manoj Khurana, Ph.D. | Clinical Pharmacology Reviewer, Division of Clinical Pharmacology II (DCP II) |
| Hyon Kwon, Pharm.D., M.P.H. | Clinical Reviewer, DMEP |
| Joe Leginus, Ph.D. | Chemist, Branch VII, DNDQA-III, ONDQA |
| Lee Pian, Ph.D. | Statistician, Division of Biometrics II |
| Mary H. Parks, M.D. | Director, DMEP |
| Todd Sahlroot, Ph.D. | Statistics Team Leader, Division of Biometrics II |
| Kellie Taylor, Pharm.D. | Deputy Director, DMEPA, OSE |
| Suong Tran, Ph.D. | Chemistry, Manufacturing, and Controls Lead, DNDQAIII, ONDQA |
| Miyun Tsai-Turton, Ph.D. | Pharmacology/Toxicology Reviewer, DMEP |

**SPONSOR ATTENDEES**

| | |
|---|---|
| Dejgaard Anders | CVP, Insulin and Device projects |
| Demissie Marek | International Medical Director |
| Fischer Robert | Senior Director, Regulatory Affairs, US |
| Haahr Hanne | Director of Insulin Clinical Pharmacology |
| Henriksen Hanne | Senior Regulatory Project Manager |
| Hyveled Liselotte | Project Vice President |
| Jensen Steen | Senior CMC Project Manager |
| Kristensen Peter | Senior Vice President, Global Development |
| Lynggaard Helle | Principal Statistician, International Project Statistician |
| Mollgaard Finn | Corporate Vice President, Regulatory Affairs |
| Olsen Kristensen Anette | Senior Non-clinical Project Manager |

**Appx129**

IND 106878
End-of-Phase 2 Meeting Minutes


Sturis Jeppe                          Vice President, Diabetes Research Unit

Tan Elizabeth                         Director, Regulatory Affairs, US

IND 106878
End-of-Phase 2 Meeting Minutes

## 1.0    BACKGROUND

The Faster Acting Insulin Aspart (FIA) IND 106878 was submitted on February 1, 2010. Novo Nordisk requested this End-of-Phase 2 meeting on December 23, 2010.  FDA granted the meeting on January 20, 2011.  The briefing package was received via the gateway on January 27, 2011.

Insulin aspart is the drug substance used in NovoLog NDA 020986, NovoLog Mix 50/50 NDA 021810, and NovoLog Mix 70/30 NDA 021172.  FIA is insulin aspart formulated to achieve an earlier absorption than NovoLog.  It contains three new excipients (nicotinamide, L-arginine hydrochloride,                            (b) (4) .

The briefing package contained the following two protocol synopses:

Trial NN1218-3852: A 26-week randomised, treat to target, multicenter, controlled, 3- arm parallel, efficacy and safety basal-bolus trial comparing administration of doubleblind meal-time FIA, double-blind meal-time NovoRapid®/NovoLog® and open-label post-meal FIA, all in combination with Levemir® in adult subjects with type 1 diabetes followed by an additional 26-week treatment period in the double-blind arms of the trial.

Trial NN1218-3853: A 26-week randomised, double-blind, treat to target, multicentre, controlled, parallel, efficacy and safety basal-bolus trial comparing administration of FIA to Novo Rapid®/NovoLog® both in combination with insulin glargine and metformin in adult subjects with type 2 diabetes.

## 2.    DISCUSSION

Preliminary responses to the questions enclosed in the meeting package were sent to you via email on March 1, 2011. We have renumbered the questions so that each question has a unique number. Your original number follows ours in brackets.  Your questions appear below followed by our preliminary responses in **bold**. A summary of the discussion at the meeting is shown in ***bold italics***. Post-meeting comments are shown in underlined regular font. For questions where no additional discussion is indicated, neither Novo Nordisk nor FDA raised any additional issues pertaining to the questions.

## CMC

1.   [1]  Does the Division agree with the proposed drug product specification for FIA?

**FDA Response:  The proposed formulation of FIA (G) differs from the approved formulation for NovoLog® in several ways. These include a)**                    (b) (4)

**e) addition of L-arginine hydrochloride as a stabilizing agent, and f)**

IND 106878
End-of-Phase 2 Meeting Minutes

**addition of nicotinamide as an absorption modifier. Due to changes in the formulation of FIA (G) compared to NovoLog, provide experimental evidence in the NDA to support your assertion that the test parameters of identity of insulin aspart, identity and content of** (b) (4) **, identity and content of** (b) (4) **pH, freezing point depression and** (b) (4) **are not stability indicating parameters which, and if shown, would then require testing only at release.**

**We do** <u>not</u> **agree with your proposal not to include a bioactivity assay as part of the drug product specifications. A bioactivity assay should be used for release and stability testing for the drug product. However, alternate approaches are available. One example would be to confirm a relationship between biological activity and an orthogonal analytical method, e.g., content by RP-HPLC assay using non-degraded as well as degraded samples of insulin aspart drug substance and drug product. The objective would be to provide experimental evidence to allow a conclusion that a second analytical method can offer a reliable indication of the biological activity of insulin aspart, thereby precluding the requirement to conduct a biological assay on the drug product at release.**

***<u>Discussion:</u> The main point of discussion centered on the need for a bioactivity assay as part of the drug product specifications. The sponsor stated that in previous applications with the same drug substance (e.g., Novolog), a bioactivity assay was conducted on the drug substance, but was not required for the drug product. FDA stated that FIA is a new drug product with a new formulation compared to Novolog, therefore, a bioactivity assay would be required. However, if a complementary analytical method (e.g., content by HPLC) could be shown to have a direct correlation with bioactivity of the FIA drug product (using non-degraded and degraded samples of FIA), then results from the analytical method could be presented as quantitative measures of bioactivity, which would preclude the necessity to conduct a bioactivity assay on the drug product.***

(b) (4)

IND 106878
End-of-Phase 2 Meeting Minutes



**<u>Nonclinical</u>**

3.  [3]  For the purpose of NDA approval, does the Division agree that safety of the excipients (L-arginine hydrochloride, nicotinamide and ⬚(b) (4) for chronic subcutaneous injection can be based on a combination of literature review, their use in currently marketed products, and local tolerance studies of FIA (A-D, G) without additional nonclinical investigations?

**FDA Response:  Based on your PK and local tolerance studies with all FIA formulations (A-D, G) and literature review of these added excipients (L-arginine, nicotinamide, and** ⬚**(b) (4) no additional animal study is needed at this time to assess the safety of these three excipients in FIA (G) formulation. Final decision will rely on your study reports upon submission.**

4.  [4a] Does the Division agree that the above described nonclinical safety program is sufficient to support initiation of the proposed Phase 3a program?

**FDA Response:  see response to question 5.**

5.  [4b]  Does the Division agree that the above described nonclinical safety program is sufficient to support approval of the NDA?

IND 106878
End-of-Phase 2 Meeting Minutes


**FDA Response:  Since insulin aspart, the active drug substance, is an approved product, local tolerance studies with the FIA (G) formulation would be sufficient to initiate Phase IIIa clinical study and to support NDA approval, assuming there would be no impurities/degradant issues raised by CMC and no unfavorable risk / benefit profile uncovered in the clinical review.**


**Clinical Pharmacology**

6. [5a]  Does the Division agree that the proposed NN1218-3872 clinical pharmacology trial with FIA (G), in addition to the trials conducted with FIA (A-D) and existing knowledge with NovoLog®, are adequate to initiate the phase 3a program?

**FDA Response: Yes, we agree.**

7. [5b]  To date, trials with FIA (A-D) have, in patients with type 1 diabetes, shown marked differences in onset of appearance and action, early exposure and early glucose lowering effect compared to NovoLog® as seen from preliminary data from NN1218-3808 and NN1218-3824. Novo Nordisk anticipates similar results with FIA (G). Would a difference within the same magnitude (as shown in Table 1 and Table 2 below and further described in Section 10.3.1.1) be acceptable for differentiating from the adjacent product, NovoLog®, in Novo Nordisk's rapid-acting insulin product line?

**FDA Response:  Appropriateness of any claims for differences of FIA from Novolog based on PK and PD properties depends on comprehensive review of results from euglycemic clamp studies as well as meal challenge PKPD studies.  In addition, keep in mind that any claim on difference should be supported by your Phase 3 trial results. Based on your meeting package, we understand FIA to be a standalone insulin product, not in the same line as Novolog and the Novolog pre-mixes. Therefore, FIA is not subject to the demonstration of "sufficient distinctiveness" from products in the same line as described in the Diabetes Draft Guidance.**

8. [5c]  Does the Division agree that the proposed confirmatory clinical pharmacology program is adequate to support NDA approval and that FIA is a distinct product from NovoLog®?

**FDA Response: We agree that the planned clinical pharmacology program is adequate to support your NDA submission.  However, clarify if you plan to rotate the injection sites in your proposed Phase 3 trials.  Please refer to our response to Question 7, regarding the lack of requirement to demonstrate "sufficient distinctiveness" for a standalone insulin product such as Novolog FIA.**

***Discussion: The sponsor indicated plans to only use the abdomen as the site of injection to reduce the variability in the Phase 3 trial and asked if they can keep the flexibility of injection sites the same as Novolog language of "can be injected at arm, thigh or***

IND 106878
End-of-Phase 2 Meeting Minutes

*abdomen" in the final FIA label.  The FDA responded that a clinical pharmacology PKPD evaluation is necessary to support this type of injection site interchangeability claim.*

### Clinical

9.  [6a]  Does the Division agree that the proposed number of exposed subjects (755 subjects) and the duration of exposure (up to 6 months) in the proposed phase 3a program for FIA together with the safety database for NovoLog® are sufficient to support market approval given the extensive clinical experience with insulin aspart as NovoLog®?

**FDA Response:  Provided there are no safety concerns related to the product formulation or unexpected safety findings identified prior to NDA submission, we agree that your proposed number of exposed subjects and the duration of exposure in the proposed 3a program are sufficient to support the NDA submission.**

10. [6b]  Does the Division agree that demonstration of non-inferiority of HbA1c (0.4% limit) for post-prandial dosing of FIA compared to dosing of FIA immediately before the meal would be adequate to add a post-prandial dosing regimen in the label?

**FDA Response: We agree that demonstration of non-inferiority of HbA1c at 0.4% margin is acceptable.  We recommend that the primary comparison be the glycemic effect of post-prandial dosing of FIA against dosing of Novolog before the meal, to avoid a bio-creep whereby post-prandial administration of Novolog FIA may be statistically non-inferior to pre-prandial Novolog FIA, but be statistically inferior to the reference comparator in the study, Novolog. In addition,  you state in your submission that the meal-time dosing in this trial is defined as injecting immediately before the meal, while post-meal dosing is defined as injection** (b) (4) **20 minutes after the start of a meal,** (b) (4) .
(b) (4)

**Instruct investigators to have the patients in the post-prandial FIA group wait a full 20 minutes after initiation of the meal before injecting the post-prandial dose of FIA.**

11. [6c]  In the T1DM trial, patients with a pre-trial QD or BID basal insulin (Levemir® or insulin glargine) regimen will be allowed and will be asked to maintain a QD or BID frequency of dosing with Levemir during the maintenance phase of the trial. In the T2DM trial, only patients on insulin glargine QD are eligible to enter the trial and they will be asked to maintain this basal insulin regimen throughout the trial.

Does the Division agree to the proposed basal insulin comparators, including dosing regimen, in the proposed phase 3a program e.g. Levemir® in the T1DM trial and insulin glargine in the T2DM trial?

IND 106878
End-of-Phase 2 Meeting Minutes

**FDA Response: Yes, we have no objections. It is not clear why you propose different basal insulin comparators in T1DM and T2DM; please provide a rationale.**

**You state that after 8-week basal insulin titration period, the investigator should focus on optimizing the bolus insulin doses individually in a treat-to-target fashion based on the clinical response and safety according to the pre-meals and bedtime glucose levels following developed algorithms. You state that further up- or down-titration of basal insulin doses can be done at the discretion of the Investigator, if dictated by the patient's safety. We concur with your proposal, because changes in dosing of basal insulins or in the algorithms for bolus insulins may affect the interpretability of trial results. Please emphasize to investigators to minimize changes to basal insulin doses during the treatment period that are unrelated to treatment or prevention of hypoglycemia, as well as changes to bolus insulins algorithms unrelated to severe or recurrent episodes of hypoglycemia.**

***Discussion:** The sponsor clarified that they would like to obtain clinical data on using both basal insulin (Levemir® and insulin glargine) with FIA, and they chose one basal insulin product for each trial for consistency. Insulin glargine was chosen for T2DM trial since this basal insulin is used more often in patients with T2DM.*

12. [6d]  Does the Division agree that it is acceptable to advise patients included in the T1DM and T2DM trials to follow their normal injection routine?

**FDA Response: Yes.**

13. [7a]  Does the Division agree that the statistical hierarchical testing procedure for the confirmatory secondary endpoints will support inclusion of significant p-values in the clinical studies section of the label?

**FDA Response: See response to question 14.**

14. [7b]  Does the Division agree that the ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (4)
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

**FDA Response: This will be a review issue. We object, however, to the 2-hour post prandial glucose (PPG) being based on SMPG. These measurements are not as reliable as lab-based, plasma glucose measurements, and the values are affected by non standardized meals with different caloric composition. In addition, the timing of these samplings depends on patient reporting . A reduction in meal carbohydrate intake at home for one of the groups may bias the 2-hour PPG results and their interpretability, in contrast to ingestion of a standard meal with collection of blood samples at pre-specified times. This may be accomplished in trial subjects by conducting a rigorous MMTT or OGTT 2-hour PPG based on in clinic lab-based glucose measurements.**

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (4)
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

IND 106878
End-of-Phase 2 Meeting Minutes



16. [9]  Does the Division agree that antibody measurements at 0, 3, 6 and 12 months in the basal/ bolus trial (NN1218-3852) in subjects with type 1 diabetes is sufficient to evaluate the potential risk of immunogenicity by the FIA formulation?

**FDA Response: Yes. In addition to antibody assessment, correlate selected Adverse Events (ranging from local irritation to loss of glycemic effect to anaphylaxis) to antibody titers in your safety analyses.**

17. [10]  Does the Division agree that

**FDA Response: This will be a review issue.  Because you claim that FIA has different pharmacokinetic and pharmacodynamic properties from NovoLog®,                        will be determined based on the findings from your trials upon submission.**

*Discussion:*
*FDA expects adequate representation of the target population in the Phase 3 trials, but does not require that separate, dedicated trials in specific populations be conducted.  However, because*

18. [11]  Does the Division agree that including injection site reactions as a Medical Event of Special Interest (MESIs) with additional tracking and follow-up of patients in the clinical program provides a sufficient level of safety assessment for local tolerability of FIA?

IND 106878
End-of-Phase 2 Meeting Minutes

**FDA Response: Yes.**

19. [12a]  Due to the significant NovoLog® clinical experience, does the Division agree
    that the proposed clinical program sufficiently investigates the cardiovascular risk
    profile of FIA?

**FDA Response: At this time, we do not require the development of parenteral insulins
to rule out a specified threshold of increased cardiovascular risk as described in the
*Guidance for Industry: Diabetes Mellitus – Evaluating Cardiovascular Risk in New
Antidiabetic Therapies to Treat Type 2 Diabetes*
(http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/
Guidances/ucm071627.pdf).  However, you should still collect and analyze the
cardiovascular data from your clinical trials as outlined in that guidance document,
perform statistical testing on your cardiovascular data, and report the relative
cardiovascular risk in your NDA submission.**

20. [12b]  Does the Division agree that this will be sufficient?

**FDA Response: See response to Question 19.  The NDA should include a detailed
description of your methodology for these analyses of major adverse cardiovascular events
(MACE), including narratives of these events**

21. [13]



(b) (4)

**FDA Response: The Pediatric Research and Equity Act (PREA) of 2007 requires that
you address dosing, safety, and efficacy for faster-acting insulin aspart in the
pediatric population.**                                          (b) (4)
**You must address dosing and safety
with faster-acting insulin aspart in the pediatric population in the context of a clinical
trial in pediatric subjects with type 1 diabetes.  In addition, you must submit a
Pediatric Plan for faster-acting insulin aspart that covers all pediatric age groups.
We recommend that you conduct the adult trial in type 1 diabetes, to determine the best
timing of Novolog FIA administration**                          (b) (4)



(b) (4)

Appx138

IND 106878
End-of-Phase 2 Meeting Minutes

(b) (4)

**Regulatory**

24. [15a]  Provided that the Usability Test results validate the market's ability to differentiate between NovoLog® and FIA, does the Division agree that only two attributes, (1) color branding of pen and cartons and (2) tradename, are sufficient to test for market approval?

**FDA Response:  FDA does not agree that only two attributes, (1) color branding of pen and cartons and (2) tradename, are sufficient to test for market approval. Although we have concern that the introduction of FIA will lead to errors with other marketed insulin products and recommend that this risk be included as a component of your human factors testing, we recommend that you conduct a comprehensive risk analysis identifying the use-related risks with the FIA / pen injector combination product.  As a general recommendation, you should perform such risk analysis for all drug/ device combination products.**

IND 106878
End-of-Phase 2 Meeting Minutes

**We are unclear with your statement "Provided that the Usability Test results validate the market's ability to differentiate between NovoLog® and FIA…"  The intent of Human Factors testing is not to make such a distinction.  Rather, the purpose of a human factors study is to demonstrate that the device can be used by representative users under simulated use conditions without producing patterns of failures that could result in negative clinical impact to patients or injury to device users.**

**We ask that you explicitly demonstrate that all of the use-related risks for this combination product have been successfully mitigated.  In this capacity, if you utilize existing testing (i.e. testing from previous NDA submissions where this particular autoinjector was the device constituent) to demonstrate the safe and effective use of the FIA / pen injector (subject device of IND 106878), then you should clearly explain how this testing mitigates the specific use risks as associated with the FIA/ pen injector combination product.  However, if FDA disagrees on whether the existing testing appropriately addresses a particular use-related risk, you may have to perform additional testing to demonstrate that the use-related risks associated with THIS combination product have been mitigated.**

**We expect that the human factors testing that you perform will be aligned with the Human Factors / Usability Testing recommendations, as explained in our Guidance, *Medical Device Use-Safety: Incorporating Human Factors Engineering into Risk Management* ([http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm094461.pdf](http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm094461.pdf)).**

25. [15b]  Does the Division have any comments to the proposed tradename of ⬛ (b) (4)

**FDA Response: We recommend that** ⬛ (b) (4) **be used for the FIA insulin product and that you** ⬛ (b) (4) **Our reasons are as follows:**

**A)** (b) (4)



**B)** (b) (4)

IND 106878
End-of-Phase 2 Meeting Minutes

26. [16a]  Does the Division agree to the proposal that the FIA NDA will extensively cross-reference the NovoLog® NDA whenever applicable?

**FDA Response: Yes.  Clearly indicate what you are bridging to in the NovoLog NDA and include submission dates.**

27. [16b]  If the Division is agreeable to the proposal, are there any special considerations which Novo Nordisk should be aware of to make the Division's review easier and more efficient?

**FDA Response:  You have submitted several NDA and IND submissions where a pen injector was utilized to deliver a particular formulation of insulin.  It is unclear whether there are unique characteristics of the pen injector utilized to deliver FIA (versus other pen injectors submitted as part of previous NDA submissions).  Please provide a table that compares the physical, material, and functional characteristics of the pen injector used to deliver FIA with the Pen Injectors that have been the subject of previous NDA submissions (i.e. PDS-290).  This information would assist the FDA to perform a comprehensive review of your combination product.**


### 3.0    ISSUES REQUIRING FURTHER DISCUSSION

There are no issues requiring further discussion.


### 4.0    ACTION ITEMS

There are not any action items.


### 5.0    ATTACHMENTS AND HANDOUTS

There are not any attachments or handouts.

--------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------

RACHEL E HARTFORD
03/29/2011

Declaration of Karen M. Hauda

# Exhibit B

# Nonproprietary Naming of Biological Products

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**January 2017**
**Labeling**

**OMB control number XXXX-XXXX**
**Expiration Date:  xx/xx/xxxx**

**The information collection provisions in this guidance regarding submission of proposed suffixes are under OMB review and are not for current implementation.**
**See additional PRA statement in section VII of this guidance**.

# Nonproprietary Naming of Biological Products

# Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

*and/or*

*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone: 800-835-4709 or 240-402-8010*
*Email: ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**January 2017**
**Labeling**

*Contains Nonbinding Recommendations*

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................................. 1

II.     SCOPE ................................................................................................................................. 2

III.    BACKGROUND ................................................................................................................. 3

   A.   The Biologics Price Competition and Innovation Act of 2009 ................................. 3

   B.   Evaluation of the Appropriate Naming Convention.................................................. 3

IV.     CONSIDERATIONS FOR NONPROPRIETARY NAMING OF ORIGINATOR
        BIOLOGICAL PRODUCTS, RELATED BIOLOGICAL PRODUCTS, AND
        BIOSIMILAR PRODUCTS ............................................................................................... 4

   A.   Enhancing Biological Product Pharmacovigilance .................................................... 4

   B.   Ensuring Safe Use for Biological Products ................................................................ 5

   C.   Advancing Appropriate Practices and Perceptions Regarding Biological Products ... 6

   D.   Prospective and Retrospective Application of Naming Convention........................... 7

V.      FRAMEWORK FOR DESIGNATING THE PROPER NAME OF A
        BIOLOGICAL PRODUCT ................................................................................................ 7

   A.   Prospective Naming of Biological Products Submitted Under Section 351(a)
        of the PHS Act ............................................................................................................ 9

   B.   Retrospective Naming of Biological Products Licensed Under Section 351(a)
        of the PHS Act ............................................................................................................ 9

   C.   Naming of Biosimilar Products Submitted Under Section 351(k) of the PHS Act ... 9

VI.     PROPOSING A SUFFIX FOR THE PROPER NAME OF AN ORIGINATOR
        BIOLOGICAL PRODUCT, A RELATED BIOLOGICAL PRODUCT, OR A
        BIOSIMILAR PRODUCT ............................................................................................... 10

VII.    PAPERWORK REDUCTION ACT OF 1995................................................................ 11

GLOSSARY.................................................................................................................................. 12

*Contains Nonbinding Recommendations*

# Nonproprietary Naming of Biological Products

# Guidance for Industry[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.

## I.    INTRODUCTION

This guidance describes FDA's current thinking on the need for biological products licensed under the Public Health Service Act (PHS Act) to bear a *nonproprietary name*[2] that includes an FDA-designated suffix. Under this naming convention, the nonproprietary name designated for each *originator biological product*, *related biological product*, and *biosimilar product* will be a proper name that is a combination of the *core name* and a distinguishing suffix that is devoid of meaning and composed of four lowercase letters.[3] The suffix format described in this guidance is applicable to originator biological products, related biological products, and biosimilar products previously licensed and newly licensed under section 351(a) or 351(k) of the PHS Act. FDA is continuing to consider the appropriate suffix format for *interchangeable products*.

This naming convention will facilitate pharmacovigilance for originator biological products, related biological products, and biosimilar products containing related drug substances when other means to track a specific dispensed product are not readily accessible or available, as described in section IV.A of this guidance. Distinguishable nonproprietary names will also facilitate accurate identification of these biological products by health care practitioners and patients. Further, distinguishing suffixes should help minimize inadvertent substitution of any such products that have not been determined to be interchangeable. Application of the naming convention to biological products licensed under the PHS Act should (1) encourage routine use of designated suffixes in ordering, prescribing, dispensing, recordkeeping, and pharmacovigilance practices and (2) avoid inaccurate perceptions of the safety and effectiveness of biological products based on their licensure pathway, as described in detail in this guidance.

---

[1] This guidance has been prepared by the Office of Medical Policy in the Center for Drug Evaluation and Research in cooperation with the Center for Biologics Evaluation and Research at the Food and Drug Administration.

[2] See the Glossary for definitions and usage of specific terms used throughout this guidance.

[3] The nonproprietary name designated by FDA in the license for a biological product licensed under the PHS Act is its proper name (section 351(a)(1)(B)(i) of the PHS Act (42 U.S.C. 262(a)(1)(B)(i)) and § 600.3(k) (21 CFR 600.3(k)).

*Contains Nonbinding Recommendations*

This guidance provides information to industry, the health care community, other regulatory agencies, and the public on FDA's rationale for this naming convention. It is also intended to assist applicants and license holders in proposing the suffix to be incorporated in the nonproprietary name (referred to throughout this guidance as the *proper name*) for an originator biological product, a related biological product, or a biosimilar product.

In general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.    SCOPE

This guidance describes FDA's approach to designating the proper name for originator and related biological products licensed under section 351(a) of the PHS Act and for biosimilar products licensed under section 351(k) of the PHS Act. FDA intends to apply a naming convention to interchangeable products that will feature a core name and a suffix included in the proper name; however, FDA is continuing to consider the appropriate format of the suffix for these products. FDA intends to apply the naming convention discussed in this guidance to both newly licensed and previously licensed biological products. As discussed further in section V of this guidance, the revised proper name of biological products previously licensed under the PHS Act generally would include the product's original proper name serving as the core name plus the distinguishing suffix attached with a hyphen. FDA is continuing to consider the process for implementation of this naming convention for previously licensed products but, in the near term, intends to assign distinguishing suffixes to a limited group of these products[4] and also will accept submissions of prior approval labeling supplements that include proposed suffixes.

This guidance also will apply to those biological products that are approved under the Federal Food, Drug, and Cosmetic Act (FD&C Act) on or before March 23, 2020, when such products are deemed to be licensed under section 351 of the PHS Act on March 23, 2020 (section 7002(e)(2) through (e)(4) of the Biologics Price Competition and Innovation Act of 2009 (BPCI Act)).[5] FDA intends to provide additional guidance regarding administrative issues associated with the transition (including the process for implementing the naming convention described in this guidance).

---

[4] The Agency published a proposed rule in the *Federal Register* of August 28, 2015 (80 FR 52224) ("Designation of Official Names and Proper Names for Certain Biological Products").

[5] See the draft guidance for industry *Implementation of the 'Deemed to be a License' Provision of the Biologics Price Competition and Innovation Act of 2009.* When final, this guidance will represent FDA's current thinking on this topic. For the most recent version of a guidance, check the FDA Drugs guidance Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

2

*Contains Nonbinding Recommendations*

For the purposes of this document, unless otherwise specified, references to biological products include biological products licensed under the PHS Act, such as therapeutic protein products, vaccines, allergenic products, and blood derivatives, and do not include certain biological products that also meet the definition of a device in section 201(h) of the FD&C Act (21 U.S.C. 321(h)), such as in vitro reagents (e.g., antibody to hepatitis B surface antigen, blood grouping reagents, hepatitis C virus encoded antigen) and blood donor screening tests (e.g., HIV and hepatitis C). Also, for the purposes of this document, unless otherwise specified, references to biological products do not include products for which a proper name is provided in the regulations (e.g., 21 CFR part 640) or to certain categories of biological products for which there are well-established, robust identification and tracking systems to ensure safe dispensing practices and optimal pharmacovigilance (e.g., ISBT 128 for cord blood products and blood components).

## III.     BACKGROUND

### A.     The Biologics Price Competition and Innovation Act of 2009

With the passage of the BPCI Act,[6] which established an abbreviated licensure pathway for products demonstrated to be biosimilar to or interchangeable with an FDA-licensed *reference product*, a growing number of biological products will be entering the marketplace.

Section 351(k) of the PHS Act (42 U.S.C. 262(k)), added by the BPCI Act, sets forth the requirements for an application for a proposed biosimilar product and an application or a supplement for a proposed interchangeable product. Section 351(i) defines biosimilarity to mean "that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components" and that "there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product" (see section 351(i)(2) of the PHS Act). To meet the additional standard of interchangeability, an applicant must provide sufficient information to demonstrate biosimilarity and also to demonstrate that the biological product can be expected to produce the same clinical result as the reference product in any given patient and, if the biological product is administered more than once to an individual, the risk in terms of safety or diminished efficacy of alternating or switching between the use of the biological product and the reference product is not greater than the risk of using the reference product without such alternation or switch (see section 351(k)(4) of the PHS Act). Interchangeable products may be substituted for the reference product without the intervention of the prescribing health care provider (see section 351(i)(3) of the PHS Act).

### B.     Evaluation of the Appropriate Naming Convention

The proper name of a biological product reflects certain scientific characteristics of the product, such as chemical structure and pharmacological properties. This name is different from a

---

[6] Sections 7001 through 7003 of the Patient Protection and Affordable Care Act (Public Law 111-148).

**Appx149**

*Contains Nonbinding Recommendations*

*proprietary name*, which generally is trademarked and registered for private use. For biological products licensed under the PHS Act, FDA designates the proper name in the license for use upon each package of the biological product (see section 351(a)(1)(B)(i) of the PHS Act and 21 CFR 600.3(k)). Among other things, the proper name of a biological product helps health care providers identify the product's drug substance and distinguish biological products from one another.

As part of FDA's implementation of the BPCI Act, the Agency requested public comment on its development of a framework for safe use and optimal pharmacovigilance for biosimilar products and interchangeable products that is informed by current experience and industry best practices, including the role of a product's proper name.

FDA has evaluated comments received on the approaches to naming biosimilar products and interchangeable products.[7] In light of the issues considered for biosimilar products and interchangeable products, FDA also evaluated its approach to designating proper names for biological products licensed under section 351(a) of the PHS Act.

In implementing the BPCI Act, FDA has carefully considered the appropriate naming convention to maximize the success of biosimilar products and interchangeable products and to help ensure the safety of patients receiving biological products licensed under the PHS Act.

## IV.   CONSIDERATIONS FOR NONPROPRIETARY NAMING OF ORIGINATOR BIOLOGICAL PRODUCTS, RELATED BIOLOGICAL PRODUCTS, AND BIOSIMILAR PRODUCTS

This section discusses the main considerations that led FDA to adopt the naming convention described in section V of this guidance.

### A.   Enhancing Biological Product Pharmacovigilance

The Agency considers appropriate pharmacovigilance fundamentally important for biological products. Although safety of biological products is rigorously assessed before approval, safety issues that are specific to a manufacturer may arise after approval with any marketed product. To help ensure patient safety and allow the Agency and the manufacturer to swiftly identify and address a problem, FDA aims to track adverse events to a specific manufacturer (and as appropriate, to a lot or manufacturing site for a particular biological product) and allow surveillance systems to detect safety signals throughout the life cycle of a product. Identifying a biological product's manufacturer can help target remedial action (including recall) to avoid implicating a broader set of products for which no such problem exists.

---

[7] See, for example, notices that published in the *Federal Register*, "Approval Pathway for Biosimilar and Interchangeable Biological Products; Public Hearing; Request for Comments" (75 FR 61497, October 5, 2010); "Draft Guidances Relating to the Development of Biosimilar Products; Public Hearing; Request for Comments" (77 FR 12853, March 2, 2012); "Nonproprietary Naming of Biological Products; Draft Guidance for Industry; Availability" (80 FR 52296, August 28, 2015); and other public dockets established by FDA.

**Appx150**

*Contains Nonbinding Recommendations*

Pharmacovigilance systems, both active and passive, vary in their use of identifiers to differentiate among biological products. These identifiers may include the proprietary name, proper name, manufacturer, national drug code (NDC) number, lot number, and billing codes. However, many active pharmacovigilance systems, which generally identify adverse events by querying privately held electronic health care data such as administrative and billing data, have limited ability to track to its manufacturer a biological product that shares the same proper name with other biological products. Other product identifiers, such as NDC numbers, are not routinely recorded in billing and patient records in many clinical settings in which biological products are dispensed and administered, and therefore the utility of these alternative identifiers in active pharmacovigilance is limited. Similarly, proprietary names and NDC numbers are often not included in adverse event reports. As a result, the use of alternative identifiers, including distinct proprietary names or NDC numbers, is insufficient to address concerns regarding pharmacovigilance.

Nonproprietary names that include distinguishing suffixes can serve as a key element to identify specific products in spontaneous adverse event reporting and to reinforce accurate product identification in billing and claims records used for active pharmacovigilance. Other product-specific identifiers, such as proprietary names or NDCs, may not be available or could change over time. A distinguishing suffix will also support the tracking of product-specific events over time, thereby enhancing the accurate attribution of product-specific adverse event reports.[8]

The Agency's approach to nonproprietary naming of biological products will provide another critical tool for accurately identifying and facilitating pharmacovigilance for originator biological products, related biological products, and biosimilar products.

### B.    Ensuring Safe Use for Biological Products

Biological products generally consist of large, complex molecules and raise unique safety concerns related to immunogenicity. FDA believes the nonproprietary naming convention for originator biological products, related biological products, or biosimilar products should help prevent inadvertent substitution. Inadvertent substitution may lead to unintended alternating or switching of biological products that are not determined by FDA to be interchangeable with each other. This naming convention should facilitate safe use and help to protect the safety of patients.

Related biological products may be licensed for different indications. Biosimilar products may be licensed for fewer than all indications for which the reference product is licensed. Likewise, related biological products and biosimilar products may be licensed for fewer than all routes of administration and may be packaged in different delivery systems than those approved for the

---

[8]See the draft guidance for industry *Postmarketing Safety Reporting for Human Drugs and Biological Products Including Vaccines*. When final, this guidance will represent FDA's current thinking on this topic.

*Contains Nonbinding Recommendations*

originator biological product.  If originator biological products, related biological products, and biosimilar products all share the same proper name, inadvertent substitution may lead to medication errors.  For example, a patient could inadvertently receive a product with a different delivery system or route of administration than was prescribed, which may lead to confusion among patients and result in dosing errors.

Confusion may also arise among health care providers who, based on their experience with small-molecule drugs and generic versions of those drugs, may incorrectly assume that FDA has determined biological products with the same proper name to be interchangeable.  Information on alternating or switching between a proposed product and its reference product is required to support a demonstration of interchangeability, but is not required to support a demonstration of biosimilarity (see section 351(k)(4) of the PHS Act).  Applications for related biological products are not required to include any comparative data to any other biological product in support of licensure (see section 351(a) of the PHS Act).  Although many biological products may have proprietary names, many health care systems mainly use proper names instead of proprietary names for ordering, prescribing, and dispensing products.

The naming convention discussed in this guidance will also facilitate use of the Purple Book[9] for biological products.  The Purple Book enables a user to readily see all licensed biological products and identify whether a biological product licensed under section 351(k) of the PHS Act has been determined by FDA to be biosimilar to or interchangeable with a reference product (a previously licensed biological product).  Biosimilar products and interchangeable products licensed under section 351(k) of the PHS Act will be listed under the reference product to which biosimilarity or interchangeability was demonstrated.

### C.   Advancing Appropriate Practices and Perceptions Regarding Biological Products

With the introduction of more biological products, FDA believes it is important to encourage routine use of designated suffixes in ordering, prescribing, dispensing, recordkeeping, and pharmacovigilance practices for biological products, irrespective of their licensure pathway and date of licensure.  The designated suffix will provide a consistent, readily available and recognizable mechanism for patients and health care professionals, including providers and pharmacists, to correctly identify these products.  FDA believes it is likely that FDA-designated suffixes will be used routinely when identifying, describing, and recording use of biological products if such suffixes are present in the proper names of all biological products licensed under the PHS Act.

---

[9] FDA published the *Purple Book*: *Lists of Licensed Biological Products With Reference Product Exclusivity and Biosimilarity or Interchangeability Evaluations* in September 2014, which is publicly available at http://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approvalapplications/therapeuticbiologicapplications/biosimilars/ucm411418.htm.  The Purple Book is updated periodically to reflect FDA licensure of a biological product under section 351(a) or section 351(k) of the PHS Act and/or to reflect a determination regarding date of first licensure for a biological product licensed under section 351(a) of the PHS Act.

*Contains Nonbinding Recommendations*

The inclusion of an FDA-designated suffix in the nonproprietary name of biological products licensed under section 351(a) or 351(k) of the PHS Act should have the added benefit of helping to avoid inaccurate perceptions of the safety and effectiveness of biological products based on their licensure pathway.  The safety and effectiveness of biological products is rigorously assessed before approval.  Through FDA's implementation of the BPCI Act's standards for biosimilarity and interchangeability, FDA can ensure that the products it determines to be biosimilar to or interchangeable with a reference product can be relied upon by providers and patients to be safe and effective.  Applying this naming convention only for products licensed under section 351(k) of the PHS Act—but not for the reference product licensed under 351(a) of the PHS Act—could adversely affect health care provider and patient perceptions of these new products.  Specifically, such an approach could be misinterpreted as indicating that biosimilar products differ from their reference products in a clinically meaningful way or are inferior to their reference products for their approved conditions of use.

### D.   Prospective and Retrospective Application of Naming Convention

FDA's current thinking is that a proper name that includes a distinguishing suffix is warranted for both newly licensed and previously licensed originator biological products, related biological products, and biosimilar products.  As with prospective application of the naming convention, retrospective application will help (1) prevent a patient from receiving a product different from what was intended to be prescribed; (2) facilitate manufacturer-specific pharmacovigilance by providing a means of determining which biological product is dispensed to patients; (3) encourage routine use of FDA-designated suffixes in ordering, prescribing, dispensing, and recordkeeping practices for these products; and (4) advance accurate perceptions of these biological products.

## V.   FRAMEWORK FOR DESIGNATING THE PROPER NAME OF A BIOLOGICAL PRODUCT

FDA's naming convention for biological products licensed under the PHS Act will be a proper name consisting of a core name[10] and an FDA-designated suffix.  Proper names designated by FDA for originator biological products, related biological products, and biosimilar products will include a combination of a core name and a distinguishing suffix.

For originator biological products, FDA intends to use a core name that is the adopted name designated by the USAN Council[11] for the relevant biological substance when available.  If the biological product is a related biological product, a biosimilar product, or an interchangeable

---

[10] Two examples of a *core name* are filgrastim and epoetin alfa.  The *proper name* for all biological products will include a distinguishing suffix composed of four lowercase letters attached to the core name with a hyphen.

[11] The United States Pharmacopeial Convention, 2016, Guiding Principles for Coining United States Adopted Names for Drugs (2016 USP Dictionary of USAN and International Drug Names at http://www.uspusan.com/usan/pub/index1.html).

**Appx153**

*Contains Nonbinding Recommendations*

product, the core name will be the same as the core name identified in the proper name of the relevant previously licensed product.[12]  A distinguishing suffix that is devoid of meaning and composed of four lowercase letters will be attached with a hyphen to the core name of each originator biological product, related biological product, or biosimilar product.[13]  Use of a shared core name will indicate a relationship among products.  The placement of the identifier as a suffix, rather than a prefix, should result in biological products with the same core name being grouped together in electronic databases to help health care providers locate and identify these products.[14]

To illustrate, the proper names for products sharing the core name replicamab may be displayed as follows:

> replicamab-cznm
> replicamab-hjxf

To illustrate, the proper names for products sharing the core name putonastim alfa may be displayed as follows:

> putonastim alfa-jnzt
> putonastim alfa-kngx

In designating proper names for related biological products, the Agency has in some instances designated a proper name that includes an identifier attached as a prefix to distinguish the products from previously licensed biological products; for example, ado-trastuzumab emtansine. In this case, designation of a proper name that includes a unique prefix was necessary to minimize certain medication errors and to facilitate pharmacovigilance.  FDA determined that a unique proper name including a prefix was necessary for ado-trastuzumab emtansine to distinguish the product from trastuzumab, a previously licensed biological product submitted in a different BLA.[15]  FDA may continue such practices on a limited basis, where appropriate, when the Agency determines that the designation of a prefix, in addition to a suffix as contemplated by this guidance, is necessary to ensure patient safety.

---

[12] FDA will work with stakeholders that play a role in national drug naming and listing to help ensure that the suffixes added to the core name of biological products are recorded appropriately in drug listing systems.

[13] FDA determined that a hyphen should separate the shared core name from the suffix.  A hyphen is a common punctuation mark used in writing and electronic systems; it is a readily recognized mark.  Another punctuation mark, such as an underscore, may not be normally used in handwriting and may not be readily seen in handwriting, electronic systems, or both.

[14] The license holder and all distributors of a biological product should use the proper name designated by FDA in the license for that product.

[15] As described in the BLA submission for ado-trastuzumab emtansine, medication errors involving administration of the wrong drug (trastuzumab emtansine versus trastuzumab) during clinical trials resulted in serious adverse events.

*Contains Nonbinding Recommendations*

### A. Prospective Naming of Biological Products Submitted Under Section 351(a) of the PHS Act

An applicant should propose a suffix composed of four lowercase letters for use as the distinguishing identifier included in the proper name designated by FDA at the time of licensure (see section VI of this guidance). Such submissions can be made during the investigational new drug application (IND) phase[16] or at the time of BLA submission. An applicant should submit up to 10 proposed suffixes, as described in this section, in the order of the applicant's preference. We recommend including any supporting analyses of the proposed suffixes for FDA's consideration based on the factors described in this guidance.

### B. Retrospective Naming of Biological Products Licensed Under Section 351(a) of the PHS Act

A BLA holder may propose a suffix, as described in this guidance, for use in the proper name of currently licensed biological products held by the company by submitting a prior-approval labeling supplement to its BLA (see section VI of this guidance). As part of that labeling supplement, a BLA holder should submit up to 10 proposed suffixes, as described in this section, in the order of the applicant's preference. We recommend including any supporting analyses of the proposed suffixes for FDA's consideration based on the factors described in this guidance.

### C. Naming of Biosimilar Products Submitted Under Section 351(k) of the PHS Act

An applicant for a proposed biosimilar product submitted under section 351(k) of the PHS Act should propose a suffix composed of four lowercase letters for use as the distinguishing identifier included in the proper name designated by FDA at the time of licensure (see section VI of this guidance). Such submissions can be made during the investigational new drug application (IND) phase[17] or at the time of BLA submission. An applicant should submit up to 10 proposed suffixes, as described in this section, in the order of the applicant's preference. We recommend including any supporting analyses of the proposed suffixes for FDA's consideration based on the factors described in this guidance.

---

[16] A request for FDA review of a proposed suffix submitted during the investigational new drug application (IND) phase should be submitted no earlier than at the request for a pre-biologics license application (pre-BLA) meeting for biological products to be submitted under section 351(a) of the PHS Act.

[17] A request for FDA review of a proposed suffix submitted during the investigational new drug application (IND) phase should be submitted no earlier than at the request for a biosimilar biological product development (BPD) type 4 meeting for biological products to be submitted under section 351(k) of the PHS Act.

**Appx155**

*Contains Nonbinding Recommendations*

## VI.    PROPOSING A SUFFIX FOR THE PROPER NAME OF AN ORIGINATOR BIOLOGICAL PRODUCT, A RELATED BIOLOGICAL PRODUCT, OR A BIOSIMILAR PRODUCT

The proposed suffix **should**:

- Be unique

- Be devoid of meaning

- Be four lowercase letters of which at least three are distinct

- Be nonproprietary

- Be attached to the core name with a hyphen

- Be free of legal barriers that would restrict its usage

The proposed suffix **should not:**

- Be false or misleading, such as by making misrepresentations with respect to safety or efficacy

- Include numerals and other symbols aside from the hyphen attaching the suffix to the core name

- Include abbreviations commonly used in clinical practice in a manner that may lead the suffix to be misinterpreted as another element on the prescription or order

- Contain or suggest any drug substance name or core name

- Look similar to or be capable of being mistaken for the name of a currently marketed product (e.g., should not increase the risk of confusion or medical errors with the product and/or other products in the clinical setting)

- Look similar to or otherwise connote the name of the license holder

- Be too similar to any other FDA-designated nonproprietary name suffix

FDA encourages applicants to conduct due diligence on their proposed suffixes to ensure that no other restrictions apply to use of the proposed suffix in this context. Any supporting information can be provided to FDA with the submission of the proposed suffix(es).

The final determination on the acceptability of a proposed suffix is based on FDA's review of all information and analyses described in this guidance, along with any information submitted by the sponsor.

**Appx156**

*Contains Nonbinding Recommendations*

FDA will evaluate proposed suffixes against the factors described in this section and may consider other factors if they impact the utility of the suffix in meeting the goals of the naming convention articulated in this guidance.  Upon completion of the Agency's evaluation, FDA will notify applicants if a proposed suffix is acceptable or if all of the proposed suffixes are determined to be unacceptable.  If all of the proposed suffixes are determined to be unacceptable, applicants may submit additional proposed suffixes for FDA's consideration.  If an applicant does not submit a suffix that FDA finds acceptable or does not propose suffix candidates within an appropriate time frame to allow sufficient time for FDA review, FDA may elect to assign a four-letter suffix for inclusion in the proper name designated in the license at the time FDA approves the application.

## VII.   PAPERWORK REDUCTION ACT OF 1995

This guidance contains information collection provisions that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520).  Specifically, the guidance recommends that applicants and application holders submit up to 10 proposed suffixes, in the order of the applicant's preference.  FDA also recommends including any supporting analyses for FDA's consideration, demonstrating that the proposed suffixes meet the factors described in the final guidance.

FDA estimates that the time required to complete this information collection will average 420 hours per response, including the time to review instructions, search existing data sources, gather the data needed, and complete and review the information collection.  Send comments regarding this burden estimate or suggestions for reducing this burden to:

> Office of Medical Policy, Center for Drug Evaluation and Research, Food and Drug Administration, 10903 New Hampshire Avenue, Bldg. 51, rm. 6337, Silver Spring, MD 20993-0002

This guidance also refers to previously approved collections of information found in FDA regulations.  The collections of information related to the submission of a BLA under section 351(k) of the PHS Act have been approved under OMB control number 0910-0719, and the collections of information in 21 CFR part 601 have been approved under OMB control number 0910-0338.

An Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.  The information collection provisions in this guidance, including resulting proposed modifications to the information collections approved under OMB control number 0910-0338, have been submitted to OMB for review as required by section 3507(d) of the Paperwork Reduction Act of 1995 **and are not for current implementation**.  Before implementing the information collection provisions contained in this guidance, we will publish a notice in the *Federal Register* announcing OMB's decision to approve, modify, or disapprove those information collection provisions.

**Appx157**

*Contains Nonbinding Recommendations*

# GLOSSARY

**Biosimilar Product** means a biological product submitted in a 351(k) application that has been shown to be highly similar to the reference product notwithstanding minor differences in clinically inactive components, and for which there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product (see section 351(i)(2) of the PHS Act).

**Core Name** means the component shared among an originator biological product and any related biological product, biosimilar product, or interchangeable product as part of the proper names of those products. Two examples of a *core name* are filgrastim and epoetin alfa.

**Interchangeable Product** means a biological product that has been shown to meet the standards described in section 351(k)(4) of the PHS Act and may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product (see section 351(i)(3) of the PHS Act).

**Nonproprietary Name** means a name unprotected by trademark rights that is in the public domain. It may be used by the public at large, both lay and professional.

**Originator Biological Product** means a biological product submitted in a BLA under section 351(a) of the PHS Act (i.e., a stand-alone BLA) that is not a related biological product.

**Proper Name** means the nonproprietary name designated by FDA in the license for a biological product licensed under the PHS Act.[18]

**Proprietary Name** means the trademark or brand name.

**Reference Product** means the single biological product licensed under section 351(a) of the PHS Act against which a biological product is evaluated in a 351(k) application (section 351(i)(4) of the PHS Act).

**Related Biological Product** means a biological product submitted in a BLA under section 351(a) of the PHS Act (i.e., a stand-alone BLA) for which there is a previously licensed biological product submitted in a different section 351(a) BLA that contains a drug substance for which certain nomenclature conventions (e.g., United States Adopted Names (USAN) Guiding Principles[19]) would be expected to provide for use of the same drug substance name.[20]

---

[18] Section 351(a)(1)(B)(i) of the PHS Act (42 U.S.C. 262(a)(1)(B)(i) and § 600.3(k)( 21 CFR 600.3(k)).

[19] The United States Pharmacopeial Convention, 2016, Guiding Principles for Coining United States Adopted Names for Drugs (*2016 USP Dictionary of USAN and International Drug Names at* http://www.uspusan.com/usan/pub/index1.html).

[20] FDA's description of a biological product as a *related biological product* in this guidance is separate from any determination FDA may make about whether a related biological product is eligible for a period of exclusivity under section 351(k)(7) of the PHS Act.

**Appx158**

Declaration of Karen M. Hauda

# Exhibit C

# Nonproprietary Naming of Biological Products: Update

# Guidance for Industry

### *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance.  Submit electronic comments to https://www.regulations.gov.  Submit written comments to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD  20852.  All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document, contact (CDER) Sandra Benton, 301-796-1042, or (CBER) Office of Communication, Outreach and Development, 800-835-4709 or 240-402-8010.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**March 2019**
**Labeling**

# Nonproprietary Naming of Biological Products: Update

# Guidance for Industry

*Additional copies are available from:*
*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone:  855-543-3784 or 301-796-3400; Fax:  301-431-6353*
*Email:  druginfo@fda.hhs.gov*
*https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

*and/or*

*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone:  800-835-4709 or 240-402-8010*
*Email:  ocod@fda.hhs.gov*
*https://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**March 2019**
**Labeling**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

## TABLE OF CONTENTS

I.     **INTRODUCTION** .................................................................................................... 1

II.    **SCOPE** ...................................................................................................................... 2

III.   **BACKGROUND** ..................................................................................................... 3

    A.   **The Biologics Price Competition and Innovation Act of 2009** ......................... 3

    B.   **Evaluation of the Appropriate Naming Convention** ......................................... 3

IV.   **REVISED APPLICATION OF THE NAMING CONVENTION** ............................... 4

    A.   **Biological Products Licensed Without a Suffix and Transition Biological Products** ............. 4

    B.   **Vaccines** ....................................................................................................... 5

V.     **SUFFIX FORMAT FOR INTERCHANGEABLE PRODUCTS SUBMITTED UNDER SECTION 351(k) OF THE PHS ACT** ....................................................... 5

**GLOSSARY** ...................................................................................................................... 7

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

# Nonproprietary Naming of Biological Products:  Update Guidance for Industry[1]

This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA or Agency) on this topic.  It does not establish any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.    INTRODUCTION

This draft guidance describes FDA's current thinking on *nonproprietary names*[2] of biological products licensed under section 351 of the Public Health Service Act (PHS Act) that do not include an FDA-designated suffix.  Specifically, the nonproprietary names of these products need not be revised in order to accomplish the objectives of the naming convention described in the *Guidance for Industry:  Nonproprietary Naming of Biological Products* (Naming Guidance).[3]  Similarly, FDA does not intend to apply the naming convention described in the Naming Guidance to biological products that are the subject of an approved application under section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) as of March 23, 2020, when such an application is deemed to be a biologics license application (BLA) under section 351 of the PHS Act on March 23, 2020 (*transition biological products*).[4]

In addition, this draft guidance describes FDA's current thinking on the appropriate suffix format for the *proper name* of an interchangeable biological product licensed under section 351(k) of the PHS Act.  For each *interchangeable product*, FDA intends to designate a proper name that is a combination of the *core name* and a distinguishing suffix that is devoid of meaning and composed of four lowercase letters.[5]

FDA is also reconsidering whether vaccines should be within the scope of the naming convention.

---

[1] This guidance has been prepared by the Office of New Drugs and the Office of Surveillance and Epidemiology in the Center for Drug Evaluation and Research in cooperation with the Center for Biologics Evaluation and Research at the Food and Drug Administration.

[2] Terms italicized on first use (other than the names of guidance documents) are found in the Glossary.

[3] We update guidances periodically.  For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

[4] See section 7002(e)(4) of the Biologics Price Competition and Innovation Act of 2009 (BPCI Act) (sections 7001 through 7003 of the Patient Protection and Affordable Care Act (Public Law 111-148)).

[5] The nonproprietary name designated by FDA in the license for a biological product licensed under the PHS Act is its proper name (section 351(a)(1)(B)(i) of the PHS Act (42 U.S.C. 262(a)(1)(B)(i)); 21 CFR 600.3(k)).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

36  FDA believes this approach to implementing the naming convention is appropriate to:  (1)
37  facilitate pharmacovigilance for *originator biological products, related biological products,*
38  *biosimilar products*, and interchangeable products when other means to track a specific
39  dispensed product are not readily accessible or available; (2) facilitate accurate identification of
40  these biological products by health care practitioners and patients; and (3) help minimize
41  inadvertent substitution of biological products.  Application of the naming convention to
42  interchangeable products as described in this guidance should also further encourage routine use
43  of designated suffixes in ordering, prescribing, dispensing, recordkeeping, and
44  pharmacovigilance practices.
45
46  This draft guidance document is not intended to be finalized.  FDA is issuing this draft guidance
47  document to seek public comment on these issues through the accompanying docket.  Based on
48  the comments received in the docket, we intend to revise the Naming Guidance and to amend
49  sections, such as sections IV.D and V.B, in that document regarding the subjects addressed in
50  this guidance and issue a revised, final version of the Naming Guidance.
51
52  In general, FDA's guidance documents do not establish legally enforceable responsibilities.
53  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only
54  as recommendations, unless specific regulatory or statutory requirements are cited.  The use of
55  the word *should* in Agency guidances means that something is suggested or recommended, but
56  not required.
57
58
59  **II.   SCOPE**
60
61  This draft guidance describes FDA's current thinking on nonproprietary names of biological
62  products licensed under section 351 of the PHS Act that do not include an FDA-designated
63  suffix.  Specifically, the nonproprietary names of these products need not be revised in order to
64  accomplish the objectives of the naming convention described in the Naming Guidance.  For
65  similar reasons, FDA does not intend to apply the naming convention described in the Naming
66  Guidance to transition biological products.
67
68  In addition, this draft guidance describes FDA's current thinking on the appropriate suffix format
69  for the proper name of an interchangeable product licensed under section 351(k) of the PHS Act.
70  For interchangeable products, FDA intends to designate a proper name that is a combination of
71  the core name and a distinguishing suffix that is devoid of meaning and composed of four
72  lowercase letters.
73
74  FDA is also reconsidering whether vaccines should be within the scope of the naming
75  convention.
76
77  For the purposes of this document, unless otherwise specified, references to biological products
78  include biological products licensed under the PHS Act, such as therapeutic protein products,
79  vaccines, allergenic products, and blood derivatives, and do not include certain biological
80  products that also meet the definition of a device in section 201(h) of the FD&C Act (21 U.S.C.
81  321(h)), such as in vitro reagents (e.g., antibody to hepatitis B surface antigen, blood grouping

**Appx164**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

82  reagents, hepatitis C virus encoded antigen), blood donor screening tests (e.g., HIV and hepatitis
83  C), and those reagents used in determining donor/recipient compatibility in transfusion medicine.
84  Also, for the purposes of this document, unless otherwise specified, references to biological
85  products do not include products for which a proper name is provided in the regulations (e.g., 21
86  CFR part 640) or to certain categories of biological products for which there are well-
87  established, robust identification and tracking systems to ensure safe dispensing practices and
88  optimal pharmacovigilance (e.g., ISBT 128 for cord blood products and blood components).
89
90
91  **III.   BACKGROUND**
92
93      **A.    The Biologics Price Competition and Innovation Act of 2009**
94
95  The Biologics Price Competition and Innovation Act of 2009 (BPCI Act), enacted in 2010,
96  established an abbreviated licensure pathway for products demonstrated to be biosimilar to or
97  interchangeable with an FDA-licensed *reference product*.  FDA anticipates that licensure of new
98  biosimilar and interchangeable products — in addition to licensure of new products in "stand-
99  alone" BLAs — will contribute to a growing number of biological products entering the
100  marketplace in the coming years.
101
102  Section 351(k) of the PHS Act (42 U.S.C. 262(k)), added by the BPCI Act, sets forth the
103  requirements for an application for a proposed biosimilar product and an application or a
104  supplement for a proposed interchangeable product.  Section 351(i) defines biosimilarity to mean
105  "that the biological product is highly similar to the reference product notwithstanding minor
106  differences in clinically inactive components" and that "there are no clinically meaningful
107  differences between the biological product and the reference product in terms of the safety,
108  purity, and potency of the product" (see section 351(i)(2) of the PHS Act).  To meet the
109  additional standard of interchangeability, an applicant must provide sufficient information to
110  demonstrate biosimilarity and also to demonstrate that the biological product can be expected to
111  produce the same clinical result as the reference product in any given patient and, if the
112  biological product is administered more than once to an individual, the risk in terms of safety or
113  diminished efficacy of alternating or switching between the use of the biological product and the
114  reference product is not greater than the risk of using the reference product without such
115  alternation or switch (see section 351(k)(4) of the PHS Act).  Interchangeable products may be
116  substituted for the reference product without the intervention of the prescribing health care
117  provider (see section 351(i)(3) of the PHS Act).
118
119      **B.    Evaluation of the Appropriate Naming Convention**
120
121  The proper name of a biological product reflects certain scientific characteristics of the product,
122  such as chemical structure and pharmacological properties.  This name is different from a
123  *proprietary name*, which generally is trademarked and registered for private use.  For biological
124  products licensed under the PHS Act, FDA designates the proper name in the license for use
125  upon each package of the biological product (see section 351(a)(1)(B)(i) of the PHS Act and
126  21 CFR 600.3(k)).  Among other things, the proper name of a biological product helps health

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

127  care providers identify the product's drug substance and distinguish biological products from one
128  another.
129
130  As part of FDA's implementation of the BPCI Act, the Agency requested public comment on its
131  development of a framework for safe use and optimal pharmacovigilance for biosimilar products
132  and interchangeable products that is informed by current experience and industry best practices,
133  including the role of a product's proper name.
134
135  FDA has evaluated comments received on approaches to naming biological products, including
136  biosimilar products and interchangeable products.[6]  In light of the issues considered for
137  biosimilar products and interchangeable products, FDA also evaluated its approach to
138  designating proper names for biological products licensed under section 351(a) of the PHS Act.
139
140  In implementing the BPCI Act, FDA has carefully considered the appropriate naming convention
141  to maximize the success of biosimilar products and interchangeable products and to help ensure
142  the safety of patients receiving biological products licensed under the PHS Act.
143
144  The Naming Guidance currently states that application of the naming convention to originator
145  biological products, related biological products, and biosimilar products will facilitate
146  pharmacovigilance when other means to track a specific dispensed product are not readily
147  accessible or available.  The Naming Guidance explains that distinguishable nonproprietary
148  names will facilitate accurate identification of these biological products by health care
149  practitioners and patients, and that distinguishing suffixes should help minimize inadvertent
150  substitution of any such products that have not been determined to be interchangeable.  In
151  addition, the Naming Guidance explains that application of the naming convention to biological
152  products licensed under 351(a) or 351(k) of the PHS Act should encourage routine use of FDA-
153  designated suffixes in ordering, prescribing, dispensing, recordkeeping, and pharmacovigilance
154  practices, and should avoid inaccurate perceptions of biological products based on their licensure
155  pathway.  The Naming Guidance also states that a proper name that includes a distinguishing
156  suffix is warranted for all licensed products.
157
158
159  **IV.    REVISED APPLICATION OF THE NAMING CONVENTION**
160
161      **A.    Biological Products Licensed Without a Suffix and Transition Biological**
162          **Products**
163

---

[6] See, for example, notices published in the *Federal Register*:  "Approval Pathway for Biosimilar and
Interchangeable Biological Products; Public Hearing; Request for Comments" (75 FR 61497, October 5, 2010);
"Draft Guidances Relating to the Development of Biosimilar Products; Public Hearing; Request for Comments"
(77 FR 12853, March 2, 2012); "Nonproprietary Naming of Biological Products; Draft Guidance for Industry;
Availability" (80 FR 52296, August 28, 2015); "Nonproprietary Naming of Biological Products; Guidance for
Industry; Availability" (82 FR 4345, January 13, 2017); and other public dockets established by FDA.

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

164 FDA no longer intends to modify the proper names of biological products that were licensed
165 under the PHS Act without an FDA-designated suffix in their proper names.[7]  FDA also does not
166 intend to apply the naming convention to the proper names of transition biological products.[8]

168 FDA has determined that the core objectives of the naming convention — pharmacovigilance
169 and safe use — can be accomplished by applying the naming convention to biological products
170 at the time they are licensed under section 351 of the PHS Act, and without applying it to
171 licensed biological products that do not contain a suffix in their proper names.  This approach is
172 intended to minimize the potential burden for sponsors and the healthcare systems, and to avoid
173 potential confusion for healthcare providers and patients, given that the nonproprietary names of
174 drugs seldom change postapproval.  Under this approach to applying the naming convention,
175 most biological products that share the same core name will have nonproprietary names that are
176 distinct from each other.  Furthermore, applying the naming convention to all biological products
177 at the time they are licensed under 351(a) or 351(k) is expected to mitigate the risk of inaccurate
178 perceptions of the relative safety and effectiveness of biological products based on licensure
179 pathway.

181    **B.    Vaccines**

183 Vaccines are currently within the scope of the naming convention described in the Naming
184 Guidance.  However, FDA is reconsidering that approach and is evaluating whether the currently
185 available identification systems associated with the administration of vaccines[9] are sufficiently
186 robust to ensure safe dispensing practices and optimal pharmacovigilance without requiring
187 distinguishable proper names.

190   **V.    SUFFIX FORMAT FOR INTERCHANGEABLE PRODUCTS SUBMITTED
191         UNDER SECTION 351(k) OF THE PHS ACT**

193 FDA considered two approaches to the format of the suffix for interchangeable products:  A
194 unique suffix that distinguishes an interchangeable product from other products sharing the same
195 core name, or a suffix shared with the reference product.[10]  FDA believes a distinguishing suffix
196 is necessary to achieve adequate pharmacovigilance for these products.  A unique suffix will
197 facilitate manufacturer-specific pharmacovigilance by providing a means of determining which

---

[7] FDA has licensed, under section 351 of the PHS Act, several biological products with proper names that include a four-letter suffix.

[8] See the guidance for industry *Interpretation of the "Deemed To Be a License" Provision of the Biologics Price Competition and Innovation Act of 2009* (December 2018).  For the most recent version of a guidance, check the FDA Drugs guidance Web page at

http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

[9] For example, the National Childhood Vaccine Injury Act of 1986 requires each healthcare provider (HCP) who administers a vaccine included in the "Vaccine Injury Table" to any person to "record … in such person's permanent medical record … (1) the date of administration of the vaccine, (2) the vaccine manufacturer and lot number of the vaccine, (3) the name and address and, if appropriate, the title of the [HCP] administering the vaccine, and (4) any other identifying information on the vaccine required pursuant to regulations promulgated by the Secretary" (42 U.S.C. 300aa–25).

[10] See "Nonproprietary Naming of Biological Products; Draft Guidance for Industry; Availability" (80 FR 52296, August 28, 2015).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

198  biological product is dispensed to patients when other means to track this information are not
199  readily accessible or available.  Use of a distinguishing suffix will also avoid the need for
200  changes to the nonproprietary name of a biological product that is first licensed as a biosimilar
201  product and later determined to be an interchangeable product.  Such changes could be
202  burdensome on sponsors, FDA, and the health care system, and could confuse health care
203  practitioners or patients.
204
205  Application of the naming convention to interchangeable products should further encourage
206  routine use of designated suffixes in ordering, prescribing, dispensing, recordkeeping, and
207  pharmacovigilance practices, and should help mitigate the risk of and avoid inaccurate
208  perceptions of the safety and effectiveness of biosimilar biological products that do not have an
209  interchangeability determination.
210
211  An applicant for a proposed interchangeable product submitted under section 351(k) of the PHS
212  Act should propose a suffix composed of four lowercase letters for use as the distinguishing
213  identifier included in the proper name designated by FDA at the time of licensure.  Such
214  submissions can be made during the investigational new drug application (IND) phase[11] or at the
215  time of BLA submission.  An applicant should submit up to 10 proposed suffixes, as described in
216  the Naming Guidance, in the order of the applicant's preference.  We recommend including any
217  supporting analyses of the proposed suffixes for FDA's consideration based on the factors
218  described in the Naming Guidance.
219
220  An applicant seeking a determination of interchangeability in a supplement to an approved
221  351(k) application will keep the nonproprietary name of its product including the  FDA-
222  designated suffix without submitting further proposed suffix requests to FDA for review.  At the
223  time of supplement submission, the applicant would reflect the proper name, including the
224  previously designated suffix, throughout the proposed labeling for the interchangeable product.
225
226

---

[11] A request for FDA review of a proposed suffix submitted during the investigational new drug application (IND) phase should be submitted no earlier than at the request for a biosimilar biological product development (BPD) type 4 meeting for biological products to be submitted under section 351(k) of the PHS Act.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

# GLOSSARY

**Biosimilar Product** means a biological product submitted in a 351(k) application that has been shown to be highly similar to the reference product notwithstanding minor differences in clinically inactive components, and for which there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product (see section 351(i)(2) of the PHS Act).

**Core Name** means the component shared among an originator biological product and any related biological product, biosimilar product, or interchangeable product as part of the proper names of those products. Two examples of a *core name* are filgrastim and epoetin alfa.

**Interchangeable Product** means a biological product that has been shown to meet the standards described in section 351(k)(4) of the PHS Act and may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product (see section 351(i)(3) of the PHS Act).

**Nonproprietary Name** means a name unprotected by trademark rights that is in the public domain. It may be used by the public at large, both lay and professional.

**Originator Biological Product** means a biological product submitted in a BLA under section 351(a) of the PHS Act (i.e., a stand-alone BLA) that is not a related biological product.

**Proper Name** means the nonproprietary name designated by FDA in the license for a biological product licensed under the PHS Act (21 CFR 600.3(k)).

**Proprietary Name** means the trademark or brand name.

**Reference Product** means the single biological product licensed under section 351(a) of the PHS Act against which a biological product is evaluated in a 351(k) application (section 351(i)(4) of the PHS Act).

**Related Biological Product** means a biological product submitted in a BLA under section 351(a) of the PHS Act (i.e., a stand-alone BLA) for which there is a previously licensed biological product submitted in a different section 351(a) BLA that contains a drug substance for which certain nomenclature conventions (e.g., United States Adopted Names (USAN) Guiding Principles[12]) would be expected to provide for use of the same drug substance name.[13]

---

[12] The United States Pharmacopeial Convention, 2016, Guiding Principles for Coining United States Adopted Names for Drugs (*2016 USP Dictionary of USAN and International Drug Names at* http://www.uspusan.com/usan/pub/index1.html).

[13] FDA's description of a biological product as a *related biological product* in this guidance is separate from any determination FDA may make about whether a related biological product is eligible for a period of exclusivity under section 351(k)(7) of the PHS Act.

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

266 **Transition Biological Product** means a biological product that is the subject of an approved
267 application under section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) as of
268 March 23, 2020, that will be deemed to be a biologics license application (BLA) under section
269 351 of the PHS Act on March 23, 2020 (see section 7002(e)(4) of the BPCI Act).
270

Declaration of Karen M. Hauda

# Exhibit D

# Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026

In August 2022, President Biden signed the Inflation Reduction Act of 2022 (P.L. 117-169) into law. The new law makes improvements to Medicare by expanding benefits, lowering drug costs, and improving the sustainability of the Medicare program for generations to come. The law provides meaningful financial relief for millions of people with Medicare by improving access to affordable treatments and strengthening Medicare, both now and in the long run.

For the first time, the law provides Medicare the ability to directly negotiate the prices of certain high expenditure, single source drugs without generic or biosimilar competition. Below is the list of 10 drugs covered under Medicare Part D selected for negotiation for initial price applicability year 2026, based on total gross covered prescription drug costs under Medicare Part D and other criteria as required by the law.

| Drug Name | Commonly Treated Conditions | Total Part D Gross Covered Prescription Drug Costs from June 2022-May 2023 | Number of Medicare Part D Enrollees Who Used the Drug from June 2022-May 2023 |
|---|---|---|---|
| Eliquis | Prevention and treatment of blood clots | $16,482,621,000 | 3,706,000 |
| Jardiance | Diabetes; Heart failure | $7,057,707,000 | 1,573,000 |
| Xarelto | Prevention and treatment of blood clots; Reduction of risk for patients with coronary or peripheral artery disease | $6,031,393,000 | 1,337,000 |
| Januvia | Diabetes | $4,087,081,000 | 869,000 |
| Farxiga | Diabetes; Heart failure; Chronic kidney disease | $3,268,329,000 | 799,000 |
| Entresto | Heart failure | $2,884,877,000 | 587,000 |
| Enbrel | Rheumatoid arthritis; Psoriasis; Psoriatic arthritis | $2,791,105,000 | 48,000 |
| Imbruvica | Blood cancers | $2,663,560,000 | 20,000 |
| Stelara | Psoriasis; Psoriatic arthritis; Crohn's disease; Ulcerative colitis | $2,638,929,000 | 22,000 |
| Fiasp; Fiasp FlexTouch; Fiasp PenFill; NovoLog; NovoLog FlexPen; NovoLog PenFill | Diabetes | $2,576,586,000 | 777,000 |

Note: Numbers are rounded to the nearest thousands.

*For the time period between June 1, 2022 and May 31, 2023, which is the time period used to determine which drugs were eligible for negotiation, about 8,247,000 people with Medicare Part D coverage used these drugs to treat a variety of conditions, such as cardio-vascular disease, diabetes, autoimmune diseases, and cancer. These selected drugs accounted for $50.5 billion in total Part D gross covered prescription drug costs, or about 20% of total Part D gross covered prescription drug costs during that time period.*

**Key Milestones to Date:**



— **On March 15, 2023**, the Centers for Medicare & Medicaid Services (CMS) issued initial guidance for the Medicare Drug Price Negotiation Program, including requests for public comment on key elements.

— **On June 30, 2023**, CMS issued revised guidance detailing the requirements and parameters of the Medicare Drug Price Negotiation Program for the first round of negotiations, which will occur during 2023 and 2024 and will result in prices that will be effective beginning in 2026.

— **On August 29, 2023**, CMS announced the drugs covered under Medicare Part D selected for the first cycle of negotiations.

## Q: How did CMS select the 10 drugs for the first round of negotiations?

The Inflation Reduction Act specified that CMS select drugs for the first round of negotiations by:

1. Identifying potential qualifying single source drugs — that is, drugs for which at least seven years, or biologics for which at least 11 years, have elapsed between the FDA approval or licensure and the selected drug publication date, and for which there is no generic or biosimilar competition.

2. Excluding certain orphan drugs, low-spend Medicare drugs, and plasma-derived products.

3. Determining the negotiation-eligible drugs — that is, the 50 qualifying single source drugs with the highest total Part D gross covered prescription drug costs under Part D, except for small biotech drugs.

4. Ranking the negotiation-eligible drugs according to highest total Part D gross covered prescription drug costs.

5. Selecting the 10 drugs with the highest total Part D gross covered prescription drug costs after excluding from the ranked list of 50 negotiation-eligible drugs any biologics that qualify for delayed selection as a result of there being a high likelihood that a biosimilar will enter the market within a specified time.

## Q: What was the time period used for determining which drugs were eligible for negotiation?

The time period for the data on total gross covered prescription drug costs under Medicare Part D that was used to determine negotiation-eligible drugs, for initial price applicability year 2026 (the first year of negotiation), was June 1, 2022 through May 31, 2023.

## Q: How many drugs qualified for the Small Biotech Exception?

For initial price applicability year 2026, drug companies submitted requests and information to CMS for four drugs that were determined to be qualified for the small biotech exception.

## Q: How many drugs would have been selected drugs for initial price applicability year 2026, absent the Biosimilar Delay (described in section 1192(f) of the Social Security Act)?

For initial price applicability year 2026, zero drugs would have been selected drugs for initial price applicability year 2026, absent the Biosimilar Delay.

## Q: How is CMS structuring the negotiation process with the drug companies of selected drugs?

CMS is approaching implementation of the new drug law, including the Medicare Drug Price Negotiation Program, with the goal of promoting transparency and engagement. As discussed in detail in the **revised guidance**, CMS set out a process for the first round of negotiations that engages drug companies and the public throughout. The process includes several steps, such as:

- Drug companies with a selected drug for the Negotiation Program and the public will have an opportunity to submit data and information on the selected drugs to CMS no later than October 2, 2023.

- During the Fall 2023, CMS will invite each participating drug company with a selected drug to engage in a meeting on its data submission. CMS will also hold a public patient-focused listening session for each selected drug with patients and other interested parties. The patient-focused listening sessions will be held between October 30, 2023 and November 15, 2023. The listening sessions are subject to change, including postponement and/or cancellation.

- CMS will send an initial offer for each selected drug for which the drug company is participating in the Negotiation Program with CMS' proposal for the maximum fair price and a concise justification no later than February 1, 2024, and companies will have 30 days to respond to the initial offer by accepting the offer or providing a counteroffer, if desired. In developing an initial offer, CMS will consider evidence related to therapeutic alternatives as well as other factors, such as costs of research and development and production and distribution of the selected drug.

- If agreement on a maximum fair price is not reached through the initial offer or counteroffer, CMS will invite each participating drug company for up to three negotiation meetings during Spring and Summer 2024 before the negotiation period ends on August 1, 2024.

## Q: What are the details of the patient-focused listening sessions?

CMS is providing opportunities for public engagement during the negotiation process. These include meetings with participating drug companies with a selected drug in Fall 2023 as well as a CMS-hosted patient-focused listening session for each selected drug. The listening sessions will be open to the public and will provide an opportunity for patients, beneficiaries, caregivers, consumer and patient organizations, and other interested parties, to share patient-focused input on therapeutic alternative(s) to the selected drugs, how the selected drugs address unmet medical need, and the impact of selected drugs on specific populations.

The listening sessions are currently planned between October 30, 2023 and November 15, 2023. Registration to apply to be a speaker will open on September 1, 2023 and will close on October 2, 2023. The listening sessions are subject to change, including postponement and/or cancellation. Separately, the public is also invited to submit data on selected drugs, therapeutic alternatives to the selected drugs, data related to unmet medical need, and data on impacts on specific populations by October 2, 2023. More information about the Listening Sessions and how to submit data for CMS to consider in the negotiation process is available **here**.

Learn more about the Medicare Drug Price Negotiation Program, including a timeline for Initial Price Applicability Year 2026 **here**.

View a fact sheet from the HHS Office of the Assistant Secretary for Planning and Evaluation (ASPE) **here**.



Case 3:23-cv-20814-ZNQ-JBD    Document 29-5    Filed 12/08/23    Page 1 of 5 PageID: 295

Declaration of Karen M. Hauda

# Exhibit E

MEDICARE DRUG PRICE NEGOTIATION PROGRAM AGREEMENT
(hereinafter referred to as the "Agreement")

Between

the Centers for Medicare & Medicaid Services (CMS), pursuant to delegated authority of the Secretary of Health and Human Services

And

**Novo Nordisk Inc.**
(hereinafter referred to as the "Manufacturer")

For

**Fiasp; Fiasp FlexTouch; Fiasp PenFill; NovoLog; NovoLog FlexPen; NovoLog PenFill**
(hereinafter referred to as the "Selected Drug")

WHEREAS, pursuant to sections 1191 through 1198 of the Social Security Act ("the Act"), as set forth in the Inflation Reduction Act (IRA), Pub. L. 117-169, CMS is responsible for the administration of the Medicare Drug Price Negotiation Program (hereinafter referred to as the "Negotiation Program"), which sets forth a framework under which manufacturers and CMS may negotiate to determine a price (referred to as "maximum fair price" in the Act) for selected drugs in order for manufacturers to provide access to such price to maximum fair price eligible individuals; and

WHEREAS, CMS has designated the Manufacturer as the Primary Manufacturer, as defined in applicable guidance or regulations adopted in accordance with section 1193 of the Act, of the Selected Drug, and CMS has included the Selected Drug on the list of selected drugs published on August 29, 2023; and

WHEREAS, the Manufacturer, if it reaches agreement with CMS, intends to provide access to the determined price pursuant to section 1193 of the Act and in accordance with how the price is computed and applied across different strengths and dosage forms of the Selected Drug as identified by CMS and updated, as applicable, in accordance with sections 1194(f), 1195(b), and 1196(a)(2) of the Act and applicable guidance and regulations, including where the Selected Drug is sold or marketed by any Secondary Manufacturers as defined in applicable guidance or regulations;

NOW THEREFORE, CMS, on behalf of the Department of Health and Human Services, and the Manufacturer, on its own behalf, in accordance with sections 1191 through 1198 of the Act, and all applicable guidance and regulations, hereby agree to the following:

**I. Definitions**

All terms included in this Agreement shall have the meaning given to them under the provisions of sections 1191 through 1198 of the Act and any applicable guidance and regulations implementing those provisions, except where such terms are expressly defined in this Agreement.

**II. CMS and Manufacturer Responsibilities**

CMS shall administer the Negotiation Program and the Manufacturer agrees to comply with all applicable requirements and conditions for the Negotiation Program set forth in sections 1191 through 1198 of the
Act and all applicable guidance and regulations implementing those provisions and any changes to the Act that affect the Negotiation Program.

Without limiting the foregoing, CMS and the Manufacturer agree:
   a) During the negotiation period for the initial price applicability year for the Selected Drug, in accordance with section 1194 of the Act and applicable guidance and regulations CMS and the Manufacturer shall negotiate to determine (and, by not later than the last date of such period, agree to) a maximum fair price for the Selected Drug of the Manufacturer in order for the Manufacturer to provide access to such price—
      i. to maximum fair price eligible individuals who with respect to the Selected Drug are described in subparagraph

(A) of section 1191(c)(2) of the Act and are dispensed the Selected Drug (and to pharmacies, mail order services, and other dispensers, with respect to such maximum fair price eligible individuals who are dispensed the Selected Drug) during, subject to paragraph (b) of this section, the price applicability period; and

    ii. to hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to the Selected Drug are described in subparagraph (B) of section 1191(c)(2) of the Act and are furnished or administered the Selected Drug during, subject to paragraph (b) of this section, the price applicability period.

b) As applicable, CMS and the Manufacturer shall, in accordance with section 1194 of the Act and applicable guidance and regulations, renegotiate (and, by not later than the last date of the period of renegotiation, agree to) the maximum fair price for the Selected Drug, in order for the Manufacturer to provide access to such maximum fair price (as so renegotiated)—

    i. to maximum fair price eligible individuals who with respect to the Selected Drug are described in subparagraph (A) of section 1191(c)(2) of the Act and are dispensed the Selected Drug (and to pharmacies, mail order services, and other dispensers, with respect to such maximum fair price eligible individuals who are dispensed the Selected Drug) during any year during the price applicability period (beginning after such renegotiation) with respect to such Selected Drug; and

    ii. to hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to the Selected Drug are described in subparagraph (B) of section 1191(c)(2) of the Act and are furnished or administered the Selected Drug during any year during the price applicability period (beginning after such renegotiation) with respect to such Selected Drug.

c) Subject to paragraph (f) of this section and in accordance with applicable guidance and regulations, access to the maximum fair price (including as renegotiated pursuant to paragraph (b) of this section), with respect to such a Selected Drug, shall be provided by the Manufacturer to—

    i. maximum fair price eligible individuals, who with respect to the Selected Drug are described in subparagraph (A) of section 1191(c)(2) of the Act, at the pharmacy, mail order service, or other dispenser at the point-of-sale of the Selected Drug (and shall be provided by the Manufacturer to the pharmacy, mail order service, or other dispenser, with respect to such maximum fair price eligible individuals who are dispensed the Selected Drug), as described in paragraph (a)(i) or (b)(i) of this section, as applicable; and

    ii. hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to the Selected Drug are described in subparagraph (B) of section 1191(c)(2) of the Act and are furnished or administered the Selected Drug, as described in paragraph (a)(ii) or (b)(ii) of this section, as applicable.

d) The Manufacturer shall submit to CMS, in a form and manner specified by CMS and in accordance with applicable guidance and regulations, for the negotiation period for the price

    applicability period (and, if applicable, before any period of renegotiation pursuant to section 1194(f) of the Act), and for section 1192(f) of the Act, with respect to the Selected Drug—

    i. information on the non-Federal average manufacturer price (as defined in section 8126(h)(5) of title 38, United States Code) for the Selected Drug for the applicable year or period;

    ii. information that CMS requires to carry out the negotiation (or renegotiation) process under sections 1191 through 1198 of the Act; and

    iii. information that CMS requires to carry out section 1192(f) of the Act, including rebates under section 1192(f)(4) of the Act.

e) The Manufacturer shall comply with requirements determined by CMS to be necessary for purposes of administering the Negotiation Program and monitoring compliance with the Negotiation Program, including in accordance with applicable guidance and regulations.

f) Under this Agreement and in accordance with applicable guidance and regulations, the Manufacturer—

    i Shall not be required to provide access to the maximum fair price under paragraph (c), with respect to the Selected Drug and maximum fair price eligible individuals who are eligible to be furnished, administered, or dispensed the Selected Drug at a covered entity described in section 340B(a)(4) of the Public Health Service Act, to such covered entity if the Selected Drug is subject to an agreement described in section 340B(a)(1) of such Act and the ceiling price (defined in section 340B(a)(1) of such Act) is lower than the maximum fair price for such selected drug; and

    ii Shall be required to provide access to the maximum fair price to such covered entity with respect to maximum fair price eligible individuals who are eligible to be furnished, administered, or dispensed the Selected Drug at such entity at such ceiling price in a nonduplicated amount to the ceiling price if such maximum fair price is below the ceiling price for the Selected Drug.

g) In accordance with section 1193(c) of the Act and applicable guidance and regulations, information submitted to CMS

under the Negotiation Program by the Manufacturer that is proprietary information of such Manufacturer, as determined by CMS, shall be used only by CMS or disclosed to and used by the Comptroller General of the United States to carry out such Negotiation Program, unless otherwise required by law.

### III. Effective Date, Term and Termination

a) This Agreement shall have an effective date of the date this Agreement is signed by both parties.

b) The term of this Agreement shall be from the effective date until the termination date, which shall be the earlier of the first day that the Selected Drug is no longer a selected drug pursuant to CMS' determination in accordance with section 1192(c) of the Act and applicable guidance and regulations, or the date that the Agreement is terminated by either party in accordance with applicable guidance and regulations.

c) Notwithstanding the termination of this Agreement, certain requirements and obligations shall continue to apply in accordance with applicable guidance and regulations.

### IV. General Provisions

a) This Agreement contains the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all prior oral and written representations, agreements, and understandings of the parties. If CMS and the Manufacturer reach agreement on a price for the Selected Drug pursuant to section II(a) or II(b) of this Agreement, CMS and the Manufacturer shall execute an addendum setting forth the price for the Selected Drug that will apply for purposes of this Agreement.

b) CMS retains authority to amend this Agreement to reflect changes in law, regulation, or guidance. When possible, CMS shall give the Manufacturer at least 60-day notice of any change to the Agreement.

c) Any notice required to be given by either party pursuant to the terms and provisions of this Agreement shall be sent by email. CMS shall provide the appropriate email address for notice in guidance, rulemaking, or other publications. The Manufacturer shall provide the appropriate email address(es) for notice to CMS in a form and manner specified by CMS.

d) Nothing in this Agreement shall prohibit the Manufacturer from transferring the Selected Drug and obligations of this Agreement to another entity in accordance with applicable guidance and regulations.

e) Nothing in this Agreement shall limit the Manufacturer from providing access under the Medicare program to a price lower than the price determined pursuant to this Agreement.

f) In signing this Agreement, the Manufacturer does not make any statement regarding or endorsement of CMS' views, and makes no representation or promise beyond its intention to comply with its obligations under the terms of this Agreement with respect to the Selected Drug. Use of the term "maximum fair price" and other statutory terms throughout this Agreement reflects the parties' intention that such terms be given the meaning specified in the statute and does not reflect any party's views regarding the colloquial meaning of those terms.

g) Nothing in this Agreement shall be construed to require or authorize the commission of any act contrary to law. If any provision of this Agreement is found to be invalid by a court of law with competent jurisdiction, this Agreement will be construed in all respects as if any invalid or unenforceable provisions were eliminated, and without any effect on any other provision.

h) No failure by any party to insist upon the strict performance of any requirement, obligation or condition of this Agreement shall constitute a waiver of any such requirement, obligation or condition.

i) This Agreement shall be construed in accordance with Federal law and any ambiguities shall be interpreted in the manner that best effectuates the statute. Any litigation relating to this Agreement, to the extent that jurisdiction and a cause of action would otherwise be available for such litigation, shall be resolved in Federal court. Actions by the Manufacturer for damages are not permitted pursuant to this Agreement, and the Manufacturer's remedies for any breach are limited to termination of the Agreement or other action consistent with applicable statutes, regulations, or guidance.

j) CMS and the Manufacturer acknowledge and agree that in accordance with section 1197 of the Act and 26 U.S.C. § 5000D, the Manufacturer may be subject to civil monetary penalties and an excise tax, as applicable, for failure to meet the requirements of the Negotiation Program, including violations of this Agreement.

k) Neither party shall be liable for failure to perform its obligations under this Agreement if such failure is occasioned by a contingency beyond such party's reasonable control, including, but not limited to, lockouts, riots, wars, fires, floods or storms (a "Force Majeure Event"). A party claiming a right to excused performance under this section shall promptly notify the other party in writing of the extent of its inability to perform, which notice shall specify the Force Majeure Event that prevents such performance and include a timeline for remediation. The party failing to perform shall use reasonable efforts to avoid or remove the cause of the Force Majeure Event and shall resume performance

under the Agreement promptly upon the cessation of the Force Majeure Event.

## V. Signatures

**FOR THE MANUFACTURER**

A. By signing this Agreement, the Manufacturer agrees to abide by all provisions set forth in this Agreement and acknowledges having received notice of potential penalties for violation of the terms of the Agreement.

B. The undersigned individual hereby attests that he or she is authorized by the Manufacturer to execute this Agreement with regard to the Selected Drug and to legally bind the Manufacturer on whose behalf he or she is executing the Agreement to all terms and conditions specified herein. The undersigned individual further attests that he or she has obtained access in the CMS Health Plan Management System (CMS HPMS) as an authorized representative to be signatory for the Manufacturer and that the individual's CMS HPMS access credentials contain the same information regarding the undersigned individual as the information set forth below.

Date: 09/29/2023
   --------------
Name: Farruq Jafery
   -------------------------------
Title: VP, Pricing, Contract Ops & Reimbursement
   -------------------------------
P-Number: P1029
   -------------------------------
Manufacturer
Address: 800 Scudders Mill Road, Plainsboro, NJ 08536
   -----------------------------------------------------------

**FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES**

By:

Date: 09/30/2023
   --------------
Name: Cheri Rice
   --------------
Title: Deputy Director
   Center for Medicare
   --------------------

Signature:
   --------------

Declaration of Karen M. Hauda

# Exhibit F

**19 23** | **Driving change**
**20 23** | for generations



**Dr. Meena Seshamani, M.D., Ph.D.**
CMS Deputy Administrator and Director of the Center for Medicare
Centers for Medicare & Medicaid Services
U.S. Department of Health and Human Services
7500 Security Boulevard
Baltimore, MD 21244-8016
Attn: PO Box 8016

September 29, 2023

**Re: Inflation Reduction Act: Medicare Drug Price Negotiation Agreement**

Dear Dr. Seshamani,

On behalf of Novo Nordisk Inc. and Novo Nordisk Pharma, Inc. ("Novo Nordisk"), enclosed please find a signed copy of the "Medicare Drug Price Negotiation Program Agreement," which is being submitted on this date in accordance with the requirements of the Inflation Reduction Act.

In signing this document, and consistent with section IV(g) of the Agreement, Novo Nordisk preserves and does not waive or forfeit any of its rights, arguments, or objections relating either to the constitutionality of the Inflation Reduction Act or the legality of the actions taken by the Centers for Medicare & Medicaid Services ("CMS"). In particular, Novo Nordisk does not waive or forfeit any of the arguments or objections that have been raised or may be raised in the lawsuit filed by Novo Nordisk in the United States District Court for the District of New Jersey, captioned *Novo Nordisk Inc. and Novo Nordisk Pharma, Inc. v. Becerra et al.* (D.N.J.), the comments submitted in response to CMS's guidance, or any other pending or future litigation that may be filed challenging the statute or CMS's past or future actions. In signing the enclosed document, Novo Nordisk is not agreeing with any of CMS's assertions, requirements, or characterizations concerning the statute or CMS's actions, including CMS's characterizations of Novo Nordisk's actions in, for example, signing the "Medicare Drug Price Negotiation Program Agreement."

Novo Nordisk has already submitted all of the required data and information through the HPMS system, and the data is ready to be certified. Following transmission of this letter, Novo Nordisk will submit an electronic copy of the enclosed document through HPMS and, once CMS

**Novo Nordisk Inc.**
**Finance and Operations**

800 Scudders Mill Road
Plainsboro, NJ 08536
USA

Telephone:
+1 609-987-5800
Direct dial:
+1 609 786 4041
Telefax:
+1 609-921-8082

E-mail:
faja@novonordisk.com
Internet:
www.novonordisk-us.com

has countersigned, will complete the related certifications indicating that Novo Nordisk has complied with applicable requirements and the information provided is, to the best of its knowledge, complete and accurate.  The original record of this submission shall be the combination of the enclosed document and this letter.

We emphasize that the data that Novo Nordisk has submitted via HPMS contains trade secret and confidential commercial and financial information that Novo Nordisk customarily and actually treats as private. Disclosure of the information would result in harm to Novo Nordisk's business interests, including because disclosure of any individual piece(s) of information could result in public identification of confidential materials. Novo Nordisk is submitting this information under CMS's assurances of confidentiality (Guidance § 40.2.1 (citing id. § 40.2.2; 5 U.S.C. § 552(b)(3), (4); 18 U.S.C. § 1905)) and hereby designates the submission as confidential *and exempt from disclosure under Exemption 4 of the FOIA (45 C.F.R. 5.41).  As such,* predisclosure notification is required (45 C.F.R. 5.42).  Novo Nordisk's future disclosure of any piece of the information contained in the data submission and designated as confidential does not alter the status of the remaining information as exempt from disclosure or otherwise waive or forfeit Novo Nordisk's rights to confidential treatment and predisclosure notification.

Respectfully submitted,

Farruq Jafery
Vice President, Pricing, Contract Operations & Reimbursement
Novo Nordisk Inc.
Novo Nordisk Pharma, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### Trenton

NOVO NORDISK INC., *et al.*,

    *Plaintiffs*,

v.

XAVIER BECERRA, *et al.*,

    *Defendants*.

No. 3:23-cv-20814-ZNQ-JBD

### DECLARATION OF DR. NATHAN LANEY

I, Dr. Nathan Laney, declare as follows pursuant to 28 U.S.C. § 1746

1.    I am a resident of Florida. I am over the age of eighteen, and I am competent to provide this declaration.

2.    I received an MD in 2003 from the University of Missouri-Kansas City School of Medicine and an MBA from Florida International University in 2022. I am board certified in endocrinology. I have been at Novo Nordisk, Inc. since 2015. I have worked as Regional Medical Liaison - Philadelphia; Regional Medical Scientist - South Atlantic; Scientific Director, Diabetes TA; and most recently as the Medical Director at Novo Nordisk Inc. Before that, I spent six years as a practicing endocrinologist at St. Luke's Endocrinology & Diabetes. In all of these roles, I have either worked directly with patients or with healthcare professionals on diabetes management options, including insulin selection and dosing, to improve outcomes for patients living with diabetes. In my role as Medical Director at Novo Nordisk Inc., I have been deeply

involved in the Company's response to CMS inquiries under the Inflation Reduction Act and other related medical policy discussions.

**The Need for Insulin to Manage Diabetes**

3.      In healthy individuals, beta cells in the pancreas release the hormone insulin to help regulate glucose levels in the blood.  At mealtimes, insulin output from the beta cells acutely increases to allow the body to use and/or store glucose released from the digestion of food.  Most patients living with diabetes have either Type 1 diabetes (T1D), an autoimmune disease where beta cells have been destroyed by the body's own immune system yielding insufficient and/or total loss of insulin production by the pancreas, or Type 2 diabetes (T2D), where the body suffers from a combination of disorders involving glucose metabolism, including inadequate insulin secretion, insulin resistance, and metabolic syndrome.

4.      There is no cure for diabetes.  While medicines have improved treatment, if diabetes is not properly controlled, and often even if it is well treated, it can lead over time to complications including vision impairment (or even blindness), loss of kidney function, and nerve damage which can increase the risk of amputations.  Diabetes is also associated with cardiovascular risks, including myocardial infarction, stroke, heart failure, and peripheral arterial disease.

5.      Innovations resulting in the development of new products to assist in insulin therapy have provided patients with the necessary tools for managing this chronic disease.  Important advances include the development of both prandial—or

mealtime—insulins (fast-acting insulins taken at mealtime to prevent excessive elevations in blood sugar levels after the meal) and basal insulins (slower, longer-acting insulins that control blood sugar levels between meals and when the patient is not eating).

### Insulin Dosing

6.      The cornerstone of diabetes management is ensuring that treatment approaches are tailored to individual patients.

7.      Controlling insulin dosing is critical.  "In people with type 1 diabetes, treatment with analog insulins is associated with less hypoglycemia and weight gain as well as lower [average blood sugar levels or] A1C compared with human insulins.  More recently … insulin formulations with enhanced rapid-action profiles have been introduced … and faster-acting insulin aspart and insulin lispro-aabc may reduce prandial excursions better than [rapid acting analogues or] RAA."  Nuha A. ElSayed et al., *Pharmacologic Approaches to Glycemic Treatment: Standards of Care in Diabetes—2023*, 43 Diabetes Care S140, S141 (2023) (endnotes omitted) (attached as Exhibit A).  However, choosing between appropriate analogue prandial insulin products is just the starting point.  Individual patients must have their insulin doses adjusted and tailored to their individual needs.

8.      Because insulin dictates how much sugar cells absorb, too much insulin can cause hypoglycemia, or low blood sugar; too little insulin can cause hyperglycemia, or too high of blood sugar levels in the blood.  Increased hypoglycemia increases risk

of complications, including decreased sensitivity to hypoglycemia over time which amounts to hypoglycemic unawareness. And, with more hypoglycemic events comes increased risk of impaired cognitive function, heart arrhythmias, and mortality. When increased hyperglycemia leads to overall poor control of diabetes, it can be associated with both microvascular and macrovascular complications. Microvascular complications refer to those conditions affecting organs supplied by smaller blood vessels, and include visual disturbances, or retinopathy; reduced kidney function, or nephropathy; and disorders of the nerves, or neuropathy. In fact, diabetes remains the leading cause of blindness and chronic kidney failure in the United States, and neuropathy significantly increases the risk of these patients to develop foot ulcers and infections that lead to amputations. Macrovascular complications refer to those conditions affecting organs supplied by larger blood vessels, and include conditions like myocardial infarctions, strokes, heart failure, and peripheral arterial disease.

9.      Landmark clinical data in patients with both T1D and T2D have shown that targeting appropriate overall blood sugar control reduces the risk of developing microvascular and macrovascular complications. In terms of appropriate overall blood sugar control, the laboratory measurement historically used to assess overall control is the A1C, which reflects the average glucose levels over the past 3 months. Ideally, the goal is to achieve an A1C level that is below 7%, as this is the threshold lowering the rate of hyperglycemia related complications. *See* Nuha A. ElSayed et al., *Glycemic Targets: Standards of Care in Diabetes—2023*, 46 Diabetes Care S97 (2023) (attached as Exhibit

B).  A1C is the sum of all glucose exposure, including fasting blood glucose ("FBG") and post prandial glucose ("PPG") levels—blood sugar levels after a meal. This is particularly important at lower A1C levels, where PPG is the predominant contributor to A1C targets.  Therefore, while A1C is an important measure, other measurements, such as PPG levels, should also be considered when assessing a person's overall diabetes control.  *See* Louis Monnier et al., *Contributions of Fasting and Postprandial Glucose to Hemoglobin A1c*, 12 Endocrine Prac. 42 (2006) (attached as Exhibit C).

10.    Once patients are using insulin as part of their diabetes treatment, additional modalities can be implemented to monitor blood sugar control, including continuous glucose monitoring with a device that continuously measures interstitial glucose levels over the course of the day and/or home blood glucose monitoring with a device that measures capillary glucose levels at the time the capillary blood is obtained.

11.    Insulin dosing is a complex process that requires the consideration of multiple factors on an individual basis.  For patients with T1D and the subset of patients with T2D who require insulin, insulin coverage is necessary throughout the day.  This 24-hour insulin coverage is provided through a basal insulin component and a mealtime insulin component, both of which are intended to maintain blood sugar levels in the desired target range.  The basal insulin works in the background to keep blood sugar levels in the desired target range between meals and while the individual is not eating. The mealtime insulin works to keep blood sugar levels after meals, known as PPG, from rising too high.

12.     Each patient will have individualized basal and mealtime insulin needs. For example, the basal insulin component can be achieved through once- or twice-daily injections with either the newer, long-acting basal insulin analogues or the older, longer-acting NPH regular insulin, or even through the continuous administration of a rapid acting insulin analogue via an insulin pump.  The mealtime component preferably will be met by one of the newer, rapid acting or ultra-rapid acting insulin analogues. Selection and dosing of both the basal insulin and the mealtime insulin will be highly specific to individual patients.

13.     Because the underlying disturbances in blood sugar metabolism carry significant differences between patients living with T1D and T2D, the initiation of insulin therapy is different.

14.     Most individuals with T1D are treated with multiple daily injections of insulin, including a combination of both prandial insulin and basal insulin, or with continuous subcutaneous infusion of the newer rapid- or ultra-rapid-acting insulin analogues administered through an external insulin pump.  For patients who are living with T1D, in particular, where their B-cells are producing very little to no insulin, insulin therapy is life sustaining.  In general, a weight-based approach can be used to initiate insulin therapy, with typical total daily insulin requirements ranging between 0.4-1 unit/kg/day.

15.     Patients living with T2D have several other medications available to control blood sugar levels initially in the disease process.  Due to the progressive nature

of T2D, many individuals with T2D eventually require insulin therapy to overcome progressive declines in insulin production from the B-cells and control their blood sugar levels. These patients typically continue using their oral anti-diabetes medications and/or non-insulin injectable medications to control blood sugar levels, with the exception of classes known to non-discriminately stimulate insulin secretion like the sulfonylurea and glinide classes of diabetes medications. Unlike patients living with T1D, most individuals with T2D will initially add a basal insulin to their non-insulin medications, with use of mealtime insulin initiation reserved for those patients suffering from significant elevations in blood sugar levels (e.g., up into the 300 mg/dL range) or when additional control of blood sugar levels is necessary. The basal insulin dose for those patients is generally initiated using either the fixed starting dose outlined in the FDA-approved product label for the long-acting analogues, or a weight-based dose between 0.1-0.3 units/kg/day, and then titrated upwards until the desired fast blood sugar target is achieved. *See* ElSayed et al. (Exhibit A); Susan L. Samson et al., *American Association of Clinical Endocrinology Consensus Statement: Comprehensive Type 2 Diabetes Management Algorithm - 2023 Update*, 29 Endocrine Prac. 305 (2023) (attached as Exhibit D). When T2D patients need to advance their regimens to include mealtime insulin, the more conservative approach would be to start mealtime insulin at a fixed dose of 4-5 units prior to the largest meal or calculating the starting dose using either 10 percent of the basal insulin or a weight-based approach dose as the starting point.

16.     For both T1D and T2D patients who require mealtime insulin, once the total daily insulin dose for a patient is calculated, generally half of the dose is given as the basal insulin component and the other half is split between other meals.  The mealtime component is then further divided among the number of meals the individual consumes daily.  *See* ElSayed et al. (Exhibit A); Samson et al. (Exhibit D).  From this starting point, both T1D and T2D patients must account for *when* their mealtime insulin will start working after it is injected, as well as how to adjust their planned dose based on current blood sugar level, what they are eating, and their activity level—in order to avoid causing either high or low blood sugar levels after meals related to their mealtime insulin.  This process is a balancing act between increasing the basal insulin dose to lower fasting blood sugar levels while simultaneously monitoring for when it is appropriate to add or adjust mealtime insulin.  If the titration process is not handled with care, these patients are at risk for persistent episodes of high blood sugars levels after meals as well as low blood sugar levels when they are not eating.

17.     The dosing regimen will differ across different mealtime insulin formulations, as different insulins are absorbed into the bloodstream at different rates and thus have different rates of onset.  For instance, patients that use a short-acting human regular insulin as their mealtime insulin would have to inject their mealtime insulin dose 30 minutes before they even start eating their meal, while the same patient using a rapid acting analogue like NovoLog®, would only have to administer their mealtime dose 5-10 minutes before they start eating.  Patients using an ultra-rapid

analogue like FIASP® would wait until they start eating or up to 20 minutes after they start eating before they must inject their mealtime insulin.  For this reason, among others, the optimal time to administer prandial insulin varies based on the specific insulin product and the needs of the individual patient.

<u>**Insulin Administration**</u>

18.    Taking insulin in pill form is not an option as, under current technology, the insulin in the pill would be broken down like a protein in food and would be ineffective.  Insulin is therefore injected, either under the skin (subcutaneously) or intravenously, in order for it to enter the bloodstream and travel to the cells where it exerts its action to regulate blood sugar levels.  The need for this type of administration makes insulin delivery devices critical to patient use.

19.    Insulin products are generally available in (1) a vial, to be used with a syringe, (2) a pen injector or (3) a pump device.

20.    The vial-and-syringe method, which requires the patient to draw up the appropriate amount of insulin through a syringe, can pose risks such as drawing the incorrect insulin dose, and can be particularly challenging for those with vision impairment or dexterity limitations.

21.    Pen injectors and insulin pumps can mean more precise and flexible dosing, which can reduce the risk of hyperglycemia (too high blood sugar) and hypoglycemia (too low blood sugar).  A pen injector enables the patient to dial in the correct dose, resulting in easier and more accurate administration and less pain on

injection—as well as more accurate dosing. Patients can also opt for an insulin pump—a small, computerized device that continuously delivers insulin as programmed.

22.    Different injectors and pumps are used for different insulin products. For example, while NovoLog® products and FIASP® products are both available for pump use, the pumps used for the different products are not the same. FIASP® products cannot be used in certain pumps due to risks of occlusion (or blockage in pump tubing); those pumps are labeled only for use with NovoLog® products.

### The NovoLog® Products

23.    NovoLog® is Novo Nordisk Inc.'s ("Novo") rapid-acting mealtime insulin. It is indicated to improve glycemic control in adults and pediatric patients with diabetes mellitus. The NovoLog® family of products includes: NovoLog® 10 mL (100 units/mL, or "U100") vial; NovoLog® PenFill® 3 mL (U100) cartridges, for use with a reusable insulin pen; and NovoLog® FlexPen® 3 mL (U100), a single-patient-use prefilled insulin pen. Each of these products is a distinct product that is used for different purposes, but I refer to them together as the "NovoLog® products."

24.    Patients administer NovoLog® products 5–10 minutes before a meal; the American Diabetes Association ("ADA") and the American Association of Clinical Endocrinology ("AACE") consider them to be "rapid-acting" insulin products.

### The FIASP® Products

25.    FIASP® is Novo's *ultra*-rapid-acting mealtime insulin. It is indicated to improve glycemic control in adults and pediatric patients with diabetes mellitus. The

**Appx192**

FIASP® family of products includes: FIASP® 10 mL (U100) vial; FIASP® FlexTouch® 3 mL (U100), a single-patient-use prefilled insulin pen; FIASP® PenFill® 3 mL (U100) cartridges, for use with a reusable insulin pen; and FIASP® PumpCart®, a 1.6 mL (U100) cartridge for use with insulin pumps. Each of these products is a distinct product that is used for different purposes, but I refer to them together as the "FIASP® products."

26.    In addition to different prescribing guidance from the ADA and the AACE for the FIASP® family of products versus the NovoLog® family of products, the FDA-approved prescribing information also differs, reflecting, among other things, these products' different onset of action and dosing regimens, and the differing clinical studies that supported FDA approval of the different products.

27.    Onset of appearance for FIASP® products has consistently been shown to be twice as fast as that for NovoLog® products as a result of the faster onset of exposure and increased initial absorption rate seen with the FIASP® products.

28.    The ADA and the AACE consider the FIASP® products to be "ultra-rapid-acting" insulin products. Patients administer at their first bite or within 20 minutes after starting a meal. This provides patients with more flexible options for dosing. They can use a FIASP® product right at the start of a meal, up to 20 minutes after starting the meal, or at an interim point, as they deem as optimal to account for factors affecting their dosing.

29.    The ADA Standards of Care differentiate "rapid-acting" insulins from "ultra-rapid-acting insulins." ElSayed et al. (Exhibit A at S143). According to the AACE Consensus Statement published in 2023, "Rapid-acting insulin analogs are preferred over human insulin preparations (e.g., regular insulin) because of their comparatively earlier onset of action." Samson et al. (Exhibit D at 319).

### The FIASP® and NovoLog® Products Differ in Clinically Meaningful Ways

30.    The different products included in the NovoLog® family of products and the FIASP® family of products all contain the same active ingredient, insulin aspart. But that does not mean that all of the different products within each family qualify as a single product. There are meaningful differences between the products in terms of how they are prescribed, dosed, and used by patients. As described above, when a healthcare provider writes an insulin prescription they write it not just for the active ingredient, but for the dosage and delivery method appropriate for each individual patient based on their needs.

31.    The goal of therapy is to provide an insulin regimen that mimics normal insulin secretion, which requires consideration of factors that would affect normal insulin secretion in the body—factors like the individual's current blood sugar level, the size and makeup of the meal, and even the body's current demand for sugar based on recent and/or future activity level.

32.    Basal insulin and short-acting human insulin R help control blood sugar levels, but they are too slow to be responsive to mealtime insulin needs. Both the

NovoLog® products and the FIASP® products help lower mealtime blood sugar spikes—but they do so at different rates.

33.    The FIASP® products are formulated with vitamin B3 (niacinamide) to increase the speed of initial absorption and an amino acid (L-arginine) to stabilize the formulation.  As a result, and as reflected in pharmacokinetic and pharmacodynamic clinical studies, the insulin in the FIASP® products enters the bloodstream faster than that in the NovoLog® products, resulting in a faster onset of action.  In fact, the onset for FIASP® products is approximately 2.5 minutes, more than twice as fast as NovoLog® products' onset at just over 5 minutes.  The onset of the glucose-lowering effect (onset of action) is statistically significantly faster as a result of the faster onset of exposure and increased initial absorption rate seen with the FIASP® products.

34.    Because the faster onset of FIASP® products allows for later dosing with respect to the meal, the dose timing is different between the NovoLog® products and the FIASP® products.  That is why the FIASP® products can be dosed flexibly, between the start of a meal and up to 20 minutes later, as compared to the NovoLog® products, which are dosed 5-10 minutes *before* the start of a meal.

35.    Being able to take a FIASP® product after starting a meal is very important.  As described above, each mealtime insulin dose is driven by how much the person eats, what they eat, and when they eat it, *i.e.*, is subject to hunger, availability, and interruptions.  The patient must tailor the dose for each meal, to account for the meal itself, as well as to make other adjustments, such as adjustments related to exercise.  For

example, a patient planning to eat a meal heavy in carbohydrates will have a different insulin need from a patient eating a low-carbohydrate meal. But ultra-fast-acting insulins can be dosed based on food *actually consumed* instead of estimates of what might be consumed.

36.    The ability to wait until after a meal has been decided upon, ordered, or even consumed, offers a considerable benefit to some patients. For pediatric and elderly patients, for example, there is a real concern that they will not eat as expected, which can require dose adjustments after a meal or result in hypoglycemia. In a survey of parents of pediatric patients with Type 1 diabetes, 81% indicated that, at least once a week, their children ate more or less food than anticipated after dosing mealtime insulin. *See* Wendy Lane et al., *Exploring the Burden of Mealtime Insulin Dosing in Adults and Children with Type 1 Diabetes*, 39 Clinical Diabetes J. 347 (2021) (attached as Exhibit E). And for all patients, there can be interruptions—a child may need something just as the person is sitting down to eat after dosing, or a waiter at a restaurant may inform the patient that their selection is not available after placing an order and administering an insulin dose accordingly.

37.    A patient using a rapid-acting insulin must eat the planned amount once dosed, or they may experience hypoglycemia, with the side effects that ensue. Nocturnal hypoglycemia also can occur if a patient does not eat enough food after taking an insulin dose or taking more insulin that prescribed in the evening. In a survey of adults with

Type 1 diabetes, 58% of patients reported a need for additional food intake as a corrective action to prevent hypoglycemia at least once a week. *See id.* (Exhibit E).

38.    The flexibility of ultra-rapid-acting insulin, however, allows a patient to ensure what they are eating—and that they are in fact consuming it—*before* dosing. That, in turn, enables a person to best match their insulin dose to their actual intake, minimizing the chance of taking too much or too little insulin (which can have adverse consequences and could lead to adverse events or serious adverse events). The improved flexibility in timing of mealtime and post-meal dosing can therefore improve therapeutic adherence which could lead to better glycemic control. *See id.* (Exhibit E). For a patient taking insulin on a daily basis, this flexibility is absolutely key to quality of life, controlling their diabetes, and avoiding daily highs and lows.

39.    In addition to the added flexibility of ultra-rapid mealtime insulin for some patients, the differences in onset timing can result in lower PPG levels after a meal. In a survey of adults with Type 1 diabetes, 91% reported experiencing challenges with mealtime insulin dosing, including the need to inject more insulin after a meal because of eating more or different food than anticipated. *See id.* (Exhibit E).

40.    High PPG levels have been linked to the development of vascular complications and other adverse effects. *See* Kenneth S. Hershon et al., *Importance of Postprandial Glucose in Relation to A1c and Cardiovascular Disease*, 37 Clinical Diabetes J. 250 (2019) (attached as Exhibit F).

41.     Too little insulin, and for patients with Type 2 diabetes, the loss of early phase endogenous insulin secretion, contributes to elevated PPG levels after a meal, but with improved dosing flexibility and other clinical characteristics of a ultra rapid acting insulins, PPG levels can be better controlled.  When administered at mealtime, FIASP® outperformed NovoLog® in terms of significantly reducing 1-hour PPG increments in both Type 1 and Type 2 diabetes patients in multiple clinical trials.  *See* David Russell-Jones et al., *Fast-Acting Insulin Aspart Improves Glycemic Control in Basal-Bolus Treatment for Type 1 Diabetes: Results of a 26-Week Multicenter, Active-Controlled, Treat-to-Target, Randomized, Parallel-Group Trial (Onset 1)*, 40 Diabetes Care 943 (2017) (attached as Exhibit G); Keith Bowering et al., *Faster Aspart Versus Insulin Aspart as Part of a Basal-Bolus Regimen in Inadequately Controlled Type 2 Diabetes: The Onset 2 Trial*, 40 Diabetes Care 951 (2017) (attached as Exhibit H).  This, in turn, can result in fewer instances of immediate post-prandial hypoglycemia, complications and long-term clinical impacts.  A randomized, blinded clinical trial in adults with Type 2 diabetes found a lower relative risk of severe hypoglycemia for FIASP® compared to NovoLog®.  *See* Wendy S. Lane et al., *A Randomized Trial Evaluating the Efficacy and Safety of Fast-Acting Insulin Aspart Compared With Insulin Aspart, Both in Combination With Insulin Degludec With or Without Metformin, in Adults With Type 2 Diabetes (ONSET 9)*, 43 Diabetes Care 1710 (2020) (attached as Exhibit I).

42.     Thus, the ADA Standards of Care have recognized that ultra rapid-acting insulins like the FIASP® products may reduce prandial excursions better than rapid-

acting insulins like NovoLog®.  In fact, there is a demonstrated statistically significant reduction in A1C in patients with T1D when FIASP® was dosed at mealtime versus NovoLog® dosed at mealtime.  *See* Russell-Jones et al. (Exhibit G).

43.    Because of these differences, it is medically critical to appropriately differentiate between the different NovoLog® products and the different FIASP® products to avoid inadvertent substitution and the potential for medication errors— particularly given the disparate injection timing of the different products.

44.    For instance, if a patient administered a NovoLog product® after starting a meal, they would have a blood sugar spike; if a patient administered a FIASP® product several minutes before starting a meal, they would risk hypoglycemia.  In addition, as with all drugs, users of a product within the NovoLog® family of products inadvertently administered a product within the FIASP family of products (or vice versa) without changing their dosing procedure accordingly, they may experience adverse events.

45.    Confusion between a FIASP® product and a NovoLog® product when used in an insulin pump can result in occlusion (or blockage in pump tubing), which can result in nondelivery of needed insulin, which could lead to an individual with Type 1 diabetes to develop a life-threatening condition called diabetic ketoacidosis, or DKA. While DKA can develop following short periods of insulin nondelivery over the course of minutes to hours in patients with Type 1 diabetes, those living with Type 2 diabetes also could be at risk for developing an alternate condition called hyperosmolar

**Appx199**

hyperglycemic state, though this would generally require much longer periods of insulin nondelivery over days rather than minutes or hours, as well as cessation of other diabetes medications used to control glucose levels.

46.    A healthcare provider would not prescribe a NovoLog® product *and* a FIASP® product, nor would a healthcare provider transition patients between these products without significant discussion and training related to dosing regimens and delivery devices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____07_____ day of __December__, 2023.

By: _____

**Appx201**

Declaration of Dr. Nathan Laney

# Exhibit A

S140                                                                   Diabetes Care  Volume 46, Supplement 1, January 2023


Check for updates

9. PHARMACOLOGIC APPROACHES TO GLYCEMIC TREATMENT

# 9. Pharmacologic Approaches to Glycemic Treatment: *Standards of Care in Diabetes—2023*

*Diabetes Care 2023;46(Suppl. 1):S140–S157 | https://doi.org/10.2337/dc23-S009*

Nuha A. ElSayed, Grazia Aleppo, Vanita R. Aroda, Raveendhara R. Bannuru, Florence M. Brown, Dennis Bruemmer, Billy S. Collins, Marisa E. Hilliard, Diana Isaacs, Eric L. Johnson, Scott Kahan, Kamlesh Khunti, Jose Leon, Sarah K. Lyons, Mary Lou Perry, Priya Prahalad, Richard E. Pratley, Jane Jeffrie Seley, Robert C. Stanton, and Robert A. Gabbay, on behalf of the American Diabetes Association

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693608/dc23s009.pdf by guest on 07 December 2023

**The American Diabetes Association (ADA) "Standards of Care in Diabetes" includes the ADA's current clinical practice recommendations and is intended to provide the components of diabetes care, general treatment goals and guidelines, and tools to evaluate quality of care. Members of the ADA Professional Practice Committee, a multidisciplinary expert committee, are responsible for updating the Standards of Care annually, or more frequently as warranted. For a detailed description of ADA standards, statements, and reports, as well as the evidence-grading system for ADA's clinical practice recommendations and a full list of Professional Practice Committee members, please refer to Introduction and Methodology. Readers who wish to comment on the Standards of Care are invited to do so at professional.diabetes.org/SOC.**

## PHARMACOLOGIC THERAPY FOR ADULTS WITH TYPE 1 DIABETES

### Recommendations

**9.1** Most individuals with type 1 diabetes should be treated with multiple daily injections of prandial and basal insulin, or continuous subcutaneous insulin infusion. **A**

**9.2** Most individuals with type 1 diabetes should use rapid-acting insulin analogs to reduce hypoglycemia risk. **A**

**9.3** Individuals with type 1 diabetes should receive education on how to match mealtime insulin doses to carbohydrate intake, fat and protein content, and anticipated physical activity. **B**

## Insulin Therapy

Because the hallmark of type 1 diabetes is absent or near-absent β-cell function, insulin treatment is essential for individuals with type 1 diabetes. In addition to hyperglycemia, insulinopenia can contribute to other metabolic disturbances like hypertriglyceridemia and ketoacidosis as well as tissue catabolism that can be life threatening. Severe metabolic decompensation can be, and was, mostly prevented with once- or twice-daily injections for the six or seven decades after the discovery of insulin. However, over the past three decades, evidence has accumulated supporting more intensive insulin replacement, using multiple daily injections of insulin or continuous subcutaneous administration through an insulin pump, as providing the best combination of effectiveness and safety for people with type 1 diabetes. The Diabetes Control and Complications Trial (DCCT) demonstrated that intensive therapy with multiple daily injections or continuous subcutaneous insulin infusion (CSII) reduced A1C and was associated with improved long-term outcomes (1–3).

*Disclosure information for each author is available at https://doi.org/10.2337/dc23-SDIS.*

*Suggested citation: ElSayed NA, Aleppo G, Aroda VR, et al., American Diabetes Association. 9. Pharmacologic approaches to glycemic treatment: Standards of Care in Diabetes—2023. Diabetes Care 2023;46(Suppl. 1):S140–S157*

*© 2022 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. More information is available at https://www. diabetesjournals.org/journals/pages/license.*

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693969/dc23s009.pdf by guest on 07 December 2023

The study was carried out with short-acting (regular) and intermediate-acting (NPH) human insulins. In this landmark trial, lower A1C with intensive control (7%) led to ∼50% reductions in microvascular complications over 6 years of treatment. However, intensive therapy was associated with a higher rate of severe hypoglycemia than conventional treatment (62 compared with 19 episodes per 100 patient-years of therapy). Follow-up of subjects from the DCCT more than 10 years after the active treatment component of the study demonstrated fewer macrovascular as well as fewer microvascular complications in the group that received intensive treatment (2,4).

Insulin replacement regimens typically consist of basal insulin, mealtime insulin, and correction insulin (5). Basal insulin includes NPH insulin, long-acting insulin analogs, and continuous delivery of rapid-acting insulin via an insulin pump. Basal insulin analogs have longer duration of action with flatter, more constant plasma concentrations and activity profiles than NPH insulin; rapid-acting analogs (RAA) have a quicker onset and peak and shorter duration of action than regular human insulin. In people with type 1 diabetes, treatment with analog insulins is associated with less hypoglycemia and weight gain as well as lower A1C compared with human insulins (6–8). More recently, two injectable insulin formulations with enhanced rapid-action profiles have been introduced. Inhaled human insulin has a rapid peak and shortened duration of action compared with RAA and may cause less hypoglycemia and weight gain (9) (see also subsection ALTERNATIVE INSULIN ROUTES IN PHARMACOLOGIC THERAPY FOR ADULTS WITH TYPE 2 DIABETES), and faster-acting insulin aspart and insulin lispro-aabc may reduce prandial excursions better than RAA (10–12). In addition, longer-acting basal analogs (U-300 glargine or degludec) may confer a lower hypoglycemia risk compared with U-100 glargine in individuals with type 1 diabetes (13,14). Despite the advantages of insulin analogs in individuals with type 1 diabetes, for some individuals the expense and/or intensity of treatment required for their use is prohibitive. There are multiple approaches to insulin treatment, and the central precept in the management of type 1 diabetes is that some form of insulin be given in a planned regimen tailored to the individual to keep them safe and out of diabetic ketoacidosis and to avoid significant hypoglycemia, with every effort made to reach the individual's glycemic targets.

Most studies comparing multiple daily injections with CSII have been relatively small and of short duration. However, a systematic review and meta-analysis concluded that CSII via pump therapy has modest advantages for lowering A1C (−0.30% [95% CI −0.58 to −0.02]) and for reducing severe hypoglycemia rates in children and adults (15). However, there is no consensus to guide the choice of injection or pump therapy in a given individual, and research to guide this decision-making is needed (16). The arrival of continuous glucose monitors (CGM) into clinical practice has proven beneficial in people using insulin therapy. Its use is now considered standard of care for most people with type 1 diabetes (5) (see Section 7, "Diabetes Technology"). Reduction of nocturnal hypoglycemia in individuals with type 1 diabetes using insulin pumps with CGM is improved by automatic suspension of insulin delivery at a preset glucose level (16–18). When choosing among insulin delivery systems, individual preferences, cost, insulin type and dosing regimen, and self-management capabilities should be considered (see Section 7, "Diabetes Technology").

The U.S. Food and Drug Administration (FDA) has now approved multiple hybrid closed-loop pump systems (also called automated insulin delivery [AID] systems). The safety and efficacy of hybrid closed-loop systems has been supported in the literature in adolescents and adults with type 1 diabetes (19,20), and evidence suggests that a closed-loop system is superior to sensor-augmented pump therapy for glycemic control and reduction of hypoglycemia over 3 months of comparison in children and adults with type 1 diabetes (21). In the International Diabetes Closed Loop (iDCL) trial, a 6-month trial in people with type 1 diabetes at least 14 years of age, the use of a closed-loop system was associated with a greater percentage of time spent in the target glycemic range, reduced mean glucose and A1C levels, and a lower percentage of time spent in hypoglycemia compared with use of a sensor-augmented pump (22).

Intensive insulin management using a version of CSII and continuous glucose monitoring should be considered in most individuals with type 1 diabetes. AID systems may be considered in individuals with type 1 diabetes who are capable of using the device safely (either by themselves or with a caregiver) in order to improve time in range and reduce A1C and hypoglycemia (22). See Section 7, "Diabetes Technology," for a full discussion of insulin delivery devices.

In general, individuals with type 1 diabetes require 50% of their daily insulin as basal and 50% as prandial, but this is dependent on a number of factors, including whether the individual consumes lower or higher carbohydrate meals. Total daily insulin requirements can be estimated based on weight, with typical doses ranging from 0.4 to 1.0 units/kg/day. Higher amounts are required during puberty, pregnancy, and medical illness. The *American Diabetes Association/JDRF Type 1 Diabetes Sourcebook* notes 0.5 units/kg/day as a typical starting dose in individuals with type 1 diabetes who are metabolically stable, with half administered as prandial insulin given to control blood glucose after meals and the other half as basal insulin to control glycemia in the periods between meal absorption (23); this guideline provides detailed information on intensification of therapy to meet individualized needs. In addition, the American Diabetes Association (ADA) position statement "Type 1 Diabetes Management Through the Life Span" provides a thorough overview of type 1 diabetes treatment (24).

Typical multidose regimens for individuals with type 1 diabetes combine premeal use of shorter-acting insulins with a longer-acting formulation. The long-acting basal dose is titrated to regulate overnight and fasting glucose. Postprandial glucose excursions are best controlled by a well-timed injection of prandial insulin. The optimal time to administer prandial insulin varies, based on the pharmacokinetics of the formulation (regular, RAA, inhaled), the premeal blood glucose level, and carbohydrate consumption. Recommendations for prandial insulin dose administration should therefore be individualized. Physiologic insulin secretion varies with glycemia, meal size, meal composition, and tissue demands for glucose. To approach this variability in people using insulin treatment, strategies have evolved to adjust prandial doses based on predicted needs. Thus, education on how to

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

adjust prandial insulin to account for carbohydrate intake, premeal glucose levels, and anticipated activity can be effective and should be offered to most individuals (25,26). For individuals in whom carbohydrate counting is effective, estimates of the fat and protein content of meals can be incorporated into their prandial dosing for added benefit (27) (see Section 5, "Facilitating Positive Health Behaviors and Well-being to Improve Health Outcomes").

The 2021 ADA/European Association for the Study of Diabetes (EASD) consensus report on the management of type 1 diabetes in adults summarizes different insulin regimens and glucose monitoring strategies in individuals with type 1 diabetes (**Fig. 9.1** and **Table 9.1**) (5).

### Insulin Injection Technique

Ensuring that individuals and/or caregivers understand correct insulin injection technique is important to optimize glucose control and insulin use safety. Thus, it is important that insulin be delivered into the proper tissue in the correct way. Recommendations have been published elsewhere outlining best practices for insulin injection (28). Proper insulin injection technique includes injecting into appropriate body areas, injection site rotation, appropriate care of injection sites to avoid infection or other complications, and avoidance of intramuscular (IM) insulin delivery.

Exogenously delivered insulin should be injected into subcutaneous tissue, not intramuscularly. Recommended sites for insulin injection include the abdomen, thigh, buttock, and upper arm. Insulin absorption from IM sites differs from that in subcutaneous sites and is also influenced by the activity of the muscle. Inadvertent IM injection can lead to unpredictable insulin absorption and variable effects on glucose and is associated with frequent and unexplained hypoglycemia. Risk for IM insulin delivery is increased in younger, leaner individuals when injecting into the limbs rather than truncal sites (abdomen and buttocks) and when using longer needles. Recent evidence supports the use of short needles (e.g., 4-mm pen needles) as effective and well tolerated when compared with longer needles, including a study performed in adults with obesity (29).

Injection site rotation is additionally necessary to avoid lipohypertrophy, an accumulation of subcutaneous fat in response to the adipogenic actions of insulin at a site of multiple injections. Lipohypertrophy appears as soft, smooth raised areas several centimeters in breadth and can contribute to erratic insulin absorption, increased glycemic variability, and unexplained hypoglycemic episodes. People treated with insulin and/or caregivers should receive education about proper injection site rotation and how to recognize and avoid areas of lipohypertrophy. As noted in **Table 4.1**, examination of insulin injection sites for the presence of lipohypertrophy, as well as assessment of injection device use and injection technique, are key components of a comprehensive diabetes medical evaluation and treatment plan. Proper insulin injection technique may lead to more effective use of this therapy and, as such, holds the potential for improved clinical outcomes.

### Noninsulin Treatments for Type 1 Diabetes

Injectable and oral glucose-lowering drugs have been studied for their efficacy as adjuncts to insulin treatment of type 1 diabetes. Pramlintide is based on the naturally occurring β-cell peptide amylin and is approved for use in adults with type 1 diabetes. Clinical trials have demonstrated a modest reduction in A1C (0.3–0.4%) and modest weight loss (~1 kg) with pramlintide (30–33). Similarly, results have been reported for several agents currently approved only for the treatment of type 2 diabetes. The addition of metformin in adults with type 1 diabetes caused small reductions in body weight and lipid levels but did not improve A1C (34,35). The largest clinical trials of glucagon-like peptide 1 receptor agonists (GLP-1 RAs) in type 1 diabetes have been conducted with liraglutide 1.8 mg daily, showing modest A1C reductions (~0.4%), decreases in weight (~5 kg), and reductions in insulin doses (36,37). Similarly, sodium–glucose cotransporter 2 (SGLT2) inhibitors have been studied in clinical trials in people with type 1 diabetes, showing improvements in A1C, reduced body weight, and improved blood pressure (38–40); however, SGLT2 inhibitor use in type 1 diabetes is associated with an increased rate of diabetic ketoacidosis. The risks and benefits of adjunctive agents continue to be evaluated, with consensus statements providing guidance on patient selection and precautions (41).

### SURGICAL TREATMENT FOR TYPE 1 DIABETES

#### Pancreas and Islet Transplantation

Successful pancreas and islet transplantation can normalize glucose levels and mitigate microvascular complications of type 1 diabetes. However, people receiving these treatments require lifelong immunosuppression to prevent graft rejection and/or recurrence of autoimmune islet destruction. Given the potential adverse effects of immunosuppressive therapy, pancreas transplantation should be reserved for people with type 1 diabetes undergoing simultaneous renal transplantation, following renal transplantation, or for those with recurrent ketoacidosis or severe hypoglycemia despite intensive glycemic management (42).

The 2021 ADA/EASD consensus report on the management of type 1 diabetes in adults offers a simplified overview of indications for β-cell replacement therapy in people with type 1 diabetes (**Fig. 9.2**) (5).

### PHARMACOLOGIC THERAPY FOR ADULTS WITH TYPE 2 DIABETES

*Recommendations*

**9.4a** Healthy lifestyle behaviors, diabetes self-management education and support, avoidance of clinical inertia, and social determinants of health should be considered in the glucose-lowering management of type 2 diabetes. Pharmacologic therapy should be guided by person-centered treatment factors, including comorbidities and treatment goals. **A**

**9.4b** In adults with type 2 diabetes and established/high risk of atherosclerotic cardiovascular disease, heart failure, and/or chronic kidney disease, the treatment regimen should include agents that reduce cardiorenal risk (**Fig. 9.3** and **Table 9.2**). **A**

**9.4c** Pharmacologic approaches that provide adequate efficacy to achieve and maintain treatment goals should be considered, such as metformin or other agents, including combination therapy (**Fig. 9.3** and **Table 9.2**). **A**

**9.4d** Weight management is an impactful component of glucose-lowering management in type 2 diabetes. The glucose-lowering

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693969/dc23s009.pdf by guest on 07 December 2023

### Representative relative attributes of insulin delivery approaches in people with type 1 diabetes[1]

| Injected insulin regimens | Flexibility | Lower risk of hypoglycemia | Higher costs |
|---|---|---|---|
| MDI with LAA + RAA or URAA | +++ | +++ | +++ |

Less-preferred, alternative injected insulin regimens

| | Flexibility | Lower risk of hypoglycemia | Higher costs |
|---|---|---|---|
| MDI with NPH + RAA or URAA | ++ | ++ | ++ |
| MDI with NPH + short-acting (regular) insulin | ++ | + | + |
| Two daily injections with NPH + short-acting (regular) insulin or premixed | + | + | + |

| Continuous insulin infusion regimens | Flexibility | Lower risk of hypoglycemia | Higher costs |
|---|---|---|---|
| Hybrid closed-loop technology | +++++ | +++++ | ++++++ |
| Insulin pump with threshold/predictive low-glucose suspend | ++++ | ++++ | +++++ |
| Insulin pump therapy without automation | +++ | +++ | ++++ |

**Figure 9.1**—Choices of insulin regimens in people with type 1 diabetes. Continuous glucose monitoring improves outcomes with injected or infused insulin and is superior to blood glucose monitoring. Inhaled insulin may be used in place of injectable prandial insulin in the U.S. [1]The number of plus signs (+) is an estimate of relative association of the regimen with increased flexibility, lower risk of hypoglycemia, and higher costs between the considered regimens. LAA, long-acting insulin analog; MDI, multiple daily injections; RAA, rapid-acting insulin analog; URAA, ultra-rapid-acting insulin analog. Reprinted from Holt et al. (5).

treatment regimen should consider approaches that support weight management goals (**Fig. 9.3** and **Table 9.2**). **A**

**9.5** Metformin should be continued upon initiation of insulin therapy (unless contraindicated or not tolerated) for ongoing glycemic and metabolic benefits. **A**

**9.6** Early combination therapy can be considered in some individuals at treatment initiation to extend the time to treatment failure. **A**

**9.7** The early introduction of insulin should be considered if there is evidence of ongoing catabolism (weight loss), if symptoms of hyperglycemia are present, or when A1C levels (>10% [86 mmol/mol]) or blood glucose levels (≥300 mg/dL [16.7 mmol/L]) are very high. **E**

**9.8** A person-centered approach should guide the choice of pharmacologic agents. Consider the

effects on cardiovascular and renal comorbidities, efficacy, hypoglycemia risk, impact on weight, cost and access, risk for side effects, and individual preferences (**Fig. 9.3** and **Table 9.2**). **E**

**9.9** Among individuals with type 2 diabetes who have established atherosclerotic cardiovascular disease or indicators of high cardiovascular risk, established kidney disease, or heart failure, a sodium–glucose cotransporter 2 inhibitor and/or glucagon-like peptide 1 receptor agonist with demonstrated cardiovascular disease benefit (**Fig. 9.3**, **Table 9.2**, **Table 10.3B**, and **Table 10.3C**) is recommended as part of the glucose-lowering regimen and comprehensive cardiovascular risk reduction, independent of A1C and in consideration of person-specific factors (**Fig. 9.3**) (see Section 10, "Cardiovascular Disease and Risk Management,"

for details on cardiovascular risk reduction recommendations). **A**

**9.10** In adults with type 2 diabetes, a glucagon-like peptide 1 receptor agonist is preferred to insulin when possible. **A**

**9.11** If insulin is used, combination therapy with a glucagon-like peptide 1 receptor agonist is recommended for greater efficacy, durability of treatment effect, and weight and hypoglycemia benefit. **A**

**9.12** Recommendation for treatment intensification for individuals not meeting treatment goals should not be delayed. **A**

**9.13** Medication regimen and medication-taking behavior should be reevaluated at regular intervals (every 3–6 months) and adjusted as needed to incorporate specific factors that impact choice of treatment (**Fig. 4.1** and **Table 9.2**). **E**

**9.14** Clinicians should be aware of the potential for overbasalization with insulin therapy. Clinical signals that may prompt evaluation of overbasalization include basal dose more than ∼0.5 units/kg/day, high bedtime–morning or postprepandial glucose differential, hypoglycemia (aware or unaware), and high glycemic variability. Indication of overbasalization should prompt reevaluation to further individualize therapy. **E**

The ADA/EASD consensus report "Management of Hyperglycemia in Type 2 Diabetes, 2022" (43–45) recommends a holistic, multifactorial person-centered approach accounting for the lifelong nature of type 2 diabetes. Person-specific factors that affect choice of treatment include individualized glycemic and weight goals, impact on weight, hypoglycemia and cardiorenal protection (see Section 10, "Cardiovascular Disease and Risk Management," and Section 11 "Chronic Kidney Disease and Risk Management"), underlying physiologic factors, complexity of regimen, regimen choice to optimize medication use and reduce treatment discontinuation, and access, cost, and availability of medication. Lifestyle

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

**Table 9.1—Examples of subcutaneous insulin regimens**

| Regimen | Timing and distribution | Advantages | Disadvantages | Adjusting doses |
|---|---|---|---|---|
| **Regimens that more closely mimic normal insulin secretion** | | | | |
| Insulin pump therapy (hybrid closed-loop, low-glucose suspend, CGM-augmented open-loop, BGM-augmented open-loop) | Basal delivery of URAA or RAA; generally 40–60% of TDD. Mealtime and correction: URAA or RAA by bolus based on ICR and/or ISF at target glucose, with pre-meal insulin ~15 min before eating. | Can adjust basal rates for varying insulin sensitivity by time of day, for exercise and for sick days. Flexibility in meal timing and content. Pump can deliver insulin in increments of fractions of units. Potential for integration with CGM for low-glucose suspend or hybrid closed-loop. TIR % highest and TBR % lowest with: hybrid closed-loop > low-glucose suspend > CGM-augmented open-loop > BGM-augmented open-loop. | Most expensive regimen. Must continuously wear one or more devices. Risk of rapid development of ketosis or DKA with interruption of insulin delivery. Potential reactions to adhesives and site infections. Most technically complex approach (harder for people with lower numeracy or literacy skills). | Mealtime insulin: if carbohydrate counting is accurate, change ICR if glucose after meal consistently out of target. Correction insulin: adjust ISF and/or target glucose if correction does not consistently bring glucose into range. Basal rates: adjust based on overnight, fasting or daytime glucose outside of activity of URAA/RAA bolus. |
| MDI: LAA + flexible doses of URAA or RAA at meals | LAA once daily (insulin detemir or insulin glargine may require twice-daily dosing); generally 50% of TDD. Mealtime and correction: URAA or RAA based on ICR and/or ISF and target glucose. | Can use pens for all components. Flexibility in meal timing and content. Insulin analogs cause less hypoglycemia than human insulins. | At least four daily injections. Most costly insulins. Smallest increment of insulin is 1 unit (0.5 unit with some pens). LAAs may not cover strong dawn phenomenon (rise in glucose in early morning hours) as well as pump therapy. | Mealtime insulin: if carbohydrate counting is accurate, change ICR if glucose after meal consistently out of target. Correction insulin: adjust ISF and/or target glucose if correction does not consistently bring glucose into range. LAA: based on overnight or fasting glucose or daytime glucose outside of activity time course, or URAA or RAA injections. |
| **MDI regimens with less flexibility** | | | | |
| Four injections daily with fixed doses of N and RAA | Pre-breakfast: RAA ~20% of TDD. Pre-lunch: RAA ~10% of TDD. Pre-dinner: RAA ~10% of TDD. Bedtime: N ~50% of TDD. | May be feasible if unable to carbohydrate count. All meals have RAA coverage. N is less expensive than LAAs. | Shorter duration RAA may lead to basal deficit during day; may need twice-daily N. Greater risk of nocturnal hypoglycemia with N. Requires relatively consistent mealtimes and carbohydrate intake. | Pre-breakfast RAA: based on BGM after breakfast or before lunch. Pre-lunch RAA: based on BGM after lunch or before dinner. Pre-dinner RAA: based on BGM after dinner or at bedtime. Evening N: based on fasting or overnight BGM. |

*Continued on p. S145*

**Appx207**

Pharmacologic Approaches to Glycemic Treatment    S145

**Table 9.1—Continued**

| Regimen | Timing and distribution | Advantages | Disadvantages | Adjusting doses |
|---|---|---|---|---|
| Four injections daily with fixed doses of N and R | Pre-breakfast: R ~20% of TDD. Pre-lunch: R ~10% of TDD. Pre-dinner: R ~10% of TDD. Bedtime: N ~50% of TDD. | May be feasible if unable to carbohydrate count. R can be dosed based on ICR and correction. All meals have R coverage. Least expensive insulins. | Greater risk of nocturnal hypoglycemia with N. Greater risk of delayed post-meal hypoglycemia with R. Requires relatively consistent mealtimes and carbohydrate intake. R must be injected at least 30 min before meal for better effect. | Pre-breakfast R: based on BGM after breakfast or before lunch. Pre-lunch R: based on BGM after lunch or before dinner. Pre-dinner R: based on BGM after dinner or at bedtime. Evening N: based on fasting or overnight BGM. |

**Regimens with fewer daily injections**

| Regimen | Timing and distribution | Advantages | Disadvantages | Adjusting doses |
|---|---|---|---|---|
| Three injections daily: N+R or N+RAA | Pre-breakfast: ~40% N + ~15% R or RAA. Pre-dinner: ~15% R or RAA. Bedtime: 30% N. | Morning insulins can be mixed in one syringe. May be appropriate for those who cannot take injection in middle of day. Morning N covers lunch to some extent. Same advantages of RAAs over R. Least (N+R) or less expensive insulins than MDI with analogs. | Greater risk of nocturnal hypoglycemia with N than LAAs. Greater risk of delayed post-meal hypoglycemia with R than RAAs. Requires relatively consistent mealtimes and carbohydrate intake. Coverage of post-lunch glucose often suboptimal. R must be injected at least 30 min before meal for better effect. | Morning N: based on pre-dinner BGM. Morning R: based on pre-lunch BGM. Morning RAA: based on post-breakfast or pre-lunch BGM. Pre-dinner R: based on bedtime BGM. Pre-dinner RAA: based on post-dinner or bedtime BGM. Evening N: based on fasting BGM. |
| Twice-daily "split-mixed": N+R or N+RAA | Pre-breakfast: ~40% N + ~15% R or RAA. Pre-dinner: ~30% N + ~15% R or RAA. | Least number of injections for people with strong preference for this. Insulins can be mixed in one syringe. Least (N+R) or less (N+RAA) expensive insulins vs analogs. Eliminates need for doses during the day. | Risk of hypoglycemia in afternoon or middle of night from N. Fixed mealtimes and meal content. Coverage of post-lunch glucose often suboptimal. Difficult to reach targets for blood glucose without hypoglycemia. | Morning N: based on pre-dinner BGM. Morning R: based on pre-lunch BGM. Morning RAA: based on post-breakfast or pre-lunch BGM. Evening R: based on bedtime BGM. Evening RAA: based on post-dinner or bedtime BGM. Evening N: based on fasting BGM. |

BGM, blood glucose monitoring; CGM, continuous glucose monitoring; ICR, insulin-to-carbohydrate ratio; ISF, insulin sensitivity factor; LAA, long-acting analog; MDI, multiple daily injections; N, NPH insulin; R, short-acting (regular) insulin; RAA, rapid-acting analog; TDD, total daily insulin dose; URAA, ultra-rapid-acting analog. Reprinted from Holt et al. (5).

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/690669/dc23s009.pdf by guest on 07 December 2023

**Appx208**

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023



**Figure 9.2**—Simplified overview of indications for β-cell replacement therapy in people with type 1 diabetes. The two main forms of β-cell replacement therapy are whole-pancreas transplantation or islet cell transplantation. β-Cell replacement therapy can be combined with kidney transplantation if the individual has end-stage renal disease, which may be performed simultaneously or after kidney transplantation. All decisions about transplantation must balance the surgical risk, metabolic need, and the choice of the individual with diabetes. GFR, glomerular filtration rate. Reprinted from Holt et al. (5).

modifications and health behaviors that improve health (see Section 5, "Facilitating Positive Health Behaviors and Well-being to Improve Health Outcomes") should be emphasized along with any pharmacologic therapy. Section 13, "Older Adults," and Section 14, "Children and Adolescents," have recommendations specific for older adults and for children and adolescents with type 2 diabetes, respectively. Section 10, "Cardiovascular Disease and Risk Management," and Section 11, "Chronic Kidney Disease and Risk Management," have recommendations for the use of glucose-lowering drugs in the management of cardiovascular and renal disease, respectively.

**Choice of Glucose-Lowering Therapy**
Healthy lifestyle behaviors, diabetes self-management, education, and support, avoidance of clinical inertia, and social determinants of health should be considered in the glucose-lowering management of type 2 diabetes. Pharmacologic therapy should be guided by person-centered treatment factors, including comorbidities and treatment goals. Pharmacotherapy should be started at the time type 2 diabetes is diagnosed unless there are contraindications. Pharma-

cologic approaches that provide the efficacy to achieve treatment goals should be considered, such as metformin or other agents, including combination therapy, that provide adequate efficacy to achieve and maintain treatment goals (45). In adults with type 2 diabetes and established/high risk of atherosclerotic cardiovascular disease (ASCVD), heart failure (HF), and/or chronic kidney disease (CKD), the treatment regimen should include agents that reduce cardiorenal risk (see **Fig. 9.3**, **Table 9.2**, Section 10, "Cardiovascular Disease and Risk Management," and Section 11, "Chronic Kidney Disease and Risk Management"). Pharmacologic approaches that provide the efficacy to achieve treatment goals should be considered, specified as metformin or agent(s), including combination therapy, that provide adequate efficacy to achieve and maintain treatment goals (**Fig. 9.3** and **Table 9.2**). In general, higher-efficacy approaches have greater likelihood of achieving glycemic goals, with the following considered to have very high efficacy for glucose lowering: the GLP-1 RAs dulaglutide (high dose) and semaglutide, the gastric inhibitory peptide (GIP) and GLP-1 RA tirzepatide, insulin, combination oral therapy, and combination injectable therapy.

Weight management is an impactful component of glucose-lowering management in type 2 diabetes (45,46). The glucose-lowering treatment regimen should consider approaches that support weight management goals, with very high efficacy for weight loss seen with semaglutide and tirzepatide (**Fig. 9.3** and **Table 9.2**) (45).

Metformin is effective and safe, is inexpensive, and may reduce risk of cardiovascular events and death (47). Metformin is available in an immediate-release form for twice-daily dosing or as an extended-release form that can be given once daily. Compared with sulfonylureas, metformin as first-line therapy has beneficial effects on A1C, weight, and cardiovascular mortality (48).

The principal side effects of metformin are gastrointestinal intolerance due to bloating, abdominal discomfort, and diarrhea; these can be mitigated by gradual dose titration. The drug is cleared by renal filtration, and very high circulating levels (e.g., as a result of overdose or acute renal failure) have been associated with lactic acidosis. However, the occurrence of this complication is now known to be very rare, and metformin may be



Figure 9.3—Use of glucose-lowering medications in the management of type 2 diabetes. ACEi, angiotensin-converting enzyme inhibitor; ACR, albumin-to-creatinine ratio; ARB, angiotensin receptor blocker; ASCVD, atherosclerotic cardiovascular disease; CGM, continuous glucose monitoring; CKD, chronic kidney disease; CV, cardiovascular; CVD, cardiovascular disease; CVOT, cardiovascular outcomes trial; DPP-4i, dipeptidyl peptidase 4 inhibitor; eGFR, estimated glomerular filtration rate; GLP-1 RA, glucagon-like peptide 1 receptor agonist; HF, heart failure; HFpEF, heart failure with preserved ejection fraction; HFrEF, heart failure with reduced ejection fraction; HHF, hospitalization for heart failure; MACE, major adverse cardiovascular events; MI, myocardial infarction; SDOH, social determinants of health; SGLT2i, sodium–glucose cotransporter 2 inhibitor; T2D, type 2 diabetes; TZD, thiazolidinedione. Adapted from Davies et al. (45).

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693690/dc23s009.pdf by guest on 07 December 2023

Appx210

S148    Pharmacologic Approaches to Glycemic Treatment                                                                 Diabetes Care Volume 46, Supplement 1, January 2023

## Table 9.2—Medications for lowering glucose, summary of characteristics

| | Efficacy[1] | Hypoglycemia | Weight change[2] | CV effects — Effect on MACE | CV effects — HF | Renal effects — Progression of DKD | Renal effects — Dosing/use considerations* | Oral/SQ | Cost | Clinical considerations |
|---|---|---|---|---|---|---|---|---|---|---|
| **Metformin** | High | No | Neutral (potential for modest loss) | Potential benefit | Neutral | Neutral | • Contraindicated with eGFR <30 mL/min per 1.73 m² | Oral | Low | • GI side effects common; to mitigate GI side effects, consider slow dose titration, extended release formulations, and administration with food • Potential for vitamin B12 deficiency; monitor at regular intervals |
| **SGLT2 inhibitors** | Intermediate to high | No | Loss (intermediate) | Benefit: canagliflozin, empagliflozin | Benefit: canagliflozin, dapagliflozin, empagliflozin, ertugliflozin | Benefit: canagliflozin, dapagliflozin, empagliflozin | • See labels for renal dose considerations of individual agents • Glucose-lowering effect is lower for SGLT2 inhibitors at lower eGFR | Oral | High | • DKA risk, rare in T2DM: discontinue, evaluate, and treat promptly if suspected; be aware of predisposing risk factors and clinical presentation (including euglycemic DKA); discontinue before scheduled surgery (e.g., 3–4 days), during critical illness, or during prolonged fasting to mitigate potential risk • Increased risk of genital mycotic infections • Necrotizing fasciitis of the perineum (Fournier gangrene), rare reports; institute prompt treatment if suspected • Attention to volume status, blood pressure; adjust other volume-contracting agents as applicable |
| **GLP-1 RAs** | High to very high | No | Loss (intermediate to very high) | Benefit: dulaglutide, liraglutide, semaglutide (SQ). Neutral: exenatide once weekly, lixisenatide | Neutral | Benefit for renal endpoints in CVOTs, driven by albuminuria outcomes: dulaglutide, liraglutide, semaglutide (SQ) | • See labels for renal dose considerations of individual agents • No dose adjustment for dulaglutide, liraglutide, semaglutide • Monitor renal function when initiating or escalating doses in patients with renal impairment reporting severe adverse GI reactions | SQ; oral (semaglutide) | High | • Risk of thyroid C-cell tumors in rodents; human relevance not determined (liraglutide, dulaglutide, exenatide extended release, semaglutide) • Counsel patients on potential for GI side effects and their typically temporary nature; provide guidance on dietary modifications to mitigate GI side effects (reduction in meal size, mindful eating practices [e.g., stop eating once full], decreasing intake of high-fat or spicy food); consider slower dose titration for patients experiencing GI challenges • Pancreatitis has been reported in clinical trials but causality has not been established. Discontinue if pancreatitis is suspected • Evaluate for gallbladder disease if cholelithiasis or cholecystitis is suspected |
| **GIP and GLP-1 RA** | Very high | No | Loss (very high) | Under investigation | Under investigation | Under investigation | • See label for renal dose considerations • No dose adjustment • Monitor renal function when initiating or escalating doses in patients with renal impairment reporting severe adverse GI reactions | SQ | High | • Risk of thyroid C-cell tumors in rodents; human relevance not determined • Counsel patients on potential for GI side effects and their typically temporary nature; provide guidance on dietary modifications to mitigate GI side effects (reduction in meal size, mindful eating practices [e.g., stop eating once full], decreasing intake of high-fat or spicy food); consider slower dose titration for patients experiencing GI challenges • Pancreatitis has been reported in clinical trials but causality has not been established. Discontinue if pancreatitis is suspected • Evaluate for gallbladder disease if cholelithiasis or cholecystitis is suspected |
| **DPP-4 inhibitors** | Intermediate | No | Neutral | Neutral | Neutral (potential risk, saxagliptin) | Neutral | • Renal dose adjustment required (sitagliptin, saxagliptin, alogliptin); can be used in renal impairment • No dose adjustment required for linagliptin | Oral | High | • Pancreatitis has been reported in clinical trials but causality has not been established. • Discontinue if pancreatitis is suspected • Joint pain • Bullous pemphigoid (postmarketing); discontinue if suspected |
| **Thiazolidinediones** | High | No | Gain | Potential benefit: pioglitazone | Increased risk | Neutral | • No dose adjustment required • Generally not recommended in renal impairment due to potential for fluid retention | Oral | Low | • Congestive HF (pioglitazone, rosiglitazone) • Fluid retention (edema; heart failure) • Benefit in NASH • Risk of bone fractures • Weight gain; consider lower doses to mitigate weight gain and edema |
| **Sulfonylureas (2nd generation)** | High | Yes | Gain | Neutral | Neutral | Neutral | • Glyburide generally not recommended in chronic kidney disease • Glipizide and glimepiride: initiate conservatively to avoid hypoglycemia | Oral | Low | • FDA Special Warning on increased risk of CV mortality based on studies of an older sulfonylurea (tolbutamide); glimepiride shown to be CV safe (see text) • Use with caution in persons at risk for hypoglycemia |
| **Insulin — Human / Analogs** | High to very high | Yes | Gain | Neutral | Neutral | Neutral | • Lower insulin doses required with a decrease in eGFR; titrate per clinical response | SQ inhaled / SQ | Low (SQ) / High | • Injection site reactions • Higher risk of hypoglycemia with human insulin (NPH or premixed formulations) vs. analogs |

CV, cardiovascular; CVOT, cardiovascular outcomes trial; DKA, diabetic ketoacidosis; DKD, diabetic kidney disease; DPP-4, dipeptidyl peptidase 4; eGFR, estimated glomerular filtration rate; FDA, U.S. Food and Drug Administration; GI, gastrointestinal; GIP, gastric inhibitory polypeptide; GLP-1 RA, glucagon-like peptide 1 receptor agonist; HF, heart failure; NASH, nonalcoholic steatohepatitis; MACE, major adverse cardiovascular events; SGLT2, sodium–glucose cotransporter 2; SQ, subcutaneous; T2DM, type 2 diabetes mellitus. *For agent-specific dosing recommendations, please refer to manufacturers' prescribing information. [1]Tsapas et al. (114). [2]Tsapas et al. (62). Reprinted from Davies et al. (45).

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

safely used in people with reduced estimated glomerular filtration rates (eGFR); the FDA has revised the label for metformin to reflect its safety in people with eGFR ≥30 mL/min/1.73 m² (49). A randomized trial confirmed previous observations that metformin use is associated with vitamin B12 deficiency and worsening of symptoms of neuropathy (50). This is compatible with a report from the Diabetes Prevention Program Outcomes Study (DPPOS) suggesting periodic testing of vitamin B12 (51) (see Section 3, "Prevention or Delay of Type 2 Diabetes and Associated Comorbidities").

When A1C is ≥1.5% (12.5 mmol/mol) above the glycemic target (see Section 6, "Glycemic Targets," for appropriate targets), many individuals will require dual-combination therapy or a more potent glucose-lowering agent to achieve and maintain their target A1C level (45,52) (**Fig. 9.3** and **Table 9.2**). Insulin has the advantage of being effective where other agents are not and should be considered as part of any combination regimen when hyperglycemia is severe, especially if catabolic features (weight loss, hypertriglyceridemia, ketosis) are present. It is common practice to initiate insulin therapy for people who present with blood glucose levels ≥300 mg/dL (16.7 mmol/L) or A1C >10% (86 mmol/mol) or if the individual has symptoms of hyperglycemia (i.e., polyuria or polydipsia) or evidence of catabolism (weight loss) (**Fig. 9.4**). As glucose toxicity resolves, simplifying the regimen and/or changing to noninsulin agents is often possible. However, there is evidence that people with uncontrolled hyperglycemia associated with type 2 diabetes can also be effectively treated with a sulfonylurea (53).

## Combination Therapy

Because type 2 diabetes is a progressive disease in many individuals, maintenance of glycemic targets often requires combination therapy. Traditional recommendations have been to use stepwise addition of medications to metformin to maintain A1C at target. The advantage of this is to provide a clear assessment of the positive and negative effects of new drugs and reduce potential side effects and expense (54). However, there are data to support initial combination therapy for more rapid attainment of glycemic goals (55,56) and later combination therapy for longer

durability of glycemic effect (57). The VERIFY (Vildagliptin Efficacy in combination with metfoRmIn For earlY treatment of type 2 diabetes) trial demonstrated that initial combination therapy is superior to sequential addition of medications for extending primary and secondary failure (58). In the VERIFY trial, participants receiving the initial combination of metformin and the dipeptidyl peptidase 4 (DPP-4) inhibitor vildagliptin had a slower decline of glycemic control compared with metformin alone and with vildagliptin added sequentially to metformin. These results have not been generalized to oral agents other than vildagliptin, but they suggest that more intensive early treatment has some benefits and should be considered through a shared decision-making process, as appropriate. Initial combination therapy should be considered in people presenting with A1C levels 1.5–2.0% above target. Finally, incorporation of high-glycemic-efficacy therapies or therapies for cardiovascular/renal risk reduction (e.g., GLP-1 RAs, SGLT2 inhibitors) may allow for weaning of the current regimen, particularly of agents that may increase the risk of hypoglycemia. Thus, treatment intensification may not necessarily follow a pure sequential addition of therapy but instead reflect a tailoring of the regimen in alignment with person-centered treatment goals (**Fig. 9.3**).

Recommendations for treatment intensification for people not meeting treatment goals should not be delayed. Shared decision-making is important in discussions regarding treatment intensification. The choice of medication added to initial therapy is based on the clinical characteristics of the individual and their preferences. Important clinical characteristics include the presence of established ASCVD or indicators of high ASCVD risk, HF, CKD, obesity, nonalcoholic fatty liver disease or nonalcoholic steatohepatitis, and risk for specific adverse drug effects, as well as safety, tolerability, and cost. Results from comparative effectiveness meta-analyses suggest that each new class of noninsulin agents added to initial therapy with metformin generally lowers A1C approximately 0.7–1.0% (59,60) (**Fig. 9.3** and **Table 9.2**).

For people with type 2 diabetes and established ASCVD or indicators of high ASCVD risk, HF, or CKD, an SGLT2 inhibitor and/or GLP-1 RA with demonstrated CVD benefit (see **Table 9.2**, **Table 10.3B**,

**Table 10.3C**, and Section 10, "Cardiovascular Disease and Risk Management") is recommended as part of the glucose-lowering regimen independent of A1C, independent of metformin use and in consideration of person-specific factors (**Fig. 9.3**). For people without established ASCVD, indicators of high ASCVD risk, HF, or CKD, medication choice is guided by efficacy in support of individualized glycemic and weight management goals, avoidance of side effects (particularly hypoglycemia and weight gain), cost/access, and individual preferences (61). A systematic review and network meta-analysis suggests greatest reductions in A1C level with insulin regimens and specific GLP-1 RAs added to metformin-based background therapy (62). In all cases, treatment regimens need to be continuously reviewed for efficacy, side effects, and burden (**Table 9.2**). In some instances, the individual will require medication reduction or discontinuation. Common reasons for this include ineffectiveness, intolerable side effects, expense, or a change in glycemic goals (e.g., in response to development of comorbidities or changes in treatment goals). Section 13, "Older Adults," has a full discussion of treatment considerations in older adults, in whom changes of glycemic goals and de-escalation of therapy are common.

The need for the greater potency of injectable medications is common, particularly in people with a longer duration of diabetes. The addition of basal insulin, either human NPH or one of the long-acting insulin analogs, to oral agent regimens is a well-established approach that is effective for many individuals. In addition, evidence supports the utility of GLP-1 RAs in people not at glycemic goal. While most GLP-1 RAs are injectable, an oral formulation of semaglutide is commercially available (63). In trials comparing the addition of an injectable GLP-1 RA or insulin in people needing further glucose lowering, glycemic efficacy of injectable GLP-1 RA was similar or greater than that of basal insulin (64–70). GLP-1 RAs in these trials had a lower risk of hypoglycemia and beneficial effects on body weight compared with insulin, albeit with greater gastrointestinal side effects. Thus, trial results support GLP-1 RAs as the preferred option for individuals requiring the potency of an injectable therapy for glucose control (**Fig. 9.4**). In individuals

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023



**Figure 9.4**—Intensifying to injectable therapies in type 2 diabetes. DSMES, diabetes self-management education and support; FPG, fasting plasma glucose; GLP-1 RA, glucagon-like peptide 1 receptor agonist; max, maximum; PPG, postprandial glucose. Adapted from Davies et al. (43).

1. Consider insulin as the first injectable if evidence of ongoing catabolism, symptoms of hyperglycemia are present, when A1C levels (>10% [86 mmol/mol]) or blood glucose levels ( 300 mg/dL [16.7 mmol/L]) are very high, or a diagnosis of type 1 diabetes is a possibility.
2. When selecting GLP-1 RA, consider individual preference, A1C lowering, weight-lowering effect, or fequency of injection. If CVD is present, consider GLP-1 RA with proven CVD benefit. Oral or injectable GLP-1 RA are appropriate.
3. For people on GLP-1 RA and basal insulin combination, consider use of a fixed-ratio combination product (IDegLira or iGlarLixi).
4. Consider switching from evening NPH to a basal analog if the individual develops hypoglycemia and/or frequently forgets to administer NPH in the evening and would be better managed with an A.M. dose of a long-acting basal insulin.
5. If adding prandial insulin to NPH, consider initiation of a self-mixed or premixed insulin regimen to decrease the number of injections required.

Appx213

who are intensified to insulin therapy, combination therapy with a GLP-1 RA has been shown to have greater efficacy and durability of glycemic treatment effect, as well as weight and hypoglycemia benefit, than treatment intensification with insulin alone (45). However, cost and tolerability issues are important considerations in GLP-1 RA use.

Costs for diabetes medications have increased dramatically over the past two decades, and an increasing proportion is now passed on to patients and their families (71). **Table 9.3** provides cost information for currently approved noninsulin therapies. Of note, prices listed are average wholesale prices (AWP) (72) and National Average Drug Acquisition Costs (NADAC) (73), separate measures to allow for a comparison of drug prices, but do not account for discounts, rebates, or other price adjustments often involved in prescription sales that affect the actual cost incurred by the patient. Medication costs can be a major source of stress for people with diabetes and contribute to worse medication-taking behavior (74); cost-reducing strategies may improve medication-taking behavior in some cases (75).

### Cardiovascular Outcomes Trials
There are now multiple large randomized controlled trials reporting statistically significant reductions in cardiovascular events in adults with type 2 diabetes treated with an SGLT2 inhibitor or GLP-1 RA; see Section 10, "Cardiovascular Disease and Risk Management" for details. Participants enrolled in many of the cardiovascular outcomes trials had A1C ≥6.5%, with more than 70% taking metformin at baseline, with analyses indicating benefit with or without metformin (45). Thus, a practical extension of these results to clinical practice is to use these medications preferentially in people with type 2 diabetes and established ASCVD or indicators of high ASCVD risk. For these individuals, incorporating one of the SGLT2 inhibitors and/or GLP-1 RAs that have been demonstrated to have cardiovascular disease benefit is recommended (see **Fig. 9.3**, **Table 9.2**, and Section 10, "Cardiovascular Disease and Risk Management"). Emerging data suggest that use of both classes of drugs will provide additional cardiovascular and kidney outcomes benefit; thus, combination therapy with an SGLT2 inhibitor and a GLP-1 RA may be considered to provide the complementary outcomes benefits associated with these classes of medication (76). In cardiovascular outcomes trials, empagliflozin, canagliflozin, dapagliflozin, liraglutide, semaglutide, and dulaglutide all had beneficial effects on indices of CKD, while dedicated renal outcomes studies have demonstrated benefit of specific SGLT2 inhibitors. See Section 11, "Chronic Kidney Disease and Risk Management," for discussion of how CKD may impact treatment choices. Additional large randomized trials of other agents in these classes are ongoing.

### Insulin Therapy
Many adults with type 2 diabetes eventually require and benefit from insulin therapy (**Fig. 9.4**). See the section INSULIN INJECTION TECHNIQUE, above, for guidance on how to administer insulin safely and effectively. The progressive nature of type 2 diabetes should be regularly and objectively explained to patients, and clinicians should avoid using insulin as a threat or describing it as a sign of personal failure or punishment. Rather, the utility and importance of insulin to maintain glycemic control once progression of the disease overcomes the effect of other agents should be emphasized. Educating and involving patients in insulin management is beneficial. For example, instruction of individuals with type 2 diabetes initiating insulin in self-titration of insulin doses based on glucose monitoring improves glycemic control (77). Comprehensive education regarding blood glucose monitoring, nutrition, and the avoidance and appropriate treatment of hypoglycemia are critically important in any individual using insulin.

#### Basal Insulin
Basal insulin alone is the most convenient initial insulin treatment and can be added to metformin and other noninsulin injectables. Starting doses can be estimated based on body weight (0.1–0.2 units/kg/day) and the degree of hyperglycemia, with individualized titration over days to weeks as needed. The principal action of basal insulin is to restrain hepatic glucose production and limit hyperglycemia overnight and between meals (78,79). Control of fasting glucose can be achieved with human NPH insulin or a long-acting insulin analog. In clinical trials, long-acting basal analogs (U-100 glargine or detemir) have been demonstrated to reduce the risk of symptomatic and nocturnal hypoglycemia compared with NPH insulin (80–85), although these advantages are modest and may not persist (86). Longer-acting basal analogs (U-300 glargine or degludec) may convey a lower hypoglycemia risk compared with U-100 glargine when used in combination with oral agents (87–93). Clinicians should be aware of the potential for overbasalization with insulin therapy. Clinical signals that may prompt evaluation of overbasalization include basal dose greater than ~0.5 units/kg, high bedtime–morning or postprandial glucose differential (e.g., bedtime–morning glucose differential ≥50 mg/dL), hypoglycemia (aware or unaware), and high variability. Indication of overbasalization should prompt reevaluation to further individualize therapy (94).

The cost of insulin has been rising steadily over the past two decades, at a pace severalfold that of other medical expenditures (95). This expense contributes significant burden to patients as insulin has become a growing "out-of-pocket" cost for people with diabetes, and direct patient costs contribute to decrease in medication-taking behavior (95). Therefore, consideration of cost is an important component of effective management. For many individuals with type 2 diabetes (e.g., individuals with relaxed A1C goals, low rates of hypoglycemia, and prominent insulin resistance, as well as those with cost concerns), human insulin (NPH and regular) may be the appropriate choice of therapy, and clinicians should be familiar with its use (96). Human regular insulin, NPH, and 70/30 NPH/regular products can be purchased for considerably less than the AWP and NADAC prices listed in **Table 9.4** at select pharmacies. Additionally, approval of follow-on biologics for insulin glargine, the first interchangeable insulin glargine product, and generic versions of analog insulins may expand cost-effective options.

#### Prandial Insulin
Many individuals with type 2 diabetes require doses of insulin before meals, in addition to basal insulin, to reach glycemic targets. If the individual is not already being treated with a GLP-1 RA, a GLP-1 RA (either in free combination or fixed-ratio combination) should be considered prior to prandial insulin to further

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23soo09.pdf by guest on 07 December 2023

**Table 9.3—Median monthly (30-day) AWP and NADAC of maximum approved daily dose of noninsulin glucose-lowering agents in the U.S.**

| Class | Compound(s) | Dosage strength/product (if applicable) | Median AWP (min, max)† | Median NADAC (min, max)† | Maximum approved daily dose* |
|---|---|---|---|---|---|
| Biguanides | • Metformin | 850 mg (IR) | $106 ($5, $189) | $2 | 2,550 mg |
| | | 1,000 mg (IR) | $87 ($3, $144) | $2 | 2,000 mg |
| | | 1,000 mg (ER) | $242 ($242, $7,214) | $32 ($32, $160) | 2,000 mg |
| Sulfonylureas (2nd generation) | • Glimepiride | 4 mg | $74 ($71, $198) | $3 | 8 mg |
| | • Glipizide | 10 mg (IR) | $70 ($67, $91) | $6 | 40 mg |
| | | 10 mg (XL/ER) | $48 ($46, $48) | $11 | 20 mg |
| | • Glyburide | 6 mg (micronized) | $52 ($48, $71) | $12 | 12 mg |
| | | 5 mg | $79 ($63, $93) | $9 | 20 mg |
| Thiazolidinedione | • Pioglitazone | 45 mg | $345 ($7, $349) | $4 | 45 mg |
| α-Glucosidase inhibitors | • Acarbose | 100 mg | $106 ($104, $106) | $29 | 300 mg |
| | • Miglitol | 100 mg | $241 ($241, $346) | NA | 300 mg |
| Meglitinides | • Nateglinide | 120 mg | $155 | $27 | 360 mg |
| | • Repaglinide | 2 mg | $878 ($58, $897) | $31 | 16 mg |
| DPP-4 inhibitors | • Alogliptin | 25 mg | $234 | $154 | 25 mg |
| | • Saxagliptin | 5 mg | $565 | $452 | 5 mg |
| | • Linagliptin | 5 mg | $606 | $485 | 5 mg |
| | • Sitagliptin | 100 mg | $626 | $500 | 100 mg |
| SGLT2 inhibitors | • Ertugliflozin | 15 mg | $390 | $312 | 15 mg |
| | • Dapagliflozin | 10 mg | $659 | $527 | 10 mg |
| | • Canagliflozin | 300 mg | $684 | $548 | 300 mg |
| | • Empagliflozin | 25 mg | $685 | $547 | 25 mg |
| GLP-1 RAs | • Exenatide (extended release) | 2 mg powder for suspension or pen | $936 | $726 | 2 mg** |
| | • Exenatide | 10 μg pen | $961 | $770 | 20 μg |
| | • Dulaglutide | 4.5 mg mL pen | $1,064 | $852 | 4.5 mg** |
| | • Semaglutide | 1 mg pen | $1,070 | $858 | 2 mg** |
| | | 14 mg (tablet) | $1,070 | $858 | 14 mg |
| | • Liraglutide | 1.8 mg pen | $1,278 | $1,022 | 1.8 mg |
| | • Lixisenatide | 20 μg pen | $814 | NA | 20 μg |
| GLP-1/GIP dual agonist | • Tirzepatide | 15 mg pen | $1,169 | $935 | 15 mg** |
| Bile acid sequestrant | • Colesevelam | 625 mg tabs | $711 ($674, $712) | $83 | 3.75 g |
| | | 3.75 g suspension | $674 ($673, $675) | $177 | 3.75 g |
| Dopamine-2 agonist | • Bromocriptine | 0.8 mg | $1,118 | $899 | 4.8 mg |
| Amylin mimetic | • Pramlintide | 120 μg pen | $2,783 | NA | 120 μg/injection†† |

AWP, average wholesale price; DPP-4, dipeptidyl peptidase 4; ER and XL, extended release; GIP, glucose-dependent insulinotropic polypeptide; GLP-1 RA, glucagon-like peptide 1 receptor agonist; IR, immediate release; max, maximum; min, minimum; NA, data not available; NADAC, National Average Drug Acquisition Cost; SGLT2, sodium-glucose cotransporter 2. †Calculated for 30-day supply (AWP [72] or NADAC [73] unit price × number of doses required to provide maximum approved daily dose × 30 days); median AWP or NADAC listed alone when only one product and/or price. *Utilized to calculate median AWP and NADAC (min, max); generic prices used, if available commercially. **Administered once weekly. ††AWP and NADAC calculated based on 120 μg three times daily.

address prandial control and to minimize the risks of hypoglycemia and weight gain associated with insulin therapy (45). For individuals who advance to prandial insulin, a prandial insulin dose of 4 units or 10% of the amount of basal insulin at the largest meal or the meal with the greatest postprandial excursion is a safe estimate for initiating therapy. The prandial insulin regimen can then be intensified based on individual needs (**Fig. 9.4**). Individuals with type 2 diabetes are generally more insulin resistant than those

with type 1 diabetes, require higher daily doses (~1 unit/kg), and have lower rates of hypoglycemia (97). Titration can be based on home glucose monitoring or A1C. With significant additions to the prandial insulin dose, particularly with the evening meal, consideration should be given to decreasing basal insulin. Meta-analyses of trials comparing rapid-acting insulin analogs with human regular insulin in type 2 diabetes have not reported important differences in A1C or hypoglycemia (98,99).

### Concentrated Insulins

Several concentrated insulin preparations are currently available. U-500 regular insulin is, by definition, five times more concentrated than U-100 regular insulin. U-500 regular insulin has distinct pharmacokinetics with delayed onset and longer duration of action, has characteristics more like an intermediate-acting (NPH) insulin, and can be used as two or three daily injections (100). U-300 glargine and U-200 degludec are three and two times as concentrated as their U-100

Appx215

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

**Table 9.4—Median cost of insulin products in the U.S. calculated as AWP (72) and NADAC (73) per 1,000 units of specified dosage form/product**

| Insulins | Compounds | Dosage form/product | Median AWP (min, max)* | Median NADAC* |
|---|---|---|---|---|
| Rapid-acting | • Lispro follow-on product | U-100 vial | $118 ($118, $157) | $94 |
| | | U-100 prefilled pen | $151 | $121 |
| | • Lispro | U-100 vial | $99† | $79† |
| | | U-100 cartridge | $408 | $326 |
| | | U-100 prefilled pen | $127† | $102† |
| | | U-200 prefilled pen | $424 | $339 |
| | • Lispro-aabc | U-100 vial | $330 | $261 |
| | | U-100 prefilled pen | $424 | $339 |
| | | U-200 prefilled pen | $424 | NA |
| | • Glulisine | U-100 vial | $341 | $272 |
| | | U-100 prefilled pen | $439 | $351 |
| | • Aspart | U-100 vial | $174† | $140† |
| | | U-100 cartridge | $215† | $172† |
| | | U-100 prefilled pen | $224† | $180† |
| | • Aspart ("faster acting product") | U-100 vial | $347 | $277 |
| | | U-100 cartridge | $430 | $344 |
| | | U-100 prefilled pen | $447 | $357 |
| | • Inhaled insulin | Inhalation cartridges | $1,418 | NA |
| Short-acting | • Human regular | U-100 vial | $165†† | $132†† |
| | | U-100 prefilled pen | $208 | $166 |
| Intermediate-acting | • Human NPH | U-100 vial | $165†† | $132†† |
| | | U-100 prefilled pen | $208 | $168 |
| Concentrated human regular insulin | • U-500 human regular insulin | U-500 vial | $178 | $142 |
| | | U-500 prefilled pen | $230 | $184 |
| Long-acting | • Glargine follow-on products | U-100 prefilled pen | $261 ($118, $323) | $209 ($209, $258) |
| | | U-100 vial | $118 ($118, $323) | $95 |
| | • Glargine | U-100 vial; U-100 prefilled pen | $136† | $109† |
| | | U-300 prefilled pen | $346 | $277 |
| | • Detemir | U-100 vial; U-100 prefilled pen | $370 | $296 |
| | • Degludec | U-100 vial; U-100 prefilled pen; U-200 prefilled pen | $407 | $326 |
| Premixed insulin products | • NPH/regular 70/30 | U-100 vial | $165†† | $133†† |
| | | U-100 prefilled pen | $208 | $167 |
| | • Lispro 50/50 | U-100 vial | $342 | $274 |
| | | U-100 prefilled pen | $424 | $339 |
| | • Lispro 75/25 | U-100 vial | $342 | $273 |
| | | U-100 prefilled pen | $127† | $103† |
| | • Aspart 70/30 | U-100 vial | $180† | $146† |
| | | U-100 prefilled pen | $224† | $178† |
| Premixed insulin/GLP-1 RA products | • Glargine/Lixisenatide | 100/33 μg prefilled pen | $646 | $517 |
| | • Degludec/Liraglutide | 100/3.6 μg prefilled pen | $944 | $760 |

AWP, average wholesale price; GLP-1 RA, glucagon-like peptide 1 receptor agonist; NA, data not available; NADAC, National Average Drug Acquisition Cost. *AWP or NADAC calculated as in **Table 9.3**. †Generic prices used when available. ††AWP and NADAC data presented do not include vials of regular human insulin and NPH available at Walmart for approximately $25/vial; median listed alone when only one product and/or price.

formulations, respectively, and allow higher doses of basal insulin administration per volume used. U-300 glargine has a longer duration of action than U-100 glargine but modestly lower efficacy per unit administered (101,102). The FDA has also approved a concentrated formulation of rapid-acting insulin lispro, U-200 (200 units/mL), and insulin lispro-aabc (U-200). These concentrated preparations may be more convenient and comfortable for individuals to inject and may improve treatment plan engagement in those with insulin resistance who require large doses of insulin. While U-500 regular insulin is available in both prefilled pens and vials, other concentrated insulins are available only in prefilled pens to minimize the risk of dosing errors.

*Alternative Insulin Routes*
Insulins with different routes of administration (inhaled, bolus-only insulin delivery patch pump) are also available (45). Inhaled insulin is available as a rapid-acting insulin; studies in individuals with type 1 diabetes suggest rapid pharmacokinetics (8). Studies comparing inhaled insulin with injectable insulin have demonstrated its faster onset and shorter duration compared with rapid-acting insulin lispro as well as clinically meaningful A1C reductions and weight reductions compared with insulin aspart over 24 weeks (103–105). Use of inhaled insulin may result in a decline in lung function (reduced forced expiratory volume in 1 s [FEV$_1$]). Inhaled insulin is contraindicated in individuals with chronic lung disease, such as asthma and chronic obstructive pulmonary disease, and is not

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

recommended in individuals who smoke or who recently stopped smoking. All individuals require spirometry ($FEV_1$) testing to identify potential lung disease prior to and after starting inhaled insulin therapy.

**Combination Injectable Therapy**

If basal insulin has been titrated to an acceptable fasting blood glucose level (or if the dose is >0.5 units/kg/day with indications of need for other therapy) and A1C remains above target, consider advancing to combination injectable therapy (**Fig. 9.4**). This approach can use a GLP-1 RA or dual GIP and GLP-1 RA added to basal insulin or multiple doses of insulin. The combination of basal insulin and GLP-1 RA has potent glucose-lowering actions and less weight gain and hypoglycemia compared with intensified insulin regimens (106–111). The DUAL VIII (Durability of Insulin Degludec Plus Liraglutide Versus Insulin Glargine U100 as Initial Injectable Therapy in Type 2 Diabetes) randomized controlled trial demonstrated greater durability of glycemic treatment effect with the combination GLP-1 RA–insulin therapy compared with addition of basal insulin alone (57). In select individuals, complex insulin regimens can also be simplified with combination GLP-1 RA–insulin therapy in type 2 diabetes (112). Two different once-daily, fixed dual combination products containing basal insulin plus a GLP-1 RA are available: insulin glargine plus lixisenatide (iGlarLixi) and insulin degludec plus liraglutide (IDegLira).

Intensification of insulin treatment can be done by adding doses of prandial insulin to basal insulin. Starting with a single prandial dose with the largest meal of the day is simple and effective, and it can be advanced to a regimen with multiple prandial doses if necessary (113). Alternatively, in an individual on basal insulin in whom additional prandial coverage is desired, the regimen can be converted to two doses of a premixed insulin. Each approach has advantages and disadvantages. For example, basal-prandial regimens offer greater flexibility for individuals who eat on irregular schedules. On the other hand, two doses of premixed insulin is a simple, convenient means of spreading insulin across the day. Moreover, human insulins, separately, self-mixed, or as premixed NPH/regular (70/30) formulations, are less costly alternatives to insulin analogs. **Figure 9.4** outlines these options as well as recommendations for further intensification, if needed, to achieve glycemic goals. When initiating combination injectable therapy, metformin therapy should be maintained, while sulfonylureas and DPP-4 inhibitors are typically weaned or discontinued. In individuals with suboptimal blood glucose control, especially those requiring large insulin doses, adjunctive use of a thiazolidinedione or an SGLT2 inhibitor may help to improve control and reduce the amount of insulin needed, though potential side effects should be considered. Once a basal-bolus insulin regimen is initiated, dose titration is important, with adjustments made in both mealtime and basal insulins based on the blood glucose levels and an understanding of the pharmacodynamic profile of each formulation (also known as pattern control or pattern management). As people with type 2 diabetes get older, it may become necessary to simplify complex insulin regimens because of a decline in self-management ability (see Section 13, "Older Adults").

**References**

1. Cleary PA, Orchard TJ, Genuth S, et al.; DCCT/EDIC Research Group. The effect of intensive glycemic treatment on coronary artery calcification in type 1 diabetic participants of the Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications (DCCT/EDIC) Study. Diabetes 2006;55:3556–3565

2. Nathan DM, Cleary PA, Backlund JYC, et al.; Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications (DCCT/EDIC) Study Research Group. Intensive diabetes treatment and cardiovascular disease in patients with type 1 diabetes. N Engl J Med 2005;353:2643–2653

3. Diabetes Control and Complications Trial (DCCT)/Epidemiology of Diabetes Interventions and Complications (EDIC) Study Research Group. Mortality in type 1 diabetes in the DCCT/EDIC versus the general population. Diabetes Care 2016;39:1378–1383

4. Writing Team for the Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications Research Group. Effect of intensive therapy on the microvascular complications of type 1 diabetes mellitus. JAMA 2002;287:2563–2569

5. Holt RIG, DeVries JH, Hess-Fischl A, et al. The management of type 1 diabetes in adults. A consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). Diabetes Care 2021;44:2589–2625

6. Tricco AC, Ashoor HM, Antony J, et al. Safety, effectiveness, and cost effectiveness of long acting versus intermediate acting insulin for patients with type 1 diabetes: systematic review and network meta-analysis. BMJ 2014;349:g5459

7. Bartley PC, Bogoev M, Larsen J, Philotheou A. Long-term efficacy and safety of insulin detemir compared to neutral protamine Hagedorn insulin in patients with type 1 diabetes using a treat-to-target basal-bolus regimen with insulin aspart at meals: a 2-year, randomized, controlled trial. Diabet Med 2008;25:442–449

8. DeWitt DE, Hirsch IB. Outpatient insulin therapy in type 1 and type 2 diabetes mellitus: scientific review. JAMA 2003;289:2254–2264

9. Bode BW, McGill JB, Lorber DL, Gross JL, Chang PC; Affinity 1 Study Group. Inhaled technosphere insulin compared with injected dianabol insulin in type 1 diabetes: a randomized 24-week trial. Diabetes Care 2015;38:2266–2273

10. Russell-Jones D, Bode BW, De Block C, et al. Fast-acting insulin aspart improves glycemic control in basal-bolus treatment for type 1 diabetes: results of a 26-week multicenter, active-controlled, treat-to-target, randomized, parallel-group trial (onset 1). Diabetes Care 2017;40:943–950

11. Klaff L, Cao D, Dellva MA, et al. Ultra rapid lispro improves postprandial glucose control compared with lispro in patients with type 1 diabetes: Results from the 26-week PRONTO-T1D study. Diabetes Obes Metab 2020;22:1799–1807

12. Blevins T, Zhang Q, Frias JP, Jinnouchi H; PRONTO-T2D Investigators. Randomized double-blind clinical trial comparing ultra rapid lispro with lispro in a basal-bolus regimen in patients with type 2 diabetes: PRONTO-T2D. Diabetes Care 2020;43:2991–2998

13. Lane W, Bailey TS, Gerety G, et al.; Group Information; SWITCH 1. Effect of insulin degludec vs insulin glargine U100 on hypoglycemia in patients with type 1 diabetes: the SWITCH 1 randomized clinical trial. JAMA 2017;318:33–44

14. Home PD, Bergenstal RM, Bolli GB, et al. New insulin glargine 300 units/mL versus glargine 100 units/mL in people with type 1 diabetes: a randomized, phase 3a, open-label clinical trial (EDITION 4). Diabetes Care 2015;38:2217–2225

15. Yeh HC, Brown TT, Maruthur N, et al. Comparative effectiveness and safety of methods of insulin delivery and glucose monitoring for diabetes mellitus: a systematic review and meta-analysis. Ann Intern Med 2012;157:336–347

16. Pickup JC. The evidence base for diabetes technology: appropriate and inappropriate meta-analysis. J Diabetes Sci Technol 2013;7:1567–1574

17. Bergenstal RM, Klonoff DC, Garg SK, et al.; ASPIRE In-Home Study Group. Threshold-based insulin-pump interruption for reduction of hypoglycemia. N Engl J Med 2013;369:224–232

18. Buckingham BA, Raghinaru D, Cameron F, et al.; In Home Closed Loop Study Group. Predictive low-glucose insulin suspension reduces duration of nocturnal hypoglycemia in children without increasing ketosis. Diabetes Care 2015;38:1197–1204

19. Bergenstal RM, Garg S, Weinzimer SA, et al. Safety of a hybrid closed-loop insulin delivery system in patients with type 1 diabetes. JAMA 2016;316:1407–1408

20. Garg SK, Weinzimer SA, Tamborlane WV, et al. Glucose outcomes with the in-home use of a hybrid closed-loop insulin delivery system in adolescents and adults with type 1 diabetes. Diabetes Technol Ther 2017;19:155–163

21. Tauschmann M, Thabit H, Bally L, et al.; APCam11 Consortium. Closed-loop insulin delivery in suboptimally controlled type 1 diabetes: a

multicentre, 12-week randomised trial. Lancet 2018;392:1321–1329

22. Brown SA, Kovatchev BP, Raghinaru D, et al.; iDCL Trial Research Group. Six-month randomized, multicenter trial of closed-loop control in type 1 diabetes. N Engl J Med 2019;381:1707–1717

23. Peters AL, Laffel L (Eds.). *American Diabetes Association/JDRF Type 1 Diabetes Sourcebook*. Alexandria, VA, American Diabetes Association, 2013

24. Chiang JL, Kirkman MS, Laffel LMB; Type 1 Diabetes Sourcebook Authors. Type 1 diabetes through the life span: a position statement of the American Diabetes Association. Diabetes Care 2014;37:2034–2054

25. Bell KJ, Barclay AW, Petocz P, Colagiuri S, Brand-Miller JC. Efficacy of carbohydrate counting in type 1 diabetes: a systematic review and meta-analysis. Lancet Diabetes Endocrinol 2014;2:133–140

26. Vaz EC, Porfírio GJM, Nunes HRC, Nunes-Nogueira VDS. Effectiveness and safety of carbohydrate counting in the management of adult patients with type 1 diabetes mellitus: a systematic review and meta-analysis. Arch Endocrinol Metab 2018;62:337–345

27. Bell KJ, Smart CE, Steil GM, Brand-Miller JC, King B, Wolpert HA. Impact of fat, protein, and glycemic index on postprandial glucose control in type 1 diabetes: implications for intensive diabetes management in the continuous glucose monitoring era. Diabetes Care 2015;38:1008–1015

28. Frid AH, Kreugel G, Grassi G, et al. New insulin delivery recommendations. Mayo Clin Proc 2016; 91:1231–1255

29. Bergenstal RM, Strock ES, Peremislov D, Gibney MA, Parvu V, Hirsch LJ. Safety and efficacy of insulin therapy delivered via a 4mm pen needle in obese patients with diabetes. Mayo Clin Proc 2015;90:329–338

30. Whitehouse F, Kruger DF, Fineman M, et al. A randomized study and open-label extension evaluating the long-term efficacy of pramlintide as an adjunct to insulin therapy in type 1 diabetes. Diabetes Care 2002;25:724–730

31. Ratner RE, Want LL, Fineman MS, et al. Adjunctive therapy with the amylin analogue pramlintide leads to a combined improvement in glycemic and weight control in insulin-treated subjects with type 2 diabetes. Diabetes Technol Ther 2002;4:51–61

32. Hollander PA, Levy P, Fineman MS, et al. Pramlintide as an adjunct to insulin therapy improves long-term glycemic and weight control in patients with type 2 diabetes: a 1-year randomized controlled trial. Diabetes Care 2003;26:784–790

33. Ratner RE, Dickey R, Fineman M, et al. Amylin replacement with pramlintide as an adjunct to insulin therapy improves long-term glycaemic and weight control in type 1 diabetes mellitus: a 1-year, randomized controlled trial. Diabet Med 2004; 21:1204–1212

34. Meng H, Zhang A, Liang Y, Hao J, Zhang X, Lu J. Effect of metformin on glycaemic control in patients with type 1 diabetes: a meta-analysis of randomized controlled trials. Diabetes Metab Res Rev 2018;34:e2983

35. Petrie JR, Chaturvedi N, Ford I, et al.; REMOVAL Study Group. Cardiovascular and metabolic effects of metformin in patients with type 1 diabetes (REMOVAL): a double-blind, randomised, placebo-controlled trial. Lancet Diabetes Endocrinol 2017;5:597–609

36. Mathieu C, Zinman B, Hemmingsson JU, et al.; ADJUNCT ONE Investigators. Efficacy and safety of liraglutide added to insulin treatment in type 1 diabetes: the ADJUNCT ONE treat-to-target randomized trial. Diabetes Care 2016;39:1702–1710

37. Ahrén B, Hirsch IB, Pieber TR, et al.; ADJUNCT TWO Investigators. Efficacy and safety of liraglutide added to capped insulin treatment in subjects with type 1 diabetes: the ADJUNCT TWO randomized trial. Diabetes Care 2016;39:1693–1701

38. Dandona P, Mathieu C, Phillip M, et al.; DEPICT-1 Investigators. Efficacy and safety of dapagliflozin in patients with inadequately controlled type 1 diabetes (DEPICT-1): 24 week results from a multicentre, double-blind, phase 3, randomised controlled trial. Lancet Diabetes Endocrinol 2017;5:864–876

39. Rosenstock J, Marquard J, Laffel LM, et al. Empagliflozin as adjunctive to insulin therapy in type 1 diabetes: the EASE trials. Diabetes Care 2018;41:2560–2569

40. Snaith JR, Holmes-Walker DJ, Greenfield JR. Reducing type 1 diabetes mortality: role for adjunctive therapies? Trends Endocrinol Metab 2020;31:150–164

41. Danne T, Garg S, Peters AL, et al. International consensus on risk management of diabetic ketoacidosis in patients with type 1 diabetes treated with sodium-glucose cotransporter (SGLT) inhibitors. Diabetes Care 2019;42:1147–1154

42. Dean PG, Kukla A, Stegall MD, Kudva YC. Pancreas transplantation. BMJ 2017;357:j1321. Accessed 18 October 2022. Available from https://www.bmj.com/content/357/bmj.j1321

43. Davies MJ, D'Alessio DA, Fradkin J, et al. Management of hyperglycemia in type 2 diabetes, 2018. A consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). Diabetes Care 2018; 41:2669–2701

44. Buse JB, Wexler DJ, Tsapas A, et al. 2019 Update to: management of hyperglycemia in type 2 diabetes, 2018. A consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). Diabetes Care 2020;43:487–493

45. Davies MJ, Aroda VR, Collins BS, et al. Management of hyperglycemia in type 2 diabetes, 2022. A consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). Diabetes Care 2022; 45:2753–2786

46. Lingvay I, Sumithran P, Cohen RV, le Roux CW. Obesity management as a primary treatment goal for type 2 diabetes: time to reframe the conversation. Lancet 2022;399:394–405

47. Holman RR, Paul SK, Bethel MA, Matthews DR, Neil HAW. 10-year follow-up of intensive glucose control in type 2 diabetes. N Engl J Med 2008;359:1577–1589

48. Maruthur NM, Tseng E, Hutfless S, et al. Diabetes medications as monotherapy or metformin-based combination therapy for type 2 diabetes: a systematic review and meta-analysis. Ann Intern Med 2016;164:740–751

49. U.S. Food and Drug Administration. FDA Drug Safety Communication: FDA revises warnings regarding use of the diabetes medicine metformin in certain patients with reduced kidney function. Accessed 18 October 2022. Available from https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-fda-revises-warnings-regarding-use-diabetes-medicine-metformin-certain

50. Out M, Kooy A, Lehert P, Schalkwijk CA, Stehouwer CDA. Long-term treatment with metformin in type 2 diabetes and methylmalonic acid: post hoc analysis of a randomized controlled 4.3-year trial. J Diabetes Complications 2018;32:171–178

51. Aroda VR, Edelstein SL, Goldberg RB, et al.; Diabetes Prevention Program Research Group. Long-term metformin use and vitamin B12 deficiency in the Diabetes Prevention Program Outcomes Study. J Clin Endocrinol Metab 2016;101:1754–1761

52. Henry RR, Murray AV, Marmolejo MH, Hennicken D, Ptaszynska A, List JF. Dapagliflozin, metformin XR, or both: initial pharmacotherapy for type 2 diabetes, a randomised controlled trial. Int J Clin Pract 2012;66:446–456

53. Babu A, Mehta A, Guerrero P, et al. Safe and simple emergency department discharge therapy for patients with type 2 diabetes mellitus and severe hyperglycemia. Endocr Pract 2009;15:696–704

54. Cahn A, Cefalu WT. Clinical considerations for use of initial combination therapy in type 2 diabetes. Diabetes Care 2016;39(Suppl. 2):S137–S145

55. Abdul-Ghani MA, Puckett C, Triplitt C, et al. Initial combination therapy with metformin, pioglitazone and exenatide is more effective than sequential add-on therapy in subjects with new-onset diabetes. Results from the Efficacy and Durability of Initial Combination Therapy for Type 2 Diabetes (EDICT): a randomized trial. Diabetes Obes Metab 2015;17:268–275

56. Phung OJ, Sobieraj DM, Engel SS, Rajpathak SN. Early combination therapy for the treatment of type 2 diabetes mellitus: systematic review and meta-analysis. Diabetes Obes Metab 2014;16:410–417

57. Aroda VR, González-Galvez G, Grøn R, et al. Durability of insulin degludec plus liraglutide versus insulin glargine U100 as initial injectable therapy in type 2 diabetes (DUAL VIII): a multicentre, open-label, phase 3b, randomised controlled trial. Lancet Diabetes Endocrinol 2019;7:596–606

58. Matthews DR, Paldánius PM, Proot P, Chiang Y, Stumvoll M; VERIFY study group. Glycaemic durability of an early combination therapy with vildagliptin and metformin versus sequential metformin monotherapy in newly diagnosed type 2 diabetes (VERIFY): a 5-year, multicentre, randomised, double-blind trial. Lancet 2019;394:1519–1529

59. Bennett WL, Maruthur NM, Singh S, et al. Comparative effectiveness and safety of medications for type 2 diabetes: an update including new drugs and 2-drug combinations. Ann Intern Med 2011; 154:602–613

60. Maloney A, Rosenstock J, Fonseca V. A model-based meta-analysis of 24 antihyperglycemic drugs for type 2 diabetes: comparison of treatment effects at therapeutic doses. Clin Pharmacol Ther 2019;105:1213–1223

61. Vijan S, Sussman JB, Yudkin JS, Hayward RA. Effect of patients' risks and preferences on health gains with plasma glucose level lowering in type 2 diabetes mellitus. JAMA Intern Med 2014;174:1227–1234

62. Tsapas A, Avgerinos I, Karagiannis T, et al. Comparative effectiveness of glucose-lowering drugs for type 2 diabetes: a systematic review

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

S156    Pharmacologic Approaches to Glycemic Treatment

and network meta-analysis. Ann Intern Med 2020;173:278–286

63. Pratley R, Amod A, Hoff ST, et al.; PIONEER 4 investigators. Oral semaglutide versus subcutaneous liraglutide and placebo in type 2 diabetes (PIONEER 4): a randomised, double-blind, phase 3a trial. Lancet 2019;394:39–50

64. Singh S, Wright EE Jr, Kwan AYM, et al. Glucagon-like peptide-1 receptor agonists compared with basal insulins for the treatment of type 2 diabetes mellitus: a systematic review and meta-analysis. Diabetes Obes Metab 2017;19:228–238

65. Levin PA, Nguyen H, Wittbrodt ET, Kim SC. Glucagon-like peptide-1 receptor agonists: a systematic review of comparative effectiveness research. Diabetes Metab Syndr Obes 2017;10:123–139

66. Abd El Aziz MS, Kahle M, Meier JJ, Nauck MA. A meta-analysis comparing clinical effects of short- or long-acting GLP-1 receptor agonists versus insulin treatment from head-to-head studies in type 2 diabetic patients. Diabetes Obes Metab 2017;19:216–227

67. Giorgino F, Benroubi M, Sun JH, Zimmermann AG, Pechtner V. Efficacy and safety of once-weekly dulaglutide versus insulin glargine in patients with type 2 diabetes on metformin and glimepiride (AWARD-2). Diabetes Care 2015;38:2241–2249

68. Aroda VR, Bain SC, Cariou B, et al. Efficacy and safety of once-weekly semaglutide versus once-daily insulin glargine as add-on to metformin (with or without sulfonylureas) in insulin-naive patients with type 2 diabetes (SUSTAIN 4): a randomised, open-label, parallel-group, multicentre, multinational, phase 3a trial. Lancet Diabetes Endocrinol 2017; 5:355–366

69. Davies M, Heller S, Sreenan S, et al. Once-weekly exenatide versus once- or twice-daily insulin detemir: randomized, open-label, clinical trial of efficacy and safety in patients with type 2 diabetes treated with metformin alone or in combination with sulfonylureas. Diabetes Care 2013;36:1368–1376

70. Diamant M, Van Gaal L, Stranks S, et al. Once weekly exenatide compared with insulin glargine titrated to target in patients with type 2 diabetes (DURATION-3): an open-label randomised trial. Lancet 2010;375:2234–2243

71. Riddle MC, Herman WH. The cost of diabetes care-an elephant in the room. Diabetes Care 2018;41:929–932

72. IBM. Micromedex Red Book. Accessed 9 November 2022. Available from https://www.ibm.com/products/micromedex-red-book

73. Data.Medicaid.gov. NADAC (National Average Drug Acquisition Cost). Accessed 23 October 2022. Available from https://data.medicaid.gov/dataset/dfa2ab14-06c2-457a-9e36-5cb6d80f8d93

74. Kang H, Lobo JM, Kim S, Sohn MW. Cost-related medication non-adherence among U.S. adults with diabetes. Diabetes Res Clin Pract 2018;143:24–33

75. Patel MR, Piette JD, Resnicow K, Kowalski-Dobson T, Heisler M. Social determinants of health, cost-related nonadherence, and cost-reducing behaviors among adults with diabetes: findings from the National Health interview survey. Med Care 2016;54:796–803

76. Gerstein HC, Sattar N, Rosenstock J, et al.; AMPLITUDE-O Trial Investigators. Cardiovascular and renal outcomes with efpeglenatide in type 2 diabetes. N Engl J Med 2021;385:896–907

77. Blonde L, Merilainen M, Karwe V; TITRATE Study Group. Patient-directed titration for achieving glycaemic goals using a once-daily basal insulin analogue: an assessment of two different fasting plasma glucose targets–the TITRATE study. Diabetes Obes Metab 2009;11:623–631

78. Porcellati F, Lucidi P, Cioli P, et al. Pharmacokinetics and pharmacodynamics of insulin glargine given in the evening as compared with in the morning in type 2 diabetes. Diabetes Care 2015;38:503–512

79. Wang Z, Hedrington MS, Gogitidze Joy N, et al. Dose-response effects of insulin glargine in type 2 diabetes. Diabetes Care 2010;33:1555–1560

80. Singh SR, Ahmad F, Lal A, Yu C, Bai Z, Bennett H. Efficacy and safety of insulin analogues for the management of diabetes mellitus: a meta-analysis. CMAJ 2009;180:385–397

81. Horvath K, Jeitler K, Berghold A, et al. Long-acting insulin analogues versus NPH insulin (human isophane insulin) for type 2 diabetes mellitus. Cochrane Database Syst Rev 2007 2:CD005613

82. Monami M, Marchionni N, Mannucci E. Long-acting insulin analogues versus NPH human insulin in type 2 diabetes: a meta-analysis. Diabetes Res Clin Pract 2008;81:184–189

83. Owens DR, Traylor L, Mullins P, Landgraf W. Patient-level meta-analysis of efficacy and hypoglycaemia in people with type 2 diabetes initiating insulin glargine 100U/mL or neutral protamine Hagedorn insulin analysed according to concomitant oral antidiabetes therapy. Diabetes Res Clin Pract 2017;124(Suppl. C):57–65

84. Riddle MC, Rosenstock J; Insulin Glargine 4002 Study Investigators. The treat-to-target trial: randomized addition of glargine or human NPH insulin to oral therapy of type 2 diabetic patients. Diabetes Care 2003;26:3080–3086

85. Hermansen K, Davies M, Derezinski T, Martinez Ravn G, Clauson P, Home P. A 26-week, randomized, parallel, treat-to-target trial comparing insulin detemir with NPH insulin as add-on therapy to oral glucose-lowering drugs in insulin-naive people with type 2 diabetes. Diabetes Care 2006;29:1269–1274

86. Yki-Järvinen H, Kauppinen-Mäkelin R, Tiikkainen M, et al. Insulin glargine or NPH combined with metformin in type 2 diabetes: the LANMET study. Diabetologia 2006;49:442–451

87. Bolli GB, Riddle MC, Bergenstal RM, et al.; on behalf of the EDITION 3 Study Investigators. New insulin glargine 300 U/ml compared with glargine 100 U/ml in insulin-naïve people with type 2 diabetes on oral glucose-lowering drugs: a randomized controlled trial (EDITION 3). Diabetes Obes Metab 2015;17:386–394

88. Terauchi Y, Koyama M, Cheng X, et al. New insulin glargine 300 U/ml versus glargine 100 U/ml in Japanese people with type 2 diabetes using basal insulin and oral antihyperglycaemic drugs: glucose control and hypoglycaemia in a randomized controlled trial (EDITION JP 2). Diabetes Obes Metab 2016;18:366–374

89. Yki-Järvinen H, Bergenstal RM, Bolli GB, et al. Glycaemic control and hypoglycaemia with new insulin glargine 300 U/ml versus insulin glargine 100 U/ml in people with type 2 diabetes using basal insulin and oral antihyperglycaemic drugs: the EDITION 2 randomized 12-month trial including 6-month extension. Diabetes Obes Metab 2015; 17:1142–1149

90. Marso SP, McGuire DK, Zinman B, et al.; DEVOTE Study Group. Efficacy and safety of degludec versus glargine in type 2 diabetes. N Engl J Med 2017;377:723–732

91. Rodbard HW, Cariou B, Zinman B, et al.; BEGIN Once Long Investigators. Comparison of insulin degludec with insulin glargine in insulin-naive subjects with type 2 diabetes: a 2-year randomized, treat-to-target trial. Diabet Med 2013;30:1298–1304

92. Wysham C, Bhargava A, Chaykin L, et al. Effect of insulin degludec vs insulin glargine u100 on hypoglycemia in patients with type 2 diabetes: the SWITCH 2 randomized clinical trial. JAMA 2017; 318:45–56

93. Zinman B, Philis-Tsimikas A, Cariou B, et al.; NN1250-3579 (BEGIN Once Long) Trial Investigators. Insulin degludec versus insulin glargine in insulin-naive patients with type 2 diabetes: a 1-year, randomized, treat-to-target trial (BEGIN Once Long). Diabetes Care 2012;35:2464–2471

94. Cowart K. Overbasalization: addressing hesitancy in treatment intensification beyond basal insulin. Clin Diabetes 2020;38:304–310

95. Cefalu WT, Dawes DE, Gavlak G, et al.; Insulin Access and Affordability Working Group. Conclusions and recommendations. Diabetes Care 2018;41:1299–1311

96. Lipska KJ, Parker MM, Moffet HH, Huang ES, Karter AJ. Association of initiation of basal insulin analogs vs neutral protamine hagedorn insulin with hypoglycemia-related emergency department visits or hospital admissions and with glycemic control in patients with type 2 diabetes. JAMA 2018;320:53–62

97. McCall AL. Insulin therapy and hypoglycemia. Endocrinol Metab Clin North Am 2012;41:57–87

98. Mannucci E, Monami M, Marchionni N. Short-acting insulin analogues vs. regular human insulin in type 2 diabetes: a meta-analysis. Diabetes Obes Metab 2009;11:53–59

99. Heller S, Bode B, Kozlovski P, Svendsen AL. Meta-analysis of insulin aspart versus regular human insulin used in a basal-bolus regimen for the treatment of diabetes mellitus. J Diabetes 2013;5:482–491

100. Wysham C, Hood RC, Warren ML, Wang T, Morwick TM, Jackson JA. Effect of total daily dose on efficacy, dosing, and safety of 2 dose titration regimens of human regular U500 insulin in severely insulin-resistant patients with type 2 diabetes. Endocr Pract 2016;22:653–665

101. Riddle MC, Yki-Järvinen H, Bolli GB, et al. One-year sustained glycaemic control and less hypoglycaemia with new insulin glargine 300 U/ml compared with 100 U/ml in people with type 2 diabetes using basal plus meal-time insulin: the EDITION 1 12-month randomized trial, including 6-month extension. Diabetes Obes Metab 2015; 17:835–842

102. Yki-Järvinen H, Bergenstal R, Ziemen M, et al.; EDITION 2 Study Investigators. New insulin glargine 300 units/mL versus glargine 100 units/mL in people with type 2 diabetes using oral agents and basal insulin: glucose control and hypoglycemia in a 6-month randomized controlled trial (EDITION 2). Diabetes Care 2014;37:3235–3243

103. Akturk HK, Snell-Bergeon JK, Rewers A, et al. Improved postprandial glucose with inhaled technosphere insulin compared with insulin aspart in patients with type 1 diabetes on multiple daily

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693669/dc23s009.pdf by guest on 07 December 2023

injections: the STAT study. Diabetes Technol Ther 2018;20:639–647

104. Hoogwerf BJ, Pantalone KM, Basina M, Jones MC, Grant M, Kendall DM. Results of a 24-week trial of technosphere insulin versus insulin aspart in type 2 diabetes. Endocr Pract 2021;27:38–43

105. Grant M, Heise T, Baughman R. Comparison of pharmacokinetics and pharmacodynamics of inhaled technosphere insulin and subcutaneous insulin lispro in the treatment of type 1 diabetes mellitus. Clin Pharmacokinet 2022;61:413–422

106. Diamant M, Nauck MA, Shaginian R, et al.; 4B Study Group. Glucagon-like peptide 1 receptor agonist or bolus insulin with optimized basal insulin in type 2 diabetes. Diabetes Care 2014; 37:2763–2773

107. Eng C, Kramer CK, Zinman B, Retnakaran R. Glucagon-like peptide-1 receptor agonist and basal insulin combination treatment for the management of type 2 diabetes: a systematic review and meta-analysis. Lancet 2014;384:2228–2234

108. Maiorino MI, Chiodini P, Bellastella G, Capuano A, Esposito K, Giugliano D. Insulin and glucagon-like peptide 1 receptor agonist combination therapy in type 2 diabetes: a systematic review and meta-analysis of randomized controlled trials. Diabetes Care 2017;40:614–624

109. Aroda VR, Rosenstock J, Wysham C, et al.; LixiLan-L Trial Investigators. Efficacy and safety of LixiLan, a titratable fixed-ratio combination of insulin glargine plus lixisenatide in type 2 diabetes inadequately controlled on basal insulin and metformin: the LixiLan-L randomized trial. Diabetes Care 2016; 39:1972–1980

110. Lingvay I, Pérez Manghi F, García-Hernández P, et al.; DUAL V Investigators. Effect of insulin glargine up-titration vs insulin degludec/liraglutide on glycated hemoglobin levels in patients with uncontrolled type 2 diabetes: the DUAL V randomized clinical trial. JAMA 2016;315:898–907

111. Dahl D, Onishi Y, Norwood P, et al. Effect of subcutaneous tirzepatide vs placebo added to titrated insulin glargine on glycemic control in patients with type 2 diabetes: the SURPASS-5 randomized clinical trial. JAMA 2022;327:534–545

112. Taybani Z, Bótyik B, Katkó M, Gyimesi A, Várkonyi T. Simplifying complex insulin regimens while preserving good glycemic control in type 2 diabetes. Diabetes Ther 2019;10:1869–1878

113. Rodbard HW, Visco VE, Andersen H, Hiort LC, Shu DHW. Treatment intensification with stepwise addition of prandial insulin aspart boluses compared with full basal-bolus therapy (FullSTEP Study): a randomised, treat-to-target clinical trial. Lancet Diabetes Endocrinol 2014;2: 30–37

114. Tsapas A, Karagiannis T, Kakotrichi P, et al. Comparative efficacy of glucose-lowering medications on body weight and blood pressure in patients with type 2 diabetes: A systematic review and network meta-analysis. Diabetes Obes Metab 2021;23: 2116–2124

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S140/693069/dc23s009.pdf by guest on 07 December 2023

Declaration of Dr. Nathan Laney

# Exhibit B

**Diabetes Care** Volume 46, Supplement 1, January 2023

S97



# 6. Glycemic Targets: *Standards of Care in Diabetes—2023*

*Diabetes Care 2023;46(Suppl. 1):S97–S110 | https://doi.org/10.2337/dc23-S006*

Nuha A. ElSayed, Grazia Aleppo,
Vanita R. Aroda, Raveendhara R. Bannuru,
Florence M. Brown, Dennis Bruemmer,
Billy S. Collins, Marisa E. Hilliard,
Diana Isaacs, Eric L. Johnson,
Scott Kahan, Kamlesh Khunti, Jose Leon,
Sarah K. Lyons, Mary Lou Perry,
Priya Prahalad, Richard E. Pratley,
Jane Jeffrie Seley, Robert C. Stanton, and
Robert A. Gabbay, on behalf of the
American Diabetes Association

**The American Diabetes Association (ADA) "Standards of Care in Diabetes" includes the ADA's current clinical practice recommendations and is intended to provide the components of diabetes care, general treatment goals and guidelines, and tools to evaluate quality of care. Members of the ADA Professional Practice Committee, a multidisciplinary expert committee, are responsible for updating the Standards of Care annually, or more frequently as warranted. For a detailed description of ADA standards, statements, and reports, as well as the evidence-grading system for ADA's clinical practice recommendations and a full list of Professional Practice Committee members, please refer to Introduction and Methodology. Readers who wish to comment on the Standards of Care are invited to do so at professional.diabetes.org/SOC.**

## ASSESSMENT OF GLYCEMIC CONTROL

Glycemic control is assessed by the A1C measurement, continuous glucose monitoring (CGM) using time in range (TIR) and/or glucose management indicator (GMI), and blood glucose monitoring (BGM). A1C is the metric used to date in clinical trials demonstrating the benefits of improved glycemic control. Individual glucose monitoring (discussed in detail in Section 7, "Diabetes Technology") is a useful tool for diabetes self-management, which includes meals, physical activity, and medication adjustment, particularly in individuals taking insulin. CGM serves an increasingly important role in the management of the effectiveness and safety of treatment in many people with type 1 diabetes and in selected people with type 2 diabetes. Individuals on a variety of insulin treatment plans can benefit from CGM with improved glucose control, decreased hypoglycemia, and enhanced self-efficacy (Section 7, "Diabetes Technology") (1).

### Glycemic Assessment

**Recommendations**

**6.1** Assess glycemic status (A1C or other glycemic measurement such as time in range or glucose management indicator) *at least* two times a year in patients who are meeting treatment goals (and who have stable glycemic control). **E**

**6.2** Assess glycemic status at least quarterly and as needed in patients whose therapy has recently changed and/or who are not meeting glycemic goals. **E**

A1C reflects average glycemia over approximately 3 months. The performance of the test is generally excellent for National Glycohemoglobin Standardization Program

*Disclosure information for each author is available at https://doi.org/10.2337/dc23-SDIS.*

*Suggested citation: ElSayed NA, Aleppo G, Aroda VR, et al., American Diabetes Association. 6. Glycemic targets: Standards of Care in Diabetes—2023. Diabetes Care 2023;46(Suppl. 1):S97–S110*

*© 2022 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. More information is available at https://www.diabetesjournals.org/journals/pages/license.*

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693690/dc23s006.pdf by guest on 07 December 2023

6. GLYCEMIC TARGETS

(NGSP)-certified assays (ngsp.org). The test is the primary tool for assessing glycemic control and has a strong predictive value for diabetes complications (2–4). Thus, A1C testing should be performed routinely in all people with diabetes at initial assessment and as part of continuing care. Measurement approximately every 3 months determines whether patients' glycemic targets have been reached and maintained. A 14-day CGM assessment of TIR and GMI can serve as a surrogate for A1C for use in clinical management (5–9). The frequency of A1C testing should depend on the clinical situation, the treatment plan, and the clinician's judgment. The use of point-of-care A1C testing or CGM-derived TIR and GMI may provide an opportunity for more timely treatment changes during encounters between patients and health care professionals. People with type 2 diabetes with stable glycemia well within target may do well with A1C testing or other glucose assessment only twice per year. Unstable or intensively managed patients or people not at goal with treatment adjustments may require testing more frequently (every 3 months with interim assessments as needed for safety) (10). CGM parameters can be tracked in the clinic or via telehealth to optimize diabetes management.

### A1C Limitations

The A1C test is an indirect measure of average glycemia and, as such, is subject to limitations. As with any laboratory test, there is variability in the measurement of A1C. Although A1C variability is lower on an intraindividual basis than that of blood glucose measurements, clinicians should exercise judgment when using A1C as the sole basis for assessing glycemic control, particularly if the result is close to the threshold that might prompt a change in medication therapy. For example, conditions that affect red blood cell turnover (hemolytic and other anemias, glucose-6-phosphate dehydrogenase deficiency, recent blood transfusion, use of drugs that stimulate erythropoiesis, end-stage kidney disease, and pregnancy) may result in discrepancies between the A1C result and the patient's true mean glycemia (11). Hemoglobin variants must be considered, particularly when the A1C result does not correlate with the patient's CGM or BGM levels. However,

most assays in use in the U.S. are accurate in individuals who are heterozygous for the most common variants (ngsp.org/interf.asp). Other measures of average glycemia such as fructosamine and 1,5-anhydroglucitol are available, but their translation into average glucose levels and their prognostic significance are not as clear as for A1C and CGM. Though some variability in the relationship between average glucose levels and A1C exists among different individuals, in general the association between mean glucose and A1C within an individual correlates over time (12).

A1C does not provide a measure of glycemic variability or hypoglycemia. For patients prone to glycemic variability, especially people with type 1 diabetes or type 2 diabetes with severe insulin deficiency, glycemic control is best evaluated by the combination of results from BGM/CGM and A1C. Discordant results between BGM/CGM and A1C can be the result of the conditions outlined above or glycemic variability, with BGM missing the extremes.

### Correlation Between BGM and A1C

**Table 6.1** shows the correlation between A1C levels and mean glucose levels based on the international A1C-Derived Average Glucose (ADAG) study, which assessed the correlation between A1C and frequent BGM and CGM in 507 adults (83% non-Hispanic White) with type 1, type 2, and no diabetes (13), and an empirical study of the average blood glucose levels at premeal, postmeal, and bedtime associated with specified A1C levels using data from the ADAG trial (14). The American Diabetes Association (ADA) and the American Association for Clinical Chemistry have determined that the correlation (r = 0.92) in the ADAG trial is strong enough to justify reporting both the A1C result and the estimated average glucose (eAG) result when a clinician orders the A1C test. Clinicians should note that the mean plasma glucose numbers in **Table 6.1** are based on ∼2,700 readings per A1C measurement in the ADAG trial. In a report, mean glucose measured with CGM versus central laboratory–measured A1C in 387 participants in three randomized trials demonstrated that A1C may underestimate or overestimate mean glucose in individuals (12). Thus, as suggested, a patient's BGM or CGM profile

| Table 6.1—Estimated average glucose (eAG) | | |
|---|---|---|
| A1C (%) | mg/dL* | mmol/L |
| 5 | 97 (76–120) | 5.4 (4.2–6.7) |
| 6 | 126 (100–152) | 7.0 (5.5–8.5) |
| 7 | 154 (123–185) | 8.6 (6.8–10.3) |
| 8 | 183 (147–217) | 10.2 (8.1–12.1) |
| 9 | 212 (170–249) | 11.8 (9.4–13.9) |
| 10 | 240 (193–282) | 13.4 (10.7–15.7) |
| 11 | 269 (217–314) | 14.9 (12.0–17.5) |
| 12 | 298 (240–347) | 16.5 (13.3–19.3) |

Data in parentheses are 95% CI. A calculator for converting A1C results into eAG, in either mg/dL or mmol/L, is available at professional.diabetes.org/eAG. *These estimates are based on ADAG data of ∼2,700 glucose measurements over 3 months per A1C measurement in 507 adults with type 1, type 2, or no diabetes. The correlation between A1C and average glucose was 0.92 (13,14). Adapted from Nathan et al. (13).

has considerable potential for optimizing their glycemic management (13).

### A1C Differences in Ethnic Populations and Children

In the ADAG study, there were no significant differences among racial and ethnic groups in the regression lines between A1C and mean glucose, although the study was underpowered to detect a difference and there was a trend toward a difference between the African and African American and the non-Hispanic White cohorts, with higher A1C values observed in the African and African American cohorts compared with non-Hispanic White cohorts for a given mean glucose. Other studies have also demonstrated higher A1C levels in African American participants than in White participants at a given mean glucose concentration (15,16). In contrast, a recent report in Afro-Caribbean individuals found lower A1C relative to glucose values (17). Taken together, A1C and glucose parameters are essential for the optimal assessment of glycemic status.

A1C assays are available that do not demonstrate a statistically significant difference in individuals with hemoglobin variants. Other assays have statistically significant interference, but the difference is not clinically significant. Use of an assay with such statistically significant interference may explain a report that

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693609/dc23s006.pdf by guest on 07 December 2023

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693909/dc23s006.pdf by guest on 07 December 2023

**Table 6.2—Standardized CGM metrics for clinical care**

| | |
|---|---|
| 1. Number of days CGM device is worn (recommend 14 days) | |
| 2. Percentage of time CGM device is active (recommend 70% of data from 14 days) | |
| 3. Mean glucose | |
| 4. Glucose management indicator | |
| 5. Glycemic variability (%CV) target ≤36%* | |
| 6. TAR: % of readings and time >250 mg/dL (>13.9 mmol/L) | Level 2 hyperglycemia |
| 7. TAR: % of readings and time 181–250 mg/dL (10.1–13.9 mmol/L) | Level 1 hyperglycemia |
| 8. TIR: % of readings and time 70–180 mg/dL (3.9–10.0 mmol/L) | In range |
| 9. TBR: % of readings and time 54–69 mg/dL (3.0–3.8 mmol/L) | Level 1 hypoglycemia |
| 10. TBR: % of readings and time <54 mg/dL (<3.0 mmol/L) | Level 2 hypoglycemia |

CGM, continuous glucose monitoring; CV, coefficient of variation; TAR, time above range; TBR, time below range; TIR, time in range. *Some studies suggest that lower %CV targets (<33%) provide additional protection against hypoglycemia for those receiving insulin or sulfonylureas. Adapted from Battelino et al. (35).

for any level of mean glycemia, African American individuals heterozygous for the common hemoglobin variant HbS had lower A1C by about 0.3 percentage points when compared with those without the trait (18,19). Another genetic variant, X-linked glucose-6-phosphate dehydrogenase G202A, carried by 11% of African American individuals, was associated with a decrease in A1C of about 0.8% in hemizygous men and 0.7% in homozygous women compared with those without the trait (20).

A small study comparing A1C to CGM data in children with type 1 diabetes found a highly statistically significant correlation between A1C and mean blood glucose, although the correlation (*r* = 0.7) was significantly lower than that in the ADAG trial (21). Whether there are clinically meaningful differences in how A1C relates to average glucose in children or in different ethnicities is an area for further study (15,22,23). Until further evidence is available, it seems prudent to establish A1C goals in these populations with consideration of individualized CGM, BGM, and A1C results. Limitations in perfect alignment between glycemic measurements do not interfere with the usefulness of BGM/CGM for insulin dose adjustments.

## Glucose Assessment by Continuous Glucose Monitoring

*Recommendations*

6.3 Standardized, single-page glucose reports from continuous glucose monitoring (CGM) devices with visual cues, such as the ambulatory glucose profile, should be considered as a standard summary for all CGM devices. **E**

6.4 Time in range is associated with the risk of microvascular complications and can be used for assessment of glycemic control. Additionally, time below range and time above range are useful parameters for the evaluation of the treatment plan (**Table 6.2**). **C**

CGM is rapidly improving diabetes management. As stated in the recommendations, time in range (TIR) is a useful metric of glycemic control and glucose patterns, and it correlates well with A1C in most studies (24–29). New data support the premise that increased TIR correlates with the risk of complications. The studies supporting this assertion are reviewed in more detail in Section 7, "Diabetes Technology"; they include cross-sectional data and cohort studies (30–32) demonstrating TIR as an acceptable end point for clinical trials moving forward and that it can be used for assessment of glycemic control. Additionally, time below range (<70 and <54 mg/dL [3.9 and 3.0 mmol/L]) and time above range (>180 mg/dL [10.0 mmol/L]) are useful parameters for insulin dose adjustments and reevaluation of the treatment plan.

For many people with diabetes, glucose monitoring is key for achieving glycemic targets. Major clinical trials of insulin-treated patients have included BGM as part of multifactorial interventions to demonstrate the benefit of intensive glycemic control on diabetes complications (33). BGM is thus an integral component of effective therapy of patients taking insulin. In recent years, CGM has become a standard method for glucose monitoring for most adults with type 1 diabetes (34). Both approaches to glucose monitoring allow patients to evaluate individual responses to therapy and assess whether glycemic targets are being safely achieved. The international consensus on TIR provides guidance on standardized CGM metrics (**Table 6.2**) and considerations for clinical interpretation and care (35). To make these metrics more actionable, standardized reports with visual cues, such as the ambulatory glucose profile (**Fig 6.1**), are recommended (35) and may help the patient and the health care professional better interpret the data to guide treatment decisions (24,27). BGM and CGM can be useful to guide medical nutrition therapy and physical activity, prevent hypoglycemia, and aid medication management. While A1C is currently the primary measure to guide glucose management and a valuable risk marker for developing diabetes complications, the CGM metrics TIR (with time below range and time above range) and GMI provide the insights for a more personalized diabetes management plan. The incorporation of these metrics into clinical practice is in evolution, and remote access to these data can be critical for telehealth. A rapid optimization and harmonization of CGM terminology and remote access is occurring to meet patient and health care professional needs (36–38). The patient's specific needs and goals should dictate BGM frequency and timing and consideration of CGM use. Please refer to Section 7, "Diabetes Technology," for a more complete discussion of the use of BGM and CGM.

With the advent of new technology, CGM has evolved rapidly in both accuracy and affordability. As such, many patients have these data available to assist with self-management and their health care professionals' assessment of glycemic status. Reports can be generated from CGM that will allow the health care professional and person with diabetes to determine TIR, calculate GMI, and

**AGP Report:** Continuous Glucose Monitoring



Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693909/dc23s006.pdf by guest on 07 December 2023

### Ambulatory Glucose Profile (AGP)

AGP is a summary of glucose values from the report period, with median (50%) and other percentiles shown as if they occurred in a single day.



### Daily Glucose Profiles

Each daily profile represents a midnight-to-midnight period.



**Figure 6.1**—Key points included in standard ambulatory glucose profile (AGP) report. Reprinted from Holt et al. (34).

Appx225

assess hypoglycemia, hyperglycemia, and glycemic variability. As discussed in a recent consensus document, a report formatted as shown in **Fig. 6.1** can be generated (35). Published data from two retrospective studies suggest a strong correlation between TIR and A1C, with a goal of 70% TIR aligning with an A1C of ~7% (8,26). Note the goals of therapy next to each metric in **Fig. 6.1** (e.g., low, <4%; very low, <1%) as values to guide changes in therapy.

## GLYCEMIC GOALS

For glycemic goals in older adults, please refer to Section 13, "Older Adults." For glycemic goals in children, please refer to Section 14, "Children and Adolescents." For glycemic goals during pregnancy, please refer to Section 15, "Management of Diabetes in Pregnancy." Overall, regardless of the population being served, it is critical for the glycemic targets to be woven into the overall person-centered strategy. For example, in a very young child, safety and simplicity may outweigh the need for glycemic stability in the short run. Simplification may decrease parental anxiety and build trust and confidence, which could support further strengthening of glycemic targets and self-efficacy. In healthy older adults, there is no empiric need to loosen control; however, less stringent A1C goals may be appropriate for patients with limited life expectancy or where the harms of treatment are greater than the benefits (39,40).

However, the health care professional needs to work with an individual and should consider adjusting targets for simplifying the treatment plan if this change is needed to improve safety and medication-taking behavior. Setting goals by face-to-face or remote consultations has been shown to be more effective than usual care for glycemic control in type 2 diabetes for fasting plasma glucose and glycated hemoglobin (41).

### Recommendations

**6.5a** An A1C goal for many nonpregnant adults of <7% (53 mmol/mol) without significant hypoglycemia is appropriate. **A**

**6.5b** If using ambulatory glucose profile/glucose management indicator to assess glycemia, a parallel goal for many nonpregnant adults is time in range of >70% with time below range <4% and time <54 mg/dL <1%. For those with frailty or at high risk of hypoglycemia, a target of >50% time in range with <1% time below range is recommended. (See **Fig. 6.1** and **Table 6.2**.) **B**

**6.6** On the basis of health care professional judgment and patient preference, achievement of lower A1C levels than the goal of 7% may be acceptable and even beneficial if it can be achieved safely without significant hypoglycemia or other adverse effects of treatment. **B**

**6.7** Less stringent A1C goals (such as <8% [64 mmol/mol]) may be appropriate for patients with limited life expectancy or where the harms of treatment are greater than the benefits. Health care professionals should consider deintensification of therapy if appropriate to reduce the risk of hypoglycemia in patients with inappropriate stringent A1C targets. **B**

**6.8** Reassess glycemic targets based on the individualized criteria in **Fig. 6.2**. **E**

**6.9** Setting a glycemic goal during consultations is likely to improve patient outcomes. **E**

## A1C and Microvascular Complications

Hyperglycemia defines diabetes, and glycemic control is fundamental to diabetes management. The Diabetes Control and Complications Trial (DCCT) (33), a prospective randomized controlled trial of intensive (mean A1C about 7% [53 mmol/mol]) versus standard (mean A1C about 9% [75 mmol/mol]) glycemic control in people with type 1 diabetes, showed definitively that better glycemic control is associated with 50–76% reductions in rates of development and progression of microvascular (retinopathy, neuropathy, and diabetic kidney disease) complications. Follow-up of the DCCT cohort in the Epidemiology of Diabetes Interventions and Complications (EDIC) study (42,43) demonstrated persistence of these microvascular benefits over two decades despite the fact that the glycemic separation between the treatment groups diminished and disappeared during follow-up.

The Kumamoto Study (44) and UK Prospective Diabetes Study (UKPDS) (45,46) confirmed that intensive glycemic control significantly decreased rates of microvascular complications in people with short-duration type 2 diabetes. Long-term follow-up of the UKPDS cohorts showed enduring effects of early glycemic control on most microvascular complications (47).

Therefore, achieving A1C targets of <7% (53 mmol/mol) has been shown to reduce microvascular complications of type 1 and type 2 diabetes when instituted early in the course of disease (2,48). Findings from the DCCT (33) and UKPDS (49) studies demonstrate a curvilinear relationship between A1C and microvascular complications. Such analyses suggest that, on a population level, the greatest number of complications will be averted by taking patients from very poor control to fair/good control. These analyses also suggest that further lowering of A1C from 7 to 6% (53 mmol/mol to 42 mmol/mol) is associated with further reduction in the risk of microvascular complications, although the absolute risk reductions become much smaller. The implication of these findings is that there is no need to deintensify therapy for an individual with an A1C between 6 and 7% in the setting of low hypoglycemia risk with a long life expectancy. There are now newer agents that do not cause hypoglycemia, making it possible to maintain glucose control without the risk of hypoglycemia (see Section 9, "Pharmacologic Approaches to Glycemic Treatment").

Given the substantially increased risk of hypoglycemia in type 1 diabetes and with polypharmacy in type 2 diabetes, the risks of lower glycemic targets may outweigh the potential benefits on microvascular complications. Three landmark trials (Action to Control Cardiovascular Risk in Diabetes [ACCORD], Action in Diabetes and Vascular Disease: Preterax and Diamicron MR Controlled Evaluation [ADVANCE], and Veterans Affairs Diabetes Trial [VADT]) were conducted to test the effects of near normalization of blood glucose on cardiovascular outcomes in individuals with long-standing type 2 diabetes and either known cardiovascular disease (CVD) or high cardiovascular

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693609/dc23s006.pdf by guest on 07 December 2023

**Diabetes Care** Volume 46, Supplement 1, January 2023



**Figure 6.2**—Patient and disease factors used to determine optimal glycemic targets. Characteristics and predicaments toward the left justify more stringent efforts to lower A1C; those toward the right suggest less stringent efforts. A1C 7% = 53 mmol/mol. Adapted with permission from Inzucchi et al. (71).

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693909/dc23s006.pdf by guest on 07 December 2023

risk. These trials showed that lower A1C levels were associated with reduced onset or progression of some microvascular complications (50–52).

The concerning mortality findings in the ACCORD trial discussed below and the relatively intense efforts required to achieve near euglycemia should also be considered when setting glycemic targets for individuals with long-standing diabetes, such as those populations studied in ACCORD, ADVANCE, and VADT. Findings from these studies suggest caution is needed in treating diabetes to near-normal A1C goals in people with long-standing type 2 diabetes with or at significant risk of CVD.

These landmark studies need to be considered with an important caveat; glucagon-like peptide 1 (GLP-1) receptor agonists and sodium–glucose cotransporter 2 (SGLT2) inhibitors were not approved at the time of these trials. As such, these agents with established cardiovascular and renal benefits appear to be safe and beneficial in this group of individuals at high risk for cardiorenal complications. Randomized clinical trials examining these agents for cardiovascular safety were not designed to test

higher versus lower A1C; therefore, beyond post hoc analysis of these trials, we do not have evidence that it is the glucose lowering by these agents that confers the CVD and renal benefit (53). As such, based on clinician judgment and patient preferences, select patients, especially those with little comorbidity and a long life expectancy, may benefit from adopting more intensive glycemic targets if they can achieve them safely and without hypoglycemia or significant therapeutic burden.

## A1C and Cardiovascular Disease Outcomes

### Cardiovascular Disease and Type 1 Diabetes
CVD is a more common cause of death than microvascular complications in populations with diabetes. There is evidence for a cardiovascular benefit of intensive glycemic control after long-term follow-up of cohorts treated early in the course of type 1 diabetes. In the DCCT, there was a trend toward lower risk of CVD events with intensive control. In the 9-year post-DCCT follow-up of the EDIC cohort, participants previously randomized to the intensive arm had a significant 57% reduction in the risk

of nonfatal myocardial infarction (MI), stroke, or cardiovascular death compared with those previously randomized to the standard arm (54). The benefit of intensive glycemic control in this cohort with type 1 diabetes has been shown to persist for several decades (55) and to be associated with a modest reduction in all-cause mortality (56).

### Cardiovascular Disease and Type 2 Diabetes
In type 2 diabetes, there is evidence that more intensive treatment of glycemia in newly diagnosed patients may reduce long-term CVD rates. In addition, data from the Swedish National Diabetes Registry (56) and the Joint Asia Diabetes Evaluation (JADE) demonstrate greater proportions of people with diabetes being diagnosed at <40 years of age and a demonstrably increased burden of heart disease and years of life lost in people diagnosed at a younger age (57–60). Thus, to prevent both microvascular and macrovascular complications of diabetes, there is a major call to overcome therapeutic inertia and treat to target for an individual patient (60,61). During the UKPDS, there was a 16% reduction in CVD events (combined fatal or nonfatal MI and sudden death) in the intensive glycemic control arm that did not reach statistical significance (*P* = 0.052), and there was no suggestion of benefit on other CVD outcomes (e.g., stroke). Similar to the DCCT/EDIC, after 10 years of observational follow-up, those originally randomized to intensive glycemic control had significant long-term reductions in MI (15% with sulfonylurea or insulin as initial pharmacotherapy, 33% with metformin as initial pharmacotherapy) and in all-cause mortality (13% and 27%, respectively) (47).

ACCORD, ADVANCE, and VADT suggested no significant reduction in CVD outcomes with intensive glycemic control in participants followed for shorter durations (3.5–5.6 years) and who had more advanced type 2 diabetes and CVD risk than the UKPDS participants. All three trials were conducted in relatively older participants with a longer known duration of diabetes (mean duration 8–11 years) and either CVD or multiple cardiovascular risk factors. The target A1C among intensive-control participants was <6% (42 mmol/mol) in ACCORD, <6.5% (48 mmol/mol) in ADVANCE,

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693606/dc23s006.pdf by guest on 07 December 2023

and a 1.5% reduction in A1C compared with control participants in VADT, with achieved A1C of 6.4% vs. 7.5% (46 mmol/mol vs. 58 mmol/mol) in ACCORD, 6.5% vs. 7.3% (48 mmol/mol vs. 56 mmol/mol) in ADVANCE, and 6.9% vs. 8.4% (52 mmol/mol vs. 68 mmol/mol) in VADT. Details of these studies are reviewed extensively in the joint ADA position statement "Intensive Glycemic Control and the Prevention of Cardiovascular Events: Implications of the ACCORD, ADVANCE, and VA Diabetes Trials" (61).

The glycemic control comparison in ACCORD was halted early due to an increased mortality rate in the intensive compared with the standard treatment arm (1.41% vs. 1.14% per year; hazard ratio 1.22 [95% CI 1.01–1.46]), with a similar increase in cardiovascular deaths. Analysis of the ACCORD data did not identify a clear explanation for the excess mortality in the intensive treatment arm (62).

Longer-term follow-up has shown no evidence of cardiovascular benefit, or harm, in the ADVANCE trial (63). The end-stage renal disease rate was lower in the intensive treatment group over follow-up. However, 10-year follow-up of the VADT cohort (64) did demonstrate a reduction in the risk of cardiovascular events (52.7 [control group] vs. 44.1 [intervention group] events per 1,000 person-years) with no benefit in cardiovascular or overall mortality. Heterogeneity of mortality effects across studies was noted, which may reflect differences in glycemic targets, therapeutic approaches, and, importantly, population characteristics (65).

Mortality findings in ACCORD (62) and subgroup analyses of VADT (66) suggest that the potential risks of intensive glycemic control may outweigh its benefits in higher-risk individuals. In all three trials, severe hypoglycemia was significantly more likely in participants who were randomly assigned to the intensive glycemic control arm. Individuals with a long duration of diabetes, a known history of hypoglycemia, advanced atherosclerosis, or advanced age/frailty may benefit from less aggressive targets (67,68).

As discussed further below, severe hypoglycemia is a potent marker of high absolute risk of cardiovascular events and mortality (69). Therefore, health care professionals should be vigilant in preventing hypoglycemia and should not aggressively attempt to achieve near-normal A1C levels in people in whom such targets cannot be safely and reasonably achieved. As discussed in Section 9, "Pharmacologic Approaches to Glycemic Treatment," addition of specific SGLT2 inhibitors or GLP-1 receptor agonists that have demonstrated CVD benefit is recommended in patients with established CVD, chronic kidney disease, and heart failure. As outlined in more detail in Section 9, "Pharmacologic Approaches to Glycemic Treatment," and Section 10, "Cardiovascular Disease and Risk Management," the cardiovascular benefits of SGLT2 inhibitors or GLP-1 receptor agonists are not contingent upon A1C lowering; therefore, initiation can be considered in people with type 2 diabetes and CVD independent of the current A1C or A1C goal or metformin therapy. Based on these considerations, the following two strategies are offered (70):

1. If already on dual therapy or multiple glucose-lowering therapies and not on an SGLT2 inhibitor or GLP-1 receptor agonist, consider switching to one of these agents with proven cardiovascular benefit.
2. Introduce SGLT2 inhibitors or GLP-1 receptor agonists in people with CVD at A1C goal (independent of metformin) for cardiovascular benefit, independent of baseline A1C or individualized A1C target.

**Setting and Modifying A1C Goals**
Numerous factors must be considered when setting glycemic targets. The ADA proposes general targets appropriate for many people but emphasizes the importance of individualization based on key patient characteristics. Glycemic targets must be individualized in the context of shared decision-making to address individual needs and preferences and consider characteristics that influence risks and benefits of therapy; this approach may optimize engagement and self-efficacy.

The factors to consider in individualizing goals are depicted in **Fig. 6.2**. This figure is not designed to be applied rigidly but to be used as a broad construct to guide clinical decision-making (71) and engage people with type 1 and type 2 diabetes in shared decision-making. More aggressive targets may be recommended if they can be achieved safely and with an acceptable burden of therapy and if life expectancy is sufficient to reap the benefits of stringent targets. Less stringent targets (A1C up to 8% [64 mmol/mol]) may be recommended if the patient's life expectancy is such that the benefits of an intensive goal may not be realized, or if the risks and burdens outweigh the potential benefits. Severe or frequent hypoglycemia is an absolute indication for the modification of treatment plans, including setting higher glycemic goals.

Diabetes is a chronic disease that progresses over decades. Thus, a goal that might be appropriate for an individual early in the course of their diabetes may change over time. Newly diagnosed patients and/or those without comorbidities that limit life expectancy may benefit from intensive control proven to prevent microvascular complications. Both DCCT/EDIC and UKPDS demonstrated metabolic memory, or a legacy effect, in which a finite period of intensive control yielded benefits that extended for decades after that control ended. Thus, a finite period of intensive control to near-normal A1C may yield enduring benefits even if control is subsequently deintensified as patient characteristics change. Over time, comorbidities may emerge, decreasing life expectancy and thereby decreasing the potential to reap benefits from intensive control. Also, with longer disease duration, diabetes may become more difficult to control, with increasing risks and burdens of therapy. Thus, A1C targets should be reevaluated over time to balance the risks and benefits as patient factors change.

Recommended glycemic targets for many nonpregnant adults are shown in **Table 6.3**. The recommendations include blood glucose levels that appear to correlate with achievement of an A1C of <7% (53 mmol/mol). Pregnancy recommendations are discussed in more detail in Section 15, "Management of Diabetes in Pregnancy."

The issue of preprandial versus postprandial BGM targets is complex (72,73). Elevated postchallenge (2-h oral glucose tolerance test) glucose values have been associated with increased cardiovascular risk independent of fasting plasma glucose in some epidemiologic studies, whereas intervention trials have not

**Table 6.3—Summary of glycemic recommendations for many nonpregnant adults with diabetes**

| | |
|---|---|
| A1C | <7.0% (53 mmol/mol)*# |
| Preprandial capillary plasma glucose | 80–130 mg/dL* (4.4–7.2 mmol/L) |
| Peak postprandial capillary plasma glucose† | <180 mg/dL* (10.0 mmol/L) |

*More or less stringent glycemic goals may be appropriate for individual patients. #CGM may be used to assess glycemic target as noted in Recommendation 6.5b and **Fig. 6.1**. Goals should be individualized based on duration of diabetes, age/life expectancy, comorbid conditions, known CVD or advanced microvascular complications, hypoglycemia unawareness, and individual patient considerations (as per **Fig. 6.2**). †Postprandial glucose may be targeted if A1C goals are not met despite reaching preprandial glucose goals. Postprandial glucose measurements should be made 1–2 h after the beginning of the meal, generally peak levels in people with diabetes.

shown postprandial glucose to be a cardiovascular risk factor independent of A1C. In people with diabetes, surrogate measures of vascular pathology, such as endothelial dysfunction, are negatively affected by postprandial hyperglycemia. It is clear that postprandial hyperglycemia, like preprandial hyperglycemia, contributes to elevated A1C levels, with its relative contribution being greater at A1C levels that are closer to 7% (53 mmol/mol). However, outcome studies have shown A1C to be the primary predictor of complications, and landmark trials of glycemic control such as the DCCT and UKPDS relied overwhelmingly on preprandial BGM. Additionally, a randomized controlled trial in patients with known CVD found no CVD benefit of insulin treatment plans targeting postprandial glucose compared with those targeting preprandial glucose (73). Therefore, it is reasonable to check postprandial glucose in individuals who have premeal glucose values within target but A1C values above target. In addition, when intensifying insulin therapy, measuring postprandial plasma glucose 1–2 h after the start of a meal (using BGM or CGM) and using treatments aimed at reducing postprandial plasma glucose values to <180 mg/dL (10.0 mmol/L) may help to lower A1C.

An analysis of data from 470 participants in the ADAG study (237 with type 1 diabetes and 147 with type 2 diabetes) found that the glucose ranges highlighted in **Table 6.1** are adequate to meet targets and decrease hypoglycemia (14). These findings support that premeal glucose targets may be relaxed without undermining overall glycemic control as measured by A1C. These data prompted the revision in the ADA-recommended premeal glucose target

to 80–130 mg/dL (4.4–7.2 mmol/L) but did not affect the definition of hypoglycemia.

## HYPOGLYCEMIA

### Recommendations

**6.10** Occurrence and risk for hypoglycemia should be reviewed at every encounter and investigated as indicated. Awareness of hypoglycemia should be considered using validated tools. **C**

**6.11** Glucose (approximately 15–20 g) is the preferred treatment for the conscious individual with blood glucose <70 mg/dL (3.9 mmol/L), although any form of carbohydrate that contains glucose may be used. Fifteen minutes after treatment, if blood glucose monitoring (BGM) shows continued hypoglycemia, the treatment should be repeated. Once the BGM or glucose pattern is trending up, the individual should consume a meal or snack to prevent recurrence of hypoglycemia. **B**

**6.12** Glucagon should be prescribed for all individuals at increased risk of level 2 or 3 hypoglycemia, so that it is available should it be needed. Caregivers, school personnel, or family members providing support to these individuals should know where it is and when and how to administer it. Glucagon administration is not limited to health care professionals. **E**

**6.13** Hypoglycemia unawareness or one or more episodes of level 3 hypoglycemia should

hypoglycemia avoidance education and reevaluation and adjustment of the treatment plan to decrease hypoglycemia. **E**

**6.14** Insulin-treated patients with hypoglycemia unawareness, one level 3 hypoglycemic event, or a pattern of unexplained level 2 hypoglycemia should be advised to raise their glycemic targets to strictly avoid hypoglycemia for at least several weeks in order to partially reverse hypoglycemia unawareness and reduce risk of future episodes. **A**

**6.15** Ongoing assessment of cognitive function is suggested with increased vigilance for hypoglycemia by the clinician, patient, and caregivers if impaired or declining cognition is found. **B**

Hypoglycemia is the major limiting factor in the glycemic management of type 1 and type 2 diabetes. Recommendations regarding the classification of hypoglycemia are outlined in **Table 6.4** (74–83). Level 1 hypoglycemia is defined as a measurable glucose concentration <70 mg/dL (3.9 mmol/L) but ≥54 mg/dL (3.0 mmol/L). A blood glucose concentration of 70 mg/dL (3.9 mmol/L) has been recognized as a threshold for neuroendocrine responses to falling glucose in people without diabetes. Because many people with diabetes demonstrate impaired counterregulatory responses to hypoglycemia and/or experience hypoglycemia unawareness, a measured glucose level <70 mg/dL (3.9 mmol/L) is considered clinically important (independent of the severity of acute hypoglycemic symptoms). Level 2 hypoglycemia (defined as a blood glucose concentration <54 mg/dL [3.0 mmol/L]) is the threshold at which neuroglycopenic symptoms begin to occur and requires immediate action to resolve the hypoglycemic event. If a patient has level 2 hypoglycemia without adrenergic or neuroglycopenic symptoms, they likely have hypoglycemia unawareness (discussed further below). This clinical scenario warrants investigation and review of the treatment plan (75,79). Use Clarke score, Gold score, or Pedersen-Bjergaard score to assess impaired awareness (76). Lastly, level 3 hypoglycemia is defined as a severe

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693609/dc23s006.pdf by guest on 07 December 2023

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693909/dc23s006.pdf by guest on 07 December 2023

| Table 6.4—Classification of hypoglycemia | |
|---|---|
| | Glycemic criteria/description |
| Level 1 | Glucose <70 mg/dL (3.9 mmol/L) and ≥54 mg/dL (3.0 mmol/L) |
| Level 2 | Glucose <54 mg/dL (3.0 mmol/L) |
| Level 3 | A severe event characterized by altered mental and/or physical status requiring assistance for treatment of hypoglycemia |

Reprinted from Agiostratidou et al. (74).

event characterized by altered mental and/or physical functioning that requires assistance from another person for recovery.

Symptoms of hypoglycemia include, but are not limited to, shakiness, irritability, confusion, tachycardia, and hunger. Hypoglycemia may be inconvenient or frightening to people with diabetes. Level 3 hypoglycemia may be recognized or unrecognized and can progress to loss of consciousness, seizure, coma, or death. Hypoglycemia is reversed by administration of rapid-acting glucose or glucagon. Hypoglycemia can cause acute harm to the person with diabetes or others, especially if it causes falls, motor vehicle accidents, or other injury. Recurrent level 2 hypoglycemia and/or level 3 hypoglycemia is an urgent medical issue and requires intervention with medical treatment plan adjustment, behavioral intervention, and, in some cases, use of technology to assist with hypoglycemia prevention and identification (76,79–82). A large cohort study suggested that among older adults with type 2 diabetes, a history of level 3 hypoglycemia was associated with greater risk of dementia (84). Conversely, in a substudy of the ACCORD trial, cognitive impairment at baseline or decline in cognitive function during the trial was significantly associated with subsequent episodes of level 3 hypoglycemia (85). Evidence from DCCT/EDIC, which involved adolescents and younger adults with type 1 diabetes, found no association between frequency of level 3 hypoglycemia and cognitive decline (86).

Studies of rates of level 3 hypoglycemia that rely on claims data for hospitalization, emergency department visits, and ambulance use substantially underestimate rates of level 3 hypoglycemia (87) yet reveal a high burden of hypoglycemia in adults over 60 years of age in the community (88). African American individuals are at substantially increased risk of level 3 hypoglycemia (88,89). In addition to age and race, other important risk factors found in a community-based epidemiologic cohort of older adults with type 2 diabetes include insulin use, poor or moderate versus good glycemic control, albuminuria, and poor cognitive function (88). Level 3 hypoglycemia was associated with mortality in participants in both the standard and the intensive glycemia arms of the ACCORD trial, but the relationships between hypoglycemia, achieved A1C, and treatment intensity were not straightforward. An association of level 3 hypoglycemia with mortality was also found in the ADVANCE trial (90). An association between self-reported level 3 hypoglycemia and 5-year mortality has also been reported in clinical practice (91). Glucose variability is also associated with an increased risk for hypoglycemia (92).

Young children with type 1 diabetes and the elderly, including those with type 1 and type 2 diabetes (84,93), are noted as particularly vulnerable to hypoglycemia because of their reduced ability to recognize hypoglycemic symptoms and effectively communicate their needs. Individualized glucose targets, patient education, nutrition intervention (e.g., bedtime snack to prevent overnight hypoglycemia when specifically needed to treat low blood glucose), physical activity management, medication adjustment, glucose monitoring, and routine clinical surveillance may improve patient outcomes (94). CGM with automated low glucose suspend and hybrid closed-loop systems have been shown to be effective in reducing hypoglycemia in type 1 diabetes (95). For people with type 1 diabetes with level 3 hypoglycemia and hypoglycemia unawareness that persists despite medical treatment, human islet transplantation may be an option, but the approach remains experimental (96,97).

In 2015, the ADA changed its preprandial glycemic target from 70–130 mg/dL (3.9–7.2 mmol/L) to 80–130 mg/dL (4.4–7.2 mmol/L). This change reflects the results of the ADAG study, which demonstrated that higher glycemic targets corresponded to A1C goals (14). An additional goal of raising the lower range of the glycemic target was to limit overtreatment and provide a safety margin in patients titrating glucose-lowering drugs such as insulin to glycemic targets.

### Hypoglycemia Treatment

Health care professionals should continue to counsel patients to treat hypoglycemia with fast-acting carbohydrates at the hypoglycemia alert value of 70 mg/dL (3.9 mmol/L) or less. This should be reviewed at each patient visit. Hypoglycemia treatment requires ingestion of glucose- or carbohydrate-containing foods (98–100). The acute glycemic response correlates better with the glucose content of food than with the carbohydrate content of food. Pure glucose is the preferred treatment, but any form of carbohydrate that contains glucose will raise blood glucose. Added fat may retard and then prolong the acute glycemic response. In type 2 diabetes, ingested protein may increase insulin response without increasing plasma glucose concentrations (101). Therefore, carbohydrate sources high in protein should not be used to treat or prevent hypoglycemia. Ongoing insulin activity or insulin secretagogues may lead to recurrent hypoglycemia unless more food is ingested after recovery. Once the glucose returns to normal, the individual should be counseled to eat a meal or snack to prevent recurrent hypoglycemia.

#### Glucagon

The use of glucagon is indicated for the treatment of hypoglycemia in people unable or unwilling to consume carbohydrates by mouth. Those in close contact with, or having custodial care of, people with hypoglycemia-prone diabetes (family members, roommates, school personnel, childcare professionals, correctional institution staff, or coworkers) should be instructed on the use of glucagon, including where the glucagon product is kept and when and how to administer it. An individual does not need to be a health care professional to safely

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693609/dc23s006.pdf by guest on 07 December 2023

administer glucagon. In addition to traditional glucagon injection powder that requires reconstitution prior to injection, intranasal glucagon and ready-to-inject glucagon preparations for subcutaneous injection are available and may be beneficial in view of safety, efficacy, and ease of use. Care should be taken to ensure that glucagon products are not expired (102).

**Hypoglycemia Prevention**

Hypoglycemia prevention is a critical component of diabetes management. BGM and, for some individuals, CGM are essential tools to assess therapy and detect incipient hypoglycemia. People with diabetes should understand situations that increase their risk of hypoglycemia, such as when fasting for laboratory tests or procedures, when meals are delayed, during and after the consumption of alcohol, during and after intense physical activity, and during sleep. Hypoglycemia may increase the risk of harm to self or others, such as when driving. Teaching people with diabetes to balance insulin use and carbohydrate intake and physical activity are necessary, but these strategies are not always sufficient for prevention (77, 103–105). Formal training programs to increase awareness of hypoglycemia and to develop strategies to decrease hypoglycemia have been developed, including the Blood Glucose Awareness Training Program, Dose Adjusted for Normal Eating (DAFNE), and DAFNE-plus. Conversely, some individuals with type 1 diabetes or type 2 diabetes and hypoglycemia who have a fear of hyperglycemia are resistant to relaxation of glycemic targets (74–83). Regardless of the factors contributing to hypoglycemia and hypoglycemia unawareness, this represents an urgent medical issue requiring intervention.

In type 1 diabetes and severely insulin-deficient type 2 diabetes, hypoglycemia unawareness (or hypoglycemia-associated autonomic failure) can severely compromise stringent diabetes control and quality of life. This syndrome is characterized by deficient counterregulatory hormone release, especially in older adults, and a diminished autonomic response, which are both risk factors for and caused by hypoglycemia. A corollary to this "vicious cycle" is that several weeks of avoidance of hypoglycemia has been demonstrated to improve counterregulation and hypoglycemia awareness in many people with

diabetes (106). Hence, individuals with one or more episodes of clinically significant hypoglycemia may benefit from at least short-term relaxation of glycemic targets and availability of glucagon (107). Any person with recurrent hypoglycemia or hypoglycemia unawareness should have their glucose management treatment plan adjusted.

*Use of CGM Technology in Hypoglycemia Prevention*

With the advent of sensor-augmented CGM and CGM-assisted pump therapy, there has been a promise of alarm-based prevention of hypoglycemia (108,109). To date, there have been a number of randomized controlled trials in adults with type 1 diabetes and studies in adults and children with type 1 diabetes using real-time CGM (see Section 7, "Diabetes Technology"). These studies had differing A1C at entry and differing primary end points and thus must be interpreted carefully. Real-time CGM studies can be divided into studies with elevated A1C with the primary end point of A1C reduction and studies with A1C near target with the primary end point of reduction in hypoglycemia (98, 109–124). In people with type 1 and type 2 diabetes with A1C above target, CGM improved A1C between 0.3 and 0.6%. For studies targeting hypoglycemia, most studies demonstrated a significant reduction in time spent between 54 and 70 mg/dL. A report in people with type 1 diabetes over the age of 60 years revealed a small but statistically significant decrease in hypoglycemia (125). No study to date has reported a decrease in level 3 hypoglycemia. In a single study using intermittently scanned CGM, adults with type 1 diabetes with A1C near goal and impaired awareness of hypoglycemia demonstrated no change in A1C and decreased level 2 hypoglycemia (115). For people with type 2 diabetes, studies examining the impact of CGM on hypoglycemic events are limited; a recent meta-analysis does not reflect a significant impact on hypoglycemic events in type 2 diabetes (126), whereas improvements in A1C were observed in most studies (126–132). Overall, real-time CGM appears to be a useful tool for decreasing time spent in a hypoglycemic range in people with impaired awareness. For people with type 2 diabetes, other strategies to assist them with

insulin dosing can improve A1C with minimal hypoglycemia (133,134).

**INTERCURRENT ILLNESS**

For further information on management of individuals with hyperglycemia in the hospital, see Section 16, "Diabetes Care in the Hospital."

Stressful events (e.g., illness, trauma, surgery) may worsen glycemic control and precipitate diabetic ketoacidosis or nonketotic hyperglycemic hyperosmolar state, life-threatening conditions that require immediate medical care to prevent complications and death. Any condition leading to deterioration in glycemic control necessitates more frequent monitoring of blood glucose; ketosis-prone patients also require urine or blood ketone monitoring. If accompanied by ketosis, vomiting, or alteration in the level of consciousness, marked hyperglycemia requires temporary adjustment of the treatment plan and immediate interaction with the diabetes care team. The patient treated with noninsulin therapies or medical nutrition therapy alone may require insulin. Adequate fluid and caloric intake must be ensured. Infection or dehydration are more likely to necessitate hospitalization of individuals with diabetes versus those without diabetes.

A clinician with expertise in diabetes management should treat the hospitalized patient. For further information on the management of diabetic ketoacidosis and the nonketotic hyperglycemic hyperosmolar state, please refer to the ADA consensus report "Hyperglycemic Crises in Adult Patients With Diabetes" (134).

**References**

1. Deshmukh H, Wilmot EG, Gregory R, et al. Effect of flash glucose monitoring on glycemic control, hypoglycemia, diabetes-related distress, and resource utilization in the Association of British Clinical Diabetologists (ABCD) nationwide audit. Diabetes Care 2020;43:2153–2160

2. Laiteerapong N, Ham SA, Gao Y, et al. The legacy effect in type 2 diabetes: impact of early glycemic control on future complications (the Diabetes & Aging Study). Diabetes Care 2019;42:416–426

3. Stratton IM, Adler AI, Neil HAW, et al. Association of glycaemia with macrovascular and microvascular complications of type 2 diabetes (UKPDS 35): prospective observational study. BMJ 2000;321:405–412

4. Little RR, Rohlfing CL; National Glycohemoglobin Standardization Program (NGSP) Steering Committee. Status of hemoglobin A1c measurement and goals

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693605/dc23s006.pdf by guest on 07 December 2023

for improvement: from chaos to order for improving diabetes care. Clin Chem 2011;57:205–214

5. Valenzano M, Cibrario Bertolotti I, Valenzano A, Grassi G. Time in range–A1c hemoglobin relationship in continuous glucose monitoring of type 1 diabetes: a real-world study. BMJ Open Diabetes Res Care 2021;9:e001045

6. Fabris C, Heinemann L, Beck R, Cobelli C, Kovatchev B. Estimation of hemoglobin A1c from continuous glucose monitoring data in individuals with type 1 diabetes: is time in range all we need? Diabetes Technol Ther 2020;22:501–508

7. Ranjan AG, Rosenlund SV, Hansen TW, Rossing P, Andersen S, Nørgaard K. Improved time in range over 1 year is associated with reduced albuminuria in individuals with sensor-augmented insulin pump-treated type 1 diabetes. Diabetes Care 2020;43:2882–2885

8. Beck RW, Bergenstal RM, Cheng P, et al. The relationships between time in range, hyperglycemia metrics, and HbA1c. J Diabetes Sci Technol 2019; 13:614–626

9. Šoupal J, Petruželková L, Grunberger G, et al. Glycemic outcomes in adults with T1D who are impacted more by continuous glucose monitoring than by insulin delivery method: 3 years of follow-up from the COMISAIR study. Diabetes Care 2020;43:37–43

10. Jovanovič L, Savas H, Mehta M, Trujillo A, Pettitt DJ. Frequent monitoring of A1C during pregnancy as a treatment tool to guide therapy. Diabetes Care 2011;34:53–54

11. Kidney Disease: Improving Global Outcomes (KDIGO) Diabetes Work Group. KDIGO 2020 clinical practice guideline for diabetes management in chronic kidney disease. Kidney Int 2020;98(4S): S1–S115

12. Beck RW, Connor CG, Mullen DM, Wesley DM, Bergenstal RM. The fallacy of average: how using HbA1c alone to assess glycemic control can be misleading. Diabetes Care 2017;40:994–999

13. Nathan DM, Kuenen J, Borg R, Zheng H, Schoenfeld D; A1c-Derived Average Glucose Study Group. Translating the A1C assay into estimated average glucose values. Diabetes Care 2008;31:1473–1478

14. Wei N, Zheng H, Nathan DM. Empirically establishing blood glucose targets to achieve HbA1c goals. Diabetes Care 2014;37:1048–1051

15. Selvin E. Are there clinical implications of racial differences in HbA1c? A difference, to be a difference, must make a difference. Diabetes Care 2016;39:1462–1467

16. Bergenstal RM, Gal RL, Connor CG, et al.; T1D Exchange Racial Differences Study Group. Racial differences in the relationship of glucose concentrations and hemoglobin A1c levels. Ann Intern Med 2017;167:95–102

17. Khosla L, Bhat S, Fullington LA, Horlyck-Romanovsky MF. HbA1c performance in african descent populations in the United States with normal glucose tolerance, prediabetes, or diabetes: a scoping review. Prev Chronic Dis 2021;18:E22

18. Lacy ME, Wellenius GA, Sumner AE, Correa A, Carnethon MR, Liem RI, et al. Association of sickle cell trait with hemoglobin A1c in African Americans. JAMA 2017;317:507–515.

19. Rohlfing C, Hanson S, Little RR. Measurement of hemoglobin A1c in patients with sickle cell trait. JAMA 2017;317:2237.

20. Wheeler E, Leong A, Liu CT, et al.; EPIC-CVD Consortium; EPIC-InterAct Consortium; Lifelines Cohort Study. Impact of common genetic determinants of hemoglobin A1c on type 2 diabetes risk and diagnosis in ancestrally diverse populations: a transethnic genome-wide meta-analysis. PLoS Med 2017;14:e1002383

21. Diabetes Research in Children Network (DirecNet) Study Group. Relationship of A1C to glucose concentrations in children with type 1 diabetes: assessments by high-frequency glucose determinations by sensors. Diabetes Care 2008; 31:381–385

22. Buse JB, Kaufman FR, Linder B, Hirst K, El Ghormli L; HEALTHY Study Group. Diabetes screening with hemoglobin A(1c) versus fasting plasma glucose in a multiethnic middle-school cohort. Diabetes Care 2013;36:429–435

23. Kamps JL, Hempe JM, Chalew SA. Racial disparity in A1C independent of mean blood glucose in children with type 1 diabetes. Diabetes Care 2010;33:1025–1027

24. Advani A. Positioning time in range in diabetes management. Diabetologia 2020;63:242–252

25. Avari P, Uduku C, George D, Herrero P, Reddy M, Oliver N. Differences for percentage times in glycemic range between continuous glucose monitoring and capillary blood glucose monitoring in adults with type 1 diabetes: analysis of the REPLACE-BG dataset. Diabetes Technol Ther 2020; 22:222–227

26. Vigersky RA, McMahon C. The relationship of hemoglobin A1C to time-in-range in patients with diabetes. Diabetes Technol Ther 2019;21: 81–85

27. Kröger J, Reichel A, Siegmund T, Ziegler R. Clinical recommendations for the use of the ambulatory glucose profile in diabetes care. J Diabetes Sci Technol 2020;14:586–594

28. Livingstone R, Boyle JG, Petrie JR. How tightly controlled do fluctuations in blood glucose levels need to be to reduce the risk of developing complications in people with type 1 diabetes? Diabet Med 2020;37:513–521

29. Messer LH, Berget C, Vigers T, et al. Real world hybrid closed-loop discontinuation: Predictors and perceptions of youth discontinuing the 670G system in the first 6 months. Pediatr Diabetes 2020;21:319–327

30. Mayeda L, Katz R, Ahmad I, et al. Glucose time in range and peripheral neuropathy in type 2 diabetes mellitus and chronic kidney disease. BMJ Open Diabetes Res Care 2020;8:e000991

31. Yoo JH, Choi MS, Ahn J, et al. Association between continuous glucose monitoring-derived time in range, other core metrics, and albuminuria in type 2 diabetes. Diabetes Technol Ther 2020; 22:768–776

32. Lu J, Ma X, Shen Y, et al. Time in range is associated with carotid intima-media thickness in type 2 diabetes. Diabetes Technol Ther 2020;22: 72–78

33. Diabetes Control and Complications Trial Research Group; Nathan DM, Genuth S, Lachin J, et al. The effect of intensive treatment of diabetes on the development and progression of long-term complications in insulin-dependent diabetes mellitus. N Engl J Med 1993;329:977–986

34. Holt RIG, DeVries JH, Hess-Fischl A, et al. The management of type 1 diabetes in adults. A Consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). Diabetes Care 2021;44:2589–2625

35. Battelino T, Danne T, Bergenstal RM, et al. Clinical targets for continuous glucose monitoring data interpretation: recommendations from the International Consensus on Time in Range. Diabetes Care 2019;42:1593–1603

36. Tchero H, Kangambega P, Briatte C, Brunet-Houdard S, Retali GR, Rusch E. Clinical effectiveness of telemedicine in diabetes mellitus: a meta-analysis of 42 randomized controlled trials. Telemed J E Health 2019;25:569–583

37. Salabelle C, Ly Sall K, Eroukhmanoff J, et al. COVID-19 pandemic lockdown in young people with type 1 diabetes: positive results of an unprecedented challenge for patients through telemedicine and change in use of continuous glucose monitoring. Prim Care Diabetes 2021;15:884–886

38. Prabhu Navis J, Leelarathna L, Mubita W, et al. Impact of COVID-19 lockdown on flash and real-time glucose sensor users with type 1 diabetes in England. Acta Diabetol 2021;58:231–237

39. Seidu S, Kunutsor SK, Topsever P, Hambling CE, Cos FX, Khunti K. Deintensification in older patients with type 2 diabetes: a systematic review of approaches, rates and outcomes. Diabetes Obes Metab 2019;21:1668–1679

40. Khunti K, Davies MJ. Clinical inertia–time to reappraise the terminology? Prim Care Diabetes 2017;11:105–106

41. Whitehead L, Glass C, Coppell K. The effectiveness of goal setting on glycaemic control for people with type 2 diabetes and prediabetes: a systematic review and meta-analysis. J Adv Nurs 2022;78:1212–1227

42. Diabetes Control and Complications Trial (DCCT)/Epidemiology of Diabetes Interventions and Complications (EDIC) Research Group; Lachin JM, White NH, Hainsworth DP, et al. Effect of intensive diabetes therapy on the progression of diabetic retinopathy in patients with type 1 diabetes: 18 years of follow-up in the DCCT/EDIC. Diabetes 2015;64:631–642

43. Diabetes Control and Complications Trial/ Epidemiology of Diabetes Interventions and Complications Research Group; Lachin JM, Genuth S, Cleary P, Davis MD, Nathan DM. Retinopathy and nephropathy in patients with type 1 diabetes four years after a trial of intensive therapy. N Engl J Med 2000;342:381–389

44. Ohkubo Y, Kishikawa H, Araki E, et al. Intensive insulin therapy prevents the progression of diabetic microvascular complications in Japanese patients with non-insulin-dependent diabetes mellitus: a randomized prospective 6-year study. Diabetes Res Clin Pract 1995;28:103–117

45. UK Prospective Diabetes Study (UKPDS) Group. Effect of intensive blood-glucose control with metformin on complications in overweight patients with type 2 diabetes (UKPDS 34). Lancet 1998;352:854–865

46. UK Prospective Diabetes Study (UKPDS) Group. Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with type 2 diabetes (UKPDS 33). Lancet 1998;352:837–853

47. Holman RR, Paul SK, Bethel MA, Matthews DR, Neil HAW. 10-year follow-up of intensive glucose control in type 2 diabetes. N Engl J Med 2008;359:1577–1589

S108    Glycemic Targets    Diabetes Care Volume 46, Supplement 1, January 2023

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693600/dc23s006.pdf by guest on 07 December 2023

48. Lind M, Pivodic A, Svensson AM, Ólafsdóttir AF, Wedel H, Ludvigsson J. HbA1c level as a risk factor for retinopathy and nephropathy in children and adults with type 1 diabetes: Swedish population based cohort study. BMJ 2019;366: l4894

49. Adler AI, Stratton IM, Neil HAW, et al. Association of systolic blood pressure with macrovascular and microvascular complications of type 2 diabetes (UKPDS 36): prospective observational study. BMJ 2000;321:412–419

50. Duckworth W, Abraira C, Moritz T, et al.; VADT Investigators. Glucose control and vascular complications in veterans with type 2 diabetes. N Engl J Med 2009;360:129–139

51. Patel A, MacMahon S, Chalmers J, et al.; ADVANCE Collaborative Group. Intensive blood glucose control and vascular outcomes in patients with type 2 diabetes. N Engl J Med 2008;358: 2560–2572

52. Ismail-Beigi F, Craven T, Banerji MA, et al.; ACCORD trial group. Effect of intensive treatment of hyperglycaemia on microvascular outcomes in type 2 diabetes: an analysis of the ACCORD randomised trial. Lancet 2010;376:419–430

53. Buse JB, Bain SC, Mann JFE, et al.; LEADER Trial Investigators. Cardiovascular risk reduction with liraglutide: an exploratory mediation analysis of the LEADER trial. Diabetes Care 2020;43: 1546–1552

54. Nathan DM, Cleary PA, Backlund JYC, et al.; Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications (DCCT/EDIC) Study Research Group. Intensive diabetes treatment and cardiovascular disease in patients with type 1 diabetes. N Engl J Med 2005;353:2643–2653

55. Nathan DM, Zinman B, Cleary PA, et al.; Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications (DCCT/EDIC) Research Group. Modern-day clinical course of type 1 diabetes mellitus after 30 years' duration: the diabetes control and complications trial/epidemiology of diabetes interventions and complications experience (1983-2005). Arch Intern Med 2009;169:1307–1316

56. Emerging Risk Factors Collaboration; Di Angelantonio E, Kaptoge S, Wormser D, et al. Association of cardiometabolic multimorbidity with mortality. JAMA 2015;314:52–60

57. Yeung RO, Zhang Y, Luk A, et al. Metabolic profiles and treatment gaps in young-onset type 2 diabetes in Asia (the JADE programme): a cross-sectional study of a prospective cohort. Lancet Diabetes Endocrinol 2014;2:935–943

58. Sattar N, Rawshani A, Franzén S, et al. Age at diagnosis of type 2 diabetes mellitus and associations with cardiovascular and mortality risks. Circulation 2019;139:2228–2237

59. Zabala A, Darsalia V, Holzmann MJ, et al. Risk of first stroke in people with type 2 diabetes and its relation to glycaemic control: a nationwide observational study. Diabetes Obes Metab 2020; 22:182–190

60. Zoungas S, Woodward M, Li Q, et al.; ADVANCE Collaborative group. Impact of age, age at diagnosis and duration of diabetes on the risk of macrovascular and microvascular complications and death in type 2 diabetes. Diabetologia 2014;57: 2465–2474

61. Skyler JS, Bergenstal R, Bonow RO, et al.; American Diabetes Association; American College of Cardiology Foundation; American Heart Association. Intensive glycemic control and the prevention of cardiovascular events: implications of the ACCORD, ADVANCE, and VA diabetes trials: a position statement of the American Diabetes Association and a scientific statement of the American College of Cardiology Foundation and the American Heart Association. Diabetes Care 2009;32:187–192

62. Gerstein HC, Miller ME, Byington RP, et al.; Action to Control Cardiovascular Risk in Diabetes Study Group. Effects of intensive glucose lowering in type 2 diabetes. N Engl J Med 2008;358: 2545–2559

63. Zoungas S, Chalmers J, Neal B, et al.; ADVANCE-ON Collaborative Group. Follow-up of blood-pressure lowering and glucose control in type 2 diabetes. N Engl J Med 2014;371:1392–1406

64. Hayward RA, Reaven PD, Wiitala WL, et al.; VADT Investigators. Follow-up of glycemic control and cardiovascular outcomes in type 2 diabetes. N Engl J Med 2015;372:2197–2206

65. Turnbull FM, Abraira C, Anderson RJ, et al.; Control Group. Intensive glucose control and macrovascular outcomes in type 2 diabetes. Diabetologia 2009;52:2288–2298

66. Duckworth WC, Abraira C, Moritz TE, et al.; Investigators of the VADT. The duration of diabetes affects the response to intensive glucose control in type 2 subjects: the VA Diabetes Trial. J Diabetes Complications 2011;25:355–361

67. Lipska KJ, Ross JS, Miao Y, Shah ND, Lee SJ, Steinman MA. Potential overtreatment of diabetes mellitus in older adults with tight glycemic control. JAMA Intern Med 2015;175:356–362

68. Vijan S, Sussman JB, Yudkin JS, Hayward RA. Effect of patients' risks and preferences on health gains with plasma glucose level lowering in type 2 diabetes mellitus. JAMA Intern Med 2014;174: 1227–1234

69. Lee AK, Warren B, Lee CJ, et al. The association of severe hypoglycemia with incident cardiovascular events and mortality in adults with type 2 diabetes. Diabetes Care 2018;41:104–111

70. Davies MJ, D'Alessio DA, Fradkin J, et al. Management of hyperglycemia in type 2 diabetes, 2018. A consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). Diabetes Care 2018;41:2669–2701

71. Inzucchi SE, Bergenstal RM, Buse JB, et al. Management of hyperglycemia in type 2 diabetes, 2015: a patient-centered approach: update to a position statement of the American Diabetes Association and the European Association for the Study of Diabetes. Diabetes Care 2015;38:140–149

72. American Diabetes Association. Postprandial blood glucose. Diabetes Care 2001;24:775–778

73. Raz I, Wilson PWF, Strojek K, et al. Effects of prandial versus fasting glycemia on cardiovascular outcomes in type 2 diabetes: the HEART2D trial. Diabetes Care 2009;32:381–386

74. Agiostratidou G, Anhalt H, Ball D, et al. Standardizing clinically meaningful outcome measures beyond HbA$_{1c}$ for type 1 diabetes: a consensus report of the American Association of Clinical Endocrinologists, the American Association of Diabetes Educators, the American Diabetes

Association, the Endocrine Society, JDRF International, The Leona M. and Harry B. Helmsley Charitable Trust, the Pediatric Endocrine Society, and the T1D Exchange. Diabetes Care 2017;40:1622–1630

75. Polonsky WH, Fortmann AL, Price D, Fisher L. "Hyperglycemia aversiveness": investigating an overlooked problem among adults with type 1 diabetes. J Diabetes Complications 2021;35: 107925

76. Ghandi K, Pieri B, Dornhorst A, Hussain S. A comparison of validated methods used to assess impaired awareness of hypoglycaemia in type 1 diabetes: an observational study. Diabetes Ther 2021;12:441–451

77. Li P, Geng Z, Ladage VP, Wu J, Lorincz I, Doshi JA. Early hypoglycaemia and adherence after basal insulin initiation in a nationally representative sample of Medicare beneficiaries with type 2 diabetes. Diabetes Obes Metab 2019;21:2486–2495

78. Hendrieckx C, Ivory N, Singh H, Frier BM, Speight J. Impact of severe hypoglycaemia on psychological outcomes in adults with type 2 diabetes: a systematic review. Diabet Med 2019;36:1082–1091

79. Amiel SA, Potts L, Goldsmith K, et al. A parallel randomised controlled trial of the Hypoglycaemia Awareness Restoration Programme for adults with type 1 diabetes and problematic hypoglycaemia despite optimised self-care (HARPdoc). Nat Commun 2022;13:2229

80. Khunti K, Alsifri S, Aronson R, et al. Impact of hypoglycaemia on patient-reported outcomes from a global, 24-country study of 27,585 people with type 1 and insulin-treated type 2 diabetes. Diabetes Res Clin Pract 2017;130:121–129

81. Choudhary P, Amiel SA. Hypoglycaemia in type 1 diabetes: technological treatments, their limitations and the place of psychology. Diabetologia 2018;61:761–769

82. Hopkins D, Lawrence I, Mansell P, Thompson G, Amiel S, Campbell M, et al. Improved biomedical and psychological outcomes 1 year after structured education in flexible insulin therapy for people with type 1 diabetes: the U.K. DAFNE experience. Diabetes Care 2012;35:1638–1642

83. Yang W, Ma J, Yuan G, et al. Determining the optimal fasting glucose target for patients with type 2 diabetes: results of the multicentre, open-label, randomized-controlled FPG GOAL trial. Diabetes Obes Metab 2019;21:1973–1977

84. Whitmer RA, Karter AJ, Yaffe K, Quesenberry CP Jr, Selby JV. Hypoglycemic episodes and risk of dementia in older patients with type 2 diabetes mellitus. JAMA 2009;301:1565–1572

85. Punthakee Z, Miller ME, Launer LJ, et al.; ACCORD Group of Investigators; ACCORD-MIND Investigators. Poor cognitive function and risk of severe hypoglycemia in type 2 diabetes: post hoc epidemiologic analysis of the ACCORD trial. Diabetes Care 2012;35:787–793

86. Jacobson AM, Musen G, Ryan CM, et al.; Diabetes Control and Complications Trial/ Epidemiology of Diabetes Interventions and Complications Study Research Group. Long-term effect of diabetes and its treatment on cognitive function. N Engl J Med 2007;356:1842–1852

87. Karter AJ, Moffet HH, Liu JY, Lipska KJ. Surveillance of hypoglycemia—limitations of emergency department and hospital utilization data. JAMA Intern Med 2018;178:987–988

88. Lee AK, Lee CJ, Huang ES, Sharrett AR, Coresh J, Selvin E. risk factors for severe hypoglycemia in

Appx233

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693606/dc23s006.pdf by guest on 07 December 2023

black and white adults with diabetes: the Atherosclerosis Risk in Communities (ARIC) study. Diabetes Care 2017;40:1661–1667

89. Karter AJ, Lipska KJ, O'Connor PJ, et al.; SUPREME-DM Study Group. High rates of severe hypoglycemia among African American patients with diabetes: the surveillance, prevention, and Management of Diabetes Mellitus (SUPREME-DM) network. J Diabetes Complications 2017;31: 869–873

90. Zoungas S, Patel A, Chalmers J, et al.; ADVANCE Collaborative Group. Severe hypoglycemia and risks of vascular events and death. N Engl J Med 2010;363:1410–1418

91. McCoy RG, Van Houten HK, Ziegenfuss JY, Shah ND, Wermers RA, Smith SA. Increased mortality of patients with diabetes reporting severe hypoglycemia. Diabetes Care 2012;35: 1897–1901

92. Cahn A, Zuker I, Eilenberg R, et al. Machine learning based study of longitudinal HbA1c trends and their association with all-cause mortality: analyses from a national diabetes registry. Diabetes Metab Res Rev 2022;38:e3485

93. DuBose SN, Weinstock RS, Beck RW, et al. Hypoglycemia in older adults with type 1 diabetes. Diabetes Technol Ther 2016;18:765–771

94. Seaquist ER, Anderson J, Childs B, et al. Hypoglycemia and diabetes: a report of a workgroup of the American Diabetes Association and the Endocrine Society. Diabetes Care 2013;36:1384–1395

95. Bergenstal RM, Klonoff DC, Garg SK, et al.; ASPIRE In-Home Study Group. Threshold-based insulin-pump interruption for reduction of hypoglycemia. N Engl J Med 2013;369:224–232

96. Hering BJ, Clarke WR, Bridges ND, et al.; Clinical Islet Transplantation Consortium. Phase 3 trial of transplantation of human islets in type 1 diabetes complicated by severe hypoglycemia. Diabetes Care 2016;39:1230–1240

97. Harlan DM. Islet transplantation for hypoglycemia unawareness/severe hypoglycemia: caveat emptor. Diabetes Care 2016;39:1072–1074

98. McTavish L, Wiltshire E. Effective treatment of hypoglycemia in children with type 1 diabetes: a randomized controlled clinical trial. Pediatr Diabetes 2011;12(4pt2):381–387

99. McTavish L, Corley B, Weatherall M, Wiltshire E, Krebs JD. Weight-based carbohydrate treatment of hypoglycaemia in people with type 1 diabetes using insulin pump therapy: a randomized crossover clinical trial. Diabet Med 2018;35:339–346

100. Georgakopoulos K, Katsilambros N, Fragaki M, et al. Recovery from insulin-induced hypoglycemia after saccharose or glucose administration. Clin Physiol Biochem 1990;8:267–272

101. Layman DK, Clifton P, Gannon MC, Krauss RM, Nuttall FQ. Protein in optimal health: heart disease and type 2 diabetes. Am J Clin Nutr 2008;87:1571S–1575S

102. Pontiroli AE, Ceriani V. Intranasal glucagon for hypoglycaemia in diabetic patients. An old dream is becoming reality? Diabetes Obes Metab 2018;20:1812–1816

103. Stanton-Fay SH, Hamilton K, Chadwick PM, et al.; DAFNEplus study group. The DAFNEplus programme for sustained type 1 diabetes self management: intervention development using the Behaviour Change Wheel. Diabet Med 2021; 38:e14548

104. Farrell CM, McCrimmon RJ. Clinical approaches to treat impaired awareness of hypoglycaemia. Ther Adv Endocrinol Metab 2021;12:20420188211000248

105. Cox DJ, Gonder-Frederick L, Julian DM, Clarke W. Long-term follow-up evaluation of blood glucose awareness training. Diabetes Care 1994;17:1–5

106. Cryer PE. Diverse causes of hypoglycemia-associated autonomic failure in diabetes. N Engl J Med 2004;350:2272–2279

107. Mitchell BD, He X, Sturdy IM, Cagle AP, Settles JA. Glucagon prescription patterns in patients with either type 1 or 2 diabetes with newly prescribed insulin. Endocr Pract 2016;22:123–135

108. Hermanns N, Heinemann L, Freckmann G, Waldenmaier D, Ehrmann D. Impact of CGM on the management of hypoglycemia problems: overview and secondary analysis of the HypoDE study. J Diabetes Sci Technol 2019;13:636–644

109. Heinemann L, Freckmann G, Ehrmann D, Faber-Heinemann G, Guerra S, Waldenmaier D, et al. Heinemann L, Freckmann G, Ehrmann D, et al. Real-time continuous glucose monitoring in adults with type 1 diabetes and impaired hypoglycaemia awareness or severe hypoglycaemia treated with multiple daily insulin injections (HypoDE): a multicentre, randomised controlled trial. Lancet 2018;391:1367–1377

110. Beck RW, Riddlesworth T, Ruedy K, Ahmann A, Bergenstal R, Haller S, et al. Effect of continuous glucose monitoring on glycemic control in adults with type 1 diabetes using insulin injections: the DIAMOND randomized clinical trial. JAMA 2017; 317:371–378

111. Sequeira PA, Montoya L, Ruelas V, et al. Continuous glucose monitoring pilot in low-income type 1 diabetes patients. Diabetes Technol Ther 2013;15:855–858

112. Tumminia A, Crimi S, Sciacca L, et al. Efficacy of real-time continuous glucose monitoring on glycaemic control and glucose variability in type 1 diabetic patients treated with either insulin pumps or multiple insulin injection therapy: a randomized controlled crossover trial. Diabetes Metab Res Rev 2015;31:61–68

113. Bolinder J, Antuna R, Geelhoed-Duijvestijn P, Kröger J, Weitgasser R. Novel glucose-sensing technology and hypoglycaemia in type 1 diabetes: a multicentre, non-masked, randomised controlled trial. Lancet 2016;388:2254–2263

114. Hermanns N, Schumann B, Kulzer B, Haak T. The impact of continuous glucose monitoring on low interstitial glucose values and low blood glucose values assessed by point-of-care blood glucose meters: results of a crossover trial. J Diabetes Sci Technol 2014;8:516–522

115. Reddy M, Jugnee N, El Laboudi A, Spanudakis E, Anantharaja S, Oliver N. A randomized controlled pilot study of continuous glucose monitoring and flash glucose monitoring in people with Type 1 diabetes and impaired awareness of hypoglycaemia. Diabet Med 2018;35:483–490

116. Riddlesworth T, Price D, Cohen N, Beck RW. Hypoglycemic event frequency and the effect of continuous glucose monitoring in adults with type 1 diabetes using multiple daily insulin injections. Diabetes Ther 2017;8:947–951

117. van Beers CAJ, DeVries JH, Kleijer SJ, et al. Continuous glucose monitoring for patients with type 1 diabetes and impaired awareness of hypoglycaemia (IN CONTROL): a randomised, open-label, crossover trial. Lancet Diabetes Endocrinol 2016;4:893–902

118. Battelino T, Conget I, Olsen B, et al.; SWITCH Study Group. The use and efficacy of continuous glucose monitoring in type 1 diabetes treated with insulin pump therapy: a randomised controlled trial. Diabetologia 2012;55:3155–3162

119. Deiss D, Bolinder J, Riveline J-P, et al. Improved glycemic control in poorly controlled patients with type 1 diabetes using real-time continuous glucose monitoring. Diabetes Care 2006;29:2730–2732

120. Tamborlane WV, Beck RW, Bode BW, et al.; Juvenile Diabetes Research Foundation Continuous Glucose Monitoring Study Group. Continuous glucose monitoring and intensive treatment of type 1 diabetes. N Engl J Med 2008;359:1464–1476

121. O'Connell MA, Donath S, O'Neal DN, et al. Glycaemic impact of patient-led use of sensor-guided pump therapy in type 1 diabetes: a randomised controlled trial. Diabetologia 2009; 52:1250–1257

122. Beck RW, Hirsch IB, Laffel L, et al.; Juvenile Diabetes Research Foundation Continuous Glucose Monitoring Study Group. The effect of continuous glucose monitoring in well-controlled type 1 diabetes. Diabetes Care 2009;32:1378–1383

123. Battelino T, Phillip M, Bratina N, Nimri R, Oskarsson P, Bolinder J. Effect of continuous glucose monitoring on hypoglycemia in type 1 diabetes. Diabetes Care 2011;34:795–800

124. Ludvigsson J, Hanas R. Continuous subcutaneous glucose monitoring improved metabolic control in pediatric patients with type 1 diabetes: a controlled crossover study. Pediatrics 2003;111:933–938

125. Pratley RE, Kanapka LG, Rickels MR, Ahmann A, Aleppo G, Beck R, et al. Effect of continuous glucose monitoring on hypoglycemia in older adults with type 1 diabetes: a randomized clinical trial. JAMA 2020;323:2397–2406

126. Dicembrini I, Mannucci E, Monami M, Pala L. Impact of technology on glycemic control in type 2 diabetes: a meta-analysis of randomized trials on continuous glucose monitoring and continuous subcutaneous insulin infusion. Diabetes Obes Metab 2019;21:2619–2625

127. Beck RW, Riddlesworth TD, Ruedy K, et al.; DIAMOND Study Group. Continuous glucose monitoring versus usual care in patients with type 2 diabetes receiving multiple daily insulin injections: a randomized trial. Ann Intern Med 2017;167:365–374

128. Ehrhardt NM, Chellappa M, Walker MS, Fonda SJ, Vigersky RA. The effect of real-time continuous glucose monitoring on glycemic control in patients with type 2 diabetes mellitus. J Diabetes Sci Technol 2011;5:668–675

129. Haak T, Hanaire H, Ajjan R, Hermanns N, Riveline JP, Rayman G. Flash glucose-sensing technology as a replacement for blood glucose monitoring for the management of insulin-treated type 2 diabetes: a multicenter, open-label randomized controlled trial. Diabetes Ther 2017;8:55–73

130. Yoo HJ, An HG, Park SY, et al. Use of a real time continuous glucose monitoring system as a motivational device for poorly controlled type 2 diabetes. Diabetes Res Clin Pract 2008;82:73–79

131. Garg S, Zisser H, Schwartz S, et al. Improvement in glycemic excursions with a transcutaneous, real-time continuous glucose

S110    Glycemic Targets

**Diabetes Care**  Volume 46, Supplement 1, January 2023

sensor: a randomized controlled trial. Diabetes Care 2006;29:44–50

132. New JP, Ajjan R, Pfeiffer AFH, Freckmann G. Continuous glucose monitoring in people with diabetes: the randomized controlled Glucose Level Awareness in Diabetes Study (GLADIS). Diabet Med 2015;32:609–617

133. Bergenstal RM, Johnson M, Passi R, et al. Automated insulin dosing guidance to optimise insulin management in patients with type 2 diabetes: a multicentre, randomised controlled trial. Lancet 2019;393:1138–1148

134. Kitabchi AE, Umpierrez GE, Miles JM, Fisher JN. Hyperglycemic crises in adult patients with diabetes. Diabetes Care 2009;32:1335–1343

Downloaded from http://diabetesjournals.org/care/article-pdf/46/Supplement_1/S97/693609/dc23s006.pdf by guest on 07 December 2023

Appx235

Declaration of Dr. Nathan Laney

# Exhibit C

**ACE/AACE Diabetes Recommendations Implementation Conference**

# CONTRIBUTIONS OF FASTING AND POSTPRANDIAL GLUCOSE TO HEMOGLOBIN A1c*

*Louis Monnier, MD,[1] and Claude Colette, PhD[2]*

**ABSTRACT**

***Objective:*** To define the respective contributions of fasting and postprandial plasma glucose to hemoglobin A1c (HbA1c) in patients with non-insulin-treated type 2 diabetes.

***Methods:*** Previous studies of diurnal glycemic profiles are reviewed, and glucose values for predicting successful treatment of diabetes are suggested.

***Results:*** By analyzing the results from prior studies of diurnal glycemic profiles, we found that the relative contribution of postprandial plasma glucose was high (70%) in patients with fairly good control of diabetes (HbA1c <7.3%) and decreased progressively (30%) with worsening diabetes (HbA1c >10.2%). In contrast, the contribution of fasting plasma glucose showed a gradual increase with increasing levels of HbA1c. By using the same model (the diurnal glycemic profile), we established that postmeal glycemia was a better predictor of good or satisfactory control of diabetes (HbA1c <7%) than was fasting glucose. The best cutoff values that ensured the optimal balance between high sensitivity and specificity were approximately 200 mg/dL at 11 AM and 160 mg/dL at 2 PM. The cut-point values for predicting treatment success (specificity ≥90%) were 162 mg/dL at 11 AM and 126 mg/dL at 2 PM.

***Conclusion:*** Postprandial plasma glucose is the predominant contributor in patients with satisfactory to good control of diabetes, whereas the contribution of fasting plasma glucose increases with worsening diabetes. Postmeal thresholds for predicting good or satisfactory

control of diabetes are dependent on the timing of the meals. **(Endocr Pract. 2006;12[Suppl 1]:42-46)**

**Abbreviations:**
**AUC** = area under the curve; **CGMS** = continuous glucose monitoring system; **FPF** = false-positive fraction; **HbA1c** = hemoglobin A1c; **PG** = plasma glucose; **ROC** = receiver operating characteristic

## INTRODUCTION

Until recently, the exact contributions of fasting and postprandial glucose to the overall glycemic control of patients with type 2 diabetes remained largely undetermined (1). Because this issue had not been clearly resolved, both hemoglobin A1c (HbA1c) and fasting plasma glucose (PG) have been considered valid markers for overall glucose exposure and thus were routinely used to evaluate the control of diabetes (2). Recent studies, however, have suggested that a third component of the glucose triad—the postprandial glucose excursions—might have a role in the overall glycemic load and might also reflect glycemic control (3,4). A few years ago, in patients with non-insulin-treated type 2 diabetes, we found that postlunch and extended postlunch PG concentrations were better correlated with HbA1c than were fasting PG values (3). More recently, in the same type of patients, investigators reported that preprandial PG concentrations were more strongly related to HbA1c than were postprandial PG concentrations (5). The best correlation, however, was observed between HbA1c and mean daily glucose concentrations, a finding confirming that HbA1c is a function of both fasting and postprandial hyperglycemia (5,6). Despite published recommendations for achieving postprandial glucose levels of less than 180 mg/dL (7) or less than 140 mg/dL (8), two questions, at least, must be answered before postprandial glucose measurements become well recognized as indicators of diabetic control: (*1*) What are the respective contributions of fasting glucose and postprandial glucose increments to the overall glucose exposure as estimated from HbA1c (9-11)? and (*2*) Are we able to define precise timings and suitable

*This material was excerpted from the following publications: Monnier L, Lapinski H, Colette C. Contributions of fasting and postprandial plasma glucose increments to the overall diurnal hyperglycemia of type 2 diabetic patients: variations with increasing levels of HbA(1c). *Diabetes Care.* 2003;26:881-885; and Monnier L, Colette C, Lapinski H. Global assessment for quality and safety of control in type 2 diabetic patients. *Eur J Clin Invest.* 2004;34:37-42.

From the [1]Department of Metabolism, LAPEYRONIE Hospital, MONTPELLIER, France, and the [2]University Institute of Clinical Research, MONTPELLIER, France.

Presented at the American College of Endocrinology and the American Association of Clinical Endocrinologists Diabetes Recommendations Implementation Conference, Washington, DC, January 31 and February 1, 2005.

© 2006 AACE.

ACE/AACE Diabetes Conference (Monnier), *Endocr Pract.* 2006;12(Suppl 1)    43

ranges for postprandial glucose values (12,13)? In the current review, we will attempt to provide appropriate responses to these two questions.

## LESSONS FROM HUMAN PHYSIOLOGY: EXTENT OF POSTPRANDIAL STATES

The postprandial state, with respect to glucose, is defined as a 4-hour period that immediately follows ingestion of a meal (14). During this period, dietary carbohydrates (mainly starch and, to a lesser extent, oligosaccharides and disaccharides) are progressively hydrolyzed through several sequential enzymatic actions. The monosaccharides (primarily glucose units) that are released are absorbed by the intestine, enter the portal stream, and finally are delivered into the systemic circulation within a few minutes after eating. As a result, the PG concentration rapidly increases. Even though the glucose absorption decreases progressively with time, the overall period of absorption has approximately a 4-hour duration that corresponds to the postprandial state. The postabsorptive state consists of a 6-hour period that follows the postprandial period. During this interval, PG concentrations remain within a normal range in subjects without diabetes. The rate of removal of glucose from the circulation is compensated by the hepatic glucose output, which is mainly derived from the breakdown of the glycogen (glycogenolysis) stored during the preceding postprandial period.

The actual fasting state commences only at the end of the postabsorptive period (approximately 10 to 12 hours after the beginning of the last meal intake). During the fasting state, PG levels are maintained at a nearly normal steady state in subjects without diabetes. This stabilization is attributable to the progressive shift in glucose production from glycogenolysis to gluconeogenesis (glucose derived from lactate, alanine, and glycerol) as the duration of the fasting state is prolonged.

Therefore, in a nondiabetic person who consumes 3 meals per day at relatively fixed hours, the overall nyctohemeral period can be divided into 3 segments corresponding to fasting, postprandial, and postabsorptive states. The overall daily postprandial time (4 hours for each postmeal period) is equal to 12 hours and thus encompasses half a day: from 8 AM to 4 PM and from 7 PM (dinnertime) to 11 PM (Fig. 1) (15).

The actual fasting period is limited to only a brief time at the end of the night (from 5 AM to 8 AM). Furthermore, taking into account the overlap between the postprandial and postabsorptive periods, all the remaining segments of the day correspond to postabsorptive states: from 4 PM to 7 PM and from 11 PM to 5 AM (Fig. 1).

## LESSONS FROM STUDIES OF PROLONGED GLYCEMIC PROFILES

Use of continuous glucose monitoring system (CGMS) is the best method for studying blood glucose patterns in real life over prolonged periods. Because the technology for the CGMS was not routinely available until recently (16,17), for many years we had used a 4-point diurnal glycemic profile as a surrogate (3). The rationale for this model is based on the determination of PG concentrations at 4 points: 8 AM (before breakfast), 11 AM (3 hours after breakfast), 2 PM (2 hours after lunch), and 5 PM (extended postlunch time). In these conditions, the prebreakfast PG value at 8 AM is considered to reflect an actual fasting state, the 2-hour postlunch value at 2 PM corresponds to a definite postprandial period, the 3-hour postbreakfast value is considered a compromise between a



**Fig. 1.** Durations of postprandial (*white areas*), postabsorptive (*gray areas*), and fasting (*black area*) states. The postprandial and postabsorptive states last 4 and 6 hours, respectively; thus, the cumulative duration of postprandial states is approximately equal to 12 hours (a full half-day period) and the actual fasting state is limited to a 3-hour interval at the end of the night. Data from Monnier (15).

**44  ACE/AACE Diabetes Conference (Monnier),** *Endocr Pract.* **2006;12(Suppl 1)**

late postbreakfast and an early prelunch value, whereas the 5-hour postlunch value (extended postlunch time at 5 PM) is a marker of a postabsorptive period (14,15).

### Contributions of Fasting and Postprandial Glucose to HbA1c in Patients With Type 2 Diabetes

We conducted a study in 290 patients with non-insulin-treated type 2 diabetes mellitus who were subclassified into 5 equal groups, stratified by quintiles of HbA1c. For that purpose, the 290 HbA1c values were ranked in increasing order, with random ranking when 2 or several HbA1c measurements were equal.

After an overnight fast, all patients were admitted at the outpatient clinic of the Department of Metabolism and were asked to eat a test breakfast at 8 AM and a test lunch at 12 AM. The energy and macronutrient contents of each test meal were standardized. As previously mentioned, 4 venous samples were collected for PG determinations at 8 AM, 11 AM, 2 PM, and 5 PM.

The diurnal PG response to meals was estimated as a whole by calculating the incremental area under the daytime PG curve from 8 AM to 5 PM. Two areas were calculated geometrically from the 4-point curve, the area below the baseline value being ignored. The first, the area under the curve (AUC) above fasting PG concentrations (AUC1), was calculated above a baseline level equal to the fasting PG value and was therefore considered a reflection of the postprandial glycemic responses to breakfast and lunch. The second area (AUC2) was calculated above a baseline level equal to 110 mg/dL (6.1 mmol/L), reflecting the increases in both fasting and postprandial PG. The baseline value of 110 mg/dL was chosen because this threshold has been defined as the upper limit of normal PG at fasting or preprandial times by the American Diabetes Association (18,19). Therefore, the difference (AUC2 − AUC1) can be considered an assessment of the increment in fasting PG values. As a result, the relative contributions of postprandial and fasting PG to the total PG increment were calculated, respectively, by using the following equations: (AUC1/AUC2) × 100 for the postprandial PG contribution and [(AUC2 − AUC1)/AUC2] × 100 for the fasting PG contribution.

As shown in Figure 2, the relative contribution of postprandial PG decreased gradually from the lowest to the highest quintile of HbA1c. In contrast, the relative contribution of fasting PG showed a gradual increase with increasing values of HbA1c.

For each relative postprandial or fasting PG contribution, analyzed individually, comparisons over quintiles of HbA1c showed significant differences first between the lowest quintile and all the following upper quintiles and second between the 2nd and the 5th quintile. Furthermore, significant differences were found in quintiles 1, 4, and 5 when relative postprandial and fasting PG contributions were compared within the same quintile. By using the MiniMed CGMS (Northridge, CA) (16) in a small subgroup of 38 patients investigated on an ambulatory basis



**Fig. 2.** Relative contributions (%) of postprandial (*white columns*) and fasting (*black columns*) hyperglycemia to the overall diurnal hyperglycemia. Variations are evident with quintiles of hemoglobin A1c (*HbA1c*) (11). Postprandial glucose makes the major contribution (70%) in the lowest quintile (HbA1c <7.3%). Fasting glucose is the main contributor in the 2 upper quintiles (HbA1c ≥9.3%). The contributions of postprandial and fasting glucose are approximately equivalent in patients with HbA1c ranging from 7.3% to 9.2%. Data from Monnier et al.

for 24 hours and by applying the aforementioned methods for the calculation of fasting and postprandial PG increments, we found that the relationship between the contribution of postprandial PG to the overall hyperglycemia and HbA1c was described by an exponential curve (Fig. 3) and that the contribution of postprandial PG became predominant (>50%) when HbA1c was <7.3% (unpublished data).

These results suggest that postprandial glycemic excursions have a major role in the metabolic dysequilibrium of patients who have mild or moderate hyperglycemia. On the contrary, fasting hyperglycemia appears as the main contributor to the overall diurnal hyperglycemia in patients with poorly controlled diabetes, and the role of postprandial glucose elevations decreases as the condition of patients with diabetes deteriorates toward poor diabetic control. This relationship was confirmed in the 38 patients investigated with the CGMS.

Thus, our results demonstrate a progressive shift in the respective contributions of fasting and postprandial hyperglycemia with progression from moderate to high hyperglycemia. The contribution of postprandial glucose excursions is predominant in patients with moderate diabetes (HbA1c <7.3%), whereas the contribution of fasting hyperglycemia increases with worsening diabetes. Such

ACE/AACE Diabetes Conference (Monnier), *Endocr Pract.* 2006;12(Suppl 1)  45



**Fig. 3.** Relationship between contributions of postprandial hyperglycemia to the overall hyperglycemia and hemoglobin A1c (*HbA1c*) in 38 patients with type 2 diabetes investigated with the continuous glucose monitoring system. (Some data points are superimposed on others.)

observations seem to conciliate the different results that have been reported in the literature because the shift in the respective contributions of fasting and postprandial hyperglycemia appears as a continuous spectrum from fairly to poorly controlled type 2 diabetes.

**Prediction of Satisfactory Control of Diabetes by PG Values**

By analyzing the 4-point diurnal glucose profiles in 480 patients with non-insulin-treated type 2 diabetes (13), we tested the performance of PG at each time point to detect a cutoff value that can define the quality of patients' control of diabetes as estimated from HbA1c levels. The tests were performed at a 7% threshold of HbA1c, a value less than this level being considered as a reference for good or satisfactory control of diabetes. Sensitivities and

specificities for predicting the quality of control of diabetes were calculated at different levels of PG by using step-by-step increments (1 mmol/L for each step) of PG from a low (5 mmol/L or 90 mg/dL) to a high (13 mmol/L or 234 mg/dL) value. Sensitivity (true-positive fraction) was defined as the proportion of subjects predicted to have good or satisfactory glycemic control (HbA1c <7%) and who indeed had it. Specificity was defined as the proportion of subjects predicted not to have good or satisfactory glycemic control (HbA1c ≥7%) and who did not have it. We selected the optimal cutoff PG values by using a receiver operating characteristic (ROC) curve that we constructed by plotting sensitivity against the false-positive fraction (FPF) (1 − specificity) over the range of cut-point glucose values. The optimal cut points balancing between high sensitivity and specificity were selected at the shoulders of the ROC curves. In order to improve the clinical screening for patients with treatment success—that is, HbA1c <7%—we determined lower cutoff values characterized by specificities equal to or slightly greater than 90%—that is, FPF ≤0.10.

The results are summarized in Table 1. The cut points that were calculated from the shoulders of the ROC curves and that ensured the optimal balance between high sensitivity and high specificity were, respectively, 8 mmol/L (144 mg/dL) at 8 AM, 11 mmol/L (198 mg/dL) at 11 AM, 9 mmol/L (162 mg/dL) at 2 PM, and 7 mmol/L (126 mg/dL) at 5 PM. The best sensitivities and specificities were obtained at 11 AM, 2 PM, and 5 PM. The best cut points for predicting treatment success with a high specificity (≥90%)—that is, at a FPF threshold ≤0.10—were, respectively, 6 mmol/L (108 mg/dL) at 8 AM, 9 mmol/L (162 mg/dL) at 11 AM, 7 mmol/L (126 mg/dL) at 2 PM, and 6 mmol/L (108 mg/dL) at 5 PM.

From these results, it appears that setting peak postprandial glucose thresholds at 10 mmol/L (180 mg/dL), as suggested by the American Diabetes Association (7), could be adequate for the postbreakfast period because this value is between the two optimal PG cutoff values at 11

**Table 1**
**Cutoff Values of Plasma Glucose**
**for Predicting Patients With Hemoglobin Alc <7%**

| Time points | Optimal values (mg/dL) balancing between high sensitivity and specificity | Optimal values (mg/dL) based on specificity ≥90% for treatment success |
|---|---|---|
| 8 AM | 144 | 108 |
| 11 AM | 198 | 162 |
| 2 PM | 162 | 126 |
| 5 PM | 126 | 108 |

Adapted from Monnier et al (13).

**46** ACE/AACE Diabetes Conference (Monnier), *Endocr Pract*. 2006;12(Suppl 1)

AM (162 and 198 mg/dL), but it is probably too high for the postlunch period at 2 PM, a time point at which the optimal cutoff values were 126 and 162 mg/dL, respectively (Table 1). Thus, these observations prompt the question of whether postmeal PG thresholds should be set at levels lower than 180 mg/dL. For example, other organizations have recommended that upper target limits for postmeal PG levels should be set at 140 mg/dL (8) or at 135 mg/dL (20). Such recommendations appear too stringent for post-breakfast periods but are certainly appropriate at postlunch times. Even though having worldwide uniformity for glycemic guidelines would be helpful, our results outline the difficulty with providing an average target for post-prandial glucose. Despite the lack of available strong evidence-based data, it seems that achieving peak glucose levels of <180 mg/dL and <140 mg/dL during post-breakfast and postlunch periods, respectively, might be a reasonable goal.

## CONCLUSION

The responses to the two questions that were raised at the beginning of this review are as follows: (*1*) Post-prandial glucose makes the predominant contribution (70%) in patients with fairly good control of diabetes (HbA1c <7.3%), whereas fasting glucose is the main contributor in patients with poorly controlled diabetes. (*2*) Guidelines for establishing postmeal PG thresholds should recommend specific values for each meal. The first statement might have practical implications for implementing treatments in patients with type 2 diabetes, and the second one might be helpful for defining the objectives to facilitate achievement of optimal glycemic control.

## REFERENCES

1.  **American Diabetes Association.** Postprandial blood glucose. *Diabetes Care*. 2001;24:775-778.
2.  **UK Prospective Diabetes Study (UKPDS) Group.** Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with type 2 diabetes (UKPDS 33) [erratum in *Lancet*. 1999;354:602]. *Lancet*. 1998;352: 837-853.
3.  **Avignon A, Radauceanu A, Monnier L.** Nonfasting plasma glucose is a better marker of diabetic control than fasting plasma glucose in type 2 diabetes. *Diabetes Care*. 1997;20:1822-1826.
4.  **El-Kebbi JM, Ziemer DC, Cook CB, Gallina DL, Barnes CS, Phillips LS.** Utility of casual postprandial glucose levels in type 2 diabetes management. *Diabetes Care*. 2004;27:335-339.
5.  **Bonora E, Calcaterra F, Lombardi S, et al.** Plasma glucose levels throughout the day and HbA(1c) interrelationships in type 2 diabetes: implications for treatment and monitoring of metabolic control. *Diabetes Care*. 2001;24: 2023-2029.
6.  **Rohlfing CL, Wiedmeyer HM, Little RR, England JD, Tennill A, Goldstein DE.** Defining the relationship between plasma glucose and HbA(1c): analysis of glucose profiles and HbA(1c) in the Diabetes Control and Complications Trial. *Diabetes Care*. 2002;25:275-278.
7.  **American Diabetes Association.** Standards of medical care in diabetes. *Diabetes Care*. 2004;27(Suppl 1):S15-S35.
8.  The American Association of Clinical Endocrinologists medical guidelines for the management of diabetes mellitus: the AACE system of intensive diabetes self-management—2002 update. *Endocr Pract*. 2002;8(Suppl 1): 40-82.
9.  **Reaven GM, Hollenbeck C, Jeng CY, Wu MS, Chen YD.** Measurement of plasma glucose, free fatty acid, lactate, and insulin for 24 h in patients with NIDDM. *Diabetes*. 1988;37:1020-1024.
10. **Riddle MC.** Evening insulin strategy. *Diabetes Care*. 1990;13:676-686.
11. **Monnier L, Lapinski H, Colette C.** Contributions of fasting and postprandial plasma glucose increments to the overall diurnal hyperglycemia of type 2 diabetic patients: variations with increasing levels of HbA(1c). *Diabetes Care*. 2003;26:881-885.
12. **Davidson J.** Should postprandial glucose be measured and treated to a particular target? Yes. *Diabetes Care*. 2003;26:1919-1921.
13. **Monnier L, Colette C, Lapinski H.** Global assessment for quality and safety of control in type 2 diabetic patients. *Eur J Clin Invest*. 2004;34:37-42.
14. **Dinneen S, Gerich J, Rizza R.** Carbohydrate metabolism in non-insulin-dependent diabetes mellitus. *N Engl J Med*. 1992;327:707-713.
15. **Monnier L.** Is postprandial glucose a neglected cardiovascular risk factor in type 2 diabetes? *Eur J Clin Invest*. 2000;30(Suppl 2):3-11.
16. **Monsod TP, Flanagan DE, Rife F, et al.** Do sensor glucose levels accurately predict plasma glucose concentrations during hyperglycaemia and hyperinsulinemia? *Diabetes Care*. 2002;25:889-893.
17. **Metzger M, Leibowitz G, Wainstein J, Glaser B, Raz I.** Reproducibility of glucose measurements using the glucose sensor. *Diabetes Care*. 2002;25:1185-1191.
18. **Expert Committee on the Diagnosis and Classification of Diabetes Mellitus.** Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus. *Diabetes Care*. 2003;26(Suppl 1):S5-S20.
19. **American Diabetes Association.** Standards of medical care for patients with diabetes mellitus [erratum in *Diabetes Care*. 2003;26:972]. *Diabetes Care*. 2003; 26(Suppl 1):S33-S50.
20. **European Diabetes Policy Group 1999.** A desktop guide to type 2 diabetes mellitus. *Diabet Med*. 1999;16:716-730.

Declaration of Dr. Nathan Laney

# Exhibit D

Endocrine Practice 29 (2023) 305–340





AACE Consensus Statement

# American Association of Clinical Endocrinology Consensus Statement: Comprehensive Type 2 Diabetes Management Algorithm — 2023 Update



Susan L. Samson, MD, PhD, FRCPC, FACE [a], Priyathama Vellanki, MD [b], Lawrence Blonde, MD, FACP, MACE [c], Elena A. Christofides, MD, FACE [d], Rodolfo J. Galindo, MD, FACE [e], Irl B. Hirsch, MD [f], Scott D. Isaacs, MD, FACP, FACE [g], Kenneth E. Izuora, MD, MBA, FACE [h], Cecilia C. Low Wang, MD, FACP [i], Christine L. Twining, MD, FACE [j], Guillermo E. Umpierrez, MD, CDCES, MACP, FACE [k], Willy Marcos Valencia, MD, MSc [l]

[a] Chair of Task Force; Chair of the Division of Endocrinology, Diabetes and Metabolism, Department of Medicine, Mayo Clinic, Jacksonville, Florida
[b] Vice Chair of Task Force; Associate Professor of Medicine, Department of Medicine, Division of Endocrinology, Metabolism and Lipids, Emory University School of Medicine, Emory University; Section Chief, Endocrinology, Grady Memorial Hospital, Atlanta, Georgia
[c] Director, Ochsner Diabetes Clinical Research Unit, Frank Riddick Diabetes Institute, Department of Endocrinology, Ochsner Health, New Orleans, Louisiana
[d] Endocrinology Associates, Inc., Columbus, Ohio
[e] Associate Professor of Medicine, University of Miami Miller School of Medicine; Director, Comprehensive Diabetes Center, Lennar Medical Center, UMiami Health System; Director, Diabetes Management, Jackson Memorial Health System, Miami, Florida
[f] Professor of Medicine, Department of Medicine, University of Washington School of Medicine, Seattle, Washington
[g] Department of Medicine, Emory University School of Medicine, Atlanta, Georgia
[h] Professor, Department of Internal Medicine, Endocrinology, Kirk Kerkorian School of Medicine, University of Nevada Las Vegas, Las Vegas, Nevada
[i] Professor of Medicine, Department of Medicine, Division of Endocrinology, Metabolism, and Diabetes, University of Colorado Anschutz Medical Campus, Aurora, Colorado
[j] Endocrinology, Diabetes and Metabolism, Maine Medical Center, Maine Health, Scarborough, Maine
[k] Professor of Medicine, Emory University School of Medicine, Division of Endocrinology, Metabolism; Chief of Diabetes and Endocrinology, Grady Health Systems, Atlanta, Georgia
[l] Endocrinology and Metabolism Institute, Center for Geriatric Medicine, Cleveland Clinic, Cleveland, Ohio

## ARTICLE INFO

Article history:
Received 19 December 2022
Received in revised form 31 January 2023
Accepted 6 February 2023
Available online 5 May 2023

Key words:
diabetes algorithm
diabetes management
diabetes mellitus

## ABSTRACT

*Objective:* This consensus statement provides (1) visual guidance in concise graphic algorithms to assist with clinical decision-making of health care professionals in the management of persons with type 2 diabetes mellitus to improve patient care and (2) a summary of details to support the visual guidance found in each algorithm.

*Methods:* The American Association of Clinical Endocrinology (AACE) selected a task force of medical experts who updated the 2020 AACE Comprehensive Type 2 Diabetes Management Algorithm based on the 2022 AACE Clinical Practice Guideline: Developing a Diabetes Mellitus Comprehensive Care Plan and consensus of task force authors.

*Results:* This algorithm for management of persons with type 2 diabetes includes 11 distinct sections: (1) Principles for the Management of Type 2 Diabetes; (2) Complications-Centric Model for the Care of Persons with Overweight/Obesity; (3) Prediabetes Algorithm; (4) Atherosclerotic Cardiovascular Disease Risk Reduction Algorithm: Dyslipidemia; (5) Atherosclerotic Cardiovascular Disease Risk

*Address correspondence to the American Association of Clinical Endocrinology, 7643 Gate Parkwy, Suite 104-328, Jacksonville, FL 32256.
*Email address:* publications@aace.com

**Disclaimer:** This document represents the official position of the American Association of Clinical Endocrinology on the subject matter at the time of publication. Subject matter experts who participated on the task force used their judgment and experience supported by relevant scientific evidence as available. Every effort was made to achieve consensus among the task force members. Consensus statements are meant to provide guidance, but they are not to be considered prescriptive for any individual patient and cannot replace the judgment of a clinician. We encourage health care professionals to use this information in conjunction with their best clinical judgement. The presented guidance may not be appropriate in all situations. Any decision(s) by health care professionals to apply this guidance provided in this consensus statement must be made in consideration of local resources and individual patient circumstances.

https://doi.org/10.1016/j.eprac.2023.02.001
1530-891X/© 2023 AACE. Published by Elsevier Inc. All rights reserved.

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

diabetes treatment
type 2 diabetes

Reduction Algorithm: Hypertension; (6) Complications-Centric Algorithm for Glycemic Control; (7) Glucose-Centric Algorithm for Glycemic Control; (8) Algorithm for Adding/Intensifying Insulin; (9) Profiles of Antihyperglycemic Medications; (10) Profiles of Weight-Loss Medications (new); and (11) Vaccine Recommendations for Persons with Diabetes Mellitus (new), which summarizes recommendations from the Advisory Committee on Immunization Practices of the U.S. Centers for Disease Control and Prevention.

*Conclusions:* Aligning with the 2022 AACE diabetes guideline update, this 2023 diabetes algorithm update emphasizes lifestyle modification and treatment of overweight/obesity as key pillars in the management of prediabetes and diabetes mellitus and highlights the importance of appropriate management of atherosclerotic risk factors of dyslipidemia and hypertension. One notable new theme is an emphasis on a complication-centric approach, beyond glucose levels, to frame decisions regarding first-line pharmacologic choices for the treatment of persons with diabetes. The algorithm also includes access/cost of medications as factors related to health equity to consider in clinical decision-making.

© 2023 AACE. Published by Elsevier Inc. All rights reserved.

## Abbreviations

AACE, American Association of Endocrinology; ABCD, adiposity-based chronic disease; ABI, ankle-brachial index; ACE, American College of Endocrinology; ACEi, angiotensin-converting enzyme inhibitor; AGI, alpha-glucosidase inhibitor; AKI, acute kidney injury; apo B, apolipoprotein B; ARB, angiotensin II receptor blocker; ASCVD, atherosclerotic cardiovascular disease; ATP, Adult Treatment Panel; A1C, hemoglobin A1C; BeAM, bedtime minus morning prebreakfast glucose; BG, blood glucose; BMI, body mass index; BP, blood pressure; BRC-QR, bromocriptine quick release; CAD, coronary artery disease; CCB, calcium channel blocker; CDC, U.S. Centers for Disease Control and Prevention; CGM, continuous glucose monitoring; CHF, congestive heart failure; CK, creatine kinase; CKD, chronic kidney disease; COLSVL, colesevelam; CoQ10, coenzyme q10; CPG, clinical practice guideline; CrCl, creatinine clearance; CV, cardiovascular; CVD, cardiovascular disease; CVOT, cardiovascular outcomes trial; DA, dopamine agonist; DASH, Dietary Approaches to Stop Hypertension; DKA, diabetic ketoacidosis; DKD, diabetic kidney disease; DM, diabetes mellitus; DPP-4i, dipeptidyl peptidase-4 inhibitor; eGFR, estimated glomerular filtration rate; ER, extended release; FBG, fasting blood glucose; FDA, U.S. Food and Drug Administration; FPG, fasting plasma glucose; GERD, gastroesophageal reflux disease; GI, gastrointestinal; GIP/GLP-1 RA, glucose-dependent insulinotropic polypeptide and glucagon-like peptide-1 receptor agonist; GLN, glinide; GLP-1 RA, glucagon-like peptide-1 receptor agonist; GMI, glucose management indicator; GU, genitourinary; HCP, health care professional; HDL-C, high-density lipoprotein cholesterol; HF, heart failure; HFpEF, heart failure with preserved ejection fraction; HR, hazard ratio; HTN, hypertension; IFG, impaired fasting glucose; IGT, impaired glucose tolerance; IPE, icosapent ethyl; IV, intravenous; LADA, latent autoimmune diabetes in adults; LDL-C, low-density lipoprotein cholesterol; Lp(a), lipoprotein(a); LV, left ventricle; MACE, major adverse cardiovascular event; MEN2, multiple endocrine neoplasia type 2; MET, metformin; MI, myocardial infarction; MRA, mineralocorticoid receptor antagonist; MTC, medullary thyroid carcinoma; NAFLD, nonalcoholic fatty liver disease; NASH, nonalcoholic steatohepatitis; NCEP, National Cholesterol Education Program; NPH, neutral protamine Hagedorn; OA, osteoarthritis; OGTT, oral glucose tolerance test; OSA, obstructive sleep apnea; PCOS, polycystic ovary syndrome; PCSK9, proprotein convertase subtilisin/kexin type 9; PG, plasma glucose; PPG, postprandial glucose; PRAML, pramlintide; PVD, peripheral vascular disease; Rx, medical prescription; SAMS, statin-associated muscle symptoms; sCR, serum creatinine; SGLT2i, sodium glucose cotransporter 2 inhibitor; SU, sulfonylurea; TDD, total daily dose; TG, triglyceride; TIA, transient ischemic attack; TIR, time in range; TZD, thiazolidinedione; T1D, type 1 diabetes; T2D, type 2 diabetes; UACR, urine albumin-to-creatinine ratio; VLDL, very low-density lipoprotein

## Introduction

The first iteration of the American Association of Clinical Endocrinology (AACE) algorithm for glycemic control was published in 2009 and expanded on the visual guidance provided by the American College of Endocrinology (ACE)/AACE Diabetes Road Maps to help clinicians navigate the expanded classes of approved antihyperglycemic agents.[1,2] At that time, thiazolidinediones (TZDs), alpha-glucosidase inhibitors, metformin, and sulfonylureas

(SUs)/glinides were in use, with the addition of exenatide as well as dipeptidyl peptidase-4 inhibitors (DPP-4is). The next update was in 2013 with publication of the Comprehensive Type 2 Diabetes (T2D) Management Algorithm, which incorporated new sections on the management of overweight/obesity, dyslipidemia, and hypertension (HTN).[3] Revisions to this first iteration have been incorporated on a yearly basis through 2020,[4-8] and the task force is grateful for the contributions and framework provided by previous authors of the algorithm (see Acknowledgments). In 2022, the AACE published the Clinical Practice Guideline: Developing a Diabetes Mellitus Comprehensive Care Plan — 2022 Update,[9] which provided 170 revised or new graded recommendations accompanied by detailed, evidence-based rationales. This 2023 algorithm update builds on previous versions of the algorithm but with the incorporation of new management approaches that align with the 2022 AACE clinical practice guideline (CPG) on diabetes mellitus (DM). The algorithm is intended as a more concise document than the guideline, providing easily accessible, visual guidance for decision-making in the clinic setting. This summary is not intended to iterate all of the evidence base behind the algorithmic pathways, as this is detailed in the 2022 AACE DM CPG update.[9] Instead, the objective of this summary is to provide a written guide or "roadmap" through the graphic depictions of the algorithm contents.

The process for updating the algorithm involved multiple meetings of task force members/authors between January 2022 and November 2022. Smaller groups focused on specific algorithm subsections, which were then brought to the complete task force for discussion and peer review. It was intentional that a proportion of algorithm task force members overlapped with the diabetes CPG task force to ensure continuity and alignment with the 2022 published guideline recommendations. In this 2023 algorithm, there continues to be an emphasis on lifestyle modification and treatment of overweight/obesity as key pillars of the management of prediabetes and DM. In addition, the importance of appropriate management of the atherosclerotic risk factors of dyslipidemia and HTN is highlighted. One notable new theme is an obvious emphasis on a complication-centric approach, beyond glucose levels, to frame decisions regarding first-line pharmacologic choices for the treatment of persons with DM, as recommended in the 2022 AACE DM CPG update[9] and by other organizations.[10,11] However, the task force members/authors acknowledge that health care disparities and lack of access to newer medications remain a significant barrier for some persons with DM.

The algorithm is divided into discrete graphic sections that outline the principles for management of T2D (Algorithm Fig. 1) and guide management of adiposity-based chronic disease (ABCD) (Algorithm Fig. 2), prediabetes (Algorithm Fig. 3), and

Appx244

S.L. Samson, P. Vellanki, L. Blonde et al. Endocrine Practice 29 (2023) 305—340

atherosclerotic risk factors of dyslipidemia (Algorithm Fig. 4) and HTN (Algorithm Fig. 5). In addition, the algorithms for anti-hyperglycemic agents include both complication-centric (Algorithm Fig. 6) and glucose-centric (Algorithm Fig. 7) approaches, and there is direction for insulin initiation and titration (Algorithm Fig. 8). Convenient tables summarizing the benefits and risks of anti-hyperglycemic medications (updated) (Algorithm Fig. 9) and weight-loss pharmacotherapy (new) (Algorithm Fig. 10) are provided. A new table of immunization guidance is provided that summarizes recommendations from the Advisory Committee on Immunization Practices of the U.S. Centers for Disease Control and Prevention (CDC) (Algorithm Fig. 11).

### Principles of the AACE Comprehensive T2D Management Algorithm

Following are the principles of this algorithm for the management of T2D (Algorithm Fig. 1).

*Lifestyle modification underlies all therapy.* Lifestyle modification includes exercise, healthy dietary changes, smoking cessation, and reduced alcohol intake. Additional aspects of lifestyle modification include assessment and management of sleep disorders and depression. The Complications-Centric Model for the Care of Persons with Overweight/Obesity (Algorithm Fig. 2) emphasizes the underlying components of a comprehensive assessment for staging overweight/obesity in the context of ABCD and provides guidance on proposed interventions to improve the overall health of persons with overweight/obesity.

*Maintain or achieve optimal weight.* Excess weight results in insulin resistance and increases the risk for prediabetes and T2D, but also leads to multiple complications beyond dysglycemia that comprise ABCD and lead to excess morbidity and mortality. Lifestyle intervention to achieve weight loss is a key pillar of the comprehensive treatment of persons with prediabetes to decrease progression to T2D. Weight loss also improves many of the cardiometabolic and biomechanical components of ABCD, including increased glycemia, dyslipidemia, elevated blood pressure (BP), cardiovascular disease (CVD), nonalcoholic fatty liver disease (NAFLD), sleep apnea, and osteoarthritis, albeit with varied thresholds ranging from >5% to >15% of body weight.

*Choice of antihyperglycemic therapy reflects glycemic targets, atherosclerotic cardiovascular disease (ASCVD), congestive heart failure (CHF), chronic kidney disease (CKD), overweight/obesity, and NAFLD.* Although glycemic control has an essential role in the prevention and decreased progression of T2D complications, there is evidence for the positive impact of individual pharmacotherapies on outcomes of comorbidities beyond glycemic control. Clinicians should use the coexistence of these frequently associated conditions to select the antihyperglycemic therapy or therapies with the most potential for improved overall outcomes. The 2022 AACE CPG update on a DM comprehensive care plan[9] recommends that "if there is established or high risk for ASCVD, heart failure [HF], and/or CKD, clinicians should prescribe a glucagon-like peptide-1 receptor agonist (GLP-1 RA) or a sodium glucose cotransporter 2 inhibitor (SGLT2i) with proven efficacy for the specific condition(s)" independent of glycemic control.[9] Additional considerations could include the choice of a medication with potential benefit for stroke



**Algorithm Fig. 1.** Principles of the AACE Comprehensive Type 2 Diabetes Management Algorithm. *AACE* = American Association of Endocrinology.

**Appx245**

S.L. Samson, P. Vellanki, L. Blonde et al. Endocrine Practice 29 (2023) 305–340

or NAFLD (eg, pioglitazone). This important paradigm shift was the impetus for the updated Complications-Centric Algorithm for Glycemic Control (Algorithm Fig. 6). The Profiles of Antihyperglycemic Medications table (Algorithm Fig. 9) also summarizes key aspects of the benefits and risks of available pharmacotherapies from this perspective.

*Choice of therapy includes ease of use and access*. The armamentarium of antihyperglycemic agents has expanded over the past 2 decades beyond the insulin secretagogues (SUs/glinides), TZDs, and metformin. Large prospective clinical trials have confirmed the efficacy of new medical therapies for glycemic control but also revealed a positive impact on progression of ASCVD, CHF, and diabetic kidney disease (DKD) or CKD in those with DM. The evolution of basal and rapid-acting analog insulins has also led to improvements in predictability of glucose response with decreased hypoglycemia. Ideally, decision-making regarding prescription of antihyperglycemic agents and insulin analogs should be based on what is most likely to benefit the patient, balanced with the risks and potential side effects. However, barriers to access including availability, cost, insurance coverage, and formularies need to be considered, and this is acknowledged in the Glucose-Centric Algorithm for Glycemic Control (Algorithm Fig. 7) and the table outlining the Profiles of Weight-Loss Medications (Algorithm Fig. 10).

*Optimal hemoglobin A1c (A1C) is ≤6.5% or as close to normal as is safe and achievable for most patients*. For most patients, an A1C of ≤6.5% should be targeted.[9] Achieving this A1C goal may require targeting fasting plasma glucose (FPG) to <110 mg/dL and 2-hour postprandial glucose (PPG) to <140 mg/dL.[9] The impact of tight glycemic control for the prevention and/or decreased progression of microvascular and microangiopathic complications of T2D is well established.[12-14] Although there are epidemiologic data supporting an association of A1C and CVD/all-cause mortality on a continuum,[15] early clinical trial evidence did not directly support that there was mitigation of negative macrovascular disease outcomes with intensive glucose lowering and there was an association with negative CVD outcomes with hypoglycemic events.[16] Pharmacologic therapies that have a lower risk of hypoglycemia and have proven efficacy in cardiovascular outcomes trials (CVOTs), particularly GLP-1 RA and SGLT2i, may allow for stricter glycemic control. However, the key word is "safe" with consideration of patient-specific characteristics that would recommend a less stringent A1C target (eg, 7%-8%), including the following[9,13,14,17]:

- Limited life expectancy
- History of severe hypoglycemia
- Hypoglycemia unawareness
- Advanced renal disease
- Other severe comorbid conditions with a high risk for CVD events
- Long T2D disease duration with difficulty to attain an A1C goal
- Prohibitive cognitive and/or psychological status

*Individualize all glycemic targets (A1C, glucose management indicator [GMI], time in range [TIR], fasting blood glucose [FBG], and PPG)*. A1C is a convenient measurement in the clinical setting that is widely used to assess glycemic control and should be measured every 3 months when not at goal and a minimum of twice per year in persons at goal. A1C also has limitations and can be imprecise in some populations, including people with altered red blood cell lifespan, hemoglobinopathies, CKD, and some racial backgrounds. In addition, other glucose parameters have been shown to correlate with outcomes, such as TIR, as generated by continuous glucose

monitoring (CGM). It is recommended that TIR (glucose range 70-180 mg/dL) be >70%, combined with minimal time below range (4% for <70 mg/dL and <1% for <54 mg/dL).[18-20] CGM also can generate the GMI, which is of utility as a surrogate for an A1C.[21] When available, these alternative glucose parameters should be incorporated for monitoring and adjustment of therapy.

*Get to goal as soon as possible (adjust ≤3 months)*. Therapeutic inertia—failure of clinicians to escalate therapy or initiate new therapies—is a major threat to achieving improved health outcomes in persons with overweight/obesity, prediabetes, and T2D.[22,23] Clinicians should continuously evaluate treatment goals at each visit, ideally ≤3 months, and consider making therapeutic changes to more rapidly achieve targets for glucose, lipids, and BP.

*Avoid hypoglycemia*. Hypoglycemia, defined as blood glucose (BG) <70 mg/dL, is associated with an increased risk for adverse outcomes including mortality.[14,16] Therefore, the optimal treatment for T2D should take into account the risk of hypoglycemia. Antihyperglycemic agents and A1C goals should be chosen to avoid hypoglycemia.[9] Agents such as DPP-4i, GLP-1 RA, and SGLT2i have a lower risk of hypoglycemia compared with that of insulin and SUs and are preferred to achieve optimal glycemic goals.

*CGM is highly recommended to assist persons with diabetes in reaching goals safely*. CGM has provided a major advance in the treatment of persons with all forms of DM. For those persons with T2D, and on basal insulin, clinical trials have shown that CGM is associated with increased TIR, improved A1C, and decreased hypoglycemia, including severe hypoglycemic events.[24-26] The 2021 AACE CPG: The Use of Advanced Technology in the Management of Persons With Diabetes Mellitus[20] discusses the different avenues for application of CGM including for all persons with DM on multiple-dose insulin (≥3 injections/day) or an insulin pump as well as those who have frequent or severe hypoglycemia, nocturnal hypoglycemia, or hypoglycemia unawareness.[20] Real-time CGM or intermittently scanned CGM including alarms or alerts is recommended, particularly for persons with hypoglycemia who would benefit from these warnings.[20] However, as an alternative, intermittently scanned CGM may also provide valuable information in persons who are newly diagnosed with T2D and/or at low risk for hypoglycemia. Diagnostic (professional use) CGM can be used for new T2D diagnosis and for those with hypoglycemia but without access to personal CGM and can be educational for the person with T2D (eg, effects on behaviors including diet and exercise) and also aid the clinician in investigating avenues to improve glycemic control with medical therapies.

*Comorbidities must be managed for comprehensive care*. Hypertension and dyslipidemia are comorbidities often associated with T2D that further increase the risk for complications including CVD, chronic kidney failure, and retinopathy. Improvements in glycemic control must be accompanied by treatment of concomitant dyslipidemia and HTN for optimized outcomes.

## Complications-Centric Model for the Care of Persons with Overweight/Obesity (ABCD)

Lifestyle intervention is the essential foundation for the management of persons with prediabetes and T2D. Although the phrase lifestyle intervention is often thought of in relation to nutrition, weight loss, and exercise, a comprehensive plan also should include assessment, counseling, and intervention of sleep hygiene and sleep disorders, promotion of healthy habits beyond diet, including moderation of alcohol intake and cessation of smoking, and

Appx246

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

monitoring for mood disturbances that can impact success in incorporating durable change (Algorithm Fig. 2). In addition, with advances in weight management, clinicians must consider and incorporate pharmacologic and surgical interventions, including bariatric procedures, as indicated based on a patient-centered assessment.

In 2017, AACE published a position statement on the diagnostic term ABCD.[27] The objective of the document was to embrace the importance of viewing overweight/obesity as a chronic disease and to emphasize the importance of assessing persons with overweight/obesity for the existence of or risk for associated complications, beyond body mass index (BMI), including the following:

- Prediabetes
- Dyslipidemia
- HTN
- NAFLD
- ASCVD
- CHF with reduced ejection fraction
- Heart failure with preserved ejection fraction
- CKD
- Obstructive sleep apnea (OSA)
- Osteoarthritis
- Gastroesophageal reflux disease
- Urinary incontinence
- Hypogonadism
- Polycystic ovary syndrome
- Reduced fertility

Determination of the presence of ABCD complications allows for staging of persons with overweight/obesity, which can impact the approach to interventions.

- Step 1 is to calculate BMI with the understanding of the published thresholds of what is overweight ($\geq$25 kg/m$^2$) or obese ($\geq$30 kg/m$^2$), noting that lower thresholds for overweight/obesity may apply for South, East, and Southeast Asian persons ($\geq$23.5 kg/m$^2$ for overweight and $\geq$25 kg/m$^2$ for obese).
- Step 2 provides further classification of the stage of overweight/obesity by assessing for the presence of ABCD complications, as listed above. Previous AACE guidance documents have utilized stages 0, 1, and 2 for ABCD severity, but a recent AACE consensus statement centered on obesity stigma and weight bias[28] recommends a shift to stages 1, 2, and 3 to avoid inviting treatment inertia at stage 0, where primary prevention must still be in place. The revised staging also incorporates weight bias/stigma and mental health as key components of ABCD that should be addressed in addition to the cardiometabolic and biomechanical complications which can be improved by treatment of obesity. Patients may have an elevated BMI but lack physical complications (Stage 1). Alternatively, patients without a substantially elevated BMI may already have manifested components of ABCD, and action is required. Stage 2 obesity includes patients who have $\geq$1 mild-to-moderate obesity complications. The highest stage 3 includes patients with multiple and/or more severe complications and applies to patients already diagnosed with T2D as a severe ABCD complication. The combination of BMI with stage is helpful to inform the clinician of needed interventions.



**Algorithm Fig. 2.** Complications-Centric Model for the Care of Persons with Overweight/Obesity (Adiposity-Based Chronic Disease).

Appx247

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305−340

- Step 3 requires implementation of a comprehensive lifestyle modification plan for the patient that encompasses all aspects of the health of the patient and includes nutrition, physical activity, sleep, counseling, medications, and interventions.

### Nutrition

For persons above optimal weight, caloric deprivation of 500 to 1000 kcal daily energy deficit in the context of a healthy diet should be initiated to promote weight loss. In the context of ABCD, a minimum threshold of >5% to ≥10% is needed to have a positive impact on glycemia, BP, and lipids. Weight loss of ≥15% may help to mitigate other ABCD complications such as OSA and nonalcoholic steatohepatitis. The selection of a diet should be personalized, but choices include Mediterranean, low-fat, low-carbohydrate, very low−carbohydrate, vegetarian, vegan, and Dietary Approaches to Stop Hypertension (DASH) diets. Structured diets with prepared meals or liquid meal replacements may increase adherence to the calorie limitations. Adherence also may be improved with weight-loss programs or apps that encourage external accountability.

### Physical Activity

A plan for physical activity should take into account any physical limitations and disabilities, some of which may derive from overweight/obesity itself. Ideally, the amount of physical activity should progress to include moderate, aerobic exercise ≥150 minutes per week divided into 3 to 5 sessions, combined with 2 to 3 sessions of resistance training per week.

### Sleep

Reduced sleep duration is associated with adverse outcomes, including obesity, T2D, HTN, CVD, and mortality. In adults >18 years of age, 6 to 8 hours of sleep per night is recommended. OSA is highly prevalent in persons with T2D and/or obesity. Clinicians should incorporate routine screening for sleep disorders either clinically, with questions about symptoms of OSA (eg, snoring, choking, daytime sleepiness, fatigue, and nonrestorative sleep), or using a formal screening tool, such as the STOP-Bang questionnaire.[29] Testing with home oximetry or a formal sleep study may be indicated. Persons who meet criteria for OSA should be referred for appropriate diagnostic studies and intervention, such as with prescription of a continuous positive airway pressure device.

### Counseling

Depression and diabetes distress are prevalent in persons with T2D and can result in nonadherence to diet, exercise, and medication regimens. Potential formal screening tools include the WHO Wellbeing Index,[30] the Patient Health Questionaire-9,[31] or the Beck Depression Inventory III.[32] Appropriate referral for cognitive behavioral therapy or medical intervention should be considered when depression is present.

### Medications

Weight-loss medications should be considered, in combination with a reduced-calorie diet, to achieve and sustain weight-loss goals in patients with BMI 27 kg/m$^2$ to 29.9 kg/m$^2$ with T2D or ≥1 ABCD complication and all persons with a BMI >30 kg/m$^2$. See also Profiles of Weight-Loss Medications (Algorithm Fig. 10). Caution is required for persons >65 years of age with T2D and ABCD; assessment of bone health and sarcopenia is important.

### Interventions

Metabolic (bariatric) procedures are an effective option for persons with T2D and ABCD and should be considered in persons with a BMI of 30 kg/m$^2$ to 34.9 kg/m$^2$ with uncontrolled DM in spite of lifestyle and medical therapy and BMI >35 kg/m$^2$ and ≥1 ABCD complications, including prediabetes, that can be remedied with weight loss.

### Prediabetes Algorithm

Prediabetes is a cardiometabolic state resulting from failure of the pancreas to compensate for insulin resistance most often caused by overweight/obesity. Prediabetes continues to be defined by the presence of impaired fasting glucose (IFG) (100-125 mg/dL) and/or impaired glucose tolerance (IGT) (140-199 mg/dL) at 2 hours of an oral glucose tolerance test (OGTT) with ingestion of 75 g of glucose.[9] A1C values of 5.7% to 6.4% may indicate chronic hyperglycemia and the existence of prediabetes, but an OGTT should be used to confirm diagnosis (Algorithm Fig. 3).[9] Metabolic syndrome using National Cholesterol Education Program Adult Treatment Panel III criteria is considered a prediabetes equivalent, so that persons diagnosed with metabolic syndrome are at high risk for developing DM.[33,34]

The prediabetes algorithm includes medical nutrition therapy (with reduction and modification of caloric intake to achieve weight loss in those who are overweight or obese), appropriately prescribed physical activity, avoidance of tobacco products, and adequate sleep quantity and quality. Additional topics commonly taught in DM self-management education and support programs outline principles of glycemia treatment options; BG monitoring; insulin dosage adjustments; acute complications of DM; and prevention, recognition, and treatment of hypoglycemia.

There are ample data that prediabetes confers an increased risk for progression to T2D and ASCVD.[35-37] Therefore, in addition to prevention of progression to overt T2D, other key goals in the treatment of prediabetes and metabolic syndrome should include weight loss and/or prevention of weight gain, mitigation of the CVD risk factors HTN and dyslipidemia, and prevention of progression of NAFLD.

Although ABCD is a risk factor for prediabetes and subsequent DM, these are distinct entities that can occur independently, so the presence of prediabetes should alert the clinician to assess for additional complications of ABCD to guide clinical decision-making and therapeutic choices (see section on Complications-Centric Model for the Care of Persons with Overweight/Obesity [Algorithm Fig. 2]). If overweight/obesity and/or ABCD is absent, the possibility of other etiologies of elevated glucose beyond insulin resistance should be considered, including the potential for latent autoimmune diabetes in adults, which would merit screening for type 1 diabetes antibodies.

Weight loss is highly effective in preventing the progression of prediabetes to T2D. Lifestyle intervention to promote weight loss is essential, but the addition of weight-loss pharmacotherapies or bariatric procedures may need to be considered depending on patient-specific characteristics, including stage of obesity (see section on Complications-Centric Model for the Care of Persons with Overweight/Obesity [Algorithm Fig. 2]). Data have shown that weight reduction of 7% to 10% in persons with overweight/obesity is an important threshold, as this degree of weight loss has been demonstrated to be highly effective in preventing progression to T2D.[38,39]

Lifestyle interventions that have been shown to reduce progression to T2D[38,40,41] and decrease the risk of CVD should be a part of the strategy for all individuals with prediabetes independent of

## Appx248

S.L. Samson, P. Vellanki, L. Blonde et al.     *Endocrine Practice 29 (2023) 305–340*



**Algorithm Fig. 3.** Prediabetes Algorithm.

weight status. This should involve a healthy meal plan, such as the Mediterranean[42,43] or DASH diet.[44,45] Other diets including low-fat, low-carbohydrate, vegetarian, and vegan diets can also be considered. Regular physical activity through a combination of aerobic and resistance exercises to achieve ≥150 minutes per week of moderately intense aerobic exercise over 3 to 5 sessions and resistance exercise consisting of single-set repetitions targeting the major muscle groups 2 to 3 times per week should be added.[46-50] Nonexercise active leisure activities should be encouraged to reduce sedentary behavior. Behavioral health should be incorporated for optimal outcomes.

Pharmacotherapy for weight loss should be considered when lifestyle measures alone are inadequate to achieve goal weight loss in those with ABCD. The U.S. Food and Drug Administration (FDA)–approved agents shown to have efficacy to achieve weight-loss goals that impact prediabetes include semaglutide 2.4 mg, liraglutide 3 mg, and phentermine/topiramate-extended release (ER).[39,51-54] Tirzepatide is a weekly dual glucose-dependent insulinotropic polypeptide (GIP) and GLP-1 RA that has been shown to cause substantial weight loss in persons with overweight/obesity but has not received regulatory approval for this indication at this time.[55] Other weight-loss medications approved by the FDA (naltrexone-ER/bupropion-ER, short-term phentermine, or orlistat) could be considered if the above medications are not tolerated or are not accessible to the patient (see Algorithm Fig. 10, Profiles of Weight-Loss Medications).

A nonpharmacologic option for persons with a BMI >25 mg/kg² is hydrogel capsules, containing cellulose and citric acid, taken before meals, which achieved ≥5% weight loss in a majority of participants in placebo-controlled trials, including persons with

prediabetes and T2D.[56] Additional devices that have regulatory approval by the FDA for the treatment of obesity, but not T2D, include intragastric balloons, transpyloric shuttle, and gastric aspiration.[57-59] Bariatric procedures are more effective than lifestyle interventions and medications in weight reduction and should be considered in those with prediabetes with a BMI >35 kg/m².[60]

For patients with prediabetes who do not meet the BMI criteria of overweight/obesity but who still require intervention for prediabetes after implementation of lifestyle modifications, pharmacologic agents with evidence of efficacy in preventing progression to T2D should be considered. Although there are currently no drugs approved by the FDA with an indication to prevent the progression of prediabetes to T2D, metformin, pioglitazone, and acarbose have evidence of efficacy in clinical trials.[38,61,62]

Despite the interventions discussed above, persons with prediabetes are at high risk to progress to T2D. Clinicians are directed to sections on the Complications-Centric Algorithm for Glycemic Control (Algorithm Fig. 6) and the Glucose-Centric Algorithm for Glycemic Control (Algorithm Fig. 7) for further guidance on anti-hyperglycemic pharmacotherapy.

## ASCVD Risk Reduction Algorithm: Dyslipidemia

Treatment of dyslipidemia (Algorithm Fig. 4) is an essential component of DM and prediabetes management. The combined effects of insulin deficiency, insulin resistance, and hyperglycemia cause multiple disruptions in lipoprotein metabolism.[63-68] This leads to an especially atherogenic state characterized by increased levels of apolipoprotein B (apo B)–containing particles, including

Appx249

S.L. Samson, P. Vellanki, L. Blonde et al.                                    Endocrine Practice 29 (2023) 305—340



**Algorithm Fig. 4.** Atherosclerotic Cardiovascular Disease Risk Reduction Algorithm: Dyslipidemia.

triglyceride (TG)-rich very low-density lipoprotein (VLDL), intermediate-density lipoprotein, and remnant particles resulting in low levels of high-density lipoprotein-cholesterol (HDL-C) and increased levels of small, dense, low-density lipoprotein cholesterol (LDL-C).[69-71] Additional detailed guidance for management of dyslipidemia is available in the 2017 AACE Guidelines for Management of Dyslipidemia and Prevention of Cardiovascular Disease[72] and the 2020 Algorithm on the Management of Dyslipidemia and Prevention of Cardiovascular Disease.[73]

*Step 1. Assess Lipid Panel at First Visit or at Diagnosis*

All adult persons with prediabetes or T2D should be screened with a lipid panel at diagnosis and annually to assess ASCVD risk. The standard lipid panel includes total cholesterol, TG levels, HDL-C, and LDL-C. Fasting lipid panels are not necessary for therapeutic decisions, and nonfasting lipid panels may aid patient compliance with timely blood draws.[74]

Secondary causes of dyslipidemia should be excluded. There may be a contributing underlying medical condition or medication, and intervention—if medically appropriate—may improve or resolve the abnormalities. Evaluation should begin with a medical, family, and nutrition history. Review all medications, over-the-counter medications, and supplements. Laboratory testing for thyroid, renal, and liver function may expose secondary causes. Persons with baseline LDL-C >190 mg/dL should be investigated for familial hypercholesterolemia. With extremely high TG levels, a diagnosis of familial chylomicronemia syndrome is a possibility. With both disorders, referral to a lipid specialist for assessment and management is recommended.

Additional secondary causes of dyslipidemia include medical conditions such as overweight or obesity, hyperglycemia, hypothyroidism, pregnancy, stage ≥3 CKD (particularly with albuminuria), nephrotic syndrome, cholestatic disease, lipodystrophy, paraproteinemia (eg, dysgammaglobulinemia, multiple myeloma), and chronic inflammatory conditions (eg, rheumatoid arthritis, systemic lupus erythematosus).

Medications that can cause or exacerbate dyslipidemia include oral estrogens and progestins, anabolic steroids, selective estrogen receptor modulators, highly active antiretroviral therapy such as protease inhibitors for the treatment of HIV, immunosuppressive medications (eg, cyclosporine, mammalian target of rapamycin kinase inhibitor), glucocorticoids, retinoids, interferon, taxol derivatives, L-asparaginase, cyclophosphamide, atypical antipsychotic agents, beta-blockers, and thiazide diuretics. Although bile acid sequestrants can reduce cholesterol, these agents may also increase TG levels and should be used cautiously in patients with elevated TG levels. In addition, TG levels and LDL-C levels may change as glycemic control improves, so the impact of initiation of antihyperglycemic therapy must be taken into account when considering adding or titrating antilipid therapies.

Ancillary apo B measurement is recommended to assess for residual ASCVD risk from remnant and small dense lipoproteins not revealed with a standard lipid panel.[75-78] Apo B is superior for predication of ASCVD risk over LDL-C and is more accurate than non-HDL-C.[79,80] There are additional biomarkers, including high sensitivity C-reactive protein,[81] lipoprotein(a) (Lp[a]),[82] coronary artery calcium score,[83-86] and ankle-brachial index (ABI)[87] that are independently associated with increased risk of ASCVD events, and these may be helpful when the lipid management goal is unclear.[88]

**Appx250**

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

When the decision to initiate or intensify treatment is uncertain, such as for a person with prediabetes and without previous CV events, a risk calculator can also be helpful to estimate 10-year risk for ASCVD (Table 1).

## Step 2. Initiate Lifestyle Intervention

The most common secondary cause of dyslipidemia is a diet high in carbohydrates and/or simple sugars combined with a sedentary lifestyle. Excessive alcohol consumption also contributes to dyslipidemia, particularly hypertriglyceridemia; minimization of alcohol consumption should be encouraged. Persons with dyslipidemia should be provided with tools to promote weight loss with caloric deprivation if overweight/obese. Loss of body weight ≥5% improves TG levels and continued further decline in TG levels is noted even at >15% weight loss.[89] Counseling on lifestyle interventions is essential and should include advice on a healthful diet (whole-foods, plant-based, Mediterranean, and DASH diets); avoidance of processed foods, saturated fat, simple carbohydrates, white starches, and added sugars; and increased intake of dietary fiber (30-40 g per day) and lean proteins (eg, fish, lean meat, and skinless poultry).[73] Exercise regimens should include a minimum of 150 minutes per week of moderate-intensity activity divided into 3 to 5 sessions per week, along with ≥2 resistance training sessions per week.[73]

## Step 3. Determine Patient-Specific Lipid Targets

Treatment targets are based on the duration of T2D and the presence of traditional ASCVD risk factors, including advancing age, HTN, CKD stage ≥3, smoking, family history of premature ASCVD in males <55 years of age and females <65 years of age, low HDL-C, or high non–HDL-C. Assessment of the patient's risk category helps to determine lipid treatment targets and direct appropriate lipid-lowering therapy. Patients with prediabetes or T2D can be classified to set goals of therapy as follows:

- High risk (<10% 10-year risk): T2D duration <10 years and <2 additional traditional ASCVD risk factors with no target organ damage
  o Goal: LDL-C <100 mg/dL, apo B <90 mg/dL, and non–HDL-C <130 mg/dL
- Very high risk (10%-20% 10-year risk): T2D >10 years with ≥2 traditional ASCVD risk factors and no target organ damage
  o Goal: LDL-C <70 mg/dL, apo B <80 mg/dL, and non–HDL-C <100 mg/dL
- Extreme risk (>20% 10-year risk): T2D or prediabetes plus established ASCVD or target organ damage (left ventricular [LV]

systolic or diastolic dysfunction, estimated glomerular filtration rate [eGFR] <45 mL/min/1.73 m², or ABI <0.9)
  o Goal: LDL-C <55 mg/dL, apo B <70 mg/dL, and non–HDL-C <90 mg/dL

## Step 4. Initiate a Statin as First-Line Therapy

Unless contraindicated, a statin should be used as the first-line therapy for dyslipidemia in persons with T2D. High-risk patients (T2D with <10% 10-year risk) should be started on moderate-intensity statin therapy, which results in an LDL-C reduction in the range of 30% to 40% (Table 2). For patients with prediabetes, the benefits of statin therapy should be weighed in the context of their ASCVD risk score and the minor risk of progression to T2D with statin use.[90,91] For persons at very high risk (10%-20% 10-year risk) and extreme risk (>20% 10-year risk), high-intensity statin therapy, which lowers LDL-C by 50% to 60%, should be started regardless of baseline LDL-C level (Table 2).[9,92,93] Residual risk can persist even with maximally tolerated statin therapy in persons with multiple risk factors and persons with stable clinical ASCVD. Lipids should initially be monitored at 6- to 12-week intervals to determine if intensification of therapy is needed and then at less frequent intervals (eg, 6 months) once goals are attained.

Some patients may manifest statin intolerance. Statin-associated muscle symptoms (SAMS) are characterized by bilateral muscle symptoms—pain, weakness, cramping, and stiffness—associated with onset of statin use, but the causality is not always clear.[94,95] The incidence of statin intolerance is in the range of 5% to 20%, with lower rates in placebo-controlled trials; clinical trials with direct queries about muscle symptoms did not show a significant difference in the rates of muscle symptoms among statin and placebo groups.[94] SAMS may resolve with discontinuation and recur when rechallenged with the same or alternative statin. Management includes acknowledging the patient's symptoms and considering the addition of creatine kinase (CK). The FDA–accepted definition of statin-induced myopathy is pain or weakness accompanied by a CK level >10-fold higher than the upper limit of normal laboratory range, but this is rare (<0.1% over placebo). The risk of severe rhabdomyolysis with CK >40-fold, the upper limit of normal is approximately 1 to 4 in 10,000 per year.[94]

Risk factors for myopathy include age >65 years, female sex, low BMI, East Asian heritage, history of muscle symptoms, impaired renal and/or hepatic function, DM, HIV infection, concomitant medications (eg, fibrates, erythromycin, fluconazole), vitamin D deficiency, hypothyroidism, and acute infection.[73] Drug interactions should be considered, particularly for concomitant medications and statins that have high first-pass metabolism and are metabolized through CYP3A4 (eg, simvastatin, lovastatin). When symptoms resolve, and if myopathy was not severe, a rechallenge with a lower dose or less frequent dosing (1-3 times per

**Table 1**
ASCVD 10-year Risk Calculators

| | |
|---|---|
| Reynolds CVD Risk Score | http://www.reynoldsriskscore.org/ |
| Framingham CVD Risk Score | https://www.framinghamheartstudy.org/fhs-risk-functions/hard-coronary-heart-disease-10-year-risk/ |
| American College of Cardiology/ American Heart Association Pooled Cohort CVD Risk Calculator | http://www.cvriskcalculator.com/ |
| Multi-Ethnic Study of Atherosclerosis (MESA) Risk Score | https://www.mesa-nhlbi.org/MESACHDRisk/MesaRiskScore/RiskScore.aspx |

**Table 2**
Intensity of Statin Therapy

| | Low Intensity | Moderate Intensity | High Intensity |
|---|---|---|---|
| Simvastatin 10 mg | 10 mg | 20-40 mg | — |
| Pravastatin 10-20 mg | 10-20 mg | 40-80 mg | — |
| Lovastatin 20 mg | 20 mg | 40 mg | — |
| Fluvastatin 20-40 mg | 20-40 mg | 40 mg BID/80 mg XL | — |
| Pitavastatin 1 mg | 1 mg | 2-4 mg | — |
| Atorvastatin | — | 10-20 mg | 40-80 mg |
| Rosuvastatin | — | 5-10 mg | 20-40 mg |

Modified from [9,92,93].

S.L. Samson, P. Vellanki, L. Blonde et al.
Endocrine Practice 29 (2023) 305—340

week), or use of a hydrophilic statin with less association with myopathy (eg, pitavastatin, fluvastatin) may allow continuation of statin therapy. Even though observational studies showed that normalization of 25-hydroxy-vitamin D$_3$ levels[96] may help with statin-induced myopathy, a secondary analysis of the VITamin D and OmegA-3 Trial (VITAL) showed that the frequency of statin-induced myopathy did not differ with vitamin D supplementation compared with placebo.[97] However, adding coenzyme Q10 supplementation can be considered.[96]

### Step 5A. Intensify Therapy to Achieve Lipid Target

In persons with T2D, additional laboratory testing of lipid levels should be undertaken at frequent intervals (every 6-12 weeks) to direct titration of the statin or addition of an adjunct therapy in order to achieve lipid targets; less frequent testing intervals can be considered once lipid goals are consistently achieved. If lipid targets cannot be achieved with maximally tolerated statin therapy, then the addition of the cholesterol absorption inhibitor ezetimibe (10 mg/day) should be considered. If treatment goals are not met on a maximally tolerated statin combined with ezetimibe, additional therapy with a bile acid sequestrant (colesevelam, colestipol, cholestyramine) or bempedoic acid (adenosine triphosphate-citrate lyase inhibitor) is an option. In extreme risk patients with lipid values above targets on maximal high-intensity statin in combination with the above-mentioned add-on therapies, there may be a need for more aggressive therapy with a proprotein convertase subtilisin/kexin type 9 inhibitor (PCSK9i) or inclisiran (PCSK9 siRNA), with consideration of approved indications and access.

### Step 5B. Hypertriglyceridemia Management

Management of hypertriglyceridemia also is important for optimal lipid levels with a goal of <150 mg/dL in persons with T2D. If needed, pioglitazone and/or insulin may improve both glycemic control and TG levels. In persons with fasting TG level of >200 mg/dL despite a maximally tolerated statin, optimal glucose control, tight adherence to a healthy diet (eg, avoidance of simple carbohydrates, fruit juices, and alcohol), fenofibrate, and/or high-dose prescription grade omega-3 fatty acid may help to achieve goals for TG levels and non–HDL-C. Over-the-counter fish oil supplements are not approved by the FDA for hypertriglyceridemia. In persons with a fasting TG level of >200 mg/dL despite a maximally tolerated statin, optimal glucose control, tight adherence to a healthy diet, fenofibrate, and/or high-dose prescription grade omega-3 fatty acid may help to achieve goals for TG levels and non–HDL-C. However, the CV risk reduction with addition of fibrates, on the background of an optimally dosed statin, for TG levels >200 to 500 mg/dL has not been definitively established. The incidence of CV events in T2D with TG levels >200 was not reduced by pemafibrate in the Pemafibrate to Reduce Cardiovascular Outcomes by Reducing Triglycerides in Patients with Diabetes (PROMINENT) trial, despite lowering of TG, VLDL, remnant cholesterol, and Apo C-III levels.[98] However, subgroup analysis and meta-analyses of trials with fibrates have shown improved ASCVD outcomes in persons with elevated TG levels (>200 mg/dL) and/or HDL-C (<40 mg/dL).[9,72,99-101]

The Reduction of Cardiovascular Events with Icosapent Ethyl - Intervention Trial (REDUCE-IT) demonstrated that the addition of icosapent ethyl (IPE) to statin therapy positively reduced CVD events by 25% in T2D participants with TG levels >135 mg/dL and ASCVD or age >50 years and a second CV risk factor, although this effect was independent of TG level lowering.[102] Potential concerns about the magnitude of the beneficial effect of IPE with use of the mineral oil placebo in REDUCE-IT have been voiced, but overall, IPE should be considered if TG levels are >135 mg/dL in persons with T2D and with established ASCVD or ≥2 additional traditional CVD risk factors.

For severe hypertriglyceridemia (TG levels ≥1000 mg/dL), a very low-fat diet may be required in addition to a fibrate and/or prescription omega-3 fatty acid. For refractory cases, if the fasting TG level remains >1000 mg/dL, niacin may be needed to lower TG levels and reduce the risk of pancreatitis. Notably, niacin may lower TG levels and Lp(a) but does not reduce ASCVD and can worsen glycemia.

### ASCVD Risk Reduction Algorithm: Hypertension

HTN is prevalent among persons with T2D and increases the risk of macrovascular and microvascular complications of DM.[103] The coexistence of prediabetes and HTN also increases the risk of CV events.[104] Data from the UK Prospective Diabetes Study (UKPDS) demonstrated that increased BP control in persons with T2D decreased the risk of death related to DM and micro- and macrovascular complications, which has been confirmed in subsequent clinical trials.[105,106]

AACE has set a systolic BP goal for the majority of patients with T2D as <130 mm Hg with a diastolic BP goal of <80 mm Hg (Algorithm Fig. 5).[9] A lower target can be considered for persons with micro- or macroalbuminuria, moderate/high risk for or with established ASCVD, peripheral vascular disease, or retinopathy. It is recognized that some persons with T2D may not tolerate a goal of <130/80 mm Hg, including those with autonomic neuropathy with orthostatic hypotension, acute coronary syndrome (acute myocardial infarction [MI] or unstable angina), frailty, or medication intolerance.

The accuracy of BP measurement in the clinical setting should be ensured using appropriately maintained and calibrated equipment, trained and proficient medical staff, and with the patient in the appropriate position (ie, sitting in a chair with feet on floor, arm supported at heart level) with a correctly sized cuff. Ideally, serial measurements should be taken and averaged.

### Step 1. Initiate Lifestyle Interventions

Weight loss of ≥5% lowers BP with the largest impact in persons who lose 10% to >15%.[89,107] Exercise several times per week is also an important component in the treatment of HTN, because there are reductions in both systolic and diastolic BP with endurance (aerobic) and dynamic resistance training.[108] Patients also should be counseled on limiting dietary sodium such as with the DASH diet.[109] Mediterranean diets also have been demonstrated to lower BP.[110]

### Step 2. Start an Angiotensin-Converting Enzyme Inhibitor or Angiotensin II Receptor Blocker

Angiotensin-converting enzyme inhibitors (ACEis) or angiotensin II receptor blockers (ARBs) are considered first-line therapies for HTN in persons with T2D, particularly in those with DKD. Both agents are efficacious, but there is no additional benefit for coadministration of an ACEi and an ARB together, and combination may cause harm.[111-114] The dose should be titrated up on a regular basis (minimum every 2-3 months) to reach the BP goal. For those persons who manifest intolerance to an ACEi (eg, cough), an ARB can be substituted. If the initial BP is >150/100 mm Hg, dual therapy may need to be used at the outset (see Step 3. Add-on Therapy).

### Step 3. Add-on Therapy

If the BP goal is not achieved with optimally titrated ACEi or ARB therapy alone, additional add-on therapy is needed. Other antihypertensive agents also have shown efficacy in slowing GFR decline

S.L. Samson, P. Vellanki, L. Blonde et al.
Endocrine Practice 29 (2023) 305—340



**Algorithm Fig. 5.** Atherosclerotic Cardiovascular Disease Risk Reduction Algorithm: Hypertension.

in persons with T2D and HTN, including diuretics and calcium channel blockers.[115] A thiazide diuretic (eg, hydrochlorothiazide, chlorthalidone, indapamide) is an effective second-line antihypertensive, and there are numerous combination pills with ACEi or ARBs with the potential to increase adherence. The dihydropyridine calcium channel blockers amlodipine or nifedipine also can be considered as add-on therapies.

Understanding that many persons with HTN can require multiple antihypertensive medications to achieve their goal BP, additional therapies can include β-blockade. Notably, β-blockers can be associated with weight gain, thought to be secondary to decreased energy expenditure.[116,117] This may be more pronounced with older agents such as atenolol or metoprolol, so the use of newer α-β blockade (carvedilol, labetalol, dilevalol) or β1-selective agents (nebivolol or betaxolol) may be more weight sparing. The central α2 agonist (clonidine) or a peripheral α1 RA (eg, doxazosin, prazosin, terazosin) may be needed for persons who are still hypertensive despite multiple therapies. Hydralazine also may be an effective adjunct therapy but requires multiple doses throughout the day.

Primary hyperaldosteronism is an underdiagnosed cause of endocrine HTN, and there should be a low threshold for screening.[118,119] For the purposes of this algorithm, patients should be screened if they have resistant HTN (>140/90 mm Hg) on ≥3 medications, including a maximum-dose diuretic. A mineralocorticoid receptor antagonist (MRA) (eg, eplerenone, spironolactone) is the rational choice for the medical management of primary hyperaldosteronism but also can be considered for resistant HTN in persons with T2D. More frequent laboratory monitoring of potassium levels and kidney function should be performed in persons on a combination of an ACEi or ARB with an MRA. There also are data

supporting the benefits of the nonsteroidal MRA finerenone for progression of CKD and risk of HF, ASCVD events, and related mortality in persons with T2D and microalbuminuria (urine albumin-to-creatinine ratio ≥30 mg/g), macroalbuminuria, or more advanced CKD but with an eGFR >25 mL/min/1.73 m².[120-123] Although finerenone can modestly reduce systolic BP, its effects are independent of pretreatment BP levels, and regulatory approval is for risk reduction for eGFR decline, end-stage kidney disease, CV death, nonfatal MI, and hospitalization for HF in persons with CKD and T2D.[124]

For those persons initiated on GLP-1 RA or SGLT2i, there may be a mild reduction in BP when these agents are started.[125-128]

**Complications-Centric Algorithm for Glycemic Control**

Persons with T2D experience significant morbidity caused by ASCVD, which is the leading cause of mortality in T2D despite contemporary therapy with lipid-modifying, antiplatelet, and antihypertensive agents.[129] Therapeutic lifestyle changes remain a fundamental component of glycemic control and should include a healthy meal plan, regular physical activity, healthful behavior practices, and weight management. Importantly, some agents belonging to 2 of the newer classes of antihyperglycemic agents, GLP-1 RA and SGLT2i, have been demonstrated in large, international, multicenter randomized, controlled trials to reduce ASCVD risk in persons with T2D and established ASCVD as well as in those at high risk for ASCVD. The CVOTs demonstrate that each antihyperglycemic agent has distinct effects on various components of CV risk, with some showing reduction in CV death, improvement in CKD, reduction in hospitalization for HF, and/or reduced risk of

*S.L. Samson, P. Vellanki, L. Blonde et al.*

*Endocrine Practice 29 (2023) 305–340*

stroke. There is a need for a paradigm shift from an exclusively glucose-centric approach to add a complications-centric approach in the algorithm for glycemic control of persons with T2D (Algorithm Fig. 6).

Three of the GLP-1 RAs have been demonstrated to significantly lower the risk of major adverse cardiovascular events (MACEs) (the composite endpoint "3-point MACE" includes nonfatal MI, nonfatal stroke, and CV death), whereas SGLT2is lower the risk of hospitalization for HF, improve renal outcomes, and some reduce the risk of CV death and/or MACE. The definition of high risk was not consistent across all CVOTs, but generally included albuminuria or proteinuria, HTN and LV hypertrophy, LV systolic or diastolic dysfunction, and/or ABI <0.9. A 2021 meta-analysis of GLP-1 RA CVOTs found a 14% (hazard ratio [HR] 0.86, 95% confidence interval [CI] 0.80-0.93, *P* < .001) reduction in risk of MACEs in persons with or without established ASCVD, A1C, or background antihyperglycemic therapy.[130] Therefore, when persons with T2D have established ASCVD or are at high risk, a GLP-1 RA with proven CV benefit (eg, liraglutide, semaglutide, or dulaglutide) should be initiated as a first-line therapy independent of A1C goal or other antihyperglycemic treatments, including metformin.[9] As an alternative to GLP-1 RA, with consideration of comorbidities, potential side effects, and/or patient preference, clinicians may recommend initiating an SGLT2i with proven CV benefit to reduce the risk of MACE or CV death in persons with T2D and established ASCVD.[131,132] For persons with T2D and established ASCVD or at high risk for ASCVD, the use of an SGLT2i reduces the risk of hospitalization for HF regardless of background antihyperglycemic therapy, CV therapy, or A1C,[9] and in persons with HF and/or CKD, SGLT2i should be initiated as first-line therapy.

SGLT2is clearly have been shown to significantly and robustly reduce the risk of hospitalization for HF or CV death in persons with T2D with or without ASCVD and to improve HF-related symptoms in persons with established HF regardless of LV ejection fraction, background glucose-lowering therapies, or HF therapies.[9] A recent meta-analysis showed that use of an SGLT2i resulted in a 32% reduction in risk of hospitalization for HF (HR 0.68 [95% CI 0.61-0.76]) and a 15% reduction in CV death (HR 0.85 [95% CI 0.78-0.93]) compared with placebo.[133] SGLT2is should be recommended in persons with T2D and HF regardless of A1C goal or other antihyperglycemic treatments, including metformin.

Studies with DPP-4i have shown neutrality compared with placebo regarding MACEs but saxagliptin has been shown to increase the rate of HF hospitalizations.[134] There also was a trend for HF hospitalizations with alogliptin in post hoc analysis of the EXAMINE trial, so caution is advised with use of this agent for persons with New York Heart Association Class III or IV CHF.[135] TZDs can worsen fluid retention and should not be used in persons who have symptomatic HF, and initiation of pioglitazone is contraindicated in individuals with New York Heart Association Class III or Class IV CHF.[136] However, in patients with insulin resistance but without DM who experienced a stroke or transient ischemic attack, pioglitazone has been shown to reduce the risk of acute coronary syndromes.[137] Studies of acarbose on CVD have been limited to patients with impaired glucose tolerance, with 1 study reporting a nearly 50% reduction in MACEs[138] associated with decreased postprandial glucose, while another showed no effect,[139] albeit in patients with already established CVD.

The risk of stroke is markedly increased in DM, with a National Health and Nutrition Examination Survey study demonstrating an



**Algorithm Fig. 6.** Complications-Centric Algorithm for Glycemic Control.

**Appx254**

S.L. Samson, P. Vellanki, L. Blonde et al.                                                    Endocrine Practice 29 (2023) 305–340

odds ratio of 28 (95% CI 19-41).[140] Across meta-analyses, GLP-1 RA appear to reduce risk of stroke by 15% to 17% in persons with T2D and prior ASCVD or at high risk for ASCVD.[9,130,141,142] The 3 GLP-1 RA agents approved by the FDA to reduce the risk of MACEs (including stroke) are dulaglutide (with or without established ASCVD), liraglutide, and subcutaneous semaglutide (in persons with established CVD).[143] In persons with T2D and ASCVD or those at high risk for ASCVD, use of GLP-1 RA with proven benefit is recommended to reduce stroke risk.[9] Pioglitazone, a TZD, appears to reduce the risk of recurrent stroke in persons with insulin resistance, prediabetes, or T2D and a prior transient ischemic attack (TIA) or stroke.[9,144,145] With regard to stroke and SGLT2i, 2 meta-analyses have shown that there was a reduced HR of 0.5 for hemorrhagic stroke when pooling data from completed SGLT2i trials, while there was no significant impact on ischemic stroke.[146,147]

Nearly 50% of U.S. adults with kidney failure have DM.[148] The evidence for benefit of SGLT2is to reduce adverse renal outcomes is robust, with an approximately 38% reduction in composite outcomes, which varied across trials but included worsening of eGFR or creatinine, end-stage kidney disease with or without need for kidney replacement therapy or transplant, kidney death, or CV death.[133] Use of an SGLT2i with proven benefit is recommended as foundational therapy to reduce progression of DKD and CVD risk for persons with T2D and DKD with eGFR 25 mL/min/1.73 m$^2$ or 20 mL/min/1.73 m$^2$ if HF is also present.[9,149,150] Two prospective placebo-controlled trials have examined the impact of dapagliflozin (included participants with eGFR 25 to 70 mL/min/1.73 m$^2$ and 200-5000 mg urine albumin/g creatinine) and empagliflozin (included participants with eGFR 20 to <45 mL/min/1.73 m$^2$ or >45 mL/min/1.73 m$^2$ with >200 mg urine albumin/g creatinine) decline in eGFR and progression of CKD, with a majority of participants enrolled with known T2D.[151,152] Dapagliflozin slowed the rate of decline more in patients with T2D than in patients without T2D, while the impact on eGFR decline was similar for both groups with empagliflozin. GLP-1 RAs also are an option to reduce progression of albuminuria, eGFR decline, and ASCVD risk in persons with T2D and DKD with eGFR 15 mL/min/1.73 m$^2$.[9,153,154]

The A1C target should be individualized in persons with T2D and ASCVD or at high risk for ASCVD, with a target A1C of ≤6.5% in most nonpregnant adults if it can be achieved safely. Consideration of life expectancy, disease duration, presence or absence of micro- and macrovascular complications, CV disease risk factors, comorbid conditions, and risk of hypoglycemia as well as cognitive and psychological status must be considered.[9,16] Newer antihyperglycemic agents such as GLP-1 RA and SGLT2i are associated with a lower risk of hypoglycemia unless used with SUs, glinides, and/or insulin. Less stringent A1C goals (7%-8%) should be adopted in persons with a history of severe hypoglycemia, hypoglycemia unawareness, limited life expectancy, advanced renal disease, extensive comorbid conditions, or longstanding DM in whom the A1C goal has been difficult to attain despite intensive efforts as long as the person remains free of hyperglycemia-associated symptoms.[9,13,14,17]

If further lowering of the A1C is needed to achieve the individualized glycemic target(s) and renal function is GFR >30 mL/min/1.73 m$^2$, metformin should be considered if the patient is not already taking this agent. Each medication should be up-titrated to the maximally tolerated approved dose and additional antihyperglycemic agents should be added on to achieve glycemic targets. If the initial A1C is >7.5%, early combination therapy with 2 agents may be needed, and for those with an initial A1C of >9% or 1.5% above goal, then 2 or 3 antihyperglycemic agents should be initiated concomitantly. If there is symptomatic hyperglycemia, an

A1C >10% and/or BG >300 mg/dL, suggestive of marked insulin deficiency, basal insulin should be initiated to reduce glucose as safely and promptly as possible. In this scenario, use of a combination basal insulin with a GLP-1 RA can also be considered, but with the understanding that GLP-1 RA will require a titration phase that could potentially delay glycemic control. Clinicians should refer to the Algorithm for Adding/Intensifying Insulin section (Algorithm Fig. 8) and the Profiles of Antihyperglycemic Medications table (Algorithm Fig. 9) for additional guidance.

If a person with T2D does not have established or high risk for ASCVD, HF, stroke/TIA, or CKD, then the clinician should refer to the Glucose-Centric Algorithm for Glycemic Control section (Algorithm Fig. 7) and the Profiles of Antihyperglycemic Medications table (Algorithm Fig. 9).

### Glucose-Centric Algorithm for Glycemic Control

The Glucose-Centric Algorithm for Glycemic Control (Algorithm Fig. 7) is for determining initial and add-on therapies for persons with DM but without established or high risk for ASCVD, HF, stroke/TIA, or CKD. Metformin should be initiated if there is no contraindication (eg, GFR <30 mL/min/1.73 m$^2$). In order to maximize tolerability, metformin should be started at a low dose and titrated over the course of a few weeks to the maximally tolerated dose.[16] The newer antihyperglycemic agents such as GLP-1 RA and SGLT2i are associated with low risk of hypoglycemia unless combined with SUs, glinides, and/or insulin.

Given that T2D is a progressive disease, many individuals will require >1 antihyperglycemic medication to achieve their individualized A1C target over the course of the disease. Clinicians should consider multiple factors when selecting the second agent, including presence of overweight or obesity, hypoglycemia risk, access/cost, and presence of severe hyperglycemia. Patients often present with >1 of these factors, so using a patient-centered, shared decision-making approach is important. The order that medications are listed in the algorithm denotes the suggested preference hierarchy for selection. In those patients with overweight or obesity and the additional goal of weight loss, dual GIP/GLP-1 RA, GLP-1 RA, or SGLT2i class are preferred options. Persons with a history of hypoglycemia, at high risk of hypoglycemia. and/or at risk for severe complications from hypoglycemia should preferentially be initiated with an agent associated with low risk for hypoglycemia, including GLP-1 RA, SGLT2i, dual GIP/GLP-1 RA, TZD, or DPP-4i.

For many persons with T2D, access and cost are barriers to receiving newer antihyperglycemic agents. In this situation, a TZD, SU, or glinide would be the more economical choices. While TZDs are associated with low risk for hypoglycemia and have shown benefit for NAFLD, they also can increase weight, so patients must be counseled accordingly. Lastly, patients with symptomatic hyperglycemia and/or an A1C >10% suggestive of marked insulin deficiency should start basal insulin to improve glycemia as quickly as possible. Basal insulin can be initiated with or without initiation and titration of a GLP-1 RA if the patient is not already on this class of agents. Some patients with severe hyperglycemia may need simultaneous initiation of bolus insulin. Clinicians should refer to the Algorithm for Adding/Intensifying Insulin section (Algorithm Fig. 8) for more guidance about initiating or advancing insulin therapy.

In persons with newly diagnosed T2D who are drug naive, prospective studies support the initiation of combination therapy to achieve glycemic targets more quickly as compared with a stepwise approach.[155,156] For recently diagnosed individuals with

Appx255

S.L. Samson, P. Vellanki, L. Blonde et al.                                                                 Endocrine Practice 29 (2023) 305—340



**Algorithm Fig. 7.** Glucose-Centric Algorithm for Glycemic Control.

T2D and an A1C ≥7.5%, early combination therapy may also be considered, usually with metformin combined with another agent that does not cause hypoglycemia, particularly a GLP-1 RA, SGLT2i, or DPP-4i.[9] Clinicians should be cognizant that combination of incretin-based therapies is not recommended (ie, DPP-4i with GLP-1 RA or dual GIP/GLP-1 RA). Antihyperglycemic medications should be titrated to the maximally tolerated dose to achieve the individualized A1C goal, and additional antihyperglycemic agents should be considered in a timely fashion to avoid therapeutic inertia. If the A1C is >9% or >1.5% above goal, ≥2 antihyperglycemic agents may need to be initiated at once.[9] Alternative agents and those associated with concerns regarding adverse effects or ineffectiveness are listed in the algorithm and the clinician is referred to the Profiles of Antihyperglycemic Medications table (Algorithm Fig. 9) for more details regarding the risks and benefits of each antihyperglycemic class.

### Algorithm for Adding/Intensifying Insulin

The overall goal of insulin therapy is to achieve glycemic control after failure of noninsulin antihyperglycemic agents. Glycemic targets should be individualized, although an A1C of 6.5% to 7% for persons on insulin is recommended for most patients (Algorithm Fig. 8). Although A1C is a key measure, insulin titration requires use of multiple glycemic parameters including FBG, premeal or 2-hour postprandial BG, and data from CGM, when available, including TIR,

time below range, and GMI.[21] In general, targets for fasting and premeal glucose are <110 mg/dL without hypoglycemia and can be individualized based on a person's comorbidities and clinical status. The use of CGM is recommended for persons treated with insulin to optimize glycemic control while minimizing hypoglycemia.[20]

### Symptomatic Hyperglycemia

Basal with or without prandial insulin treatment may be needed as initial therapy if the A1C is >10% and/or glucose values are >300 mg/dL, combined with catabolic symptoms, such as weight loss. If symptomatic hyperglycemia is present, a GLP-1 RA alone is not recommended as it requires titration and may delay glucose control. The goal of initial intensive insulin therapy for symptomatic hyperglycemia is to reduce glucose levels safely and promptly. After improved glycemic control is achieved with short-term insulin therapy, especially with a new diagnosis of DM,[157] a role for non-insulin antihyperglycemic agents could be considered.

### Failure of Noninsulin Antihyperglycemic Treatments

For most persons who need intensification of glycemic control and who are already undergoing 3 to 4 oral therapies, a GLP-1 RA or GIP/GLP-1 RA should be the initial choice, if not already in use.[9] If glycemic targets are not achieved with these therapies, basal

S.L. Samson, P. Vellanki, L. Blonde et al.                                                    Endocrine Practice 29 (2023) 305−340

**Algorithm Fig. 8.** Algorithm for Adding/Intensifying Insulin.

insulin should be added alone or as a basal insulin/GLP-1 RA combination injection. Stepwise addition of prandial insulin at 1 to 3 meals is recommended if additional glycemic control is required.

### Basal Insulin Initiation

The dose of basal insulin can be based on A1C levels at the time of initiation. For an A1C <8%, basal insulin can be started at 0.1 to 0.2 U/kg/day and for an A1C >8%, 0.2 to 0.3 U/kg/day can be considered. Analog insulins, including detemir, glargine, and degludec are preferred over human insulins such as neutral protamine Hagedorn (NPH) to reduce hypoglycemia.[9,158] After basal insulin is initiated, discontinuation of SUs is recommended. Fixed-dose GLP-1 RA and basal insulin combinations also can provide improved glycemic control when basal insulin alone has not achieved targets.[159]

### Basal Insulin Titration

Basal insulin should be titrated every 2 to 3 days to reach glycemic targets with a goal FBG of <110 mg/dL without hypoglycemia. Because of the longer half-life of insulin degludec, slower titration every 3 to 5 days is recommended. Persons taking insulin can be counseled on how to titrate insulin doses independently based on self-monitoring of blood glucose.[160,161] One approach to titration of basal insulin is to use the FBG and increase by 20% if >180 mg/dL, 10% if 140 to 180 mg/dL, and 1 unit if 110 to 139 mg/dL. Insulin doses should be reduced as follows for fasting hypoglycemia: FBG <70 mg/dL, decreased by 10% to 20%; FBG <40 mg/dL, decreased by 20% to 40%.

If the basal insulin dose is >0.5 units/kg/day or the bedtime minus morning prebreakfast glucose score is >50 mg/dL,[162] prandial insulin should be considered.

### Initiation of Prandial Insulin

Rapid-acting insulin analogs are preferred over human insulin preparations (eg, regular insulin) because of their comparatively earlier onset of action. Prandial insulin can be initiated at the largest meal at 10% of the basal insulin dose or 5 units, with stepwise addition to other meals as additional glycemic control is needed.[163,164] Alternatively, prandial insulin can be started at all meals simultaneously at 50% of the total daily dose divided by the number of meals.[163,164]

Although less preferred, fixed-dose premixed insulins that combine a long-acting and short-acting insulin can also be considered for persons who may have concerns about multiple insulins and injections. Although premixed insulin requires fewer injections, it also has less flexibility for dosing adjustments and may increase hypoglycemia.[9,165] Nonetheless, premixed insulin may offer an alternative to achieve adequate glycemic control due to simplicity of the insulin regimen and increased adherence.

### Prandial Insulin Titration

Goal premeal glucose targets are 110 to 140 mg/dL.[9] Prandial insulin should be titrated every 2 to 3 days, based on the premeal glucose of the meal until glycemic targets are met. One approach is to titrate prandial insulin as follows:

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

- For pre-midday meal glucose >110 mg/dL, increase the morning meal dose by 10% to 20%
- For pre-evening glucose >140 mg/dL, increase the midday meal dose by 10% to 20%
- For bedtime glucose >140 mg/dL, increase the pre-evening meal dose by 10%
- Fixed-dose insulin can be titrated by 2 units every 2 to 3 days relying on the morning FBG because of the presence of basal insulin

*Hypoglycemia*

For premeal hypoglycemia (glucose <70 mg/dL), prandial insulin should be adjusted with the following approach:

- For pre-midday meal glucose <70 mg/dL, decrease AM meal dose by 10% to 20%
- For pre-evening meal glucose <70mg/dL, decrease pre-midday meal dose by 10% to 20%
- For bedtime glucose <70 mg/dL, decrease pre-evening meal dose by 10% to 20%

Persons with DM on insulin and their families/companions should be educated on the symptoms and treatment of hypoglycemia (<70 mg/dL) and severe hypoglycemia (<54 mg/dL). If a person can safely swallow, an oral source of glucose (eg, tablets, fruit juice) should be given.[166] For a person who is unresponsive or unable to take oral glucose, glucagon should be administered. There are multiple formulations of glucagon available. While older glucagon formulations require reconstitution before subcutaneous or intramuscular injection, soluble glucagon and a glucagon analog, dasiglucagon, are available that do not require reconstitution and are ready for immediate injection.[167,168] Intranasal glucagon also has been shown to be efficacious.[169-173]

### Profiles of Antihyperglycemic Medications

The table of Profiles of Antihyperglycemic Medications (Algorithm Fig. 9) provides a summary of clinically relevant information for approved medical therapies for the treatment of persons with T2D. Details regarding the mechanisms of action and evidence of benefits or harms are outside the scope of this algorithm; clinicians are encouraged to consult the 2022 AACE Clinical Practice Guideline: Developing a Diabetes Mellitus Comprehensive Care Plan[9] for more details.

The organization of the pharmacologic agents (left to right) and the information selected for each medication (top to bottom) provide a framework for clinicians to select from the multiple available antihyperglycemic medications and to incorporate the highlighted benefits or cautions in discussions with patients. Medications on the left side of the table potentially have more positive indications to be considered first-line compared with agents on the right side of the table.

### Profiles of Weight-Loss Medications

The table of Profiles of Weight-Loss Medications (Algorithm Fig. 10) summarizes weight-loss therapies currently approved by the FDA regarding approximate efficacy for weight loss, dosing and



**Algorithm Fig. 9.** Profiles of Antihyperglycemic Medications.

Appx258

S.L. Samson, P. Vellanki, L. Blonde et al.                                                                                 Endocrine Practice 29 (2023) 305−340

**Algorithm Fig. 10.** Profiles of Weight-Loss Medications.

delivery, and potential side effects and contraindications. For a discussion of the evidence for use of these medications for persons with obesity, prediabetes, or T2D, the clinician should consult the 2022 AACE Clinical Practice Guideline: Developing a Diabetes Mellitus Comprehensive Care Plan.[9]

### Vaccine Recommendations for Persons with Diabetes

Vaccine-preventable illnesses caused by bacteria and viruses result in significant morbidity and mortality, with worse outcomes among high-risk populations like persons with DM.[174,177] Vaccinations are effective in reducing the severity and associated morbidity and mortality related to these vaccine-preventable illnesses.[174,177] However, the rates of vaccination are suboptimal among patients with DM.[178]

The CDC Advisory Committee on Immunization Practices (ACIP) maintains a comprehensive and updated reference for age-appropriate vaccine recommendations (https://www.cdc.gov/vaccines/schedules/).[179] The AACE supports these recommendations from the CDC/ACIP (Algorithm Fig. 11). The key vaccines recommended for patients with DM also are detailed in the 2022 AACE DM CPG.[9]

Despite the evidence supporting effectiveness of vaccinations among patients with DM, most health care professionals (HCPs) do not routinely evaluate the vaccination status of their patients who rely on the HCP's recommendations to get vaccinated.[180] This results in missed opportunities to increase uptake of preventive vaccines. To address this gap in care, the CDC developed a set of steps that form a framework for implementing vaccinations in clinics called the Standards for Adult Immunization Practice (https://www.cdc.gov/vaccines/hcp/adults/for-practice/standards/index.html).[181] These steps, summarized below, recognize that many HCPs may not be vaccine providers but that they can still play a significant role in getting their patients vaccinated.

- Assess immunization status of all persons with DM at every encounter. This involves staying up to date with the latest vaccine recommendations, implementing protocols that facilitate review of patient immunization status by the care team, and sending reminders for vaccinations.[182]
- Strongly recommend vaccines to patients who are not fully vaccinated. Recommendation from the HCP is a strong predictor of vaccine acceptance by patients.[183] Address patient questions and concerns, explain benefits of vaccination, and highlight positive experiences with vaccinations.
- Administer the vaccines you stock and for those you do not stock, refer your patient to facilities that can provide these vaccines. Know the local resources where you can refer your patients for vaccination.
- Document vaccines administered in your office or by other vaccine providers in the electronic health record (EHR). Make sure the EHR communicates with your state's immunization information system in a bidirectional manner to consolidate vaccination records. Documentations will ensure patients get the vaccinations they need and will prevent unnecessary vaccinations.

S.L. Samson, P. Vellanki, L. Blonde et al.                                Endocrine Practice 29 (2023) 305—340



**Algorithm Fig. 11.** Vaccine Recommendations for Persons with Diabetes Mellitus.

When incorporated into routine clinic visits, these steps will be effective in increasing vaccinations and providing protection for patients with DM. Having a properly trained staff and a culture of vaccine confidence in the entire clinical practice are important in ensuring that all health care team members are engaged in efforts to improve patient vaccinations. Other measures recommended to improve vaccination rates include making vaccinations more convenient, coadministration of compatible vaccines, and making use of vaccination champions in the clinical setting.[184]

## Review Process

Drafts of this consensus statement were reviewed and approved by all task force members, the AACE CPG Oversight Committee, the AACE Board of Directors, and peer reviewers for *Endocrine Practice*.

## Disclosures

The Task Force was empaneled in accordance with the AACE Conflict of Interest (COI) Policy and approved by the AACE COI Subcommittee, Clinical Practice Guidelines Oversight Committee, and AACE executive leadership. All members of the expert Task Force completed disclosures related to commercial and direct financial relationships within the preceding 12 months with companies that develop products connected with endocrine disorders. Categories for disclosure included employment, stock or other ownership, direct financial relationships (eg, speaker or consultant), research funding, authorship or panel involvement on a guideline or white paper related to an overlapping topic, or other situations related to a perceived COI. The AACE COI Subcommittee

reviewed disclosures of potential authors against an AACE-approved list of affected companies related to the topic of this consensus statement and made recommendations regarding who could serve on the Task Force in the nonconflicted majority, those who could serve in the conflicted minority with management strategy, and those who were disqualified from serving on the Task Force. Members of this Task Force were reminded throughout development to update potential disclosures if any new relationships/potential COI arose during their appointments and to verify currency of disclosures. AACE made every effort to minimize the potential for COI that could influence guidance provided in this consensus statement.

S.L.S. is a member of the AACE Board of Directors and Executive Committee and has received research support to Mayo Clinic from Corcept, served on a steering committee, and been a national or overall principal investigator from Chiasma and Novartis, and is ABIM Chair, Longitudinal Knowledge Assessment Approval Committee for Endocrinology, Diabetes, and Metabolism. P.V. is a consultant for Takeda Pharmaceutical Company and has been a national or overall principal investigator for National Institutes of Health grant K23 DK 11324-01A1. L.B. is a consultant, with payment to Ochsner Health, for Corcept Therapeutics, Merck, Novo Nordisk, Salix Pharmaceuticals, and Sanofi. E.A.C. received research support to company from Abbott and AbbVie; is a consultant for Ascendis, Boehringer Ingelheim, Merck, and Novo Nordisk; is a speaker for Amryt, AstraZeneca, Bayer, Corcept, Eli Lilly, Boehringer Ingelheim, and Novo Nordisk; designed study protocol and is a national principal investigator for the GLITTER1 diabetes mellitus trial funded by Gan & Lee pharmaceuticals; is owner of Endocrinology Associates, Inc; and is part-owner of MediZen. R.J.G. is or has been a consultant for

*S.L. Samson, P. Vellanki, L. Blonde et al.*

*Endocrine Practice 29 (2023) 305–340*





AMERICAN ASSOCIATION OF CLINICAL ENDOCRINOLOGY

**AACE COMPREHENSIVE TYPE 2 DIABETES MANAGEMENT ALGORITHM**

2023

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE. Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

Algorithm Title Page

2023 AACE Type 2 Diabetes Algorithm Title Page. *AACE* = American Association of Endocrinology.

S.L. Samson, P. Vellanki, L. Blonde et al.
Endocrine Practice 29 (2023) 305–340

# TABLE OF CONTENTS

## COMPREHENSIVE TYPE 2 DIABETES MANAGEMENT ALGORITHM

I.    Principles of the AACE Comprehensive Type 2 Diabetes Management Algorithm

II.   Complications-Centric Model for the Care of Persons with Overweight/Obesity

III.  Prediabetes Algorithm

IV.   ASCVD Risk Reduction Algorithm: Dyslipidemia

V.    ASCVD Risk Reduction Algorithm: Hypertension

VI.   Complications-Centric Algorithm for Glycemic Control

VII.  Glucose-Centric Algorithm for Glycemic Control

VIII. Algorithm for Adding / Intensifying Insulin

IX.   Profiles of Antihyperglycemic Medications

X.    Profiles of Weight-Loss Medications

XI.   Vaccine Recommendations for Persons with Diabetes Mellitus

**Abbreviations: AACE**, American Association of Endocrinology; **ABCD**, adiposity-based chronic disease; **ABI**, ankle brachial index; **ACEi**, angiotensin-converting enzyme inhibitor; **AGI**, alpha-glucosidase inhibitor; **AKI**, acute kidney injury; **apo B**, apolipoprotein B; **ARB**, angiotensin II receptor blocker; **ASCVD**, atherosclerotic cardiovascular disease; **ATP**, Adult Treatment Panel; **AiC**, hemoglobin A1c; **BeAM**, bedtime minus a.m. pre-breakfast glucose; **BRC-QR**, bromocriptine quick release; **BG**, blood glucose; **BMI**, body mass index; **BP**, blood pressure; **CAD**, coronary artery disease; **CCB**, calcium channel blocker; **CDC**, Centers for Disease Control and Prevention; **CGM**, continuous glucose monitoring; **CHF**, congestive heart failure; **CKD**, chronic kidney disease; **COLSVL**, colesevelam; **CoQ10**, coenzyme q10; **COVID-19**, coronavirus disease 2019; **CrCl**, creatinine clearance; **CV**, cardiovascular; **CVD**, cardiovascular disease; **DA**, dopamine agonist; **DASH**, Dietary Approaches to Stop Hypertension; **DKA**, diabetic ketoacidosis; **DKD**, diabetic kidney disease; **DM**, diabetes mellitus; **DPP-4i**, dipeptidyl peptidase-4 inhibitor; **eGFR**, estimated glomerular filtration rate; **ER**, extended release; **FBG**, fasting blood glucose; **FDA**, US Food and Drug Administration; **FPG**, fasting plasma glucose; **GERD**, gastroesophageal reflux disease; **GI**, gastrointestinal; **GIP/GLP-1 RA**, glucose-dependent insulinotropic polypeptide and glucagon-like peptide-1 receptor agonist; **GLN**, glinide; **GLP-1 RA**, glucagon-like peptide-1 receptor agonist; **GMI**, glucose management indicator; **GU**, genitourinary; **HDL-C**, high-density lipoprotein cholesterol; **HF**, heart failure; **HFpEF**, heart failure with preserved ejection fraction; **HTN**, hypertension; **IFG**, impaired fasting glucose; **IGT**, impaired glucose tolerance; **LADA**, latent autoimmune diabetes in adults; **LDL-C**, low-density lipoprotein cholesterol; **MACE**, major adverse cardiovascular events; **MEN2**, multiple endocrine neoplasia type 2; **MET**, metformin; **MI**, myocardial infarction; **MRA**, mineralocorticoid receptor antagonist; **MTC**, medullary thyroid carcinoma; **NAFLD**, nonalcoholic fatty liver disease; **NASH**, nonalcoholic steatohepatitis; **NCEP**, National Cholesterol Education Program; **NPH**, Neutral Protamine Hagedorn; **NYHA**, New York Heart Association; **OA**, osteoarthritis; **OSA**, obstructive sleep apnea; **PCOS**, polycystic ovary syndrome; **PCSK9**, proprotein convertase subtilisin/kexin type 9; **PG**, plasma glucose; **PPG**, postprandial glucose; **PRAML**, pramlintide; **PVD**, peripheral vascular disease; **RA**, receptor antagonist; **Rx**, medical prescription; **SCR**, serum creatinine; **SGLT2**, sodium glucose cotransporter 2 inhibitor; **SU**, sulfonylurea; **TDD**, total daily dose; **TG**, triglycerides; **TIA**, transient ischemic attack; **TIR**, time in range; **TZD**, thiazolidinedione; **T1D**, type 1 diabetes; **T2D**, type 2 diabetes; **UACR**, urine albumin-to-creatinine ratio

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE.
Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

Algorithm Table of Contents

**AACE.**

2023 AACE Type 2 Diabetes Algorithm Table of Contents. *AACE* = American Association of Endocrinology.

324
**Appx262**

S.L. Samson, P. Vellanki, L. Blonde et al.
Endocrine Practice 29 (2023) 305–340



PRINCIPLES OF THE AACE COMPREHENSIVE TYPE 2 DIABETES MANAGEMENT ALGORITHM

1. Lifestyle modification underlies all therapy.

2. Maintain or achieve optimal weight.

3. Choice of antihyperglycemic therapy reflects glycemic targets, ASCVD, CHF, CKD, overweight/obesity, and NAFLD.

4. Choice of therapy includes ease of use and access.

5. Optimal A1C is ≤6.5% or as close to normal as is safe and achievable for most patients.

6. Individualize all glycemic targets (A1C, GMI, TIR, FBG, PPG).

7. Get to goal as soon as possible (adjust ≤3 months).

8. Avoid hypoglycemia.

9. CGM is highly recommended to assist patients in reaching goals safely.

10. Comorbidities must be managed for comprehensive care.

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE.
Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

Algorithm Figure 1-Principles

S.L. Samson, P. Vellanki, L. Blonde et al.
Endocrine Practice 29 (2023) 305–340

COMPLICATIONS-CENTRIC MODEL FOR THE CARE OF PERSONS WITH OVERWEIGHT/OBESITY (ADIPOSITY-BASED CHRONIC DISEASE)

[1]BMI 23 to 25 kg/m² may be considered overweight for South Asian, Southeast Asian, and East Asian adults; [2]ABCD complications can include prediabetes, dyslipidemia, hypertension, NAFLD/NASH, ASCVD, CHF and HFpEF, CKD, OSA, OA, asthma/reactive airways disease, GERD, urinary incontinence, PCOS, hypogonadism, and reduced fertility; [3]see PROFILES OF WEIGHT-LOSS MEDICATIONS table.

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE.
Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

Algorithm Figure 2–ABCD

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340



S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340



Algorithm Figure 4-Dyslipidemia

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE.
Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340



Algorithm Figure S-Hypertension

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340



Algorithm Figure 6-Complications-Centric Glycemic Control

**Appx268**

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305−340



Algorithm Figure 7-Glucose-Centric Glycemic Control

**Appx269**

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340



Algorithm Figure 8-Adding/Intensifying Insulin

S.L. Samson, P. Vellanki, L. Blonde et al.   Endocrine Practice 29 (2023) 305–340

## PROFILES OF ANTIHYPERGLYCEMIC MEDICATIONS

| | MET | GLP-1 RA | DUAL GIP/GLP-1 RA | SGLT2i | TZD | INSULIN (basal & basal bolus) | DPP-4i | SU | GLN | AGi | COLSVL | BRC | PRAML |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EFFICACY FOR GLUCOSE LOWERING | ++ | +++ | +++ | ++ | ++ | +++/++++ | + | ++ | + | + | + | + | + |
| MACE | Neutral | Benefit[1,3] | Safe | Benefit[2] | Neutral[3] | Neutral | Neutral | Possible Increased Risk | Neutral | Insufficient Evidence | Neutral[3] | Safe | Insufficient Evidence |
| ASCVD — CHF | Neutral | Unclear | Safe | Reduced Risk | Moderate to Severe[4] | Moderate | Moderate[4] | Possible Increased Risk | Neutral | Insufficient Evidence | Neutral[3] | Safe | Insufficient Evidence |
| STROKE | Neutral | Benefit[5] | Safe | Possible Benefit[2] | Benefit | Neutral | Neutral | Possible Increased Risk | Neutral | Insufficient Evidence | Neutral[3] | Safe | Insufficient Evidence |
| CKD | CKD3a/3b[6] | Benefit[7] | Insufficient Evidence | Benefit | Neutral | Increased hypoglycemia risk with impaired renal function | Neutral | Increased hypoglycemia risk with impaired renal function | Increased hypoglycemia risk with impaired renal function | Not recommended SCR ≥2 mg/dL or CrCl <25 | Neutral | Neutral | Neutral |
| RENAL ADJUSTMENT | Not with CKD4 eGFR <30[6] | Exenatide not recommended eGFR <45 | Neutral | Check medication-specific eGFR thresholds[8] | Neutral | Increased hypoglycemia risk with impaired renal function | Adjust Dose[9] | Increased hypoglycemia risk with impaired renal function | Increased hypoglycemia risk with impaired renal function | Not recommended SCR ≥2 mg/dL or CrCl <25 | Neutral | Neutral | Neutral |
| HYPOGLYCEMIA RISK[14] | Neutral | Neutral | Neutral | Neutral | Neutral | Moderate to Severe | Neutral | Moderate to Severe | Mild | Neutral | Neutral | Neutral | Neutral |
| WEIGHT | Slight loss | Loss | Loss | Loss | Gain[4] | Gain | Neutral | Gain | Neutral | Neutral | Neutral | Neutral | Loss |
| NAFLD | Neutral | Benefit | Benefit | Potential Benefit | Benefit | Neutral | Neutral | Neutral | Neutral | Neutral | Neutral | Neutral | Benefit |
| GI ADVERSE SYMPTOMS | Mild to Moderate | Moderate[10] | Moderate[10] | Neutral | Neutral | Neutral | Neutral | Neutral | Neutral | Moderate | Mild | Moderate | Moderate |
| OTHER CONSIDERATIONS | | Medullary Thyroid Carcinoma/MEN2 | Medullary Thyroid Carcinoma/MEN2 | GU Infections DKA[11] Fracture Risk[12] | Fracture Risk | Increased hypoglycemia risk with impaired renal function | Rare Arthralgias/Myalgias | | | | | | |
| ACCESS/COST | $ | $$$ | $$$ | $$$ | $ | $ – $$$[13] | $-$$ | $ | $-$$ | $-$$ | $$$ | $$$ | $$$ |

**Legend:**
- ■ Possible benefits
- ■ Use with caution
- ■ Likelihood of adverse events
- ■ Neutral, not studied, insufficient evidence

[1] GLP-1 RA MACE benefits with liraglutide, semaglutide, dulaglutide. [2] SGLT2i MACE benefits with empagliflozin, canagliflozin. Possible benefit for hemorrhagic stroke.
[3] GLP-1 RA, TZD, COLSVL can lower LDL. [4] TZDs increase fluid retention and edema and are contraindicated in persons with NYHA Class III/IV CHF. There is increased risk of hospitalization for CHF with saxagliptin, and limited experience for persons with NYHA Class II/IV CHF with alogliptin. [5] GLP-1 RA stroke benefits observed with semaglutide and dulaglutide. [6] CKD3a no adjustment with monitoring, CKD3b decrease dose and do not initiate. CKD4 contraindicated. Hold for acute kidney injury, IV contrast. [7] Dulaglutide, semaglutide decrease CKD progression. [8] The eGFR thresholds for initiation and/or continuation of therapy in CKD vary among SGLT2i. Check medication-specific eGFR levels. [9] Only linagliptin does not require adjustment. [10] Slow titration, portion control, and consider reducing to prior tolerated dose. [11] Precipitants include significant current illness, surgery, inappropriate or rapid insulin dose reduction. [12] Reported with canagliflozin, dapagliflozin. [13] Cost varies widely with devices (e.g., pens), formulations (e.g., analogues), and combinations (e.g., 70/30). [14] Single-agent risks of hypoglycemia may be low but increases when combined with other agents.

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE. Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

Algorithm Figure 9–Antihyperglycemic Medications

AACE.

S.L. Samson, P. Vellanki, L. Blonde et al.

*Endocrine Practice 29 (2023) 305–340*

## PROFILES OF WEIGHT-LOSS MEDICATIONS

| | SEMAGLUTIDE | LIRAGLUTIDE | PHENTERMINE/TOPIRAMATE-ER | NALTREXONE-ER/BUPROPRION-ER | ORLISTAT | PHENTERMINE[1] |
|---|---|---|---|---|---|---|
| CLASS | GLP-1 RA | GLP-1 RA | Sympathomimetic Amine/Gabaminergic | Opioid-Receptor Antagonist/DA-Norepi Reuptake Inhibitor | GI Lipase Inhibitor | Sympathomimetic |
| WEIGHT LOSS[2] | 15%-18% | 5%-6% | 9%-10% | 4%-6% | 4% | 3%[2] |
| MECHANISM | Decreased Appetite Delayed Gastric Emptying | Decreased Appetite Delayed Gastric Emptying | Decreased Appetite Increased Satiety | Decreased Cravings Decreased Appetite | Decreased Fat Absorption | Decreased Appetite |
| DELIVERY | Weekly Subcutaneous Injection | Daily Subcutaneous Injection | Oral | Oral | Oral | Oral |
| STARTING DOSE | 0.25 mg/week | 0.6 mg/day | 3.75 mg/23 mg daily | 8 mg/90 mg daily | 120 mg three times daily | 15 mg daily |
| TREATMENT DOSE | 2.4 mg/week | 3 mg/day | 7.5 mg/46 mg daily (maximum 15 mg/92 mg daily) | 16 mg/180 mg twice per day | 120 mg three times daily | 37.5 mg daily[1] |
| POTENTIAL SIDE EFFECTS | Nausea/Vomiting Diarrhea Constipation Headache Fatigue | Nausea/Vomiting Diarrhea Constipation Headache Fatigue | Restlessness Insomnia Headache Dry Mouth Blurred Vision Tachycardia/BP Elevation/Paresthesia Dysgeusia Mental Clouding/Mood Changes | Nausea/Vomiting Diarrhea Constipation Headache Fatigue Insomnia Dry Mouth Blurred Vision Agitation/Mood Changes | Flatulence Fecal Urgency Oily Stools Fat-Soluble Vitamin Drug Malabsorption | Restlessness Insomnia Headache Dry Mouth Tachycardia/BP Elevation |
| CAUTIONS AND CONTRAINDICATIONS[3] | MTC/MEN2 Tachycardia Pancreatitis/ Gallbladder Disease Diabetic Retinopathy | MTC/MEN2 Tachycardia Pancreatitis/ Gallbladder Disease | Glaucoma Hyperthyroidism Urolithiasis Metabolic Acidosis | Seizure Risk Uncontrolled Hypertension Chronic Opioid Use | Organ Transplant Urolithiasis (Oxalate) Cholestasis | Active CAD Uncontrolled Hypertension Hyperthyroidism Agitated States |
| ACCESS/COST | $$$ | $$$ | $$ | $$ | $$ | $ |

[1]Approved for short term ≤3 months. 15 mg / 30 mg / 37.5 mg phentermine hydrochloride = 12 mg / 24 mg / 30 mg phentermine resin.
[2]Approximate placebo-subtracted with 1 year of therapy except phentermine (12 weeks). [3]All agents are contraindicated in pregnancy/breastfeeding.
COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE.
Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.
Algorithm Figure 10-Weight-Loss Medications

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

# VACCINE RECOMMENDATIONS FOR PERSONS WITH DIABETES MELLITUS

## CDC IMMUNIZATION RECOMMENDATIONS FOR PERSONS WITH DIABETES MELLITUS[1]

| VACCINE | RECOMMENDATION |
|---|---|
| Age-appropriate vaccines | All persons should receive according to the CDC/ACIP immunization schedules. |
| COVID-19 | Primary series and booster per current CDC recommendations and FDA approvals |
| Flu | Annually |
| HepB | All adults ≤59 years<br>Based on risk and quality of immune response for adults ≥60 years |
| PCV | Adults with DM ages ≥19 years<br>1 dose PCV15 followed by PPSV23 at ≥1 year (or ≥8 weeks for adults who are immunocompromised) OR 1 dose PCV20<br>See also current CDC recommendations for details. |
| RZV | All adults ≥50 years |
| Tdap | Every 10 years following completion of the primary series |

ACIP = Advisory Committee on Immunization Practices; CDC = Centers for Disease Control and Prevention; COVID-19 = coronavirus disease 2019; DM = diabetes mellitus; FDA = Food and Drug Administration; HepB = hepatitis B; PCV = pneumococcal conjugate vaccine; PPSV23 = pneumococcal polysaccharide vaccine; RZV = recombinant zoster vaccine; TDAP = tetanus, diphtheria, acellular pertussis

[1]https://www.cdc.gov/vaccines/schedules/index.html

For child/adolescent specific recommendations, see https://www.cdc.gov/vaccines/schedules/hcp/imz/child-adolescent.html

## CDC STANDARDS FOR ADULT IMMUNIZATION PRACTICE

| | |
|---|---|
| ASSESS | Assess immunization status of all individuals at every encounter.<br>• Incorporate into workflow.<br>• Stay up to date on the latest recommendations of the CDC Advisory Committee on Immunization Practices.<br>Updated immunization schedules are released annually. |
| RECOMMEND | STRONGLY recommend vaccines based on age/risk factors.<br>• Address questions and concerns.<br>• Highlight positive experiences and benefits of vaccines. |
| ADMINISTER/ REFER | Administer or refer patients for immunization.<br>• Stock routine vaccines or know your local vaccine providers for referral. |
| DOCUMENT | Document receipt of vaccine in state immunization registry and electronic health record.<br>https://www.cdc.gov/vaccines/hcp/adults/for-practice/standards/index.html |

AACE.

COPYRIGHT © 2023 AACE. May not be reproduced in any form without express written permission from Elsevier on behalf of AACE.
Visit https://doi.org/10.1016/j.eprac.2023.02.001 to request copyright permission.

Algorithm Figure 11-Vaccine Recommendations for Persons with DM

S.L. Samson, P. Vellanki, L. Blonde et al.    Endocrine Practice 29 (2023) 305–340

Bayer, Boehringer Ingelheim, Eli Lilly and Company, Novo Nordisk, Pfizer, Sanofi, and Weight Watchers; has received research support to Emory University for investigator-initiated studies and been a national or overall principal investigator for Dexcom, Eli Lilly and Company, and Novo Nordisk; and has been partially supported by the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) of the National Institutes of Health under Award Numbers P30DK111024-04S, 1K23DK123384. I.B.H. is on the advisory boards of Abbott, Bigfoot, GWave, and Roche; received research support from Beta Bionics, Insulet, and Medtronic Diabetes Care; participated in development of a consensus report on the Management of Type 1 Diabetes in Adults for the American Diabetes Association and European Association for the Study of Diabetes and an Endocrine Society guideline on inpatient diabetes management. S.D.I. is a member of the AACE Board of Directors and Executive Committee and is a consultant (without pay) for Myovant Sciences, Madrigal Pharmaceuticals, Siemens, and Novo Nordisk. K.E.I. is a member of the AACE Board of Directors and has received research support from Novo Nordisk and is on the board of the Nevada Clinical Endocrinologists Association. C.C.L. receives research support to Jaeb Coordinating Center and the University of Colorado for investigator-initiated studies from Dexcom, Inc, is treasurer of the American College of Diabetology, secretary of the Clinical Diabetes and Endocrine Institute, and chair of the Advisory Committee for the FDA on Endocrinologic and Metabolic Drugs, whose views are not represented herein. G.E.U. has received research support and been a national or overall principal investigator for AstraZeneca, Dexcom, and Novo Nordisk; serves as president, Medicine & Science, for the American Diabetes Association; and participated in development of the Endocrine Society guideline on hospital diabetes and Society of Critical Care guideline on ICU diabetes. W.M.V. and C.L.T. have no conflicts of interest to disclose.

## Acknowledgment

The task force is grateful for the invaluable contributions of authors of preceding versions of the AACE Comprehensive Type 2 Diabetes Management Algorithm and the ACE/AACE Diabetes Roadmaps who laid the foundation for this 2023 update: Martin J. Abrahamson, Joshua I. Barzilay, Lawrence Blonde, Zachary T. Bloomgarden, Michael A. Bush, Samuel Dagogo-Jack, Jaime A. Davidson, Michael B. Davidson, Michael H. Davidson, Ralph A. DeFronzo, Daniel Einhorn, Vivian A. Fonseca, Alan J. Garber, Jeffrey R. Garber, James Garvin III, W. Timothy Garvey, George Grunberger, Yehuda Handelsman, Richard Hellman, Robert R. Henry, Irl B. Hirsch, Edward S. Horton, Paul S. Jellinger, Harold Lebovitz, Philip Levy, Janet B. McGill, Jeffrey I. Mechanick, Etie S. Moghissi, Leigh Perreault, Victor L. Roberts, Helena W. Rodbard, Paul D. Rosenblit, Susan L. Samson, Stanley S. Schwartz, and Guillermo E. Umpierrez.

## Funding

This comprehensive management algorithm for type 2 diabetes was developed with financial support from the American Association of Clinical Endocrinology (AACE). AACE received no outside funding for the development of this consensus statement. All members who served on this AACE task force completed work on the manuscript electronically and met via video conferences. Volunteer authors on this task force received no remuneration for their participation in development of this consensus statement.

## Panel Composition

The Task Force was empaneled in accordance with the AACE Conflict of Interest and Diversity, Equity, and Inclusion policies. This consensus statement was developed by a group of credentialed medical professionals in the field of endocrinology. Participants on this task force included current AACE members in good standing.

## Updating Policy

AACE reviews and updates or retires its guidance documents every 3 to 5 years or after significant scientific developments or change in public policy as determined by AACE executive leadership, the AACE Clinical Practice Guidelines Oversight Committee, and relevant AACE disease state network(s).

## Document Expiration Date: June 2026

## References

1. Rodbard HW, Jellinger PS, Davidson JA, et al. Statement by an American Association of Clinical Endocrinologists/American College of Endocrinology consensus panel on type 2 diabetes mellitus: an algorithm for glycemic control. *Endocr Pract*. 2009;15(6):540–559. https://doi.org/10.4158/ep.15.6.540

2. Jellinger PS, Davidson JA, Blonde L, et al. Road maps to achieve glycemic control in type 2 diabetes mellitus: ACE/AACE Diabetes Road Map Task Force. *Endocr Pract*. 2007;13(3):260–268. https://doi.org/10.4158/ep.13.3.260

3. Garber AJ, Abrahamson MJ, Barzilay JI, et al. AACE comprehensive diabetes management algorithm 2013. *Endocr Pract*. 2013;19(2):327–336. https://doi.org/10.4158/endp.19.2.a38267720403k242

4. Garber AJ, Abrahamson MJ, Barzilay JI, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the comprehensive type 2 diabetes management algorithm–2015 executive summary. *Endocr Pract*. 2015;21(12):1403–1414. https://doi.org/10.4158/ep151063.Cs

5. Garber AJ, Abrahamson MJ, Barzilay JI, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the comprehensive type 2 diabetes management algorithm–2016 executive summary. *Endocr Pract*. 2016;22(1):84–113. https://doi.org/10.4158/ep151126.Cs

6. Garber AJ, Abrahamson MJ, Barzilay JI, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the comprehensive type 2 diabetes management algorithm – 2018 executive summary. *Endocr Pract*. 2018;24(1):91–120. https://doi.org/10.4158/cs-2017-0153

7. Garber AJ, Abrahamson MJ, Barzilay JI, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the comprehensive type 2 diabetes management algorithm – 2019 executive summary. *Endocr Pract*. 2019;25(1):69–100. https://doi.org/10.4158/cs-2018-0535

8. Garber AJ, Handelsman Y, Grunberger G, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the comprehensive type 2 diabetes management algorithm - 2020 executive summary. *Endocr Pract*. 2020;26(1):107–139. https://doi.org/10.4158/cs-2019-0472

9. Blonde L, Umpierrez GE, Reddy SS, et al. American Association of Clinical Endocrinology clinical practice guideline: developing a diabetes mellitus comprehensive care plan-2022 update. *Endocr Pract*. 2022;28(10):923–1049. https://doi.org/10.1016/j.eprac.2022.08.002

10. Davies MJ, Aroda VR, Collins BS, et al. Management of hyperglycemia in type 2 diabetes, 2022. A consensus report by the American Diabetes Association (ADA) and the European Association for the Study of Diabetes (EASD). *Diabetes Care*. 2022;45(11):2753–2786. https://doi.org/10.2337/dci22-0034

11. Handelsman Y, Anderson JE, Bakris GL, et al. DCRM Multispecialty Practice Recommendations for the management of diabetes, cardiorenal, and metabolic diseases. *J Diabetes Complications*. 2022;36(2), 108101. https://doi.org/10.1016/j.jdiacomp.2021.108101

12. Ismail-Beigi F, Craven T, Banerji MA, et al. Effect of intensive treatment of hyperglycaemia on microvascular outcomes in type 2 diabetes: an analysis of the ACCORD randomised trial. *Lancet*. 2010;376(9739):419–430. https://doi.org/10.1016/s0140-6736(10)60576-4

13. Patel A, MacMahon S, Chalmers J, et al. Intensive blood glucose control and vascular outcomes in patients with type 2 diabetes. *N Engl J Med*. 2008;358(24):2560–2572. https://doi.org/10.1056/NEJMoa0802987

14. Action to Control Cardiovascular Risk in Diabetes Study Group, Gerstein HC, Miller ME, et al. Effects of intensive glucose lowering in type 2 diabetes. *N Engl J Med*. 2008;358(24):2545–2559. https://doi.org/10.1056/NEJMoa0802743

15. Khaw KT, Wareham N, Bingham S, Luben R, Welch A, Day N. Association of hemoglobin A1c with cardiovascular disease and mortality in adults: the European prospective investigation into cancer in Norfolk. *Ann Intern Med*. 2004;141(6):413–420. https://doi.org/10.7326/0003-4819-141-6-200409210-00006

S.L. Samson, P. Vellanki, L. Blonde et al.                                                          Endocrine Practice 29 (2023) 305–340

16. Rodriguez-Gutierrez R, Gonzalez-Gonzalez JG, Zuñiga-Hernandez JA, McCoy RG. Benefits and harms of intensive glycemic control in patients with type 2 diabetes. *BMJ*. 2019;367:l5887. https://doi.org/10.1136/bmj.l5887

17. Duckworth W, Abraira C, Moritz T, et al. Glucose control and vascular complications in veterans with type 2 diabetes. *N Engl J Med*. 2009;360(2):129–139. https://doi.org/10.1056/NEJMoa0808431

18. Vigersky RA, McMahon C. The relationship of hemoglobin a1c to time-in-range in patients with diabetes. *Diabetes Technol Ther*. 2019;21(2):81–85. https://doi.org/10.1089/dia.2018.0310

19. Beck RW, Bergenstal RM, Cheng P, et al. The relationships between time in range, hyperglycemia metrics, and HbA1c. *J Diabetes Sci Technol*. 2019;13(4):614–626. https://doi.org/10.1177/1932296818822496

20. Grunberger G, Sherr J, Allende M, et al. American Association of Clinical Endocrinology clinical practice guideline: the use of advanced technology in the management of persons with diabetes mellitus. *Endocr Pract*. 2021;27(6):505–537. https://doi.org/10.1016/j.eprac.2021.04.008

21. Bergenstal RM, Beck RW, Close KL, et al. Glucose management indicator (GMI): a new term for estimating A1C from continuous glucose monitoring. *Diabetes Care*. 2018;41(11):2275–2280. https://doi.org/10.2337/dc18-1581

22. Powell RE, Zaccardi F, Beebe C, et al. Strategies for overcoming therapeutic inertia in type 2 diabetes: a systematic review and meta-analysis. *Diabetes Obes Metab*. 2021;23(9):2137–2154. https://doi.org/10.1111/dom.14455

23. Khunti K, Gomes MB, Pocock S, et al. Therapeutic inertia in the treatment of hyperglycaemia in patients with type 2 diabetes: a systematic review. *Diabetes Obes Metab*. 2018;20(2):427–437. https://doi.org/10.1111/dom.13088

24. Martens T, Beck RW, Bailey R, et al. Effect of continuous glucose monitoring on glycemic control in patients with type 2 diabetes treated with basal insulin: a randomized clinical trial. *JAMA*. 2021;325(22):2262–2272. https://doi.org/10.1001/jama.2021.7444

25. Karter AJ, Parker MM, Moffet HH, Gilliam LK, Dlott R. Association of real-time continuous glucose monitoring with glycemic control and acute metabolic events among patients with insulin-treated diabetes. *JAMA*. 2021;325(22):2273–2284. https://doi.org/10.1001/jama.2021.6530

26. Haak T, Hanaire H, Ajjan R, Hermanns N, Riveline JP, Rayman G. Flash glucose-sensing technology as a replacement for blood glucose monitoring for the management of insulin-treated type 2 diabetes: a multicenter, open-label randomized controlled trial. *Diabetes Ther*. 2017;8(1):55–73. https://doi.org/10.1007/s13300-016-0223-6

27. Mechanick JI, Hurley DL, Garvey WT. Adiposity-based chronic disease as a new diagnostic term: the American Association of Clinical Endocrinologists and American College of Endocrinology position statement. *Endocr Pract*. 2017;23(3):372–378. https://doi.org/10.4158/ep161688.Ps

28. Nadolsky K, Addison B, Agarwal M, et al. American Association of Clinical Endocrinology consensus statement: addressing stigma and bias in the diagnosis and management of patients with obesity/adiposity-based chronic disease and assessing bias and stigmatization as determinants of disease severity. *Endocr Pract*. 2023;29:IN PRESS. https://doi.org/10.1016/j.eprac.2023.03.272

29. Chung F, Yegneswaran B, Liao P, et al. STOP questionnaire: a tool to screen patients for obstructive sleep apnea. *Anesthesiology*. 2008;108(5):812–821. https://doi.org/10.1097/ALN.0b013e31816d83e4

30. Topp CW, Østergaard SD, Søndergaard S, Bech P. The WHO-5 Well-Being Index: a systematic review of the literature. *Psychother Psychosom*. 2015;84(3):167–176. https://doi.org/10.1159/000376585

31. Kroenke K, Spitzer RL, Williams JB. The PHQ-9: validity of a brief depression severity measure. *J Gen Intern Med*. 2001;16(9):606–613. https://doi.org/10.1046/j.1525-1497.2001.016009606.x

32. Beck AT, Ward CH, Mendelson M, Mock J, Erbaugh J. An inventory for measuring depression. *Arch Gen Psychiatry*. 1961;4:561–571. https://doi.org/10.1001/archpsyc.1961.01710120031004

33. Bethel MA, Hyland KA, Chacra AR, et al. Updated risk factors should be used to predict development of diabetes. *J Diabetes Complications*. 2017;31(5):859–863. https://doi.org/10.1016/j.jdiacomp.2017.02.012

34. Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on detection, evaluation, and treatment of high blood cholesterol in adults (Adult Treatment Panel III) final report. *Circulation*. 2002;106(25):3143–3421.

35. de Vegt F, Dekker JM, Jager A, et al. Relation of impaired fasting and postload glucose with incident type 2 diabetes in a Dutch population: the Hoorn Study. *JAMA*. 2001;285(16):2109–2113. https://doi.org/10.1001/jama.285.16.2109

36. Lakka HM, Laaksonen DE, Lakka TA, et al. The metabolic syndrome and total and cardiovascular disease mortality in middle-aged men. *JAMA*. 2002;288(21):2709–2716. https://doi.org/10.1001/jama.288.21.2709

37. Laaksonen DE, Lakka HM, Niskanen LK, Kaplan GA, Salonen JT, Lakka TA. Metabolic syndrome and development of diabetes mellitus: application and validation of recently suggested definitions of the metabolic syndrome in a prospective cohort study. *Am J Epidemiol*. 2002;156(11):1070–1077. https://doi.org/10.1093/aje/kwf145

38. Knowler WC, Barrett-Connor E, Fowler SE, et al. Reduction in the incidence of type 2 diabetes with lifestyle intervention or metformin. *N Engl J Med*. 2002;346(6):393–403. https://doi.org/10.1056/NEJMoa012512

39. Garvey WT, Ryan DH, Henry R, et al. Prevention of type 2 diabetes in subjects with prediabetes and metabolic syndrome treated with phentermine and topiramate extended release. *Diabetes Care*. 2014;37(4):912–921. https://doi.org/10.2337/dc13-1518

40. Laaksonen DE, Lindström J, Lakka TA, et al. Physical activity in the prevention of type 2 diabetes: the Finnish diabetes prevention study. *Diabetes*. 2005;54(1):158–165. https://doi.org/10.2337/diabetes.54.1.158

41. Pan XR, Li GW, Hu YH, et al. Effects of diet and exercise in preventing NIDDM in people with impaired glucose tolerance. The Da Qing IGT and Diabetes Study. *Diabetes Care*. 1997;20(4):537–544. https://doi.org/10.2337/diacare.20.4.537

42. Salas-Salvadó J, Bulló M, Estruch R, et al. Prevention of diabetes with Mediterranean diets: a subgroup analysis of a randomized trial. *Ann Intern Med*. 2014;160(1):1–10. https://doi.org/10.7326/m13-1725

43. Salas-Salvadó J, Bulló M, Babio N, et al. Erratum. Reduction in the incidence of type 2 diabetes with the Mediterranean diet: Results of the PREDIMED-Reus nutrition intervention randomized trial. Diabetes Care 2011;34:14–19. *Diabetes Care*. 2018;41(10):2259–2260. https://doi.org/10.2337/dc18-er10

44. Svetkey LP, Simons-Morton D, Vollmer WM, et al. Effects of dietary patterns on blood pressure: subgroup analysis of the Dietary Approaches to Stop Hypertension (DASH) randomized clinical trial. *Arch Intern Med*. 1999;159(3):285–293. https://doi.org/10.1001/archinte.159.3.285

45. Sacks FM, Svetkey LP, Vollmer WM, et al. Effects on blood pressure of reduced dietary sodium and the Dietary Approaches to Stop Hypertension (DASH) diet. DASH-Sodium Collaborative Research Group. *N Engl J Med*. 2001;344(1):3–10. https://doi.org/10.1056/nejm200101043440101

46. Colberg SR, Sigal RJ, Fernhall B, et al. Exercise and type 2 diabetes: the American College of Sports Medicine and the American Diabetes Association: joint position statement executive summary. *Diabetes Care*. 2010;33(12):2692–2696. https://doi.org/10.2337/dc10-1548

47. Colberg SR, Sigal RJ, Fernhall B, et al. Exercise and type 2 diabetes: the American College of Sports Medicine and the American Diabetes Association: joint position statement. *Diabetes Care*. 2010;33(12):e147–e167. https://doi.org/10.2337/dc10-9990

48. Dai X, Zhai L, Chen Q, et al. Two-year-supervised resistance training prevented diabetes incidence in people with prediabetes: a randomised control trial. *Diabetes Metab Res Rev*. 2019;35(5), e3143. https://doi.org/10.1002/dmrr.3143

49. Aguiar EJ, Morgan PJ, Collins CE, Plotnikoff RC, Callister R. Efficacy of interventions that include diet, aerobic and resistance training components for type 2 diabetes prevention: a systematic review with meta-analysis. *Int J Behav Nutr Phys Act*. 2014;11:2. https://doi.org/10.1186/1479-5868-11-2

50. Eckel RH, Jakicic JM, Ard JD, et al. 2013 AHA/ACC guideline on lifestyle management to reduce cardiovascular risk: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines. *J Am Coll Cardiol*. 2014;63(25 Pt B):2960–2984. https://doi.org/10.1016/j.jacc.2013.11.003

51. Wilding JPH, Batterham RL, Calanna S, et al. Once-weekly semaglutide in adults with overweight or obesity. *N Engl J Med*. 2021;384(11):989–1002. https://doi.org/10.1056/NEJMoa2032183

52. Wadden TA, Bailey TS, Billings LK, et al. Effect of subcutaneous semaglutide vs placebo as an adjunct to intensive behavioral therapy on body weight in adults with overweight or obesity: the STEP 3 randomized clinical trial. *JAMA*. 2021;325(14):1403–1413. https://doi.org/10.1001/jama.2021.1831

53. Rubino D, Abrahamsson N, Davies M, et al. Effect of continued weekly subcutaneous semaglutide vs placebo on weight loss maintenance in adults with overweight or obesity: the STEP 4 randomized clinical trial. *JAMA*. 2021;325(14):1414–1425. https://doi.org/10.1001/jama.2021.3224

54. le Roux CW, Astrup A, Fujioka K, et al. 3 years of liraglutide versus placebo for type 2 diabetes risk reduction and weight management in individuals with prediabetes: a randomised, double-blind trial. *Lancet*. 2017;389(10077):1399–1409. https://doi.org/10.1016/s0140-6736(17)30069-7

55. Jastreboff AM, Aronne LJ, Ahmad NN, et al. Tirzepatide once weekly for the treatment of obesity. *N Engl J Med*. 2022;387(3):205–216. https://doi.org/10.1056/NEJMoa2206038

56. Greenway FL, Aronne LJ, Raben A, et al. A randomized, double-blind, placebo-controlled study of Gelesis100: a novel nonsystemic oral hydrogel for weight loss. *Obesity (Silver Spring)*. 2019;27(2):205–216. https://doi.org/10.1002/oby.22347

57. Genco A, Bruni T, Doldi SB, et al. BioEnterics intragastric balloon: The Italian experience with 2,515 patients. *Obes Surg*. 2005;15(8):1161–1164. https://doi.org/10.1381/0960892055002202

58. Ponce J, Woodman G, Swain J, et al. The REDUCE pivotal trial: a prospective, randomized controlled pivotal trial of a dual intragastric balloon for the treatment of obesity. *Surg Obes Relat Dis*. 2015;11(4):874–881. https://doi.org/10.1016/j.soard.2014.12.006

59. Marinos G, Eliades C, Raman Muthusamy V, Greenway F. Weight loss and improved quality of life with a nonsurgical endoscopic treatment for obesity: clinical results from a 3- and 6-month study. *Surg Obes Relat Dis*. 2014;10(5):929–934. https://doi.org/10.1016/j.soard.2014.03.005

60. Mechanick JI, Apovian C, Brethauer S, et al. Clinical practice guidelines for the perioperative nutrition, metabolic, and nonsurgical support of patients undergoing bariatric procedures - 2019 update: Cosponsored by American Association of Clinical Endocrinologists/ American College of Endocrinology, The Obesity Society, American Society for Metabolic & Bariatric Surgery, Obesity Medicine Association, and American Society of Anesthesiologists - Executive summary. *Endocr Pract*. 2019;25(12):1346–1359. https://doi.org/10.4158/gl-2019-0406

Appx275

Endocrine Practice 29 (2023) 305–340

61. Chiasson JL, Josse RG, Gomis R, Hanefeld M, Karasik A, Laakso M. Acarbose for prevention of type 2 diabetes mellitus: the STOP-NIDDM randomised trial. *Lancet.* 2002;359(9323):2072−2077. https://doi.org/10.1016/s0140-6736(02)08905-5

62. DeFronzo RA, Tripathy D, Schwenke DC, et al. Pioglitazone for diabetes prevention in impaired glucose tolerance. *N Engl J Med.* 2011;364(12):1104−1115. https://doi.org/10.1056/NEJMoa1010949

63. Flores-Le Roux JA, Comin J, Pedro-Botet J, et al. Seven-year mortality in heart failure patients with undiagnosed diabetes: an observational study. *Cardiovasc Diabetol.* 2011;10:39. https://doi.org/10.1186/1475-2840-10-39

64. Giraldez RR, Clare RM, Lopes RD, et al. Prevalence and clinical outcomes of undiagnosed diabetes mellitus and prediabetes among patients with high-risk non-ST-segment elevation acute coronary syndrome. *Am Heart J.* 2013;165(6):918−925.e2. https://doi.org/10.1016/j.ahj.2013.01.005

65. Norhammar A, Tenerz A, Nilsson G, et al. Glucose metabolism in patients with acute myocardial infarction and no previous diagnosis of diabetes mellitus: a prospective study. *Lancet.* 2002;359(9324):2140−2144. https://doi.org/10.1016/s0140-6736(02)09089-x

66. Wang N, Fulcher J, Abeysuriya N, et al. Intensive LDL cholesterol-lowering treatment beyond current recommendations for the prevention of major vascular events: a systematic review and meta-analysis of randomised trials including 327 037 participants. *Lancet Diabetes Endocrinol.* 2020;8(1):36−49. https://doi.org/10.1016/s2213-8587(19)30388-2

67. de Ritter R, Sep SJS, van der Kallen CJH, et al. Adverse differences in cardiometabolic risk factor levels between individuals with pre-diabetes and normal glucose metabolism are more pronounced in women than in men: the Maastricht Study. *BMJ Open Diabetes Res Care.* 2019;7(1), e000787. https://doi.org/10.1136/bmjdrc-2019-000787

68. Hashemi Madani N, Ismail-Beigi F, Poustchi H, et al. Impaired fasting glucose and major adverse cardiovascular events by hypertension and dyslipidemia status: the Golestan cohort study. *BMC Cardiovasc Disord.* 2020;20(1):113. https://doi.org/10.1186/s12872-020-01390-8

69. Taskinen MR. Diabetic dyslipidaemia: from basic research to clinical practice. *Diabetologia.* 2003;46(6):733−749. https://doi.org/10.1007/s00125-003-1111-y

70. Halcox JP, Banegas JR, Roy C, et al. Prevalence and treatment of atherogenic dyslipidemia in the primary prevention of cardiovascular disease in Europe: EURIKA, a cross-sectional observational study. *BMC Cardiovasc Disord.* 2017;17(1):160. https://doi.org/10.1186/s12872-017-0591-5

71. Jin JL, Zhang HW, Cao YX, et al. Association of small dense low-density lipoprotein with cardiovascular outcome in patients with coronary artery disease and diabetes: a prospective, observational cohort study. *Cardiovasc Diabetol.* 2020;19(1):45. https://doi.org/10.1186/s12933-020-01015-6

72. Jellinger PS, Handelsman Y, Rosenblit PD, et al. American Association of Clinical Endocrinologists and American College of Endocrinology guidelines for management of dyslipidemia and prevention of cardiovascular disease. *Endocr Pract.* 2017;23(Suppl 2):1−87. https://doi.org/10.4158/ep171764.Appgl

73. Handelsman Y, Jellinger PS, Guerin CK, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the management of dyslipidemia and prevention of cardiovascular disease algorithm - 2020 executive summary. *Endocr Pract.* 2020;26(10):1196−1224. https://doi.org/10.4158/cs-2020-0490

74. Mora S, Chang CL, Moorthy MV, Sever PS. Association of nonfasting vs fasting lipid levels with risk of major coronary events in the anglo-scandinavian cardiac outcomes trial-lipid lowering arm. *JAMA Intern Med.* 2019;179(7):898−905. https://doi.org/10.1001/jamainternmed.2019.0392

75. Sathiyakumar V, Park J, Quispe R, et al. Impact of novel low-density lipoprotein-cholesterol assessment on the utility of secondary non-high-density lipoprotein-c and apolipoprotein B targets in selected worldwide dyslipidemia guidelines. *Circulation.* 2018;138(3):244−254. https://doi.org/10.1161/circulationaha.117.032463

76. Sniderman AD, St-Pierre AC, Cantin B, Dagenais GR, Després JP, Lamarche B. Concordance/discordance between plasma apolipoprotein B levels and the cholesterol indexes of atherosclerotic risk. *Am J Cardiol.* 2003;91(10):1173−1177. https://doi.org/10.1016/s0002-9149(03)00262-5

77. Johannesen CDL, Mortensen MB, Langsted A, Nordestgaard BG. Apolipoprotein B and non-HDL cholesterol better reflect residual risk than LDL cholesterol in statin-treated patients. *J Am Coll Cardiol.* 2021;77(11):1439−1450. https://doi.org/10.1016/j.jacc.2021.01.027

78. Khan SU, Khan MU, Valavoor S, et al. Association of lowering apolipoprotein B with cardiovascular outcomes across various lipid-lowering therapies: systematic review and meta-analysis of trials. *Eur J Prev Cardiol.* 2020;27(12):1255−1268. https://doi.org/10.1177/2047487319871733

79. Sniderman AD, Thanassoulis G, Glavinovic T, et al. Apolipoprotein B particles and cardiovascular disease: a narrative review. *JAMA Cardiol.* 2019;4(12):1287−1295. https://doi.org/10.1001/jamacardio.2019.3780

80. Sniderman AD, Williams K, Contois JH, et al. A meta-analysis of low-density lipoprotein cholesterol, non-high-density lipoprotein cholesterol, and apolipoprotein B as markers of cardiovascular risk. *Circ Cardiovasc Qual Outcomes.* May 2011;4(3):337−345. https://doi.org/10.1161/circoutcomes.110.959247

81. Ridker PM, Paynter NP, Rifai N, Gaziano JM, Cook NR. C-reactive protein and parental history improve global cardiovascular risk prediction: the Reynolds Risk Score for men. *Circulation.* 2008;118(22):2243−2251, 4p following 2251. https://doi.org/10.1161/circulationaha.108.814251

82. Viney NJ, van Capelleveen JC, Geary RS, et al. Antisense oligonucleotides targeting apolipoprotein(a) in people with raised lipoprotein(a): two randomised, double-blind, placebo-controlled, dose-ranging trials. *Lancet.* 2016;388(10057):2239−2253. https://doi.org/10.1016/s0140-6736(16)31009-1

83. Lee JH, Han D, Hartaigh BO, et al. Warranty period of zero coronary artery calcium score for predicting all-cause mortality according to cardiac risk burden in asymptomatic Korean adults. *Circ J.* 2016;80(11):2356−2361. https://doi.org/10.1253/circj.CJ-16-0731

84. Pereira AC, Gomez LM, Bittencourt MS, et al. Age, gender, and race-based coronary artery calcium score percentiles in the Brazilian Longitudinal Study of Adult Health (ELSA-Brasil). *Clin Cardiol.* 2016;39(6):352−359. https://doi.org/10.1002/clc.22539

85. Al Rifai M, McEvoy JW, Nasir K, et al. Traditional cardiovascular disease risk factors associated with one-year all-cause mortality among those with coronary artery calcium scores ≥400. *Atherosclerosis.* 2015;241(2):495−497. https://doi.org/10.1016/j.atherosclerosis.2015.06.002

86. Lai R, Ju J, Lin Q, Xu H. Coronary artery calcification under statin therapy and ts effect on cardiovascular outcomes: a systematic review and meta-analysis. *Front Cardiovasc Med.* 2020;7, 600497. https://doi.org/10.3389/fcvm.2020.600497

87. Nie F, He J, Cao H, Hu X. Predictive value of abnormal ankle-brachial index in patients with diabetes: a meta-analysis. *Diabetes Res Clin Pract.* 2021;174, 108723. https://doi.org/10.1016/j.diabres.2021.108723

88. Brunzell JD, Davidson M, Furberg CD, et al. Lipoprotein management in patients with cardiometabolic risk: consensus conference report from the American Diabetes Association and the American College of Cardiology Foundation. *J Am Coll Cardiol.* 2008;51(15):1512−1524. https://doi.org/10.1016/j.jacc.2008.02.034

89. Wing RR, Lang W, Wadden TA, et al. Benefits of modest weight loss in improving cardiovascular risk factors in overweight and obese individuals with type 2 diabetes. *Diabetes Care.* 2011;34(7):1481−1486. https://doi.org/10.2337/dc10-2415

90. Preiss D, Seshasai SR, Welsh P, et al. Risk of incident diabetes with intensive-dose compared with moderate-dose statin therapy: a meta-analysis. *JAMA.* 2011;305(24):2556−2564. https://doi.org/10.1001/jama.2011.860

91. Sattar N, Preiss D, Murray HM, et al. Statins and risk of incident diabetes: a collaborative meta-analysis of randomised statin trials. *Lancet.* 2010;375(9716):735−742. https://doi.org/10.1016/s0140-6736(09)61965-6

92. Stone NJ, Robinson JG, Lichtenstein AH, et al. 2013 ACC/AHA guideline on the treatment of blood cholesterol to reduce atherosclerotic cardiovascular risk in adults: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines. *J Am Coll Cardiol.* 2014;63(25 Pt B):2889−2934. https://doi.org/10.1016/j.jacc.2013.11.002

93. Correction. *J Am Coll Cardiol.* 2015;66(24):2812. https://doi.org/10.1016/j.jacc.2015.11.019

94. Newman CB, Preiss D, Tobert JA, et al. Statin safety and associated adverse events: a scientific statement from the American Heart Association. *Arterioscler Thromb Vasc Biol.* 2019;39(2):e38−e81. https://doi.org/10.1161/atv.0000000000000073

95. Correction to: Statin safety and associated adverse events: a scientific statement From the American Heart Association. *Arterioscler Thromb Vasc Biol.* 2019;39(5):e158. https://doi.org/10.1161/atv.0000000000000081

96. Qu H, Guo M, Chai H, Wang WT, Gao ZY, Shi DZ. Effects of coenzyme q10 on statin-induced myopathy: an updated meta-analysis of randomized controlled trials. *J Am Heart Assoc.* 2018;7(19), e009835. https://doi.org/10.1161/jaha.118.009835

97. Hlatky MA, Gonzalez PE, Manson JE, et al. Statin-associated muscle symptoms among new statin users randomly assigned to vitamin D or placebo. *JAMA Cardiol.* 2023;8(1):74−80. https://doi.org/10.1001/jamacardio.2022.4250

98. Das Pradhan A, Glynn RJ, Fruchart JC, et al. Triglyceride lowering with pemafibrate to reduce cardiovascular risk. *N Engl J Med.* 2022;387(21):1923−1934. https://doi.org/10.1056/NEJMoa2210645

99. Scott R, O'Brien R, Fulcher G, et al. Effects of fenofibrate treatment on cardiovascular disease risk in 9,795 individuals with type 2 diabetes and various components of the metabolic syndrome: the Fenofibrate Intervention and Event Lowering in Diabetes (FIELD) study. *Diabetes Care.* 2009;32(3):493−498. https://doi.org/10.2337/dc08-1543

100. Bruckert E, Labreuche J, Deplanque D, Touboul PJ, Amarenco P. Fibrates effect on cardiovascular risk is greater in patients with high triglyceride levels or atherogenic dyslipidemia profile: a systematic review and meta-analysis. *J Cardiovasc Pharmacol.* 2011;57(2):267−272. https://doi.org/10.1097/FJC.0b013e318202709f

101. Lee M, Saver JL, Towfighi A, Chow J, Ovbiagele B. Efficacy of fibrates for cardiovascular risk reduction in persons with atherogenic dyslipidemia: a meta-analysis. *Atherosclerosis.* 2011;217(2):492−498. https://doi.org/10.1016/j.atherosclerosis.2011.04.020

102. Bhatt DL, Steg PG, Miller M, et al. Cardiovascular risk reduction with icosapent ethyl for hypertriglyceridemia. *N Engl J Med.* 2019;380(1):11−22. https://doi.org/10.1056/NEJMoa1812792

103. Suh DC, Kim CM, Choi IS, Plauschinat CA, Barone JA. Trends in blood pressure control and treatment among type 2 diabetes with comorbid hypertension in the United States: 1988-2004. *J Hypertens.* 2009;27(9):1908−1916. https://doi.org/10.1097/HJH.0b013e32832d4aee

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

104. Liu HH, Cao YX, Li S, et al. Impacts of prediabetes mellitus alone or plus hypertension on the coronary severity and cardiovascular outcomes. *Hypertension.* 2018;71(6):1039–1046. https://doi.org/10.1161/hypertensionaha.118.11063

105. Tight blood pressure control and risk of macrovascular and microvascular complications in type 2 diabetes: UKPDS 38. UK Prospective Diabetes Study Group. *BMJ.* 1998;317(7160):703–713.

106. Adler AI, Stratton IM, Neil HA, et al. Association of systolic blood pressure with macrovascular and microvascular complications of type 2 diabetes (UKPDS 36): prospective observational study. *BMJ.* 2000;321(7258):412–419. https://doi.org/10.1136/bmj.321.7258.412

107. Neter JE, Stam BE, Kok FJ, Grobbee DE, Geleijnse JM. Influence of weight reduction on blood pressure: a meta-analysis of randomized controlled trials. *Hypertension.* 2003;42(5):878–884. https://doi.org/10.1161/01.Hyp.0000094221.86888.Ae

108. Cornelissen VA, Smart NA. Exercise training for blood pressure: a systematic review and meta-analysis. *J Am Heart Assoc.* 2013;2(1), e004473. https://doi.org/10.1161/jaha.112.004473

109. Conlin PR. The dietary approaches to stop hypertension (DASH) clinical trial: implications for lifestyle modifications in the treatment of hypertensive patients. *Cardiol Rev.* 1999;7(5):284–288. https://doi.org/10.1097/00045415-199909000-00013

110. Davis CR, Hodgson JM, Woodman R, Bryan J, Wilson C, Murphy KJ. A Mediterranean diet lowers blood pressure and improves endothelial function: results from the MedLey randomized intervention trial. *Am J Clin Nutr.* 2017;105(6):1305–1313. https://doi.org/10.3945/ajcn.116.146803

111. Saglimbene V, Palmer SC, Ruospo M, et al. The Long-term Impact of Renin-Angiotensin System (RAS) Inhibition on Cardiorenal Outcomes (LIRICO): a randomized, controlled trial. *J Am Soc Nephrol.* 2018;29(12):2890–2899. https://doi.org/10.1681/asn.2018040443

112. Fried LF, Emanuele N, Zhang JH, et al. Combined angiotensin inhibition for the treatment of diabetic nephropathy. *N Engl J Med.* 2013;369(20):1892–1903. https://doi.org/10.1056/NEJMoa1303154

113. Palmer SC, Mavridis D, Navarese E, et al. Comparative efficacy and safety of blood pressure-lowering agents in adults with diabetes and kidney disease: a network meta-analysis. *Lancet.* 2015;385(9982):2047–2056. https://doi.org/10.1016/s0140-6736(14)62459-4

114. Yusuf S, Teo KK, Pogue J, et al. Telmisartan, ramipril, or both in patients at high risk for vascular events. *N Engl J Med.* 2008;358(15):1547–1559. https://doi.org/10.1056/NEJMoa0801317

115. Rahman M, Pressel S, Davis BR, et al. Renal outcomes in high-risk hypertensive patients treated with an angiotensin-converting enzyme inhibitor or a calcium channel blocker vs a diuretic: a report from the Antihypertensive and Lipid-Lowering Treatment to Prevent Heart Attack Trial (ALLHAT). *Arch Intern Med.* 2005;165(8):936–946. https://doi.org/10.1001/archinte.165.8.936

116. Pischon T, Sharma AM. Use of beta-blockers in obesity hypertension: potential role of weight gain. *Obes Rev.* 2001;2(4):275–280. https://doi.org/10.1046/j.1467-789x.2001.00044.x

117. Sharma AM, Pischon T, Hardt S, Kunz I, Luft FC. Hypothesis: beta-adrenergic receptor blockers and weight gain: a systematic analysis. *Hypertension.* 2001;37(2):250–254. https://doi.org/10.1161/01.hyp.37.2.250

118. Carey RM, Calhoun DA, Bakris GL, et al. Resistant hypertension: detection, evaluation, and management: a scientific statement from the American Heart Association. *Hypertension.* 2018;72(5):e53–e90. https://doi.org/10.1161/hyp.0000000000000084

119. Williams TA, Reincke M. Management of endocrine disease: diagnosis and management of primary aldosteronism: the Endocrine Society guideline 2016 revisited. *Eur J Endocrinol.* 2018;179(1):R19–R29. https://doi.org/10.1530/eje-17-0990

120. Bakris GL, Agarwal R, Anker SD, et al. Effect of finerenone on chronic kidney disease outcomes in type 2 diabetes. *N Engl J Med.* 2020;383(23):2219–2229. https://doi.org/10.1056/NEJMoa2025845

121. Agarwal R, Filippatos G, Pitt B, et al. Cardiovascular and kidney outcomes with finerenone in patients with type 2 diabetes and chronic kidney disease: the FIDELITY pooled analysis. *Eur Heart J.* 2022;43(6):474–484. https://doi.org/10.1093/eurheartj/ehab777

122. Corrigendum to: Cardiovascular and kidney outcomes with finerenone in patients with type 2 diabetes and chronic kidney disease: the FIDELITY pooled analysis. *Eur Heart J.* 2022;43(20):1989. https://doi.org/10.1093/eurheartj/ehab886

123. Pitt B, Filippatos G, Agarwal R, et al. Cardiovascular events with finerenone in kidney disease and type 2 diabetes. *N Engl J Med.* 2021;385(24):2252–2263. https://doi.org/10.1056/NEJMoa2110956

124. U.S. Food & Drug Administration (FDA). Kerendia (finerenone) prescribing information. Accessed December 1, 2022. https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/215341s000lbl.pdf

125. Mazidi M, Rezaie P, Gao HK, Kengne AP. Effect of sodium-glucose cotransport-2 inhibitors on blood pressure in people with type 2 diabetes mellitus: a systematic review and meta-analysis of 43 randomized control trials with 22 528 patients. *J Am Heart Assoc.* 2017;6(6), e004007. https://doi.org/10.1161/jaha.116.004007

126. Baker WL, Smyth LR, Riche DM, Bourret EM, Chamberlin KW, White WB. Effects of sodium-glucose co-transporter 2 inhibitors on blood pressure: a systematic review and meta-analysis. *J Am Soc Hypertens.* 2014;8(4):262–275.e9. https://doi.org/10.1016/j.jash.2014.01.007

127. Sun F, Wu S, Guo S, et al. Impact of GLP-1 receptor agonists on blood pressure, heart rate and hypertension among patients with type 2 diabetes: a

128. Berra C, Manfrini R, Regazzoli D, et al. Blood pressure control in type 2 diabetes mellitus with arterial hypertension. The important ancillary role of SGLT2-inhibitors and GLP1-receptor agonists. *Pharmacol Res.* 2020;160, 105052. https://doi.org/10.1016/j.phrs.2020.105052

129. Raghavan S, Vassy JL, Ho YL, et al. Diabetes mellitus-related all-cause and cardiovascular mortality in a national cohort of adults. *J Am Heart Assoc.* 2019;8(4), e011295. https://doi.org/10.1161/jaha.118.011295

130. Sattar N, Lee MMY, Kristensen SL, et al. Cardiovascular, mortality, and kidney outcomes with GLP-1 receptor agonists in patients with type 2 diabetes: a systematic review and meta-analysis of randomised trials. *Lancet Diabetes Endocrinol.* 2021;9(10):653–662. https://doi.org/10.1016/s2213-8587(21)00203-5

131. Neal B, Perkovic V, Mahaffey KW, et al. Canagliflozin and cardiovascular and renal events in type 2 diabetes. *N Engl J Med.* 2017;377(7):644–657. https://doi.org/10.1056/NEJMoa1611925

132. Zinman B, Wanner C, Lachin JM, et al. Empagliflozin, cardiovascular outcomes, and mortality in type 2 diabetes. *N Engl J Med.* 2015;373(22):2117–2128. https://doi.org/10.1056/NEJMoa1504720

133. McGuire DK, Shih WJ, Cosentino F, et al. Association of SGLT2 inhibitors with cardiovascular and kidney outcomes in patients with type 2 diabetes: a meta-analysis. *JAMA Cardiol.* 2021;6(2):148–158. https://doi.org/10.1001/jamacardio.2020.4511

134. Scirica BM, Bhatt DL, Braunwald E, et al. Saxagliptin and cardiovascular outcomes in patients with type 2 diabetes mellitus. *N Engl J Med.* 2013;369(14):1317–1326. https://doi.org/10.1056/NEJMoa1307684

135. Zannad F, Cannon CP, Cushman WC, et al. Heart failure and mortality outcomes in patients with type 2 diabetes taking alogliptin versus placebo in EXAMINE: a multicentre, randomised, double-blind trial. *Lancet.* 2015;385(9982):2067–2076. https://doi.org/10.1016/s0140-6736(14)62225-x

136. U.S. Food & Drug Administration (FDA). Actos (pioglitazone hydrochloride) prescribing information. Accessed January 31, 2023. https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/021073s043s044lbl.pdf

137. Young LH, Viscoli CM, Curtis JP, et al. Cardiac outcomes after ischemic stroke or transient ischemic attack: effects of pioglitazone in patients with insulin resistance without diabetes mellitus. *Circulation.* 2017;135(20):1882–1893. https://doi.org/10.1161/circulationaha.116.024863

138. Chiasson JL, Josse RG, Gomis R, Hanefeld M, Karasik A, Laakso M. Acarbose treatment and the risk of cardiovascular disease and hypertension in patients with impaired glucose tolerance: the STOP-NIDDM trial. *JAMA.* 2003;290(4):486–494. https://doi.org/10.1001/jama.290.4.486

139. Holman RR, Coleman RL, Chan JCN, et al. Effects of acarbose on cardiovascular and diabetes outcomes in patients with coronary heart disease and impaired glucose tolerance (ACE): a randomised, double-blind, placebo-controlled trial. *Lancet Diabetes Endocrinol.* 2017;5(11):877–886. https://doi.org/10.1016/s2213-8587(17)30309-1

140. Ren Z, Fu X. Stroke risk factors in United States: an analysis of the 2013-2018 National Health and Nutrition Examination Survey. *Int J Gen Med.* 2021;14:6135–6147. https://doi.org/10.2147/ijgm.S327075

141. Grewal S, Zaman N, Borgatta L, Nudy M, Foy AJ, Peterson B. Usefulness of glucagon-like peptide-1 receptor agonists to reduce adverse cardiovascular disease events in patients with type 2 diabetes mellitus. *Am J Cardiol.* 2021;154:48–53. https://doi.org/10.1016/j.amjcard.2021.05.043

142. Malhotra K, Katsanos AH, Lambadiari V, et al. GLP-1 receptor agonists in diabetes for stroke prevention: a systematic review and meta-analysis. *J Neurol.* 2020;267(7):2117–2122. https://doi.org/10.1007/s00415-020-09813-4

143. Das SR, Everett BM, Birtcher KK, et al. 2020 expert consensus decision pathway on novel therapies for cardiovascular risk reduction in patients with type 2 diabetes: a report of the American College of Cardiology Solution Set Oversight Committee. *J Am Coll Cardiol.* 2020;76(9):1117–1145. https://doi.org/10.1016/j.jacc.2020.05.037

144. Lee M, Saver JL, Liao HW, Lin CH, Ovbiagele B. Pioglitazone for secondary stroke prevention: a systematic review and meta-analysis. *Stroke.* 2017;48(2):388–393. https://doi.org/10.1161/strokeaha.116.013977

145. Spence JD, Viscoli CM, Inzucchi SE, et al. Pioglitazone therapy in patients with stroke and prediabetes: a post hoc analysis of the IRIS randomized clinical trial. *JAMA Neurol.* 2019;76(5):526–535. https://doi.org/10.1001/jamaneurol.2019.0079

146. Zhou Z, Jardine MJ, Li Q, et al. Effect of SGLT2 inhibitors on stroke and atrial fibrillation in diabetic kidney disease: results from the CREDENCE trial and meta-analysis. *Stroke.* 2021;52(5):1545–1556. https://doi.org/10.1161/strokeaha.120.031623

147. Tsai WH, Chuang SM, Liu SC, et al. Effects of SGLT2 inhibitors on stroke and its subtypes in patients with type 2 diabetes: a systematic review and meta-analysis. *Sci Rep.* 2021;11(1), 15364. https://doi.org/10.1038/s41598-021-94945-4

148. Schroeder EB, Powers JD, O'Connor PJ, et al. Prevalence of chronic kidney disease among individuals with diabetes in the SUPREME-DM Project, 2005-2011. *J Diabetes Complications.* 2015;29(5):637–643. https://doi.org/10.1016/j.jdiacomp.2015.04.007

149. Packer M, Anker SD, Butler J, et al. Cardiovascular and renal outcomes with empagliflozin in heart failure. *N Engl J Med.* 2020;383(15):1413–1424. https://doi.org/10.1056/NEJMoa2022190

S.L. Samson, P. Vellanki, L. Blonde et al.

Endocrine Practice 29 (2023) 305–340

150. Zannad F, Ferreira JP, Pocock SJ, et al. Cardiac and kidney benefits of empagliflozin in heart failure across the spectrum of kidney function: insights from EMPEROR-Reduced. *Circulation.* 2021;143(4):310–321. https://doi.org/10.1161/circulationaha.120.051685

151. Heerspink HJL, Jongs N, Chertow GM, et al. Effect of dapagliflozin on the rate of decline in kidney function in patients with chronic kidney disease with and without type 2 diabetes: a prespecified analysis from the DAPA-CKD trial. *Lancet Diabetes Endocrinol.* 2021;9(11):743–754. https://doi.org/10.1016/s2213-8587(21)00242-4

152. Herrington WG, Staplin N, Wanner C, et al. Empagliflozin in patients with chronic kidney disease. *N Engl J Med.* 2023;388(2):117–127. https://doi.org/10.1056/NEJMoa2204233

153. Mann JFE, Fonseca V, Mosenzon O, et al. Effects of liraglutide versus placebo on cardiovascular events in patients with type 2 diabetes mellitus and chronic kidney disease. *Circulation.* 2018;138(25):2908–2918. https://doi.org/10.1161/circulationaha.118.036418

154. Mann JFE, Fonseca VA, Poulter NR, et al. Safety of liraglutide in type 2 diabetes and chronic kidney disease. *Clin J Am Soc Nephrol.* 2020;15(4):465–473. https://doi.org/10.2215/cjn.11881019

155. Abdul-Ghani M, Puckett C, Adams J, et al. Durability of triple combination therapy versus stepwise addition therapy in patients with new-onset T2DM: 3-year follow-up of EDICT. *Diabetes Care.* 2021;44(2):433–439. https://doi.org/10.2337/dc20-0978

156. Matthews DR, Paldánius PM, Proot P, Chiang Y, Stumvoll M, Del Prato S. Glycaemic durability of an early combination therapy with vildagliptin and metformin versus sequential metformin monotherapy in newly diagnosed type 2 diabetes (VERIFY): a 5-year, multicentre, randomised, double-blind trial. *Lancet.* 2019;394(10208):1519–1529. https://doi.org/10.1016/s0140-6736(19)32131-2

157. Kramer CK, Zinman B, Retnakaran R. Short-term intensive insulin therapy in type 2 diabetes mellitus: a systematic review and meta-analysis. *Lancet Diabetes Endocrinol.* 2013;1(1):28–34. https://doi.org/10.1016/s2213-8587(13)70006-8

158. Mannucci E, Caiulo C, Naletto L, Madama G, Monami M. Efficacy and safety of different basal and prandial insulin analogues for the treatment of type 2 diabetes: a network meta-analysis of randomized controlled trials. *Endocrine.* 2021;74(3):508–517. https://doi.org/10.1007/s12020-021-02889-6

159. Men P, Qu S, Luo W, Li C, Zhai S. Comparison of lixisenatide in combination with basal insulin vs other insulin regimens for the treatment of patients with type 2 diabetes inadequately controlled by basal insulin: systematic review, network meta-analysis and cost-effectiveness analysis. *Diabetes Obes Metab.* 2020;22(1):107–115. https://doi.org/10.1111/dom.13871

160. Yki-Järvinen H, Juurinen L, Alvarsson M, et al. Initiate Insulin by Aggressive Titration and Education (INITIATE): a randomized study to compare initiation of insulin combination therapy in type 2 diabetic patients individually and in groups. *Diabetes Care.* 2007;30(6):1364–1369. https://doi.org/10.2337/dc06-1357

161. Riddle MC, Rosenstock J, Gerich J. The treat-to-target trial: randomized addition of glargine or human NPH insulin to oral therapy of type 2 diabetic patients. *Diabetes Care.* 2003;26(11):3080–3086. https://doi.org/10.2337/diacare.26.11.3080

162. Zisman A, Morales F, Stewart J, Stuhr A, Vlajnic A, Zhou R. BeAM value: an indicator of the need to initiate and intensify prandial therapy in patients with type 2 diabetes mellitus receiving basal insulin. *BMJ Open Diabetes Res Care.* 2016;4(1), e000171. https://doi.org/10.1136/bmjdrc-2015-000171

163. Owens DR, Luzio SD, Sert-Langeron C, Riddle MC. Effects of initiation and titration of a single pre-prandial dose of insulin glulisine while continuing titrated insulin glargine in type 2 diabetes: a 6-month 'proof-of-concept' study. *Diabetes Obes Metab.* 2011;13(11):1020–1027. https://doi.org/10.1111/j.1463-1326.2011.01459.x

164. Lankisch MR, Ferlinz KC, Leahy JL, Scherbaum WA. Introducing a simplified approach to insulin therapy in type 2 diabetes: a comparison of two single-dose regimens of insulin glulisine plus insulin glargine and oral antidiabetic drugs. *Diabetes Obes Metab.* 2008;10(12):1178–1185. https://doi.org/10.1111/j.1463-1326.2008.00967.x

165. Vora J, Cohen N, Evans M, Hockey A, Speight J, Whately-Smith C. Intensifying insulin regimen after basal insulin optimization in adults with type 2 diabetes: a 24-week, randomized, open-label trial comparing insulin glargine plus insulin glulisine with biphasic insulin aspart (LanScape). *Diabetes Obes Metab.* 2015;17(12):1133–1141. https://doi.org/10.1111/dom.12528

166. Carlson JN, Schunder-Tatzber S, Neilson CJ, Hood N. Dietary sugars versus glucose tablets for first-oral treatment of symptomatic hypoglycaemia in awake patients with diabetes: a systematic review and meta-analysis. *Emerg Med J.* 2017;34(2):100–106. https://doi.org/10.1136/emermed-2015-205637

167. Newswanger B, Ammons S, Phadnis N, et al. Development of a highly stable, nonaqueous glucagon formulation for delivery via infusion pump systems. *J Diabetes Sci Technol.* 2015;9(1):24–33. https://doi.org/10.1177/1932296814565131

168. Hövelmann U, Bysted BV, Mouritzen U, et al. Pharmacokinetic and pharmacodynamic characteristics of dasiglucagon, a novel soluble and stable glucagon analog. *Diabetes Care.* 2018;41(3):531–537. https://doi.org/10.2337/dc17-1402

169. Christiansen MP, Cummins M, Prestrelski S, Close NC, Nguyen A, Junaidi K. Comparison of a ready-to-use liquid glucagon injection administered by autoinjector to glucagon emergency kit for the symptomatic relief of severe hypoglycemia: two randomized crossover non-inferiority studies. *BMJ Open Diabetes Res Care.* 2021;9(1), e002137. https://doi.org/10.1136/bmjdrc-2021-002137

170. Pontiroli AE. Intranasal glucagon: a promising approach for treatment of severe hypoglycemia. *J Diabetes Sci Technol.* 2015;9(1):38–43. https://doi.org/10.1177/1932296814557518

171. Rickels MR, Ruedy KJ, Foster NC, et al. Intranasal glucagon for treatment of insulin-induced hypoglycemia in adults with type 1 diabetes: a randomized crossover noninferiority study. *Diabetes Care.* 2016;39(2):264–270. https://doi.org/10.2337/dc15-1498

172. Sherr JL, Ruedy KJ, Foster NC, et al. Glucagon nasal powder: a promising alternative to intramuscular glucagon in youth with type 1 diabetes. *Diabetes Care.* 2016;39(4):555–562. https://doi.org/10.2337/dc15-1606

173. U.S. Food & Drug Administration (FDA). Baqsimi (glucagon) nasal powder prescribing information. Accessed November 28, 2022. https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/210134s000lbl.pdf

174. Casanova L, Cortão N, Villani P, Verger P. Bias in the measure of the effectiveness of seasonal influenza vaccination among diabetics. *Prim Care Diabetes.* 2016;10(6):398–406. https://doi.org/10.1016/j.pcd.2016.05.005

175. Smith SA, Poland GA. Use of influenza and pneumococcal vaccines in people with diabetes. *Diabetes Care.* 2000;23(1):95–108. https://doi.org/10.2337/diacare.23.1.95

176. Gregory JM, Slaughter JC, Duffus SH, et al. COVID-19 severity is tripled in the diabetes community: A prospective analysis of the pandemic's impact in type 1 and type 2 diabetes. *Diabetes Care.* 2021;44(2):526–532. https://doi.org/10.2337/dc20-2260

177. Dos Santos G, Tahrat H, Bekkat-Berkani R. Immunogenicity, safety, and effectiveness of seasonal influenza vaccination in patients with diabetes mellitus: a systematic review. *Hum Vaccin Immunother.* 2018;14(8):1853–1866. https://doi.org/10.1080/21645515.2018.1446719

178. Lu PJ, Hung MC, Srivastav A, et al. Surveillance of vaccination coverage among adult populations -United States, 2018. *MMWR Surveill Summ.* 2021;70(3):1–26. https://doi.org/10.15585/mmwr.ss7003a1

179. Centers for Disease Control and Prevention. Immunization schedules. Accessed November 10, 2022. https://www.cdc.gov/vaccines/schedules/

180. Hurley LP, Bridges CB, Harpaz R, et al. U.S. physicians' perspective of adult vaccine delivery. *Ann Intern Med.* 2014;160(3):161. https://doi.org/10.7326/m13-2332

181. Centers for Disease Control and Prevention. Standards for adult immunization practice. Accessed November 10, 2022. https://www.cdc.gov/vaccines/hcp/adults/for-practice/standards/index.html

182. Jacobson Vann JC, Jacobson RM, Coyne-Beasley T, Asafu-Adjei JK, Szilagyi PG. Patient reminder and recall interventions to improve immunization rates. *Cochrane Database Syst Rev.* 2018;1:CD003941. https://doi.org/10.1002/14651858.CD003941.pub3

183. Johnson DR, Nichol KL, Lipczynski K. Barriers to adult immunization. *Am J Med.* 2008;121(7 Suppl 2):S28–S35. https://doi.org/10.1016/j.amjmed.2008.05.005

184. Nowalk MP, Moehling KK, Zhang S, Raviotta JM, Zimmerman RK, Lin CJ. Using the 4 Pillars to increase vaccination among high-risk adults: who benefits? *Am J Manag Care.* 2017;23(11):651–655.

Endocrine Practice 29 (2023) 746

  

www.endocrinepractice.org

## Erratum



In the May 2023 issue of *Endocrine Practice*, the paper by Samson et al (Samson SL, Vellanki P, Blonde L, et al. American Association of Clinical Endocrinology Consensus Statement: Comprehensive Type 2 Diabetes Management Algorithm — 2023 Update. Endocr Pract. 2023;29(5):305−340) contained inaccurate affiliation information for Dr Kenneth Izuora. Dr Izuora's correct title is Professor and not Associate Professor as originally published. The corrected affiliation info is as follows:

Professor, Department of Internal Medicine, Endocrinology, Kirk Kerkorian School of Medicine, University of Nevada Las Vegas, Las Vegas, Nevada

DOI of original article: https://doi.org/10.1016/j.eprac.2023.02.001.

https://doi.org/10.1016/j.eprac.2023.06.009
1530-891X/© 2023 AACE. Published by Elsevier Inc. All rights reserved.

Declaration of Dr. Nathan Laney

# Exhibit E

FEATURE ARTICLE

# Exploring the Burden of Mealtime Insulin Dosing in Adults and Children With Type 1 Diabetes

Wendy Lane,[1] Emma Lambert,[2] Jesso George,[3] Naveen Rathor,[3] and Nandu Thalange[4]

Timely and accurate mealtime insulin dosing can be an ongoing challenge for people with type 1 diabetes. This multinational, online study aimed to explore attitudes and behaviors around mealtime insulin dosing and the impact of mealtime dose timing, particularly with regard to premeal dosing (15–20 minutes before a meal). Although the majority of surveyed participants (96%) recognized the importance of accurate mealtime bolus insulin dosing, only a small proportion (35%) reported being "very confident" in accurate bolus insulin estimation. Given the choice, the majority of participants would prefer to administer insulin immediately before or after a meal, as this timing would improve their quality of life.

A large proportion of people with type 1 diabetes, both adults and children, do not achieve guideline-recommended A1C targets (1,2). Contributing to overall glycemic burden is postprandial glucose (PPG), which, together with fasting plasma glucose, is a target measure that is incorporated into guideline recommendations (3). Elevated PPG levels have been shown to be associated with a significant increase in health care resource utilization, including clinic visits, calls, emails to health care providers, and hospitalizations among adults with diabetes who use a multiple daily injection insulin (MDI) regimen (4). However, managing PPG remains one of the most challenging aspects of diabetes care.

PPG control is multifactorial; contributors include timing, quantity, and composition of the meal and asynchrony between postmeal glucose absorption and maximal exogenous insulin effect, which often lags behind glucose absorption by up to 2 hours. Patient-related causes greatly contribute to suboptimal PPG control and include reduced or skipped mealtime insulin doses and inaccurate estimation of carbohydrate intake (5).

Optimal timing of mealtime insulin dosing is a key factor in controlling PPG levels (6,7). In this article, for clarity, we refer to the administration of insulin 15–20 minutes before a meal as a "premeal bolus." When insulin is administered immediately before a meal (usually

## KEY POINTS

» Although the majority of surveyed participants (96%) recognized the importance of accurate mealtime bolus insulin dosing, only a small proportion (35%) reported being "very confident" in accurate bolus insulin estimation.

» Most responding adults with type 1 diabetes (91%) and parents of children with type 1 diabetes (97%) experienced challenge(s) related to premeal insulin dosing.

» Most responding adults with type 1 diabetes (91%) and parents of children with type 1 diabetes (92%) reported worrying about postmeal glucose levels at least occasionally.

» A high proportion of responding adults with type 1 diabetes (67%) and parents of children with type 1 diabetes (72%) said that having the freedom to administer mealtime insulin immediately before or after the start of a meal rather than 15–20 minutes before the meal would have a positive impact on their lives.

[1]Mountain Diabetes and Endocrine Center, Asheville, NC; [2]Ipsos MORI, London, U.K.; [3]Novo Nordisk Service Centre India Private Ltd., Bangalore, India; [4]Al Jalila Children's Specialty Hospital, Al Jaddaf, Dubai, U.A.E.

**Corresponding author:** Wendy Lane, mountaindiabetes@msn.com

This article contains supplementary material online at https://doi.org/10.2337/figshare.14932911.

**https://doi.org/10.2337/cd20-0117**

©2021 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. More information is available at https://www.diabetesjournals.org/content/license.

Appx281

**FEATURE ARTICLE** Burden of Mealtime Insulin Dosing in Type 1 Diabetes

regarded as 0–2 minutes before the meal), we refer to this as a "mealtime bolus." Administration of insulin after the start of a meal is referred to as a "postmeal bolus."

Multiple studies and clinical practice guidelines have suggested that the optimal time to administer a rapid-acting insulin analog is 15–20 minutes before the start of a meal (6,8). This recommendation follows observations in general practice and studies evaluating the effect on PPG excursions of dose timing of rapid-acting insulin relative to meals in people with type 1 diabetes (Supplementary Table S1) (7,9–13). Premeal bolusing of rapid-acting insulin analogs 15 minutes before mealtime resulted in lower PPG excursions and more time spent in the euglycemic range (3.5–10.0 mmol/L) without increased risk of hypoglycemia (7).

Despite these results and clinical recommendations, real-world studies have demonstrated poor adherence to the recommended injection-to-meal interval, and postmeal bolus dosing is commonly observed (5,14,15). Synchronizing the administration of insulin with its anticipated effect on glucose absorption poses a significant challenge for many people with diabetes, especially children or anyone who struggles to adhere to lifestyle routines. Some of the challenges associated with mealtime insulin dosing include injection pain, embarrassment, and interference with daily activities (5,16).

Quantitative data from studies investigating the challenges of mealtime insulin dosing are scarce. Here, we explore attitudes and behaviors around mealtime insulin dosing and the impact of mealtime dose timing, particularly with regard to premeal dosing, in both adults and children with type 1 diabetes, as well as physicians who treat people with type 1 diabetes.

## Research Design and Methods

### Study Design and Recruitment

An online closed survey was conducted between 25 November 2019 and 6 February 2020 with adults with type 1 diabetes, parents of children with type 1 diabetes, and physicians who treat people with type 1 diabetes from across the United States, Canada, the United Kingdom, Japan, Spain, and France. Adults with type 1 diabetes and parents of children with type 1 diabetes were recruited online via social networks (e.g., Facebook, Twitter, Instagram, and Snapchat) as well as custom ad networks (Google). Participants were also invited through direct advertising on specific health

sites or sourced through collaboration with charities and support groups. Physicians were recruited online from Sermo and its panel partners. Incentives were offered for participation in the form of reward points for participants and money for physicians (see Supplementary Materials). Online pilot interviews were conducted with a small sample of people with type 1 diabetes to ensure that the language, flow, and clarity of the survey was appropriate. An invitation link to the main survey was sent to participants via e-mail. Each participant was assigned a unique survey ID based on their IP address and machine ID. Once accessed, participants could not access the survey again. All participants provided informed consent and chose to take part in the survey, during which no personal identifying information was collected.

The survey was conducted by Ipsos Healthcare in compliance with Market Research Society, European Society for Opinion and Marketing Research, European Pharmaceutical Market Research Association, and British Healthcare Business Intelligence Association guidelines. All data collection/abstraction was conducted according to the Health Insurance Portability and Accountability Act and institutional review board policies and procedures.

### Study Participants

Adults (age ≥18 years) and parents of children (age ≤15 years) who had had type 1 diabetes for ≥6 months and were administering insulin with meals (excluding fast-acting insulin aspart) were eligible to take the survey. Physicians were eligible if they fulfilled the following criteria: practicing for 3–40 years, treating at least 15 (United States) or 10 (other countries) people with type 1 diabetes (endocrinologists) or at least 5 people with type 1 diabetes (general practitioners/primary care physicians) in a typical month, responsible for starting or managing treatment for type 1 diabetes and for the prescription of mealtime insulin, and prescribing at least one mealtime insulin that required dosing at least 15–20 minutes before a meal.

### Outcomes and Analysis

The survey set out to determine the challenges associated with administration of insulin with meals and to assess the extent to which premeal administration affects daily routines and the emotional well-being of people with type 1 diabetes and their carers. The survey also explored the extent to which physicians believe that premeal insulin dosing presents a challenge to people with type 1 diabetes. The main survey questions used are

**Appx282**

provided in the Supplementary Materials. For this survey, premeal insulin administration refers to the administration of insulin 15–20 minutes before a meal.

Results are presented using descriptive statistics; no formal statistical analyses were conducted. Incomplete questionnaires were excluded from the analysis. The analysis provided weighted data, assuming equal sizes for each country, to give an overall indication of results across participating countries. Data analysis was conducted using SPSS statistical software (IBM).

### Data Availability

The datasets generated and/or analyzed during this study are available from the corresponding author on reasonable request.

## Results

### Participants

A flow diagram for study participants is shown in Supplementary Figure S1. Of the 2,711 participants included in the study, 1,401 were adults with type 1 diabetes, and 350 were parents of children (≤15 years old) with type 1 diabetes. The remaining 960 participants were physicians who treated people with type 1 diabetes according to the criteria outlined above.

In adults included in the survey (46% of whom were male), the mean age at baseline was 43 ± 14 years and mean duration of diabetes was 19 ± 15 years. In children (64% of whom were male), the mean age at baseline was 10 ± 4 years, and the mean duration of diabetes was 4 ± 3 years. In both groups, >70% of people were administered insulin using an MDI regimen (pen or syringe), while ~30% used an insulin pump (continuous subcutaneous insulin infusion). Insulin aspart and insulin lispro were the short-acting insulin analogs most commonly used (in 47 and 32% of adults, and in 38 and 35% of children, respectively), and 73% of adults and 91% of children used continuous glucose monitoring (CGM).

Of the participating physicians, 30.5% (n = 293) were general practitioners or primary care physicians, 39.3% (n = 377) were endocrinologists, 1.6% (n = 15) were pediatric endocrinologists, 23.2% (n = 223) were diabetologists, and 5.5% (n = 53) were pediatricians. Overall, 85.3% of interviewed physicians both initiate and manage insulin therapy for people with type 1 diabetes in their clinics, whereas 14.7% of them help manage their patients' diabetes but do not initiate treatment. Across specialties, the mean number of years in

practice was 18.8 years (range 3–40). Of their patients, 72.5% were using MDI (pen or syringe), 26.4% used an insulin pump, and 2.6% used an inhaler; 49.4% of their patients were using CGM. Although survey participants did not have experience administering ultra-fast-acting insulin, 50.8% of participating physicians did have experience prescribing one of these agents, specifically fast-acting insulin aspart.

### Attitudes Toward Mealtime Insulin Dosing

The majority of adults with type 1 diabetes (96%, n = 1349) and parents of children with type 1 diabetes (94%, n = 30) surveyed believed it is important (either very or fairly important) to take mealtime insulin accurately (Figure 1A). When asked about the level of confidence in accurately estimating the required amount of insulin needed for a meal, only 35% (n = 488) of adults and 47% (n = 164) of parents of children felt very confident, whereas 13% (n = 188) of adults and 10% (n = 35) of parents did not feel very confident or confident at all (Figure 1B). Of the surveyed physicians, only 16% (n = 115) felt that their patients were very confident in accurately estimating the amount of insulin required at mealtimes (Figure 1B).

### Challenges With Mealtime Insulin Dosing

Based on a provided list of challenges associated with mealtime insulin dosing, 91% of adults and 97% of parents of children with type 1 diabetes reportedly experienced at least one of the listed challenges. Accordingly, almost all interviewed physicians (99.6%) believed that their patients faced challenges with mealtime insulin dosing. An overview of these challenges is presented in Supplementary Figures S2 and S3.

Overall, the main challenges reported for adults and children with type 1 diabetes included the need to inject more insulin after a meal because of eating more or different food than anticipated and not knowing how much insulin to take to cover a given amount of carbohydrate (Supplementary Figure S2). Similarly, according to physicians, the main challenge for people with type 1 diabetes regarding mealtime insulin dosing was knowing what and how much food is needed (Supplementary Figure S3). The individual frequencies for respondents who ate more or less than anticipated after mealtime insulin dosing are presented in Figure 2A and B, respectively. Overall, 70% of adults and 81% of parents of children stated that, at least once a week, they ate more or less food than anticipated after dosing mealtime insulin. Furthermore, at least once a week,

**FEATURE ARTICLE** Burden of Mealtime Insulin Dosing in Type 1 Diabetes



FIGURE 1 Attitudes toward mealtime insulin dosing. *A*) Importance of taking mealtime insulin accurately, as reported by adults and parents of children with type 1 diabetes. *B*) Confidence in estimating the amount of mealtime insulin accurately, as reported by adults with type 1 diabetes, parents of children with type 1 diabetes, and physicians assessing their patients with type 1 diabetes. Corresponding survey questions (A1 and A2 on the patient/parent survey and A1 on the physician survey) are included in the Supplementary Materials. T1D, type 1 diabetes.

58% ($n$ = 720) of adults and 70% ($n$ = 241) of children needed additional food intake as a corrective action to prevent hypoglycemia as a result of eating a meal that had fewer grams of carbohydrates than anticipated (Figure 2*C*). Similarly, corrective insulin after consuming more food than was anticipated was reportedly needed at least once a week by 57% ($n$ = 719) of adults and 65% ($n$ = 219) of children (Figure 2*D*).

Of those surveyed, 25% ($n$ = 348) of adults and 38% ($n$ = 135) of children completely forgot to take their mealtime insulin at least once a week (Figure 2*E*). Of the participating physicians, 21% ($n$ = 200) stated that they always discussed mealtime insulin dosing, whereas 68% ($n$ = 650) of physicians reported sometimes and 11% ($n$ = 104) reported hardly ever having this discussion with their patients.

### Impact of Premeal Insulin Administration

Overall, 82% of surveyed adults felt that having to administer insulin 15–20 minutes before their meals

negatively affected their lifestyle greatly or to some extent. Similarly, 93% of parents felt that this practice had a negative impact to a great or to some extent on their child's day-to-day life. Accordingly, 19% ($n$ = 264) of surveyed adults and 44% ($n$ = 153) of parents chose not to eat out at least once a week because they were unsure about how much bolus insulin might be needed for the meal. The extent of the impact of premeal dosing on life in general, mood, social life, feeling of independence, work, and personal relationships is shown in Figure 3. The majority of physicians (91%, $n$ = 876) agreed that the need for premeal dosing is an extra burden for their patients.

Most adults with type 1 diabetes (91%, $n$ = 1,258) and parents of children with type 1 diabetes (92%, $n$ = 321) worry about PPG levels after a meal to some extent (15 and 21% always, 28 and 31% often, and 48 and 40% occasionally, respectively). Few adults (8%, $n$ = 119) or parents of children (8%, $n$ = 27) reported never worrying about PPG levels.

**Appx284**

A
Adults with T1D
7
25
22
36
8
2
Parents of children with T1D
16
28
26
26
3
1
0%
20%
40%
60%
80%
100%
B
Adults with T1D
14
20
20
32
11
3
Parents of children with T1D
23
33
16
24
2
2
C
Adults with T1D
7
26
25
39
2
2
Parents of children with T1D
16
32
23
28
1
D
Adults with T1D
7
26
25
38
3
1
Parents of children with T1D
11
28
26
32
3
E
Adults with T1D
4
10
11
50
25
1
Parents of children with T1D
10
15
13
39
22
Daily
Several times a week
Once a week
Less than once a week
Never
Don't know

**FEATURE ARTICLE** Burden of Mealtime Insulin Dosing in Type 1 Diabetes

FIGURE 2 Challenges with mealtime insulin dosing as reported by adults and parents of children with type 1 diabetes. *A*) Frequency of eating more than anticipated after dosing insulin according to their physician's guidance. *B*) Frequency of eating less than anticipated after dosing insulin according to their physician's guidance. *C*) Frequency of needing to consume extra food because a meal contained less carbohydrate content than anticipated. *D*) Frequency of needing to take extra insulin to correct additional food intake. *E*) Frequency of completely forgetting to take mealtime insulin. "At least once a week" was calculated by summing the responses for "daily," "several times a week," and "once a week." Corresponding survey questions (A5–A8 and A10 on the patient/parent survey) are included in the Supplementary Materials. T1D, type 1 diabetes.



FIGURE 3 The extent of negative impact of premeal insulin dosing on day-to-day life in adults with type 1 diabetes (*A*) and parents of children with type 1 diabetes (*B*). The corresponding survey question (A14 on the patient/parent survey) is included in the Supplementary Materials.

The key emotions associated with mealtime dosing, reported both by adults and parents of children with type 1 diabetes, included acceptance (28 and 31%, respectively), ability to cope (30 and 26%), and being in control (26 and 25%). A feeling of inconvenience was also reported by many adults (34%). Of the interviewed physicians, 85% (*n* = 819) believed premeal dosing negatively affects the emotional well-being of patients.

### Insulin Dosing Preferences

When asked what they would prefer, 73% (*n* = 1,023) of adults and 67% (*n* = 231) of parents of children with type 1 diabetes indicated that they would choose bolus

**Appx286**

insulin administration either immediately before or after a meal (Figure 4). Furthermore, 55% ($n = 772$) of adults and 65% ($n = 227$) of parents of children with type 1 diabetes at least once a week resorted to post-meal insulin administration when they knew exactly what had been eaten.

A large proportion of adults (67%, $n = 939$) and parents of children (72%, $n = 252$) with type 1 diabetes claimed that having the freedom to administer insulin at mealtime either immediately before or after the start of a meal would have a positive impact (very positive or fairly positive) on their lives. Likewise, the majority of physicians believed that their patients' quality of life would improve (to a great or some extent) if mealtime insulin administration was feasible immediately before a meal (92% of physicians) or immediately after the start of a meal (89% of physicians).

## Discussion

Here, we present the findings of a multinational survey conducted with >1,700 people with type 1 diabetes and >900 physicians with experience treating people with type 1 diabetes to assess perceptions, challenges, and impact of and behaviors associated with mealtime insulin dosing. To our knowledge, this is the first detailed study on understanding the burden associated with pre-meal administration of insulin (15–20 minutes before eating). The insights generated may be useful to clinicians for guiding bolus insulin management and decision-making.

Although nearly all surveyed participants (96%) recognized the importance of accurate mealtime bolus insulin dosing, only a small proportion (35%) reported being "very confident" in accurate bolus insulin estimation.

Moreover, one in four adults with type 1 diabetes and approximately one in three parents of children with type 1 diabetes acknowledged completely forgetting to administer prandial insulin at least once a week. This finding might be driven, in part, by a lack of confidence in accurate mealtime dosing, as reported by both people with type 1 diabetes and physicians in the survey.

Although not all were explored in this survey, it is well recognized that there are multiple barriers to treatment adherence and optimization and that treatment inertia exists (17). Barriers include patient factors (e.g., forgetting to take medications or fear of injections), medication factors (e.g., burdensome regimens and side effects), and system factors (e.g., inadequate follow-up, communication, and support) (17). Importantly, ∼70% of surveyed physicians acknowledged only sometimes discussing challenges around mealtime dosing requirements when their patients raised the issue, clearly indicating the need for improved patient-doctor communication on this basic precept of diabetes management.

Not surprisingly, adjusting insulin dose to meals, or vice versa, was a key challenge reported by people with type 1 diabetes and their treating physicians. Accordingly, the need for additional food intake or additional insulin was reported frequently as necessary corrective actions occurring on at least a weekly basis. Parents of children with type 1 diabetes were more likely than adults with diabetes to report these challenges, as it is more difficult to predict the amount of food a child will eat. Consequently, at least half of surveyed participants resorted to postmeal insulin administration at least once a week.

It follows that the majority of surveyed people with type 1 diabetes and physicians felt that the need for premeal



**FIGURE 4** Preferred time for taking mealtime insulin given a choice, as reported by adults and parents of children with type 1 diabetes. The corresponding survey question (A18 on the patient/parent survey) is included in the Supplementary Materials. T1D, type 1 diabetes.

**FEATURE ARTICLE**  Burden of Mealtime Insulin Dosing in Type 1 Diabetes

insulin administration has a negative impact on lifestyle and that an option to administer mealtime insulin immediately before or immediately after a meal would improve quality of life. This finding highlights the need for better education of people with type 1 diabetes around the correct adjustment of bolus insulin doses before meals. Additional food intake or insulin dosing should not be required as a postmeal corrective action.

Rapid-acting insulin analogs (i.e., insulin lispro, insulin glulisine, and insulin aspart) are generally recommended for use before a meal (18–20), and clinical guidelines recommend premeal insulin administration (21,22). When initially introduced, however, this first generation of mealtime insulin was also approved for postmeal administration, but this practice is now generally recognized as suboptimal, as it can result in higher A1C levels (compared with premeal administration of bolus insulin), postprandial hyper- and hypoglycemia, and ensuing complications (6,15). The importance of PPG is now widely accepted and is reflected in new guidelines (3,23,24).

This PPG emphasis was shown in our surveyed population, in which >90% of adults and parents of children with type 1 diabetes reported worrying about PPG levels to some degree, and ∼70% indicated that they would prefer to administer insulin either at mealtimes or postmeal. Overall, there is an unmet need for safe and effective mealtime insulin alternatives that provide people with type 1 diabetes with the desired flexibility to dose closer to their meals. This need, at least in part, might be addressed by the advent of ultra-fast-acting insulins (25–28).

Fast-acting insulin aspart, one of the first ultra-fast-acting insulin analogs, approved in 2017 (29), has a quicker onset and offset of action and a greater early glucose-lowering effect than insulin aspart (25,30). Mealtime administration (specifically defined here as 0–2 minutes before a meal) of fast-acting insulin aspart showed noninferiority in A1C reduction and improved PPG control compared with insulin aspart in both adults with type 1 or type 2 diabetes (with or without an insulin pump) and children with type 1 diabetes (25,29,31). In a phase 3 treat-to-target trial in adults with type 1 diabetes, subjects randomized to postmeal faster aspart (20 minutes after the start of a meal) for all meals maintained A1C noninferior to that obtained with mealtime insulin aspart (31).

Improvements in PPG control have also been shown with the mealtime administration of ultra-rapid lispro

(URLi), indicated for the treatment of type 1 or type 2 diabetes (32–34) and inhaled Technosphere insulin (35) in adults with type 1 diabetes (26–28). In a phase 3 treat-to-target trial in adults with type 1 diabetes, both mealtime and postmeal URLi demonstrated noninferiority to insulin lispro for change in A1C, and mealtime URLi was superior to insulin lispro in reducing PPG excursions (26).

The improved time-action profile, more rapid onset of action, and demonstrated efficacy of ultra-fast-acting compared with rapid-acting insulin analogs might indeed help to alleviate the need for corrective actions after meals and facilitate more flexible insulin dosing around meals while mitigating concerns about PPG excursions. At the time of writing, fast-acting insulin aspart and Technosphere insulin are available in several markets, and URLi was approved in the United States, the European Union, and Japan (32–34).

Patients on intensive insulin regimens should assess glucose levels regularly by either self-monitoring of blood glucose or CGM (36). The fact that 73% of adults and 91% of parents of children with type 1 diabetes in our survey were using CGM is reassuring, as close glucose monitoring is needed to monitor and optimize the use of ultra-fast-acting insulin.

Recent advances in the technology used to manage diabetes have led to the introduction of devices that can both monitor glucose and deliver insulin, some automatically (3), and even provide dosing reminders. Such tools will inevitably reduce the number of missed bolus doses in people with diabetes. "Smart" insulin pens can be programmed to calculate insulin doses to assist patients in real time and provide downloadable data reports allowing treating physicians to retrospectively review doses and make adjustments as needed (37). Sensor-augmented pumps, now approved by the U.S. Food and Drug Administration, are designed to suspend insulin dosing when they either detect low glucose or predict a fall in glucose within the next 30 minutes (3). Automated insulin delivery systems that include an insulin pump, a continuous glucose sensor, and an algorithm that determines insulin delivery, can regulate insulin dosing based on sensor-derived glucose levels. Users of these first-generation "hybrid closed-loop" systems must enter information about meals and deliver bolus insulin doses for meals and snacks. Numerous studies using a variety of systems with different algorithms, pumps, and sensors have been carried out to date in adults and children (3).

**Appx288**

LANE ET AL.

The limitations of our study, common to studies with online research designs, include the potential of inaccurate recall, false reporting, and restricted generalizability. Because of the modes of recruitment, our sample does not include people who have no access to a device connected to the Internet or who are inactive on social media platforms, those who are institutionalized, or those with the most severe comorbidities and disabilities. The former exclusion may lead to bias toward individuals with higher socioeconomic status. Nevertheless, the survey included a large number of participants from several countries to help increase the generalizability of its findings. It is also worth noting that the sample was limited to treating physicians and, as such, did not consider the views of other health care professionals involved in the care of people with type 1 diabetes. The survey did not exhaustively cover all potential challenges associated with mealtime dosing, as the impact on postprandial hypoglycemia was not explored. Although not a study limitation per se, it is acknowledged that this survey focused only on type 1 diabetes and that these findings may also be relevant to people with type 2 diabetes receiving insulin with an MDI regimen. Finally, our results might underestimate real-world dosing expectations given the potential of responder embarrassment regarding actual dosing habits.

The increasing availability and use of ultra-fast-acting insulins and their potential for greater flexibility in the timing of insulin administration will warrant further real-world studies to monitor people's attitudes toward the timing of insulin dosing and its potential impact on quality of life.

In summary, this study provides real-world insight into the challenges and behaviors associated with premeal insulin dosing in people with type 1 diabetes. The importance of injection timing is not always discussed by physicians, even though it is critical to achieving PPG control. Although the importance of accurate and timely dosing was recognized, premeal insulin administration poses a clear challenge to people with type 1 diabetes. Given the choice, participants said they would prefer mealtime or even postmeal administration as being clearly advantageous and beneficial to quality of life. Given the high proportion of people with type 1 diabetes with missed insulin boluses, more convenient timing may also aid therapeutic adherence. The advent of ultra-rapid insulin analogs now presents a possible solution to some of these issues. Physicians should aim to explore the issues around administration of insulin with

meals and address their patients' needs through support, education, and, where clinically appropriate, consideration of ultra-rapid insulin therapy.

## ACKNOWLEDGMENTS
The authors thank Pranav Kelkar (Novo Nordisk) for his review of and input on the manuscript. Medical writing and editorial assistance were provided by Matthew Robinson and Beverly La Ferla of Ashfield MedComms, an Ashfield Health company, and were funded by Novo Nordisk A/S.

## FUNDING
Survey design and the collection, analysis, and interpretation of data for this study were funded by Novo Nordisk A/S.

## DUALITY OF INTEREST
W.L. has served on advisory boards and received research grant support from Novo Nordisk and has received honoraria for serving on speakers' bureaus for Dexcom, Insulet, Novo Nordisk, and Xeris. E.L. is an employee of Ipsos MORI, which was commissioned to conduct this research. J.G. and N.R. are employees of Novo Nordisk. N.T. has received fees for speaking and consulting from Novo Nordisk A/S. No other potential conflicts of interest relevant to this article were reported.

## AUTHOR CONTRIBUTIONS
All authors contributed to data interpretation, reviewed and contributed to the content of the manuscript, and approved the manuscript for publication. E.L. was part of the team who collected and analyzed the data. W.L. is the guarantor of this work and, as such, had full access to all the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

## PRIOR PRESENTATION
Parts of this article were presented in abstract form at the virtual 56th Annual Meeting of the European Association for the Study of Diabetes, 21–25 September 2020.

## REFERENCES
1. Foster NC, Beck RW, Miller KM, et al. State of type 1 diabetes management and outcomes from the T1D Exchange in 2016–2018. Diabetes Technol Ther 2019;21:66–72

2. Renard E, Pozzilli P, Wilmot EG, et al. OP 13 – Suboptimal glycaemic control globally in all age groups of adults with type 1 diabetes: results of a multinational, observational study (SAGE). Diabetologia 2019;62(Suppl. 1):S8

3. American Diabetes Association. 9. Pharmacologic approaches to glycemic treatment: *Standards of Medical Care in Diabetes—2021.* Diabetes Care 2021;44(Suppl. 1):S111–S124

4. Pfeiffer KM, Sandberg A, Nikolajsen A, Brod M. Postprandial glucose and healthcare resource use: a cross-sectional survey of adults with diabetes treated with basal-bolus insulin. J Med Econ 2018;21:66–73

Appx289

**FEATURE ARTICLE** Burden of Mealtime Insulin Dosing in Type 1 Diabetes

5. Senior P, Hramiak I. Fast-acting insulin aspart and the need for new mealtime insulin analogues in adults with type 1 and type 2 diabetes: a Canadian perspective. Can J Diabetes 2019;43:515–523

6. Slattery D, Amiel SA, Choudhary P. Optimal prandial timing of bolus insulin in diabetes management: a review. Diabet Med 2018;35:306–316

7. Luijf YM, van Bon AC, Hoekstra JB, Devries JH. Premeal injection of rapid-acting insulin reduces postprandial glycemic excursions in type 1 diabetes. Diabetes Care 2010;33:2152–2155

8. Diabetes Canada Clinical Practice Guidelines Expert Committee; McGibbon A, Adams L, Ingersoll K, Kader T, Tugwell B. Glycemic management in adults with type 1 diabetes. Can J Diabetes 2018;42(Suppl. 1):S80–S87

9. Cobry E, McFann K, Messer L, et al. Timing of meal insulin boluses to achieve optimal postprandial glycemic control in patients with type 1 diabetes. Diabetes Technol Ther 2010;12:173–177

10. Brunner GA, Hirschberger S, Sendlhofer G, et al. Post-prandial administration of the insulin analogue insulin aspart in patients with type 1 diabetes mellitus. Diabet Med 2000;17:371–375

11. Schernthaner G, Wein W, Sandholzer K, Equiluz-Bruck S, Bates PC, Birkett MA. Postprandial insulin lispro: a new therapeutic option for type 1 diabetic patients. Diabetes Care 1998;21:570–573

12. Schernthaner G, Wein W, Shnawa N, Bates PC, Birkett MA. Preprandial vs. postprandial insulin lispro: a comparative crossover trial in patients with type 1 diabetes. Diabet Med 2004;21:279–284

13. Jovanovic L, Giammattei J, Acquistapace M, Bornstein K, Sommermann E, Pettitt DJ. Efficacy comparison between preprandial and postprandial insulin aspart administration with dose adjustment for unpredictable meal size. Clin Ther 2004;26:1492–1497

14. Tamborlane WV, Pfeiffer KM, Brod M, et al. Understanding bolus insulin dose timing: the characteristics and experiences of people with diabetes who take bolus insulin. Curr Med Res Opin 2017;33:639–645

15. Peters A, Van Name MA, Thorsted BL, Piltoft JS, Tamborlane WV. Postprandial dosing of bolus insulin in patients with type 1 diabetes: a cross-sectional study using data from the T1D Exchange registry. Endocr Pract 2017;23:1201–1209

16. Peyrot M, Rubin RR, Kruger DF, Travis LB. Correlates of insulin injection omission. Diabetes Care 2010;33:240–245

17. Russell-Jones D, Pouwer F, Khunti K. Identification of barriers to insulin therapy and approaches to overcoming them. Diabetes Obes Metab 2018;20:488–496

18. Novo Nordisk. NovoRapid (insulin aspart): summary of product characteristics. Available from https://www.ema.europa.eu/en/documents/product-information/novorapid-epar-product-information_en.pdf. Accessed 31 July 2020

19. Sanofi. Insulin lispro 100 units/ml solution for injection in cartridge: summary of product characteristics. Available from https://www.ema.europa.eu/en/documents/product-information/insulin-lispro-sanofi-epar-product-information_en.pdf. Accessed 31 July 2020

20. Sanofi. Apidra 100 Units/ml solution for injection in a vial: summary of product characteristics. Available from https://www.ema.europa.eu/en/documents/product-information/apidra-epar-product-information_en.pdf. Accessed 31 July 2020

21. Silver B, Ramaiya K, Andrew SB, et al. EADSG guidelines: insulin therapy in diabetes. Diabetes Ther 2018;9:449–492

22. National Institute for Health and Care Excellence. Insulin therapy in type 1 diabetes. Available from https://cks.nice.org.uk/insulin-therapy-in-type-1-diabetes#!scenario. Accessed 30 June 2020

23. Ceriello A, Colagiuri S. International Diabetes Federation guideline for management of postmeal glucose: a review of recommendations. Diabet Med 2008;25:1151–1156

24. International Diabetes Federation Guideline Development Group. Guideline for management of postmeal glucose in diabetes. Diabetes Res Clin Pract 2014;103:56–268

25. Evans M, Wilkinson M, Giannpolou A. Fast-acting insulin aspart: the rationale for a new mealtime insulin. Diabetes Ther 2019;10:1793–1800

26. Klaff L, Cao D, Dellva MA, et al. Ultra rapid lispro improves postprandial glucose control compared with lispro in patients with type 1 diabetes: results from the 26-week PRONTO-T1D study. Diabetes Obes Metab 2020;22:1799–1807

27. Akturk HK, Snell-Bergeon JK, Rewers A, et al. Improved postprandial glucose with inhaled technosphere insulin compared with insulin aspart in patients with type 1 diabetes on multiple daily injections: the STAT study. Diabetes Technol Ther 2018;20:639–647

28. Goldberg T, Wong E. Afrezza (insulin human) inhalation powder: a new inhaled insulin for the management of type-1 or type-2 diabetes mellitus. P T 2015;40:735–741

29. Novo Nordisk A/S. FIAsp summary of product characteristics. Available from https://www.ema.europa.eu/en/documents/product-information/fiasp-epar-product-information_en.pdf. Accessed 11 March 2021

30. Heise T, Pieber TR, Danne T, Erichsen L, Haahr H. A pooled analysis of clinical pharmacology trials investigating the pharmacokinetic and pharmacodynamic characteristics of fast-acting insulin aspart in adults with type 1 diabetes. Clin Pharmacokinet 2017;56:551–559

31. Russell-Jones D, Bode BW, De Block C, et al. Fast-acting insulin aspart improves glycemic control in basal-bolus treatment for type 1 diabetes: results of a 26-week multicenter, active-controlled, treat-to-target, randomized, parallel-group trial (onset 1). Diabetes Care 2017;40:943–950

32. Eli Lilly and Company. LYUMJEV (insulin lispro-aabc) injection, for subcutaneous or intravenous use: highlights of prescribing information. Available from https://pi.lilly.com/us/lyumjev-uspi.pdf?s=pi. Accessed 30 September 2020

**Appx290**

LANE ET AL.

33. Eli Lilly Nederland BV. Lyumjev (previously Liumjev): summary of product characteristics. Available from https://www.ema.europa.eu/en/documents/product-information/lyumjev-previously-liumjev-epar-product-information_en.pdf. Accessed 30 September 2020

34. Eli Lilly Japan KK. Lyumjev injection 100 U/mL. Available from https://www.pmda.go.jp/files/000235075.pdf. Accessed 30 October 2020

35. MannKind Corporation. Afrezza (insulin human) inhalation powder prescribing information. Available from https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/022472lbl.pdf. Accessed 31 July 2020

36. American Diabetes Association. 7. Diabetes technology: *Standards of Medical Care in Diabetes—2021.* Diabetes Care 2021;44(Suppl. 1):S85–S99

37. Gomez-Peralta F, Abreu C, Gomez-Rodriguez S, et al. Efficacy of Insulclock in patients with poorly controlled type 1 diabetes mellitus: a pilot, randomized clinical trial. Diabetes Technol Ther 2020;22:686–690

**Appx291**

Declaration of Dr. Nathan Laney

# Exhibit F

# Importance of Postprandial Glucose in Relation to A1C and Cardiovascular Disease

Kenneth S. Hershon,[1] Barbara R. Hirsch,[1] and Ola Odugbesan[2]

◼ **IN BRIEF** This article reviews the evidence regarding the impact of postprandial glucose (PPG) on overall A1C and its relation to cardiovascular disease (CVD). To date, four randomized, controlled trials have evaluated the impact of PPG reduction on CVD; however, only one of these successfully demonstrated a positive effect. Despite this, epidemiological evidence does indicate a cardiovascular benefit of PPG reduction, and agents that can be used to manage PPG in people with type 2 diabetes are also discussed.

In people without diabetes, ingestion of food results in a transient increase in plasma glucose, which elicits a postprandial increase in the secretion of insulin from pancreatic β-cells and suppression of glucagon secretion from α-cells. In people with type 2 diabetes, however, this normal response to blood glucose spikes is dampened, primarily due to reduced insulin production resulting from β-cell dysfunction and loss combined with insulin resistance, leading to hyperglycemia (1). Hyperglycemia is associated with increased risk of microvascular complications such as retinopathy, neuropathy, and nephropathy, as well as macrovascular complications, including increased risk of myocardial infarction (MI), cardiovascular disease (CVD), and stroke (2).

The achievement of glycemic control is the key principle in diabetes management. A1C provides a good indication of overall glycemic control during the previous 2–3 months and remains the gold standard for assessing glycemic control in patients with diabetes (3,4). As a result, treatment guidelines for diabetes have historically focused on reducing A1C to specified targets.

**KEY POINTS**
- Postprandial glucose (PPG) is a significant contributor to A1C that is often overlooked.
- Long-term goals cannot be achieved by targeting only fasting plasma glucose levels.
- PPG is an independent risk factor for cardiovascular disease.
- PPG should be measured after breakfast because post-breakfast excursions tend to be larger and more consistent, with lower day-to-day variation.

For example, the American Diabetes Association (ADA) recommends A1C targets ranging from <6.5% to <8.0% depending on factors such as patients' health, comorbid conditions, and duration of diabetes (5). The International Diabetes Federation (IDF), the American Association of Clinical Endocrinologists (AACE), and the American College of Endocrinology recommend a target of <6.5% where possible, with individualization of goals depending on patients' needs (6,7).

It is now well established that A1C levels are the result of a combination

[1]North Shore Diabetes and Endocrine Associates, New Hyde Park, NY

[2]North Atlanta Endocrinology and Diabetes, Lawrenceville, GA

Corresponding author: Kenneth S. Hershon, khershon@optonline.net

https://doi.org/10.2337/cd18-0040

©2019 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. See www.diabetesjournals.org/content/license for details.

**Appx293**

HERSHON ET AL.

of both fasting plasma glucose (FPG) and postprandial glucose (PPG) levels (8,9), with the relative importance of each depending on factors such as the degree of glycemic control (9). Treatment may also influence this FPG-PPG relationship. For example, basal insulin primarily reduces FPG. Therefore, after its initiation in patients treated with oral antidiabetic drugs (OADs) with uncontrolled hyperglycemia, it is PPG that accounts for the majority (approximately two-thirds) of residual hyperglycemia (10). It has become increasingly apparent that long-term A1C target levels cannot be achieved by treating only FPG; rather, PPG must also be targeted by therapeutic strategies (11). Consequently, most treatment guidelines now include specific PPG targets alongside A1C and FPG targets. The ADA/European Association for the Study of Diabetes guidelines recommend targets of A1C <7.0%, FPG 80–130 mg/dL, and PPG <180 mg/dL (5); the IDF recommends targets of A1C <7.0%, FPG 115 mg/dL, and PPG <160 mg/dL (6); and AACE recommends targets of A1C <7.0%, FPG 110 mg/dL, and PPG ≤140 mg/dL (7). However, current strategies and therapies (i.e., metformin, sulfonylureas, thiazolidinediones, and basal insulins) are mainly effective in controlling FPG; the importance of PPG, particularly in maintaining long-term glycemic control, has been given less attention (12).

Studies have shown that, in addition to its contribution to overall A1C, PPG is an independent risk factor for CVD, with a demonstrated linear relationship of PPG and risk of cardiovascular (CV) death (13). Although a significant number of publications support PPG being an independent risk factor for CVD and death, data have varied (14–22). Furthermore, a prospective study was conducted in subjects with previously undiagnosed diabetes who had demonstrated no fasting hyperglycemia, in which subjects underwent oral glucose tolerance testing. This study concluded that, of those with isolated post-challenge hyperglycemia, women but not men showed a significantly increased risk of fatal CVD and heart disease compared to those without diabetes (23).

In this article, we review the evidence regarding the impact of PPG on overall A1C and its relationship to CVD in an attempt to help reach a consensus on the importance of controlling PPG in people with type 2 diabetes.

## Impact of PPG on A1C

It is clear that A1C, as an index of overall glycemic control, is significantly affected by both FPG and PPG, although the data concerning the relative importance of each to A1C levels was initially varied. Monnier and Colette (9) investigated the relative contributions to A1C of FPG and PPG depending on the A1C level in an attempt to conciliate these different results. The group determined that the relative contributions changed, depending on whether patients' diabetes was well controlled or not, with PPG excursions predominating at lower A1C levels, and FPG predominating at higher A1C levels. They calculated that the relative contribution of PPG is 70% in patients with A1C <7.3%, reducing to 30% in patients with A1C >10.2% (Figure 1) (9).

A later analysis of data from six studies of treatment intensification with insulin or additional OADs supported these findings, determining that, where A1C is >7.0% despite OAD therapy, FPG dominates glucose exposure, contributing an average of 76–80% to hyperglycemia (10). The study also suggested that the type of antihyperglycemic treatment used may be more significant than the A1C level alone. Despite similar A1C levels, basal insulin reduced the FPG contribution to 32–41%, whereas alternative intensification regimens (i.e., insulin lispro, premixed insulin, or additional OADs) reduced the FPG contribution to 64–71% (10).

In a recent meta-analysis of 14 studies in patients with type 1 or type 2 diabetes, stronger correlations were found between PPG and A1C than between FPG and A1C (24). Furthermore, decreases in PPG resulted in greater A1C reductions than FPG reductions (24).

It has also been reported that, in type 2 diabetes, elevated PPG is one of the earliest abnormalities of glucose homeostasis, often arising before elevated FPG. This is distinctly exaggerated in patients with elevated FPG (25,26). Regardless of the exact contributions of each, the evidence clearly suggests that PPG and FPG are both significant contributors to A1C; therefore, both should be considered during treatment.

## Impact of PPG on CVD

In addition to an increase in risk of microvascular complications, diabetes is associated with an overall two- to fourfold increased risk of developing CVD (1). Indeed, CVD is by far the



■ **FIGURE 1.** Relative contributions of postprandial (□) and fasting (■) hyperglycemia (%) to the overall diurnal hyperglycemia over quintiles of A1C. [a]Significant difference between FPG and PPG (paired $t$ test). [b]Significantly different from all other quintiles (analysis of variance [ANOVA]). [c]Significantly different from quintile 5 (ANOVA). Reprinted with permission from ref. 8.

FEATURE ARTICLE

**Appx294**

single largest cause of mortality in patients with type 2 diabetes, accounting for up to 75–80% of deaths (2,27). Traditional risk factors for diabetes such as hypertension, obesity, and atherogenic dyslipidemia do not fully account for the increased risk of CVD associated with diabetes (2). Increased A1C levels are well known to be associated with increased CVD risk, implying the contribution of PPG to A1C is a significant factor in this increased risk (2). In addition, most epidemiological studies agree that PPG is a significant independent risk factor for CVD and MI, regardless of whether a person has diabetes (28,29).

Studies have also shown that, in addition to CV events, PPG is a predictor of CV-related and all-cause mortality, whereas it appears that FPG is not (30). In the Honolulu Heart Program conducted in Japanese-American men aged 45–68 years, there was an increased risk of coronary heart disease (CHD) in patients with abnormal oral glucose tolerance test results (14). Similar results were seen in the Baltimore Longitudinal Study of Aging, which concluded that, regardless of FPG and A1C, a higher 2-hour PPG level was associated with increased risks of CVD, CVD mortality, and all-cause mortality (16). The Diabetes Epidemiology: Collaborative Analysis of Diagnostic Criteria in Europe (DECODE) study analyzed data from 10 prospective European cohort studies that included 15,388 men and 7,126 women aged 30–89 years. The authors concluded that 2-hour PPG values were a better predictor than FPG of death from all causes and CVD, with the largest number of excess deaths being observed in patients showing impaired glucose tolerance (IGT) after a 2-hour oral glucose test but normal FPG levels (17). Additional analysis showed that mortality associated with FPG concentration was largely dependent on 2-hour PPG levels. In this study, ~33% of men and ~44% of women who had diabetes according to the 2-hour PPG values were not identified as having diabetes according to their FPG levels, highlighting the diagnostic value of PPG measurement (17).

It is important to stress that the Honolulu Heart Program, the Baltimore Longitudinal Study of Aging, and DECODE were non-interventional studies that looked at subjects who did not have diagnosed diabetes. It is therefore unclear whether they can inform us on how to better treat those with diagnosed diabetes.

A post hoc analysis determined that a prandial strategy targeting PPG with three premeal doses of insulin lispro daily may be associated with lower risk of subsequent CV events than a basal strategy of twice-daily NPH or once-daily insulin glargine 100 units/mL in older patients (19). A caveat of this study, which should be considered, is that the magnitude of the differences in PPG levels between the two treatment regimens was smaller than expected, and the trial was eventually stopped due to lack of efficacy (18).

A number of other studies support the findings from these studies that PPG levels are linked to CVD. In a 14-year follow-up of patients with type 2 diabetes managed in routine clinical practice, PPG and A1C, but not FPG, were found to have similar predictive power for CV events and all-cause mortality (20), whereas a review of a large number of epidemiological studies concluded that PPG is, in fact, a more powerful risk factor than either A1C or FPG (31). In the Study to Prevent Non-Insulin-Dependent Diabetes Mellitus (STOP-NIDDM), patients with IGT were randomized to receive either placebo or acarbose, an α-glucosidase inhibitor (AGI) that lowers PPG. In addition to a 25% relative risk reduction in the development of type 2 diabetes and a 34% risk reduction for hypertension, patients treated with acarbose had a 49% risk reduction of developing CV events (32). Additionally, in a substudy of STOP-NIDDM, patients treated with acarbose showed a reduced incidence of silent MIs compared to those receiving placebo (33). The Acarbose Cardiovascular Evaluation trial, conducted in Chinese patients with IGT and CHD, showed no significant difference between acarbose and placebo for incidence of primary five-point composite outcome (CV death, nonfatal MI, nonfatal stoke, hospital admission for unstable angina, and hospital admission for heart failure) or any secondary CV outcomes (34). However, patients treated with acarbose did have a reduced incidence of diabetes.

A number of studies have given indications as to the underlying mechanisms for the association between PPG levels and CV risk. For example, a study of patients without diabetes showed that higher 1-hour PPG levels were significantly associated with increased arterial stiffness as determined by cardio-ankle vascular index values, a measure of the stiffness of the aorta, femoral artery, and tibial artery (35). Furthermore, in the Risk Factors in Impaired Glucose Tolerance for Atherosclerosis and Diabetes study, there was a closer correlation between PPG and carotid intima-media thickness than FPG in patients with IGT (36).

Hypertriglyceridemia is also a risk factor for CVD and is amplified in the postprandial state, rising concomitantly with postprandial hyperglycemia. Despite this, evidence suggests a direct atherogenic role for postprandial hyperglycemia independent of that of lipids (29). Postprandial hypertriglyceridemia has been shown to be associated with increased carotid intima-media thickness in patients with diabetes, meaning that it may be an independent risk factor for early atherosclerosis in these patients (37). Furthermore, the progression of atherosclerosis has also been shown to be slowed and even reversed by therapies that reduce PPG (38).

PPG has been shown to stimulate oxidative stress, which has been implicated as the underlying cause of

HERSHON ET AL.

both macrovascular and microvascular complications in type 2 diabetes (39–42). Indeed, epidemiological and other studies have demonstrated a strong association between PPG and CV risk through oxidative stress, carotid intima-media thickness, and endothelial dysfunction (16,17). Glucose fluctuations have been shown to have a linear correlation with increased production of free radicals, and PPG induces overproduction of superoxide, which reacts with nitrous oxide to create derivatives that lead to endothelial damage (43). In the Nateglinide and Valsartan in Impaired Glucose Tolerance Outcomes Research study, treatment of patients with IGT with the angiotensin II receptor antagonist valsartan (which reduces blood pressure) did not affect CV outcomes (21). It should be noted, however, that the patients in this trial were not hypertensive, and valsartan was not used for blood pressure control (21). Thus, the observed effects of PPG on CV outcomes may not be explained by increased blood pressure associated with hyperglycemia.

In summary, in addition to its significant contribution to A1C, the literature strongly indicates that PPG is an independent risk factor for CVD. It remains unclear, however, whether the most important aspect of PPG is how frequently it is above the optimal range or whether it is its maximal values. Regardless of this, the impact of PPG on CVD implies that reducing PPG in patients with diabetes may be of significant benefit to their long-term prognosis and quality of life, even though demonstration of this benefit in randomized controlled trials has been elusive.

## Monitoring PPG

Although widely used and recommended for monitoring glycemic control, the cost of A1C testing is high, which means its availability is very limited in resource-poor settings (24). Given that studies indicate that PPG and A1C have similar predictive pow-

er for CV outcomes, regular monitoring of PPG with plasma glucose testing, which is considerably less costly and easier to perform, may represent a viable and practical alternative that enables the improvement of overall glycemic control and reduced the risk of CV complications.

Data from an observational study of people with type 2 diabetes suggest that PPG readings preferably should be obtained after breakfast rather than after lunch or dinner because post-breakfast excursions tend to be larger and more consistent, with lower day-to-day variation (44). Furthermore, the median time to peak concentration in this study was ~90 minutes, indicating that this is the time after the start of the meal that the reading should be taken (44). Postprandial self-monitoring of blood glucose (pp-SMBG) has been shown to be associated with improvements in glycemia, lipids, and weight, as well as exercise and dietary habits in subjects who have already reached their A1C goals; this provides a rationale for implementation of pp-SMBG when possible (45).

Diabetes organizations are increasingly recognizing that continuous glucose monitoring (CGM) may be an appropriate and useful diabetes management tool, especially in patients on insulin therapy. CGM technology is advancing rapidly; for example, the FreeStyle Libre and FreeStyle Libre Pro "flash" CGM systems do not require fingerstick calibration. While the Freestyle Libre system is intended to be used by patients for diabetes self-management, the FreeStyle Libre Pro is the first flash CGM system available for professional use in clinical practice. In a significant improvement over previous systems, the sensor is factory calibrated and can be continuously worn for up to 14 days, requiring no calibration via SMBG during that time period. Another system, the Dexcom G5, still requires calibration using SMBG; however, it has been granted a nonadjunctive indication by the U.S. Food and Drug

Administration (FDA), meaning its readings alone can be used to modify therapy (46). More recently, the FDA approved the Dexcom G6 system, which does not require fingerstick calibration. Similarly, the FreeStyle Libre device does not require fingerstick SMBG calibration.

## Reducing PPG

The most important and effective first step in diabetes management is to encourage patients to make lifestyle modifications, including increasing exercise and improving diet. However, diabetes is a progressive disease, and all patients will eventually require pharmacological treatment to maintain glycemic control. In general, treatment strategies to reduce A1C have focused on controlling FPG; however, as discussed, PPG is an important contributor to A1C. Controlling PPG is therefore a major unmet need, particularly in patients with longer durations of type 2 diabetes (12).

A number of treatment options are available to target PPG, including AGIs, amylin analogs, glinides, dopamine agonists, glucagon-like peptide 1 (GLP-1) receptor agonists, dipeptidyl peptidase-4 (DPP-4) inhibitors, sodium–glucose cotransporter 2 (SGLT2) inhibitors, and rapid-acting insulins (Table 1) (3,47–62). Treatment guidelines provide algorithms for the intensification of therapy, including many of these agents, and recommend that specific strategies and choices should be based on patient- and disease-specific factors (5–7).

### Insulin Therapy

In patients treated with basal insulin who are not achieving glycemic targets, prandial rapid-acting insulin analogs or premixed insulin formulations consisting of intermediate and rapid-acting insulin are often initiated (63). Rapid-acting insulins are a well-established and effective treatment for patients requiring prandial control. However, adverse effects associated with rapid-acting insulin

FEATURE ARTICLE

**TABLE 1. FDA-Approved Pharmacological Interventions That Target Postprandial Hyperglycemia***

| Agent | Mode of Action | A1C Reduction, % | PPG Reduction, mmol/L (mg/dL) | CV Benefit |
|---|---|---|---|---|
| **AGIs** | | | | |
| Acarbose | Inhibits carbohydrate digestion, delaying absorption | 0.4–0.8 | 4.0 (72) | |
| Miglitol | Inhibits carbohydrate digestion, delaying absorption; enhances GLP-1 activity | 0.2–0.8 | 1.5–3.5 (27–63) | |
| **Amylin analogs** | | | | |
| Pramlintide | Slows gastric emptying; suppresses glucagon activity; increases satiety | 0.6 | 2.0 (36) | |
| **Glinides** | | | | |
| Repaglinide | Stimulates insulin release | 0.6–1.5 | 2.6 (47) | |
| Nateglinide | Stimulates insulin release | 0.5–0.8 | 2.6 (47) | |
| **Insulin** | | | | |
| Rapid-acting | | 1.5–2.5 | | |
| **SGLT2 inhibitors** | | | | |
| Canagliflozin | Inhibition of glucose reuptake in the kidney; short-term inhibition of intestinal SLGT1 at higher doses | 0.8–1.0 | 2.4–3.3 (43–59) | ✓ |
| Dapagliflozin | Inhibition of glucose reuptake in the kidney | 0.6–1.0 | 3.6–3.8 (65–68) | |
| Empagliflozin | Inhibition of glucose reuptake in the kidney | 0.7–0.8 | 2.0–2.6 (36–47) | |
| **Incretin-based agents** | | | | |
| *GLP-1 receptor agonists* | | | | |
| Exenatide | Enhances insulin secretion; inhibits glucagon release after eating; delays gastric emptying; promotes satiety | 0.5–1.0† | 3.6 (65) | |
| | Short-acting: predominant effect on PPG | | | |
| | Long-acting: predominant effect on FPG | | | |
| Liraglutide | Enhances insulin secretion; inhibits glucagon release after eating | 1.0–1.5† | 1.7–2.7 (31–49) | ✓ |
| | Predominant effect on FPG | | | |
| Lixisenatide | Enhances insulin secretion; inhibits glucagon release after eating; delays gastric emptying; promotes satiety | 0.5–0.9 | 3.1–5.9 (56–106) | |
| | Predominant effect on PPG | | | |
| *DPP-4 inhibitors* | | | | |
| Sitagliptin | Inhibits DPP-4, increasing levels of GLP-1 | 0.6–0.8 | 2.8 (50) | |
| Saxagliptin | Inhibits DPP-4, increasing levels of GLP-1 | 0.6–0.8 | 2.8 (50) | |
| **Combination agents** | | | | |
| iDegLira | Complementary action of basal insulin on FPG and GLP-1 receptor agonist on PPG | 0.8–1.9 | Not reported | |
| iGlarLixi | Complementary action of basal insulin on FPG and GLP-1 receptor agonist on PPG | 1.1–1.6 | 4.7–5.7 (85–103) | |

*Adapted from refs. 3, 96, and 97, with additional data from refs. 47–62. *Used as monotherapy or in combination with other antidiabetic agents. †Assuming starting value ≥8%.*

Appx297

HERSHON ET AL.

analogs, including weight gain and increased risk of hypoglycemia, mean that patients and health care providers are often reluctant to initiate their use. In addition, data from population-based studies suggest that this approach may not be optimal, in terms of both long-term glycemic control and CV outcomes (12).

### AGIs

AGIs significantly reduce PPG-dependent insulinotropic polypeptide (gastric inhibitory polypeptide) secretion and are effective at reducing PPG by altering the intestinal absorption of carbohydrates (64,65). In general, AGIs have modest A1C-lowering effects and a low risk of hypoglycemia and require frequent dosing (7,66), and the action of AGIs means that undigested carbohydrates reach the colon, resulting in flatulence and diarrhea (67). Although this effect may lessen over time, gastrointestinal side effects make AGIs difficult to tolerate for many patients, and this has limited their use (7).

### Amylin Analogs

Amylin analogs target PPG by suppressing post-meal glucagon activity, slowing gastric emptying, and increasing satiety. This significantly reduces PPG and improves glycemic control when added to insulin and has a beneficial effect on weight (68). They are generally used as a supplement to basal insulin therapy in patients who are not meeting glycemic targets (69). The major disadvantages of amylin analogs are the need for multiple daily injections due to their short duration of action and increased risk of nausea. There is also an increased risk of hypoglycemia, although this is lower than with rapid-acting insulins (12).

### Glinides

Glinides are short-acting insulinotropic agents that rapidly increase insulin secretion and reduce PPG (70). Glinides are associated with an increased risk of hypoglycemia, although this is lower than that of sulfonylureas. They are also associated with

weight gain, require frequent dosing, and have only modest A1C-lowering effects (7,66).

### SGLT2 Inhibitors

SGLT2 inhibitors lower plasma glucose by inhibition of glucose reuptake in the kidney and so reduce both FPG and PPG (71). Canagliflozin 300 mg (maximum recommended dose) was shown to have provided greater reductions in PPG and insulin excursions, possibly related to a combination of renal SGLT2 inhibition and delayed absorption of ingested glucose due to intestinal SGLT1 inhibition (49). This insulin-independent mechanism of action means that they are not associated with weight gain, have a low risk of hypoglycemia, and can be used at any stage of type 2 diabetes. They have similar A1C-lowering efficacy to other OADs (7,66). Patients with type 2 diabetes and high risk for CV events who were treated with empagliflozin have been shown to have lower rates of a composite outcome of death from CV causes, nonfatal MI, or nonfatal stroke, as well as death from any cause, compared to placebo (71), and this was also seen in the canagliflozin CANVAS research program (72).

A disadvantage of SGLT2 inhibitors is that they result in elevated excretion of glucose in the urine, which is associated with urinary tract and genital infections in patients (particularly women) (73). Additionally, canagliflozin carries a black-box warning for lower-limb amputation, with an approximately twofold increased risk observed in patients with type 2 diabetes either with established CVD or at risk of CVD (74). However, it should be considered that the absolute risk remains low.

### DPP-4 Inhibitors

DPP-4 inhibitors (i.e., sitagliptin, vildagliptin, saxagliptin, and linagliptin) are incretin-based therapies that provide another way of targeting PPG. They are associated with weight loss and lower risk of hypoglycemia than rapid-acting insulin. DPP-4 inhibitors prevent DPP-4

from degrading native incretins such as GLP-1, which in turn activate the GLP-1 receptor. This results in DPP-4 inhibitors and GLP-1 receptor agonists having similar effects resulting from activation of the GLP-1 receptor; however, GLP-1 receptor agonists have been shown to provide superior glycemic control compared to DPP-4 inhibitors (3,75), effectively stimulating glucose-dependent insulin secretion and suppressing postprandial glucagon levels, and thereby reducing PPG (76).

Unlike rapid-acting insulin, DPP-4 inhibitors have a neutral effect on hypoglycemia and weight. Some may carry a risk of congestive heart failure; however, this is uncertain due to short follow-ups and low-quality evidence of studies (77). Recent analysis has suggested that only saxagliptin in the SAVOR-TIMI 53 trial resulted in increased hospitalization for heart failure (78,79).

### GLP-1 Receptor Agonists

GLP-1 receptor agonists are also an incretin-based therapy, meaning they have similar effects to DPP-4 inhibitors, resulting from activation of the GLP-1 receptor (3). As with DPP-4 inhibitors, this activation results in stimulation of insulin secretion and suppression of glucagon secretion from the pancreas in a glucose-dependent manner (11,80,81). They are also associated with a lower risk of hypoglycemia than rapid-acting insulins.

Because their mechanism of action differs from that of DPP-4 inhibitors, GLP-1 receptor agonists are associated with weight loss, whereas DPP-4 inhibitors are weight neutral; however, both classes are superior to rapid-acting insulins, which are associated with weight gain. The mechanism by which GLP-1 receptor agonists promote weight loss is multifactorial and involves both the brain and the gastrointestinal tract. They slow gastric emptying and increase satiety to varying degrees, resulting in reduced food intake and associated weight loss (11,82,83).

FEATURE ARTICLE

Appx298

Case 3:23-cv-20814-ZNQ-JBD    Document 30-6    Filed 12/08/23    Page 8 of 11 PageID: 419

Evidence suggests that GLP-1 receptor agonists result in better glycemic control and greater weight loss than DPP-4 inhibitors (75). A study has shown that GLP-1 receptors are required to be present in the central nervous system, while another study showed that a small peptide GLP-1 receptor agonist can penetrate the brain, subsequently activating certain neurons to stimulate weight loss (84,85).

Short-acting GLP-1 receptor agonists such as lixisenatide and exenatide have a predominant effect on PPG and are associated with a greater effect on gastric emptying. Longer-acting GLP-1 receptor agonists such as liraglutide, exenatide long-acting release, albiglutide, and dulaglutide have more of an effect on FPG and a lesser effect on gastric emptying. It seems that continuous stimulation of the GLP-1 receptor can attenuate this effect of gastric emptying via tachyphylaxis (5,86).

Overall, GLP-1 receptor agonists are associated with a lower incidence of hypoglycemia compared to insulin (87). Trials investigating the CV safety of GLP-1 receptor agonists show comparable (88,89) or reduced (90,91) CV outcomes compared to placebo in patients with diabetes. A meta-analysis of these four trials suggested a class effect of GLP-1 receptor agonists for improving CV outcomes. This analysis suggested that treatment with a GLP-1 receptor agonist results in a significant (10%) reduction in relative risk for three major adverse cardiac events (CV mortality, nonfatal MI, and nonfatal stroke). Furthermore, there were relative risk reductions of 13% for CV mortality and 12% for all-cause mortality. There was no identified impact of GLP-1 receptor agonist therapy on fatal and nonfatal MI, fatal and nonfatal stroke, hospital admission for unstable angina, or hospital admission for heart failure (92).

It should be noted that it is unlikely that these improved CV outcomes can be attributed solely to reduced PPG.

The meta-analysis included studies of longer-acting GLP-1 receptor agonists; although these do have a modest impact on PPG, it is likely a result of reduced basal glycemia. They have little to no sustained impact on the rate of gastric emptying, which is the factor most important for reduced PPG excursions seen with short-acting GLP-1 receptor agonists (85,93). The authors of the meta-analysis speculated that the CV effects may be related to antiatherogenic mechanisms, which affect common CV risk factors such as blood pressure, antiinflammatory pathways, cardiac output, ischemic conditioning, and endothelial function (92).

Another meta-analysis, which included a greater number of studies and compared GLP-1 receptor agonist treatment to placebo or any other non–GLP-1 receptor agonist drugs, showed similar results. Patients with type 2 diabetes treated with a GLP-1 receptor agonist had lower all-cause mortality, CV mortality, and MI rates, whereas no significant differences were seen for stroke or heart failure (94).

Given their complementary modes of action, the combination of a GLP-1 receptor agonist and basal insulin is potentially an attractive option to manage both PPG and FPG. Titratable fixed-ratio combinations of basal insulin glargine and the GLP-1 receptor agonist lixisenatide (iGlar-Lixi), and of insulin degludec and liraglutide (iDegLira), were approved by the FDA in 2016 and are now on the market. In clinical trials, once-daily injections of these formulations have been shown to result in greater A1C reduction than basal insulin or a GLP-1 receptor agonist alone. These trials have also shown weight gain associated with basal insulin therapy to be mitigated, hypoglycemia to be reduced, and gastrointestinal adverse effects to be reduced compared to GLP-1 receptor agonists alone (60–62,95).

## Conclusion

Studies have consistently demonstrated that PPG is a significant contributor to A1C and is also an independent risk factor for CVD. Long-term epidemiological studies and meta-analyses show that PPG, far more than FPG, is a predictor of CV risk. PPG is especially important to patients with diabetes who have achieved their FPG goal but whose A1C remains high. In patients with an A1C of ≥10.2%, PPG only contributes up to ~30% of 24-hour A1C; however, in patients closer to goal (A1C ≤7.3%), PPG contributes ~70% of 24-hour A1C (8). Therefore, patients who have achieved FPG goals but still have elevated A1C should consider PPG-targeting therapeutics.

Despite this association, studies have not consistently shown improved CV outcomes in patients taking PPG-lowering therapy. Although it is possible that PPG is merely a marker or surrogate for CV risk, it may be that the designs of studies conducted to date have been insufficient to fully answer this question (93). Overall, the data suggest that reducing PPG excursions may be protective against CVD. A range of available treatments can be used to target PPG, including rapid-acting insulin analogs, GLP-1 receptor agonists, DPP-4 inhibitors, and SGLT2 inhibitors.

Control of PPG should be considered equally as important as FPG control in people with type 2 diabetes. However, despite the increasing apparent importance of PPG, it is commonly ignored by primary care providers (PCPs) in lieu of FPG control. Often, PCPs have been trained to address FPG first and therefore believe that management of PPG is of lesser importance. Many PCPs have also acquired a familiarity and comfort with the use of basal insulin. However, basal insulin is effective only up to a tipping point of ~0.5 units/kg; thereafter, further titration will likely result in hypoglycemia and weight gain.

HERSHON ET AL.

Many patients are able to achieve an FPG target while their A1C remains high. At this point, agents targeting PPG are essential. However, these often require an additional injection, the use of carbohydrate counting, titration, or other nuances for which PCPs often have not been trained and would therefore be likely to refer such patients to an endocrinologist. Newer agents such as GLP-1 receptor agonists or fixed-ratio combinations may be added to basal insulin and can mitigate some of the issues of weight gain while not increasing the risk of hypoglycemia. However, there may be additional side effects with these agents, including increased gastrointestinal adverse effects, that will need to be managed.

## Acknowledgments

The authors received writing/editorial support in the preparation of this manuscript provided by Nick Patterson, PhD, and Rasilaben Vaghjiani, PhD, of Excerpta Medica.

## Funding

This review, and the writing/editorial support for it, were funded by Sanofi US, Inc.

## Duality of Interest

K.S.H. received honoraria for lectures from Amgen, AMH, Boehringer Ingelheim, Janssen, Mannkind, Novo Nordisk, and Primed and honoraria for consulting from Intarcia. B.R.H. is a consultant for Janssen, Merck, and Sanofi. O.O. is a consultant for AstraZeneca, Boehringer Ingelheim, Janssen, Lilly, Merck, Novo Nordisk, and Sanofi.

## Author Contributions

All authors contributed equally to the ideation and development of the manuscript. K.S.H. is the guarantor of this work and, as such, had full access to all the materials in the study and takes responsibility for the integrity of the materials and the accuracy of the dissemination of the materials.

## References

1. Madsbad S. Impact of postprandial glucose control on diabetes-related complications: how is the evidence evolving? J Diabetes Complications 2016;30:374–385

2. Båvenholm PN, Efendic S. Postprandial hyperglycaemia and vascular damage: the benefits of acarbose. Diab Vasc Dis Res 2006;3:72–79

3. Blevins T. Control of postprandial glucose levels with insulin in type 2 diabetes. Postgrad Med 2011;123:135–147

4. Fysekidis M, Cosson E, Banu I, Duteil R, Cyrille C, Valensi P. Increased glycemic variability and decrease of the postprandial glucose contribution to HbA1c in obese subjects across the glycemic continuum from normal glycemia to first time diagnosed diabetes. Metabolism 2014;63:1553–1561

5. American Diabetes Association. 6. Glycemic Targets: *Standards of Medical Care in Diabetes—2019.* Diabetes Care 2019;42(Suppl. 1):S61–S70

6. International Diabetes Federation Guideline Development Group. Global guideline for type 2 diabetes. Diabetes Res Clin Pract 2014;104:1–52

7. Garber AJ, Abrahamson MJ, Barzilay JI, et al. Consensus statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the comprehensive type 2 diabetes management algorithm—2017 executive summary. Endocr Pract 2017;23:207–238

8. Monnier L, Lapinski H, Colette C. Contributions of fasting and postprandial plasma glucose increments to the overall diurnal hyperglycemia of type 2 diabetic patients: variations with increasing levels of HbA(1c). Diabetes Care 2003;26:881–885

9. Monnier L, Colette C. Contributions of fasting and postprandial glucose to hemoglobin A1c. Endocr Pract 2006;12(Suppl. 1):42–46

10. Riddle M, Umpierrez G, DiGenio A, Zhou R, Rosenstock J. Contributions of basal and postprandial hyperglycemia over a wide range of A1C levels before and after treatment intensification in type 2 diabetes. Diabetes Care 2011;34:2508–2514

11. Gallwitz B. Implications of postprandial glucose and weight control in people with type 2 diabetes. Diabetes Care 2009;32(Suppl. 2):S322–S325

12. Riddle MC. Basal glucose can be controlled, but the postprandial problem persists: it's the next target! Diabetes Care 2017;40:291–300

13. Ceriello A, Hanefeld M, Leiter L, et al. Postprandial glucose regulation and diabetic complications. Arch Intern Med 2004;164:2090–2095

14. Donahue RP, Abbott RD, Reed DM, Yano K. Postchallenge glucose concentration and coronary heart disease in men of Japanese ancestry: Honolulu Heart Program. Diabetes 1987;36:689–692

15. Laws A, Marcus EB, Grove JS, Curb JD. Lipids and lipoproteins as risk factors for coronary heart disease in men with abnormal glucose tolerance: the Honolulu Heart Program. J Intern Med 1993;234:471–478

16. Sorkin JD, Muller DC, Fleg JL, Andres R. The relation of fasting and 2-h postchallenge plasma glucose concentrations to mortality: data from the Baltimore Longitudinal Study of Aging with a critical review of the literature. Diabetes Care 2005;28:2626–2632

17. DECODE Study Group, European Diabetes Epidemiology Group. Glucose tolerance and cardiovascular mortality: comparison of fasting and 2-hour diagnostic criteria. Arch Intern Med 2001;161:397–405

18. Raz I, Wilson PW, Strojek K, et al. Effects of prandial versus fasting glycemia on cardiovascular outcomes in type 2 diabetes: the HEART2D trial. Diabetes Care 2009;32:381–386

19. Raz I, Ceriello A, Wilson PW, et al. Post hoc subgroup analysis of the HEART2D trial demonstrates lower cardiovascular risk in older patients targeting postprandial versus fasting/premeal glycemia. Diabetes Care 2011;34:1511–1513

20. Cavalot F, Pagliarino A, Valle M, et al. Postprandial blood glucose predicts cardiovascular events and all-cause mortality in type 2 diabetes in a 14-year follow-up: lessons from the San Luigi Gonzaga Diabetes Study. Diabetes Care 2011;34:2237–2243

21. NAVIGATOR Study Group; McMurray JJ, Holman RR, Haffner SM, et al. Effect of valsartan on the incidence of diabetes and cardiovascular events. N Engl J Med 2010;362:1477–1490

22. Takao T, Suka M, Yanagisawa H, Iwamoto Y. Impact of postprandial hyperglycemia at clinic visits on the incidence of cardiovascular events and all-cause mortality in patients with type 2 diabetes. J Diabetes Investig 2017;8:600–608

23. Barrett-Connor E, Ferrara A. Isolated postchallenge hyperglycemia and the risk of fatal cardiovascular disease in older women and men: the Rancho Bernardo Study. Diabetes Care 1998;21:1236–1239

24. Ketema EB, Kibret KT. Correlation of fasting and postprandial plasma glucose with HbA1c in assessing glycemic control; systematic review and meta-analysis. Arch Public Health 2015;73:43

25. American Diabetes Association. Postprandial blood glucose. Diabetes Care 2001;24:775–778

26. Abrahamson MJ. Optimal glycemic control in type 2 diabetes mellitus: fasting and postprandial glucose in context. Arch Intern Med 2004;164:486–491

27. Peter R, Okoseime OE, Rees A, Owens DR. Postprandial glucose: a potential therapeutic target to reduce cardiovascular mortality. Curr Vasc Pharmacol 2009;7:68–74

28. Qiao Q, Dekker JM, de Vegt F, et al. Two prospective studies found that elevated 2-hr glucose predicted male mortality independent of fasting glucose and HbA1c. J Clin Epidemiol 2004;57:590–596

29. Ceriello A. Postprandial hyperglycemia and diabetes complications: is it time to treat? Diabetes 2005;54:1–7

FEATURE ARTICLE

Appx300

■ FEATURE ARTICLE

30. Cavalot F, Petrelli A, Traversa M, et al. Postprandial blood glucose is a stronger predictor of cardiovascular events than fasting blood glucose in type 2 diabetes mellitus, particularly in women: lessons from the San Luigi Gonzaga Diabetes Study. J Clin Endocrinol Metab 2006;91:813–819

31. Beisswenger P, Heine RJ, Leiter LA, Moses A, Tuomilehto J. Prandial glucose regulation in the glucose triad: emerging evidence and insights. Endocrine 2004;25:195–202

32. Chiasson JL. Acarbose for the prevention of diabetes, hypertension, and cardiovascular disease in subjects with impaired glucose tolerance: the Study to Prevent Non-Insulin-Dependent Diabetes Mellitus (STOP-NIDDM) trial. Endocr Pract 2006;12(Suppl. 1):25–30

33. Zeymer U, Schwarzmaier-D'assie A, Petzinna D, Chiasson JL; STOP-NIDDM Trial Research Group. Effect of acarbose treatment on the risk of silent myocardial infarctions in patients with impaired glucose tolerance: results of the randomised STOP-NIDDM trial electrocardiography substudy. Eur J Cardiovasc Prev Rehabil 2004;11:412–415

34. Holman RR, Coleman RL, Chan JCN, et al.; ACE Study Group: Effects of acarbose on cardiovascular and diabetes outcomes in patients with coronary heart disease and impaired glucose tolerance: a randomised, double-blind, placebo-controlled trial. Lancet Diabetes Endocrinol 2017;5:877–886

35. Tsuboi A, Ito C, Fujikawa R, Yamamoto H, Kihara Y. Association between the postprandial glucose levels and arterial stiffness measured according to the cardio-ankle vascular index in non-diabetic subjects. Intern Med 2015;54:1961–1969

36. Hanefeld M, Koehler C, Henkel E, Fuecker K, Schaper F, Temelkova-Kurktschiev T. Post-challenge hyperglycaemia relates more strongly than fasting hyperglycaemia with carotid intima-media thickness: the RIAD Study: risk factors in impaired glucose tolerance for atherosclerosis and diabetes. Diabet Med 2000;17:835–840

37. Teno S, Uto Y, Nagashima H, et al. Association of postprandial hypertriglyceridemia and carotid intima-media thickness in patients with type 2 diabetes. Diabetes Care 2000;23:1401–1406

38. Leiter LA, Ceriello A, Davidson JA, et al.; International Prandial Glucose Regulation Study Group. Postprandial glucose regulation: new data and new implications. Clin Ther 2005;27(Suppl. B):S42–S56

39. Monnier L, Mas E, Ginet C, et al. Activation of oxidative stress by acute glucose fluctuations compared with sustained chronic hyperglycemia in patients with type 2 diabetes. JAMA 2006;295:1681–1687

40. Brownlee M. The pathobiology of diabetic complications: a unifying mechanism. Diabetes 2005;54:1615–1625

41. Ceriello A, Falletti E, Motz E, et al. Hyperglycemia-induced circulating ICAM-1 increase in diabetes mellitus: the possible role of oxidative stress. Horm Metab Res 1998;30:146–149

42. Cominacini L, Pasini AF, Garbin U, et al. E-selectin plasma concentration is influenced by glycaemic control in NIDDM patients: possible role of oxidative stress. Diabetologia 1997;40:584–589

43. Giugliano D, Ceriello A, Esposito K. Glucose metabolism and hyperglycemia. Am J Clin Nutr 2008;87:217S–222S

44. Cichosz SL, Fleischer J, Hoeyem P, et al. Assessment of postprandial glucose excursions throughout the day in newly diagnosed type 2 diabetes. Diabetes Technol Ther 2013;15:78–83

45. Zhang DA, Katznelson L, Li M. Postprandial glucose monitoring further improved glycemia, lipids, and weight in persons with type 2 diabetes mellitus who had already reached hemoglobin A1c goal. J Diabetes Sci Technol 2012;6:289–293

46. Carlson AL, Mullen DM, Bergenstal RM. Clinical use of continuous glucose monitoring in adults with type 2 diabetes. Diabetes Technol Ther 2017;19(Suppl. 2):S4–S11

47. Stenlöf K, Cefalu WT, Kim KA, et al. Efficacy and safety of canagliflozin monotherapy in subjects with type 2 diabetes mellitus inadequately controlled with diet and exercise. Diabetes Obes Metab 2013;15:372–382

48. Lavalle-González FJ, Januszewicz A, Davidson J, et al. Efficacy and safety of canagliflozin compared with placebo and sitagliptin in patients with type 2 diabetes on background metformin monotherapy: a randomised study. Diabetologia 2013;56:2582–2592

49. Polidori D, Sha S, Mudaliar S, et al. Canagliflozin lowers postprandial glucose and insulin by delaying intestinal glucose absorption in addition to increasing urinary glucose excretion: results of a randomized, placebo-controlled study. Diabetes Care 2013;36:2154–2161

50. Rosenstock J, Vico M, Wei L, Salsali A, List JF. Effects of dapagliflozin, an SGLT2 inhibitor, on HbA(1c), body weight, and hypoglycemia risk in patients with type 2 diabetes inadequately controlled on pioglitazone monotherapy. Diabetes Care 2012;35:1473–1478

51. Bailey CJ, Gross JL, Pieters A, Bastien A, List JF. Effect of dapagliflozin in patients with type 2 diabetes who have inadequate glycaemic control with metformin: a randomised, double-blind, placebo-controlled trial. Lancet 2010;375:2223–2233

52. Strojek K, Yoon KH, Hruba V, Elze M, Langkilde AM, Parikh S. Effect of dapagliflozin in patients with type 2 diabetes who have inadequate glycaemic control with glimepiride: a randomized, 24-week, double-blind, placebo-controlled trial. Diabetes Obes Metab 2011;13:928–938

53. Häring HU, Merker L, Seewaldt-Becker E, et al.; EMPA-REG METSU Trial Investigators. Empagliflozin as add-on to metformin plus sulfonylurea in patients with type 2 diabetes: a 24-week, randomized, double-blind, placebo-controlled trial. Diabetes Care 2013;36:3396–3404

54. Häring HU, Merker L, Seewaldt-Becker E, et al.; EMPA-REG MET Trial Investigators. Empagliflozin as add-on to metformin in patients with type 2 diabetes: a 24-week, randomized, double-blind, placebo-controlled trial. Diabetes Care 2014;37:1650–1659

55. Kovacs CS, Seshiah V, Swallow R, et al.; EMPA-REG PIO Trial Investigators. Empagliflozin improves glycaemic control and weight control as add-on therapy to pioglitazone or pioglitazone plus metformin in patients with type 2 diabetes: a 24-week, randomized, placebo-controlled trial. Diabetes Obes Metab 2014;16:147–158

56. Riddle MC, Aronson R, Home P, et al. Adding once-daily lixisenatide for type 2 diabetes inadequately controlled by established basal insulin: a 24-week, randomized, placebo-controlled comparison (GetGoal-L). Diabetes Care 2013;36:2489–2496

57. Riddle MC, Forst T, Aronson R, et al. Adding once-daily lixisenatide for type 2 diabetes inadequately controlled with newly initiated and continuously titrated basal insulin glargine: a 24-week, randomized, placebo-controlled study (GetGoal-Duo 1). Diabetes Care 2013;36:2497–2503

58. Ahrén B, Leguizamo Dimas A, Miossec P, Saubadu S, Aronson R. Efficacy and safety of lixisenatide once-daily morning or evening injections in type 2 diabetes inadequately controlled on metformin (GetGoal-M). Diabetes Care 2013;36:2543–2550

59. Rodbard HW, Bode BW, Harris SB, et al.; Dual Action of Liraglutide and Insulin Degludec (DUAL) IV Trial Investigators. Safety and efficacy of insulin degludec/liraglutide (IDegLira) added to sulphonylurea alone or to sulphonylurea and metformin in insulin-naïve people with type 2 diabetes: the DUAL IV trial. Diabet Med 2017;34:189–196

60. Gough SCL, Bode B, Woo V, et al.; NN9068-3697 (DUAL-I) Trial Investigators. Efficacy and safety of a fixed-ratio combination of insulin degludec and liraglutide (IDegLira) compared with its components given alone: results of a phase 3, open-label, randomised, 26-week, treat-to-target trial in insulin-naïve patients with type 2 diabetes. Lancet Diabetes Endocrinol 2014;2:885–893

61. Rosenstock J, Aronson R, Grunberger G, et al.; LixiLan-O Trial Investigators. Benefits of lixilan, a titratable fixed-ratio combination of insulin glargine plus lixisenatide, versus insulin glargine and lixisenatide monocomponents in type 2

Appx301

diabetes inadequately controlled with oral agents: the LixiLan-O randomized trial. Diabetes Care 2016;39:2026–2035

62. Aroda VR, Rosenstock J, Wysham C, et al.; LixiLan-L Trial Investigators. Efficacy and safety of LixiLan, a titratable fixed-ratio combination of insulin glargine plus lixisenatide in type 2 diabetes inadequately controlled on basal insulin and metformin: the LixiLan-L randomized trial. Diabetes Care 2016;39:1972–1980

63. Rhinehart AS. Adding GLP-1 receptor agonist therapy to basal insulin for postprandial glucose control. Clin Diabetes 2015;33:73–75

64. Sumi K, Ohkura T, Yamamoto N, et al. Long-term miglitol administration suppresses postprandial glucose-dependent insulinotropic polypeptide secretion. Diabetol Int 2013;4:190–196

65. DiNicolantonio JJ, Bhutani J, O'Keefe JH. Acarbose: safe and effective for lowering postprandial hyperglycaemia and improving cardiovascular outcomes. Open Heart 2015;2:e000327

66. Inzucchi SE, Bergenstal RM, Buse JB, et al. Management of hyperglycemia in type 2 diabetes, 2015: a patient-centered approach: update to a position statement of the American Diabetes Association and the European Association for the Study of Diabetes. Diabetes Care 2015;38:140–149

67. Hanefeld M. Cardiovascular benefits and safety profile of acarbose therapy in prediabetes and established type 2 diabetes. Cardiovasc Diabetol 2007;6:20

68. Pullman J, Darsow T, Frias JP. Pramlintide in the management of insulin-using patients with type 2 and type 1 diabetes. Vasc Health Risk Manag 2006;2:203–212

69. Edelman S, Garg S, Frias J, et al. A double-blind, placebo-controlled trial assessing pramlintide treatment in the setting of intensive insulin therapy in type 1 diabetes. Diabetes Care 2006;29:2189–2195

70. Owens DR, Luzio SD, Ismail I, Bayer T. Increased prandial insulin secretion after administration of a single preprandial oral dose of repaglinide in patients with type 2 diabetes. Diabetes Care 2000;23:518–523

71. Zinman B, Wanner C, Lachin JM, et al. Empagliflozin, cardiovascular outcomes, and mortality in type 2 diabetes. N Engl J Med 2015;373:2117–2128

72. Mahaffey KW, Neal B, Perkovic V, et al., on behalf of the CANVAS Program Collaborative Group. Canagliflozin for primary and secondary prevention of cardiovascular events: results from the CANVAS program (canagliflozin cardiovascular assessment study). Circulation 2018;137:323–334

73. Fujita Y, Inagaki N. Renal sodium glucose cotransporter 2 inhibitors as a novel

therapeutic approach to treatment of type 2 diabetes: clinical data and mechanism of action. J Diabetes Investig 2014;5:265–275

74. Janssen. Invokana prescribing information. Available from www.janssenlabels.com/package-insert/product-monograph/prescribing-information/INVOKANA-pi.pdf. Accessed 4 April 2018

75. Brunton S. GLP-1 receptor agonists vs. DPP-4 inhibitors for type 2 diabetes: is one approach more successful or preferable than the other? Int J Clin Pract 2014;68:557–567

76. Tanimoto M, Kanazawa A, Hirose T, et al. Comparison of sitagliptin with nateglinide on postprandial glucose and related hormones in drug-naïve Japanese patients with type 2 diabetes mellitus: a pilot study. J Diabetes Invest 2015;6:560–566

77. Li L, Li S, Deng K, et al. Dipeptidyl peptidase-4 inhibitors and risk of heart failure in type 2 diabetes: systematic review and meta-analysis of randomised and observational studies. BMJ 2016;352:i610

78. Scirica BM, Braunwald E, Raz I, et al.; SAVOR-TIMI 53 Steering Committee and Investigators. Heart failure, saxagliptin, and diabetes mellitus: observations from the SAVOR-TIMI 53 randomized trial. Circulation 2015;132:e198

79. Scheen AJ. Cardiovascular outcome studies with incretin-based therapies: comparison between DPP-4 inhibitors and GLP-1 receptor agonists. Diabetes Res Clin Pract 2017;127:224–237

80. Ahrén B, Galstyan G, Gautier JF, et al. Postprandial glucagon reductions correlate to reductions in postprandial glucose and glycated hemoglobin with lixisenatide treatment in type 2 diabetes mellitus: a post hoc analysis. Diabetes Ther 2016;7:583–590

81. Fineman MS, Cirincione BB, Maggs D, Diamant M. GLP-1 based therapies: differential effects on fasting and postprandial glucose. Diabetes Obes Metab 2012;14:675–688

82. Larsen PJ. Mechanisms behind GLP-1 induced weight loss. Br J Diabetes Vasc Dis 2008;8(Suppl. 2):S34–S41

83. Ottney A. Glucagon-like peptide-1 receptor agonists for weight loss in adult patients without diabetes. Am J Health Syst Pharm 2013;70:2097–2103

84. Secher A, Jelsing J, Baquero AF, et al. The arcuate nucleus mediates GLP-1 receptor agonist liraglutide-dependent weight loss. J Clin Invest 2014;124:4473–4488

85. Sisley S, Gutierrez-Aguilar R, Scott M, D'Alessio DA, Sandoval DA, Seeley RJ. Neuronal GLP1R mediates liraglutide's anorectic but not glucose-lowering effect. J Clin Invest 2014;124:2456–2463

86. Werner U. Effects of the GLP-1 receptor agonist lixisenatide on postprandial glucose

and gastric emptying—preclinical evidence. J Diabetes Complications 2014;28:110–114

87. Li Z, Zhang Y, Quan X, et al. Efficacy and acceptability of glycemic control of glucagon-like peptide-1 receptor agonists among type 2 diabetes: a systematic review and network meta-analysis. PLoS One 2016;11:e0154206

88. Pfeffer MA, Claggett B, Diaz R, et al.; ELIXA Investigators. Lixisenatide in patients with type 2 diabetes and acute coronary syndrome. N Engl J Med 2015;373:2247–2257

89. Holman RR, Bethel MA, Mentz RJ, et al.; EXSCEL Study Group. Effects of once-weekly exenatide on cardiovascular outcomes in type 2 diabetes. N Engl J Med 2017;377:1228–1239

90. Marso SP, Bain SC, Consoli A, et al.; SUSTAIN-6 Investigators. Semaglutide and cardiovascular outcomes in patients with type 2 diabetes. N Engl J Med 2016;375:1834–1844

91. Marso SP, Daniels GH, Brown-Frandsen K, et al.; LEADER Steering Committee; LEADER Trial Investigators. Liraglutide and cardiovascular outcomes in type 2 diabetes. N Engl J Med 2016;375:311–322

92. Bethel MA, Patel RA, Merrill P, et al.; EXSCEL Study Group. Cardiovascular outcomes with glucagon-like peptide-1 receptor agonists in patients with type 2 diabetes: a meta-analysis. Lancet Diabetes Endocrinol 2018;6:105–113

93. Owens DR, Monnier L, Hanefeld M. A review of glucagon-like peptide-1 receptor agonists and their effects on lowering postprandial plasma glucose and cardiovascular outcomes in the treatment of type 2 diabetes mellitus. Diabetes Obes Metab 2017;19:1645–1654

94. Monami M, Zannoni S, Pala L, et al. Effects of glucagon-like peptide-1 receptor agonists on mortality and cardiovascular events: a comprehensive meta-analysis of randomized controlled trials. Int J Cardiol 2017;240:414–421

95. Lingvay I, Pérez Manghi F, García-Hernández P, et al.; DUAL V Investigators. Effect of insulin glargine up-titration vs insulin degludec/liraglutide on glycated haemoglobin in patients with uncontrolled type 2 diabetes: the DUAL V randomized clinical trial. JAMA 2016;315:898–907

96. Drucker DJ, Sherman SI, Gorelick FS, Bergenstal RM, Sherwin RS, Buse JB. Incretin-based therapies for the treatment of type 2 diabetes: evaluation of the risks and benefits. Diabetes Care 2010;33:428–433

97. Singh AK, Singh R. Recent cardiovascular outcome trials of antidiabetic drugs: a comparative analysis. Indian J Endocrinol Metab 2017;21:4–10

FEATURE ARTICLE

Appx302

Declaration of Dr. Nathan Laney

# Exhibit G

Diabetes Care Volume 40, July 2017    943

  


Check for updates

# Fast-Acting Insulin Aspart Improves Glycemic Control in Basal-Bolus Treatment for Type 1 Diabetes: Results of a 26-Week Multicenter, Active-Controlled, Treat-to-Target, Randomized, Parallel-Group Trial (onset 1)

*Diabetes Care 2017;40:943–950 | https://doi.org/10.2337/dc16-1771*

David Russell-Jones,[1] Bruce W. Bode,[2] Christophe De Block,[3] Edward Franek,[4] Simon R. Heller,[5] Chantal Mathieu,[6] Athena Philis-Tsimikas,[7] Ludger Rose,[8] Vincent C. Woo,[9] Anne Birk Østerskov,[10] Tina Graungaard,[10] and Richard M. Bergenstal[11]

[1]Diabetes and Endocrinology, Royal Surrey County Hospital, and University of Surrey, Guildford, U.K.
[2]Atlanta Diabetes Associates, Atlanta, GA
[3]Department of Endocrinology, Diabetology, and Metabolism, Antwerp University Hospital, Antwerp, Belgium
[4]Mossakowski Medical Research Center, Polish Academy of Sciences, Warsaw, Poland
[5]Department of Oncology and Metabolism, University of Sheffield, Sheffield, U.K.
[6]Clinical and Experimental Endocrinology, University Hospital Leuven, Catholic University of Leuven, Leuven, Belgium
[7]Scripps Whittier Diabetes Institute, Scripps Health, San Diego, CA
[8]Institute of Diabetes Research, Münster, Germany
[9]Section of Endocrinology and Metabolism, University of Manitoba, Winnipeg, Manitoba, Canada
[10]Novo Nordisk A/S, Søborg, Denmark
[11]International Diabetes Center at Park Nicollet, Minneapolis, MN

Corresponding author: David Russell-Jones, davidrussell-jones@nhs.net.

Received 16 August 2016 and accepted 27 February 2017.

Clinical trial reg. no. NCT01831765, clinicaltrials.gov.

This article contains Supplementary Data online at http://care.diabetesjournals.org/lookup/suppl/doi:10.2337/dc16-1771/-/DC1.

© 2017 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. More information is available at http://www.diabetesjournals.org/content/license.

See accompanying articles, pp. 832 and 951.

Downloaded from http://diabetesjournals.org/care

EMERGING TECHNOLOGIES AND THERAPEUTICS

2023

## OBJECTIVE

This multicenter, treat-to-target, phase 3 trial evaluated the efficacy and safety of fast-acting insulin aspart (faster aspart) versus conventional insulin aspart (IAsp) in adults with type 1 diabetes.

## RESEARCH DESIGN AND METHODS

The primary end point was change from baseline in $HbA_{1c}$ after 26 weeks. After an 8-week run-in, subjects were randomized (1:1:1) to double-blind mealtime faster aspart ($n$ = 381), IAsp ($n$ = 380), or open-label postmeal faster aspart ($n$ = 382)—each with insulin detemir.

## RESULTS

$HbA_{1c}$ was reduced in both treatment groups, and noninferiority to IAsp was confirmed for both mealtime and postmeal faster aspart (estimated treatment difference [ETD] faster aspart–IAsp, mealtime, –0.15% [95% CI –0.23; –0.07], and postmeal, 0.04% [–0.04; 0.12]); mealtime faster aspart statistically significantly reduced $HbA_{1c}$ versus IAsp ($P$ = 0.0003). Postprandial plasma glucose (PPG) increments were statistically significantly lower with mealtime faster aspart at 1 h (ETD –1.18 mmol/L [95% CI –1.65; –0.71], –21.21 mg/dL [–29.65; –12.77]; $P$ < 0.0001) and 2 h (–0.67 mmol/L [–1.29; –0.04], –12.01 mg/dL [–23.33; –0.70]; $P$ = 0.0375) after the meal test; superiority to IAsp for the 2-h PPG increment was confirmed. The overall rate of severe or blood glucose–confirmed (plasma glucose <3.1 mmol/L [56 mg/dL]) hypoglycemic episodes and safety profiles were similar between treatments.

## CONCLUSIONS

Faster aspart effectively improved $HbA_{1c}$, and noninferiority to IAsp was confirmed, with superior PPG control for mealtime faster aspart versus IAsp. Subjects randomized to postmeal faster aspart for all meals maintained $HbA_{1c}$ noninferior to that obtained with mealtime IAsp.

**Appx304**

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/943/548330/dc161771.pdf by guest on 07 December 2023

Postprandial glycemic control is an essential component for meeting HbA$_{1c}$ target levels of 6.5–7% (48–53 mmol/mol) (1–3). Such targets are recommended by several guidelines to reduce the incidence and slow the progression of diabetes-related complications (4–6). Yet, limiting postprandial plasma glucose (PPG) excursions is one of the most challenging aspects in achieving adequate glycemic control (7).

Basal-bolus insulin therapy in type 1 diabetes aims to replace physiologic insulin secretion. Rapid-acting insulin analogs, insulins aspart, glulisine, and lispro, were developed to control PPG excursions more effectively than regular human insulin (RHI), primarily by offering a faster onset and shorter duration of action (8–10).

Innovative modifications of insulin formulations and delivery methods that offer ultrafast insulin time-action profiles (11–18) aim to further improve PPG control by accelerating insulin absorption and appearance in the bloodstream. Fast-acting insulin aspart (faster aspart; an ultrafast mealtime insulin) is conventional insulin aspart (IAsp; NovoRapid/NovoLog) in a new formulation; nonclinical data demonstrate that addition of niacinamide promotes the formation of insulin aspart monomers after subcutaneous injection, facilitating a more rapid rate of insulin aspart absorption across the endothelium into the blood (19). In adults with type 1 diabetes, subcutaneous injection of faster aspart was associated with twice-as-fast onset of appearance in the bloodstream (4 vs. 9 min), twofold higher insulin concentration, and 74% greater insulin action in the first 30 min compared with IAsp (20). Furthermore, in the recently completed phase 3 clinical trials, faster aspart improved 1-h PPG control versus IAsp when administered as part of a basal-bolus regimen (21) and demonstrated superior glycemic control versus basal-only therapy (22) in subjects with type 2 diabetes.

A large proportion (81.4%) of people with diabetes would like their insulin regimen to fit with their daily life changes (23), and the option to take their insulin dose after a meal when necessary may address this need.

The objective of this double-blind trial was to confirm the efficacy of faster aspart in terms of glycemic control compared with mealtime IAsp after 26 weeks of randomized treatment. An open-label postmeal faster aspart dosing arm was also compared with IAsp to evaluate whether postmeal administration could prove effective in achieving glycemic control and thereby offer a clinically acceptable treatment option.

## RESEARCH DESIGN AND METHODS

### Trial Design

This 26-week (plus additional 26 weeks) multicenter, active-controlled, randomized, parallel-group trial compared double-blind mealtime faster aspart with mealtime IAsp in adults with type 1 diabetes. A 26-week open-label treatment group with postmeal faster aspart provided a second comparison with IAsp (Supplementary Fig. 1). The additional 26-week treatment period was included to document long-term safety (not reported here). Faster aspart and IAsp were delivered in a basal-bolus regimen with once- or twice-daily insulin detemir (Levemir).

The trial was conducted in accordance with the Declaration of Helsinki (24) and International Conference on Harmonization of Good Clinical Practice (25) and is registered with ClinicalTrials.gov (reg. no. NCT01831765).

### Subjects

Adults (≥18 years old) with type 1 diabetes (diagnosed clinically) were eligible for inclusion if treated with basal-bolus insulin for ≥12 months prior to screening and if treated with any regimen of insulin detemir or glargine for ≥4 months prior to screening, with an HbA$_{1c}$ of 7.0–9.5% (53–80 mmol/mol) and BMI of ≤35.0 kg/m$^2$. Exclusion criteria included any use of an antidiabetes drug other than insulin within 3 months prior to screening, an anticipated change in concomitant medications known to interfere significantly with glucose metabolism, cardiovascular (CV) disease within 6 months prior to screening, recurrent severe hypoglycemia (>1 event during the past 12 months), hypoglycemic unawareness as judged by the investigator, or hospitalization for diabetic ketoacidosis within 6 months prior to screening. Full criteria are listed in Supplementary Data.

### Interventions

#### Basal Titration During the Trial

After an initial 2-week screening period, an 8-week run-in allowed for the optimization of basal insulin detemir (100 units/mL; 3.0-mL FlexPen). At the start of the run-in period, subjects switched unit for unit from their previous basal insulin (if required). The same once- or twice-daily dosing frequency that was used prior to screening was maintained initially, but subjects were permitted to switch dosing frequency during the run-in period if required.

During run-in, insulin detemir was titrated using a weekly treat-to-target approach, with a prebreakfast self-monitored plasma glucose (SMPG) target of 4.0–5.0 mmol/L (71–90 mg/dL) (Supplementary Tables 1 and 2). Subjects on a twice-daily regimen used a predinner SMPG target of 4.0–6.0 mmol/L (71–108 mg/dL) (Supplementary Table 2). After run-in, basal adjustments were only performed when required as judged by the investigator; changing the dose frequency after randomization was a withdrawal reason, according to the protocol.

#### Bolus Doses During the Trial

At the start of the 8-week run-in, all subjects commenced mealtime IAsp (all bolus insulins supplied at 100 units/mL; 3.0-mL PDS290 Pen injector). After run-in, subjects (with HbA$_{1c}$ ≤9.5% [80 mmol/mol]) were randomized 1:1:1 to receive double-blind mealtime faster aspart, IAsp, or open-label postmeal faster aspart while continuing with insulin detemir. Mealtime bolus insulins were injected 0–2 min before a meal; postmeal faster aspart was injected at a fixed time of 20 min after the start of the meal. Randomization was stratified by the method used by the subject for adjusting bolus insulin (carbohydrate counting [flexible dosing] or dosing algorithm), current basal treatment regimen (once or twice daily), and continuous glucose monitoring and frequently sampled meal test subgroup participation.

At the beginning of the run-in period, subjects commenced mealtime IAsp (requiring subjects on other bolus insulins to switch unit for unit) and adjusted insulin doses as they had done before the trial. No titration of bolus insulin dose was performed by the investigator during run-in unless adjustments were necessary for safety reasons. At the randomization visit, subjects commenced the bolus regimen to which they had been randomized. It was the investigator's responsibility to ensure adequate

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/943/548833/dc161771.pdf by guest on 07 December 2023

education of each subject following the principles of flexible bolus dosing based on carbohydrate content (recommending additional local training, if required); subjects deemed proficient in carbohydrate counting were to continue using this method for bolus adjustments during the treatment period. All other subjects used a predefined bolus-dosing algorithm (Supplementary Table 3).

Meal carbohydrate content and preprandial plasma glucose (PG) values were used to determine bolus insulin doses for subjects following the principles of flexible dosing. Adjustments were made several times daily by the subject in accordance with the insulin-to-carbohydrate ratio and the PG correction (sensitivity) factor. A weekly review of the ratio and correction factor was performed by the investigator, based on individual subject SMPG values. The target preprandial PG range was 4.0–6.0 mmol/L (71–108 mg/dL); in case of hypoglycemic episodes, the dose could be reduced at the investigator's discretion.

Bolus titration (for subjects using the algorithm) was to the next preprandial target of 4.0–6.0 mmol/L (71–108 mg/dL) for both breakfast and lunch doses and to the same target at bedtime for the dinner dose. Adjustments were made twice weekly: once by the investigator and once by the subject (Supplementary Table 3).

### SMPG
At the run-in visit, subjects were supplied with a blood glucose (BG) meter, factory calibrated to display PG values, and instructed to record the date, time, and value of all SMPG measurements from 7-9-7-point profiles (pre- and postmeal, bedtime, and once at 4:00 A.M.) on three consecutive days before the scheduled clinic visits at weeks 0, 12, and 26; 4-point profiles (preprandial and at bedtime) were recorded daily for titration purposes.

### Standardized Meal Test
Subjects completing the run-in period had their 1- to 4-h PPG levels assessed after a bolus dose of IAsp (0.1 units/kg, calculated by the investigator) administered 0–2 min before a standardized mixed liquid meal test (80 g carbohydrate [Ensure] consumed within 12 min). Subjects attended the meal visit with a fasting PG (FPG) level within 4.0–8.8 mmol/L

(71–160 mg/dL) for the test to be performed. Blood samples were drawn just before the meal and after 1, 2, 3, and 4 h. The meal test was repeated at week 26, with subjects administering the bolus dose (0.1 units/kg body weight, chosen as an approximation of a clinically relevant bolus dose needed for the given size of a standardized meal for subjects with type 1 diabetes) either 0–2 min before (mealtime faster aspart and IAsp) or 20 min after (postmeal faster aspart) the meal test.

### Assessments
#### Primary End Point
The primary end point was change from baseline in HbA$_{1c}$ after 26 weeks of treatment.

#### Secondary End Points
Confirmatory secondary end points included the following: change from baseline after 26 weeks of treatment in 2-h PPG increments (meal test) and body weight, and number of treatment-emergent severe or BG-confirmed hypoglycemic episodes. Hypoglycemic episodes were categorized as treatment emergent if the onset occurred on the first day of exposure to and no later than 1 day after the last day of randomized treatment. Severe hypoglycemia was defined according to the American Diabetes Association classification (26) and BG-confirmed hypoglycemia by a PG value <3.1 mmol/L (56 mg/dL; Novo Nordisk A/S definition) with/without symptoms consistent with hypoglycemia (Supplementary Table 4).

Supportive secondary end points included the following: HbA$_{1c}$ responders (subjects achieving HbA$_{1c}$ <7% [53 mmol/mol] or ≤6.5% [47.8 mmol/mol]); change from baseline in PPG and PPG increments (meal test); change from baseline in mean SMPG 7-9-7-point profile and mean 2-h PPG and mean 2-h PPG increments (7-9-7-point profile); PPG responders (subjects achieving overall mean 2-h PPG ≤7.8 mmol/L [140 mg/dL] in SMPG); change from baseline in 1,5-anhydroglucitol (1,5-AG) (a marker for postprandial hyperglycemia), FPG, and body weight; and total (basal + bolus) insulin doses. Analyses of laboratory efficacy parameters (HbA$_{1c}$, PG during the meal test, FPG, and 1,5-AG) were carried out by central laboratory (Supplementary Table 4).

Supportive secondary safety end points included the following: the numbers of

treatment-emergent adverse events (TEAEs), hypoglycemic episodes, and injection-site and allergic reactions (Supplementary Table 4). All presented adverse events (except CV events) are TEAEs (i.e., with onset up to 7 days after the last day of treatment, excluding any events during run-in). Information on CV events and deaths occurring after randomization was sent for evaluation by an external event adjudication committee. Additional safety assessments, including physical examination, vital signs, fundoscopy, and electrocardiograms, were recorded at screening, baseline, and week 26. Laboratory parameters were recorded at various time points throughout the 26-week trial. Subject follow-up occurred at 7 and 30 days after the end of treatment.

### Statistical Methods
All statistical analyses were based on the full analysis set (all randomized subjects) and prespecified. Safety end points were summarized using the safety analysis set (subjects receiving ≥1 dose of investigational products). Statistical analysis of the primary and secondary confirmatory hypotheses followed a stepwise hierarchical procedure (Supplementary Fig. 2). Noninferiority (primary end point) was confirmed if the upper boundary of the two-sided 95% CI was ≤0.4%. For analyses of noninferiority, one-sided $P$ values are presented, and for all other analyses, two-sided $P$ values for treatment differences are presented.

Change from baseline in HbA$_{1c}$ after 26 weeks of treatment was analyzed using a mixed-effect model for repeated measurements where all changes in HbA$_{1c}$ from baseline at trial visits were included in the analysis. Change from baseline in PPG and PPG increments (meal test) was analyzed separately using an ANOVA model. Responder end points (for HbA$_{1c}$ and PPG) were analyzed separately based on a logistic regression model. Change from baseline in mean 7-9-7-point profiles; mean PPG; mean PPG increments (7-9-7-point profiles); 1,5-AG; FPG; and body weight were analyzed using a mixed-effect model for repeated measurements similar to the model used for the primary end point.

The number of treatment-emergent severe or BG-confirmed hypoglycemic episodes was analyzed using a negative binomial regression model.

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/945/548833/dc161771.pdf by guest on 07 December 2023

The sample-size calculation and additional details on the statistical methods for the primary and secondary end points are in Supplementary Data.

## RESULTS

### Trial Subjects
In total, 1,143 subjects were randomized to mealtime faster aspart (n = 381), IAsp (n = 380), or postmeal faster aspart (n = 382). All 1,143 randomized subjects were exposed to randomized trial product (Supplementary Fig. 3), and 92.9% of subjects completed the trial. Baseline characteristics were similar between the three groups (Table 1).

### Hierarchical Testing Procedure
Steps 1–3 (which are described in more detail below) were confirmed. As step 4

could not be confirmed, the hierarchical statistical testing procedure was stopped (Supplementary Table 5).

### Efficacy
#### Change in HbA$_{1c}$
Noninferiority of faster aspart, both mealtime and postmeal dosing, to mealtime IAsp in terms of change from baseline in HbA$_{1c}$ was confirmed (estimated treatment difference [ETD] mealtime −0.15% [95% CI −0.23; −0.07], −1.62 mmol/mol [−2.50; −0.73]); postmeal 0.04% [−0.04; 0.12], 0.47 mmol/mol [−0.41; 1.36]; $P$ < 0.0001 for noninferiority) (Fig. 1, steps 1 and 3). The reduction in HbA$_{1c}$ was statistically significantly greater for mealtime faster aspart than for IAsp ($P$ = 0.0003); however, superiority could not be considered confirmed,

as this was not part of the hierarchical testing procedure (Supplementary Fig. 2).

Results for subjects who achieved the HbA$_{1c}$ targets of <7.0% (53.0 mmol/mol) and ≤6.5% (47.8 mmol/mol) after 26 weeks' treatment are summarized in Supplementary Table 6. The odds of achieving HbA$_{1c}$ <7.0% (53.0 mmol/mol) were statistically significantly higher with mealtime faster aspart compared with IAsp (estimated odds ratio 1.47 [95% CI 1.02; 2.13]; $P$ = 0.0405) and not statistically significantly different between postmeal faster aspart and IAsp (0.73 [0.49; 1.07]) (Supplementary Table 6).

#### Meal Test
The estimated change from baseline in the 2-h PPG increment (meal test) was

| Table 1—Baseline characteristics | | | | |
|---|---|---|---|---|
| Parameter | Faster aspart mealtime (n = 381) | Faster aspart postmeal (n = 382) | IAsp mealtime (n = 380) | Total (N = 1,143) |
| Age, years | 46.1 (13.8) | 43.5 (13.7) | 43.7 (14.0) | 44.4 (13.9) |
| Sex, n (%) | | | | |
| Male | 215 (56) | 219 (57) | 238 (63) | 672 (59) |
| Female | 166 (44) | 163 (43) | 142 (38) | 471 (41) |
| Race, n (%) | | | | |
| White | 363 (95) | 355 (93) | 348 (92) | 1,066 (93) |
| Black or African American | 5 (1) | 12 (3) | 9 (2) | 26 (2) |
| Asian | 5 (1) | 2 (1) | 7 (2) | 14 (1) |
| Native Hawaiian or other Pacific Islander | 0 (0) | 1 (0) | 2 (1) | 3 (0) |
| American Indian or Alaska Native | 1 (0) | 0 (0) | 0 (0) | 1 (0) |
| Other | 0 (0) | 3 (1) | 3 (1) | 6 (1) |
| NA | 7 (2) | 9 (2) | 11 (3) | 27 (2) |
| BMI, kg/m$^2$ | 26.4 (3.8) | 26.9 (4.1) | 26.7 (3.7) | 26.7 (3.9) |
| Duration of diabetes, years | 20.9 (12.9) | 19.5 (12.1) | 19.3 (11.8) | 19.9 (12.3) |
| HbA$_{1c}$ | | | | |
| % | 7.6 (0.7) | 7.6 (0.7) | 7.6 (0.7) | 7.6 (0.7) |
| mmol/mol | 59.7 | 59.9 | 59.3 | 59.7 |
| FPG | | | | |
| mmol/L | 8.4 (3.1) | 8.1 (3.2) | 7.9 (2.8) | 8.1 (3.0) |
| mg/dL | 151.4 | 145.6 | 141.8 | 146.2 |
| Antidiabetes treatment at screening, n (%) | | | | |
| Basal | 381 (100.0) | 381 (99.7) | 380 (100.0) | 1,142 (99.9) |
| Glargine | 269 (70.6) | 259 (67.8) | 277 (72.9) | 805 (70.4) |
| Detemir | 111 (29.1) | 118 (30.9) | 101 (26.6) | 330 (28.9) |
| NPH insulin | 0 (0.0) | 4 (1.0) | 1 (0.3) | 5 (0.4) |
| Detemir + glargine | 1 (0.3) | 0 (0.0) | 1 (0.3) | 2 (0.2) |
| Bolus | 381 (100.0) | 382 (100.0) | 379 (99.7) | 1,142 (99.9) |
| Aspart | 185 (48.6) | 195 (51.0) | 172 (45.3) | 552 (48.3) |
| Lispro | 159 (41.7) | 157 (41.1) | 166 (43.7) | 482 (42.2) |
| Glulisine | 27 (7.1) | 22 (5.8) | 30 (7.9) | 79 (6.9) |
| RHI | 9 (2.4) | 8 (2.1) | 10 (2.6) | 27 (2.4) |
| RHI + aspart | 1 (0.3) | 0 (0.0) | 0 (0.0) | 1 (0.1) |
| Glulisine + lispro | 0 (0.0) | 0 (0.0) | 1 (0.3) | 1 (0.1) |
| Premix | 0 (0.0) | 1 (0.3) | 1 (0.3) | 2 (0.2) |
| NPH/human insulin | 0 (0.0) | 1 (0.3) | 1 (0.3) | 2 (0.2) |

Data for baseline characteristics are arithmetic means (SD) unless otherwise stated. The conversion factor between mmol/L and mg/dL is 18. Detemir, insulin detemir; NA, not applicable (subjects from Belgium did not provide information and were classed as not applicable); NPH, neutral protamine Hagedorn.

Case: 24-2510    Document: 19    Page: 290    Date Filed: 10/15/2024

Case 3:23-cv-20814-ZNQ-JBD       Document 30-7       Filed 12/08/23       Page 6 of 9 PageID:
428
care.diabetesjournals.org                                                                          Russell-Jones and Associates    947

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/943/548533/dc161771.pdf by guest on 07 December 2023



**Figure 1**—Mean HbA$_{1c}$ over time. During run-in, observed mean HbA$_{1c}$ was reduced from 8.1% (64.9 mmol/mol) to 7.6% (59.9 mmol/mol) for subjects subsequently randomized to receive postmeal faster aspart (*n* = 382), from 8.0% (64.0 mmol/mol) to 7.6% (59.7 mmol/mol) for subjects subsequently randomized to receive mealtime IAsp (*n* = 380), and from 8.0% (64.0 mmol/mol) to 7.6% (59.3 mmol/mol) for subjects subsequently randomized to receive mealtime faster aspart (*n* = 381). During the 26-week treatment period, the observed mean HbA$_{1c}$ decreased to 7.5% (58.6 mmol/mol) with postmeal faster aspart, 7.4% (57.6 mmol/mol) with mealtime IAsp, and 7.3% (56.4 mmol/mol) with mealtime faster aspart. Error bars: ±SEM.

−0.3 mmol/L (−5.2 mg/dL) with mealtime faster aspart and 0.4 mmol/L (6.8 mg/dL) with IAsp (ETD mealtime faster aspart–IAsp −0.67 mmol/L [95% CI −1.29; −0.04], −12.01 mg/dL [−23.33; −0.70]; *P* = 0.0375), and superiority of mealtime faster aspart versus IAsp was confirmed for this end point (Fig. 2*A*, step 2, and Supplementary Fig. 2). The estimated change from baseline in 1-h PPG increment was −0.8 mmol/L (−15.1 mg/dL) for mealtime faster aspart and 0.3 mmol/L (6.1 mg/dL) for IAsp (ETD mealtime faster aspart–IAsp −1.18 mmol/L [95% CI −1.65; −0.71], −21.21 mg/dL [−29.65; −12.77]; *P* < 0.0001) (Fig. 2*A*). There was no statistical difference in ETD for change from baseline in 3-h or 4-h PPG increments (Fig. 2*A*).

The estimated change from baseline in 1-h PPG increment (meal test) was 1.3 mmol/L (22.9 mg/dL) with postmeal faster aspart (ETD postmeal faster aspart–IAsp 0.93 mmol/L [95% CI 0.46; 1.40], 16.75 mg/dL [8.26; 25.24]; *P* = 0.0001) (Fig. 2*B*), but by 2 h, PPG increments for postmeal faster aspart versus mealtime IAsp were not statistically significantly different (ETD 0.30 mmol/L [95% CI −0.34; 0.93], 5.32 mg/dL [−6.05; 16.68]) (Fig. 2*B*).

The difference in mean 1- and 2-h PPG change from baseline between mealtime faster aspart and IAsp (after the meal test) was statistically significant in favor of mealtime faster aspart (ETD

mealtime faster aspart–IAsp, 1 h, −1.41 mmol/L [95% CI −2.00; −0.82], −25.44 mg/dL [−36.12; −14.76], *P* < 0.0001; 2 h, −0.93 mmol/L [−1.62; −0.23], −16.73 mg/dL [−29.26; −4.20], *P* = 0.0089). The difference in mean PPG change from baseline after 1 h between postmeal faster aspart and IAsp was statistically significant in favor of IAsp (ETD postmeal faster aspart–IAsp 0.69 mmol/L [95% CI 0.09; 1.28], 12.38 mg/dL [1.65; 23.11], *P* = 0.0238), while after 2 h there was no statistically significant difference between treatments (Supplementary Table 6).

**SMPG**

After 26 weeks, the mean of the 7-9-7-point profile was reduced in the two faster aspart treatment groups, with no statistically significant treatment differences versus IAsp (Supplementary Table 6). Reductions in 2-h PPG and 2-h PPG increments from baseline (7-9-7-point profiles) were observed at all main meals; however, there were no statistically significant treatment differences between faster aspart (mealtime or postmeal) and IAsp (Supplementary Table 6).

The proportions of subjects achieving the 2-h PPG target ≤7.8 mmol/L (140 mg/dL; 7-9-7-point profiles) by week 26 were 42.7% with mealtime faster aspart, 39.6% with postmeal faster aspart, and 38.6% with IAsp. The odds of achieving the target PPG level was not statistically significantly different between faster aspart (mealtime or

postmeal) and IAsp (Supplementary Table 6).

***Other Secondary Efficacy End Points***
Treatment with mealtime faster aspart for 26 weeks resulted in a statistically significantly greater increase from baseline in 1,5-AG compared with IAsp (ETD 0.50 μg/mL [95% CI 0.24; 0.76]; *P* = 0.0001), whereas increases in 1,5-AG from baseline were not statistically significantly different between postmeal faster aspart and IAsp (Supplementary Table 6).

In both faster aspart treatment groups, mean FPG showed an increase from baseline until week 12 and thereafter a decrease until week 26, with no statistically significant differences versus IAsp (Supplementary Table 6). The mean body weight increase from baseline in all three treatment groups was <1 kg over the 26-week treatment period; there was no statistically significant difference between faster aspart (mealtime or postmeal) and IAsp in terms of body weight increase (ETD faster aspart–mealtime IAsp, mealtime, 0.12 kg [95% CI −0.30; 0.55]; postmeal, 0.16 kg [−0.27; 0.58]).

**Insulin Dosing**
During the trial, mean and median daily bolus insulin doses increased in all three treatment groups. By week 26, the doses were comparable between faster aspart (mealtime or postmeal) and IAsp (median total insulin dose [units/kg]: mealtime faster aspart, 0.801; postmeal faster aspart, 0.842; mealtime IAsp, 0.833), and the basal/bolus ratio was ∼50/50 throughout the trial (Supplementary Table 7).

**Safety**
The overall rate of treatment-emergent severe or BG-confirmed hypoglycemic episodes, as well as the event rate of treatment-emergent severe hypoglycemic episodes, was comparable between faster aspart (mealtime or postmeal) and IAsp (Table 2). There were no statistically significant differences in the number of treatment-emergent severe or BG-confirmed hypoglycemic episodes between faster aspart (mealtime or postmeal) and IAsp, and superiority could not be confirmed (rate ratio faster aspart/IAsp, mealtime, 1.01 [95% CI 0.88; 1.15]; postmeal, 0.92 [0.81; 1.06]) (step 4).

The distribution of hypoglycemic episodes at 1 and 2 h after meals (Table 2) revealed that the rate of severe or BG-confirmed hypoglycemic episodes



**Figure 2**—*A*: PPG increment at week 26 for mealtime faster aspart versus IAsp. Observed data. One-hour and 2-h PPG increments statistically significantly in favor of mealtime faster aspart: *P < 0.0001 and **P = 0.0375, respectively. *B*: PPG increment at week 26 for postmeal faster aspart versus IAsp. Observed data. Mealtime IAsp dosed 0 to 2 min before meal; postmeal faster aspart dosed 20 min after meal. Change in 1-h PPG increment significantly in favor of IAsp: *P = 0.0001. Error bars: ±SEM. The conversion factor between mmol/L and mg/dL is 18.

during the first hour after the start of a main meal was statistically significantly higher for mealtime faster aspart than

for IAsp (rate ratio faster aspart/IAsp 1.48 [95% CI 1.11; 1.96]; *P < 0.0073*); however, the observed number of

hypoglycemic episodes reported with mealtime faster aspart during the first hour after a meal (events per patient-year of exposure: 1.476) constituted a small fraction (~1 of 40) of all severe or BG-confirmed hypoglycemic episodes reported for mealtime faster aspart (Table 2).

The proportion of subjects reporting TEAEs and the rate of TEAEs were comparable between faster aspart (mealtime or postmeal) and IAsp. All injection-site reactions (22 events reported in 19 subjects) were nonserious and of mild or moderate severity. A total of 123 allergic reactions were reported by 107 (9.4%) subjects and evenly distributed across all three treatment groups; all were of mild or moderate severity (further details on TEAEs may be found in Supplementary Table 8).

Five subjects experienced six CV adverse events (one with mealtime faster aspart, three with postmeal faster aspart, and one with IAsp) that were positively adjudicated (of 10 that qualified for adjudication) by the event adjudication committee (Supplementary Table 9). During the trial, there were two deaths, both judged unlikely to be related to trial product (see Supplementary Data).

There were no clinically relevant differences from baseline to week 26 between faster aspart (mealtime or postmeal) and IAsp in physical examinations, vital signs, fundoscopy, electrocardiogram, or other laboratory assessments.

## CONCLUSIONS

The current trial confirmed that, in subjects with type 1 diabetes on a basal-bolus regimen, both mealtime and

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/943/548833/dc161771.pdf by guest on 07 December 2023

**Table 2—Treatment-emergent hypoglycemic events**

|  | Faster aspart mealtime | | | Faster aspart postmeal | | | IAsp mealtime | | | Rate ratio (95% CI) |
|---|---|---|---|---|---|---|---|---|---|---|
|  | N (%) | E | R | N (%) | E | R | N (%) | E | R |  |
| Treatment-emergent hypoglycemia |  |  |  |  |  |  |  |  |  |  |
| Severe | 26 (6.7) | 46 | 0.25 | 30 (8.0) | 47 | 0.26 | 32 (8.4) | 51 | 0.27 |  |
| Severe or BG confirmed | 358 (92.7) | 10,993 | 58.99 | 358 (95.0) | 9,961 | 54.43 | 370 (97.4) | 11,078 | 58.65 |  |
| Meal-related severe or BG confirmed |  |  |  |  |  |  |  |  |  |  |
| Within 1 h after a meal | 131 (33.9) | 275 | 1.476 | 85 (22.5) | 131 | 0.716 | 108 (28.4) | 182 | 0.964 |  |
| Within 2 h after a meal | 258 (66.8) | 1,391 | 7.464 | 231 (61.3) | 969 | 5.295 | 251 (66.1) | 1,108 | 5.866 |  |
| Severe or BG confirmed |  |  |  |  |  |  |  |  |  |  |
| Faster aspart (mealtime)/IAsp* |  |  |  |  |  |  |  |  |  | 1.01 (0.88; 1.15) |
| Faster aspart (postmeal)/IAsp |  |  |  |  |  |  |  |  |  | 0.92 (0.81; 1.06) |

Safety analysis set. Severe hypoglycemia was defined according to the American Diabetes Association classification (26). BG-confirmed hypoglycemia was defined as an episode with a PG value <3.1 mmol/L (56 mg/dL) with or without symptoms consistent with hypoglycemia (Novo Nordisk A/S definition). E, number of events; N (%), number (percentage) of subjects; R, event rate per patient-year of exposure. *Confirmatory analysis (step 4) not statistically significant.

postmeal faster aspart are noninferior to mealtime IAsp regarding $HbA_{1c}$ change from baseline. Switching to mealtime or postmeal faster aspart was effective in improving glycemic control: the reduction in $HbA_{1c}$ with mealtime faster aspart was moderately, yet statistically significantly, greater than with IAsp. After 26 weeks of treatment, subjects receiving mealtime faster aspart were almost 1.5 times as likely to achieve the $HbA_{1c}$ target of <7.0% (53 mmol/mol) than those receiving IAsp.

Mealtime faster aspart was effective in controlling PPG excursions, and superiority versus IAsp in 2-h PPG increments (meal test) was confirmed. A statistically significant difference was demonstrated for the 1-h PPG increment (meal test) in favor of mealtime faster aspart; mean 7-9-7-point SMPG profiles and associated 2-h PPG and 2-h PPG increments showed modest trends toward improvement in PPG. Treatment with mealtime faster aspart for 26 weeks resulted in a statistically significantly greater increase from baseline in 1,5-AG compared with IAsp. This finding indicates that there were fewer recent hyperglycemic excursions, signifying that although the difference between mealtime faster aspart and IAsp was small, PPG control was improved. These results suggest that faster aspart, which has an improved action profile (20), produces the same glycemic improvements over IAsp in type 1 diabetes (0.15% statistically significantly lower $HbA_{1c}$ and 0.7–1.2 mmol/L lower PPG increments) as reported previously with IAsp versus RHI (0.15% statistically significantly lower $HbA_{1c}$ [27] and 1.1–1.3 mmol/L lower PPG increments [28,29]).

In certain situations, postmeal dosing of insulin may offer increased flexibility compared with mealtime dosing—for instance, when an individual is unable to predict the exact timing or carbohydrate content of a meal in advance (e.g., on social occasions), when experiencing lack of appetite or nausea (e.g., the very elderly or frail), when appetite is unpredictable (e.g., children), if an injection is forgotten, or if an individual is anxious about severe hypoglycemia (30,31). Subjects randomized to dosing faster aspart postmeal for all meals maintained overall glycemic control noninferior to that obtained with mealtime IAsp,

indicating that flexibility in timing of dose with faster aspart does not lead to worsening of glycemic control.

Treatment with faster aspart was well tolerated by the subjects in this trial, and no safety concerns were raised. Overall, there were no clinically relevant differences in the TEAE profiles across all three treatment groups (Supplementary Table 8). No statistically significant difference was seen in overall rate of severe or BG-confirmed hypoglycemic episodes between faster aspart (mealtime or postmeal) and IAsp. The timing of hypoglycemia in relation to a meal usually reflects the time-action profile of the administered insulin formulation. Thus, as expected, there was a higher rate of hypoglycemia in the first hour after a meal in the mealtime faster aspart arm than in the IAsp arm. This observation is consistent with the differing clinical pharmacology profiles of faster aspart and IAsp (20). Similar observations were reported when IAsp was compared with RHI in previous trials (28). Despite the higher rate of severe or BG-confirmed hypoglycemic episodes in the first hour (representing <3% of the overall episodes reported in this treatment group), there was no overall increase in severe or BG-confirmed hypoglycemia in the mealtime faster aspart arm compared with the IAsp arm.

The strengths of this trial include the number of subjects, the double blinding of subjects enrolled in the mealtime groups, and the additional 26-week period to document long-term safety and compare efficacy (which includes follow-up of subjects achieving target $HbA_{1c}$ levels). Additionally, basal insulin dose was optimized on an individual basis prior to randomization with limited adjustments during the trial, thus allowing a clearer evaluation of the effect of the different bolus regimens. The bolus insulin dose of 0.1 units/kg used in this standardized meal test was in line with the median breakfast bolus dose measured at the end of the 26-week treatment period in each of the treatment groups. However, the meal test protocol was a potential limitation of the trial, as all subjects received the same 0.1 units/kg body weight bolus, and no adjustment was made for individual insulin-to-carbohydrate ratios: for all subjects, therefore, the insulin dose was an approximation of their usual dose.

Together with the results of previous studies (32,33,34), this trial has demonstrated that faster aspart given at mealtimes is noninferior to IAsp in terms of $HbA_{1c}$ reduction while offering superior control of PPG excursions, without increased risk of overall hypoglycemia. Additionally, faster aspart offers the option of dosing up to 20 min postmeal while retaining overall glycemic control and without increased rates of overall hypoglycemia. This is an incremental step in more closely replicating the physiologic response of endogenous insulin release after a meal.

Acknowledgments. The authors are grateful to the people who participated in this study; to Theis Gondolf, Marek Demissie, and Anna Maria Louise Sandberg from Novo Nordisk A/S for review of and input into the manuscript; and to Katharine A. Peregrin from AXON Communications for medical writing and editorial assistance.

Duality of Interest. All contributors received compensation from and the study was funded by Novo Nordisk A/S. D.R.-J. reports grants and personal fees from AstraZeneca, Lilly, Novartis, Novo Nordisk A/S, and Sanofi. B.W.B. reports grants and personal fees from Abbott, AstraZeneca, BD, Biodel, Boehringer Ingelheim, DexCom, GlaxoSmithKline, Insulet, Janssen, Lexicon, Lilly, MannKind, Medtronic, Novo Nordisk A/S, Pfizer, Sanofi, and Valeritas and holds shares in Aseko. C.D.B. reports personal fees from Abbott, AstraZeneca, A. Menarini Diagnostics, Lilly, Merck Sharp & Dohme (MSD), Novartis, Novo Nordisk A/S, Sanofi, and Johnson & Johnson. E.F. reports personal fees from AstraZeneca, Bioton, Boehringer Ingelheim, Lilly, Merck, MSD, Novo Nordisk A/S, Sanofi, Servier, and Teva Pharmaceutical Industries. S.R.H. reports grants and personal fees from AstraZeneca, Boehringer Ingelheim, Lilly, Medtronic, Merck, MSD, Novo Nordisk A/S, Sanofi, and Takeda. C.M. reports grants and personal fees from AstraZeneca, Bristol-Myers Squibb, Boehringer Ingelheim, Hanmi Pharmaceuticals, Janssen, Lilly, Mannkind, Medtronic, MSD, Novartis, Novo Nordisk A/S, Pfizer, Roche Diagnostics, Sanofi, and UCB, and the institution with which C.M. is affiliated reports grants from Abbott, Lilly, MSD, Novartis, Novo Nordisk A/S, Roche Diagnostics, and Sanofi. The institution with which A.P.-T. is affiliated reports grants and fees from AstraZeneca, DexCom, Lilly, Merck, Mylan, Novo Nordisk A/S, and Sanofi. L.R. reports grants and personal fees from AstraZeneca, Lilly, and Novo Nordisk A/S. V.C.W. reports grants and personal fees from AstraZeneca, Boehringer Ingelheim, Janssen, Lilly, Merck, Novo Nordisk A/S, Sanofi, and Takeda. A.B.Ø. is an employee of and holds shares in Novo Nordisk A/S. T.G. is an employee of and holds shares in Novo Nordisk A/S. The nonprofit research institute with which R.M.B. is affiliated reports grants and fees from Abbott Diabetes Care, AstraZeneca, Boehringer Ingelheim, Bristol-Myers Squibb, Halozyme Inc., Johnson & Johnson,

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/943/548833/dc161771.pdf by guest on 07 December 2023

Appx310

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/943/548833/dc161771.pdf by guest on 07 December 2023

Lilly, Medtronic Diabetes, Novo Nordisk A/S, Roche, Sanofi, and Takeda. R.M.B. holds shares in Merck. No other potential conflicts of interest relevant to this article were reported.

**Author Contributions.** D.R.-J. and R.M.B. were the principal investigators of this study. All authors were involved in the preparation, editing, and approval of the manuscript in collaboration with Novo Nordisk A/S. A.B.Ø. was the responsible medical officer. T.G. was the responsible statistician. D.R.-J. and R.M.B. are the guarantors of this work and, as such, had full access to all the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.

**Prior Presentation.** Parts of this study were presented in abstract form at the 76th Scientific Sessions of the American Diabetes Association, New Orleans, LA, 10–14 June 2016.

## References

1. American Diabetes Association. *Standards of Medical Care in Diabetes—2016.* Diabetes Care 2016;39(Suppl. 1):S1–S108
2. Rydén L, Grant PJ, Anker SD, et al.; Authors/Task Force Members; ESC Committee for Practice Guidelines (CPG); Document Reviewers. ESC Guidelines on diabetes, pre-diabetes, and cardiovascular diseases developed in collaboration with the EASD: the Task Force on diabetes, pre-diabetes, and cardiovascular diseases of the European Society of Cardiology (ESC) and developed in collaboration with the European Association for the Study of Diabetes (EASD). Eur Heart J 2013;34:3035–3087
3. International Diabetes Federation Guideline Development Group. Guideline for management of postmeal glucose in diabetes. Diabetes Res Clin Pract 2014;103:256–268
4. Nathan DM. Long-term complications of diabetes mellitus. N Engl J Med 1993;328:1676–1685
5. Nathan DM, Cleary PA, Backlund JY, et al.; Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications (DCCT/EDIC) Study Research Group. Intensive diabetes treatment and cardiovascular disease in patients with type 1 diabetes. N Engl J Med 2005;353:2643–2653
6. Nathan DM; DCCT/EDIC Research Group. The Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications Study at 30 years: overview. Diabetes Care 2014;37:9–16
7. Luijf YM, van Bon AC, Hoekstra JB, Devries JH. Premeal injection of rapid-acting insulin reduces postprandial glycemic excursions in type 1 diabetes. Diabetes Care 2010;33:2152–2155
8. Sanofi Aventis. Apidra (insulin glulisine): summary of product characteristics [article online]. Available from http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000557/WC500025250.pdf. Accessed 16 August 2016
9. Eli Lilly. Humalog (insulin lispro): summary of product characteristics [article online]. Available from http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000088/WC500050332.pdf. Accessed 16 August 2016
10. Novo Nordisk. NovoRapid (insulin aspart): summary of product characteristics [article online]. Available from http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000258/WC500030372.pdf. Accessed 16 August 2016
11. Andersen G, Alluis B, Meiffren G, et al. Ultra-rapid BioChaperone insulin Lispro (BC-LiS): linear dose-response and faster absorption than insulin Lispro (LIS). Diabetologia 2015;58(Suppl. 1):S449
12. Boss AH, Petrucci R, Lorber D. Coverage of prandial insulin requirements by means of an ultra-rapid-acting inhaled insulin. J Diabetes Sci Technol 2012;6:773–779
13. Frost GI. Recombinant human hyaluronidase (rHuPH20): an enabling platform for subcutaneous drug and fluid administration. Expert Opin Drug Deliv 2007;4:427–440
14. Heinemann L, Hompesch M, Flacke F, et al. Reduction of postprandial glycemic excursions in patients with type 1 diabetes: a novel human insulin formulation versus a rapid-acting insulin analog and regular human insulin. J Diabetes Sci Technol 2011;5:681–686
15. Hirsch IB, Bode BW, Skyler JS, Garg SK, Buse JB, WU XW, Vaugh DE, Muchmore DB. Recombinant human hyaluronidase pretreatment of CSII cannula sites provides comparable glycemic control with reduced hypoglycemia in T1DM compared to usual CSII (Abstract). Diabetes 2014;63(Suppl. 1):85-LB
16. Hompesch M, Muchmore DB, Morrow L, Vaughn DE. Accelerated insulin pharmacokinetics and improved postprandial glycemic control in patients with type 1 diabetes after coadministration of prandial insulins with hyaluronidase. Diabetes Care 2011;34:666–668
17. Krasner A, Brazg R, Blevins T. Safety and efficacy of ultra-rapid-acting human insulin formulation BIOD-123 in patients with type 1 diabetes (Abstract). Diabetes 2014;63(Suppl. 1):A34
18. Morrow L, Canney L, Pichotta P, Krasner A, Hompesch M, De Souza E. BIOD-531 demonstrates superior prandial glucose control, post-meal dosing flexibility, and less insulin "stacking" compared to marketed prandial/basal insulins. Diabetologia 2015;58(Suppl. 1):A6
19. Buckley ST, Kildegaard J, Højberg-Nielsen R, et al. Mechanistic analysis into the mode of action of niacinamide in faster-acting insulin aspart (Abstract). Diabetes Technol Ther 2016;18(Suppl. 1):A291
20. Heise T, Pieber TR, Danne T, Erichsen L, Haahr H. A pooled analysis of clinical pharmacology trials investigating the pharmacokinetic and pharmacodynamic characteristics of fast-acting insulin aspart in adults with type 1 diabetes. Clin Pharmacokinet 2017;56:551–559
21. Bowering K, Case C, Harvey J, et al. Faster aspart versus insulin aspart as part of a basal-bolus regimen in inadequately controlled type 2 diabetes: the onset 2 trial. Diabetes Care 2017;40:951–957
22. Rodbard H, Tripathy D, Vidrio-Velázquez M, Demissie M, Can Tamer S, Piletič M. Adding faster-acting insulin aspart to basal insulin significantly improved glycemic control: the onset 3 trial (Abstract). Diabetes 2016;65(Suppl. 1):A64
23. Peyrot M, Barnett AH, Meneghini LF, Schumm-Draeger PM. Insulin adherence behaviours and barriers in the multinational Global Attitudes of Patients and Physicians in Insulin Therapy study. Diabet Med 2012;29:682–689
24. World Medical Association. WMA Declaration of Helsinki: ethical principles for medical research involving human subjects [article online], 2013. Available from https://www.wma.net/policies-post/wma-declaration-of-helsinki-ethical-principles-for-medical-research-involving-human-subjects/. Accessed 16 August 2016
25. European Medicines Society. Guideline for Good Clinical Practice E6(R1) [Internet], 1996. Available from http://www.ema.europa.eu/docs/en_GB/document_library/Scientific_guideline/2009/09/WC500002874.pdf. Accessed 16 August 2016
26. Seaquist ER, Anderson J, Childs B, et al. Hypoglycemia and diabetes: a report of a workgroup of the American Diabetes Association and the Endocrine Society. Diabetes Care 2013;36:1384–1395
27. Fullerton B, Siebenhofer A, Jeitler K, et al. Short-acting insulin analogues versus regular human insulin for adults with type 1 diabetes mellitus. Cochrane Database Syst Rev 2016;6:CD012161
28. Home PD, Lindholm A, Riis A; European Insulin Aspart Study Group. Insulin aspart vs. human insulin in the management of long-term blood glucose control in type 1 diabetes mellitus: a randomized controlled trial. Diabet Med 2000;17:762–770
29. Raskin P, Guthrie RA, Leiter L, Riis A, Jovanovic L. Use of insulin aspart, a fast-acting insulin analog, as the mealtime insulin in the management of patients with type 1 diabetes. Diabetes Care 2000;23:583–588
30. Cengiz E. Undeniable need for ultrafast-acting insulin: the pediatric perspective. J Diabetes Sci Technol 2012;6:797–801
31. Ligthelm RJ, Kaiser M, Vora J, Yale J-F. Insulin use in elderly adults: risk of hypoglycemia and strategies for care. J Am Geriatr Soc 2012;60:1564–1570
32. Bode BW, Hyveled L, Tamer SC, Ybanez P, Demissie M. Improved postprandial glycemic control with faster-acting insulin aspart in subjects with type 1 diabetes using CSII. Diabetes Technol Ther 2017;19:25–33
33. Heise T, Hövelmann U, Brøndsted L, Adrian CL, Nosek L, Haahr H. Faster-acting insulin aspart: earlier onset of appearance and greater early pharmacokinetic and pharmacodynamic effects than insulin aspart. Diabetes Obes Metab 2015;17:682–688
34. Zijlstra E, Demissie M, Graungaard T, Heise T, Nosek L, Bode BW. Compatibility and safety of faster-acting insulin aspart used in continuous subcutaneous insulin infusion therapy in patients with type 1 diabetes. Endocr Rev 2016;37(Suppl. 2):FRI697

Declaration of Dr. Nathan Laney

# Exhibit H

**Diabetes Care** Volume 40, July 2017





# Faster Aspart Versus Insulin Aspart as Part of a Basal-Bolus Regimen in Inadequately Controlled Type 2 Diabetes: The onset 2 Trial

*Diabetes Care 2017;40:951–957 | https://doi.org/10.2337/dc16-1770*

Keith Bowering,[1] Christopher Case,[2] John Harvey,[3] Michael Reeves,[4] Michael Sampson,[5] Robert Strzinek,[6] Ditte-Marie Bretler,[7] Rikke Beck Bang,[7] and Bruce W. Bode[8]

## OBJECTIVE

This multicenter, double-blind, treat-to-target, phase 3 trial evaluated the efficacy and safety of fast-acting insulin aspart (faster aspart) versus insulin aspart (IAsp) in adults with type 2 diabetes receiving basal insulin and oral antidiabetic agents.

## RESEARCH DESIGN AND METHODS

The primary end point was HbA$_{1c}$ change from baseline after 26 weeks' treatment. After an 8-week run-in to optimize basal insulin, subjects were randomized (1:1) to mealtime faster aspart ($n = 345$) or IAsp ($n = 344$), titrated using a simple daily patient-driven algorithm, plus insulin glargine U100 and metformin.

## RESULTS

HbA$_{1c}$ change was −1.38% (faster aspart) and −1.36% (IAsp); mean HbA$_{1c}$ was 6.6% for both groups. Faster aspart demonstrated noninferiority versus IAsp in reducing HbA$_{1c}$ (estimated treatment difference [ETD] [95% CI] −0.02% [−0.15; 0.10]). Both treatments improved postprandial plasma glucose (PPG) control; the PPG increment (liquid meal test) was statistically significant in favor of faster aspart after 1 h (ETD [95% CI] −0.59 mmol/L [−1.09; −0.09]; −10.63 mg/dL [−19.56; −1.69]; $P = 0.0198$), but not after 2–4 h. Change from baseline in fasting plasma glucose, body weight, and overall severe/blood glucose–confirmed hypoglycemia rates (rate ratio [RR] [95% CI] 1.09 [0.88; 1.36]) were similar between treatments. Postmeal hypoglycemia (0–2 h) rates were 2.27 (faster aspart) and 1.49 (IAsp) per patient-year of exposure (RR [95% CI] 1.60 [1.13; 2.27]).

## CONCLUSIONS

Faster aspart and IAsp were confirmed noninferior in a basal-bolus regimen regarding change from baseline in HbA$_{1c}$. Faster aspart improved 1-h PPG with no differences in 2–4-h PPG versus IAsp. Overall hypoglycemia rates were similar except for an increase in 0–2-h postmeal hypoglycemia with faster aspart.

Basal insulins are one of the recommended steps in type 2 diabetes treatment intensification when oral antidiabetic drugs (OADs) no longer provide sufficient glycemic control (1). As β-cell function decreases further, maintaining target HbA$_{1c}$ levels becomes challenging, even when target fasting plasma glucose (FPG) levels have been achieved (2), and further therapeutic intensification may be required (3). The aim of

[1]Division of Endocrinology and Metabolism, University of Alberta, Edmonton, Alberta, Canada
[2]Jefferson City Medical Group, Jefferson City, MO
[3]Gladstone Centre, Maelor Hospital, Bangor University, Wrexham, U.K.
[4]Diabetes Clinical Trials, Chattanooga, TN
[5]Diabetes, Endocrinology and General Medicine, Norfolk and Norwich University Hospitals NHS Foundation Trust, Norwich, U.K.
[6]Protenium Clinical Research, Hurst, TX
[7]Novo Nordisk A/S, Søborg, Denmark
[8]Atlanta Diabetes Associates, Atlanta, GA

Corresponding author: Keith Bowering, keith.bowering@ualberta.ca.

Received 16 August 2016 and accepted 14 April 2017.

Clinical trial reg. no. NCT01819129, clinicaltrials.gov.

This article contains Supplementary Data online at http://care.diabetesjournals.org/lookup/suppl/doi:10.2337/dc16-1770/-/DC1.

This article is featured in a podcast available at http://www.diabetesjournals.org/content/diabetes-core-update-podcasts.

© 2017 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. More information is available at http://www.diabetesjournals.org/content/license.

See accompanying articles, pp. 832 and 943.

Downloaded from http://diabetesjournals.org/care

EMERGING TECHNOLOGIES AND THERAPEUTICS

2023

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/951/549490/dc161770.pdf by guest on 07 December 2023

such intensification is to prevent excessive postprandial plasma glucose (PPG) excursions, which contribute to overall hyperglycemia. Several studies have documented that in type 2 diabetes, the relative contribution of PPG to excess hyperglycemia increases as $HbA_{1c}$ levels approach target (4,5).

Options for therapy intensification in type 2 diabetes include glucagon-like peptide-1 (GLP-1) receptor agonists or the addition of mealtime insulin as part of a basal-bolus regimen (1). Reduction of PPG excursions with the addition of bolus insulin has been clearly demonstrated in type 2 diabetes (6). First-generation rapid-acting insulin analogs represented a major step forward in reducing PPG excursions versus regular human insulin (RHI). However, there remains an unmet need for insulin analogs with an even faster onset of action than rapid-acting insulin analogs, which could potentially achieve better PPG control (7,8).

Fast-acting insulin aspart (faster aspart) is a new formulation of conventional insulin aspart (IAsp). Nonclinical data illustrate that the addition of niacinamide promotes the formation of insulin aspart monomers after subcutaneous (s.c.) injection, facilitating a more rapid rate of insulin aspart absorption across the endothelium into the blood (9). In adults with type 1 diabetes, s.c. injection of faster aspart was associated with twice as fast onset of appearance in the bloodstream (4 vs. 9 min), twofold higher insulin concentration, and 74% greater insulin action in the first 30 min versus IAsp (10). As part of a basal-bolus regimen in type 1 diabetes, mealtime faster aspart effectively improved $HbA_{1c}$ (estimated treatment difference [ETD] [95% CI] −0.15% [−0.23; −0.07]), and noninferiority to IAsp was confirmed, with statistically superior 2-h PPG control versus IAsp (ETD [95% CI] −0.67 mmol/L [−1.29; −0.04]; −12.01 mg/dL [−23.33; −0.70]) (11). Statistically superior glycemic control versus basal-only therapy was observed in subjects with type 2 diabetes, where $HbA_{1c}$ was reduced from 7.9% (63.2 mmol/mol) to 6.8% (50.7 mmol/mol) in the basal-bolus arm and from 7.9% (63.1 mmol/mol) to 7.7% (60.7 mmol/mol) in the basal arm (ETD [95% CI] −0.94% [−1.17; −0.72]; −10.29 mmol/mol [−12.75; −7.82]; $P < 0.0001$) (12).

The objective of this trial was to confirm the efficacy of mealtime faster aspart versus mealtime IAsp (NovoRapid/

NovoLog), as part of a basal-bolus regimen in subjects with type 2 diabetes inadequately controlled with basal insulin and OADs.

## RESEARCH DESIGN AND METHODS

### Trial Design
This was a 26-week, multicenter, double-blind, active-controlled, treat-to-target randomized trial in subjects with type 2 diabetes comparing mealtime faster aspart with IAsp, both in combination with insulin glargine U100 (Lantus) and metformin. Subject follow-up occurred at 7 and 30 days after the end of trial (EOT). The trial was conducted in accordance with the Declaration of Helsinki (13) and the International Conference on Harmonization Good Clinical Practice (14).

### Subjects
Subjects (≥18 years of age) with a BMI ≤40 kg/m² were eligible for inclusion if diagnosed with type 2 diabetes and treated with basal insulin for ≥6 months (current once-daily treatment with NPH insulin, insulin detemir, or insulin glargine U100 for ≥3 months) before screening. Eligible subjects had also been treated with metformin (stable dose ≥1,000 mg) alone or with a sulfonylurea, glinide, dipeptidyl peptidase 4 inhibitor, and/or an α-glucosidase inhibitor for ≥3 months before screening. Subjects receiving metformin monotherapy before enrollment were required to have an $HbA_{1c}$ of 7.0–9.5% (53–80 mmol/mol) at screening or 7.0–9.0% (53–75 mmol/mol) if receiving OADs + metformin. Exclusion criteria specified no bolus insulin use, except short-term use because of intermittent illness (≤14 days' consecutive treatment), and no GLP-1 agonists and/or thiazolidinediones (all ≤3 months before screening); concomitant medications known to interfere significantly with glucose metabolism; cardiovascular (CV) disease ≤6 months before screening; recurrent severe hypoglycemia (>1 severe hypoglycemic event during the past 12 months), hypoglycemic unawareness as judged by the investigator, or hospitalization for diabetic ketoacidosis ≤6 months before screening. All inclusion/exclusion criteria are listed in the Supplementary Data.

### Interventions

#### Basal Titration During the Trial
After an initial 2-week screening period, current OADs (except metformin) were

discontinued, and subjects entered the 8-week run-in period, during which basal insulin glargine U100 (100 units/mL; administered s.c. once daily at approximately the same time in the evening using a 3.0 mL SoloStar pen injector) was optimized. Subjects were switched unit-for-unit from their previous basal insulin to once-daily insulin glargine U100. During run-in, basal insulin was titrated using a weekly treat-to-target approach, with a prebreakfast self-monitored plasma glucose (SMPG) target of 4.0–5.0 mmol/L (71–90 mg/dL) (Supplementary Table 1). After run-in, basal adjustments were performed when required as judged by the investigator, but basal dose frequency could not be changed.

#### Bolus Doses During the Trial
After the run-in, subjects with $HbA_{1c}$ 7.0–9.5% (53–80 mmol/mol) were randomized 1:1 to receive mealtime faster aspart (100 units/mL) or IAsp (100 units/mL), both with basal insulin glargine U100 and metformin (stratified according to continuous glucose monitoring [CGM] subgroup participation). Faster aspart or IAsp was administered s.c. 0–2 min before each main meal using a 3.0 mL PDS290 prefilled pen injector. The timing of bolus insulin administration was in line with the IAsp label, which recommends administration immediately before a meal (15). The double-blind treatment period (bolus insulin titration) was 26 weeks. After randomization, bolus insulin dose adjustments were performed daily by the subject and reviewed weekly by the investigator. Bolus dose adjustments were made by subjects based on SMPG values from the previous day, according to the titration guideline (Supplementary Table 1). Subjects commenced 4 units of mealtime insulin at each meal, which was titrated by 1-unit increases or decreases to achieve the next premeal or bedtime target of 4.0–6.0 mmol/L (70–108 mg/dL). Additional bolus dosing was allowed at the investigator's discretion.

#### SMPG
Subjects were supplied with a blood glucose (BG) meter (factory calibrated to display plasma glucose [PG] values) and instructed to record the date, time, and value of all SMPG measurements for 7-9-7-point profiles (preprandial, postmeal, bedtime, and once at 3 A.M.) on three consecutive days before the scheduled clinic visits at weeks 0, 12, and 26; 4-point

Appx314

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/951/549498/dc161770.pdf by guest on 07 December 2023

profiles (preprandial and bedtime) were recorded daily for titration purposes.

## Standardized Meal Test

PPG levels from 1 to 4 h were assessed in subjects completing the run-in period via a standardized liquid meal test containing ~80 g carbohydrate, consumed as quickly as possible and ≤12 min. To participate in the meal test, subjects had to be fasting with FPG levels within 4.0–8.8 mmol/L (72–160 mg/dL; SMPG measured before meal test). Blood samples were taken just before the meal and after 1, 2, 3, and 4 h. The same meal test was repeated at week 26, with the addition of the randomized treatment, a bolus insulin dose. The bolus insulin dose at the second meal test was calculated by dividing the carbohydrate content of the standardized liquid meal by the subject-specific insulin-to-carbohydrate ratio. This ratio was calculated using the "500 rule," whereby 500 was divided by the total daily insulin dose to determine the grams of carbohydrate covered by each unit of insulin (16).

## Assessments

All end points reported were prespecified and are summarized in Supplementary Table 2.

### Primary End Point

The primary end point was change from baseline in HbA$_{1c}$ after 26 weeks' treatment.

### Secondary End Points

Confirmatory secondary end points included change from baseline in 2-h PPG increment (meal test) after 26 weeks' treatment, number of treatment-emergent severe or BG-confirmed hypoglycemic episodes from baseline to week 26, and change from baseline to week 26 in body weight. Hypoglycemic episodes were categorized as treatment emergent if the onset of the episode occurred on the first day of exposure to, and no later than 1 day after the last day of, randomized treatment. Severe hypoglycemia was defined according to the American Diabetes Association (ADA) classification as an event requiring assistance of another person to actively administer carbohydrates or glucagon or take other corrective actions. PG concentrations may not be available during an event, but neurological recovery after the return of PG to normal is considered sufficient evidence that the event was induced by a low PG concentration (17). BG-confirmed hypoglycemia

was defined by a PG value <3.1 mmol/L (56 mg/dL; Novo Nordisk definition) with or without symptoms consistent with hypoglycemia.

Supportive secondary efficacy end points included HbA$_{1c}$ responders (subjects achieving HbA$_{1c}$ <7.0% [53.0 mmol/mol] or ≤6.5% [47.5 mmol/mol], as well as the proportions who achieved these targets without severe hypoglycemia); change from baseline in PPG from the meal test (at 1, 2, 3, and 4 h separately) and PPG increment from the meal test (at 1, 3, and 4 h separately), both after 26 weeks' randomized treatment; change from baseline in mean SMPG profile and mean PPG increments (7-9-7-point profile); PPG responders (subjects achieving an overall mean 2-h PPG ≤7.8 mmol/L [140 mg/dL] and the same targets without severe hypoglycemia, derived from the 7-9-7-point SMPG profile); change from baseline to week 26 in 1,5-anhydroglucitol (1,5-AG), a marker for postprandial hyperglycemia; change from baseline to week 26 in FPG; and daily insulin dose (basal, bolus, and total).

Supportive secondary safety end points included the numbers of treatment-emergent adverse events (TEAEs), hypoglycemic episodes at 1, 2, 4, and 6 h postmeal, daytime (0600−2359 h) and nocturnal (0001−0559 h) hypoglycemic episodes, allergic reactions, and injection-site reactions. An adverse event was defined as treatment emergent if onset occurred on or after the first day of exposure to treatment and no later than 7 days after the last day of treatment. CV events and deaths occurring after randomization were sent for evaluation by an external, independent, clinical safety event adjudication committee. Additional safety assessments, physical examination, vital signs, fundoscopy, electrocardiograms, and laboratory parameters were recorded at baseline and week 26.

## Statistical Methods

Efficacy analysis was based on the full analysis set, following the intention-to-treat principle. Confirmatory end points were tested using a hierarchical (fixed-sequence) procedure (Supplementary Fig. 1). The primary end point was analyzed using a mixed-effect model for repeated measurements, where all calculated changes in HbA$_{1c}$ from baseline at trial visits were included in the analysis. This

model included treatment, region, and CGM strata as fixed effects; subject as a random effect; HbA$_{1c}$ at baseline as a covariate; and interactions between all fixed effects and visit and between the covariate and visit. Noninferiority was confirmed if the upper boundary of the two-sided 95% CI was ≤0.4%. PG and PPG increments (meal test) were based on an ANOVA model. Target end points were analyzed separately based on a logistic regression model. Body weight, FPG, 1,5-AG, and PPG increment (SMPG) were analyzed using a mixed-effect model for repeated measurements similar to the model used for the primary end point. For the primary analysis, the one-sided $P$ value for noninferiority is presented; for the remaining analyses, the two-sided $P$ value for treatment difference is presented. Additional details on the sample size, power determination, statistical methods for the secondary efficacy end points, and stepwise hierarchical test (Supplementary Fig. 1) are in the Supplementary Data.

Safety end points were summarized using the safety analysis set and analyzed using the full analysis set. Hypoglycemic episodes were summarized by severity, using Novo Nordisk and ADA hypoglycemia definitions, and by category and total number of events in relation to the time since the start of a meal (Supplementary Data).

## RESULTS

### Trial Subjects

The trial randomized 689 subjects to receive faster aspart ($n$ = 345) or IAsp ($n$ = 344). Overall, 682 subjects were exposed to randomized treatment ($n$ = 341 in each group) (Supplementary Fig. 2), and 606 (88%; $n$ = 301, faster aspart; $n$ = 305, IAsp) completed the trial. Baseline characteristics were similar between groups (Table 1).

### Hierarchical Testing Procedure

Step 1 was confirmed. Because step 2 was not confirmed, the stepwise testing procedure was stopped (Supplementary Table 3).

### Efficacy

#### Change in HbA$_{1c}$

Mean HbA$_{1c}$ in subjects subsequently randomized to the faster aspart and IAsp groups were, respectively, 8.2% and 8.1% (65.6 mmol/mol and 65.2 mmol/mol) before the 8-week run-in period and

954    Faster Aspart in Basal-Bolus Therapy    **Diabetes Care** Volume 40, July 2017

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/951/546498/dc161771r.pdf by guest on 07 December 2023

**Table 1—Baseline characteristics at randomization**

| Parameter | Faster aspart $n = 345$ | IAsp $n = 344$ | Total $N = 689$ |
|---|---|---|---|
| Age, years | 59.6 (9.3) | 59.4 (9.6) | 59.5 (9.4) |
| Gender, $n$ (%) | | | |
| Male | 163 (47) | 173 (50) | 336 (49) |
| Female | 182 (53) | 171 (50) | 353 (51) |
| Race, $n$ (%) | | | |
| White | 277 (80) | 281 (82) | 558 (81) |
| Asian | 40 (12) | 42 (12) | 82 (12) |
| Black or African American | 22 (6) | 18 (5) | 40 (6) |
| American Indian or Alaska Native | 3 (1) | 0 (0) | 3 (0) |
| Native Hawaiian or other Pacific Islander | 2 (1) | 0 (0) | 2 (0) |
| Other | 1 (0) | 3 (1) | 4 (1) |
| Body weight | | | |
| kg | 89.0 (16.9) | 88.3 (16.7) | 88.7 (16.8) |
| lb | 196.3 (37.3) | 194.7 (36.9) | 195.5 (37.1) |
| BMI, kg/m$^2$ | 31.5 (4.7) | 31.0 (4.5) | 31.2 (4.6) |
| Duration of diabetes, years | 13.2 (6.7) | 12.3 (6.3) | 12.7 (6.5) |
| HbA$_{1c}$ | | | |
| % | 8.0 (0.7) | 7.9 (0.7) | 7.9 (0.7) |
| mmol/mol | 63.5 (7.5) | 62.7 (7.7) | 63.1 (7.6) |
| FPG | | | |
| mmol/L | 6.8 (1.8) | 6.8 (2.0) | 6.8 (1.9) |
| mg/dL | 121.7 (32.7) | 122.7 (35.1) | 122.2 (33.9) |
| Antidiabetic treatment at screening, $n$ (%) | | | |
| Basal + OAD | 345 (100.0) | 344 (100.0) | 689 (100.0) |
| Basal OD + 1 OAD | 187 (54.2) | 184 (53.5) | 371 (53.8) |
| Basal OD + 2 OADs | 149 (43.2) | 152 (44.2) | 301 (43.7) |
| Basal OD + >2 OADs | 9 (2.6) | 8 (2.3) | 17 (2.5) |

Values for baseline characteristics are arithmetic means (SD), unless stated otherwise. The conversion factor between mmol/L and mg/dL is 18. OD, once daily.

8.0% and 7.9% (63.5 mmol/mol and 62.7 mmol/mol) at baseline. By EOT, mean HbA$_{1c}$ had decreased to 6.6% (49 mmol/mol) in both groups (Fig. 1). The estimated mean change in HbA$_{1c}$ from baseline to EOT was −1.38% (−15.1 mmol/mol) for faster aspart and −1.36% (−14.9 mmol/mol) for IAsp. The ETD was −0.02% (95% CI −0.15; 0.10) (−0.24 mmol/mol [−1.60; 1.11]), confirming noninferiority of faster aspart to IAsp

($P < 0.0001$; hierarchical testing step 1) (Supplementary Fig. 1). By week 26, 74.8% of subjects in the faster aspart group and 75.9% in the IAsp group had achieved HbA$_{1c}$ <7.0% (53 mmol/mol), and 71.9% and 72.7%, respectively, had achieved this target without severe hypoglycemia (Supplementary Fig. 3A and Supplementary Table 4). By week 26, 54.5% and 56.4% of subjects had achieved HbA$_{1c}$ ≤6.5% (47.5 mmol/mol), and

52.2% and 53.5% had achieved this target without severe hypoglycemia in the faster aspart and IAsp groups, respectively (Supplementary Fig. 3B and Supplementary Table 4).

**Meal Test**

Estimated change from baseline in 2-h PPG increment was −3.2 mmol/L (−58.3 mg/dL) with faster aspart versus −2.9 mmol/L (−51.8 mg/dL) for IAsp. The ETD was −0.36 mmol/L (95% CI −0.81; 0.08) (−6.57 mg/dL [−14.54; 1.41]) (Fig. 2), which did not reach statistical significance. The estimated change from baseline in 1-h PPG increment was −2.1 mmol/L (−38.5 mg/dL) for faster aspart and −1.6 mmol/L (−27.9 mg/dL) for IAsp. The ETD was −0.59 mmol/L (95% CI −1.09; −0.09) (−10.63 mg/dL [−19.56; −1.69]), which was statistically significantly in favor of faster aspart ($P = 0.0198$) (Fig. 2 and Supplementary Table 4).

Statistical superiority of treatment with faster aspart versus IAsp could not be confirmed for change from baseline in 2-h PPG increment (Supplementary Fig. 1). There were no statistical differences between groups for change from baseline in 3-h or 4-h PPG increments or in PPG at any time point (Supplementary Table 4).

**SMPG**

Mean 9-point SMPG values (observed data) were reduced after the addition of bolus insulin doses (Supplementary Fig. 4). The observed mean of the 7-9-7-point profile was ∼9.0 mmol/L (162.1 mg/dL) in both groups at baseline compared with ∼6.9 mmol/L (124.4 mg/dL) by EOT (Supplementary Table 4). The change from baseline in 2-h PPG increment (7-9-7-point profile) was numerically greater with faster aspart versus IAsp at all meals, but this difference only reached statistical significance after lunch (−1.2 mmol/L [−21.4 mg/dL]) vs. −0.8 mmol/L [−15.0 mg/dL]; ETD [95% CI] −0.35 mmol/L [−0.65; −0.05]; 6.36 mg/dL [−11.81; −0.92]; $P = 0.0219$) (Supplementary Table 4).

Overall, 71.2% and 67.2% of subjects achieved the 2-h PPG target of ≤7.8 mmol/L (140 mg/dL) at week 26 (7-9-7-point SMPG profile) in the faster aspart and IAsp groups, respectively (Supplementary Fig. 3C and Supplementary Table 4), with 69.4% and 64.5% of subjects, respectively, achieving the target without experiencing severe



**Figure 1**—Mean HbA$_{1c}$ over time. Error bars: ± SEM.



**Figure 2**—PPG increment (meal test) at week 26. *Change in 1-h PPG increment statistically significant in favor of faster aspart: ETD (95% CI): −0.59 (−1.09; −0.09) mmol/L; −10.63 (−19.56; −1.69) mg/dL; $P = 0.0198$. Observed data. Error bars: ± SEM. The conversion factor between mmol/L and mg/dL is 18.

hypoglycemia (Supplementary Fig. 3C and Supplementary Table 4).

*Other Secondary Efficacy End Points*
At EOT, increases in mean 1,5-AG levels were observed in both groups (to 12.8 μg/mL in faster aspart and 13.2 μg/mL in IAsp), with no difference in change from baseline between groups (Supplementary Table 4).

FPG remained similar from baseline to EOT in both groups (Supplementary Table 4). Body weight increased by ~2.7 kg in both groups (ETD [95% CI] 0.00 kg [−0.60; 0.61]; 0.01 lb [−1.33; 1.35]).

*Insulin Dosing*
The total daily insulin dose increased during the treatment period for both groups due to the bolus intensification. Median total daily insulin dose increased from 0.56 units/kg to 1.02 units/kg in the faster aspart group and from 0.51 units/kg to 1.02 units/kg in the IAsp group (Supplementary Table 5). Observed insulin doses

were similar between the faster aspart and IAsp groups. For both groups, the proportion of bolus daily insulin relative to total daily insulin was 56% after 26 weeks' treatment (Supplementary Table 5).

**Safety (TEAEs)**
The difference in overall rate of severe or BG-confirmed hypoglycemia was not statistically significant between treatment groups (treatment rate ratio [RR] 1.09 [95% CI 0.88; 1.36]) (Table 2). The number of severe or BG-confirmed hypoglycemic episodes per subject increased at a similar rate in both groups (Supplementary Fig. 5). The observed rates of severe hypoglycemic episodes were low in both groups (0.17 and 0.11 episodes per patient-year of exposure for, respectively, faster aspart and IAsp) (Table 2). The proportion of subjects who experienced severe hypoglycemia was 3.2% (faster aspart) and 3.8% (IAsp). The relative difference in

the observed rates of severe hypoglycemic episodes between groups was not statistically significant.

For the interval 0−2 h after meals, a statistically significantly higher rate of meal-related hypoglycemia was reported for faster aspart (estimated RR 1.60 [95% CI 1.13; 2.27]; $P = 0.0082$), but there was no statistically significant difference between treatment groups for any other time frame or for daytime or nocturnal episodes of hypoglycemia (Table 2). The proportion of subjects reporting TEAEs and the rate of TEAEs was similar between groups (Supplementary Table 6). The most frequently reported TEAEs (≥1% of subjects; by preferred terms) across the treatment groups were nasopharyngitis and upper respiratory and urinary tract infections. Most events were nonserious and mild or moderate in severity. In total, 58 allergic reactions in 51 (7.5%) subjects were reported and evenly distributed across groups; most were nonserious. The event rate for injection-site reactions was low in this trial and similar between groups. All injection-site reactions were nonserious and did not recur, with the exception of two events of injection-site hematoma reported for one subject in the IAsp group.

The event adjudication committee positively adjudicated 12 adverse events as CV events (Supplementary Table 7). Six of these events were identified as major adverse CV events: two in the faster aspart group and four in the IAsp group. In the subjects with positively adjudicated CV events, most recovered/resolved and were judged by the investigator as unlikely to be related to trial products.

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/951/543498/dc161770.pdf by guest on 07 December 2023

**Table 2—Treatment-emergent hypoglycemic events**

| Treatment-emergent hypoglycemia | Faster aspart | | | IAsp | | | Treatment RR (faster aspart-to-IAsp) |
|---|---|---|---|---|---|---|---|
| | n (%) | E | R | n (%) | E | R | Estimate (95% CI) |
| Severe | 11 (3.2) | 27 | 0.17 | 13 (3.8) | 17 | 0.11 | 1.25 (0.44; 3.55) |
| Severe or BG confirmed | 262 (76.8) | 2,857 | 17.9 | 250 (73.3) | 2,692 | 16.6 | 1.09 (0.88; 1.36) |
| Meal-related severe or BG-confirmed hypoglycemia | | | | | | | |
|   Within 1 h | 45 (13.2) | 78 | 0.49 | 39 (11.4) | 62 | 0.38 | 1.29 (0.78; 2.15) |
|   Within 2 h | 112 (32.8) | 362 | 2.27 | 96 (28.2) | 241 | 1.49 | 1.60 (1.13; 2.27)* |
|   Within 4 h | 208 (61.0) | 1,248 | 7.81 | 179 (52.5) | 1,092 | 6.73 | 1.18 (0.91; 1.53) |
|   Within 6 h | 238 (69.8) | 2,036 | 12.74 | 217 (63.6) | 1,987 | 12.25 | 1.07 (0.84; 1.36) |
| Daytime and nocturnal severe or BG-confirmed hypoglycemia | | | | | | | |
|   Daytime | 257 (75.4) | 2,572 | 16.09 | 245 (71.8) | 2,475 | 15.25 | 1.07 (0.86; 1.33) |
|   Nocturnal | 104 (30.5) | 285 | 1.78 | 84 (24.6) | 217 | 1.34 | 1.38 (0.96; 2.00) |

Severe hypoglycemia was defined according to the ADA classification (17). BG-confirmed hypoglycemia was defined as an episode with a PG value <3.1 mmol/L (56 mg/dL), with or without symptoms consistent with hypoglycemia (Novo Nordisk definition). E, number of events; R, event rate per patient-year of exposure. *$P = 0.0082$.

There were no clinically relevant differences from baseline to EOT or between treatment groups in physical examinations, vital signs, fundoscopy, electrocardiograms, or laboratory assessments.

## CONCLUSIONS

In this trial, treatment intensification with mealtime faster aspart or IAsp improved glycemic control in subjects with type 2 diabetes inadequately controlled on basal insulin and OADs, with faster aspart confirmed as noninferior to IAsp for $HbA_{1c}$ change over 26 weeks. In both treatment groups, $HbA_{1c}$ decreased during the first 16 weeks of treatment, stabilizing at ~6.6% thereafter until EOT, demonstrating that subjects were able to maintain tight glycemic control, as recommended by current guidelines (1), which is predicted to reduce the risk of long-term diabetes-associated complications (18–20). These results were achieved with a simple daily patient-driven algorithm that titrated mealtime insulin by 1-unit increases or decreases, as necessary, to achieve the next premeal or bedtime target of 4.0–6.0 mmol/L (70–108 mg/dL). The improvement in $HbA_{1c}$ (~6.6%) over time was reflected in the high proportion of subjects who met the target $HbA_{1c}$ level (<7.0% [53 mmol/mol]), including those without severe hypoglycemia, which is generally recommended by the European Association for the Study of Diabetes and ADA for type 2 diabetes (1). The degree of improvement in $HbA_{1c}$ from baseline with the addition of preprandial bolus insulin is notable and demonstrates the contribution of excessive PPG excursions to overall glycemic control. The final $HbA_{1c}$ achieved in this trial (through a simple self-titration algorithm) is one of the lowest attained in a large randomized trial of basal-bolus insulin in type 2 diabetes (21).

Mealtime faster aspart and IAsp were effective in controlling PPG (assessed by both the meal test and SMPG) and improved levels of 1,5-AG, a marker for postprandial hyperglycemia (22,23). In studies of basal-bolus therapy in type 2 diabetes, changes in $HbA_{1c}$ are often small and nonsignificant (~0.09%) (21). Given the heterogeneity of type 2 diabetes, both in regard to insulin resistance and residual β-cell function (24), that similar overall glycemic control was achieved with both faster aspart and IAsp is unsurprising. This similar control occurred despite a statistically significant improvement in the 1-h PPG increment (meal test) and a lower lunchtime 2-h PPG increment (7-9-7-point SMPG profile) with faster aspart. Here we report a 0.59 mmol/L (10.63 mg/dL) lower increment (meal test) in 1-h PPG with faster aspart versus IAsp. A previous meta-analysis of randomized clinical trials in type 1 and type 2 diabetes comparing IAsp and RHI reported a significant difference in PPG improvement between regimens in favor of IAsp, with overall estimates of –0.47 mmol/L (90-min PPG value); analysis of average change in PPG increment gave similar results (25). Faster aspart demonstrated statistically superior 2-h PPG control versus IAsp when used as part of a basal-bolus regimen in type 1 diabetes (11). Conceivably, in day-to-day clinical practice, people with type 2 diabetes who have marked reductions in endogenous insulin secretion might be the ones to most benefit from a faster-acting mealtime insulin.

After 26-weeks' treatment, 56% of the total insulin dose was provided by mealtime insulin in both groups. Use of CGM has previously shown that existing approaches for calculating total insulin doses may overestimate total insulin dose required and underestimate mealtime insulin requirements (26). Recommending a regimen in which the basal dose comprises <50% of the overall insulin dose is preferable for achieving optimal glycemic control in basal-bolus treatment (27). The results from the current trial broadly support this ratio.

Body weight gain was ~2.7 kg over 26 weeks for both treatment groups, which is typical of the weight gain associated with intensive insulin regimens (28).

The overall safety profiles for faster aspart and IAsp were similar and as expected for IAsp. Many people with diabetes fear hypoglycemia; however, although a high proportion of subjects achieved $HbA_{1c}$ <7%, hypoglycemia rates were comparable with those previously reported (21), and no statistically significant differences were observed between the two treatments. The timing of hypoglycemia is usually indicative of the time-action profile of the administered insulin. The higher rate of overall hypoglycemic episodes within the first 2 h after a meal for faster aspart versus IAsp (absolute difference of ~0.8 events per patient-year of exposure) is consistent with the clinical pharmacology profiles of faster aspart and IAsp, wherein a greater early glucose-lowering effect with faster aspart was demonstrated versus IAsp (10). Similar observations were made previously when IAsp was compared with RHI (29). There were no statistically significant differences in hypoglycemic episodes between faster aspart and IAsp within 1, 4, and 6 h of a meal.

Strengths of the current trial include the double-blind design, use of a standardized meal test at baseline and after 26 weeks, and the relatively high (88%) completer rate. A limitation was the need for subjects to perform frequent finger-prick tests to record SMPG values, which, in the real-world setting, many patients may be unwilling to do. Advances in needle-free technology to measure glucose may, however, improve the practicality of intensive insulin self-management regimens in everyday life. Other limitations are the inclusion of subjects with relatively good glycemic control, who are not usually representative of subjects encountered in clinical practice, initiation of three bolus doses simultaneously, and the liquid meal test, which standardizes macronutrient composition between subjects but is not fully representative of a real-life setting. However, a treat-to-target trial of well-controlled subjects with type 2 diabetes showed that ~75% of subjects initiated with one bolus injection eventually required a full basal-bolus regimen (30), so it is of value to assess faster aspart in the same regimen.

In adults with type 2 diabetes inadequately controlled on basal insulin and OADs, insulin intensification with faster aspart or IAsp improved overall glycemic and PPG control, with statistically significantly improved 1-h PPG control with faster aspart. Overall hypoglycemia (severe or BG confirmed) rates were similar between treatment groups, with an increase in hypoglycemia rates during the 0−2 h postmeal interval with faster aspart. Thus, faster aspart and IAsp are both effective, well-tolerated treatment options for patients requiring mealtime insulin.

**Acknowledgments.** The authors are grateful to the people who participated in this study, to Alexandru Lucian Dinita, MD, Marek Demissie, MD, and Anna Maria Louice Sandberg from Novo Nordisk A/S for their review and input

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/951/546498/dc161771.pdf by guest on 07 December 2023

to the manuscript, and to Jennifer Chang, PhD, from AXON Communications for medical writing and editorial assistance.

**Funding and Duality of Interest.** All authors received compensation from and the study was funded by Novo Nordisk A/S. K.B. reports grants and personal fees from AstraZeneca, Boehringer Ingelheim, Eli Lilly, Janssen, Merck, Novo Nordisk, Sanofi, and Takeda. C.C. reports grants and personal fees from Amari, Amgen, AstraZeneca, Janssen, Lilly, Novo Nordisk, and Sanofi. J.H. reports grants and personal fees from Novo Nordisk. M.R. reports grants and personal fees from Boehringer Ingelheim, Lexicon, Novo Nordisk, and Sanofi. D.-M.B. and R.B.B are employees of Novo Nordisk. B.W.B. reports grants and personal fees from Abbott, AstraZeneca, BD, Biodel, Boehringer Ingelheim, DexCom, GlaxoSmithKline, Insulet, Janssen, Lexicon, Lilly, MannKind, Medtronic, Novo Nordisk, Pfizer, Sanofi, and Valeritas and holds shares with Aseko. No other potential conflicts of interest relevant to this article were reported.

**Author Contributions.** K.B. was the principal investigator of this study. K.B., C.C., J.H., M.R., M.S., R.S., D.-M.B., R.B.B., and B.W.B. were involved in the preparation, editing, and approval of the manuscript in collaboration with Novo Nordisk. D.-M.B. was the responsible medical officer. R.B.B. was the responsible statistician. K.B. is the guarantor of this work and, as such, had full access to all data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

**Prior Presentation.** Parts of this study were presented in abstract form and as an oral presentation at the 76th Scientific Sessions of the American Diabetes Association, New Orleans, LA, 10–14 June 2016.

## References

1. Inzucchi SE, Bergenstal RM, Buse JB, et al. Management of hyperglycemia in type 2 diabetes, 2015: a patient-centered approach: update to a position statement of the American Diabetes Association and the European Association for the Study of Diabetes. Diabetes Care 2015;38:140–149
2. Ceriello A. The glucose triad and its role in comprehensive glycaemic control: current status, future management. Int J Clin Pract 2010;64:1705–1711
3. International Diabetes Federation. Global Guideline for Type 2 Diabetes. Brussels, Belgium, International Diabetes Federation [article online], 2012. Available from http://www.idf.org/guideline-type-2-diabetes. Accessed 29 Jun 2016
4. Monnier L, Colette C, Dejager S, Owens DR. "Mild dysglycemia" in type 2 diabetes: to be neglected or not? J Diabetes Complications 2015;29:451–458
5. Peter R, Dunseath G, Luzio SD, Chudleigh R, Choudhury SR, Owens DR. Relative and absolute contributions of postprandial and fasting plasma glucose to daytime hyperglycaemia and HbA(1c) in subjects with type 2 diabetes. Diabet Med 2009;26:974–980

6. Raccah D, Bretzel RG, Owens D, Riddle M. When basal insulin therapy in type 2 diabetes mellitus is not enough–what next? Diabetes Metab Res Rev 2007;23:257–264
7. Heinemann L, Muchmore DB. Ultrafast-acting insulins: state of the art. J Diabetes Sci Technol 2012;6:728–742
8. Home PD. Plasma insulin profiles after subcutaneous injection: how close can we get to physiology in people with diabetes? Diabetes Obes Metab 2015;17:1011–1020
9. Buckley ST, Kildegaard J, Høiberg-Nielsen R, et al. Mechanistic analysis into the mode of action of niacinamide in faster-acting insulin aspart. Diabetes Technol Ther 2016;18(Suppl. 1):A291
10. Heise T, Pieber TR, Danne T, Erichsen L, Haahr H. A pooled analysis of clinical pharmacology trials investigating the pharmacokinetic and pharmacodynamic characteristics of fast-acting insulin aspart in adults with type 1 diabetes. Clin Pharmacokinet 2017;56:551–559
11. Russell-Jones D, Bode BW, De Block C, et al. Fast-acting insulin aspart improves glycemic control in basal-bolus treatment for type 1 diabetes: results of a 26-week multicenter, active-controlled, treat-to-target, randomized, parallel-group trial (onset 1). Diabetes Care 2017;40:943–950
12. Rodbard HW, Tripathy D, Vidrio Velázquez M, Demissie M, Can Tamer S, Piletič M. Adding fast-acting insulin aspart to basal insulin significantly improved glycaemic control in patients with type 2 diabetes: a randomised, 18-week, open-label, phase 3 trial (onset 3). Diabetes Obes Metab 27 March 2017 [Epub ahead of print] DOI: 10.1111/dom.12955
13. World Medical Association. WMA Declaration of Helsinki: Ethical Principles for Medical Research Involving Human Subjects. Amended by the 59th WMA General Assembly, Seoul 2008
14. International Conference on Harmonisation. ICH Harmonised Tripartite Guideline: Guideline for Good Clinical Practise [article online], 1996. Available from: http://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Efficacy/E6/E6_R1_Guideline.pdf. Accessed 27 July 2016
15. Novo Nordisk. NovoRapid (insulin aspart): Summary of Product Characteristics [article online]. Available from http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000258/WC500030372.pdf. Accessed 16 August 2016
16. Magee MF, Reyes-Castano, Nassar CM. Insulin therapy in adults with type 1 diabetes mellitus. In *Type 1 Diabetes in Adults: Principles and Practice*. Jabbour S, Stephens EA, Eds. Boca Raton, CRC Press, 2007, p. 67–108
17. Seaquist ER, Anderson J, Childs B, et al. Hypoglycemia and diabetes: a report of a workgroup of the American Diabetes Association and the Endocrine Society. Diabetes Care 2013;36:1384–1395
18. Holman RR, Paul SK, Bethel MA, Matthews DR, Neil HA. 10-year follow-up of intensive

glucose control in type 2 diabetes. N Engl J Med 2008;359:1577–1589
19. UK Prospective Diabetes Study (UKPDS) Group. Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with type 2 diabetes (UKPDS 33). Lancet 1998;352:837–853
20. UK Prospective Diabetes Study (UKPDS) Group. Effect of intensive blood-glucose control with metformin on complications in overweight patients with type 2 diabetes (UKPDS 34). Lancet 1998;352:854–865
21. Giugliano D, Chiodini P, Maiorino MI, Bellastella G, Esposito K. Intensification of insulin therapy with basal-bolus or premixed insulin regimens in type 2 diabetes: a systematic review and meta-analysis of randomized controlled trials. Endocrine 2016;51:417–428
22. Dungan KM, Buse JB, Largay J, et al. 1,5-anhydroglucitol and postprandial hyperglycemia as measured by continuous glucose monitoring system in moderately controlled patients with diabetes. Diabetes Care 2006;29:1214–1219
23. Wang Y, Zhang YL, Wang YP, Lei CH, Sun ZL. A study on the association of serum 1,5-anhydroglucitol levels and the hyperglycaemic excursions as measured by continuous glucose monitoring system among people with type 2 diabetes in China. Diabetes Metab Res Rev 2012;28:357–362
24. Cerf ME. Beta cell dysfunction and insulin resistance. Front Endocrinol (Lausanne) 2013;4:37
25. Heller S, Bode B, Kozlovski P, Svendsen AL. Meta-analysis of insulin aspart versus regular human insulin used in a basal-bolus regimen for the treatment of diabetes mellitus. J Diabetes 2013;5:482–491
26. King AB. How much do I give? Reevaluation of insulin dosing estimation formulas using continuous glucose monitoring. Endocr Pract 2010;16:428–432
27. Davidson PC, Hebblewhite HR, Steed RD, Bode BW. Analysis of guidelines for basal-bolus insulin dosing: basal insulin, correction factor, and carbohydrate-to-insulin ratio. Endocr Pract 2008;14:1095–1101
28. van Dieren S, Czernichow S, Chalmers J, et al. Weight changes and their predictors amongst 11 140 patients with type 2 diabetes in the ADVANCE trial. Diabetes Obes Metab 2012;14:464–469
29. Home PD, Lindholm A, Riis A; European Insulin Aspart Study Group. Insulin aspart vs. human insulin in the management of long-term blood glucose control in type 1 diabetes mellitus: a randomized controlled trial. Diabet Med 2000;17:762–770
30. Meneghini L, Mersebach H, Kumar S, Svendsen AL, Hennemann K. Comparison of 2 intensification regimens with rapid-acting insulin aspart in type 2 diabetes mellitus inadequately controlled by once-daily insulin detemir and oral antidiabetes drugs: the step-wise randomized study. Endocr Pract 2011;17:727–736

Downloaded from http://diabetesjournals.org/care/article-pdf/40/7/951/549489/dc161770.pdf by guest on 07 December 2023

Declaration of Dr. Nathan Laney

# Exhibit I

1710                                                                                                 **Diabetes Care** Volume 43, August 2020

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/530255/dc192232.pdf by guest on 07 December 2023



# A Randomized Trial Evaluating the Efficacy and Safety of Fast-Acting Insulin Aspart Compared With Insulin Aspart, Both in Combination With Insulin Degludec With or Without Metformin, in Adults With Type 2 Diabetes (ONSET 9)

*Diabetes Care 2020;43:1710–1716 | https://doi.org/10.2337/dc19-2232*

Wendy S. Lane,[1] Elena Favaro,[2] Naveen Rathor,[2] Hak C. Jang,[3] Maiken I.S. Kjærsgaard,[4] Alejandra Oviedo,[5] Ludger Rose,[6] Peter Senior,[7] Giorgio Sesti,[8] Alfonso Soto Gonzalez,[9] and Edward Franek[10]

CLIN CARE/EDUCATION/NUTRITION/PSYCHOSOCIAL

## OBJECTIVE

To evaluate the efficacy and safety of fast-acting insulin aspart (faster aspart) compared with insulin aspart (IAsp), both with insulin degludec with or without metformin, in adults with type 2 diabetes not optimally controlled with a basal-bolus regimen.

## RESEARCH DESIGN AND METHODS

This multicenter, double-blind, treat-to-target trial randomized participants to faster aspart ($n = 546$) or IAsp ($n = 545$). All available information, regardless of treatment discontinuation or use of ancillary treatment, was used for evaluation of effect.

## RESULTS

Noninferiority for the change from baseline in HbA$_{1c}$ 16 weeks after randomization (primary end point) was confirmed for faster aspart versus IAsp (estimated treatment difference [ETD] −0.04% [95% CI −0.11; 0.03]; −0.39 mmol/mol [−1.15; 0.37]; $P < 0.001$). Faster aspart was superior to IAsp for change from baseline in 1-h postprandial glucose (PPG) increment using a meal test (ETD −0.40 mmol/L [−0.66; −0.14]; −7.23 mg/dL [−11.92; −2.55]; $P = 0.001$ for superiority). Change from baseline in self-measured 1-h PPG increment for the mean over all meals favored faster aspart (ETD −0.25 mmol/L [−0.42; −0.09]); −4.58 mg/dL [−7.59; −1.57]; $P = 0.003$). The overall rate of treatment-emergent severe or blood glucose (BG)–confirmed hypoglycemia was statistically significantly lower for faster aspart versus IAsp (estimated treatment ratio 0.81 [95% CI 0.68; 0.97]).

## CONCLUSIONS

In combination with insulin degludec, faster aspart provided effective overall glycemic control, superior PPG control, and a lower rate of severe or BG-confirmed hypoglycemia versus IAsp in adults with type 2 diabetes not optimally controlled with a basal-bolus regimen.

[1]Mountain Diabetes and Endocrine Centre, Asheville, NC
[2]Novo Nordisk A/S, Søborg, Denmark
[3]Department of Internal Medicine, Seoul National University College of Medicine and Seoul National University Bundang Hospital, Seongnam, South Korea
[4]Novo Nordisk A/S, Aalborg, Denmark
[5]Santojanni Hospital and CENUDIAB, Ciudad Autonoma de Buenos Aires, Buenos Aires, Argentina
[6]Institute of Diabetes Research, Münster, Germany
[7]Division of Endocrinology and Metabolism, University of Alberta, Edmonton, Alberta, Canada
[8]Department of Clinical and Molecular Medicine, Sapienza University of Rome, Rome, Italy
[9]Service of Endocrinology and Nutrition, University Hospital of A Coruña, La Coruña, Spain
[10]Mossakowski Clinical Research Center, Polish Academy of Sciences, and Department of Endocrinology and Diabetology, Central Clinical Hospital of the MSWiA, Warsaw, Poland

Corresponding author: Wendy S. Lane, mountain diabetes@msn.com

Received 6 November 2019 and accepted 15 February 2020

Clinical trial reg. no. NCT03268005, clinicaltrials.gov

This article contains supplementary material online at https://care.diabetesjournals.org/lookup/suppl/doi:10.2337/dc19-2232/-/DC1.

This article is featured in a podcast available at https://www.diabetesjournals.org/content/diabetes-core-update-podcasts.

© 2020 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. More information is available at https://www.diabetesjournals.org/content/license.

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/630255/dc192232.pdf by guest on 07 December 2023

The progressive deterioration of β-cell function in type 2 diabetes requires the intensification of treatment over time (1). There are a number of antihyperglycemic therapies available for treating type 2 diabetes, and current guidelines recommend a stepwise approach to treatment intensification taking into account patient factors and preferences (2). For many people with long-standing type 2 diabetes, control of fasting hyperglycemia on regimens that include basal insulin is necessary but often insufficient to achieve and maintain HbA$_{1c}$ goals (3). Options for treatment intensification targeting postprandial glucose (PPG) include the addition of a glucagon-like peptide 1 receptor agonist, a sodium–glucose cotransporter 2 inhibitor, a dipeptidyl peptidase 4 inhibitor, a rapid-acting insulin analog (RAIA), or a premix insulin (2).

Studies indicate that targeting PPG excursions is important for achieving overall glycemic control and reducing the risk of the macrovascular and microvascular complications of diabetes (4). Postprandial hyperglycemia has been shown to be associated with adverse outcomes even in the absence of fasting hyperglycemia, including elevated intraocular pressure and cognitive dysfunction (5,6). Although further evidence is needed to fully demonstrate the benefits of lowering PPG on hard end points, careful consideration should be given to the treatment options available to physicians to limit PPG excursions in people with type 2 diabetes.

RAIAs aim to mimic the physiological action of endogenous insulin secreted in response to meals to reduce PPG excursions. However, current RAIAs have a delayed onset and a longer duration of action compared with endogenous insulin in individuals without diabetes and there is an unmet need for mealtime insulins that more closely mimic physiological prandial insulin secretion.

Fast-acting insulin aspart (faster aspart) is a novel formulation of insulin aspart (IAsp) containing the excipients niacinamide and L-arginine. In people with type 2 diabetes, faster aspart is associated with an ~9 min earlier onset of action and an ~150% greater glucose-lowering effect during the first 30 min after dosing compared with IAsp (7). In the ONSET 2 trial, faster aspart was confirmed to be noninferior to IAsp in terms of change from baseline in HbA$_{1c}$ after 26 weeks of treatment in bolus-naive adults with type 2 diabetes treated with basal insulin and oral antidiabetes agents (OADs). Moreover, faster aspart improved 1-h PPG after a meal test, with no differences in overall hypoglycemia rates compared with IAsp (8).

The aim of the ONSET 9 trial was to confirm the effect in terms of glycemic control of treatment with faster aspart compared with IAsp, both in combination with insulin degludec with or without metformin, in adults with type 2 diabetes not optimally controlled with a basal-bolus regimen. The trial also aimed to test superiority in terms of PPG regulation while evaluating the safety profile of both treatments. This was the first trial with faster aspart to recruit only participants with long-standing (≥10 years) type 2 diabetes treated with intensive (basal-bolus) insulin therapy for ≥1 year. The trial was designed to quantify a population average effect for participants with type 2 diabetes irrespective of adherence to randomized treatment and use of ancillary treatment. The primary objective was to estimate the effect based on difference in HbA$_{1c}$ from baseline to 16 weeks under these circumstances.

## RESEARCH DESIGN AND METHODS

### Trial Design
In this phase 3b, multicenter, active-controlled, treat-to-target, randomized, parallel-group trial (ClinicalTrials.gov: NCT03268005), faster aspart was compared with IAsp, both in combination with insulin degludec with or without metformin, in adults with type 2 diabetes not optimally controlled with basal-bolus treatment (Supplementary Fig. 1). The trial consisted of a 12-week run-in period, a 16-week treatment period, and a 30-day follow-up period. At the start of the treatment period, participants were randomized 1:1 to double-blind treatment with either faster aspart or IAsp delivered in a basal-bolus regimen with once-daily insulin degludec with or without metformin. The trial included 165 sites across 17 countries (Supplementary Data). The trial was conducted in accordance with the Declaration of Helsinki and International Conference on Harmonization Good Clinical Practice.

### Study Population
Adults (≥18 years old) were eligible for inclusion if they were diagnosed with type 2 diabetes for ≥10 years and had been treated with a basal-bolus insulin regimen for ≥1 year before screening (defined as basal insulin once or twice daily and bolus insulin analog taken with meals at least three times daily) with or without OADs. Participants were required to have an HbA$_{1c}$ of 7.0–10.0% (53–86 mmol/mol) at screening and an HbA$_{1c}$ ≤9.0% (75 mmol/mol) at randomization.

Key exclusion criteria were as follows: treatment with injectable glucagon-like peptide 1 receptor agonists within a period of 90 days before screening; any anticipated initiation or change in concomitant medications (for >14 consecutive days) known to affect weight or glucose metabolism; myocardial infarction, stroke, or hospitalization for unstable angina and/or transient ischemic attack within 180 days before screening; heart failure of New York Heart Association class IV; or planned coronary, carotid, or peripheral artery revascularization known on day of screening. Additional exclusion criteria included any known or suspected hypersensitivity to trial products or related products and being pregnant, planning to become pregnant, or breastfeeding (see Supplementary Appendix for full list of inclusion and exclusion criteria).

### Treatment Interventions

#### Basal Insulin Dosing
After a 2-week screening period, a 12-week run-in allowed for basal insulin titration. Participants switched from their previous basal insulin to insulin degludec once daily (100 units/mL at any time of the day, preferably at the same time every day, using a 3-mL pen injector) with dose optimization based on protocol-specified guidelines. Basal insulin dose was titrated weekly by the investigator to a prebreakfast target of 4.0–5.0 mmol/L (71–90 mg/dL) (Supplementary Table 1). An increase in dose was based on the mean of three prebreakfast self-measured blood glucose (SMBG) values measured on the last 2 days prior to and on the day of contact, while a decrease was based on the lowest of three prebreakfast SMBG values measured on the last 2 days prior to and on the day of contact. During the treatment period, basal insulin adjustments were not performed by the investigators unless for safety reasons.

#### Bolus Insulin Dosing
During the run-in period, participants continued their pretrial bolus insulin

1712    Faster Aspart Versus IAsp in Type 2 Diabetes                                    Diabetes Care Volume 43, August 2020

analog. The dose was not adjusted unless considered necessary for safety reasons by the investigator. During the 16-week treatment period, eligible participants with HbA$_{1c}$ ≤9.0% (75 mmol/mol) were randomized 1:1 to receive double-blinded faster aspart or IAsp (both 100 units/mL, administered 0–2 min before each main meal using a 3-mL pen injector). Bolus insulin was titrated twice weekly in a treat-to-target approach to achieve a glycemic target of preprandial and bedtime blood glucose (BG) between 4.0 and 6.0 mmol/L (71 and 108 mg/dL). Participants titrated bolus insulin using a predefined bolus-dosing algorithm (Supplementary Table 2).

### Other Diabetes Treatment

All OADs, except for metformin, were stopped at the start of the run-in period. The dose and dosing frequency of metformin were not changed during the trial unless for safety reasons. Initiation of any other diabetes treatment was not allowed during the screening, run-in, or treatment period.

### SMBG Measurements

Participants were supplied with a BG meter (MyGlucoHealth [Entra Health] and FreeStyle [Abbott]) calibrated to display plasma-equivalent glucose values and instructed to record the date, time, and value of all SMBG measurements for 7-9-7 point profiles (preprandial, postprandial, bedtime, and once at 4:00 A.M.) on three consecutive days before the scheduled clinic visits at weeks 0, 8, and 16; four-point profiles (preprandial and bedtime) were recorded daily for titration purposes.

### Meal Test Protocol

Participants were required to undergo a meal test with a fasting SMBG (adjusted to plasma glucose) of 4.0–8.8 mmol/L (71–160 mg/dL). The meal test was rescheduled if the participant's SMBG was outside of this range. Before randomization at week 0 (baseline), a bolus dose of the participant's pretrial insulin analog was administered followed by a mixed liquid-meal test (Ensure, Fortisip, or NutriDrink; all contained 78 g carbohydrate that needed to be consumed within 12 min). The bolus dose was calculated by dividing the digestible carbohydrate content of the liquid meal by an insulin:carbohydrate ratio. The insulin:carbohydrate ratio was calculated using the "500 rule," whereby 500 was divided by the participant's total daily dose (taken

from the day before) of both basal and bolus insulin. Blood samples were taken 2 min before the meal and after 30 min and 1, 2, 3, and 4 h (0 h defined as start time of meal consumption). The meal test was repeated at week 16 with the participant's randomized trial product using the same bolus dose calculated at the baseline meal test. During the meal test, glucose rescue medication could be used if the participant experienced hypoglycemia (SMBG ≤3.9 mmol/L [70 mg/dL]).

### Assessments

#### Primary End Point

The primary end point was change from baseline in HbA$_{1c}$ 16 weeks after randomization.

#### Secondary End Points

Confirmatory secondary end points were change from baseline in 1-h PPG increment (meal test) and change from baseline in 1,5-anhydroglucitol 16 weeks after randomization. 1,5-anhydroglucitol was used as a surrogate marker for measuring PPG excursions (9).

Key supportive secondary efficacy end points included change from baseline 16 weeks after randomization in the following: fasting plasma glucose (FPG), PPG and PPG increment (meal test), PPG and PPG increment (7-9-7 point SMBG profile), mean of the 7-9-7 point SMBG profile, and the percentage of participants achieving HbA$_{1c}$ <7.0% (53 mmol/L) and PPG ≤7.8 mmol/L (140 mg/dL) targets with and without severe hypoglycemia at 16 weeks.

Key supportive secondary safety end points included number of treatment-emergent adverse events, number of treatment-emergent hypoglycemic episodes, and change from baseline in body weight 16 weeks after randomization (end points are summarized in Supplementary Table 3).

Adverse events were defined as treatment emergent if the onset of the event occurred on or after the 1st day of exposure to randomized treatment and no later than 7 days after last day of treatment. Hypoglycemic episodes were defined as treatment emergent if the onset of the episode occurred on or after the 1st day of treatment administration after randomization and no later than 1 day after the last day of treatment. Severe hypoglycemia was defined according to the American Diabetes Association

classification (10), and BG-confirmed hypoglycemia was defined as a plasma glucose value <3.1 mmol/L (56 mg/dL) with or without symptoms consistent with hypoglycemia.

### Statistical Methods

All statistical analyses were prespecified. Efficacy end points were summarized and analyzed using the full analysis set, and results are presented based on data from all randomized participants for the entire trial period, which include data collected after participants prematurely discontinued treatment or initiated ancillary treatment. Safety end points (and insulin dose) were summarized using the safety analysis set (participants receiving one or more doses of IAsp or faster aspart) and are presented as either treatment emergent or based on data collected up to 7 days after the last dose of randomized treatment or the day before initiation of ancillary treatment.

Statistical analysis of the primary and secondary confirmatory end points followed a stepwise hierarchical procedure in order to control type 1 error (Supplementary Table 4). Noninferiority (primary end point) was confirmed if the upper boundary of the two-sided 95% CI was ≤0.4%. One-sided P values are presented for noninferiority analysis and for the other confirmatory analyses, with two-sided P values for treatment differences presented for all other analyses. Supportive analyses were not corrected for multiplicity.

Change from baseline in HbA$_{1c}$ 16 weeks after randomization was analyzed using an ANOVA model after multiple imputation, where participants with missing data at scheduled visits had their HbA$_{1c}$ values imputed using available information from the treatment arm to which the participant had been randomized. The model included treatment, region, and metformin use at baseline as factors and baseline HbA$_{1c}$ as a covariate. A similar statistical model was used to analyze change from baseline to 16 weeks in PPG and PPG increments (meal test), 1,5-anhydroglucitol, FPG, PPG and PPG increment (7-9-7 point SMBG profile), mean of the 7-9-7 point SMBG profile, and body weight. For change from baseline in PPG and PPG increments (meal test), participants with missing data had their PPG values at week 16 imputed based on information from the IAsp arm.

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/530255/dc192232.pdf by guest on 07 December 2023

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/630255/dc192232.pdf by guest on 07 December 2023

HbA$_{1c}$ and PPG responder end points were analyzed using a logistic regression model. The number of treatment-emergent severe or BG-confirmed hypoglycemic episodes was analyzed using a negative binomial regression model.

Further details on the statistical methods for the primary and secondary end points and the sample-size calculation are provided in Supplementary Data.

### Data and Resource Availability

The data sets generated during the current study are available from the corresponding author on reasonable request.

## RESULTS

### Trial Participants

Participants ($n = 1,091$) were randomized to faster aspart ($n = 546$) or IAsp ($n = 545$), and 99.6% ($n = 544$) and 99.8% ($n = 544$) of participants, respectively, were exposed to randomized trial product. A total of 1,062 participants (97.3%) completed the trial, while 1,053 participants (96.5%) completed the 16-week treatment period without premature discontinuation of randomized treatment (Supplementary Fig. 2). Premature discontinuation of randomized treatment occurred in 23 participants in the faster aspart arm and 15 in the IAsp arms (Supplementary Fig. 2). The number of participants who withdrew from the trial was distributed similarly across treatment arms (Supplementary Fig. 2). Baseline characteristics were similar between treatment arms (Table 1). There were no marked differences in antihyperglycemic treatment at screening between treatment arms.

### Efficacy

#### HbA$_{1c}$

During the run-in period, observed mean HbA$_{1c}$ was reduced from 8.25% (66.69 mmol/mol) to 7.15% (54.64 mmol/mol) for participants subsequently randomized to faster aspart and from 8.28% (67.01 mmol/mol) to 7.05% (53.54 mmol/mol) for those randomized to IAsp (Fig. 1). At the end of the 16-week treatment period, observed mean HbA$_{1c}$ was 7.00% (52.96 mmol/mol) and 6.96% (52.59 mmol/mol) in the faster aspart and IAsp arms, respectively. Noninferiority of faster aspart to IAsp in change from baseline in HbA$_{1c}$ after 16 weeks was confirmed (estimated treatment difference [ETD] $-0.04\%$ [95% CI $-0.11$; 0.03]; $-0.39$ mmol/mol [$-1.15$;

0.37]; $P < 0.001$ for noninferiority [0.4% margin]). Superiority of faster aspart versus IAsp regarding change from baseline in HbA$_{1c}$ could not be confirmed (hierarchical testing was stopped after step 3 [Supplementary Table 3]).

At 16 weeks, the proportion of subjects achieving HbA$_{1c}$ <7.0% (53 mmol/mol) was 49.6% in the faster aspart group and 51.7% in the IAsp group. The odds of achieving HbA$_{1c}$ <7.0% (53 mmol/mol) were not statistically significantly different between faster aspart and IAsp (Supplementary Table 5).

#### Meal Test

PPG increment profiles at baseline and week 16 are shown in Fig. 2. The observed change from baseline in 1-h PPG increment after 16 weeks was $-0.43$ mmol/L ($-7.72$ mg/dL) in the faster aspart and 0.08 mmol/L (1.52 mg/dL) in the IAsp arm. Superiority of faster aspart to IAsp in terms of change from baseline in 1-h PPG increment was confirmed (ETD $-0.40$ mmol/L [95% CI $-0.66$; $-0.14$]; $-7.23$ mg/dL [$-11.92$; $-2.55$]; $P = 0.001$ for superiority) (Fig. 2). There were no statistically significant differences between treatment arms for change from baseline in 30-min or 2-, 3-, or 4-h PPG increment (Supplementary Table 5). Change from baseline in PPG favored faster aspart at 1 h and 2 h with ETDs of $-0.47$ mmol/L (95% CI $-0.81$; $-0.13$) ($-8.47$ mg/dL [$-14.68$; $-2.27$]) ($P = 0.007$) and $-0.39$ mmol/L ($-0.78$; $-0.002$) ($-7.02$ mg/dL [$-14.00$; $-0.04$]) ($P = 0.049$), respectively. There was no statistically significant difference between treatment arms for change from baseline in 30-min or 3- or 4-h PPG (Supplementary Table 5).

#### SMBG

Observed mean 7-9-7 point SMBG profiles at baseline and 16 weeks after randomization were similar between treatment arms (Supplementary Fig. 4). There was no statistically significant difference in the change from baseline in mean of the 7-9-7 point SMBG profile between faster aspart and IAsp (Supplementary Table 4). The observed change from baseline in the 1-h PPG increment mean over all main meals was $-0.48$ mmol/L ($-8.66$ mg/dL) with faster aspart and $-0.23$ mmol/L ($-4.14$ mg/dL) with IAsp, with a statistically significant ETD in favor of faster aspart (ETD $-0.25$ mmol/L [95% CI $-0.42$; $-0.09$]; $-4.58$ mg/dL [$-7.59$; $-1.57$]; $P = 0.003$). There were also

significant treatment differences in 1-h PPG increment after lunch ($-0.32$ mmol/L [$-0.57$; $-0.07$]; $-5.73$ mg/dL [$-10.19$; $-1.27$]; $P = 0.012$) and the main evening meal ($-0.27$ mmol/L [$-0.51$; $-0.03$]; $-4.80$ mg/dL [$-9.14$; $-0.47$]; $P = 0.030$). There was no statistically significant difference between treatments after breakfast. Change from baseline in 1-h PPG for each individual meal or for the mean over all meals was not statistically significantly different for faster aspart versus IAsp (Supplementary Table 5).

The proportion of subjects achieving PPG ≤7.8 mmol/L (140 mg/dL) (based on SMBG values) 16 weeks after randomization was 34.1% in the faster aspart group and 35.2% in the IAsp group. The odds of achieving PPG ≤7.8 mmol/L (140 mg/dL) were not statistically significantly different between treatments (Supplementary Table 5).

#### 1,5-anhydroglucitol

The observed mean change from baseline in 1,5-anhydroglucitol at 16 weeks was 1.38 µg/mL in the faster aspart arm and 0.89 µg/mL in the IAsp arm (Supplementary Fig. 5). The change from baseline in 1,5-anhydroglucitol 16 weeks after randomization was statistically significantly greater with faster aspart compared with IAsp (ETD 0.50 µg/mL [95% CI 0.11; 0.89]).

#### FPG and Insulin Dose

There was no statistically significant difference in change from baseline in FPG between treatment arms (Supplementary Table 5).

During the run-in period, the mean daily basal insulin dose increased from 41.35 units to 64.47 units with faster aspart and from 40.83 units to 64.81 units with IAsp. During the treatment period, the mean daily bolus insulin dose increased over time with both faster aspart and IAsp. Observed mean total daily insulin doses at week 16 were similar between treatments arms (118.52 units [1.23 units/kg] for faster aspart and 115.63 units [1.19 units/kg] for IAsp) (Supplementary Table 6). The basal and bolus splits at baseline and week 16 were similar in both treatment arms (baseline 62% and 38% and week 16 54% and 46%, respectively).

#### Safety

Treatment-emergent hypoglycemia rates are presented in Table 2. The overall rate of severe or BG-confirmed hypoglycemic

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/630255/dc192232.pdf by guest on 07 December 2023

**Table 1—Baseline characteristics**

| Parameter | FA ($n$ = 546) | IAsp ($n$ = 545) | Total ($n$ = 1,091) |
|---|---|---|---|
| Age, years | 62.6 (8.6) | 62.1 (8.8) | 62.3 (8.7) |
| Sex, $n$ (% male) | 265 (48.5) | 289 (53.0) | 554 (50.8) |
| Body weight, kg | 94.36 (19.96) | 95.06 (21.46) | 94.71 (20.72) |
| Body weight, lb | 208.02 (44.01) | 209.56 (47.32) | 208.79 (45.68) |
| BMI, kg/m$^2$ | 33.43 (6.10) | 33.25 (6.52) | 33.34 (6.31) |
| Duration of diabetes, years | 19.4 (7.0) | 19.4 (7.5) | 19.4 (7.3) |
| HbA$_{1c}$, % | 7.15 (0.77) | 7.05 (0.70) | 7.10 (0.74) |
| HbA$_{1c}$, mmol/mol | 54.64 (8.39) | 53.54 (7.66) | 54.09 (8.05) |
| FPG, mmol/L | 6.52 (1.87) | 6.38 (1.82) | 6.45 (1.84) |
| FPG, mg/dL | 117.51 (33.62) | 114.89 (32.73) | 116.20 (33.19) |
| Metformin use at baseline, $n$ (% yes) | 322 (59.0) | 329 (60.4) | 651 (59.7) |

Data are means (SD) unless otherwise stated. Baseline is at randomization. FA, fast-acting insulin aspart.

episodes was statistically significantly lower for faster aspart versus IAsp (estimated treatment ratio 0.81 [95% CI 0.68; 0.97]; $P$ = 0.019). Both daytime and nocturnal rates were lower for faster aspart versus IAsp (0.83 [0.70; 0.99], $P$ = 0.038, and 0.66 [0.49; 0.88], $P$ = 0.004, respectively). There was no statistically significant difference in the rate of severe or BG-confirmed hypoglycemic episodes observed within 1 or 2 h after the start of the meal (1.16 [0.78; 1.71] and 0.97 [0.71; 1.32], respectively). However, a significant difference favoring faster aspart was observed within 4 h after the start of the meal (0.78 [0.63; 0.98]; $P$ = 0.030).

After the 16-week treatment period, the observed change from baseline in body weight was 1.19 kg and 1.12 kg with faster aspart and IAsp, respectively. There was no statistically significant difference in change from baseline between treatment arms.

No clinically relevant differences were observed in the treatment-emergent adverse event profiles (including injection site and allergic reactions) for faster aspart and IAsp during the 16-week treatment period (Supplementary Table 7). Wrong product administered (mainly a mix-up between basal and bolus insulin or vice versa) was reported more often with faster aspart (4.8% of participants) than with IAsp (2.2% of participants) (Supplementary Table 8). No clinically significant differences were seen with regard to vital signs, BMI, physical examination, safety laboratory assessments (biochemistry and hematology), electrocardiogram, and eye examination.

## CONCLUSIONS

In this trial, intensified insulin titration with faster aspart or IAsp, both in combination with insulin degludec with or without metformin, improved glycemic control in patients with long-standing

type 2 diabetes not optimally controlled on a basal-bolus regimen, and faster aspart was confirmed to be noninferior to IAsp in terms of the change from baseline in HbA$_{1c}$ following 16 weeks of randomized treatment. Switching patients to, and optimization of, insulin degludec during the 12-week run-in period resulted in a considerable and sustained improvement in HbA$_{1c}$ ($\sim$1.0%) in both treatment arms. Compared with the IAsp treatment arm, PPG regulation 1 h after a meal was significantly improved in the faster aspart treatment arm, demonstrated by the difference in change from baseline in 1-h PPG increment 16 weeks after randomization using either a meal test or SMBG measurement profiles and supported by a significantly greater increase in 1,5-anhydroglucitol with faster aspart. Together, these findings are encouraging given that patients with advanced type 2 diabetes ($\sim$19 years in the reported study population) treated with a basal-bolus regimen represent a difficult patient population to manage, with PPG control being particularly challenging.

The glycemic findings of ONSET 9 generally align with previous studies comparing the efficacy and safety of faster aspart in patients with type 2 diabetes. In ONSET 2, after a 12-week run-in period to optimize basal insulin glargine, faster aspart was found to be noninferior to IAsp in terms of change from baseline in HbA$_{1c}$ after a 26-week treatment period; however, the reduction in HbA$_{1c}$ (1.4%) by end of trial was numerically greater compared with that reported here (8). This difference is likely to reflect the difference in study population, as well as the basal insulin analog (glargine versus degludec) and run-in period duration; in ONSET 2, patients were bolus insulin naive prior to commencing the study and thus would have been more likely to experience a greater change in glycemic control with the addition of bolus insulin, while in our bolus-experienced population most of the change in HbA$_{1c}$ occurred during the run-in period when switching basal insulin to insulin degludec.

Compared with IAsp, faster aspart has been shown to improve PPG control 1 h after a meal test in bolus-naive patients treated with basal insulin and OADs (8). In the current trial, changing the insulin in bolus-experienced patients to faster aspart significantly reduced 1-h PPG increments compared with IAsp, indicating



**Figure 1—**Mean HbA$_{1c}$ over time. Error bars: ±SE (mean). All available information regardless of treatment discontinuation or use of ancillary treatment was used. ETD after 16 weeks for the change in HbA$_{1c}$ from baseline was −0.04% (95% CI −0.11; 0.03); −0.39 mmol/mol (−1.15; 0.37). Noninferiority confirmed at 0.4% level ($P$ value from the one-sided test for noninferiority evaluated at the 2.5% level: $P$ < 0.001).



**Figure 2**—PPG increment after a meal test at baseline (*A*) and week 16 (*B*). Error bars: ±SE (mean). All available information regardless of treatment discontinuation or use of ancillary treatment was used. *ETD was −0.40 mmol/L (95% CI −0.66; −0.14); −7.23 mg/dL (−11.92; −2.55), and superiority was confirmed (*P* = 0.001).

that improvement in mealtime glucose control can be achieved in this clinically challenging population.

Hypoglycemia often impedes the achievement of optimal glycemic control in patients with type 2 diabetes treated with insulin. However, noninferior HbA$_{1c}$ reduction and an improvement in PPG control were achieved alongside a significantly lower rate of overall, daytime, and nocturnal hypoglycemia with faster aspart versus IAsp. This aligns with a recent post hoc analysis of two large trials in adults with type 1 diabetes, which reported a lower rate of nocturnal hypoglycemia with faster aspart versus insulin aspart treatment (11).

These findings demonstrate that these next-generation insulins, faster aspart and insulin degludec, can provide important clinical value in tailoring of complex basal-bolus regimens to limit the incidence of hypoglycemia for patients with advanced type 2 diabetes.

Collectively, strengths of this trial include the positive efficacy and safety findings in a difficult-to-treat population of people with a mean diabetes duration of >19 years, along with a relatively high trial completion rate (>95%). The study also employed a double-blind design and used a meal test, which, although not fully representative of a real-life setting, standardized macronutrient composition between participants, to measure PPG control at baseline and 16 weeks. A limitation of the trial was the need for participants to perform frequent capillary BG monitoring for dose titration, which, in the real-world setting, many patients may be unwilling to do.

In conclusion, with use of a treat-to-target approach, intensive insulin titration with faster aspart provided effective overall glycemic control, superior PPG control, and a lower rate of severe or BG-confirmed hypoglycemia versus IAsp, both in combination with insulin degludec with or without metformin, in adults with advanced type 2 diabetes not optimally controlled with a basal-bolus regimen.

**Table 2—Treatment-emergent hypoglycemic episodes**

| Hypoglycemia | FA | | | | IAsp | | | |
|---|---|---|---|---|---|---|---|---|
| | n | % | E | R | n | % | E | R |
| Severe | 16 | 2.9 | 18 | 0.11 | 10 | 1.8 | 14 | 0.08 |
| Severe or BG confirmed | | | | | | | | |
| Overall | 367 | 67.5 | 2,227 | 13.40 | 391 | 71.9 | 2,749 | 16.52 |
| Daytime | 354 | 65.1 | 2,032 | 12.23 | 382 | 70.2 | 2,454 | 14.75 |
| Nocturnal | 116 | 21.3 | 195 | 1.17 | 136 | 25.0 | 295 | 1.77 |
| Total | 495 | 91.0 | 9,033 | 54.37 | 500 | 91.9 | 10,006 | 60.14 |
| Meal-related severe or BG confirmed | | | | | | | | |
| Within 1 h after a meal | 57 | 10.5 | 74 | 0.45 | 55 | 10.1 | 65 | 0.39 |
| Within 2 h after a meal | 116 | 21.3 | 235 | 1.41 | 122 | 22.4 | 247 | 1.48 |
| Within 4 h after a meal | 232 | 42.6 | 768 | 4.62 | 269 | 49.4 | 974 | 5.85 |

Hypoglycemic episodes were defined as treatment emergent if the onset of the episode occurred on or after the 1st day of exposure to randomized treatment and no later than 1 day after the last day of exposure to randomized treatment. Severe hypoglycemia was defined according to the American Diabetes Association classification (10), and BG-confirmed hypoglycemia was defined as an episode with a plasma glucose value <3.1 mmol/L (<56 mg/dL) with or without symptoms consistent with hypoglycemia. Nocturnal was defined as occurring in the period between 00:01 and 05:59 h (both included). Episodes with missing time stamps were considered daytime episodes. Total episodes included episodes where subjects were able to self-treat and that were not BG confirmed as well as episodes where subjects were able to self-treat but could not be classified due to missing data. %, percentage of participants; E, number of events; FA, fast-acting insulin aspart; n, number of participants; R, event rate per patient-year of exposure.

**Acknowledgments.** The authors thank all investigators, trial staff, and participants of this study. Medical writing and editorial assistance were provided by Helen Parker and Catherine Jones of Watermeadow Medical, an Ashfield company, part of UDG Healthcare plc, funded by Novo Nordisk A/S.
**Duality of Interest.** The ONSET 9 trial, including study design and data collection, analysis, and interpretation, was funded by Novo Nordisk A/S. W.S.L. has served on advisory boards for Novo Nordisk, Sanofi, and Insulet; has received honoraria for serving on speakers' bureaus for Novo Nordisk, Insulet, and Dexcom; and has received research grant support from Novo Nordisk. E.Fa., N.R., and M.I.S.K. are employees of Novo Nordisk A/S. H.C.J. has participated in advisory panels for Boehringer Ingelheim, Handok, Yuhan, Sanofi, and Novo Nordisk and has received

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/630255/dc192232.pdf by guest on 07 December 2023

Case 3:23-cv-20814-ZNQ-JBD    Document 30-9    Filed 12/08/23    Page 8 of 8 PageID: 447

honoraria for serving on speakers' bureaus for Boehringer Ingelheim, Handok, Yuhan, Sanofi, and Novo Nordisk. A.O. has received research support from Novo Nordisk and is on the speakers' bureau for Novo Nordisk. L.R. has participated in advisory panels for Novo Nordisk and has acted as a consultant for and is a member of the National Association of Statutory Health Insurance Physicians. P.S. has received honoraria for delivering continuing medical education and consulting fees from Abbott, AstraZeneca, Boehringer Ingelheim, Eli Lilly, Janssen, Merck, Novo Nordisk, and Sanofi. In addition, P.S. has received research support to his institution from AstraZeneca, Novo Nordisk, Prometic, and Sanofi. G.S. has received speaker/consulting honoraria from Novo Nordisk, Eli Lilly, AstraZeneca, Boehringer Ingelheim, Merck Sharp & Dohme (MSD), Sanofi, Amgen, GlaxoSmithKline, Theras, L-Nutra, and Servier. A.S.G. has served on advisory boards for Boehringer Ingelheim, Janssen, Mundipharma, Novartis, Eli Lilly, Sanofi, and Novo Nordisk; has received honoraria for serving on speakers' bureaus for Novo Nordisk, Novartis, Janssen, Mundipharma, Eli Lilly, and Sanofi; and has received research grant support from Menarini. E.Fr. has participated in advisory panels for AstraZeneca, BIOTON, Boehringer Ingelheim, and Novo Nordisk and has received honoraria for serving on speakers' bureaus for AstraZeneca, BIOTON, Boehringer Ingelheim, Eli Lilly, Merck, MSD, Novo Nordisk, and Servier. No other potential conflicts of interest relevant to this article were reported.

**Author Contributions.** W.S.L. and E.Fr. were the principal investigators of this clinical trial. E.Fa. and N.R. were the medical specialists for the trial and had the medical responsibility on a clinical trial level. M.I.S.K. was the responsible statistician. All authors had access to the study data, take responsibility for the accuracy of the analysis, contributed to data interpretation, reviewed and contributed to the content of the manuscript, and had authority in the decision to submit the manuscript. W.S.L. and E.Fr. are the guarantors of this work and, as such, had full access to all the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.

**Prior Presentation.** Parts of this study were presented in abstract form at the 55th Annual Meeting of the European Association for the Study of Diabetes, Barcelona, Spain, 16–20 September 2019.

## References

1. Turner RC, Cull CA, Frighi V, Holman RR; UK Prospective Diabetes Study (UKPDS) Group. Glycemic control with diet, sulfonylurea, metformin, or insulin in patients with type 2 diabetes mellitus: progressive requirement for multiple therapies (UKPDS 49). JAMA 1999;281:2005–2012
2. American Diabetes Association. 9. Pharmacologic approaches to glycemic treatment: *Standards of Medical Care in Diabetes—2019.* Diabetes Care 2019;42(Suppl. 1):S90–S102
3. Woerle HJ, Neumann C, Zschau S, et al. Impact of fasting and postprandial glycemia on overall glycemic control in type 2 diabetes importance of postprandial glycemia to achieve target HbA1c levels. Diabetes Res Clin Pract 2007;77:280–285
4. Monnier L, Lapinski H, Colette C. Contributions of fasting and postprandial plasma glucose increments to the overall diurnal hyperglycemia of type 2 diabetic patients: variations with increasing levels of HbA$_{1c}$. Diabetes Care 2003;26:881–885
5. Wu CJ, Fang WH, Kao TW, et al. Postprandial glucose as a risk factor for elevated intraocular pressure. PLoS One 2016;11:e0168142
6. Abbatecola AM, Rizzo MR, Barbieri M, et al. Postprandial plasma glucose excursions and cognitive functioning in aged type 2 diabetics. Neurology 2006;67:235–240
7. Pieber TR, Svehlikova E, Brunner M, Halberg IB, Due Thomsen KM, Haahr H. Fast-acting insulin aspart in people with type 2 diabetes: earlier onset and greater initial exposure and glucose-lowering effect compared with insulin aspart. Diabetes Obes Metab 2019;21:2068–2075
8. Bowering K, Case C, Harvey J, et al. Faster aspart versus insulin aspart as part of a basal-bolus regimen in inadequately controlled type 2 diabetes: the onset 2 trial. Diabetes Care 2017;40:951–957
9. Dungan KM, Buse JB, Largay J, et al. 1,5-anhydroglucitol and postprandial hyperglycemia as measured by continuous glucose monitoring system in moderately controlled patients with diabetes. Diabetes Care 2006;29:1214–1219
10. Seaquist ER, Anderson J, Childs B, et al. Hypoglycemia and diabetes: a report of a workgroup of the American Diabetes Association and the Endocrine Society. Diabetes Care 2013;36:1384–1395
11. De Block C, Carlson AL, Rose L, Gondolf T, Gorst-Rasmussen A, Lane W. Hypoglycemia with mealtime fast-acting insulin aspart vs. insulin aspart across two large type 1 diabetes trials (Abstract). Diabetes 2018;67(Suppl. 1):96-LB

Downloaded from http://diabetesjournals.org/care/article-pdf/43/8/1710/630255/dc192232.pdf by guest on 07 December 2023

**Appx327**

```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
2

3    _____

     JANSSEN PHARMACEUTICALS,          CIVIL ACTION NUMBER:
4    INC.,
                                       3:23-cv-03818-ZNQ-JBD
5         Plaintiff,                   3:23-cv-03335-ZNQ-JBD
                                       3:23-cv-14221-ZNQ-JBD
6         v.                           3:23-cv-20814-ZNQ-JBD

7    XAVIER BECERRA, in his            ORAL ARGUMENT
     official capacity as
8    Secretary of Health and
     Human Services, et al,
9         Defendants.
     _____
10            Clarkson S. Fisher Building & U.S. Courthouse
              402 East State Street
11            Trenton, New Jersey  08608
              March 7, 2024
12            Commencing at 11:20 a.m.

13   B E F O R E:           THE HONORABLE ZAHID N. QURAISHI,
                            UNITED STATES DISTRICT JUDGE
14

15   A P P E A R A N C E S:

         CHIESA SHAHINIAN & GIANTOMASI PC
16       BY:  JEFFREY S. CHIESA, ESQUIRE
         105 Eisenhower Parkway
17       Roseland, NJ 07069
         For the Plaintiffs

18
         COVINGTON & BURLING LLP
19       BY:  KEVIN KING, ESQUIRE
              ROBERT LONG, ESQUIRE
20       One City Center
         850 Tenth Street, NW
21       Washington, DC 20001
         For the Plaintiff Janssen Pharmaceutical, Inc.

22

23        Megan McKay-Soule, Official Court Reporter
             Megan_McKay-Soule@njd.uscourts.gov
24                    (609) 815-2319

25   Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription.
```

```
1   A P P E A R A N C E S :
        SILLIS CUMMINS & GROSS
2       BY:  JEFFREY J. GREENBAUM, ESQUIRE
            VICTOR HERLINSKY, ESQUIRE
3       The Legal Center, One River Front Plaza
        Newark, NJ 07102
4       For the Plaintiff

5       JONES DAY
        BY:  YAAKOV M. ROTH, ESQUIRE
6            TONI-ANN CITERA, ESQUIRE
        51 Louisiana Avenue, NW
7       Washington, D.C. 20001
        For the Plaintiff Bristol Myers Squibb
8
        KING & SPALDING LLP
9       BY:  ASHLEY C. PARRISH, ESQUIRE
            ISRAEL DAHAN, ESQUIRE
10           JOHN SHAKOW, ESQUIRE
        1700 Pennsylvania Avenue, NW
11      Suite 900
        Washington, D.C. 20006
12      For the Plaintiff Novo Nordisk, Inc.

13      LATHAM & WATKINS, LLP
        BY:  SAMIR DEGER-SEN, ESQUIRE
14           DANIEL MERON, ESQUIRE
            CHRISTINA GAY, ESQUIRE
15      1271 Avenue of the Americas
        New York, NY 10020
16      For the Plaintiff Novartis Pharmaceutical Corporation

17      U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
        BY:  BRIAN D. NETTER, DEPUTY ASSISTANT ATTORNEY GENERAL
18      950 Pennsylvania Avenue, NW
        Washington, DC 20530
19      For the Defendants

20      U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
        FEDERAL PROGRAMS BRANCH
21      BY:  ALEXANDER V. SVERDLOV, ESQUIRE
        1100 L. Street, NW
22      Washington, D.C. 20005
        For the Defendants
23
        U.S. DEPARTMENT OF JUSTICE
24      BY:  MICHAEL GAFFNEY, ESQUIRE
        950 Pennsylvania Avenue, NW
25      Washington, D.C., 20530
        For the Defendants
```

*United States District Court*
*District of New Jersey*
**Appx329**

1      (PROCEEDINGS held in open court before The Honorable ZAHID

2  N. QURAISHI, United States District Judge, on March 7, 2024,

3  at 11:20 a.m.)

4            THE DEPUTY COURT CLERK:  All rise.

5            THE COURT:  All right, folks.  You may be seated.

6  Thank you.

7       All right, everybody.  We are on the record actually in

8  four matters, so let me just put that on the record:  Bristol

9  Myers Squibb v. Becerra et al., Docket Number 23-3335; Janssen

10 Pharmaceuticals v. Becerra et al., Docket Number 23-3818;

11 Novartis Pharmaceuticals v. Becerra et al., Docket Number

12 23-14221; and Novo Nordisk v. Becerra et al., Docket Number

13 23-20814 for oral argument.

14      Folks, before I take appearances, let me just briefly

15 address the gallery this morning.

16      I understand that there was a delay this morning, and I

17 do want to apologize to members of the public, other folks

18 that are here, including counsel, for the delay.

19      But I also want to make clear to everybody here that we

20 do not apologize for ensuring the safety of the folks that

21 work in this courthouse, the attorneys and the parties that

22 appear before this courthouse, and the members of the public

23 that have a right to be here.

24      And I hope this serves as a reminder to all of you

25 about where you are today, the matters of importance that this

```
 1    Court has to address on a daily basis, and the real dangers
 2    and risks that come with serving on this court.
 3          And with that, I'm not going to say much more.
 4          Let me have appearances from counsel, beginning with
 5    the plaintiffs.
 6          MR. GREENBAUM:  Good morning, Your Honor.
 7          In the Bristol Myers Squibb case, Jeffrey J. Greenbaum,
 8    Sills Cummins & Gross.  I'm here with my partner, Victor
 9    Herlinsky.
10          I'd like to introduce to the Court two lawyers from
11    Jones Day who have been admitted pro hac vice, Mr. Yaakov Roth
12    and Toni-Ann Citera.
13          Mr. Roth will be arguing for us today.
14          THE COURT:  All right.  Good to see you,
15    Mr. Greenbaum and counsel.
16          Additional appearances?
17          MR. CHIESA:  Good morning, Your Honor.
18    Jeffrey Chiesa, Chiesa, Shahinian & Giantomasi, on behalf of
19    Janssen.
20          I'm joined by my colleagues from Covington & Burling,
21    Kevin King and Robert Long.  My colleague Patty Bergamasco is
22    also here in the courtroom.
23          THE COURT:  Good to see you, Mr. Chiesa, and counsel
24    as well.
25          MR. DEGER-SEN:  Thank you, Your Honor.
```

1   Samir Deger-Sen from Latham Watkins.  I'm joined by Daniel

2   Meron and Christina Gay.

3          THE COURT:  Good morning to you as well.

4          MR. DAHAN:  Israel Dahan from King & Spalding here

5   with my colleagues, Ashley Parrish and John Shakow, on behalf

6   of Novo Nordisk.

7          THE COURT:  Good morning to you as well.

8          I think that's everybody on the plaintiff's side,

9   right?  It's a little crowded over there.

10      Government?

11         MR. NETTER:  Good morning, Your Honor.  Brian Netter

12  from the Department of Justice for the defendants in all the

13  case.  I'm joined here at counsel table by Alexander Sverdlov

14  and Michael Gaffney.

15         THE COURT:  Good morning to the three of you as well.

16      So, look, it's my understanding that the parties have

17  already submitted a proposal of how you want to proceed today

18  in oral argument.  I appreciate you all doing so.

19      Do we have any housekeeping that we need to address

20  before -- I believe we're going to deal with opening remarks,

21  right, Mr. Chiesa?

22         MR. CHIESA:  Yes, Your Honor.

23         THE COURT:  All right.  So do we have any

24  housekeeping from either the plaintiffs or the defense before

25  we proceed?

1          MR. NETTER:  None from the defense, Your Honor.

2          THE COURT:  Plaintiffs, none?

3          MR. CHIESA:  None.

4          THE COURT:  All right.  Mr. Chiesa, you may proceed.

5     Actually, I have a question already, but I'm going to

6     wait.  I'm going to hold my tongue.  I'm going to hold my

7     tongue.

8          Go ahead, Mr. Chiesa.

9          MR. CHIESA:  Good morning, Your Honor.  May it please

10    the Court.

11         Your Honor, on behalf of the four plaintiffs, we are

12    grateful for your time and attention to the important issues

13    presented by these cases.

14         It is my role this morning to provide a brief roadmap

15    of how plaintiffs intend to present their arguments and to

16    identify the lawyers and the specific arguments that they will

17    be making.

18         As Your Honor is aware, these cases challenge the drug

19    price control provisions of the Inflation Reduction Act.

20    Different plaintiffs challenged different aspects of the law,

21    but we anticipate Your Honor will note some consistent themes.

22    I'll discuss three of them.

23         First, the cases before you raise issues that go beyond

24    drug prices and this particular statute.  The government has

25    advanced the extreme position that there can be no

1    constitutional violation whenever a party has elected to

2    participate in a federal benefit program.  That principle, if

3    accepted, without that long-settled principle of

4    constitutional law and have extraordinary ramifications.

5         Second, the statute at issue is unprecedented because

6    it strips away many constitutional safeguards that are

7    essential to protecting private rights, ensuring

8    accountability, and safeguarding the public interest.

9         Third, the constitutional problems are reinforced by

10   the lengths to which the government has gone to obscure the

11   statutes requirements.

12        As just one example, the government repeatedly refers

13   to a negotiation process, but, in fact, the government is

14   unilaterally dictating the price at which it is forcing

15   certain manufacturers to sell their drugs.

16        Consistent with our submission, plaintiffs have split

17   their arguments into two sessions:  one this morning, one this

18   afternoon.

19        Plaintiffs will focus first on the statutes'

20   constitutional failures.  Plaintiffs will then address the way

21   in which CMS has exceeded its statutory authority.

22        We plan on starting this morning with the issues raised

23   by Bristol Myers, Janssen, and Novartis, that the statute

24   violates the takings clause because it forces certain

25   manufacturers to sell their property on terms dictated by the

 1   government.

 2        Yaakov Roth, counsel for Bristol Myers, will address

 3   these arguments.

 4        Next, we will address the defendants' primary defense

 5   to the takings claim, which is based on their assertion that

 6   participation is voluntary.  Plaintiffs have two responses.

 7        First, plaintiffs will explain why the Voluntariness

 8   Doctrine does not apply.  Samir Deger-Sen, counsel for

 9   Novartis, will argue that issue.

10        Second, plaintiffs will explain why the statute's

11   forced sale regime is not voluntary and why it violates the

12   Unconstitutional Conditions Doctrine.  Kevin King, counsel for

13   Janssen, will address these arguments.

14        After the government addresses these issues, plaintiffs

15   respectfully request to reserve ten minutes for rebuttal, with

16   that rebuttal time deducted from the 60 minutes allocated to

17   plaintiffs for the morning session.

18        In the afternoon, we plan to address the other

19   constitutional claims and then turn to the statutory

20   violations.

21        For each argument, we expect counsel for one of the

22   plaintiffs to present the argument, for the government to

23   respond, and for plaintiffs' counsel to present rebuttal.

24        First, plaintiffs will explain why the statute forces

25   manufacturers to speak the government's preferred message in

1    violation of the First Amendment.  Mr. Roth will address these

2    issues.

3         Second, Novartis will argue that the fines the statute

4    imposes to prevent manufacturers from escaping price controls

5    are constitutionally excessive.  Mr. Deger-Sen will address

6    this claim.

7         Third, Novo Nordisk will argue that the statute

8    violates separation of powers and due process because it

9    includes no standards to constrain CMS's price setting

10   decisions and no procedures to protect against confiscatory

11   prices.  Ashley Parrish, counsel for Novo Nordisk, will

12   address these claims.

13        And finally, Novo Nordisk will argue that CMS's actions

14   violates express statutory mandates.  Mr. Parrish will address

15   these arguments as well.

16        Your Honor, thank you again for your careful

17   consideration of these important issues.

18            THE COURT:  Thank you, Mr. Chiesa.

19        Now can I ask my one question?

20            MR. CHIESA:  Of course, Your Honor.

21            THE COURT:  Only because I want to make sure my

22   record is clear.

23        So, Mr. Chiesa, there's been decisions in this arena

24   already, and I'm thinking of -- let me just make sure I have

25   the cases right.  You have the *National Infusion Center*

 1    *Association v. Becerra*.  That's a case out of the Western

 2    District of Texas.

 3          You have *Dayton Area Chamber of Commerce v. Becerra* in

 4    the Southern District of Ohio.

 5          You have *AstraZeneca v. Becerra*, which is a decision

 6    from our sister court in the District of Delaware that came

 7    out recently.

 8          In light of any of these decisions, are plaintiffs

 9    withdrawing or waiving any arguments in this matter?

10          MR. CHIESA:  We are not, Your Honor.

11          THE COURT:  All right.  It's as simple as that.  So

12    no less homework for me.  All right.

13          MR. CHIESA:  Sorry about that.

14          THE COURT:  I appreciate that.

15          MR. CHIESA:  Thank you, Judge.

16          MR. ROTH:  May it please the Court, Yaakov Roth on

17    behalf of Bristol Myers Squibb.

18          THE COURT:  Good morning.

19          MR. ROTH:  And I'll be addressing why the program

20    affects a physical taking of property, and I'm hoping to keep

21    this part to about 15 minutes.

22          Your Honor, the point of the takings clause is that if

23    the government wants to take private property for public use,

24    even for the most noble reasons, it has to pay for it.  The

25    reason is we want to make sure the costs of those social

1    welfare programs are borne by the people as a whole and not by

2    a select few.

3        What's going on here is that the government has,

4    through the Medicare program, chosen to and promised to cover

5    the costs of prescription drugs for millions of citizens, and

6    that is very expensive to do.

7        This program is designed to get those medications to

8    the Medicare beneficiaries without the government having to

9    pay their market price; instead shifting the costs of that

10   program and that promise to what is for now ten manufacturers

11   who have been selected to bear the brunt --

12        THE COURT:  By the way, Mr. Roth, when you say

13   "market price," is it a market price if by definition you're

14   the only seller?  Isn't that a monopoly price?

15        MR. ROTH:  It's both a monopoly and a market price,

16   Your Honor.  If the market is a monopoly, then that is the

17   market price.

18        I'm going to speak about specific pricing and how that

19   plays into this later, but there is a market for these

20   products and there's a price that is paid in the market.  And

21   the purpose of this program is for the government not to have

22   to pay that price, and that is the taking clause.

23        Now, the government says in one of its briefs

24   essentially, Come on, look, it's not like CMS is sending

25   trucks to your factories and hauling off the drugs.  And that

1   is true.  But I'd actually like to start there because it

2   seems that the government concedes that that would be a

3   physical taking.

4          THE COURT:  Well, is this a voluntary program,

5   Mr. Roth?  I know you argue that it isn't, but let me just

6   say -- I'll be more specific, right, because we're in a

7   courtroom now.

8          Have you found any case law in this circuit or any

9   other that holds that the participation in the Medicare system

10  is not voluntary?  That's my question.

11         MR. ROTH:  No, Your Honor, but this program operates

12  differently --

13         THE COURT:  Well, that's my next question.  You're

14  reading the tea leaves here because why is this case

15  different, then?

16         MR. ROTH:  Right.

17         So what I'd like to do is explain the way the program

18  operates and then explain how Medicare and the sort of

19  participation in Medicare fits into that.

20         The way I'd like to do it is -- if Your Honor is

21  amenable -- I'd like to suggest that there are four

22  distinctions between the hypothetical I just gave, the truck

23  showing up, hauling off drugs from the factory, and this

24  program.

25         Now, I'm going to address three of them.  The fourth is

1    actually the one that Your Honor's question goes to, which is

2    this idea that, look, this is part of participating in

3    Medicare.  You don't have to participate in Medicare;

4    therefore, we don't have to worry about this.

5         So it's as if in the hypothetical, trucks are going to

6    show up at your factory and haul off drugs, but only if you

7    participate in Medicare or Medicaid.  If you drop out, the

8    trucks won't show up.

9         Okay.  That distinction, which, to be very candid, is

10   really the thrust of the government's defense on these claims.

11   That's actually going to be the distinction that is going to

12   be addressed directly by counsel for Novartis and for Janssen.

13        I'd like to focus on the three other distinctions

14   between the hypothetical and the program, sort of bracket off

15   the Medicare participation issue for now, not because I want

16   to hide from it.  It is a very important issue in the case,

17   but I think, analytically, it's a two-step analysis.

18        So can the government do this directly as a mandate?

19   If not, is it okay because of this sort of back-end link to

20   Medicare where you can opt out --

21        THE COURT:  No.  I hear you, Mr. Roth, but I am a

22   little confused, then, because, look, the voluntariness issue,

23   to me it appears to be a threshold issue, right?

24        If I were to find that the program is voluntary and

25   that you and your clients and the plaintiffs can withdraw,

1  then what claims are left?

2          MR. ROTH:  Your Honor, I don't think that makes it a

3  threshold issue.  It's an important issue.  It's an issue

4  Your Honor absolutely has to address.

5          But I think analytically, the way to approach this --

6  and this is the way the Supreme Court approaches other sort of

7  conditions arguments, which is what -- essentially what the

8  government is arguing here -- is to ask first the question

9  of -- put aside the condition and opt out:  Is this something

10  the government can do constitutionally?

11          If the answer is no, you can't force somebody, then the

12  question becomes, All right, well, can't force them, but I'm

13  not forcing you, you have this choice available.  Does that

14  change the analysis?

15          That goes to the issue of unconstitutional conditions.

16  What are the restrictions on the government's ability to

17  condition benefits on the waiver of constitutional rights?  So

18  I think it's two separate analytical steps.

19          I'd like to start with the first, which is put aside

20  the opt out -- and I'll get to exactly how this works in a

21  minute.  Put aside the opt out.  Can the government say,

22  You've got to sell at this price or we're going to impose a

23  penalty on you, which is directly in the Texas statute how

24  this operates.

25          And then we'll get to the question of, All right, it

1    doesn't matter that you can get on Medicare as a whole and

2    then make this go away.

3         So, Your Honor, I think the first distinction between

4    the hypothetical of the trucks and this program is, here, the

5    government would say -- I think the manufacturers are agreeing

6    to provide the medications at the price.  It's an agreement.

7    The reason that distinction doesn't work, respectfully, is the

8    IRA imposes penalties if the manufacturer does not agree to

9    turn over the product.

10        So it's like the government saying, We didn't take your

11   house.  We just said we would put you in jail if you didn't

12   hand over the keys and you handed over the keys.  So there's

13   no taking.  Obviously, that would not be right.

14        If the government is using civil or criminal penalties

15   to induce, coerce, transfer property, that's a taking, and the

16   Supreme Court decision in *Horne* is a perfect example.  That's

17   the raisin case that we rely on quite a lot.

18        The farmers had to turn over a share of the raisins.

19   If they didn't, they have to pay a fine.  The Supreme Court

20   said that's a taking.

21        The D.C. Circuit decision in *Valancourt* last year,

22   which is another important case we rely on for physical

23   takings, same thing.  If you publish a book, you need to send

24   two copies to the Library of Congress or else you pay a fine.

25   D.C. Circuit said, Sure, you can pay the fine instead of

```
1    giving the property.  It's still a taking because that's how
2    you're enforcing the obligation to turn over the property.
3         This program operates the same way, Your Honor.
4    Statute says the Secretary and the manufacturer shall enter an
5    agreement under which they agree to provide access to the
6    maximum fair price for eligible individuals.  It's in
7    1320f-2(a)(1) and (a)(3).
8         And then the second piece of the statute is, well, what
9    happens if you don't agree to provide access to the drugs?
10   Well, then you incur a tax penalty every day going forward.
11   They call that the noncompliance periods, and they're huge,
12   huge penalties.  There's some dispute about how much --
13          THE COURT:  The parties -- the math, someone is going
14   to have to walk me through the math because when you read
15   these briefs, your folks are claiming that the penalties are
16   astronomical, that it would be a deterrence to ever being able
17   to actually withdraw from the program.
18        I feel like I'm watching a Godfather scene.  You've got
19   Luca Brasi trying to get Johnny Fontane out of a -- you know,
20   a deal with the band leader.  You've got a gun to the head,
21   and the Godfather says, Either your brain or your signature is
22   going on the contract.
23        That's what you guys are claiming.  The government has
24   a completely different argument here.  I mean, they're saying
25   that the penalties are not remotely what you guys are
```

1    alleging, so somebody's going to have to walk me through the

2    fuzzy math because only one of you can be right, or it's

3    possible both of you are wrong.

4         MR. ROTH:  Your Honor, I think it actually doesn't

5    really -- I think the difference on that point actually is not

6    legally material.  It goes to how you calculate the percentage

7    of the price that is the tax.

8         So it's like if you charge a hundred dollars for the

9    pill, the question is:  Is the tax $95?  In other words, you

10   take the 95 of the hundred, or do you gross up, in which case

11   it's sort of a -- it's a much higher number.

12        But either way, we're talking about tens or hundreds of

13   millions of dollars a day.  I don't think the government is

14   going to dispute that.

15        So it is a huge penalty and, frankly, the amount of

16   penalty doesn't -- for this purpose doesn't actually matter.

17   I mean, in *Valancourt*, it was something like $250, you know,

18   if you don't pay, if you don't turn over the property.

19        The point is still you're using that threat and that

20   penalty tax to coerce the transfer of property.  That makes it

21   a taking.

22        If you put these two things together in the statute,

23   the obligation to agree, the penalty if you don't agree to

24   provide the access, then I think this is just like *Horne* and

25   *Valancourt*.

1    Manufacturers have to either hand over the medicines,

2    or they have to pay large penalties.  That is a compelled

3    transfer of the product that legally is no different from a

4    direct seizure.

5    Now, before moving on to the second distinction, I want

6    to address the government's argument that when the statute

7    says we have to provide access, they say that doesn't mean you

8    actually have to sell the drug to Medicare at all.

9    They sort of hinted this in the first brief, but they

10   really double down on it in their -- in their reply.  They say

11   you have to provide access to the maximum fair price.  That

12   just means if you sell it, you can't charge more, but you

13   don't have to sell it in the first place.

14   Respectfully, the government's just wrong in its

15   premise about what the statute says and means.  I think they

16   can't -- they can't defend what the statute -- the statute

17   that Congress actually wrote, and so I'm trying to change it.

18   It's an economically significant distinction, though,

19   because if the manufacturer didn't have to provide the drug at

20   the government-dictated price, that would provide the

21   manufacturer with some leverage in the negotiations, say,

22   Look, we don't like your price.  We're just not going to sell

23   it to Medicare.  Right?

24   But Congress didn't want to take the risk that Medicare

25   beneficiaries would lose access to their medications, and so

1   Congress provided that manufacturers have to agree to just

2   that "access."  That's the word that the statute uses.  Access

3   means we need to allow the Medicare beneficiaries to get the

4   drugs on these terms.

5           Now, it's true, as the government says, the statutory

6   phrase is "access to the maximum fair price."  You can't have

7   access to a price without access to a product, and it just

8   really -- to me, it doesn't make any sense.  If you refuse to

9   sell the product to a person, you're not giving access to the

10  price.

11          And I sort of imagined a hypothetical.  The statute

12  said, Store is required to provide access to a senior's

13  discount of 25 percent off.  And the store said, Okay.  We're

14  going to check IDs at the door.  If you're 65 and older, you

15  can't come in.  Sorry.

16          Nobody would say they're complying with the duty to

17  provide access to a senior's discount on those facts.

18          And the structure of the statute, I think, powerfully

19  confirms that our reading is correct.  And that's because, as

20  Your Honor alluded to earlier, Congress did provide that you

21  can suspend the tax penalty if you withdraw all of your

22  products from both Medicare and Medicaid.  That's the way to

23  suspend the penalty all together.

24          So it just makes no sense to say, Well, Congress

25  demanded wholesale withdrawal all products from both of these

```
 1   programs in order to suspend the penalty, but Congress was
 2   perfectly okay with the manufacturer just withholding the one
 3   drug, the selected drug from Medicare on the government's
 4   terms while continuing to receive comprehension reimbursement
 5   for all of its other products.
 6            THE COURT:  Has anybody withdrawn?
 7            MR. ROTH:  No, Your Honor.
 8            THE COURT:  Has there been a single pharmaceutical
 9   company that has withdrawn from Medicare based on the issues
10   that you've raised under the IRA?  I'm just curious.  I mean,
11   has anybody said, I'm out, we'll find another way to do deal
12   with this?
13            MR. ROTH:  To my knowledge, nobody has withdrawn.
14            THE COURT:  And by the way, government, that question
15   is coming to you as well, so I'm not going to hold Mr. Roth to
16   anything more than his knowledge on the case.
17        But you're not aware of a single company saying, We're
18   going to withdraw.  We can't -- we can't manage this.
19            MR. ROTH:  No.  I'm not aware of that, and I think
20   that actually goes to what we'll talk about next, which is the
21   Unconstitutional Conditions Doctrine.
22            THE COURT:  Well, I don't know.  It can count both
23   ways.  But I understand that you're going to argue that it
24   counts one.
25            MR. ROTH:  I think that's right.
```

1          Just on that structural point, the government really
2     never grapples with that problem with its interpretation of
3     the statute.
4          So the bottom line, Your Honor, on this is the statute,
5     on its face, clearly does require the manufacturer to hand
6     over the product on the government-dictated terms or else pay
7     a penalty, and that is a physical taking of property, just
8     like in *Horne* and in *Valancourt*.
9          Two other distinctions between this program and the
10    truck hypothetical.  Second distinction:  Instead of a CMS
11    truck picking up drugs in bulk for the government, this is
12    actually third parties.  They're Medicare beneficiaries who
13    are coming, and they are getting their individual pills.  That
14    doesn't matter to the analysis either.
15         For one thing, it's the government who is the payor.
16    The government is the insurer for these products.  That's why
17    they're doing this.  So the government is actually the one
18    reaping the benefits of the compelled discounts designed to
19    save money for Medicare.
20         Second point:  Putting that aside, it actually doesn't
21    matter for takings purposes whether the statute requires
22    access for the government or access for third parties.  It's
23    still a taking.
24         The best example of that is the Supreme Court's
25    *Cedar Point* decision.  That's the one involving the California

1  law that required agricultural facilities to provide access --

2  same word -- to union organizers to come onto their property,

3  and the Court said, Yeah, that is a physical taking of the

4  property because the government is forcing you to provide

5  access to your property to these third parties.

6       The third distinction is there is some payment made.

7       THE COURT:  I just want to go back, Mr. Roth.

8       MR. ROTH:  Sure.

9       THE COURT:  I thought you said earlier -- and correct

10  me if I'm wrong.  You're saying the government benefits from

11  this.  Is that what your point is?

12       What about Americans?  They don't benefit from this?

13       MR. ROTH:  They're not the principal

14  beneficiary directly.

15       THE COURT:  That wasn't my question, though.

16       Do they benefit from the price reduction?

17       MR. ROTH:  They may.  Some Medicare beneficiaries may

18  see lower co-pays.  It depends on how the Part D plan works

19  because they work in different ways.  So they may; they may

20  not.  But the government, as you can see, a very large benefit

21  in the form of paying less money to buy these products.

22       Just to go back to where I started, the problem is that

23  benefit or that the cost of that is not being spread among the

24  people as a whole.  It's being taken out of these ten

25  manufacturers.

 1          So, Your Honor, unlike the truck hypothetical, this is

 2     the third distinction I wanted to draw.  The program does

 3     provide some payment.  It's not taking it and giving you

 4     nothing.  Right?  It's as if the trucks show up, they haul off

 5     some drugs, they leave you a check for half.  Okay?

 6          That matters.  It matters for damages purposes.

 7     Certainly, when we got to that point, you would deduct the

 8     maximum fair price from the market, fair market value, which

 9     is the standard under the takings clause for just

10     compensation.

11          And it would -- it would go to the amount after that

12     manufacturers are entitled to recover after the taking occurs,

13     but it doesn't mean there isn't a taking in the first place.

14          And the Supreme Court decision in *Horne* controls on

15     this point, too.  The raisin farmers there retained a right to

16     be reimbursed after the government resold the raisins, you

17     know, less certain expenses.

18          And the Supreme Court said, Yeah, that goes to the

19     amount of just compensation you might be owed on the back end,

20     after the fact.  It doesn't change the existence of the taking

21     in the first place.

22          Now, if the program guaranteed fair market value, that

23     would be a different story, of course, but it doesn't.  The

24     whole point is for Medicare to get a discount.

25          And, in fact, the statute caps the maximum fair price

 1    at a fraction of at least one benchmark market value that's

 2    out there, the non-federal average manufacturer price.

 3         Now, look, drug pricing is very complicated.  There's a

 4    lot of numbers.  There's a lot of different prices.

 5         But our point is simple for now, which is the program

 6    takes them.  The program doesn't guarantee just compensation.

 7    That's the declaration judgment we want.

 8         The actual amounts of how -- you know, what is the real

 9    value of the drug, how much should we be entitled to get,

10    that's not before the Court right now.  That would be a

11    later-stage issue for damages, if and when the government

12    actually proceeds with the taking.

13         For now, all we are trying to say -- and this is sort

14    of a sum-up for this part -- is requiring a manufacturer to

15    sell its products to certain buyers at a government-dictated

16    discount, no different from a takings clause perspective than

17    sending government trucks to seize the property from the

18    factory.

19         With that predicate, the only remaining question, I

20    think, becomes does this become constitutional because the

21    manufacturers can withdraw entirely from Medicare and

22    Medicaid?

23         And that's the question to which my co-counsel will

24    turn next, with Your Honor's permission.

25              THE COURT:  All right.  Thank you, Mr. Roth.

```
 1          MR. ROTH:  Thank you.

 2          MR. DEGER-SEN:  Thank you, Your Honor.

 3     I'm Samir Deger-Sen for Novartis.  I'm going to speak

 4 for about ten minutes.

 5          THE COURT:  Good morning.

 6          MS. DEGEN-SEN:  Good morning, Your Honor.

 7          The government's primary defense is that there's no

 8 taking here because manufacturers agreed to terminate all of

 9 their contracts for all of their drugs under the Medicare and

10 Medicaid programs.

11          In making that argument, the government has sort of

12 tried to cause that as a condition on participation.

13          My colleague, Mr. King, is going to address why -- even

14 if that characterization is correct -- the program is still an

15 unconstitutional condition and unduly coercive.

16          But I want to make two important threshold arguments

17 that challenge that premise.  First, the program shouldn't be

18 understood as a condition at all.  Rather, it is a requirement

19 to hand over property backed by a penalty, and that needs to

20 be analyzed differently.

21          And, second, when you have a physical taking backed by

22 a penalty like this, it doesn't matter that a party can avoid

23 the taking by exiting the relevant market.

24          This case is, therefore, very different from the cases

25 Your Honor was describing, which are regulatory takings cases
```

1    or due process challenges to the rate itself.  Those are all

2    cases saying that the rate is too high.

3         This is a case saying that there was a physical taking

4    and it's not a condition.  And that makes the analysis more

5    akin to the *Horne* and *Valancourt* cases --

6         THE COURT:  So just so I'm clear, is it your position

7    that whether the program is voluntary or not is irrelevant?

8    Basically, the circumstances of this case.

9         MR. DEGER-SEN:  It's not irrelevant, but the -- when

10   you have a physical taking there is special sort of doctrinal

11   considerations that apply, and that -- that's really governed

12   by *Horne*.  And those doctrinal considerations say that there's

13   a distinction between voluntariness and avoidance.  And

14   avoidance, which is what this is, is not a sufficient basis to

15   say the government gets to do the taking.

16        So on this first point it would be clear, because I

17   think it's easy to miss, this regime is not actually a

18   condition on participation.  The clearest way to see that is

19   to think about what happens if we -- if the manufacturer

20   rejects the MFP.

21        The result isn't that we don't sell that drug.  The

22   result isn't even that we don't get to be part of the

23   Medicare/Medicaid program.

24        The result is we stay in the program.  So we sell the

25   drugs at the market base prices we were previously paying,

```
 1    that everyone is reimbursed at the rates they were previously

 2    paying.  Everything stays the same except we're subject to a

 3    massive penalty.

 4         That is a not condition on coverage like the other

 5    programs the government analogizes it to, and it's not a price

 6    tag.  It's not the government saying, We're just going to pay

 7    a specific price.  If you don't like it, you can go.

 8         The crux of the program is a physical taking

 9    requirement, as Mr. Roth described it, backed by a penalty.

10    It's sort of nested within Medicare and Medicaid.

11         And that brings me to the second point, which is when

12    it comes to a physical taking, no court has ever said that the

13    fact you can leave the relevant market place excuses the

14    physical taking.

15         And the reason, I think, is pretty clear, because it

16    would give the government carte blanche to say, Well, you're

17    in a government program, a federally regulated program, so now

18    we can violate your constitutional rights.

19              THE COURT:  Let me ask you this.  I don't mean to

20    interrupt, but let me just step back.

21         Is the format for today that you're all going to

22    address all your arguments on all the claims and then I'm

23    going to hear from the government?  Because that's not as

24    helpful to me.

25         My understanding is that you guys were going to address
```

1    an issue on the plaintiffs' side, and then I get to hear what

2    the government's response is.

3         It's not going to be helpful if I have two hours or two

4    and a half hours of plaintiff argument, and then I have to go

5    back in time to remember all the things you've said to hear

6    what the content is going to be from the government.

7         So how do we do that, Mr. Chiesa?  Is that what you all

8    agreed to, that you would raise all the arguments from the

9    plaintiffs first, and then I would then hear from the

10   government?  Because I would prefer to hear from them on the

11   takings issue first and then hear from Mr. Deger-Sen and then

12   go back and forth.

13        Otherwise, I'm getting all the arguments at one time

14   from one side.  I'm not sure how helpful that is to me.

15        MR. CHIESA:  I won't speak for everybody, Your Honor,

16   but whatever is best for you to understand what is going on

17   here.

18        THE COURT:  Mr. Chiesa, I'm not trying to interrupt

19   you, and I want to hear from you, but I don't want to wait two

20   and a half hours to hear what the government has to say

21   about the case --

22        MR. DEGER-SEN:  And to be clear, that's not what

23   this -- this is all part of the takings --

24        THE COURT:  So you're still addressing the second

25   part of the takings?

```
 1         MR. DEGER-SEN:  We're still addressing the takings.
 2   This is part of our takings -- I mean, it's broken up into
 3   three sections.
 4         And the reason we did that is because I think we wanted
 5   to get -- make it analytically clear that this doesn't look
 6   like the kinds of other cases, the regulatory takings cases,
 7   because physical takings have a different analysis.
 8         THE COURT:  And the government, you're going to
 9   address all of these particular pieces in one shot when
10   they're done breaking it up?
11         MR. NETTER:  Yes.
12         MR. DEGER-SEN:  Exactly, Your Honor.  And then with
13   respect to our other claims -- I'm sorry.  I was going to say
14   with respect to our other claims in the afternoon, we'll be
15   discussing them --
16         THE COURT:  Fair enough.  All right.  That makes
17   sense to me --
18         MR. DEGER-SEN:  Sorry if that was confusing,
19   Your Honor.
20         Did you want to say something?
21         MR. NETTER:  No.
22         MR. DEGER-SEN:  Great.
23         So this is all sort of part of the takings doctrine --
24   this is sort of part of the takings doctrine -- is when it
25   comes to physical taking -- that's why we broke it up this
```

1    way.

2         You have to first establish it's a physical taking.

3    That puts you into the special doctrinal bucket governed by

4    *Horne* where voluntariness looks a little bit different, and,

5    you know, that -- that sort of -- the hypothetical that --

6    that Mr. Roth stressed, the question becomes, Is it okay to

7    come to our plants, to our facilities, take all of our stuff?

8    And say, Well, you can avoid that, you don't have to be in

9    Medicare and Medicaid.  You can -- you can just leave, but,

10   you know, we're here and we're going to take this, and if you

11   don't want us to grab the stuff, you have to pay us an

12   enterprise destroying penalty.  Is that fine?

13        And the Supreme Court said -- and no Court has ever

14   said that is fine.  All the cases they rely on are regulatory

15   takings cases or due process cases.

16        And the Supreme Court in *Horne* made clear that's not

17   the case.  And this is very similar structurally to the

18   argument that was made in *Horne*.  In *Horne* the government said

19   a very similar thing.  They said, Look, we stabilized the

20   price in the raisins market.  It's because of this program

21   that the price in the raisins market is what you get.

22        This is a federally regulated and subsidized market.

23   You're people who grow grapes.  You don't have to be part of

24   the raisins market.  You can go sell your grapes directly.

25   You can go sell them to a winemaker or you can go make wine.

1    These are all things you can do, but if you want to be

2    part of the federally regulated raisins market, then you have

3    to agree to a taking.

4    And the Supreme Court said, No, that's not appropriate,

5    that -- when it comes to physical takings, the government

6    doesn't just get to say, You can just leave the entirety of

7    the federally regulated market.

8    And I would just like to read from Justice Sotomayor's

9    dissent because it perfectly characterizes the government's

10    argument in that case, the dissent argument.  The argument was

11    rejected.

12    This is what she said:  "Insofar as the *Horne's* wish to

13    sell some raisins in a market regulated by the government at a

14    price supported by governmental intervention, the order

15    requires that they give up that right to sell some portion of

16    those raisins at that price and, instead, accept disposal of

17    them at a lower price."

18    That is word for word what the government is saying in

19    this case.  If you want to be part of the Medicare and

20    Medicaid markets, you have to subject yourself to this, and

21    we're going to give you the difference between the price you

22    want and the other price.  And if you don't want to be part of

23    the federally regulated market, we're not taking anything from

24    you.  You can go somewhere else.  There is no taking.

25    That is exactly what the Supreme Court rejected in

 1   *Horne*, and it's also -- the only other case that's even

 2   remotely close to this is the *Valancourt* case and the analysis

 3   goes exactly the same way.

 4       Again, if you look at the government's brief, they look

 5   exactly like this.  They said that the physical taking there

 6   was depositing books at the Library of Congress.  It was

 7   voluntary because you could just abandon the government's

 8   protected market by giving up your copyright.

 9       You know, you don't have an entitlement to a copyright.

 10  The government is the only reason you have the copyright, give

 11  up your copyright.

 12      And the D.C. Circuit said, First of all, the conditions

 13  framework isn't the right way to even think about this because

 14  this isn't an actual condition.

 15      You get copyright protection, in any event.  This

 16  wasn't, you know -- there is no incremental benefit for the

 17  book deposit requirement.

 18      So we're not going to analyze this as a condition, and

 19  that way of thinking about it is wrong.  And then it said, you

 20  know, ultimately, that is a physical taking, and it's not

 21  acceptable to say you can just abandon your copyright.

 22      In addition it said, Maybe if there was a costless and

 23  seamless way of abandoning your copyright, the analysis might

 24  be different.  But as I said, it's not costless here because

 25  of the $125 penalty.  We're not sure that that cost seamless

1   exception applies.  But even if it does, Mr. King is going to

2   explain this is clearly not costless.

3           THE COURT:  The government's position is this is how

4   much we're willing to pay.  Take it or leave it.

5        You're saying that's a problem for them?

6           MR. DEGER-SEN:  No.  They're saying when it comes to

7   that -- that would not be a problem, Your Honor.

8           THE COURT:  You're saying that's not what --

9           MR. CHIESA:  That's not what they're doing, exactly.

10  If the government had a price cap and it said, We just -- this

11  is how much you want to pay.  If you don't like it, don't sell

12  us this drug, or even -- you know, it might -- even if they

13  said, You don't like it, don't sell us any drugs.  Maybe they

14  can do that.

15       I'm not sure -- Mr. King will give you reasons why

16  probably that doesn't work either, but that -- you don't even

17  have to go there because that's sort of a more classic price

18  cap system.

19       This is a physical taking backed by a penalty at its

20  crux.  None of the programs -- this is what makes this

21  unprecedented and novel.  There is no other program that looks

22  like this where it says you have to put the drugs in the

23  formulary.  You have to physically hand them over at the

24  government-dictated price, and if you don't, we're going to

25  tax you billions and billions and billions of dollars.

1        That is at its crux physical taking backed by -- and,

2   you know, it's wrong for the government to just keep calling

3   this a spending clause case or a spending clause legislation.

4   It's not.  This is not a question of what the government wants

5   to spend or doesn't want to spend.

6        It's using its sovereign power to coerce someone to

7   hand over something, and then backs it with an enterprise

8   destroying tax.  That is all regulatory.  That is the

9   government acting in a sovereign capacity, not at all acting

10  like a market participant.

11       That's why you think it's so important, to see that

12  that is the crux of the program.  At -- at bottom, this is

13  just -- it isn't -- they tried to sort of mask it, and they've

14  done a great job in sort of making it sound like this is all

15  voluntary.  But at its absolute core, it is exactly like the

16  trucks at the factory hypothetical, and they have not

17  responded in any of the briefs to that hypothetical.

18       If you find that hypothetical to be, you know,

19  unacceptable, and I think it's imputed unacceptable and *Horne*

20  makes it clear it's unacceptable, that is what this program

21  is.  The fact that the person at the factory door could just

22  leave Medicare, Medicaid does not mean the government gets to

23  go and seize their property.

24          THE COURT:  Even if I find the program is voluntary,

25  that's not the end of -- your claims survive?

```
 1              MR. DEGER-SEN:  I think the way to think about it is
 2   when it comes to physical takings, the fact that you can avoid
 3   something doesn't make it involuntary.
 4              THE COURT:  Involuntary.
 5              MR. DEGER-SEN:  Exactly.  Avoidance is not voluntary.
 6         Thank you, Your Honor.
 7              THE COURT:  All right.  Thank you.
 8              MR. KING:  Good morning, Your Honor.
 9              THE COURT:  Good morning.
10              MR. KING:  Kevin King, counsel for Janssen
11   Pharmaceuticals.  I'll be addressing the remainder of the
12   government's voluntariness defense and then the
13   unconstitutional conditions framework that plaintiffs have put
14   forward as an alternative basis for their claims.
15         I'm the last plaintiffs' side lawyer you're going to
16   hear on these takings issues before we hand it over to the
17   government.
18              THE COURT:  All right.
19              MR. KING:  And I'd be glad to answer any of your
20   questions about those issues.
21         But just to pick up where Mr. Deger-Sen left off,
22   voluntariness is not a defense.  He gave the reasons for that.
23         My role here is to show you that even if voluntariness
24   were theoretically available as a defense, the government's
25   argument would fail here.  The statute gives plaintiffs no
```

1    choice but to acquiesce in the program's requirements, both as

2    a matter of law and as a matter of fact.

3        The Supreme Court has said that a program is not

4    voluntary if it relies on coercion to secure participation,

5    and that is exactly what the program does here.  Indeed,

6    Congress designed this program to be voluntary in theory but

7    mandatory in fact.

8        As Mr. Roth said, it subjects plaintiffs to an excise

9    tax penalty that is so crippling that Congress knew in advance

10   and recognized that no company ever could incur it.

11       Just to give you one concrete example of what that tax

12   would look like -- you asked earlier about what it would look

13   like -- our declaration -- this is ECF 30 10 in the Janssen

14   case -- shows that this tax, if it were to be applied to

15   Janssen Pharmaceuticals, would be three times as much as

16   Janssen's parent company across all its products.  Not just

17   pharmaceuticals, but everything.  So that's the size of what

18   we're dealing with here.

19       Now, the government asserts that this program is

20   voluntary because plaintiffs could theoretically withdraw all

21   their drugs, not just the four selected drugs we're talking

22   about here today, but all of their drugs for Medicare and

23   Medicaid, which, by the way, for the four plaintiffs that are

24   before you today, Your Honor, that's 120 drugs -- more than

25   120 drugs that cover serious medical conditions like cancer,

 1   HIV, heart disease, and more.

 2       The government's argument is essentially that the

 3   program is optional because the plaintiffs could either give

 4   an arm if they complied with the program's requirements or an

 5   arm and a leg if they did not, and that is no choice at all.

 6       Let me just tick quickly through a few of the reasons.

 7   One of the reasons there is that Medicare and Medicaid have

 8   this dominant role.

 9       THE COURT:  Look, I don't want to beat up your

10   analogy, but there's a lot of folks that would say

11   pharmaceutical companies can give up an arm.  They've got

12   plenty of appendages.

13       So, I mean, what's the real bottom line here as to how

14   this impacts -- I mean, there's a threat that the plaintiffs

15   are saying that, you know, we wouldn't be able to fund R&D,

16   and this is going to prevent us curing diseases and developing

17   new drugs.

18       And I don't have -- I've got to be honest, Mr. King, I

19   don't have much before this Court, because if you're going to

20   make that argument before the Court and say the effect of the

21   IRA and this reduction program that is coercive in nature

22   would destroy the pharmaceutical companies' efforts to develop

23   new drugs, to help assist Americans in curing new disease,

24   then I would probably want to know a whole bunch of more

25   things, like what else are you spending the money on?  What

1    are you spending on advertising?  What are you spending on

2    executive compensation?  What are you spending on all these

3    other areas, stock buybacks and all the rest of it?

4         I don't have any of that before me, so if you are

5    taking the argument that this would destroy the pharmaceutical

6    business and we wouldn't be able to develop drugs for

7    Americans to survive or cure new diseases, you have to give me

8    more than just I said it, so, therefore, it is so.

9         I mean, do you have more before the Court?  Is there a

10   declaration before me, ECF Number 1056, or whatever number of

11   documents you guys have filed in this case that I should be

12   looking at to say this is the real deal?

13        If we are bound by this program, if we stay in this

14   program, it will effectively hurt Americans as opposed to

15   helping them.

16        MR. KING:  Your Honor, thank you for the opportunity

17   to address that.

18        You asked earlier during Mr. Roth's presentation, Do

19   Americans benefit from this program?  And the answer is no,

20   they do not benefit because -- because of the reason you were

21   just alluding to, and the best place to look to find those

22   facts -- which, by the way, are uncontested, the government

23   has had ample opportunity.  Its filed hundreds of pages of

24   briefs in these cases.  It has not contested anything that we

25   say in ECF 30 10, the Penkowski declaration, which shows that

1    this program would have a debilitating effect on plaintiffs'

2    ability to compete and to innovate by developing the new drugs

3    that Americans depend on to treat those kinds of conditions

4    that I was talking about:  cancer, HIV, heart disease.  And a

5    lot more.  Right?

6         And so it's a sworn declaration and it's uncontested

7    and what it says is there's a cycle of innovation here and

8    that this program would have debilitating effects on the

9    ability of that cycle of innovation to continue.  A cycle,

10   which, by the way, just to fill in some of the blanks,

11   Your Honor, new drugs cost on average more than $2.6 billion

12   each to develop.  99.98 percent of those drugs never get to

13   market.  There needs to be a way to cover that R&D, and the

14   revenues for these programs, Medicare and Medicaid, are an

15   essential part of that.

16         THE COURT:  But there are some of those mechanisms in

17   place already?  I mean, we have a patent system, right?  We

18   have market exclusivity that's conferred by the FDA.

19         Do we need to have other protections for pharmaceutical

20   companies that we haven't already put in place to protect --

21   with respect to development and the amount of cost it takes to

22   develop, you know, drugs and all the rest?

23         I mean, don't we have programs in place to already

24   protect that interest?

25         MR. KING:  Those programs are -- and those

1    protections that you refer to are undermined by this program

2    because what the IRA does, in effect, is it devalues and

3    undermines the patents and the exclusivity rights that

4    plaintiffs have.

5         That's not the core of what we're talking about when we

6    talk about takings.  Physical takings here is the takings of

7    the pills themselves, but as a policy matter, it's true that

8    those patents aren't worth much if you can't enforce them, if

9    you don't have the benefits of exclusivity.

10        So that's the policy side of it, but I really don't

11   want to lose track of the patient side of it.

12        The government's voluntariness arguments is essentially

13   that plaintiffs can withdraw all 120 plus of their drugs from

14   Medicare and Medicaid, leaving millions and millions of

15   Americans without coverage for the drugs they depend on in

16   their daily lives.  That's not voluntary given the core

17   mission of these companies.

18        Now, this goes to some questions you asked to

19   Mr. Deger-Sen.  You said, Does voluntariness matter?  Is it

20   relevant?  The answer is, yes, it's relevant to some of the

21   arguments, but at the end of the day, it's not relevant to

22   this.

23        Either the program is not voluntary, in which case you

24   need to address our takings claim head-on, or if it is

25   voluntary, then you still need to address and resolve our

```
 1   takings claim under the Unconstitutional Conditions Doctrine.

 2        Indeed, the entire point of that doctrine is that

 3   something is not immunized from constitutional scrutiny merely

 4   because it's labeled as a condition on participation in a

 5   voluntary program.

 6        So one way or the other, Your Honor, you're going to

 7   need to confront and resolve the merits of our takings claim.

 8        THE COURT:  Are any of you going to give me a break

 9   today, or is it just going to be -- is there one claim that I

10   can maybe not address if I address another claim?

11        We have, what, over 400 cases a judge in this district,

12   and there's not one you're going to -- you're going relieve me

13   from?

14        All right.  That's fair, Mr. King.

15        MR. KING:  Your Honor, I sympathize.  I know you've

16   got a busy docket.  You've got four big cases before you

17   today.  We appreciate the opportunity to come in and to talk

18   about these cases together.  We have done our best --

19        THE COURT:  But your point, just so I'm clear, is

20   regardless of whether I find that the program may be

21   voluntary, that does not address the -- I would still have to

22   do the analysis of the takings claim?

23        MR. KING:  Yes.

24        THE COURT:  It doesn't fail on its face simply

25   because you may have an opt-out in the program, and I find it
```

1    to be voluntary.

2        I know you're arguing that it's not.  I'm not saying

3    we're going to make that finding, but if I were to make that

4    finding in that hypothetical universe, my work is still ahead

5    of me.  It is not -- at least your position is it would not

6    eliminate the other constitutional claims.

7        MR. KING:  Yes.  That's correct, Your Honor.  That's

8    right.

9        And just -- you asked earlier about the *Dayton* case,

10   the *Nica* case from Texas, and the *AstraZeneca* case from

11   Delaware.  Those cases did not involve what I'm here to talk

12   about, which is unconstitutional conditions.  And by the way,

13   when the government points -- hits voluntariness cases from

14   the 1980s before *Horne* was decided, those didn't involve

15   unconstitutional conditions.

16       THE COURT:  Those are due process -- there are some

17   overlapping claims from those cases, right?  It's just not the

18   one you're handling.

19       MR. KING:  Yeah, that's right.

20       THE COURT:  The due process claims, mostly.

21       MR. KING:  Yeah.  And we are trying to do this one at

22   a time.

23       THE COURT:  Yep.  I'm not going to put you on the hot

24   seat for something your colleague or one of your co-counsel is

25   going to address.

*1*       MR. KING:  Sure.  So that's the big picture.  I guess

*2*  if it would help the Court, I would like to just walk through

*3*  the reasons one at a time why we think this program is not

*4*  voluntary and then, on the back end of that, talk with you, if

*5*  it's all right, about, okay, even if it is voluntary, here's

*6*  how the Unconstitutional Conditions Doctrine analysis would

*7*  work.

*8*       So starting with involuntariness, the first component

*9*  of that is legal -- legal compulsion.  Once CMS selected

*10*  plaintiffs' drugs last summer in August, plaintiffs had a

*11*  statutory obligation to participate in the program for a

*12*  minimum period of time, either 11 or 23 months, depending on

*13*  exactly the timing.  That's right there in the statute.

*14*       There was no way to get out without paying that

*15*  monstrously large excised tax.

*16*       THE COURT:  Mr. King, I want to make clear because

*17*  the papers are -- there's no consistency with your adversary

*18*  on this position.

*19*       I'm going to ask this from the government counsel as

*20*  well.  You said 11 to 23 months, and they say 30 days.  So

*21*  which one is it?  Those are extremely different timelines for

*22*  withdrawal, no?

*23*       MR. KING:  They are incompatible, mutually exclusive.

*24*  One of us is right; one of us is wrong.  Let me tell you why I

*25*  think we're right.

1           THE COURT:  All right.

2           MR. KING:  The statute refers to withdrawal by the

3   Secretary, and that's 42 U.S.C. 1395W-114(a)(b) -- 4(b)(i)--

4   for those of you keeping track at home -- withdrawal by the

5   Secretary.

6           Then separately, in a different provision with a

7   different heading, it refers to withdrawal by whom?  By a

8   manufacturer.  The withdrawal that we're talking about here

9   today is by a manufacturer.

10          The government's defense is that a manufacturer can

11  avoid the program and its mandates by withdrawing from the

12  program.  So we're under withdrawal by a manufacturer.  And

13  the by a manufacturer says unequivocally it's a minimum of 11

14  or 23 months.  That's legal compulsion.  That means that

15  there's no way for us to get out of the program immediately,

16  certainly not the 30 days, as they say.

17          The practical reality, Your Honor, just to bring it all

18  the way to the ground, is that plaintiffs would have to have

19  withdrawn from this program in January 2022, months before the

20  statute was enacted, in order to avoid things like the duty of

21  last October to sign the manufacturer agreements.

22          So that's really all I have to say about legal

23  compulsion, which is that there's a statutory requirement that

24  we be in this program for a time.

25          The big-ticket item, though, Your Honor, is economic

1    compulsion, so let me shift gears and talk about that.

2         The government insists that plaintiffs have options

3    because they could withdraw, for example, all their drugs from

4    Medicare and Medicaid.  They have options to get out of this

5    program.  But those options exist on paper and not in the real

6    world.  Let me just explain one piece at a time why that's the

7    case, starting with the excise tax.

8         You asked earlier about the excise tax.  I'm the person

9    up here to try and explain how that incredibly complex

10   mechanism works.

11        THE COURT:  And why are those numbers so different

12   between what you're claiming and what the government's

13   claiming?

14        MR. KING:  Well, I think the government is -- the

15   government is going to get up and advocate on their view on

16   this, but they're putting a lot of spin on the ball and

17   they're stepping away from what the statute actually says.

18        So the statute has a very complex formula.  This is

19   26 U.S.C. 5000D.  It calls for a tax that's a ratio of one

20   figure to another.

21        And when you do the math, as the Congressional Research

22   Service did, what you get is an excise tax of starting at

23   186%, going all the way up to 1,900%.  There's a debate in

24   this case about, well, what is the percentage?  Is it actually

25   95%?

1     THE COURT:  I mean, that's the government's position,

2  correct?

3     MR. KING:  So, yeah.  Let me tell you why that's not

4  right, Your Honor.

5     The 95% figure is not accurate because the government

6  uses an analogy.  They say suppose there's a bill for a

7  hundred dollars, a $5 sale and $95 tax on top of that $5 sale.

8  $95 is 1,900% of 5, so even if you do it their way, it's

9  1,900%.  It's 19 times.

10     And just to -- again, to give you a concrete example,

11  this is at ECF 30-10 in our case, and in the Vineis

12  declaration in the Novartis case -- I hope I'm saying that

13  right -- we're talking about more than $90 billion per year is

14  what this would say.  Again, sworn declarations that haven't

15  been challenged.

16     So that's what the excise tax would look like.  The

17  government also says that the excise tax would apply only to

18  sales to Medicare beneficiaries, only sales in Medicare.

19     But, again, if you look at the statute, it refers to

20  sales by the manufacturer, full stop, no exceptions.

21     The by -- you know, to the Medicare part of it, the

22  government has just blue penciled in there through their

23  litigation counsel.  That's not how statutory interpretation

24  works.

25     In the end, though, I guess I'd agree with Mr. Roth

 1   that the debate about these points, the finer points of how

 2   the excise tax works, it's academic.  As the Congressional

 3   Budget Office said -- and this is Exhibit F to the Chiesa

 4   declaration -- the manufacturers are going to comply with this

 5   program because the cost of not doing so far outstrips the

 6   cost of participation.

 7        And so that's the Congressional Budget Office.  Don't

 8   take it from us.  So no matter how you slice it, the taxes are

 9   going to be astronomical.  That's the tax.

10        Now, as far as the ability to withdraw all of a

11   company's drugs, all of them, not just the selected drugs, but

12   all of those 120 plus drugs I was talking about earlier for

13   Medicare and Medicaid, that is not an option for two main

14   reasons.  The first is what I was referring to earlier: the

15   effect on patients.  Millions and millions of Americans who

16   would lose their Medicare coverage for these drugs they depend

17   on in their daily lives.  The government really doesn't

18   account for that.  They talk about cost savings, but they

19   never really deal with that real human impact.

20        And by the way, you mentioned drug companies.  These

21   plaintiffs do a lot of things.  They research.  They have, you

22   know, large revenues.

23        Well, let's talk about what they do with those

24   revenues.  The mission of these companies is to research and

25   develop innovative products that improve people's lives.  That

1   is woven into the fabric of what they do, and they go out and

2   they research and develop countless molecules and things

3   that -- 99.98 percent of which do not work out, do not make it

4   to market.

5          THE COURT:  Well, Mr. King, I appreciate the noble

6   mission of the pharmaceutical companies, but they're also

7   businesses that their goal is profit, no?

8          I don't want to talk about like your clients -- I mean,

9   Mother Theresa is here just developing drugs for free to sell

10  to the American people.  I mean, let's explain it for what it

11  is.

12         These are businesses that not only have a mission of

13  developing these drugs that help Americans, but there's a

14  significant amount of profit that is part of the margin there

15  for doing so.  No?  And the government is coming in and

16  saying, You can still profit, but less.  Do you not agree with

17  that?  I presume you don't.

18         MR. KING:  Well, I think we disagree with a lot of

19  what the government says, but I take your point, Your Honor.

20  I absolutely own it.  These companies are not Mother Theresa.

21  They are not non-profits.  They're for-profit companies, and

22  they're for-profit companies that need to cover their R&D

23  expense for these 99.98 percent of drugs that never make it to

24  market.

25         THE COURT:  That goes back to my question:  Where is

1    the rest of the money going?

2        You're saying that based on what happens with the IRA

3    that you wouldn't be able to do any R&D, but we don't have

4    other information before the Court that says what are your

5    clients and the pharmaceutical companies spending the rest of

6    their money on?  How much goes to executive compensation?  How

7    much goes to advertisements?  How much goes to stock buyback

8    and all these other things that we don't know about?

9        What you're trying to tell me is that if this money is

10   taken away from the pharmaceutical companies, we will not be

11   able to do research and development to develop new drugs to

12   help Americans and save lives.  That's an important fact.

13       My problem with that is I don't have enough information

14   before me to say if I agree with you or not.

15        MR. KING:  Well, you've got a sworn declaration

16   saying exactly that.

17        THE COURT:  But how much other money do the

18   pharmaceutical companies have, and where are they going?  Why

19   can't they take money from executive compensation and put it

20   into R&D?

21        MR. KING:  You know, Your Honor, the government

22   hasn't raised that point.  We've not had an opportunity to

23   brief it, so I don't know, standing here, the answer to those

24   questions.

25        What I do know is, you know, within the four corners of

1    the doctrine -- and maybe this is a good place to shift gears

2    and talk about the doctrine -- is that the Supreme Court has

3    told us, for example, in *NFIB* and in other cases that a

4    program is voluntary only when the party that's subject to it

5    has the ability in fact -- not just in theory -- but the

6    ability in fact to say no.  And given the significant role,

7    the market dominating force that Medicare and Medicaid play --

8    that's the Third Circuit in the *Sanofi* decision just a few

9    years ago -- the answer to that is no, it can't happen here.

10           THE COURT:  I presume your answer is the same as

11   Mr. Roth's, which is you are not aware of anybody withdrawing?

12           MR. KING:  No, I'm not.  And counsel for another

13   company in the District of Connecticut, they have not

14   withdrawn.  I'm not aware of any company that has withdrawn.

15   And, in fact, my understanding is that every company that's

16   subject to that program, the first ten drugs, all of them are

17   in court uniformly raising constitutional challenges to it,

18   either directly or through an association.  That tells you

19   something about the size and nature of the problem here.

20           Just to bring it back, if I could, to *NFIB*.  The

21   government says *NFIB* and its coercion principle is limited to

22   the federalism context, and I want to address that.

23           The answer is, no, it is not limited to that context.

24   Federalism was the reason Congress and the Affordable Care Act

25   could not directly impose its Medicaid on the states.

1          But there is a broader coercion principle that cuts

2     across cases, cuts across contexts.  It's the reason why

3     Congress could not do it indirectly through a condition.

4          And you see the very same coercion principle in cases

5     like *Union Pacific*, *Thompson*, *Carter and Butler*, all of which

6     involve regulation not of states, but of private parties.  All

7     of those cases said -- and I'll just quote quickly from the

8     Supreme Court's decision in *Butler*:

9          Coercion by economic pressure makes the asserted power

10    of choice illusory.  Illusory.  That's what we have here.  You

11    don't need to take it from me as far as *NFIB* working this way.

12    This is a new case, and so I want to call this to your

13    attention.  It's not in the briefing, as far as I'm aware, but

14    I point you to *American Health Care Association v. Burwell*,

15    217 F.Supp.3rd, 921 from 2016.

16         That federal district court held that *NFIB* works in

17    exactly the way that I'm talking about here, that it applies

18    to private parties.

19         The Court acknowledges, yes, there are some

20    differences, but nevertheless, the basic question is still the

21    same.

22         And so, I guess, that brings me to unconstitutional

23    conditions.  The idea of the Unconstitutional Conditions

24    Doctrine classifying as a condition on voluntary participation

25    is not a blank check.  There are limits on what the government

 1  can do in a condition.

 2      And the question here before the Court is whether or

 3  not this program transgresses those limits, and the reasons

 4  Mr. Roth gave, the answer is, yes, it transgresses those

 5  limits under the Unconstitutional Conditions Doctrine.  There

 6  what you would look at is, is this program -- is there a nexus

 7  and is there proportionality between this program and the

 8  government's interest?  The answer to that question is no,

 9  there is not proportionality here.  The government is

10  ransoming the revenues from all of those 120 other drugs that

11  I was talking about to secure compliance as to the selected

12  drugs -- the four selected drugs that are before you today.

13  So there is not proportionality in that regard.

14      The program, too, is a massive, massive change to the

15  way Medicaid worked from when the plaintiffs signed up for it.

16  There was a noninterference provision that said CMS is not

17  going to interfere with the dealings of the private market,

18  and yet now we have a fundamentally different kind of program,

19  the same kind of fundamental difference that you had in *NFIB*.

20      I guess I tied into the Third Circuit -- you asked

21  about circuit precedent, the Third Circuit's decision in

22  *Koslow*.  This is 302 F.3d at 174, where the Third Circuit said

23  that private entities lack the formidable institutional

24  resources of the states and are more easily coerced by the

25  federal government.  So the case for applying the coercion

```
 1    analysis here is even stronger than it was in NFIB in that

 2    respect.

 3         I could go on, but, you know, just to deal with a few

 4    of the government's other defenses, because that's really what

 5    I'm here to deal with, the government says, Well, these cases

 6    don't matter because they involve regulation of the market

 7    generally.  You couldn't sell to anybody, period, under those

 8    programs, and that's not true either.

 9         For example, in Horne, the plaintiff there -- you know,

10    it was said you could sell juice or wine.  You could use your

11    grapes for other purposes.  You could sell your farm.  None of

12    those things were a defense in Horne, and so none of them are

13    a defense here.

14         Finally, just to wrap up with this idea of the

15    government as a market participant, the government is not

16    acting here as a market participant, as Mr. Roth alluded to.

17         The government is exercising sovereign power by doing

18    things that no market participant ever could do.  A market

19    participant doesn't impose crippling excise taxes on its

20    counterparty.  A market participant does not issue regulations

21    that are backed by a requirement to comply, and if you don't

22    comply it's a million dollars a day in civil monetary

23    penalties.

24         A market participant cannot unilaterally amend the

25    parties' agreement after the fact without the other party's
```

1   consent or even notice, and yet CMS has claimed the power to

2   do that here through their revised guidance.

3        Finally, Your Honor, just to wrap it up, a market

4   participant under the antitrust laws could never do what the

5   government is doing here.  The government exercises

6   significant market power.

7        Again, that's the Third Circuit in *Sanofi*, and yet the

8   antitrust law says that you can't impose tying arrangements

9   when you have that kind of market power, that those are per se

10  illegal under the antitrust laws.  That's *U.S. v. Fortner*

11  *Enterprises* from the Supreme Court.

12       So at the end of the day, you know, our position is

13  that the government's voluntariness defenses fail, but even if

14  you disagree with us on that, Your Honor, the Unconstitutional

15  Conditions Doctrine applies and you'd have to answer all the

16  same questions.

17       So I think at the end of the day, I'm sorry that I

18  can't save you any homework, but the honest reality is that I

19  can't.  The Court must resolve the takings claim one way or

20  the other.

21       THE COURT:  Thank you.  I appreciate it.

22       Let me -- it's been a one-sided discussion this

23  morning.  Let me at least hear from the other folks and hear

24  if you have any response.

25       MR. NETTER:  A few responses.

1        THE COURT:  By the way, I just want to make this

2   clear:  Counsel, if for any reason anybody needs to take a

3   personal break at any point in time, even before we break for

4   lunch, all you need to do is ask.

5        I won't need a break, but I'm happy to accommodate.  If

6   counsel for any reason needs a five-minute recess or anything

7   like that, just make sure that you're getting my attention to

8   let me know.  Fair enough?

9        Go ahead.

10       MR. NETTER:  Thank you, Your Honor.  Good morning.

11  Brian Netter from the Department of Justice for the

12  defendants.

13       More than 49 million people are eligible to receive

14  prescription drug benefits under Medicare and Medicaid.  Large

15  sums of federal money totaling somewhere in the nine figures

16  are dedicated to providing those beneficiaries with

17  prescription drugs.

18       So it would make sense that drug manufacturers would

19  want to sell their drugs to the federal government, and it

20  would make sense that they would want to maximize the revenues

21  that they obtain in doing so.  But the Constitution does not

22  entitle drug manufacturers to dictate the terms on which the

23  government will purchase their product.  If manufacturers do

24  not wish to sell their product on the terms that the

25  government is making available, then the manufacturer's

1  recourse is to stop selling their products to the government.

2        As the Court is aware, every manufacturer of a drug

3  that was selected for the Medicare Drug Price Negotiation

4  Program is involved in litigation in some manner or fashion.

5  None of those manufacturers has signaled an intent to withdraw

6  from Medicare.

7        Over the course of today, the federal government will

8  be offering its responses to the various objections that are

9  raised by the four manufacturers.

10        THE COURT:  Since you say -- well, you've answered my

11  question.  I've asked it twice on the other side:  Has anyone

12  withdrawn?

13        And you're saying not only has no one withdrawn, but no

14  one has even expressed an intent to withdraw.  Doesn't that

15  cut against you, too?  That maybe the program is so coercive

16  in nature that they're simply signaling what the plaintiffs'

17  counsel is arguing, which is we can't withdraw.  We are forced

18  at gunpoint to execute these agreements with the government.

19        MR. NETTER:  I don't think so, Your Honor.  And this

20  is all ultimately a question of leverage, and we'll get into

21  this over the course of the government's presentation.

22        But there surely would exist a set of conditions under

23  which the pharmaceutical manufacturers would say, This program

24  isn't worth it to us.  We aren't making money on this.  We'd

25  rather dedicate our resources toward something else.

1    We're not at that point.  Each of the manufacturers

2  is -- signed an agreement to participate in the negotiation

3  program, has made a counteroffer as part of that program.

4    There hasn't been any withdrawals, and I think that

5  that just signals that the negotiation program is functioning

6  the way that Congress intended and in the way that, you know,

7  appropriately determines whether there's a price that the

8  government is willing to pay, that the manufacturers are

9  willing to accept for these products.

10    So I will be handling this morning all of the

11  presentations that the various plaintiffs' counsel presented.

12  My colleagues will be splitting the afternoon discussions.

13    But for purposes of this morning, I want to emphasize

14  four points.  First, the premise of plaintiffs' takings

15  challenge is that the government is forcibly appropriating

16  their property to serve a public function, but there is no

17  physical taking.

18    Medicare is a voluntary program.  It's a voluntary

19  spending program, and there is no applicable takings standard

20  for voluntary commercial transactions entered into between the

21  government and a willing commercial counterpart.

22    Second, even if the negotiation program were somehow

23  evaluated as a regulatory program, as -- instead of a way in

24  which the government is the proprietor of its own funds, it

25  still wouldn't run afoul of the Fifth Amendment because of the

1    opt-out mechanism.

2         Third, the Unconstitutional Conditions Doctrine has no

3    application here because, again, there's no constitutional

4    right in danger of being trampled.

5         And fourth, drug manufacturers are not subject to some

6    form of unconstitutional coercion.

7         Mr. Roth presented on behalf of the plaintiffs the

8    question of whether there is a physical appropriation, and the

9    premise of that argument is that the IRA creates some sort of

10   statutory obligation, not just to agree to a price, but to

11   physically make pills or syringes or whatever the drug product

12   is, to physically transmit or transport drug products at that

13   price.

14        And he said that that was a matter of statute, and I

15   thought that we were going to have a chance to talk about what

16   statutory provision actually imposes that requirement.  It

17   turns outs, however, that there is no statutory provision that

18   imposes such a requirement because the program as a whole and

19   individual sales of prescription medications under that

20   program is voluntary.

21        Now, as the Court is aware, both of the courts that

22   have considered constitutional challenges to the IRA so far,

23   the AstraZeneca Court and the Dayton Area Chamber Court, have

24   found that there is no compulsion.

25        Chief Judge Conley down the street found that neither

1    of the IRA nor any federal law requires AstraZeneca to sell

2    its drugs to Medicare beneficiaries.

3        Judge Newman in the Southern District of Ohio wrote as

4    a more general matter that the law established in the

5    Sixth Circuit and beyond is clear.  The participation in

6    Medicare, no matter how vital it may be to a business model,

7    is a completely voluntary choice.

8        So the plaintiffs' theory seems to turn on the use of

9    the word "access."  Now, the statute says that the

10   manufacturers have to provide access to a price as part of the

11   Drug Price Negotiation Program.

12       Now, that's a fairly thin read on which to infer that

13   actual commercial transactions need to take place at that

14   price.  So I think it's useful, first of all, to highlight the

15   statutory text.

16       I would refer the Court to the provision on civil

17   monetary penalties.  This is 42 U.S.C. Section 1320f-6 or

18   Section 1197 of the Inflation Reduction Act.

19       So what that provision says -- and I'll try to read

20   this verbatim.  It says, "Violations Relating to Offering of a

21   Maximum Fair Price."  That's the subheading.

22       "Any manufacturer of a selected drug that has entered

23   into an agreement under Section 1320f-2 of this title with

24   respect to a year during the price applicability period with

25   respect to such drug that does not provide access to a price

1   that is equal to or less than the maximum fair price for such

2   drug for such year ... to a maximum fair price ... eligible

3   individual who is dispensed such drug during such year shall

4   be liable for the civil monetary penalties that the statute

5   identifies."

6       So what does that mean?  If you only pay a penalty to

7   the individual who is dispensed the drug and there is no

8   separate obligation to dispense the drug, then all the statute

9   is doing is creating an if-then relationship; if you sell the

10  drugs, then you can charge only prices at or below the maximum

11  fair price that has been determined through the negotiation

12  program.

13      Nothing in the statute or in its program guidance

14  requires manufacturers to manufacture any particular quantity

15  of the drugs or to distribute them in any particular manner.

16      One can imagine that if this were an actual requirement

17  of the program, how much statutory and agency implementation

18  would be required to create the standards for understanding

19  whether the manufacturer's making the appropriate amount of

20  the drug available, et cetera.

21      This would be a fairly serious undertaking, but none of

22  that is in the statute.  None of that is in the program

23  guidance that has been issued by CMS in this case simply

24  because these requirements don't exist, and that's an

25  important distinction here because none of the cases that have

1    been cited by the plaintiffs involve a program that is truly a

2    voluntary undertaking that does not exist in the context of an

3    obligatory legal framework.

4         Now, here, the drug manufacturers can sell their drugs

5    outside of Medicare at whatever prices they choose to charge,

6    and they don't need to sell to the government at all.

7         So this negotiation program has set up an operation

8    where the government is going to determine through the receipt

9    of information and through a back-and-forth with the drug

10   manufacturers the price that it's willing to pay.

11        And hopefully, at the end of the day, the parties can

12   reach a price that the government is willing to pay and the

13   manufacturers are willing to accept.  If that is not the case,

14   then the manufacturers have a number of different options.

15        THE COURT:  What are those?  Walk me through the

16   options for withdrawal and the difference between the time

17   period of 11 and 23 months, which is what the plaintiffs are

18   claiming, and I believe you guys are claiming 30 days, right?

19        So there's a discrepancy there on how you can withdraw,

20   the time period to withdraw.  Can you walk me through that

21   process?

22        MR. NETTER:  Yes, Your Honor.  So the distinction is

23   there are two statutory provisions for withdraw from

24   medication.  Now, I think that our friends on the other side

25   accurately described the key distinction, which is that the 11

1   to 23 month period is a period where under the manufacturer

2   can terminate its Medicare subscription agreement.

3        So for purposes of this taking claim, a company would

4   have to file its notice no later than January 30th, 2025 to be

5   out of Medicare in time for the first sales that are actually

6   subject to the maximum fair price.

7        So it's not entirely clear how -- even if that were the

8   only way to get out of Medicare -- that helps the plaintiffs,

9   because if their position is that this program can't result,

10  that they have to at least give up an arm under this program,

11  then one would expect that they would have initiated this

12  process.  They still have time to initiate this process before

13  they sell a single drug, subject to the maximum fair price.

14       The 30-day period on which the government is relying is

15  the provision that entitles the Secretary to remove a

16  manufacturer from Medicare for good cause.  So as we explained

17  in our brief, good cause is a capacious concept that takes on

18  a meaning that makes sense in its context.

19       And in the revised guidance that CMS issued as to the

20  implementation of the negotiation program for this first price

21  possibility here, the agency determined it would constitute

22  good cause if a manufacturer said, I don't want to participate

23  in this program.

24            THE COURT:  We want out.  That would be sufficient.

25            MR. NETTER:  Right.

 1          THE COURT:  Or we can't agree on a price.

 2          MR. NETTER:  Right.  They want -- well, if they can't

 3   agree on the price and as a result want to get out --

 4          THE COURT:  Right.

 5          MR. NETTER:  -- that would constitute good cause for

 6   them to get out.

 7      It is rather curious for the plaintiffs to be

 8   challenging what is, in effect, a favorable interpretation of

 9   the statutes.  If they were trying to challenge that directly,

10   we would say that they don't have standing, right?  Because

11   you don't ordinarily have standing to say that an

12   interpretation is to your benefit.  Here they want the

13   interpretation to be contrary to their benefit so they can say

14   that it is more onerous and creates a constitutional barrier.

15      But, you know, especially in a circumstance in which

16   there are principles of constitutional avoidance that can

17   dictate how an agency is going to implement and interpret its

18   statutes.  That doesn't seem to be an appropriate question

19   that really ought to be before the Court here, both because

20   the agency has made the determination that it has made and

21   because even under the 11 to 23 month standard, there still is

22   ample time for these manufacturers to exit Medicare, should

23   they wish, prior to the maximum fair prices going into effect.

24      So that covers exiting entirely.

25      The second opportunity or option for the manufacturers

1   is that they can divest of an individual drug product that is

2   subject to negotiation such that they no longer would be the

3   manufacturer for that drug product and wouldn't have any

4   requirements under the program.

5        Now, the plaintiffs' response to that is to say that it

6   would be a fire sale, right?  If they went on to the market

7   and tried to divest the various drugs, subject to negotiation,

8   well, they would only get the value of the drug based on what

9   the maximum fair price is, and they say that that's unfair.

10       Now, that seems, to us, to be a pretty telling

11  concession in that the government is determining how much it's

12  willing to pay, and the pharmaceutical companies are entitled

13  to market their drugs and to monetize them, subject to what

14  willing buyers they have.

15       But if their position is that they should be entitled

16  to divest their drugs under the old pricing system, prices

17  that the government is no longer willing to pay, then all

18  that's saying is they think they have some sort of vested

19  constitutional right to prices that the government isn't

20  willing --

21        THE COURT:  No one's going to buy their drugs if

22  they're -- I mean, if you're asking to divest themselves of

23  one of their products, who is going to buy that product

24  knowing full well they'll be in the exact same boat that these

25  folks are all sitting in today?

1    I mean, I understand that argument.  There's no

2    argument simply saying we have to sell for this price because

3    who else is going to buy for a higher price when they've got

4    the federal government that is going to be staring right at

5    them on day 2.

6        So isn't that the argument they're making?  Of course

7    we have to sell it for this lower price.  No one will buy it

8    at a higher price because your folks will have the IRA and

9    they're going to be subject to the same conditions or

10    requirements, however you want to voice it today, that they're

11    under right now.

12        MR. NETTER:  I think that fundamentally we agree with

13    that, Your Honor.  The point is that Chief Judge Conley wrote

14    in his opinion that what the government is providing here is

15    access to an enormous market, and some companies would view

16    that as an opportunity.

17        So the plaintiffs have complained through these

18    proceedings that any drug that's subject to negotiation is

19    included on all of the formularies.  That doesn't impose a

20    requirement on the drug manufacturers again.  All that says is

21    that the -- the pharmaceutical benefit management companies

22    that are creating these formularies, they all have to include

23    the drugs, subject to negotiation.  So there's a bigger market

24    for these drugs.

25        Now, the price that the government is willing to pay

1    is -- that's the price the government is willing to pay, and

2    whether or not there are companies willing to manufacture the

3    drug at those prices, if -- that's a question for the market

4    to bear.

5         But as to the question of whether the plaintiffs should

6    somehow be entitled to divest these drug products at a rate

7    that presumes that the government is going to keep paying the

8    rates that it historically paid, there's simply no

9    constitutional warrant for such a claim.

10        One can imagine outside the drug context that there are

11   all sorts of companies -- defense contractors come to mind --

12   that would love to say that there's a specific rate that they

13   had anticipated that the government would be paying for a new

14   set of fighter jets and that the government is the only client

15   of these defense contractors.

16        So what else are they to do?  But any company that is

17   in pursuit of process necessarily takes risks and has to make

18   decisions under the guise of uncertainty in pursuit of those

19   profits.  And there is no constitutional right to contract

20   with the government in order to make those bets turn out for

21   the companies that have made them.

22        Now, the cases that the plaintiffs have cited in

23   opposition to our theory of voluntariness all suffer from the

24   defect that they involve some sort of obligatory legal

25   framework, and they don't arise in the context in which the

1  government is the purchaser or the government is using its

2  spending clause authority as the proprietor of its own assets

3  as opposed to regulating how a market is going to operate.

4        So the *Horne* case regulated all sales of raisins on the

5  open market.  These aren't sales of raisins to the government.

6  They're sales to other purchasers on the open market.

7        Likewise, *Valancourt* created an --

8        THE COURT:  I want to make sure I'm clear on this

9  issue.  That's one of the issues in dispute, right?

10       So when you analogize the program in the context of,

11 like, a regulatory program, right?  And it's the plaintiffs --

12 or I'm sorry.  The plaintiffs are referring in the context of

13 a regulatory program.

14       Your folks are saying no, that's not what we're looking

15 at.  We look at it as a product of Congress's spending powers.

16       Is that accurate?  Is that the dispute here?

17       MR. NETTER:  That is, Your Honor.

18       THE COURT:  All right.  Why are you right?

19       MR. NETTER:  Well, we're right because this is

20 plainly an exercise of Congress's spending clause authority,

21 and the case is -- over many decades and in many contexts that

22 have discussed Medicare spending have acknowledged that this

23 is a voluntary program because it arises in the spending

24 clause content.

25       Now, in many of those cases the issues that are before

 1   the courts involve economically significant disputes for the

 2   industries.  For example, there have been hospice providers

 3   and nursing homes that have come in to court to say, Well,

 4   Medicare is not truly voluntary for us because one can imagine

 5   that a hospice provider or a nursing home is getting the vast

 6   sum of its monies from Medicare and Medicaid.

 7        But the courts have, nonetheless, said in those

 8   contexts that Medicare is still -- it's a spending clause

 9   program in which the government is procuring services on its

10   own account, and the government gets to decide how it's going

11   to spend its money.

12        So that's fundamentally why this is a spending program

13   of -- an exercise of the government's proprietary function and

14   not a regulatory program.

15        Now, the response to the plaintiffs' offer is, well,

16   you know, the government is the sovereign, so, you know, it

17   does things that one would not expect to see in a transaction

18   just between two people on the street.

19        And it is surely true that the government, as a

20   proprietor of its own funds, has to operate in a different

21   manner than would two individuals interacting through some

22   arm's-length transaction on the street.  There are pros to

23   that, and there are cons to that.  There aren't constitutional

24   claims that can be brought into court when there's a

25   transaction on the street.

1          But at the end of the day, the government is still

2     spending its money, and parties cannot bind -- cannot obligate

3     the United States to spend money with their company to buy

4     their products at rates that they would like the government to

5     pay.

6          The other case on which plaintiffs spent a lot of time

7     is the *Valancourt* case.  This is the copyright case that was

8     decided by the D.C. Circuit last year.

9          That was another circumstance in which there was a

10    obligatory legal framework that couldn't be escaped, so the

11    Court suggested that perhaps the analysis in that case would

12    have been different if there were some straightforward process

13    for renouncing copyright protections such that the publisher

14    or the owner of the creative work could understand this as a

15    transaction; that in exchange for the copyright protection,

16    that you have to provide these copies of the work.

17          Instead, the Court found that there was no way to get

18    out of this system without paying a fee such that this was an

19    obligatory legal framework, which is, again, not the situation

20    here.

21          THE COURT:  Well, the plaintiffs are arguing it is.

22          MR. NETTER:  Well --

23          THE COURT:  They are arguing that these are not

24    conditions, these are mandates, that they are compelled to

25    agree with the government on these terms.  They don't really

1    have a choice in the matter.

2         Isn't that the argument by opposing counsel?

3         MR. NETTER:  I think that --

4         THE COURT:  I'm paraphrasing.  I'm simplifying for

5    purposes of having a discussion.  But, in essence, isn't that

6    what they're saying?

7         MR. NETTER:  Sorry.  I think that that's what they're

8    arguing, but they're hard-pressed to identify what the legal

9    compulsion is.

10        The thrust of their argument is that there is a

11   practical compulsion.  That's once we set aside the fact that

12   the statute doesn't actually obligate the manufacturer to

13   introduce doses of the medications into commerce.

14        So once you resolve that issue, then what's left of the

15   plaintiffs' arguments is, Well, we make a lot of money off of

16   Medicare beneficiaries, and we don't really want to get out of

17   Medicare with respect to an individual drug or with respect to

18   all of our drugs.

19        So even though it's not legal compulsion, there's some

20   sort of practical pressure that is exacted by the government,

21   but for purposes of the Fifth Amendment and for takings

22   analysis, there isn't a constitutionalization of commercial

23   transactions between the government and government

24   contractors.

25        And there have been many decades and entries,

1  transactions in which the question is, is there a price that

2  the government is willing to pay, and is there somebody

3  willing to provide the services at that price?

4       And if the answer to those questions is yes, then

5  that's the end of the story.  The Constitution doesn't get

6  involved in determining whether the price that -- whether the

7  price that reflects the meeting of the minds is the best price

8  or a price that can be validated through some sort of economic

9  means.

10      Now, I should note also that even in circumstances

11 where there is some mandate for a company to provide some

12 service -- and usually this is in the context of public

13 utilities -- the Supreme Court has held -- this is the *Verizon*

14 *v. FTC* case.  That one doesn't apply this typical takings

15 analysis to say you're taking the electricity, therefore the

16 government or the courts have to step in at the outset and

17 figure out what the price should be for that electricity.

18      So the Court in *Verizon* says that when you're in this

19 utilities context, that the constitutional questions are

20 answered on the basis of the rates, not the methods for

21 determining the rates.

22      And, of course, at this juncture, we don't know what

23 the rates are because we're only at the threshold with this

24 sort of facial challenge.

25      Now, I promised at the outset that in addition to

1    covering the fact that there's no forced appropriation here,

2    it's also our position that you can opt out.  We covered in --

3    most of the aspects of this.

4        You can opt out by exiting Medicare entirely, you can

5    divest or you can stay in the program and you can just not

6    make any sales into the program.  These are three ways in

7    which one is not forced to make sales at a price that the

8    manufacturer deems to be undesirable.

9        I think we have, in fact, covered that point.  We can

10   move on to unconstitutional conditions.

11       So the Unconstitutional Conditions Doctrine provides

12   that, at a high level, the government can't coerce people into

13   giving up their constitutional rights.

14       Now, here the implication of that doctrine doesn't help

15   the plaintiffs because, as we've been discussing, they don't

16   have a constitutional right to continue selling their drugs as

17   part of a government program.

18       So the plaintiffs' theory is they try to analogize to

19   the land use context.  So there are cases typically known as

20   the Nollan-Dolan Doctrine that refer to how the

21   Unconstitutional Conditions Doctrine is going to be applied

22   when the government tries to take property in the context of

23   granting zoning approval or some land use authority.

24       Now, the Supreme Court in *Koontz* explained why it's

25   necessary to have a special test in that context, and that's

```
 1   the nexus proportionality test that was referenced by one of
 2   the attorneys on the other side.
 3        But the Court in Koontz explained why it's essential to
 4   have a different standard in the land use context because the
 5   government has so much discretion in deciding whether or not
 6   to approve a particular use of land and that it would be easy
 7   to abuse that power by saying, okay, well, you can use this
 8   plot of land for the purpose you want to use it.
 9        THE COURT:  I presume your position is that's not
10   analogous here.  The government is not stepping in to tell
11   them how to use their profit at all.  It's simply a pricing
12   issue, correct?
13        MR. NETTER:  Right.  It's a particular context that
14   really arises in the land use context.  It has not been
15   applied outside of that context.  It shouldn't be expanded
16   here, I think, for all the obvious reasons, that this isn't
17   zoning.  This isn't land use.  This isn't a place where in
18   order to sell to the government, the plaintiffs have to give
19   up their rights.
20        The government will offer a price, and the plaintiffs
21   can accept that price or it can reject that price.
22        THE COURT:  But then how do you also reconcile that
23   with your prior analogy where you're talking about government
24   contracts and fighter jets?
25        That's not analogous to the Medicare program where you
```

1    have millions and millions of Americans who are getting their

2    medication and pharmaceuticals through the government.

3        So isn't that also separate and apart from some typical

4    government contract where some company is manufacturing

5    fighter jets with the United States?  I mean, isn't that

6    separate and apart, similar to this land use analogy that

7    fails?

8        MR. NETTER:  I don't think so, Your Honor.  I mean,

9    that's also a circumstance in which there are companies that

10   have developed expertise to manufacture certain products, and

11   they will make bids to the government to manufacture things

12   that serve the government's needs at particular prices.

13       But, again, there's no role for the courts to intervene

14   in the defense contractor cases to say, well, this company

15   really needed that contract because they were banking on the

16   fact that there was going to be some war that was going to

17   require some new form of stealth jet.

18       This isn't the role of the courts, and the companies

19   get to decide where to develop their expertise and which sorts

20   of engineers to hire, how they're going to be able to come up

21   for their bids for these individual contracts, and either

22   there's a meeting of the minds or there isn't.

23       The Federal Circuit in the context of government

24   contracts has held that there isn't really a takings overlay

25   that the courts should be looking at.  Once there is a

1  contract, the question is what are the terms of the contract?

2  We've had a meeting of the minds, and that's the end of the

3  story.

4       So I do think that the defense contractor and the

5  negotiation program analogies are fairly similar here.

6       On the coercion point, at the end of Mr. King's

7  presentation, he referenced the *NFIB* cases, *NFIB v. Sebelius*.

8  And as he foreshadowed, it is fundamentally the view of the

9  federal government that *NFIB* is about to take sovereignty.

10       And the Supreme Court has said in many times -- in many

11  different contexts that its holdings have to be understood in

12  the context in which they arise.  *NFIB* was a case in which the

13  federal government was using its spending authority to try to

14  convince the states to expand the availability of Medicaid

15  within those states.

16       The Court was trying to enforce the limitations on the

17  government's regulatory authorities.  So the concern that

18  motivates *NFIB* is that the government has limitations on its

19  ability to regulate and can't make an end run upon those

20  regulatory limitations by altering the fundamental

21  characteristics of the relationships between the federal and

22  state governments.

23       Here the fact that this arises in a proprietary content

24  where it is not the government trying to overstep in the way

25  in which it can regulate is, again, a critical point.

1     The plaintiffs' approach to *NFIB* we think approves far

2  too much because, again, it would just constitutionalize the

3  law of government contracting in the way where there is no

4  precedents.  We don't have cases suggesting that *NFIB* is of

5  the breadth that the plaintiffs would have suggested.

6     They cited a new case we hadn't seen, which we just

7  tried to pull up during their argument.  That case doesn't

8  seem to turn on constitutional grounds at all.  It seems to be

9  about the statutory scope of the Federal Arbitration Act.

10    Even if there were -- and that case was in the Northern

11 District of Mississippi.  There certainly isn't any applicable

12 precedent here in the Third Circuit that would suggest that

13 *NFIB* has the effect the plaintiffs are trying to attribute.

14    Now, in describing what form of coercion exists, the

15 plaintiffs tried to suggest that there would be effects on

16 patients, on patient outcomes, and that despite their

17 corporate structure and their obligations to their

18 shareholders, that they can't be coerced to do things that are

19 bad for patients.

20    We'll certainly discuss this some more this afternoon

21 in the context of the statutory claims, but I do think it's

22 important to mention now that the prerogative to set the

23 national policy here belongs to Congress.

24    But it is certainly a matter of judicial notice that

25 the pharmaceutical industry spent a lot of money trying to

1    lobby Congress against the policy determination that Congress

2    ultimately made.  But their concerns about patient outcomes

3    are certainly undercut by some of the problems that the IRA

4    was designed to defeat.

5         For example, the phenomenon of product hopping, in

6    which innovation is stifled with respect to new pharmaceutical

7    products by companies extending their periods of exclusivity

8    so that they don't need to innovate and develop new products

9    that will actually result in better health outcomes.

10        So I think with that, Your Honor, we've covered all of

11   the main points that the plaintiffs have addressed this

12   morning.  Fundamentally, this is a voluntary program.  It's

13   voluntary at a high level because no company is obligated to

14   participate in Medicare that does not wish to participate in

15   Medicare.

16        It's also voluntary with respect to individual sales

17   because there's no statutory or regulatory provision that

18   obligates a manufacturer to introduce into the stream of

19   commerce the individual pills that are going to result in a

20   transaction at or below the maximum fair price.

21        So there is no taking because this is a voluntary

22   commercial transaction.  The other theories that the

23   plaintiffs have creatively tried to apply to this circumstance

24   are inapposite.  And as a result, we would ask the Court to

25   rule for the government on the voluntariness issues.

1      THE COURT:  Thank you, Mr. Netter.

2    Mr. Roth, you're coming back?

3      MR. ROTH:  If I may.

4      THE COURT:  Is it rebuttal?

5      MR. ROTH:  That's what I was hoping, Your Honor.

6      THE COURT:  You may have that opportunity.  I think

7  Mr. Chiesa requested it.  I didn't grant it, but I think he

8  presumed that I would, so it's granted.

9      MR. ROTH:  I don't want to take anything for granted,

10  but, thank you, Your Honor, for that.

11    Your Honor, at a high level, I understand the

12  government -- trust the government's argument on takings to

13  be -- look, we run Medicare.  We get to decide how much we

14  want to pay for products, and you, manufacturers, can't

15  dictate to us that you want a higher price.  That's our

16  prerogative.

17    And you know what?  I completely agree with that.  They

18  can decide how much they want to spend, how much they want to

19  subsidize because they're the insurer to cover the drug.

20    And if they say from now on -- just to use the EMS

21  example, Eliquis, they say, Look, we're not going to pay for

22  more than $10 a pill, a bottle, whatever, for Eliquis.

23    We wouldn't be here with the takings clause challenge

24  to that.  They can do that.  In fact, that would have been a

25  much simpler thing to do if that's really what they wanted to

1    do.  They don't need us for that.  They can decide how much

2    they want to pay.  They set the coverage terms.

3         The point of the statute is to obligate us to sell it

4    to them at the price they want.  That's why the statute

5    regulates us and forces us to agree to provide access to the

6    price.

7         So just to flip it around, sure, they don't have to buy

8    at a high price, but we can't be forced to sell at a low

9    price.  That's the thrust of our position and about what the

10   statute does.

11        Let's look at and take the fighter jet hypothetical.

12   The Pentagon doesn't want to pay more than a hundred million

13   dollars for a fighter jet.  Nobody can force them to pay more

14   than that.

15        But they can't turn around to the defense contractor

16   and say, you know, you've got to provide us access to that jet

17   for 50 million or else we're going to impose taxes on even a

18   billion dollars a day until you fold and turn it over.

19        That would be a taking, and that is what this statute

20   does by requiring the manufacturers under threat of penalty to

21   promise access to the price.  That's the obligatory --

22            THE COURT:  Even with the opt out -- even with the

23   withdrawal provision that you're --

24            MR. ROTH:  No.  The opt-out provision is a separate

25   thing because -- yes.  We can say, look, we can't handle those

1   penalties.  We're completely pulling all the products from

2   Medicare and Medicaid all together so that we don't have to

3   deal with you ever again.

4       That gets into conditions and the restrictions on what

5   they can do with the conditions.  Again, I'm focused on the

6   first part of it, which is you promise to provide access or

7   you pay this huge amount every day until you fold.  That is

8   the taking.

9       Now, they say the statute doesn't require that, but I

10  didn't hear any response to the hypothetical about the

11  senior's discount.  I don't think the word "access" in the

12  statute is an accident.

13      Again, they didn't need to regulate us at all if all

14  they wanted to do was restrict the amount they were willing to

15  pay.  Counsel pointed to the provision that's a simple

16  monetary penalty for charging more than the maximum fair

17  price, and that is true.

18      There is a penalty provision in the statute that says,

19  in addition to agreeing to provide access at the fair price,

20  if you charge more, we're going to penalize you ten times the

21  delta, but that's the penalty after the fact.

22      At the front end, you have to agree to provide access

23  to the price, and if you don't provide access to the price,

24  you're not complying with your contract.  If you're not

25  complying with your contract, you're in trouble, and there's

1    also a million dollars a day penalty for not complying with

2    your contract.

3        Then I heard the government say, well, this is --

4    there's nothing in the guidance about how you have to

5    provide -- how you have to sell, but actually what's telling

6    about the guidance, the guidance goes to lengths to say, oh,

7    manufacturers have lots of options.

8        We had already sued before the guidance came out.  So

9    they took their time to say, CMS, look, this is voluntary.

10    You have got options.  You can divest the drug.  You can pull

11    out of Medicare entirely.  You can pay the penalty.

12        You know what they never say anywhere in the guidance?

13    You can withhold the one drug if you don't like the price and

14    continue to receive reimbursement for everything else, no

15    problem.  There's not a word of that in 186 pages of guidance.

16    I think that's very telling.

17        Just to close, Your Honor, we had some discussion about

18    policy-related issues.  Is this good, is it bad for Americans,

19    for innovation?  And so on.

20        Obviously, we think it's bad policy.  I'm not going to

21    try to convince the Court.  I don't think it's appropriate for

22    me to try to convince the Court that it's bad policy.  That is

23    a congressional judgment.

24        THE COURT:  I agree.

25        MR. ROTH:  But what I would like to do is read a

1    quote form Justice Holmes from *Pinnacle v. Mahon*, which is one

2    of -- an early takings case.

3        He said the following:  We're in danger of forgetting

4    that a strong public desire to improve the public condition is

5    not enough to warrant achieving the desire by a shorter cut

6    than the constitutional way of paying for the change.

7        That's our point.  Yes, Congress can be able to drop

8    high drug prices.  Yes, Congress can limit how much they're

9    willing to pay in Medicare, but they can't take constitutional

10   shortcuts of saying we're going to force you to turn over the

11   property, but we don't want to pay you the market value for

12   it.

13       Thank you, Your Honor.

14         THE COURT:  Thank you, Mr. Roth.

15         MR. KING:  Your Honor, I'm the last stop between you

16   and all of us and the break, and so with your permission --

17         THE COURT:  I don't take breaks.  I'm a machine.  I

18   will get you all your break shortly, but let me hear what you

19   have to say in rebuttal.  I'm still listening.

20         MR. KING:  A break for all of us mere mortals.

21       Just five points, Your Honor, on rebuttal.  Number 1,

22   legal compulsion.  Mr. Netter, when he stood up here, conceded

23   that the 11 and 23 month manufacturer withdraw delay applies,

24   and given that, there was no way for plaintiffs to get out of

25   this program immediately, as CMS said.

1       THE COURT:  Well, no, but didn't he also say

2  something about the fact that good cause would allow you out

3  in 30 days, and there's been guidance that says that if you

4  guys want out, that's good cause.

5       So I think he was agreeing with you about your initial

6  position, but he was saying that 30 days is right, too,

7  because all you have to say is I want out, and that would be

8  enough for you to go.

9       MR. KING:  It's true.  He did allude to that.  He

10  alluded to the guidance, but -- and he focused in particular

11  on good cause, so let me just to try to persuade you that good

12  cause doesn't matter here.

13       Good cause is only in the withdrawal by the Secretary

14  provision.  It does not appear in the withdrawal of the

15  manufacturer provision, so you never get to the concept of

16  good cause.

17       Mr. Netter is right.  Good cause is a capacious

18  concept.  It applies broadly, but you don't even get to the

19  question of good cause unless you're talking about withdrawal

20  by the Secretary.

21       What we're referring to here and what the guidance

22  makes clear is that this is a withdrawal that would be

23  initiated not by the Secretary, but by the manufacturers.

24       That's point number 1.  May I continue?

25       THE COURT:  My more intelligent law clerk may have a

1    question.

2         January 2022 or January 2025?  Different numbers keep

3    being said here.  What is the cutoff or what's the deadline?

4         MR. KING:  Thank you for that opportunity.  There are

5    different cutoffs.

6         If the manufacturers wanted to avoid any part of the

7    program at all, they would have needed to have withdrawn by

8    January 2022 to avoid, for example, the requirement backed by

9    the excise tax to sign the manufacturer agreement last

10   October.

11        So -- and January 2022 is before the statute even was

12   enacted, so that's -- if you wanted not to have to do anything

13   in the program --

14        THE COURT:  Right.

15        MR. KING:  If you want to be part of it, it's 2022.

16   If -- Mr. Netter referred to 2025, and his point there, which

17   is accurate, is that if you don't want to have the maximum

18   fair price, the MFP ever come into effect, it comes into

19   effect January 1, 2026.

20        If you never want to be subject to that MFP, then I

21   think you'd have to withdraw by -- it's January of either this

22   year or next.  I don't recall.  But it's not 2022.

23        THE COURT:  All right.

24        MR. KING:  It's either 2024 or 2025.  But this

25   matters here, right?  It matters, for example, for the First

1    Amendment argument Mr. Roth is going to give this afternoon.

2         There is a period of time that, no matter how you slice

3    it, these manufacturers are required by statute, backed by

4    excise taxes to be in this program, and that's legal

5    compulsion.

6         Mr. Netter says we don't have legal compulsion.  We do.

7    That's legal compulsion right there.

8         As to economic compulsion, my second point, Mr. Netter

9    talked about divestiture, the ability to divest these drugs,

10   and we agree, Your Honor, with everything you said about that,

11   but I just add on top, divestiture just passes the takings

12   problem to someone else.

13        And by the way, divestiture was not a defense in *Horne*,

14   in *Loretto*, or in other physical takings cases, so for that

15   reason, it's not a defense here either.

16        Number 3, Mr. Netter talked a lot about the government

17   acting as a market participant, relying on its spending clause

18   authority.

19        It is true the government is spending money when it

20   operates Medicare, but here at this program, that's not the

21   only thing or even the main thing the government is doing.  As

22   Mr. Roth pointed out, the government is regulating in its

23   sovereign capacity.

24        It is requiring the plaintiffs here to do things.  It

25   is imposing on them excise taxes and requiring handing over

```
 1    information and other things.  It's imposing regulations.

 2          So this is not only a spending clause.  It's a spending

 3    clause augmented with very significant sovereign power, and

 4    that fundamentally changes the analysis.

 5          Mr. Netter said, well, the government acts differently

 6    than people on the street.  Maybe that's true, but there's

 7    nothing that says the government has to operate in the way it

 8    has here, and, in fact, there are many, many government

 9    programs that look at work differently, that don't have the

10    coercive overlay.

11          Two points remaining.  Again, there was a reference to

12    a need for legal compulsion.  That's -- actually, we have that

13    here, but even if we didn't, there's economic compulsion.

14          The court in *Valancourt* talked about the inability to

15    withdraw on a costless basis.  There is no costless withdrawal

16    option here.

17          And then finally, on Unconstitutional Conditions

18    Doctrine, the proportionality test.  Mr. Netter said it

19    doesn't apply here.  He said it's limited to the land use

20    context.  Not true.

21          If you look at the *Dolan* case, it drew on *Perry v.*

22    *Sindermann*, which was not a land use case.  It's a public

23    employment case.

24          If you look at *Cedar Point*, it refers to *Monsanto*, also

25    not a land use case.  So we think that the special conditions
```

1   that triggered proportionality apply here and that this

2   program is not proportional for all the reasons we've given in

3   our briefing, but especially the fact that participation is

4   conditioned not just on withdraw from Medicare, but also

5   Medicaid, an entirely separate program, which just goes

6   further to show that the government's condition here is not

7   proportional.

8           But even if you disagree with us on nexus

9   proportionality, even if you take out of Nollan and Dolan,

10  it's still clear that the baseline unconstitutional conditions

11  test would apply.

12          In other words, you take the thing that's a condition,

13  you make it mandatory, and you decide whether it's

14  constitutional.

15          THE COURT:  All right.  I have no further questions.

16          MR. KING:  Thank you, Your Honor.

17          THE COURT:  Anybody else coming up?

18          MR. KING:  Nope.

19          THE COURT:  Everybody is ready for a break?  All

20  right.  Why don't we do this.  Why don't we recess for lunch.

21          I know we started a little bit late, but, Counsel, just

22  do me a favor.  I know we spoke briefly off the record, but I

23  at least would like to put something on the record before we

24  get into the next claims in the afternoon about subject matter

25  jurisdiction.

1      I do think it's important to have something on the

2  record even if this case is distinguishable from some of the

3  other related or unrelated cases, as you want to call them, in

4  other districts.

5      So just be mindful that I would like to at least have a

6  discussion about that before we go into the counts.

7      Anything further from plaintiffs before we take a

8  break?

9      MR. CHIESA:  No, Your Honor.  Thank you.

10      THE COURT:  What about Mr. Netter, anything from the

11  government before we recess?

12      MR. NETTER:  No, Your Honor.

13      THE COURT:  Thirty minutes, is that sufficient?  Do

14  you want to do 45?  30 minutes.

15      MR. CHIESA:  Your call.

16      THE COURT:  I'm going to say 30 minutes.  If you guys

17  reach back out and tell us you need a little more time, I'll

18  accommodate.

19      Thank you.  We are adjourned for this morning.

20      THE DEPUTY COURT CLERK:  All rise.

21      (Luncheon recess was taken from 12:37 p.m. until

22  1:17 p.m.)

23      THE COURT:  Thank you.  You may be seated.

24      Folks, we're back on the record.

25      I know there's an agenda or an itinerary for this

1    afternoon, but just briefly, I know we spoke about this

2    earlier off the record, but I think it's worth noting because

3    there was no briefing on subject matter jurisdiction.

4         And I just want to be clear that that's not an issue

5    that's either being raised by the Court or there's an issue

6    before me.  As you guys know, I need to make sure that the

7    Court has jurisdiction whether you raise it or not.

8         I do know that there was at least one decision out of

9    Texas where there was a finding that the claim does arise

10   under the Medicare Act, and because of that, plaintiffs would

11   not have standing or a substantive basis for a claim for

12   reimbursement.

13        It was not a federal question before this Court.  I

14   don't know who wants to address that first, but I want to hear

15   at least something on the record that says why is that issue

16   not before me in this particular case, if you don't mind?

17        MR. SVERDLOV:  Good afternoon, Your Honor.

18        I think it makes the most sense for the government to

19   address that.  Plaintiffs will surely say that the Court has

20   jurisdiction.

21        THE COURT:  I agree.  So, yeah, let's hear why you're

22   not -- you're not raising the issue as to whether there's --

23        MR. SVERDLOV:  Your Honor, in the interest of

24   clarity, I want to maybe separate the question out claim by

25   claim because, of course, we do have some jurisdictional

1    objections.

2         We have constitutional and jurisdictional objections on

3    the Eighth Amendment jurisdiction.  We have statutory

4    jurisdictional objections on the statutory claims.

5         We have not raised the type of channeling arguments

6    that were at issue in the Texas litigation, among other

7    reasons, because that litigation involved providers.  And

8    under the case law, provider's claims of the type that they

9    were bringing are channeled.

10        Now, manufacturers are differently situated in a number

11   of respects that, from our standpoint, means that we think

12   that argument is not one that was worth raising here.

13        We have also, as a general matter, again, aside from

14   the Eighth Amendment claim, we have not challenged the subject

15   matter jurisdiction with respect to the constitutional claims.

16        I'm happy to sort of explain why, if that's of interest

17   to the Court.  The bottom line is that on the First Amendment

18   claims, the Fifth Amendment claims, we have not made a

19   jurisdictional objection once the companies named the primary

20   manufacturer, who are, in fact, being affected by the program.

21        They have the -- the companies do have some compliance

22   costs if they choose to participate in the program, and we

23   think, under those circumstances, an Article III objection

24   doesn't really fit within the contours of this case.

25        I will say, obviously, the Court in Delaware in the

1    *AstraZeneca* decision raised a question about whether pleading

2    a property interest that's affected goes to the merits or goes

3    to jurisdiction.

4         And in the interest of clarity, I just want to say that

5    we agree with the Court down the line on the *AstraZeneca*

6    decision.  We think certainly the case law is mixed on that

7    question.  We think the Court got it right.  We also agree for

8    reasons that are not relevant here on the jurisdictional

9    ruling on the statutory claims.

10        Here we don't have the same defect -- the same Article

11   III defects on the statutory claims, among other reasons,

12   because as alleged, Novo Nordisk has, in fact, been affected

13   by the interpretation they're challenging.  That was not the

14   case for AstraZeneca.

15        So I think with that, there's -- from my standpoint, I

16   think there's not much more that we have to say.  I would love

17   to relieve the Court of some amount of work, but I think -- I

18   think --

19            THE COURT:  Yet, I'm asking for it anyway, right?

20   I'm asking you to argue something that was not briefed, but I

21   appreciate it.

22        So you're saying this is even different than the

23   Delaware decision even more recently that dealt with a

24   pharmaceutical -- that was AstraZeneca, so that was a

25   pharmaceutical company --

```
 1            MR. SVERDLOV:  It was, in fact --
 2            THE COURT:  It was a due process claim in that one as
 3    well.
 4            MR. SVERDLOV:  Correct.  Correct.
 5        So I think that case is a little bit different in the
 6    sense that that manufacturer really emphasized the statutory
 7    claims much more than the constitutional claims.  They were
 8    present in that case, and the Court gave them very thorough
 9    consideration.
10        But the thrust of certainly the briefing and the
11    discussion was on the statutory elements.  And the fact of the
12    matter was in that case, as we think the Court correctly
13    identified, the plaintiffs were challenging a statutory
14    construction that didn't matter.
15            THE COURT:  All right.  I appreciate it.  I presume
16    is there -- Mr. Roth, are we going to the next issue, the next
17    claim?
18        Is this in response?
19            MR. ROTH:  No.  I'm happy to respond and then move to
20    the next claim, if that works for Your Honor.
21            THE COURT:  However you want to proceed.
22            MR. ROTH:  I agree with the government on subject
23    matter jurisdictional.
24        What I understand them to be saying is for purposes of
25    the takings claims and the First Amendment claims, the
```

1    challenges to the statute, the plaintiffs here have standing

2    because their drugs are subject to programs, so we can

3    challenge the statute on constitutional grounds.  And there's

4    no special provision that would, for some reason, deprive the

5    Court of ordinary jurisdiction to hear and resolve those

6    claims.  So we agree with that.

7         Part of the confusion with the Delaware case on the

8    due process claim was that there was some uncertainty, I

9    think, about what is the property interest that is being

10   impaired for purposes of a due process analysis?

11        And that's a little tricky.  I hope what I've explained

12   -- addressed this morning is for takings purposes it's not

13   really that fuzzy.  It's the product.  It's the drugs.

14        THE COURT:  Right.

15        MR. ROTH:  That's sort of the end of it from a

16   property standpoint.

17        So unless Your Honor has further questions on

18   jurisdiction --

19        THE COURT:  I don't.  But I appreciate both parties

20   at least putting something on the record.  I felt like the

21   absence of it, especially when it's been addressed in at least

22   one or two other cases in different contexts I thought was

23   important, at least for the record for oral argument.

24        MR. ROTH:  Absolutely, Your Honor.  Thank you.

25        And good afternoon.  Then I'm going to address the

1    First Amendment --

2         THE COURT:  First Amendment.

3         MR. ROTH:  -- challenge now, and before I do so, I'll

4    just say this one actually does have the capacity to save work

5    because if we were running on the First Amendment, that

6    actually does moot everything else in the case.

7         THE COURT:  Go ahead.  I'm listening.

8         MR. ROTH:  Okay.  Great.

9         THE COURT:  I can read and listen at the same time,

10   Mr. Roth.

11        MR. ROTH:  I wasn't sure if it was a question.

12        THE COURT:  I chew gum, too, but I prohibit it in the

13   courtroom, so I can't do all three.

14        MR. ROTH:  Okay.  Your Honor, I think the best way to

15   appreciate the compelled speech problem with the program is to

16   focus on the very unusual way in which this program is

17   structured.

18        If I were Congress and I wanted to require

19   manufacturers to provide their drugs to Medicare beneficiaries

20   at a discount, the easiest, most obvious, most direct way to

21   do that would be to say exactly that.

22        Manufacturers, you have to provide eligible individuals

23   with access to the maximum fair price the CMS will decide or

24   else you will incur penalties.  Economically, that is exactly

25   the same thing as the program.  It's also generally how

**United States District Court**
**District of New Jersey**
**Appx421**

1    Congress regulates.  Does Congress want someone to do or not

2    do something?  They mandate or prohibit that thing.

3         That is not how the IRA is structured.  It's unusual.

4    It creates an extra step -- actually two extra steps in the

5    process.  Instead of mandating access to the maximum fair

6    price, the statute mandates that the manufacturers negotiate

7    and then agree to provide access to the maximum fair price.

8         Everything substantive is funneled through this

9    negotiation and agreement framework.  So I think the obvious

10   question to ask is why do it in that very circuitous way?

11   Instead of ordering you to do something, I'm going to order

12   you to agree to do the thing, and then it's the agreement that

13   actually controls.  It's strange.

14        I think there's an equally obvious answer to the why,

15   and the reason is this:  Although those are economically

16   identical, they're politically very different because there is

17   broad, public support for negotiating prices with drug

18   companies, but there is not broad public support for talk-down

19   mandates and price controls.  So by structuring this program

20   through this framework of negotiation and agreement, Congress

21   has dressed up one as the other to make it look like everyone

22   is on board, this was all a big voluntary negotiation and

23   agreement.  The manufacturers are ordered to negotiate,

24   they're ordered to agree to the price, and they're ordered to

25   agree that it's the maximum fair price for their product, and

1    they have to do all of that in public written documents.

2          This is something the government, both at the

3    legislative and executive branch levels, has seized on for

4    political purposes.

5          Tonight is the State of the Union Address, and the

6    White House put out a fact sheet yesterday in advance of those

7    State of the Union.  The first bullet in the fact sheet:

8    Announcing that manufacturers of ten drugs were made at the

9    negotiating table.  This is because the deadline was recently

10   to provide a counteroffer.

11         They said, look at this.  The manufacturers are at the

12   negotiating table.  We're all here hammering out a fair price

13   that we're all going to agree on.

14         And this is in the context, importantly, of a lot of

15   political messaging about price gouging, corporate greed, all

16   of that, and by forcing -- by mandating the manufacturers to

17   agree these are the maximum fair prices for our product.

18         Program effectively is requiring the manufacturers to

19   indict themselves on these charges of price gouging.  You got

20   us.  We've been charging unfair prices for the last however

21   many decades.

22         THE COURT:  They're not asking you to say that.

23         MR. ROTH:  Well, they are because the statute

24   requires the manufacturers to agree in a written contract.

25   We've got to sign on the dotted line.  These are the maximum

1  fair prices for the product, and that's what allows the

2  government to then go out and say we've reached an agreement.

3  This is fair.

4         THE COURT: Mr. Roth, not all agreements are

5  expressive, right?  So what makes this particular agreement so

6  unique?

7      I mean, you could say this in any contract or any

8  agreement, and I know that wouldn't hold up, and I don't

9  believe that's the argument you're making before the Court or

10 the ones that you had in your written submissions.

11        MR. ROTH:  Correct.

12        THE COURT:  So just, I guess, in simple terms, how is

13 this so different than other agreements?

14        MR. ROTH:  I think there are three things that make

15 it critically different.  Number 1, if you don't agree to it,

16 you have a penalty.  You are taxed.  That's when the excise

17 tax kicks in.  So you are compelled by the tax to sign.

18 That's number one.

19        Number two, the agreement itself embeds an implicit

20 political value judgment by using this phrase "maximum fair

21 price."  It means when you sign, you express ascent to that,

22 you are agreeing this is the maximum price that is fair for

23 this product, and when I've previously charged more -- but

24 when I now charge more to every other buyer outside Medicare,

25 it's unfair.  Most contracts don't have that type of value

1  judgment embedded in it.

2       And number three, I think that's the only reason to do

3  it this way.  It goes back to where I started.  There is no

4  other plausible government interest -- legitimate government

5  interest in funneling everything through an agreement when it

6  would have been ten times easier to just say here's the

7  mandate.

8       THE COURT:  Do this.

9       MR. ROTH:  Do it.  Instead, you've got to agree to

10  it, and that is the compelled speech problem because that is

11  what lets the government walk around and waive around this

12  paper that you signed and say this is a great thing, everyone

13  agrees, this is fair, and we all -- we all worked it out at

14  implicit value, but, of course, the manufacturers don't agree

15  to it.  They don't believe this is the maximum fair price, but

16  they have to say it or else they're going to be hit with

17  hundreds of millions of dollars in penalties every day.

18       Now, the Supreme Court has not been shy about applying

19  Compelled Speech Doctrine.  Just in the last decade or so, we

20  have cases holding that compelled union dues --

21       THE COURT:  I know, but I'm not here to predict what

22  the Supreme Court may or may not do to expand the

23  First Amendment one day.  I mean, you're in the trial court

24  today.  And if the Supreme Court decides to extend that,

25  that's not for me to speculate now and try to get ahead of the

1    highest court.

2           MR. ROTH:  I agree, Your Honor, but I do think we

3    have to look at what the case law says and the precedent that

4    we look at.  I think this fits really neatly into this pattern

5    of cases that we've seen where they say if you're going to

6    force somebody to adopt -- to express something that they do

7    not agree with, that is a problem for the First Amendment

8    standpoint.

9           You need a really good reason to do it, and the

10   government hasn't even tried to offer a reason.  They haven't

11   tried to satisfy any form of heightened scrutiny for this.

12          THE COURT:  Well, when you talk about scrutiny,

13   though, isn't any effect on speech by the agreement merely

14   incidental here?  Because you're going to have to get to that.

15   Because you've already taken me to strict scrutiny.  I mean,

16   that's another issue that you're all debating, I think, before

17   the Court.

18          MR. ROTH:  I agree, Your Honor.  The -- we don't get

19   to -- they're going to try to argue that they set -- they say

20   scrutiny doesn't apply at all, this isn't really a speech

21   compulsion.

22          So let's go through the reasons they give for why that

23   is, and their first one and their main one is, oh, this is

24   just incidental.

25          Respectfully, Your Honor, I think they have it exactly

1  backwards.  Incidental means the consequence of something

2  else.  It's not what you intend.  It's how you get there.

3       And so that applies when the government says here's a

4  restriction on conduct or a requirement on conduct.  In order

5  to effectuate that in practice, maybe that I can't say

6  something or I have to say something to make it happen, but

7  the actual statutory directive is the conduct.

8       There the speech is just incidental.  This is exactly

9  the opposite.  The only thing the statute mandates is the

10 agreement, the speech, and then that is what gives rise to the

11 obligation relating to pricing and conduct.

12      So it's exactly the same error that the Supreme Court

13 corrected in the *Expressions Hair* case from 2017 where this

14 isn't a restriction on pricing.  This is a restriction on how

15 you communicate your pricing, and, therefore, it does

16 implicate the First Amendment.  I think we had exactly the

17 same dynamic the way this program was structured.

18      Okay.  So then they say, Okay, even if we're compelling

19 speech, it's not expressive speech.  We touched on that a

20 little bit earlier.  I don't think it's credible to say that

21 when the manufacturers are being obligated to sign their name

22 and thus express their consent to something, that is a

23 contested political narrative that the CMS price is the

24 maximum fair price for the product.

25      Importantly, it doesn't matter that it's in a contract.

*101*

1  The *USAID* case, which is a recent Supreme Court -- compelled

2  speech case was also a contractual -- it was an amendment in

3  the contract.

4      That was the requirement, that if you want subsidy --

5  if you want grants under this program, you have to adopt a

6  policy opposing prostitution and sex trafficking.

7      The way that was effectuated was through a provision in

8  a contract by which you would get the grant.  It was in there.

9  I agree that I oppose sex -- prostitution and sex trafficking,

10 so the fact that it's in a contract doesn't make any

11 difference.

12     Then they say, well, okay, but we put a disclaimer in,

13 so if you go further down in the contract, there's this thing

14 saying, I don't really mean it.  But every court that has

15 looked at the disclaimer question, including the

16 Third Circuit, has said disclaimers don't cure compelled

17 speech.  They actually make it worse.

18     Now, you have to speak out of both sides of your mouth.

19 You say this, but actually I don't really mean this.  There's

20 no case, and the government has not cited a single case that

21 has upheld compelled speech based on a disclaimer.

22     Then they say, well, even still, there's no real

23 First Amendment harm here because you can just go out in

24 public and make your case.  You can speak.  You can write it

25 off as the paper.  You can issue a press release.  That is

1    true -- that is true, Your Honor, in every compelled speech

2    case.

3          And nonetheless, what the Supreme Court has said for

4    decades is, again, Congress can't force you to affirm in one

5    breath what you take away in the next.  They can't put you to

6    the requirement of responding to your own statements in

7    public.  That itself manipulates the marketplace of ideas in a

8    way that offends the First Amendment.

9          And then the final argument on First Amendment is,

10   again, to go back to this conditions idea that we spent a lot

11   of time on this morning, and they say, all right, even if it's

12   compelled speech, it's part of Medicare, and so it's a

13   condition on the government benefit, and that's okay.

14         I'm not going to retread the ground we covered this

15   morning on unconstitutional conditions, although all of it

16   applies here, too.

17         What I will say, though, is it's actually much easier

18   for us in the First Amendment content because the

19   Unconstitutional Conditions Doctrine is especially robust when

20   it comes to compelled speech.

21         And the best case on that is the *USAID* case from the

22   Supreme Court where they said, essentially, you can't

23   condition public benefits on the recipient's agreement to

24   convey the government's preferred message.  We don't let you

25   do that.

1          THE COURT:  And just so I'm clear, Mr. Roth, the

2     conveyance of that message is based on the language that's

3     already built into the agreement.  By your signature alone,

4     your argument is that the government is compelling you to

5     convey that message because you executed the agreements.

6          So whatever language is in there, this is fair.  We

7     negotiated.  All the things that you disagree with --

8          MR. ROTH:  Right.

9          THE COURT:  -- you would be bound by that statement

10    because you signed it.

11         MR. ROTH:  Right.  And it is all in there.  It says

12    in the negotiation agreement and it's there dozens and dozens

13    of times across about a five-page template agreement.  And,

14    again, all of that is by design because, again, no reason to

15    do it that way unless you wanted to then issue a fact sheet

16    like this one and a State of the Union address that I suspect

17    we'll hear tonight that makes the same points.

18         This is great.  We're all getting together in a room,

19    and we're working out fair prices for the American people.

20    That is not the truth of what is going on here.

21         And, look, for better or worse, the First Amendment

22    doesn't require government officials to be honest, but the

23    reason they can make these statements and what enables them to

24    make those arguments in public is the statutory obligation to

25    speak by signing these contracts.

1          So just to conclude, Your Honor, on this point, even

2     assuming Congress is allowed to coerce manufacturers to

3     provide their drugs at a discount -- this is what we talked

4     about this morning -- it at least needs to do that in an

5     honest and accountable way and not by co-opting the regulated

6     parties to manipulate the marketplace of ideas, and that's how

7     this program operates.

8               THE COURT:  All right.

9               MR. ROTH:  Thank you.

10              THE COURT:  Thank you, Mr. Roth.

11         Who's coming up for the government?

12         By the way, just make sure because -- I know Mr. Netter

13    because he identified himself at the podium, but I have both

14    your names and I don't have a face to a name, so you're going

15    to have to let me know who's who.

16              MR. SVERDLOV:  I apologize, Your Honor.  My name is

17    Alexander Sverdlov.

18              THE COURT:  All right.  Mr. Sverdlov, before you

19    begin this issue, though, I'm going to have to do what I don't

20    like to do.  I have to go back in time.

21         So when we talked about subject matter jurisdiction,

22    since I have you up at the podium, in the Texas litigation,

23    the reason why judicial review was barred was because the

24    Court found that the claims were all matters that arise under

25    Medicare.

1          MR. SVERDLOV:  Correct, Your Honor.

2          THE COURT:  I just want to be clear about that for

3   this record.  Why are these claims not also arising under

4   Medicare?  Why is that distinguishable?  Why are these claims

5   distinguishable from that case?

6       I mean, everything about this case is the impact of the

7   Medicare program, so and the -- I don't know.  I would like to

8   have some idea of why that doesn't pertain to this particular

9   case.  I don't know if that was answered.  If it was, it

10  wasn't clear to me.

11         MR. SVERDLOV:  I apologize if I didn't make it clear

12  when I was here earlier.

13      I think the short answer is that is a rule that applies

14  to the reimbursement for providers.  So in that case, the --

15  the Pharma trade group -- association found local -- an

16  association of local providers to be one of the named

17  plaintiffs.

18      That was how they sought to establish --

19         THE COURT:  Because the providers are not in this

20  case, that's not the analysis here.

21         MR. SVERDLOV:  Correct.

22         THE COURT:  All right.  Now you've hit it.

23         MR. SVERDLOV:  -- a different statutory framework by

24  which compensation happens, and that rule applies differently.

25  It applies to providers in a way that does not apply here.

1          THE COURT:  I appreciate that.  That clarifies at

2     least our prior discussion.

3          All right.  Well, do you want to talk about the

4     First Amendment?

5          MR. SVERDLOV:  I do, Your Honor, very much.

6          THE COURT:  All right.  Let's hear it.

7          MR. SVERDLOV:  Your Honor, this morning my colleague,

8     Brian Netter, explained that the IRA negotiation program is

9     fundamentally a form of government procurement in the

10    commercial market and that for that reason it triggers no

11    Fifth Amendment concerns.

12         But the same insight, this understanding that the

13    program creates a framework for commercial agreements, for

14    contracts, also defeats plaintiffs' First Amendment claims and

15    the specific objections they make.

16         So Supreme Court decisions like *Expressions Hair*

17    *Design,* that my friend on the other side mentioned, like

18    *Rumsfield v.  Forum For Academic Institutional Rights* and

19    others make clear that regulation of commercial conduct,

20    including ordinary price regulation, does not implicate

21    constitutional --

22         THE COURT:  But that's not what they're saying.

23    Mr. Roth is saying there's more in this agreement than in

24    these typical agreements.

25         You're telling them that they have to sign off saying

1    this is fair.  We negotiated this, this is the right price, or

2    words to that effect.  I'm paraphrasing now, but there's

3    additional language in this agreement that doesn't

4    necessarily -- isn't necessarily contained in a typical

5    contract.

6        And so why is that language even in there?

7        MR. SVERDLOV:  So, Your Honor, I have --

8        THE COURT:  If they agree to the price, why do they

9    have to agree it's fair or any of these things?  Why wouldn't

10   they just say -- or why wouldn't the government just say,

11   look, if we're going to negotiate the price, and if you agree,

12   great; if not, you're going to have to opt out, but you don't

13   have to actually sign off on this type of language that says

14   it's fair, that we fairly negotiated.  The government is right

15   on it, on this, and almost concede that we were not being fair

16   to the public before because we had a different price prior to

17   signing this agreement.

18       MR. SVERDLOV:  So, Your Honor, I have three responses

19   to that, if I may.

20       THE COURT:  Yeah.

21       MR. SVERDLOV:  The first line -- response is that

22   they named category error.  And the category error is that

23   these terms that they're objecting to, terms like "agreement,"

24   terms like "maximum fair price," these are statutory terms of

25   art.  Right?

1        They are in the template agreement to make clear that

2   when the parties actually affix their signatures -- and I have

3   several points I'd like to make about the expressive content

4   of the signatures or lack thereof -- but those terms are

5   ported over from the statute, they are defined by the statute,

6   and they are there to make clear that manufacturers are

7   agreeing to abide -- they are contracting to abide by the same

8   technical understanding of these terms.  And I would like to

9   direct --

10            THE COURT:  Is there a disclaimer?

11            MR. SVERDLOV:  There is.

12            THE COURT:  What's the purpose of the disclaimer,

13   though, then?

14            MR. SVERDLOV:  It's belts and suspenders, Your Honor.

15   Your Honor --

16            THE COURT:  I mean -- well, I'm going -- I don't want

17   to interrupt your line.  I don't want to interrupt your

18   argument, but you're going to have to explain to me, then,

19   when you get to the right point of this presentation that

20   based upon what you just said to me, why would you need a

21   disclaimer at all?

22        If what you're saying is the reality of this language

23   in the contract as a term of art, it's coming from the

24   statute, then why the disclaimer at all?

25        But I'll let you address that when it's the appropriate

1    time, but I do want you to address it.

2          MR. SVERDLOV:  Absolutely, Your Honor.  Absolutely

3    happy to address it.

4          But if I may, I'd like to just set a framework for

5    addressing it, and that framework, among others, is the

6    Supreme Court's decision in *Meese v. Keene* from 1987, and the

7    cite for that is 481 U.S. 465.  This was cited by some of the

8    Amici in these cases.

9          That case is very instructive because in that case

10   plaintiff challenged a statutory requirement that it affixed a

11   term "political propaganda" to certain types of materials that

12   were sponsored by the government of Canada, right?

13         And the claim was, look, this term has a political

14   valiance.  It has an emotional valiance.  It has resonance

15   that people will sort of intuitively understand.

16         The Supreme Court looked at that, and it said no.  The

17   term "political propaganda" is defined in the statute.

18   Congress gave that term a definition.  It is being used in the

19   technical sense of that legislation.

20         We're not going to inquire into Congress's motives for

21   defining that term, but the fact that Congress can define

22   terms and they're used in a technical way doesn't then give

23   the Court leeway to consider sort of the --

24         THE COURT:  Just to be clear, Congress is mandating

25   that that language be placed in the agreement?

1        MR. SVERDLOV:  That that was -- no.  No.  Obviously,

2   there's no political propaganda language in the agreement.

3        Also I should note, Your Honor -- and this goes to a

4   point that I wanted to highlight at the end, but my friends on

5   the other side say that the First Amendment claims resolve the

6   entire case.

7        I think that's not quite true for several reasons.

8   Among them is the fact the language that they're objecting to

9   is in the template agreement that was promulgated by the

10  agency.  The statute itself in Section 1193 in the public

11  law -- and I can convert that to the U.S. Code if the Court

12  would like -- it just provides for manufacturers to enter into

13  agreements.  Right?

14       So as far as like -- as far as their challenge to the

15  statute, they seem to be almost contesting the mere fact that

16  Congress has said, hey, manufacturers, we want you to sign an

17  agreement.

18       Now, I posit for the Court that if Congress had said we

19  want manufacturers to sign a contract, this claim that my

20  friends on the other side are making would feel a lot less

21  weighty, and, in fact, there is no distinction between the

22  two.

23       Congress is using the term "agreement" in the technical

24  sense, just like it's using the term "maximum fair price" in a

25  technical sense, just like it's using all of these terms in --

1    in the way that they're intended in the statute.

2         The disclaimer, Your Honor, specifically asked

3    whether --

4         THE COURT:  I don't have it before me.  There's a

5    lot of documents.  I'll look at them later.  What does the

6    disclaimer say?  If you have it, I don't have the -- I have --

7         MR. SVERDLOV:  Your Honor, I do have -- I do have it

8    in one of the numerous PDFs that I have opened, and I'm happy

9    to --

10        THE COURT:  Or generally what does it say, so I have

11   a sense of what we're talking about here?

12        MR. SVERDLOV:  I'm happy to read.  This is page 4 of

13   the template agreement that we cited to in our brief.

14        Subparagraph F, quote: "In signing this agreement, the

15   manufacturer does not make any statement regarding or

16   endorsing of CMS's views and makes no representations or

17   promise beyond its intention to comply with its obligations

18   under the terms of this agreement with respect to the selected

19   drug."

20        Use of the term, quote, "maximum fair price" and other

21   statutory terms throughout this agreement reflects the

22   parties' intention that such terms be given the meaning

23   specified in the statute and does not reflect any parties'

24   views regarding the colloquial meaning of these terms.

25        Why did CMS put that in there?  Because, Your Honor,

1    CMS promulgated initial guidance for manufacturers when it was

2    developing the revised guidance to promulgated initial

3    guidance.

4         It had a lot of provisions, and predictably

5    manufacturers who were gearing up to challenge this law raised

6    a host of objections to various provisions that CMS -- that

7    CMS -- various proposals that CMS made.

8         CMS saw that manufacturers, among other things, stated

9    that they have First Amendment concerns about these agreements

10   and other elements of the program.

11        And so to make clear to them what should otherwise be

12   clear, right, when Congress says these are the statutory terms

13   and the contract says --

14        THE COURT:  Well, is the disclaimer to make it clear

15   to them or to make it clear to others?

16        MR. SVERDLOV:  I think it's to make it clear to them.

17   They are the signatories.  It says in the contract that we are

18   not -- we are not in any way forcing you to say anything

19   outside the scope, outside the corners of this contract.

20        We are not in any way trying to put words in your

21   mouth.  You're -- by signing this, you're saying that you will

22   give effect to -- you're signing up to give effect to these

23   statutory terms.  These are terms of art.

24        Your Honor, if I may, I think it's instructive to talk

25   about the other Supreme Court cases that I mentioned -- the

1    *Expressions Hair Design* case, the *Rumsfeld v. Forum for*

2    *Academic Institutional Rights* case, and the *Agency For*

3    *International Development* case -- because I think all of

4    them made it clear just how different this is than this

5    program is than the types of regulations or arrangements that

6    raise First Amendment concerns.

7           So -- as an overarching principle, what *FAIR* --

8    *Rumsfeld v. FAIR*, what *Expressions Hair* -- *Expressions Hair*

9    decision, even the D.C. Circuit's decision in *Nica* makes clear

10   that when analyzing these things, the Supreme Court looks to

11   what is the thing that's actually being regulated, right?

12          When it's speech, when it's expressive conduct, that

13   raises First Amendment questions.  When it's not expressive

14   conduct, when it's just commercial conduct, when it's not

15   speech, when the underlying thing being regulated is not

16   speech, that doesn't draw First Amendment concerns.

17          So *Rumsfeld v. FAIR,* the requirements in that case is

18   the -- what's called the solvent amendment, the requirement

19   that institutions that receive federal funds provide access to

20   military recruiters on terms equal with other --

21          THE COURT:  I remember this back in the day, by the

22   way.

23          MR. SVERDLOV:  Right.

24          THE COURT:  I do.

25          MR. SVERDLOV:  So the Court looks at this and it

 1   says, What's being regulated here is conduct, right?  And it

 2   does so even though -- even though the law schools were

 3   actually required to generate speech to facilitate that.  They

 4   were required to put up bulletins.  They were required to send

 5   out emails, right?

 6         The Court says, no, no, that's incidental.  What is --

 7   the core thing that's being regulated here is conduct, and

 8   that does not create a First Amendment problem.

 9         So it says, among other things, compelling a law school

10   to send scheduling emails for a military recruiter is simply

11   not the same as forcing students to pledge allegiance or

12   forcing a Jehovah's Witness to explain motto, and it trickled

13   to --

14         THE COURT:  It allowed more than that.  The law

15   schools were allowed to protest even while allowing the

16   military to recruit, because my law school was one of those.

17         So it's interesting that you raise that issue.  I'm not

18   sure -- I know the case law is relevant, but if we're talking

19   about freedom of speech, even though the law schools were

20   required to allow the military recruit, like, private law

21   firms and private employers, the institution should -- or at

22   least were still allowed to publicly protest them being there.

23         MR. SVERDLOV:  I think this actually gets to the

24   other case that was mentioned.  This gets to the *Agency For*

25   *International Development* case, because as my friends on the

 1  other side mentioned, the *Agency For International Development*

 2  case looks to a requirement that -- in a constitutional

 3  condition context, right?  It looks to a spending program

 4  where the government says the only people eligible for this

 5  program are going to be those that espouse a particular set of

 6  beliefs.

 7       Now, here's the interesting thing.  What my friends

 8  don't mention is that the case actually involved two

 9  conditions.

10       The first condition was that the government funds in

11  that case that were being distributed through that contract

12  not be used to distribute the message, and then the second

13  broader condition was that the organization profess a belief.

14       And the Supreme Court looks at that and it says the

15  first one is fine.  No one takes issue with the first

16  condition.  It's the second condition we object to.

17       And what they say is Congress is free to attach

18  conditions that define the limits of the government's spending

19  programs, those that specify the activities Congress wants to

20  subsidize, but when you start imposing conditions on the

21  entity, on the speaker itself, what it can do or can't do

22  outside the confines of the contract, then you have a

23  First Amendment problem, right?

24       So if the contract says -- if the agreements here say,

25  hey, manufacturers, you're going to sign this --

1          THE COURT:  You can't speak against it.  You can't

2     say anything contrary to it.  You have to go out there and lip

3     service that this is fair, that you negotiated it.

4          So you're saying the contract doesn't prohibit all

5     these manufacturers going out there and saying, hey, gun to

6     your head, we had to do this.  I don't even agree with this.

7     We did it because it was best for the company.

8          MR. SVERDLOV:  Absolutely, Your Honor.

9          THE COURT:  It was best for the mission.

10         MR. SVERDLOV:  Absolutely.  That -- and that is, in

11    fact, a reflection -- I think not to take us back to this

12    morning or later this afternoon when we talked about

13    unconstitutional conditions in the due process context.

14         But the core of the unconstitutional conditions theory

15    is that there has to be a freestanding right that's being

16    impinged.  And so when the government says, hey, I'll give you

17    this benefit on the condition that you'll restrict your

18    First Amendment speech outside the confines of the program,

19    you know, beyond the umbrella of the federal dollars that

20    Congress is authorized to spend and to determine what those

21    dollars are spent for, you know, yeah, that infringes on that

22    separate right.

23         If manufacturers were being required to take out, you

24    know, political advertisements supporting the IRA as a

25    condition of participating in the program, yeah, that's the

1    First Amendment unconstitutional conditions problem.

2            But we don't have any of that here, right?  We don't

3    have any of that here.  We have a contract, and what they're

4    basically saying is we don't like the words of the contract

5    and we want to have the ability to criticize the government

6    within the four corners of the paper that we're signing saying

7    that we will provide -- saying that we will participate in

8    this program.

9            And that, I think, runs straight into both *FAIR* -- both

10   the *FAIR* case.  It runs straight into the *Agency For*

11   *International Development* case.  They're basically saying,

12   hey, we want -- a whole line of cases, I should say, the *Rust*

13   case from the Supreme Court.

14           There's a whole line of cases that says the government

15   gets to define the limits of its spending programming, and

16   it's not required to subsidize your exercise of

17   First Amendment or other rights within the confines of the

18   program itself.

19           So I think the D.C. Circuit in *Nicopure* follows this

20   same understanding that regulation of conduct is not the same

21   as regulation of speech.

22           That's really what this is turning on, right?  This is

23   turning on the idea that these agreements are there to codify

24   the -- what is essentially a contractual relationship between

25   these manufacturers and the government, and they're welcome to

1    say anything they want outside of it.

2         They are signing this agreement to demonstrate that,

3    yeah, we -- that there's a meeting of the minds, right?

4         I think it's actually interesting, too, to note that in

5    our brief we sort of said, look, by this logic, if you apply

6    First Amendment scrutiny to commercial arrangement of this

7    type and to contracts of this type, there really is no end

8    point.

9         Like, every DOD contract now has to be scrubbed for

10    language that manufacturers -- that defense contractors may

11    find objectionable.

12         Now, plaintiffs say, well, it's not the same, right?

13    They say it's different -- it's somehow different, but they

14    don't actually provide an analytical framework for explaining

15    why it's different.

16         And I -- at least standing here today, I thought about

17    these issues as we were briefing them.  I can't really

18    identify what the limiting principle would be.  It seems to me

19    that if plaintiffs have a First Amendment right in sort of

20    the -- the expressive valiance of technical terms of art, then

21    potentially any type of commercial agreement, any type of

22    contract is vulnerable to interpretation.

23         That is just -- that has not been the law.  We can't

24    predict where the law is going, but certainly on the

25    established precedent, that is not where the law is.

1          I would like to maybe address three additional points

2     really quickly, because my friends on the other side have

3     highlighted them, and I think it's worth -- I think it's worth

4     explaining exactly why we think they don't work.

5          The contested political narrative point that they kept

6     bringing up, the notion that these words have this

7     understanding, as I've said, is answered by *Meese v. Keene*.

8     It's answered by the overarching idea that courts don't just

9     take the plaintiffs' word for what is being regulated.  They

10    actually look -- cases like *FAIR* look to what is being

11    regulated, words or conduct.

12         The *Expressions Hair Design* case that I flagged at the

13    top and didn't circle back to until now is instructive because

14    in that case the Court specifically said what is being

15    regulated here by the New York ordinance is not the price.

16    It's how the price may be communicated.

17         The Court went through and explained, look, nothing in

18    this ordinance actually restricts what manufacturers can

19    charge.  What it does restrict is what they can call a

20    discount and what they can call a surcharge, right?

21         And so looking at that, when the Court sees a regime in

22    which plaintiffs are free to charge whatever they want but

23    there's limits on how they communicate that charge, yeah, that

24    looks like a regulation of expression as opposed to ordinary

25    price regulation.

```
 1          An ordinary price regulation, as this Court noted, has
 2    long been subject to the standard that -- that it is -- it is
 3    not subject to First Amendment protection, cases like Sorrell
 4    from the Supreme Court that say the First Amendment does not
 5    prevent restrictions directed at commerce or conduct from
 6    imposing incidental burdens of speech.  And there's a whole
 7    line of cases.
 8          Second point.  Plaintiffs have tried to distinguish
 9    these contracts, these agreements from contracts by saying
10    three things.  That, one, there's penalties involved.  Two,
11    that the implicit message and value judgment, which I have
12    just addressed, and the only reason to do it this way -- I'm
13    paraphrasing -- is because of that message, right?
14          That basically asks the Court to step in and try to
15    guess what Congress had in its mind when it promulgated this
16    program as a policy matter, when as a policy matter it decided
17    that it wants to model these agreements on other types of
18    fundamentally contractual procurement relationships.
19          The fact that Congress could have imposed a price -- a
20    regulatory price cap, and we'd be analyzing that under
21    different constitutional standards.  That was a policy call
22    for Congress to make.  Congress decided it wanted to conduct
23    these -- to -- in establishing these prices it wanted CMS to
24    hear from the manufacturers.  It provided a whole host of
25    statutory criteria so that manufacturers who chose to
```

 1   participate could come in and lay out what they think their

 2   drugs should be worth.  Here are the factors that CMS needs to

 3   consider.  This is -- this is structured as a give-and-take.

 4   Right?  It was structured to bring manufacturers into the room

 5   and have this be a back-and-forth.

 6        The fact that, at the end of the day, Congress also

 7   said, well, we're not going to pay more than a certain amount

 8   even at the end of this process, doesn't change the

 9   fundamental fact that the same is true for other types of

10   government procurements.  The Pentagon negotiates contracts

11   under a given budgetary constraint.  That doesn't make -- back

12   to what we were saying this morning -- that doesn't make that

13   any less voluntary, and it doesn't make it any less an

14   exercise of the government's procurement power than what we're

15   facing here.

16        THE COURT:  Thank you, Mr. Sverdlov.

17        Mr. Roth, do you have rebuttal?

18        MR. ROTH:  Thank you, Your Honor.  I started by

19   asking what's the reason for Congress to do it this way

20   instead of that way when the simpler thing is to mandate what

21   you want the manufacturer to do?  I don't think I really heard

22   an answer to that offered.  What I heard was, well, the

23   agreements are there to codify it.  It's very strange.  The

24   agreements are there to codify it?  Not the U.S. Code?  I

25   mean, the U.S. Code is what we codify obligations.  Here, U.S.

 1   Code says you've got to agree to do these things.  I'm not

 2   aware of any other situation like that, and I haven't heard

 3   any reason why Congress would do it that way other than --

 4        THE COURT:  Does it matter?  Do I have to figure out

 5   why Congress decided to do it this way versus what you would

 6   think is the more streamlined preferable way?  Is that an

 7   analysis I need to have in this First Amendment issue?  I

 8   don't see why I need to speculate as to why they did it this

 9   way.  I think the issue is whether because they did this way,

10   is there a violation of the First Amendment?

11        MR. ROTH:  I agree, Your Honor.

12        THE COURT:  I know you're going to say something on

13   rebuttal, but since I have you up here, I might as well ask

14   you.  What's your response to the fact they said you can say

15   whatever you want?  Nobody is compelling you to make any

16   statement that this is fair or that you agree with it or that

17   you even like it.  And you're free to go out there, just like

18   the analogy with the sovereign amendment, to say, I absolutely

19   oppose all of this.  We're here to do it, but we're

20   verbalizing that we disagree.  And the government is saying

21   you're more than free to do that.  How are your clients'

22   First Amendment rights being impeded there?

23        MR. ROTH:  I'm going to address *FAIR* separately

24   because it's a different issue.  To take that one on,

25   absolutely true.  We can go in public and say whatever we

 1    want.  You know what?  That is true in every single compelled

 2    speech case the Supreme Court has ever decided.  *PSG&E*, for

 3    example, which is one that we cite in the brief where the

 4    utility had to leave space in its envelope for another party

 5    to include material.  And the argument was you don't have to

 6    say anything about it.  You can say you disagree with it.  You

 7    can put another insert in saying we don't believe what those

 8    people are saying.  That doesn't matter.  If you are forced to

 9    carry someone else's message, yes, you may be able to go out

10    and say we disagree with the message.  But the First Amendment

11    is offended because that is forcing you to go out and make

12    that rebuttal that you wouldn't otherwise have to make, and

13    that itself impairs your First Amendment rights.

14         THE COURT:  First of all, I don't know if that's

15    analogous, the *PSE&G*, but then how does this stuff get in

16    every other contract?  I mean, this is an issue where every

17    time somebody signs an agreement, there's going to be language

18    in there that says, well, if I sign this agreement, you're

19    forcing me to agree with the paragraph number eight or

20    paragraph number 365 and, therefore, my First Amendment rights

21    are impeded because, by executing this agreement, you're

22    forcing me to adopt all the language and all the words of the

23    agreement.  I mean, where does that stop?

24         MR. ROTH:  Your Honor, first, I think what takes out

25    99 percent of that is, most of the time, you are penalized if

1   you don't sign the agreement.  This is very unusual because,

2   unlike the defense contractor who reaches a deal --

3           THE COURT:  Absent any penalty provision as part of

4   this would you have a claim?

5           MR. ROTH:  No.  Of course not.  I mean, if you enter

6   the agreement voluntarily, you enter it voluntarily.  The

7   problem is there is an excise tax of hundreds of millions

8   dollars a day if you don't sign.  That's what creates the

9   First Amendment problem.  In fact, the remedy is to strike

10  that because then we don't have the problem.

11          So, Your Honor, I don't think the fact that we can

12  speak outside addresses the compelled speech objection.  *FAIR*

13  is a little different.  That's the conduct versus speech

14  issue.  In *FAIR* the Supreme Court said the statute requires

15  you to let them in.  Letting them in isn't speech.  Everything

16  else is incidental.  That isn't how the statute works.  If it

17  said you've got to sell us a fair price, then they would have

18  an argument that it's conduct, and we could say we don't think

19  it's fair.  Too bad.  You're not being forced to say it's

20  fair.  No First Amendment problem.  It's, at most, incidental.

21  That's not how this works.  Again, here it's funneled through

22  the agreement in order to require the manufacturers to

23  subscribe to this judgment that is being embedded in the

24  contractual agreement.  That distinguishes it from *FAIR* and

25  from any other ordinary contract.

 1          Then they said, well, it's not really embedding a

 2   message.  It's just a statutory term of art.  It doesn't mean

 3   fair.  It's a statutory definition.  There actually is no

 4   statutory definition, so it doesn't help.  There's no

 5   statutory definition that says "maximum fair price" means X.

 6   It's the colloquial language.  And, again, that is the point,

 7   and that's what we see in the press releases and the

 8   statements in the congressional record.  People say this is

 9   fair.  We're just getting agreement on what's fair.  They are

10   using it in a colloquial way.  They're forcing us to use it in

11   a colloquial way and take away that it is filtering through to

12   the public discourse is exactly that.

13          The disclaimer, we've talked about that.  It's a

14   similar problem to the right to respond.  When they go out and

15   say, look, we've reached agreement.  Manufacturers agree these

16   are fair prices, and they've been gouging you for decades.

17   We're supposed to stand up and say, no, you didn't look at

18   Section 4F.  It says you don't really mean it.  That is not an

19   answer to the compelled speech problem, Your Honor.

20          *USAID* and conditions.  The government says we're

21   allowed to decide how we spend the money.  We don't have to

22   subsidize other speech.  We can determine what the contours

23   are of the spending program.  That is true.  That means they

24   can decide what to spend the money on and what not to spend

25   the money on.  This has nothing to do with money because,

 1   again, they can do the exact same thing without the agreement,

 2   and the money would be spent the same way.  So this has

 3   nothing to do with how the money is being spent.  It's being

 4   spent on drugs.  There's no question about that.  They're

 5   buying the drugs.  That's what they want to buy.  Fine.  The

 6   problem is completely collateral to that -- is they want us to

 7   say in the contract, as we discussed, that this is the fair

 8   price.  That is exactly like *USAID*.  Sure, the condition that

 9   said you can't spend this money on prostitution or whatever,

10   no problem.  They can limit how you spend the money because

11   they don't have to subsidize things they don't want to

12   subsidize.  But what they can't say now is say in the

13   agreement, you agree that you oppose prostitution.  That was

14   stricken under the First Amendment, and that is the analogy to

15   this case.

16        And then, Your Honor, finally, there was some

17   suggestion that this is really just a problem with the

18   template agreement and not with the statute itself.  We

19   actually filed this claim before there was a template

20   agreement because it's all in the statute.  It's the way the

21   statute operates.  Again, if you look at the statute, the only

22   obligation on the manufacturer is to agree to the maximum fair

23   price and to agree to provide access at the maximum fair

24   price.  So it's embedded in the statute, it can't be fixed by

25   CMS, and it violates the Compelled Speech Doctrine.  Thank

1   you.

2          THE COURT:  Thank you, Mr. Roth.

3      Next.  I'm going to try to make sure I get you out of

4  the capital before you lose daylight.

5          MR. DEGER-SEN:  Thank you so much for your patience,

6  Your Honor.  Samir Deger-Sen on behalf of Novartis.

7          THE COURT:  Good afternoon.

8          MR. DEGER-SEN:  The program here states that a

9  failure to reach agreement with the government as to the

10  maximum fair price leads to a fine that is 19 times the

11  national sales revenue of the drug, which Novartis is

12  $93.1 billion a year, which is so ludicrously high that even

13  the government has not tried to defend it.  Instead, the

14  government, through this IRS guidance, has tried to lower that

15  to a number that seems somewhat more reasonable.  That

16  rewrite, we don't really think it makes any sense, but we

17  address in our briefs why it doesn't make sense.  I don't want

18  to get bogged down in that because I don't think anything

19  turns on it.

20          Even if you accept the government's numbers, what you

21  still get is at least a $2 billion a year fine for the simple

22  act of failing to agree with what the government says is the

23  maximum fair price.  That is still a fine.  Obviously, as we

24  discussed earlier, a fine that is close to a third of

25  Novartis's earnings a year, which is an extraordinary fine for

1    what the government itself concedes is completely innocent

2    conduct.

3         And I don't think the government can really dispute

4    that the whole point of this so-called tax is to deter

5    noncompliance.  The statute itself at 26 U.S.C. 5000D says

6    that the provision is titled "designated drugs during

7    noncompliance periods."  And it's expressly triggered by a

8    failure to comply with requirements of the statute.  And it

9    said, at such an absurdly high level, that Congress itself --

10   the Congressional Budget Office said it's not going to get us

11   any money.  It expressly has no revenue raising purpose, no

12   remedial purpose.  It's just a deterrent purpose.

13        So what does that mean for the excessive fines clause?

14   The question for the excessive fines clause is

15   straightforward.  Is it a fine and is it disproportionate?  A

16   fine is a payment to a sovereign as punishment for some

17   offense.  And the Supreme Court said in *Austin*, "A civil

18   sanction that cannot fairly be said solely to serve remedial

19   purpose, but rather can only be explained as also serving

20   either retributive or deterrent purposes."  It is a fine.

21   This serves no remedial purpose.  The government doesn't

22   expect to get any money from this at all, and it serves,

23   obviously, a deterrent purpose.  It's designated towards

24   noncompliance periods, and it's meant to deter you into

25   entering back into compliance.  So it's clearly a fine, and it

*United States District Court*
*District of New Jersey*
**Appx455**

1   is disproportionate where the government itself, I think,

2   essentially concedes this.  It says, well, you know, there's

3   not even an offense here, so it doesn't really make sense to

4   even talk about the proportionality analysis.  And it has no

5   explanation for how the simple act of something that the

6   government concedes is innocent conduct -- just not agreeing

7   -- could somehow warrant a third of your annual earnings as a

8   penalty.

9        What the government does say is, well, this whole

10  doctrine doesn't really apply because excessive fines are just

11  for criminal offenses.  That's something the government has

12  been trying -- an argument that they're pushing in cases for a

13  long time, including the Supreme Court's decision in *Austin,*

14  and the Supreme Court squarely rejected that argument in

15  *Austin*.  That's the exact argument.  This is a quote from

16  *Austin*.  The question is not, as the United States would have

17  it, whether forfeiture under the statute is civil or criminal

18  but, rather, whether it is punishment.  And the government --

19  there are dozens of cases in the courts of appeals, in the

20  district courts that apply these to civil penalties.

21       The government says there are not any -- there's the

22  False Claims Act.  There are four circuits that say the False

23  Claims Act applies to civil penalties.  For example, *The City*

24  *of Los Angeles* case that applies the Eighth Amendment to the

25  municipal parking fines.  There's the *Quest Court v. Municipal*

1  *Public Utilities Commission.*  There's a civil penalty for

2  telephone carriers about interconnection agreements.  Nothing.

3  No connection to criminal penalties at all.

4       I think the Third Circuit in the top case is one of the

5  only circuits that has drawn the government's line, and

6  Justice Gorsuch accented from denial of rehearing en banc

7  saying this is clearly wrong and in conflict with the other

8  circuit.

9       So this idea the government has that it just applies to

10 criminal penalties just has been rejected across the country.

11      THE COURT:  What about irreparable harm or

12 irreparable injury?  Are you going to be talking about that,

13 or should I ask my question now?  I don't want to cut you off,

14 Mr. Deger-Sen.

15      MR. DEGER-SEN:  This goes to jurisdictional

16 questions?

17      THE COURT:  Yes.  So say I'm following you.  Say I'm

18 following you that -- let me make sure I paraphrase.  If I'm

19 inaccurate, then correct me on the record.  The program poses

20 an excise tax -- I don't know if this is right, but I have

21 notes here -- beginning 186%, and after 276 days reaches

22 1,900%.  Is that the position, 1,900%?

23      MR. DEGER-SEN:  That's correct.

24      THE COURT:  Nineteen times the drug's total national

25 revenue.  So if you say 1,900% excise tax would cause you

1  irreparable harm, I presume that's your position, correct?

2  Would 95% excise tax cause you irreparable harm?

3      MR. DEGER-SEN:  It absolutely would, A, because the

4  financial injury is really high, but the other thing to think

5  about here --

6      THE COURT:  What excise tax would not result in

7  irreparable harm?

8      MR. DEGER-SEN:  I mean, I think usually a financial

9  injury of this kind, anything with that degree with is there's

10 no realistic way in which the company can pay I think would

11 result in irreparable harm.

12    One point on this -- the fact -- the fact that this

13 fine has already compelled a compliance with entering into the

14 negotiation process, as Mr. --

15     THE COURT:  I don't know if that's true or not.  I

16 know that's your position that you've been compelled to be a

17 part of this negotiation because of that.

18     MR. DEGER-SEN:  The government has certainly said

19 unless you engage in this negotiation, we're going -- you're

20 going to have to pay to us $93 billion or maybe $2 billion or

21 whatever it might be, but the result is we have to engage in

22 negotiation.  We have to speak and say things that we don't

23 want to be saying.

24    The Supreme Court has said any kind of, you know,

25 First Amendment injury is irreparable harm.  All that, I

```
 1   think, goes to a separate question, which is a jurisdictional
 2   objection.  We only have to show irreparable harm if you're
 3   thinking about the AIA -- I'm going to get to the AIA in a
 4   minute, but I just want to establish the underlying merits of
 5   this, very, very clearly this is a fine under the Supreme
 6   Court --
 7           THE COURT:  I appreciate that.  I have no questions
 8   about your first part.  My questions are more tailored to
 9   jurisdiction.  I'm not just going to have questions just to
10   have them, but these are helpful to the Court.  If you have
11   more on the first part, I want you to build your record.
12           MR. DEGER-SEN:  That's great.  That's the first part.
13       I think it's telling the government really ultimately,
14   I think, prefaced on the jurisdictional issue.  So just
15   stepping back on what it really means -- what the government's
16   argument really means under that Anti-Injunction Act.  Under
17   the government's theory, as long as you label something a tax,
18   and then you have a fine and you make it so high that no one
19   could ever realistically challenge in a refund action, you can
20   never challenge it.  It's impossible for us to challenge this.
21   That's basically the government's theory.  We think it's wrong
22   for two reasons.  First, it's just on the text of the
23   Anti-Injunction Act.  The statute says:  "No suit for the
24   purpose of restraining the assessment of collection of any tax
25   maintained."  Our suit is not for the purpose of restraining
```

1   or collecting -- restraining the assessment or collection of

2   any tax because, as the government well knows and as the

3   Congressional Budget Office said, no tax is ever going to be

4   assessed or collected.  The whole point of this is if the tax

5   is ever assessed or collected, your company is basically out

6   of business.  So no one could ever be in a situation where

7   they're going to be assessed or collected.  The point of the

8   tax is to be used as a tool to coerce compliance.

9        That is something that has already happened, and it is

10  in the background -- all the arguments today it's looming in

11  the background, the fine, the tax, and yet, the government has

12  barely mentioned it.  It's the elephant in the room.  It's the

13  unique feature of this program that doesn't look like any

14  other program, enterprise-destroying tax that is pushing and

15  pulling manufacturers to do things and say things that they do

16  not want to do, and that's the thing that we're ultimately

17  challenging.

18       So we don't think that is a suit to restrain the

19  collection or assessment of any tax.  Justice Cavanaugh

20  concurs and *CIC Services* describes this really well.  The AIA

21  is best read as directing courts to look at the state as

22  objective of suits rather than the suits downstream

23  consequences.  It's because of that word "purpose."  What is

24  the suit's purpose?  A suit for the purpose of restraining a

25  tax that's not maintainable, but a suit like this that's

1   basically saying we want a declaratory judgment to tell HHS

2   and CMS you cannot use this as a tool in a negotiation.  You

3   cannot use it as a looming threat to make us do something.

4   That's a fundamentally different suit.  And that's obviously

5   clear, I think, because it goes to the purpose of what the AIA

6   is, and the Supreme Court said the purpose of the statute is

7   to protect the government's ability to collect a consistent

8   stream of revenue.  The government has already said it has no

9   intention of collecting revenue at all under the statute.  The

10  AIA is an activist.  They're using the AIA as a tool to shield

11  the tax.

12       Even if you don't agree with us on that, I think this

13  goes to the next question, which is the *Williams Packing*

14  exception.  You only get to the *Williams Packing* exception if

15  you think that this is a suit for the purpose of restraining

16  the assessment and collection of tax.  We don't think you need

17  to get to the exception, but if you get to the exception, then

18  it's irreparable injury on the merits, and that irreparable

19  injury is not just the financial injury.  And it's irreparable

20  at least in the sense that there is no way we would be able

21  to --

22       THE COURT:  What about the agreements for their -- to

23  exercise forbearance?

24       MR. DEGER-SEN:  What they say there is -- you can

25  apply the statute once, and we'll exercise forbearance on that

1  collection challenge.  They change the fact that the statute

2  -- because it applies through all of noncompliance periods --

3  means that you're going to be racking up the excise tax the

4  whole time.  So you have that lawsuit and that refund action.

5  You challenge it and, after two years, you lose, you pay 93

6  million or 200 billion; these figures that obviously no

7  company could ever pay.

8       So it's a completely unrealistic option to think we

9  could ever have a challenge, just wait for these penalties to

10  accrue in the background, and down roll the entire company on

11  winning one single lawsuit.  And the government knows that.

12       Just stepping back, that is what -- the position that

13  they have in this case, Your Honor, means that you have --

14  that they are going to be able to say any time they want to

15  compel compliance like this, we can take this out of the

16  constitutional challenge by calling it a tax and making it

17  unchallengeable.  That is the sort of extreme nature of the

18  challenge they have in front of you in this court.  I don't

19  think you can accept that premise to say this tax.

20       The final thing they say is that we sued the wrong

21  party.  The most straightforward thing to say about that is

22  under Rule 21, at any time you can add or drop a party.  So if

23  you think there's any concern with that, would serve the

24  government.  The government is obviously aware of this case.

25  It's a completely technical, formalistic thing.

1    THE COURT:  You mean like the IRS or the Treasury

2  Department?  I'm going to ask that question to your friends on

3  the other side.  I like Mr. Sverdlov's use of the word

4  "friends."  That's something they do before the Supreme Court.

5  We should probably implement that more in district court, but

6  I have heard that before in the Supreme Court, and I do

7  appreciate that.  I'm going to ask your friends on the other

8  side of the aisle about why we need those, folks, especially

9  -- you make a point in your paper.  HHS isn't joined.  Would

10  that keep a tax from being collected?  Right?  Let me see what

11  they have to say about that.

12    MR. DEGER-SEN:  Your Honor, it would stop the tax

13  from being collected, but more fundamentally what we're asking

14  for here it sort of syncs well with our AIA argument.  What

15  we're asking for is a declaration of the tax is unlawful.  And

16  the injury that's happening here is the use of that tax to

17  compel our behavior.  And with that declaration -- and it's

18  HHS and CMS that are doing that -- with that declaration they

19  can't do that anymore, and the game changes, and that's what

20  we're saying.  It's the use of this tax -- I think the last

21  thing I'll say about this is it is sort of telling the way

22  they described the program throughout the day.  They tried to

23  avoid the tax and say it's just the government, you know, the

24  government is just, you know, setting the price it wants.  If

25  you don't like it, walk away.  All of that stuff.

```
 1          Why do they want this tax?  Why is the tax here?  Why
 2     do you need to have this enterprise-destroying penalty backing
 3     everything?  If it's so unnecessary, maybe they should just
 4     give it up.  I think that's an important question to ask the
 5     government.
 6          Thank you, Your Honor.
 7            THE COURT:  I will.  Thank you, Mr. Deger-Sen.
 8          Who is coming on from the United States?
 9            MR. GAFFNEY:  Good afternoon.
10            THE COURT:  Good afternoon.  Before we do anything,
11     why don't you answer Mr. Deger-Sen's question?  I mean, now,
12     presume I asked it.  Why do you need this excise tax?
13            MR. GAFFNEY:  I think the question is not why do we
14     need the tax.  The question is whether the tax is
15     constitutional, and there's even a threshold question before
16     that, which is whether the Court can get to it.  You asked
17     this morning are there going to be any claims where I don't
18     need to run the analysis all the way to ground in order to
19     dispose of that claim?  This is one.
20            THE COURT:  This is one.
21            MR. GAFFNEY:  This is one.
22            THE COURT:  All right.
23            MR. GAFFNEY:  It's no surprise.  I think that counsel
24     for Novartis starts with -- to jump to the merits instead of
25     talking about the Anti-Injunction Act.  The defendants aren't
```

1  the ones that contrived this judicial review scheme.  Congress

2  did.  And under the Anti-Injunction Act, the question is not

3  -- this is from *Florida Bankers*, a D.C. Circuit case, 977 F.3d

4  1065 at 1067.  The issue here is when, not if, plaintiff may

5  challenge this tax.  Under the Anti-Injunction Act, Congress

6  chose to have refund suits be the mechanism by which taxpayers

7  challenge taxes.  The Court in *NFIB* at 567 U.S. at 544

8  explains this.  AIA is like -- taxes that Congress creates,

9  quote, "Creatures of Congress's own creation and how they

10  relate to each other is up to Congress, and the best evidence

11  of Congress's intent on that question is the statutory text."

12      So this is one of those issues where the label itself

13  matters.  And you don't hear any dispute that the 5000D tax is

14  labeled a tax.  So the first of the two questions that must be

15  asked under the Anti-Injunction Act, the first one is

16  satisfied.  The 5000D tax is a tax.

17      So the second question is -- and that's true.  It's not

18  disputed, but it's true, even when there's this

19  characterization of the tax as a regulatory tax, as opposed --

20      THE COURT:  The bottom line, Mr. Gaffney, just so I

21  am clear as day, if Congress calls it a tax, it's a tax.  Is

22  that the point that you're trying to make there?

23      MR. GAFFNEY:  That's what the Court said in *NFIB*.

24  That's what the Court said in *CIC Services*.  And that's true

25  even when a challenger to a tax says, yeah, but this tax isn't

1    even really revenue raising.  The Court said -- this is in *CIC*

2    *Services* 593 U.S. at 225 -- the AIA, quote, "Draws no

3    distinction between regulatory and revenue-raising tax rules."

4    Congress says it's a tax, it's a tax for AIA purposes.

5         That leaves the second question.  What is the purpose

6    of suit?  Now, Novartis does not cite a single case -- and

7    defendants aren't aware of one -- where the legal claim is

8    about the legality or constitutionality of a tax, and

9    Anti-Injunction Act did not apply to require that taxpayer to

10   challenge that tax in the course of a refund suit.  That's

11   what we have here.  They're saying the tax violates the

12   Eighth Amendment.  The claim squarely challenges the

13   constitutionality of the tax, and I'm not aware of any case

14   where that has been the legal claim.  And the purpose of the

15   suit has been not to restrain or enjoin the collection or

16   assessment of that tax.  And the AIA --

17        THE COURT:  This is probably the question I was going

18   to ask you.  Novartis makes an interesting point.  They

19   basically say that if HHS is enjoined, then that will keep the

20   tax from being collected.  That would be a complete relief,

21   right?  That's the argument that you're saying that's unique.

22   There's nothing out there that would support that, in every

23   situation where we have an issue of an actual tax, the IRS and

24   Treasury department are in.

25        MR. GAFFNEY:  Sorry.  I keep cutting you off.  I

1    think your summary of their redressability argument is exactly

2    right.  And I pulled a couple of the quotes from their

3    redressability argument.  Their redressability argument is we

4    don't have to sue the IRS and Treasury because even though we

5    know those are the agencies that are going to collect the tax,

6    that are going to enforce the tax provision, they know that.

7    Even though that's true, they say in their brief, yeah, but

8    CMS performs this statutory trigger for enforcement of tax.

9    In other words, CMS is involved in the enforcement.

10        I want to point a couple of spots where they say this

11   in their briefing.  This is at ECF Number 57.  So -- I've got

12   eight examples, I think, but I'll just give you three.  At

13   page 52, CMS is, thus, plainly necessary to the enforcement of

14   the excise tax.  Also at page 52, there's simply no realistic

15   basis to think that the IRS or Treasury would or could impose

16   the excise tax if CMS was enjoined.  The last one they say,

17   quote, "It's inapplicable here because CMS has an integral

18   role in the causal change of enforcing the excise tax."

19        In other words, there's no question.  Their answer on

20   redressability as to why it's fine that they just got CMS and

21   HHS in the case.  Why?  They're involved in enforcing the tax.

22   What are they trying to stop?  Enforcement of the tax.  That

23   is exactly what the AIA precludes.

24        As I mentioned, they don't cite a single case where the

25   legal claim directly challenges the constitutionality of a

 1    tax, and yet the AIA was held not to apply.

 2         In *CIC Services*, that's not what's happening.  There's

 3    a question about the legality of an IRS notice.  There are a

 4    lot of upstream things in this case that they complain about

 5    that they say lead them -- could lead them down this path to

 6    paying a tax.  We haven't raised the Anti-Injunction Act to

 7    preclude these things that if they do or don't do it might

 8    trigger a tax.  We raise the Anti-Injunction Act where it

 9    applies where there is a tax that they're challenging and

10    where the purpose of their Eighth Amendment claim is to say,

11    Court, declare this thing excessive under the excessive fines

12    clause and prevent them from enforcing it.  The AIA applies

13    there squarely.

14         On the Declaratory Judgment Act, I just want to loop

15    back.  This is the last comment that we heard is on the

16    redressability point.  Well, you know, we're still seeking a

17    declaratory judgment even if an injunction here wouldn't do

18    the trick with CMS and HHS defendants.  What about the

19    declaratory relief that we're seeking?  That's an even easier

20    case.  Their argument on the Anti-Injunction Act -- again,

21    this isn't a tax -- is that the purpose of their suit isn't to

22    restrain the assessment or collection of taxes.  The

23    Declaratory Judgment Act tax exception is even easier.  It

24    just says no declaratory judgments for declaratory judgments

25    that are, quote, "with respect to federal taxes."

1          THE COURT:  Federal taxes.

2          MR. GAFFNEY:  That's that.  There's no declaratory

3   judgment available here.  So the redressability argument can't

4   be cured by pointing to that.

5          On their reliance on the Congressional Research

6   Service, they point to this over and over as if Congress

7   itself announced that the tax would never generate revenue as

8   if HHS and CMS said that.  That's not true.  We cite ECF

9   Number 24 at page 56, note 13 there.  This case is 56

10  F.Supp.3d 280, 296.  But basically, long story short, courts

11  don't take what CDO or CRS says as evidence of congressional

12  intent.  We cite a couple cases there, but there are a host of

13  others that do the same thing.

14         I will note I looked closely at that Congressional

15  Research Service report.  At page 30, it says to challenge

16  this thing, you've got to pay the tax in full and bring a

17  refund suit.  They don't agree with that part of the CRS

18  piece.  So everybody had some disputes about what exactly is

19  going on here, and nobody thinks that the CRS research report

20  is the definitive answer here on congressional intent.

21         So AIA applies.  So the question is, is there an

22  exception that applies?  There are two judicially recognized

23  ones.  They don't try to fit within one of them.  That is

24  *Williams Packing*.  The point of *Williams Packing* -- and it's a

25  very narrow exception -- the Third Circuit has said these

1    exceptions apply, quote, "only in extraordinary

2    circumstances."  That's *Thornton*, 493rd F.2d at 166.  Third

3    Circuit also said that the taxpayer bears a, quote, "very

4    substantial," end quote, burden.  That's *Flynn*, 786 F.2d 591.

5         The thing you have to show as a taxpayer is two things:

6    irreparable harm between now and when you could bring your

7    refund suit', and, two, that you will definitely certainly

8    succeed at that suit.

9         So what's the point of that?  The point is if you

10   definitely got a winner of a claim, but in between now and

11   when you could bring that refund suit you're going to suffer

12   irreparable harm to the point that, let's say, you're not even

13   going to be around to actually win, well, then you put in the

14   claim now and win now.  But that's not what we have here.

15        So the thing that they ignore -- and I think Your Honor

16   picked up on it earlier -- is the point that this tax is a

17   divisible tax.  So what is it Novartis needs to do between now

18   and the refund suit?  Here is what they have to do.  They have

19   to file -- this is assuming -- put aside all the voluntariness

20   stuff.  Like, that they choose to remain in Medicare, they

21   choose to make Medicare sales, all of these other things.

22   Okay?  They have to, one, file a return and pay tax on a

23   single sale.  One.  That's all they have to do.  They have to

24   file a refund claim.  As we discussed earlier, IRS policy

25   statement 516 says IRS won't collect the balance in the

```
 1   interim.  And then step 3, if and when there's a denial, they
 2   file a refund suit.  So what irreparable harm will they suffer
 3   between now and the filing of that refund suit, which is the
 4   irreparable harm that's required under Williams Packing,
 5   paying tax on one sale?  That is not going to put Novartis
 6   under.
 7         You asked earlier about the math, so let's get right to
 8   that, because that's pretty important here.  Everybody keeps
 9   throwing out different numbers.  Let's clarify this.  You sell
10   -- during World War II --
11         THE COURT:  Oh, my goodness.  I mean, I'm asking you
12   to clarify the math in oral argument, and you're going back to
13   World War II.
14         MR. GAFFNEY:  In World War II, in 1944, the top
15   marginal tax bracket -- thank goodness it's not the case today
16   -- 94%.  Okay.  So how did that work?  You get paid a hundred
17   bucks.  You fork over 94 of it to the government.  You retain
18   the other 6.  If we're in the world of 271 days, so let's skip
19   the 65, 75, 85%.  So let's just jump to the 95%.  If you sell
20   a drug for a hundred dollars, the customer pays a hundred
21   dollars.  You, the manufacturer, retain your -- you retain the
22   $5, and $95 goes towards the tax.  We don't dispute that 95
23   times 5 is 19.  What we dispute is this looks anything like
24   these other cases, like in Kurth Ranch and Dye where they say,
25   Well, look, that was only four or five times.  Here's the
```

1    difference.  In *Kurth Ranch*, you sell your marijuana for a

2    hundred bucks.  You owed in tax $400.  You're out $300.  In

3    *Dye*, it was five times.  You sell your drugs for a hundred

4    bucks, you're out 500.  You're down 400 bucks.  Here this is

5    like a high income tax.  You sell your drug, and you will pay

6    a portion of that in tax.  It is not four or five times the

7    sale price.  It's not what the customer pays times four or

8    five times.  You retain less, a fraction of what you sold it

9    for, not that you owe a multiple of it to the government.

10        And that means -- I was looking back at some of the --

11   the declaration at 8, 11 -- paragraphs 8 and 11.  I'm doing

12   math here.  It's somewhere in the 40 to 50 times what they --

13   their number is 40 to 50 times what the number would actually

14   be.  And by the way, that's because the rate is 20 times and

15   their Medicare sales are -- all their sales are not Medicare.

16   Right?  This gets to the point of the Anti-Injunction Act, in

17   part.  They don't -- they want to, like, point to these

18   massive numbers, but how the IRS is actually going to enforce

19   this thing we'll know in the refund suit.  Like, they claim as

20   if the IRS isn't going to do it, even though the IRS notice

21   says taxpayers may rely on this thing now.  They couldn't --

22   these interpretations, in any event, are favorable to them.

23   It would be very unlikely, I expect, come that refund suit.  I

24   have a strong suspicion that they will not say, actually, you

25   were supposed to tax us on all our sales.  Actually, it was

1   supposed to be 1,900%.  I bet, in the refund suit, full

2   alignment on the IRS notice interpretation.  But let's get to

3   the refund suit and see what the actual amount is so we don't

4   have these numbers that are floating around that are never

5   going to materialize.

6        The other thing that they have to show under *Williams*

7   *Packing* is they have to show a certainty of success on the

8   merits.  They have to do both of these things, certainty of

9   success on the merits and irreparable harm between now and

10  that refund suit.

11       THE COURT:  Is it certainty or likelihood?  I don't

12  have it before me, but is that the language?

13       MR. GAFFNEY:  It's certainty.

14       THE COURT:  Okay.

15       MR. GAFFNEY:  There's like -- the cases pile on.  So

16  it's not just certainty.  It's not just certainty.  It's

17  certainty taking everything in favor of the government,

18  looking at this in the light most favorable, et cetera,

19  et cetera.  It's an extremely high bar.  Again, the point is

20  supposed to be you say to the taxpayers you're definitely

21  right, but you're telling me you can't possibly even get your

22  day in court.  All right.  Fine.  We'll hear it now.  We'll

23  make this one narrow exception to the requirement you got to

24  bring a refund suit.

25       But that's not what we have here.  They don't point --

1  this is going to get into merits in a second -- but they don't

2  point to any excessive fines clause case and lacks a

3  connection to criminal conduct and withheld to be a fine.  No

4  taxing.  No tax ever held to be a fine under the excessive

5  fines clause.  The only taxes that they cite that have ever

6  been held to be punishment, *Kurth Ranch* and *Dye*, look

7  completely different.  They both involve drug taxes.  They

8  both involve criminal convictions.  Lots of pieces that look

9  different.

10        On this very thing I'll say, Your Honor, is they don't

11  really make a defense that they could have sued the IRS and

12  Treasury.  They know those are the entities that enforce.

13  They say, well, then why doesn't the Court just amend -- why

14  doesn't the Court just say, okay, well, I'm anti-IRS and

15  Treasury here.  We do not do that because it would be futile.

16  We just said the anti-injunction applies.  It would, however,

17  hammer home that the anti-injunction definitely applies.  I

18  don't know why they didn't name the IRS or Treasury, but

19  certainly a complaint that did would have really cast a

20  spotlight on the fact, oh, yeah, this is a case in which the

21  Anti-Injunction Act squarely applies.  All these cases that

22  involve challenges to taxes, they involve the IRS and

23  Treasury.

24        Okay.  On the merits, so the courts --

25            THE COURT:  To save you some time, I want you to

 1   build your record on merits, but I have no questions about

 2   that section.

 3           MR. GAFFNEY:  Okay.

 4           THE COURT:  Just to note that, so you can run through

 5   it, but I'm --

 6           MR. NETTER:  I'll go pretty quickly, then.

 7       The one thing I'll say is there is this discussion --

 8   there's this back-and-forth about whether this thing is a

 9   fine, and that term has been defined.  It's punishment for

10   some offense.  How do we figure out what that is?  We should

11   be guided by the cases.  So, yes, where there's criminal

12   forfeiture, that's *Bajakajian*.  Yes, where there's civil

13   forfeiture, that's tied to criminal conduct.  But, no, where

14   there's merely a high tax rate.  That's *Kurth Ranch*.  No,

15   where the tax has a deterrent purpose.  That's both *Kurth*

16   *Ranch* and *NFIB*.  They haven't pointed to any case where a tax

17   was held to be a fine under the excessive fines clause -- and

18   there are lots of taxes.  Sometimes when there's no case, it's

19   because the thing is so anomalous.

20           There are just only seven taxes in the world, and so

21   how could one tax percolate up and have a ruling be challenged

22   under the excessive fines clause?  We have plenty of taxes, we

23   have plenty of excise taxes.  We've got plenty of excise taxes

24   that are at a rate of a hundred percent.  And I am happy to

25   rattle them off to you.  But there's never been a tax held --

1    at least that I'm aware of, the defendants are aware of, and

2    that Novartis identified -- that was held to be a fine under

3    the excessive fines clause.  And the only taxes that have ever

4    been held to be punishment for some -- the same standard under

5    the excessive fines clause to be a fine, they involve, like I

6    said, in *Kurth Ranch* and *Dye*, characteristics, anomalies that

7    are totally absent here, innocent owners defenses, a criminal

8    conviction being required, et cetera.

9         They, in their briefing, Novartis has suggested that

10   all the Court needs to find is that there is some deterrent

11   purpose.  Fine.  That's not true.  We know that from the Third

12   Circuit's decision in *Artway*, 81 F.3d at 1258.  The Court

13   there said *Kurth Ranch*, quote, "announced that the

14   no-deterrent purpose rule of *Halper and Austin* does not apply

15   in all situations.  In *Kurth Ranch* at 780, the Court explained

16   why deterrent purpose and even a high tax rate is not enough."

17        In *NFIB*, the Court explained that you can have a

18   regulatory purpose and still be a tax.  That's 567, 568.  And

19   the Court also noted there at same pages that in

20   distinguishing -- this is quoting -- in distinguishing

21   penalties from taxes, this Court has explained that if the

22   concept of penalty means anything, it means punishment for an

23   unlawful act or omission.  While the individual mandate

24   clearly aims to induce the purchase of health insurance, it

25   has some incentive mechanism.  It need not be read to declare

1  that failure to do so is unlawful.  Neither the act nor any
2  other law attaches negative legal consequences to not buying
3  health insurance beyond requiring a payment to the IRS.
4       That's the same thing here.  If a manufacturer chooses
5  to stay in Medicare but not to enter into a negotiation
6  agreement or not to agree to a maximum fair price, there are
7  no other consequences, just like in *NFIB*, beyond requiring a
8  payment to the IRS.
9       Since the Court said they didn't have any other
10 questions, I'll just quickly touch on excessiveness.  It's a
11 high bar.  Street proportionality is not required.  There's
12 another really important piece here, though, given the posture
13 of this case.  There is a strong presumption of
14 constitutionality when the fine -- let's call it a fine --
15 when the fine falls within the range prescribed by Congress.
16 We cite a couple of cases on this, but *Bajakajian* says at 524
17 U.S. at 336, quote, "Judgments about the appropriate
18 punishment for an offense belong in the first instance to the
19 legislature."
20      So is this fine, if it were a fine, would it be within
21 the range that Congress prescribed?  Of course.  We don't know
22 exactly what the amount would be, but according to Novartis's
23 own reading, the fine is actually going to be way less than
24 the range that Congress prescribed because they say the IRS
25 has gone out of its way to have a smaller assessment and a

1   lesser collection than Congress required.  But even if it's

2   exactly the same, the question is are we within the range that

3   Congress prescribed?  And these cases remind that there's a

4   strong presumption, if you are in that situation, then you

5   don't have excessiveness.

6        The last thing I'll do is just point to some of those

7   excise tax cases in case the Court wants them on the record

8   where the rates go between 50 and a hundred percent.  I'll

9   just say to start at 26 U.S.C. 49- --

10       THE COURT:  Go a little bit slower, though, only

11  because --

12       MR. GAFFNEY:  Sorry.

13       THE COURT:  -- you think we're not going to review

14  this.  I will review these citations but not right now.  Megan

15  is on my left here, and I need her to be able to type this

16  out.

17       MR. GAFFNEY:  For Megan's purposes, 26 U.S.C. 4941 is

18  the beginning of them.  There's a whole slew of them, and I'll

19  just say ending at 26 U.S.C. 4975.  You'll see a whole host of

20  them.

21       Again, I think it's worth pausing for a moment on how

22  this should actually play out.  The Anti-Injunction Act, the

23  challenge should be brought in a refund suit.  It's required.

24  That's the path that Congress created, and at that point, we

25  would know the actual amount of the tax.

1          And as we've said, what it would be at that time would

2     be the payment of tax on a single sale.  And at that point, we

3     can ask is that excessive in light of that single sale?  And

4     they don't want to get there because the Anti-Injunction Act

5     requires them to have to do that.

6          But also, once the actual numbers are there, this thing

7     will not appear as excessive as the miscalculations that have

8     been put before the Court.

9          Unless the Court has any further questions --

10          THE COURT:  I don't, but thank you, Mr. Gaffney.  I

11     appreciate it.

12          MR. GAFFNEY:  Thank you, Your Honor.

13          MR. DEGER-SEN:  Thank you, Your Honor.  Just a few

14     points.

15          So I think that what we just heard from the government

16     really underscores that, under their logic, the tax could

17     be -- could be $1 trillion.  It could be $5 trillion.  It

18     doesn't matter.  And they think that the AIA applies, and you

19     have to go through a refund action.

20          And, obviously, that is complete formalism, because no

21     one in the world would go through a refund action in that

22     situation if they're going to be subject to a penalty that

23     high at the end of it.  They would just comply like the

24     statute intends them to comply.

25          And the idea that they could just pay one and then, you

1   know, just have the refund action, and then we'll know what it

2   is, I mean, we know it's going to be at an absolute minimum

3   $2 billion plus a year, and it could be $90 billion plus a

4   year.  The only thing we have to hold onto is nonbinding IRS

5   guidance.

6       So they clearly don't think that anyone is

7   realistically going to do that.  There was no response to the

8   idea that you can't just risk paying this kind of enormous

9   fine through refund action.

10      In their theory, it just doesn't -- this fine is

11  basically immune from challenge.  That is the legal principle.

12  You call it a tax, and you make it high enough that someone

13  just can't take the risk of challenging in a refund action.

14  That's the end of it.

15      It can be excessive.  You'll just never get to the

16  merits and never be able to challenge it, and that is a very

17  dangerous principle in the hands of any government, any

18  administration.  And I don't think that this Court should

19  accept that principle, Your Honor.

20      They said we don't cite a single case where this

21  applies to a tax, but there's a reason for that because other

22  taxes do have revenue-raising purposes.  There isn't a tax

23  like this that says 19 times the national sales revenue for

24  drugs, which can be $90 billion a year.

25      And I think the key thing to just -- stepping back.

1  Congress did not want this tax to raise any revenue, not just

2  they didn't predict it to raise any revenue, they didn't want

3  it to raise any revenue.

4       If this tax raises revenue, it means that manufacturers

5  are noncompliant, and drug prices are not coming down.  It

6  means the system is failing.  So the tax has to be set at such

7  a high level that, as it's described in the statute, it brings

8  people into compliance.

9       If it's gaining revenue, it's failing.  The

10  government's own tax cases all say if you have a tax that is

11  excessive in relation to its revenue-building purpose, of

12  course, that can be a fine.

13       So the reason that this is not -- that we haven't seen

14  taxes like this is because Congress has never tried to do

15  anything like this.  This is extraordinary.  It is novel.

16  There is no such thing as a tax that is a third of a company's

17  earnings for completely innocent conduct or 10, 15 times the

18  company's earning for completely innocent conduct.

19       It is way beyond the bounds of what governments have

20  done before.  They say that a tax is a tax, but you have to

21  analyze it as tax.  I just want to be clear, that's only true

22  for the AIA and for statutory claims.

23       For constitutional purposes -- and the Supreme Court

24  made this clear in *NFIB* -- the confusion of when Congress's

25  definition doesn't control.  If it's substantively a fine,

1    it's a fine.  They mention *NFIB* and say, well, that was a

2    reasonable tax.

3        The Court specifically in *NFIB* said that the individual

4    amount wasn't set at such a high level but no one could pay

5    it.  People could pay it and then declined to get insurance.

6        So that was part of the Court's analysis as to why it

7    could be construed as reasonable tax.  Here when it's set so

8    high that no one is supposed to pay it, when the regulatory

9    scheme is designed such that people don't pay it and instead

10   go into compliance, it's a fine, just by any commonsense

11   measure.

12       If you talk about this to anyone in the street, is it a

13   tax or is it a fine?  It's a fine.  Of course it is.  It's

14   penalizing someone for noncompliance.  It's trying to bring

15   you back into compliance, and it's interesting, the other case

16   they mention a lot is *Kurth Ranch*, which, of course, is not

17   even an excessive fines case, and, you know, that statute

18   there was held to be punishment.

19       So I think it underscores -- they don't really have

20   examples of cases where you have a fine that looks anything

21   like this and, again, all that just goes to the excessive.  Is

22   this excessive?  What is it excessive to?  Completely innocent

23   conduct.

24       They don't dispute that it's innocent conduct.  They

25   don't dispute there's nothing with saying you don't want to

1    pay the MFP, but if this is a fine, then a fine that --

2    dramatically lower than this would still be excessive under

3    the excessive fines clause because you have to judge it in

4    relation to the conduct, and the conduct here is completely

5    innocent.

6         The final thing I'll say is about the question of which

7    parties to join.  Again, we had a surprising amount about

8    that, but I think it ultimately -- if this Court thinks

9    there's any concern with that, it just can easily add --

10        THE COURT:  Why didn't you guys have --

11        MR. DEGER-SEN:  Because of the nature of the claim

12   that we're bringing.  We don't think that the issue here is

13   that we're going to be levied this fine.  We are not going to

14   be levied this fine.  No manufacturer is ever going to be

15   levied this fine.

16        It is -- HHS and CMS are using the fine to coerce us,

17   and for purposes of a declaratory judgment -- and, again, the

18   purpose of this claim and our constitutional claim is it's not

19   a tax, it's a fine.

20        So that's why it does fall within -- if we're

21   challenging this on a constitutional basis, we can bring a

22   declaratory judgment action, and the Court can say that

23   substantively this is a constitutional claim, and so you're

24   allowed to challenge this as a fine.

25        And so that's what we're asking for.  That's the reason

1    we didn't, you know, join them, but if the Court thinks that

2    was a mistake or we tended to be overinclusive, this is not --

3    they didn't say anything about fair notice.

4         The only thing they said here is it would send some

5    kind of message.  I wasn't really clear on the answer, but

6    they didn't say there's any problem, they didn't say there's

7    any substantive problem.  Rule 21 is designed precisely to

8    lead -- you know, prevent the kind of formalistic results.

9    The claim is then kicked, we refile or restart the whole

10   process again.

11        There's just no purpose to that when the government is

12   clearly on notice, has vigorously disputed it.  It's all in

13   front of Your Honor.  There's no reason not to address it.

14        The fact that the government is trying to duck it so

15   hard, the fact that the government has eventually rewritten

16   five, and the fact that ultimately counsel didn't answer the

17   question:  Why is this fine here?

18        If there's no need for it, if this whole policy is just

19   the government --

20        THE COURT:  I don't know if -- I mean, I think he

21   made the points of legally not required to, right?

22        MR. DEGER-SEN:  Of course not.

23        THE COURT:  I don't think he's wrong about that.

24   Whether it's there or not is whether it's constitutional.

25        MR. DEGER-SEN:  Absolutely.  Absolutely, Your Honor.

```
 1        THE COURT:  And I wanted to ask the question because
 2   I thought he would take the bait, but he did not.
 3        MR. DEGER-SEN:  It's not -- we don't have to defend
 4   it.  I think it is telling that you have -- you know, that you
 5   could defend this scheme so much as being so valuable to the
 6   American people.
 7        They don't defend the fine at all, which is a huge
 8   component of the coercive nature of it.  They don't say
 9   anything about why is this.  They just say it's
10   constitutional.  For the reasons we've explained, it's not
11   constitutional.
12        And their ultimate argument is, even if it's not
13   constitutional, you are not allowed to even examine its
14   constitutionality because we called it a tax.
15        This Court should not accept that premise.  Thank you,
16   Your Honor.
17        THE COURT:  All right.  I appreciate that.
18        This is not a sting on Mr. Deger-Sen, but absent
19   extraordinary circumstances, I'm cutting the rebuttals for
20   oral argument only because of time constraints.
21        I want to hear from both sides, but I also don't want
22   to be here, so if there's something urgent that you will need
23   to come back after the government's spoken, I'll hear from
24   you, but let's limit the rebuttal to what you need to do.
25        Okay.  Everybody okay?  Nobody needs an -- anybody want
```

```
 1    to take a five-minute break or anything?

 2            MR. SVERDLOV:  Your Honor, can I take the Court up on

 3    that?

 4            THE COURT:  Absolutely.  Why don't we recess -- is

 5    five minutes, ten minutes?  You tell me.

 6            MR. SVERDLOV:  Five minutes is fine.

 7            THE COURT:  Why don't we recess for five minutes, and

 8    then we'll get back on.  If anyone needs to take a break, now

 9    is the time to stretch your legs.  Thank you.

10            THE DEPUTY COURT CLERK:  All rise.

11            (A short recess occurred.)

12            THE DEPUTY COURT CLERK:  All rise.

13            THE COURT:  Please remain seated.

14            Where are we?

15            MR. PARRISH:  Your Honor, Ashley Parrish for Novo

16    Nordisk.

17            THE COURT:  Good afternoon, Mr. Parrish.

18            MR. PARRISH:  Good afternoon, Your Honor.

19         There's two remaining arguments.  The first segment is

20    the last of the constitutional arguments addressing separation

21    of powers and due process.

22         And then, Your Honor, the final argument of the day is

23    something very different.  It addresses the statutory claims.

24    With your indulgence, what I'd like to do --

25            THE COURT:  Are you doing both?
```

1          MR. PARRISH:  I'm doing both, yes, sir.

2          THE COURT:  I will tell you, I have no questions on

3    the statutory claims, so I'm going to allow you to go through

4    your presentation, but that will probably move quicker.

5          Is that also with the PowerPoint?

6          MR. PARRISH:  It's with the -- not PowerPoint, but

7    with the handed --

8          THE COURT:  The handout, which I have already.

9          MR. PARRISH:  Yes.

10         Your Honor, what I was going to say, and perhaps this

11   isn't in the Court's interest, but I can actually move

12   relatively quickly through separation of powers.

13         I'd like to have a little bit of rebuttal time on the

14   statutory claim if the Court would indulge me on that.

15         THE COURT:  I will.

16         MR. PARRISH:  Thank you, Your Honor.  I appreciate

17   that.

18         THE COURT:  All right.  If you're going to be quick

19   on this, then let me ask you the one question I have for you.

20         Walk me through the property interests that are

21   implicated by the program.

22         MR. PARRISH:  Yes, Your Honor.

23         So let me say this on the property interest is that it

24   is clear that we want to be able to sell our drugs to elderly

25   and disabled people, right?

1    It is also clear that we have a property interest

2    that's been built up over the reliance interest on how these

3    federal programs have been run for years.

4    Your Honor, one thing I would say is I don't think for

5    purposes of separation of powers that any question about

6    voluntariness applies because the structural protections apply

7    regardless of whether there's consent or otherwise.

8    And, Your Honor, I'm sure you picked up on this, but if

9    the government's position is correct that this is all just

10    about procurement, which is really an extraordinary claim,

11    Your Honor, because -- the government isn't binding for

12    itself.

13    But if it's correct, then, Your Honor, housing prices,

14    food prices, gas prices, every single one of those markets,

15    the government could simply say, we're going to take over half

16    the market, 50 million people, and we will set up a system

17    where we will pay and then provide benefits.

18    And, Your Honor, the bottom line is that they are

19    allowed to do that but only subject to constitutional

20    constraints.  There's no get-out-of-the-constitution free

21    card.

22    And, Your Honor, that's why I started off -- and what

23    I'd like to do with the separation of powers argument is

24    really walk the Court through three things very quickly.

25    First, Your Honor, this statute is quite extraordinary

1  because of how many constitutional protections it strips away,

2  and I'd like to quickly walk through what those are.

3       Second, Your Honor, I would like to highlight that the

4  government identifies no case ever that has ever upheld a

5  statute that has stripped away so many essential protections.

6       And then finally, Your Honor, I'll just respond to

7  their two main arguments.  It won't take me long.

8       Your Honor, the thing I want to emphasize under the

9  separation of powers, and we see the Supreme Court has --

10  recognizes in its recent cases, it's designed to do a number

11  of things.

12       But one is to ensure that Congress is accountable for

13  the legislative judgments it has to make and that agencies

14  have accurate fidelity to law and are accountable to the

15  things that they do implementing the decisions that Congress

16  has made.

17       Your Honor, what we have here is we have first no

18  standard at all that governs what price is imposed, and,

19  Your Honor, I thought your questions early this morning where

20  you said, well, what's in the record as to how much money

21  you're making?  What are the research and development costs?

22       Your Honor, you can ask your clerk after the hearing

23  today, you know, I want to know what the right price is.  What

24  is the right price that the government is going to post?  Tell

25  me -- obviously, you can't calculate it, but tell me what's

1   the principle in the statute that will guide CMS so that CMS

2   is just not making it up itself?

3        And, Your Honor, your clerk will look for hours and

4   days, and they will not find anything because what the statute

5   says is there's a ceiling price.  It says the agency must

6   consider a bunch of factors, things like research and

7   development costs, patents.  And there is no substantive

8   standard that tells them what price to be, whether it's zero

9   or up to the ceiling price.  It's entirely left at their

10  discretion.

11       Now, Your Honor, that itself is a nondelegation problem

12  that we're familiar with going back to 1935.  But what's

13  layered on top of that is that there are no procedures in

14  place to ensure that what the agency is doing is within

15  constitutional bounds, that it is not arbitrary, capricious,

16  reasonable.

17       Your Honor, we've known since 1946 most of the

18  structural due process issues, not the individual rights that

19  you saw addressed in the *AstraZeneca* case, but the idea of

20  due process and echo a separation of powers and the structural

21  constraint on government.  We sold that, Your Honor.

22       You'll know that that's the APA, the Administrative

23  Procedure Act, so it doesn't come up because agencies have to

24  comply, except for Your Honor will note here that the

25  government points to no procedures in the statute, and they

1    even claim that the APA doesn't apply and they're exempt from

2    it.

3          And, third, Your Honor, if all of that were not

4    sufficient, there's no judicial review, particularly of the

5    key decision, which is what is the price that will be imposed?

6          So, Your Honor, even if your diligent clerk could spend

7    those days looking for some principle to tell you what is the

8    right price, at the end of the day, the government would tell

9    you that that choice of price is completely removed from

10   judicial review.

11         So not only has Congress delegated sweeping legislative

12   power to the agency with no principle to guide what the

13   agency's price setting decision is, it's also stripped away

14   any type of check on that that would usually be provided

15   through the courts.

16         Again, Your Honor, all you have to think about is if

17   tomorrow the government said, We're going to make sure that

18   your price of your house that you'd want to sell will be going

19   through a government exchange, or the price of the farmer's

20   food or the price of the gas, at least, at a minimum, you'd

21   want to know that that price was within constitutional bounds,

22   and there was some checks -- some judicial check to make sure

23   that the agency wasn't taking it at -- whatever it wanted, and

24   there's nothing in the statute.

25         Your Honor, that takes me to my second point --

1          THE COURT:  Well, one quick question, Mr. Parrish,

2     only because you brought it up, the *AstraZeneca* decision out

3     of Delaware.  What, if anything, should I take out of that

4     decision?

5          MR. PARRISH:  Your Honor, I don't think too much.

6          THE COURT:  I mean, all right.  Fine.  That was a

7     softball the way I phrased the question.  That was a little

8     bit of a softball.  I mean, go ahead.

9          MR. PARRISH:  I'm trying to cut down the things.  I

10    don't think you need to read that decision at all, Your Honor.

11    Obviously, there's two parts to that decision.  The government

12    was right.  The first part of the decision was all about

13    standing.

14         THE COURT:  Right.  Which wasn't really fully

15    addressed, but it doesn't seem like there's a big argument

16    here today, but...

17         MR. PARRISH:  So it's just the due process point, and

18    what I would say, Your Honor, is this:  The due process claim

19    in that case very much resonated and was briefed very shortly

20    as a sort of a standalone independent right and there's

21    definitely the point that due process works like that.

22         But what I'm making, Your Honor, is a broader

23    constitutional challenge about looking at this.  It really

24    sort of bleeds into the second point, that when you take a

25    look at the free enterprise and *Seila* law cases and the

1    separation of powers, what the Supreme Court has said is that

2    we have to -- we don't allow for multiple layers of

3    constitutional protections.

4        The way that you keep things in check is that Congress

5    has to make some legislative judgment in the first instance.

6    We all know since 1935 that's very broad, just any

7    intelligible principle, but it must some principle.

8        But then after that, what we've always had since 1946

9    is that the agency goes through procedures to avoid basically,

10   you know, tyranny, no arbitrary and capricious unreasonable

11   agency acts always subject to judicial review.

12       What we have here is that that procedural structural

13   check on what agencies do as an exercise of law making is

14   being stripped away here because what Congress has done is it

15   said no principle.  We are not accountable at all for what the

16   prices are.

17       But then when the agency goes ahead and exercises

18   authority, no procedures for anyone to take a look at whether

19   it's reasonable or not, and the ultimate decision, which is so

20   sequential not only for manufacturers but also for patients

21   and the market, it's also exempt from judicial review.

22       So, Your Honor, that's our fundamental point.  I would

23   just point out that if you take a look at free enterprise and

24   *Seila* law, those are obviously separation of powers cases that

25   arise in the context of appointments.

1          And the question of theirs is a situation where there's

2     insulating agency authority from oversight by the president,

3     but it's not very different from what we're talking about

4     here, which is here what we're doing is we're insulating the

5     decision in two ways: both the decision from Congress from the

6     ballot box, and secondly, the decision by CMS, which is why

7     interestingly, Your Honor, you heard all this morning this

8     debate as to what is really going on.

9          And every time you ask the other side, my friends, they

10    always referred to their guidance documents, the new IRS

11    thing, all this attempt to try to rewrite the statute.  The

12    only reason they feel emboldened to do that is because the

13    statute has ripped away --

14          THE COURT:  Are you saying I shouldn't consider any

15    of those extraneous guidance or documents outside of the

16    statute?

17          MR. PARRISH:  Your Honor, obviously, for the purposes

18    of those individual claims, you should consider them on the

19    merits as they've been argued this morning.

20          For purposes of the separation of powers, it's very

21    telling that what the government is trying to do is rewrite

22    the statute through nonbinding guidance documents, which is a

23    sign of an agency that's gone loose.  It's free, and it isn't

24    subject to the usual checks of either a principle that

25    Congress applies or a standard that a Court applies through

1  judicial review.

2        Your Honor, I'm just going to finish up here so we can

3  move on, but the government has a few arguments, and they're

4  very weak, so let me just walk through them quickly.  And, of

5  course, you can hear from my friends.

6        The first one they say is, well, there may not be any

7  standard there to determine what the price is, but there's all

8  these factors that we have to consider.

9        But, Your Honor, I mean, if they tell you tomorrow that

10  your house is now on an exchange and instead of a $250,000

11  house, you can sell it for $10, you don't really care whether

12  along the way they're also able to consider how many times you

13  painted the house or what the driveway looks like or anything

14  like that.

15        There has to be some principle that tells them how to

16  apply those factors, not just the factors that say consider

17  the information.  So that's not an intelligible principle.

18  Factors on their own do not count.

19        Your Honor, the next argument is to say, well, there's

20  never been a statute since 1935 with the *Schechter* case that

21  has ever struck something down on nondelegation grounds.

22  Well, they're right about that, Your Honor.

23        Of course, what they put out as palliative for the

24  Court is really just poison for their position because,

25  Your Honor, the reason why there's been no statute is because

1   there has always been an understanding that there must be an

2   intelligible principle.  There's nothing here.

3        There's no statute that they pointed to that looks like

4   this because statutes are almost always subject to judicial

5   review, APA procedures, or something alternative to ensure

6   that the agency acts within its delegated authority.

7        You have nothing like that there, Your Honor.  I do

8   encourage you to ask them what is the case that -- hold a

9   statute up that says no judicial review, no procedures, and no

10  standards.  They will not be able to cite one for you.

11       And then finally, Your Honor, I would just say that the

12  government says here that the absence of judicial review

13  doesn't matter, right?  They basically say there's cases that

14  say we looked at judicial review as a plus, but we don't say

15  it's a negative because Congress has authority over what gets

16  reviewed and what doesn't.

17       But, Your Honor, of course, that just takes them into

18  the teeth of the Constitution.  It is true that when an agency

19  is acting in the Medicare context, Your Honor, the cases that

20  you have, they almost always have a standard.  There's almost

21  always judicial review.

22       And to the extent there's not, it's because of a

23  calculation, some technical thing later as to calculating how

24  much spend was on the drugs.  Those are the types of things

25  you keep away from the courts.

 1          But in a price control statute, we have known now --
 2     we've had 150 years of experience with these statutes.  They
 3     always come with a standard that is attune to the
 4     constitutional standard to make sure it's not arbitrary and
 5     confiscatory or unreasonable, and we've always had judicial
 6     review, even during war time, Your Honor, when the delegation
 7     is at its best.
 8          So, Your Honor, I really appreciate your time.  I know
 9     that this next argument is really important, so unless you
10     have questions, I'll let my friends speak --
11          THE COURT:  I don't.  Let me hear the government on
12     the separation of powers issue.  Then we'll come back on the
13     statutory claim.
14          Thank you, Mr. Parrish.
15          MR. PARRISH:  Thank you, Your Honor.  I appreciate
16     it.
17          MR. SVERDLOV:  Good afternoon again, Your Honor.
18          THE COURT:  Good afternoon.
19          MR. SVERDLOV:  I will confess, I guess both from the
20     briefing and just the way the argument was set up, I find
21     myself a little disoriented because we kind of briefed these
22     cases with an understanding that there's a distinct
23     due process clause challenge.
24          Then I take my friends on the other side to sort of be
25     folding that into the separation of powers claim.  I think

1    there's several ways to address this.

2         Candidly, I don't really have a whole lot beyond our

3    briefs to say on the separation of powers because what this

4    claim amounts to that Novo has brought is basically kind of a

5    residual vessel in which plaintiffs have placed odds and ends

6    of their theories in the hope that it kind of congeals into

7    something, and it doesn't.  It doesn't congeal, and it doesn't

8    congeal because doctrinally that is not what the Supreme Court

9    has told us a nondelegation doctrine is.

10        And their efforts to bring in questions about

11   availability, or lack thereof, of judicial review sort of

12   dovetails and leads into their due process argument.  On the

13   due process piece, what I would say is we obviously think the

14   Court should give a lot of attention to the *AstraZeneca*

15   decision.

16        THE COURT:  I think you guys submitted a letter, no?

17        MR. SVERDLOV:  We did, Your Honor.

18        THE COURT:  As if I didn't know about that decision.

19   I'm tracking them.

20        MR. SVERDLOV:  We think the Court did a very good job

21   in that case.  We think the Court got it right.  There is no

22   protected interest that's really at stake.

23        I think, just to step back for a moment and to like

24   give an orienting principle here, because it's also relevant

25   to the separation of powers claims.

1    We've seen manufacturers try to bring various angles of

2    their Fifth Amendment theory, right?  And the due process

3    challenges is -- is a theory that some manufacturers have

4    pursued and not others.

5    I think the reason is sort of obvious.  The takings

6    theory suffers from all the weaknesses that we've identified

7    this morning and explained at length in all the briefs that we

8    have submitted.

9    Plaintiffs want to be able to bring what would really

10   conventionally be a regulatory takings claim in a facial

11   posture, and so they have to sort of dress it up as physical

12   taking.  It doesn't work for all the reasons that we've

13   explained.

14   But one way that they've tried to solve that problem is

15   try to go through the due process clause.  Both the *Chamber*

16   decision and the *AstraZeneca* decision correctly rejects that

17   because they have not identified a cognizable property

18   interest.

19   And the Court in *AstraZeneca* in detail explained why

20   the expectation -- the desire or the expectation to sell to

21   the government, even at -- I will, in fact, quote from that

22   decision.  This is at page 42 of the decision: "Desire or even

23   expectations to sell drugs to the government at the higher

24   prices it once enjoyed just does not create a protective

25   property right."

1    So back to the separation of powers, right, because

2    that sort of seems to be the angle they're -- they're pursuing

3    to try to solve some of these problems, right?

4    Like, well, if we -- we sort of want to plead the

5    taking, but it's too early to plead a regulatory taking.

6    We'll try the due process, but we can't really identify a

7    protected property interest.  Well, what about separation of

8    powers?  That seems good.

9    We have -- we can cite to cases dealing with

10   appointments clauses for a principle that courts sort of take

11   structural constitutional claims seriously.  They do.  But the

12   separation of powers claim is also subject to a pretty clear

13   standard, which has been laid out over and over again, and

14   most recently was detailed by the plurality in *Gundy*.

15   I will not take up the Court's time to list the

16   examples in the *Gundy* decision of the kinds of delegations

17   that the Supreme Court has sustained over the years.  We cite

18   them in our brief, and I think it's powerful enough to just

19   read them as they are written.

20   But I will make one observation, Your Honor, and that

21   goes back to the overarching theme of what this case is and

22   really what our dispute with our friends on the other side is

23   about.

24   If the Court accepts, as it should, the understanding

25   that this is basically a form of a procurement program, then

1    the idea that Congress has to delegate in some sort of great

2    detail what is a traditional executive branch function, which

3    is procurement, government contracts, becomes, I think, even

4    more stark and even more clearly wrong.

5         That takes me back around to the lack of judicial

6    review.  So my friends say, Well, all of this, let's take it

7    seriously, not withstanding the intelligible principle test as

8    articulated by the Supreme Court, we have the added problem of

9    a lack of judicial review.

10        Several points on that, Your Honor.  One, this is

11   basically a way for them to smuggle in their due process

12   claims without really trying to satisfy the threshold

13   standards of identifying the protected property interest.

14        They want to just say, Oh, the lack of procedures is a

15   problem, even though we haven't met the threshold test that

16   the Supreme Court has laid out for a Fifth Amendment claim.

17        Two, the lack of judicial review -- I'm going to be

18   happy to speak to this when we talk about the statutory

19   issues -- is not uncommon in the Medicare statute, among

20   others.  In fact, it is commonly something that courts

21   consider and analyze and uphold.

22        So this is -- in that sense, it is not an unusual

23   feature of a Medicaid program or a Medicaid regime to preclude

24   judicial review over certain types of determinations.  That is

25   what we're dealing with here.

1           If the Court has no further questions for me, I am

2    happy to rest on our briefs these issues.  I think they've

3    been dealt with at length and adequately.

4           THE COURT:  I appreciate that.  Thank you,

5    Mr. Sverdlov.

6           MR. SVERDLOV:  Thank you, Your Honor.

7           THE COURT:  Mr. Parrish, you're back up.

8           MR. PARRISH:  Yes, Your Honor.  Thank you very much.

9    Can I just say one sentence and I'll move on to the

10   next argument?

11          THE COURT:  Yes.

12          MR. PARRISH:  Thank you, Your Honor.

13   I'll just say that I mention the point that they can do

14   the same thing with your house and the idea that you could be

15   forced to sell your house for $5 with no judicial review, no

16   check on the agency, and they would come before the Court and

17   say that there's no property interest, Your Honor, I just

18   don't understand it.

19          These are drugs.  We want to sell them to elderly and

20   disabled people.  There's a government program that's

21   regulating all of that.  That's the whole point.

22          But, Your Honor, I'll take us to the next argument,

23   which goes to the statutory point, and I appreciate

24   Your Honor's indulgence.  I know you said you didn't have any

25   questions.

1          THE COURT:  Well, I may.  You know what?  I should

2     withhold that.  I may have questions.  I mean, you never know

3     what you're going to say that will trigger me.

4          But for now, I don't have any anticipated questions on

5     the statutory claims prior to you speaking.  Is that fair?

6          MR. PARRISH:  That's fair, Your Honor.  I've been

7     known for being triggering.  So let me, if I could, tell you

8     what I like to do.

9          First, Your Honor, I do think it's important to

10     emphasize that, you know -- now there's something completely

11     different, right?  This is -- even if you rejected the

12     constitutional claims, these statutory claims are separate and

13     must be resolved.

14          Your Honor, I also emphasize that there is no other

15     court where these claims have been presented and will be

16     considered on the merits.  There was a somewhat different type

17     of argument on the *AstraZeneca* case, but that got rejected on

18     standing grounds.

19          Here Novo Nordisk is directly impacted by these what we

20     think are statutory violations, and it's very important to my

21     clients.

22          So, Your Honor, we're very grateful for your time in

23     considering these issues.

24          Your Honor, what I would say is that the question here

25     is has CMS as the agency violated its order under the statute?

1          This morning, Your Honor, the concerns that we've had

2    have been focused on one part of the delegation, which is that

3    Congress didn't say anything intelligible about price, but

4    they did say a lot of intelligible and specific things about

5    what would be regulated, who would be subject to regulated --

6    what sort of things.

7          And CMS has just blown by that, and most specifically,

8    Congress was very clear for the first year of the program,

9    they could only regulate subject to price controls 10

10   negotiation-eligible drugs, which translates into 10 products,

11   either drugs or biological products, and they made it 15.

12         And, Your Honor, you probably noticed from our brief on

13   page 18, there was their list that they published, and it's

14   very telling that the list is one, one, one, one, six for

15   Novo Nordisk, and yet, they wanted to tell the Court that

16   that's just one product, and it really isn't, Your Honor.

17         So what I'd like to do in this part of the argument,

18   finishing up, is really three things:  first, walk the Court

19   very quickly through the statutory materials that I passed up

20   earlier and I've given to the government and to your clerks.

21         I think those provisions make very clear what CMS is

22   trying to do in terms of rewriting the statute.

23         Second, Your Honor, I'll respond to the government's

24   two main arguments:  Their one main argument is that it's --

25   this entire choice of what to do is barred by the judicial

1  review bars.

2        Your Honor, that fails because if it's susceptible to a

3  narrow reading, you have to apply that reading, and I'll

4  explain to you why the government's reading is just far too

5  broad.

6        The second argument they make is that they can rewrite

7  the statutory definitions because there's a statutory

8  provision called the use of data provision and other

9  provisions that allow aggregation, limited circumstances for

10  specific reasons, but they just don't apply here.

11        And then, Your Honor, if there's time, I might say a

12  few words about, you know, some common rule making, but if we

13  don't get to that, I can rest on the papers.

14        Your Honor, if you turn to the statutory appendix that

15  I've given you, it's just to orient you.  You will see there's

16  two sort of big tabs.

17        The first one are the excerpts that are just from my

18  argument.  The second one is a complete set of the statutory

19  provisions.  If you go to the code or your clerks do, it's

20  very hard to figure out how all this works.

21        THE COURT:  I appreciate it.  So this is helpful.

22  Then you can walk me through it, and I'm walking through it

23  with you.

24        So feel free to direct me where you need to.

25        MR. PARRISH:  Thank you, Your Honor.

1    So the great thing about this argument, Your Honor, is

2    I don't need to do too much here.  So I'm going to refer you

3    to 1192(a), (d), and (e), which is in 42 U.S.C. 1320f-1.

4    And Section 1192(a), that's where we start.  It's

5    probably where we end, Your Honor.  It directs that for 2026,

6    only 10 negotiation-eligible drugs.  It's precise.  It's

7    specific.  It's a numerical threshold.  It's 10.

8    Now, what Congress intended is, over time, it will

9    phase into 15, and ultimately to 20 a year, but just for this

10   year, Your Honor, it's easy to just focus on 10.

11   Your Honor, if you take a look at Section 1192(d), and

12   if you go to D, that's just on page 5 at the bottom, so it's

13   the second page, I think, of the packet, and you see I've got

14   that highlighted in yellow for you, Your Honor.

15   What you notice there is that it defines a

16   negotiation-eligible drug, and it says it's two things:  It

17   must meet the definition that Congress has set for qualifying

18   single-source drug in Subsection E and also it must meet

19   certain high-standard requirements as determined by the

20   Secretary.

21   So it's two things:  Look at the definition that we,

22   Congress, prescribed, and, second, take a look at the

23   determinations that CMS makes.

24   And then finally, Your Honor, that takes us to 1192(e),

25   which is on page 7, so you have to jump ahead a couple of

 1   pages, and 1192(e) gives you the definition of what is a

 2   qualifying single-source drug and what ultimately is the

 3   definition of a negotiation-eligible drug.

 4        And, Your Honor, I'm going to combine these together,

 5   but you can see that A relates to drug products and B relates

 6   to biological products, but they're parallel.  They say that

 7   it must be -- the definition, it must be products.  It must be

 8   a drug product or a biological product.

 9        It must be approved under Section 505(c) by FDA of the

10   Food, Drug, and Cosmetic Act or licensed by FDA under

11   Section 351(a) of the Public Health Service Act.

12        7 or 11 years must have elapsed since FDA approved or

13   licensed those, and it can be a listed drug or a referenced

14   product for a generic or a biosimilar, so there's nothing else

15   on the market.

16        Those are key congressional judgments.  You know, we

17   heard earlier, I think several times -- it was 12:27 -- my

18   friend on the other side said, The prerogatives of Congress,

19   we must respect the prerogatives of Congress.  But we see the

20   prerogative.  Those are rights there set forth.

21        Now, what's really key, Your Honor, is if you take a

22   look at page 21 of the government's brief, the government

23   concedes that when FDA approves or licenses products, it does

24   it on a product-specific basis, product by product.

25        It doesn't license them based on what the ingredients

1  are or what the molecular structure of those products are.  It

2  looks just at individual products.  And that, Your Honor, is

3  the key point because that's the same definition that the

4  Supreme Court applied in its generics case 30 years ago.

5        Now, the definition of drug more broadly can sometimes

6  mean a product, a drug product.  It can sometimes mean

7  something like a drug substance, but that's not what we're

8  talking about here.

9        We're not talking about how it might be used in

10  different content.  We're talking about two different things,

11  the definition that Congress provided in the statute, which is

12  specifically tied to the approval or license or decisions by

13  FDA, and those approval license or decisions are tied to

14  specific products.

15        Now, Your Honor, as you note from the briefing, the

16  government wants to push all of that aside.  What the

17  government says is that, No, we're not going to put price

18  controls on individual products.  We're going to put it on

19  active moieties and active ingredients.

20        And what we'll do is write into the statute that we can

21  pick any active group of products, family of products by any

22  individual manufacturer that contain the same active

23  ingredients --

24           THE COURT:  And they count one.

25           MR. PARRISH:  -- and they will count as one.

1      So, Your Honor, the reason I want to put this

2   specifically is consider how this applies to Novo Nordisk.  We

3   have six different products that they lump together as one,

4   but they are wholly different -- they're two different

5   families.

6      One is called NovoLog.  That's very different from

7   Fiasp.  You have meaningful clinical differences, these

8   products, and they have different device presentations.

9      So within the Fiasp line of products, you have a vial

10   that you can inject.  You have like an Epipen, the pen you can

11   use, or you can have a pump that you put down on your hip.

12      They're very different.  They're all innovations.

13   They've all been separately approved by FDA.

14      Now, Your Honor, as you also noted from the briefing,

15   what's really key there is the whole Fiasp line of products,

16   none of those have even been on the market for the required

17   11 years that Congress said is essential before you can put

18   price controls on.

19      So the putting together is not only violating the idea

20   that FDA approved separate products, it is also getting around

21   the critical decision that Congress made as to how long you

22   get an exclusivity before these price controls take place.

23      And, Your Honor, just for the record and for your

24   future reference, I urge you to take a look at the declaration

25   of Dr. Nathan Laney.  That's at ECF 30.  There's also another

1   declaration at ECF 29.

2          And he goes into depth about how CMS is not only

3   ignoring the clinical differences between these products --

4   and what I mean clinical differences -- and, Your Honor, I'm

5   an okay lawyer, I'm a terrible doctor.

6          But, Your Honor, the --

7          THE COURT:  I hope you're not a doctor at all.  I

8   don't need you back in my courtroom again for performing

9   unlicensed practice of medicine.

10          MR. PARRISH:  But I told you about the triggering.

11          But, Your Honor, I'm going to start off with a point

12   about Fiasp is that the key thing there, from a doctor's

13   perspective, and Dr. Laney goes into this, these are not

14   interchangeable products.

15          If you were on Fiasp, you cannot take NovoLog without

16   transitioning off and with special medical care and so forth.

17   They're not interchangeable.  These are different things.

18          One is ultra fast acting.  It affects when you can take

19   the insulin, at mealtimes, as opposed to NovoLog, where it's

20   just fast acting, and you have to take it before mealtimes.

21          And so they're very different with different profiles,

22   and the idea, Your Honor, that FDA would say, Well, we

23   approved insulin -- the underlying active ingredient.  We

24   approved that, and, therefore, you can go ahead and put on the

25   market any one of these other things you want is really,

 1   Your Honor, ludicrous.

 2          That would never be allowed to happen, and the reason,

 3   Your Honor, that Congress tied this to FDA decisions is that

 4   CMS has no expertise.  FDA is the expert agency.  They know

 5   the difference between the new product and an innovation that

 6   leads to a new product after that.  The CMS does not.

 7          What it's trying to do is wipe out the whole FDA scheme

 8   in a way that's contrary to the statute.

 9          Your Honor, I'm going to move quickly here, but I do

10   want to just address the government's two arguments because it

11   will be helpful to the Court.

12          The first one, Your Honor, is they say it falls within

13   the judicial review bars.  If you're still on that same page,

14   on page 7, you will see that I've highlight something in

15   purple.  That's -- I'm sorry.

16          I'm messing myself up here.

17          If you turn to the second tab, Section 1198, that's

18   where the judicial review is.  That's actually page 19 at the

19   bottom.

20          THE COURT:  All right.

21          MR. PARRISH:  And what's interesting there is they're

22   focused on 1192, and if I read the whole section for you, it

23   says what is not subject to review, the selection of drugs

24   under Section 1192(b), the determination of

25   negotiation-eligible drugs under 1192(d), and the

 1   determination of a qualifying single-source drug under Section

 2   1192(e).

 3         And, Your Honor, I want to focus the Court's attention

 4   on letters and verbs.  When I start with the letter, the first

 5   thing that you obviously notice, Your Honor, is that

 6   Subsection A appears nowhere there.

 7         It would have been easy for Congress to say no judicial

 8   review of how many products you are lumping together.  But,

 9   no, Congress said, We said ten, did not eliminate from

10   judicial review Subsection A.

11         The second thing is you can see that what Congress

12   wasn't doing with these decisions is it was giving CMS

13   discretion as to choose which products within the parameters

14   it set out but not to change the parameters that Congress had

15   set forth.

16         And so if you look at those verbs, it select, it's

17   determine, and it's determine.

18         And if Your Honor goes back to the other parts of it,

19   and you take a look at what I've highlighted in blue in terms

20   of the selection of drugs in the Subsection B, the

21   negotiation-eligible drugs, part -- the high spend in D and so

22   forth, in every one of these provisions, what there is is

23   there's specific directions to the agency to make

24   determinations relating to how much the -- what type of spend

25   it is, whether it's high spend or low spend, and what the

1    total revenues related to that drug is.

2         So what that provision is saying is very consistent

3    with what you might expect a judicial review provision to say,

4    which is courts -- you know, Your Honor will not get pulled in

5    to the difficult position of second-guessing the question of

6    what is a high spend or a low spend drug.

7         But nowhere in there, Your Honor, suggests that

8    Congress has spoken clearly with the intent that you would not

9    change the definition that Congress has put in the statute.

10        They don't have authority to do that.  Your Honor, if

11   you have any doubt about that, you have to rule in our favor

12   because the case law is very clear that judicial review bars

13   are interpreted narrowly.

14        Now, the only way they try to get around that is to

15   say, Well, these decisions are sort of all inexplicably

16   intertwined, but you'll look at those cases, Your Honor, and

17   you realize those are all about calculations.  They're not

18   about rewriting statutory definitions.

19        Your Honor, that takes me to the very last argument

20   that they make, which is they say, Well, it's okay, we can

21   take words that don't appear in the statute, like active

22   ingredients, and we can redefine Congress's definitions

23   because there's provisions in there that talk about

24   aggregation.

25        Your Honor, I misspoke earlier, but if you now go back

1    to the purple highlighting, which is where I was getting to,

2    you'll see that that purple highlighting is the use of data

3    provision.

4         And that use of data provision is something that refers

5    to what it's allowed to do when it's calculating what

6    qualifies as a high-spend drug, and you will notice,

7    Your Honor, when you look at it, what it says is it says, In

8    determining whether any drug has satisfied the statute's

9    high-spend criteria, the Secretary shall use data that is

10   aggregated against dosage forms and the strength of the drug.

11        Now, Your Honor, what is key there is dosage forms and

12   strength.  It's not device presentations, and it's certainly

13   not different entire family of product.

14        So what they can do is if I have a pill that comes in a

15   2 milligram form and a 5 milligram, they can only pick one for

16   price controls, but what they can do is through the use of

17   data provision, they can look at both the 2 milligram and the

18   5 milligram.

19        And then later when putting the price control, there's

20   another provision later in the statute that says they can come

21   up for procedures to apply across those dosage forms and

22   strength.

23        But in the case of Novo Nordisk, Your Honor, there's

24   nothing in that provision or any other provision our friends

25   will cite to you today that says anything about a cross device

1    presentation.

2         So again, needle -- sorry, vial injection, needles or

3    pump, those are device presentations differently.  Nothing

4    that authorizes them to go across those.  Those are not dosage

5    forms or strength.  That's something totally different.

6         And certainly, Your Honor, there's nothing that says

7    they can take an entire family, Fiasp, which is treated

8    differently by FDA, the NovoLog, and merge those together and

9    take the Fiasp products, which have been on the market for far

10   less than the 11 years, and sweep them all in.

11        And, Your Honor, obviously, we don't think, as you've

12   heard all this morning, that the statute is constitutional,

13   but if the statute is constitutional, we urge the Court to at

14   least have CMS apply it the way that Congress wanted because

15   Congress certainly wanted to jump the bounds of

16   accountability, which is what it did with the First Amendment

17   prongs and the separation of powers and the taking.

18        It was trying to get away from accountability, but it

19   wasn't crazy, Your Honor.  It said that we have this drug

20   market, we have these patients that rely on those products,

21   and we need to have innovation, so we're going to phase this

22   in slowly, and we're not going to allow the agency to move too

23   quickly.

24        And the agency is moving very, very quickly,

25   Your Honor.

1      So with that, I'd love to save a little time for

2  rebuttal.  Unless Your Honor has more questions, I'll sit

3  down.

4          THE COURT:  I don't, but you can reserve your time

5  for rebuttal.

6          MR. PARRISH:  Thank you, Your Honor.  I appreciate

7  it.

8          THE COURT:  Who is back up from the government,

9  Mr. Sverdlov?

10         MR. SVERDLOV:  Your Honor, I'd love to keep this

11 short, but I feel like there's a few things to walk through.

12         THE COURT:  I don't want to cut off your time.  The

13 reason why I didn't have, you know, I guess, questions

14 intended for this particular area in advance is because I

15 think at lot of this -- at least your positions were fairly

16 clear in the written submissions.

17     So don't read anything into it that I think these are

18 unimportant claims or less important than the constitutional

19 claim.  It's just these I think were a little more clear in

20 the written submissions.

21     But feel free to make your record, and I'm going to

22 give Mr. Parrish some time on rebuttal anyway.

23         MR. SVERDLOV:  Your Honor, I really appreciate that.

24     As I said before, we've put a lot of thought into the

25 briefs, and so I do think that our positions are encapsulated

1  better there than I'll be able to sort of speak off of the top

2  of my head here.

3       There are a few things to say about the statutory

4  claims, both the preclusion piece and the merits piece.  I

5  want to separate them out, and I do want to start with the

6  preclusion piece and then move on to the merits.

7       The two are obviously intertwined in the sense that

8  determining the determinations that are -- figuring out the

9  scope of the judicial review bar has some overlap with the

10 types of claims that plaintiffs are making by necessity.

11      But nonetheless, I think it makes sense to start with

12 the preclusion of judicial review, and I will start with the

13 text of the statute, as we have -- hopefully in this packet,

14 we have the text of Section 1198, which is codified at 13 --

15 42 U.S.C. 1320f-7(2).

16      And that provision states that the selection of drugs

17 under Section 1192(b), the determination of

18 negotiation-eligible drugs under Section 1192(d), and the

19 determination of qualifying single-source drugs under Section

20 1192(e) are precluded in determinations.

21      Now, what is Novo Nordisk challenging?  They say, Well,

22 when the statute says "drugs," it really means FDA drug

23 products.  We don't think that's right.  I'll get to why.

24      But they are literally challenging the selection of

25 drugs, and more fundamentally, they are challenging what CMS

1  determined the methodologies that CMS has selected to

2  determine what is a qualifying single-source drug, right?

3       They are pointing the Court to the definition of

4  qualifying single-source drug when they say that they weigh on

5  the merits of the statutory claim.  Well, the determination of

6  qualifying single-source drug is a precluded determination.

7       One thing to note, Your Honor, we didn't hear a lot

8  about the notice and common claim.  I'm more than happy to

9  rest on the papers on that claim.  I think it's just -- it's

10 fully dealt with.

11      But I do think it's worth noting that the preclusion

12 piece -- the preclusion arguments we make reach both the

13 merits of the statutory interpretation and the APA notice and

14 comment claim.

15      I don't think our friends on the other side appreciated

16 that.  At least I didn't read their reply brief to address the

17 preclusion of judicial review in the context of the APA notice

18 and comment claim, but it does, in fact, apply.

19      And one of the ways we know that it applies or

20 confirmation of the fact that this is how statutory preclusion

21 provisions works comes from the wealth of cases that we have

22 cited in our brief.

23      Our friends and counterparts say that those cases are

24 all distinguishable from the circumstances, and that provides

25 us as good of an opening as any to explain why they're not.  I

1    think there's a number of cases to walk through.

2         I would just like to highlight two here at the podium.

3    The first, *Texas Alliance for Homecare Services v. Sebelius*

4    from the D.C. Circuit in 2012.  That's at 681 F.3d 402.  So

5    what was at issue in that case?  The suppliers of medical

6    equipment challenged a regulation addressing the eligibility

7    criteria for a Medicare contractor under the APA substantive

8    and procedural requirements.  They have both a statutory

9    construction claim and an APA notice and comment claim.

10        The statutory provision, the preclusion part in that

11   case, stated that there shall be no administrative or judicial

12   review of awarding of contracts under this section.  And the

13   D.C. Circuit finds that this provision covers the challenge.

14   It says, quote, "Under the statute, financial standards are

15   indispensable to the awarding of contracts as such standards

16   determine whether or not a contract may be awarded to the

17   bidder."

18        I think the Court likely sees the parallel I am trying

19   to draw here.  A regulation defining the eligibility for the

20   awarding of contracts is found to be covered by a judicial

21   review bar against the awarding of the contracts.  What are

22   they challenging here?  They are challenging the methodology

23   by which CMS makes the determinations that are explicitly

24   called out in the judicial review bar.

25        The second case I'd like to point to, *Yale New Haven*

1   *Hospital v. Becerra*, from the Second Circuit in 2022.  That's

2   at 56 F4th 9.  Once again, we have a provision that says that

3   there shall be no administrative or judicial review of any

4   estimate of the Secretary for purposes of determining three

5   statutory factors.  The plaintiffs in there say, Well, you

6   know what?  We're not going to challenge the substance of the

7   guidance that the agency issues.  We're going to challenge it

8   just on notice and comments grounds.  We're going to try to

9   undo this.  We're going to undo these estimates by saying that

10  it was procedurally improper -- improperly promulgated.

11      The Second Circuit walks through why that doesn't work.

12  It says no.  It says plaintiffs must explain how we could

13  possibly entertain such a challenge without reviewing the

14  estimate itself, which is a precluded determination.  What

15  these cases speak to is this standard that we have articulated

16  in our brief, the indispensable or integral to or inextricably

17  intertwined standard.

18      Courts have made clear that decisions -- administrative

19  decisions that are, in fact, indispensable, integral, or

20  inextricably intertwined with an unreviewable agency action

21  are covered by the jurisdictional bars.  That is the case

22  here, Your Honor.  That is true for both the substance and the

23  procedural claim.

24      If the Court has no questions on that point, I am happy

25  to turn to the merits.

*194*

1    THE COURT:  I don't.  Feel free.

2    MR. SVERDLOV:  Your Honor, the plaintiffs --

3  Novo Nordisk's basic thesis here that they sometimes

4  articulate, sometimes don't articulate is this desire to

5  equate the term "drug" in the IRA with the notion of a drug

6  product.  They want to say "the drug" means product.  Look, we

7  have many different products, therefore, they must be

8  different drugs.  Neither the text nor the structure nor the

9  purpose of the IRA supports that interpretation.  And there

10  are cases that I will get to in a minute that have rejected

11  the same kind of daisy-chaining efforts that plaintiffs made

12  here to tie FDA's practice to the Medicare context.

13    So, first, let's just turn to the text and talk about

14  the text.  My friends have said that there's only one

15  provision, that this interpretation of the qualifying

16  single-source drug definition that CMS uses is based on one

17  statutory provision.  That's not true, Your Honor.  It's based

18  on three.  We've cited them in our brief, but I think it's

19  worth walking through.

20    So, first of all, on the selection of

21  negotiation-eligible drugs, 42 U.S.C. 1320f-1(d)(3)(b), the

22  use of data.  It says, "In determining whether a qualifying

23  single-source drug satisfies any of the criteria described in

24  the relevant paragraphs, the Secretary shall use data that is

25  aggregated across dosage forms" -- plural -- "strengths" --

1    plural -- "of the drug" -- singular -- "including new

2    formulations" -- plural -- "of the drug, such as an

3    extended-release formulation and based on the specific

4    formulation or package size or package type of the drug."

5         Second place there Congress references the idea of one

6    drug having multiple of these aspects is the negotiation of

7    price.  When Congress directs the factors that the Secretary

8    is to consider in formulating its offer -- 42 U.S.C.

9    1320f-3(e), the factors (1)(D) -- this is the

10   manufacturer-specific data.  It says that the Secretary shall

11   consider data on pending and approved patent applications,

12   exclusivity recognized by the Food and Drug Administration,

13   and applications and approvals -- plural -- under Section 355

14   of the FDCA for the drug -- singular.  Again, applications and

15   approvals, multiple; the drug, singular.

16        Finally, the application of price provision.  Once they

17   go through the process, they come up with a number, they come

18   up with the negotiated price, and they sign the agreement.

19   The Secretary then has administrative duties related to

20   compliance monitoring.  We touched on some of these things.

21   The administrative duties include -- this is 41 U.S.C.

22   1320f-5(a)(2).  The secretary's administrative duties include

23   the establishment of procedures to compute and apply the

24   maximum fair price across different strengths -- plural -- and

25   dosage forms -- plural -- of a selected drug and not based on

1    the specific formulation or package size or package type of

2    such drug.  Right?

3         So throughout the statute we have multiple references

4    to dosage forms, different -- different formulations, new

5    formulations, extended-release formulations, all being

6    considered part of one drug.

7         Now, none of those statutory provisions would make any

8    sense under the interpretations that Novo is positing, and

9    here is how we know.  We can look to the declarations that

10   they submitted.  So the Hauda declaration, ECF 29 at paragraph

11   21, they say, "To change a product's dosage form or device

12   presentation, the manufacturer will create a new product that

13   must be evaluated, approved, and licensed by FDA."

14        So they view each of these different formulations, each

15   of these different presentations as a distinct drug.  That's

16   the move they want to make.  Product equals drug, drug equals

17   product.  I previewed this a few minutes ago, but courts have

18   rejected similar attempts to import the FDCA into the

19   Medicare.

20        THE COURT:  This is the daisy chain analogy.

21        MR. SVERDLOV:  First time --

22        THE COURT:  I'm still listening to you, Mr. Sverdlov.

23   It's late in the afternoon, but I'm still quick up here.

24        MR. SVERDLOV:  Two cases I will cite to the Court

25   this afternoon on that point.  The first, *Ipsen*

1  *Biopharmaceuticals v. Azar.*  That's at 2020 Westlaw 3402344.

2         The Court says, quote, at page 9, star 9 specifically,

3  it says, "The Medicaid Act does not adopt the entire FDCA

4  wholesale."  And then it goes on to reject the very type of

5  daisy chain that plaintiffs are positing here.

6         Another case, *Baker Norton Farms versus FDA*, 132

7  F. Supp. 2d 30 from CDC in 2001.  It does something even more

8  relevant here.  It says, even within FDA's practice, the term

9  "drug" doesn't mean one thing.  So in that case, the Court is

10  looking at the orphan drug, which establishes certain types of

11  exclusivities, eligibilities.  And the plaintiffs in that case

12  come in and they say, no, no, no.  The word "drug" for

13  purposes of the Orphan Drug Act means the same thing as what

14  it means for FDA's other practice.  And the Court explains why

15  that's not correct.  You have to read the statutory provisions

16  within the context in which they are presented, not across

17  broad swaths of agency practice, much less across two

18  completely different agencies, as we have.

19         The -- I said at the top that neither of the text nor

20  the structure nor the purpose of the IRA supports Novo's

21  position.  I think my point on the structure and purpose can

22  be summarized pretty quickly.  I can refer the Court to the

23  revised guidance at page 12 where CMS explains why the kind of

24  interpretation that Novo was positing here doesn't work.  But

25  the short answer is that if it were the case that CMS went

198

1  through the process of selecting the drug, negotiated the

2  price, and then were only applying the established price to

3  one dosage form, one package type, one presentation, it would

4  be trivially easy for a manufacturer to just shift production

5  of the same -- what is essentially the same drug, the same

6  active moiety, the same active ingredient, depending on

7  whether you're dealing with a biologic or the drug product,

8  have doctors prescribe the new drug and the -- or the new

9  product, rather, and the entire regime becomes -- becomes

10  vitiated, becomes a nullity.  The maximum fair price that was

11  established, that was just for this pill container.  That's

12  clearly not what Congress intended.  CMS explained that's not

13  Congress's interpretation.  I think our briefs lay out in

14  detail responses on some of the other points that my friend

15  made about the high-spend requirements and such.  I wanted to

16  reiterate those.

17         I think I have been up here long enough.  I'm happy to

18  address any questions.

19          THE COURT:  I thank you for your time.  I appreciate

20  it, Mr. Sverdlov.

21         Mr. Parrish, do you want to respond to some of these

22  comments, arguments?

23          MR. PARRISH:  I would, Your Honor.  I'm going to be

24  very quick.  I've got three points on jurisdiction.  I've got

25  one point on notice and comment, and I've got three points on

1    the merits, and they're all very short and to the point.

2         THE COURT:  Build your record.

3         MR. PARRISH:  I hope that you and your clerks picked

4    up on opposing counsel's first argument.

5         THE COURT:  They picked up on it.  I don't know if I

6    have.  They're much smarter than me.  I hire very well.

7         MR. PARRISH:  My ears perked up because he said the

8    merits and the jurisdictional issues are intertwined.  He said

9    they overlap.  Well, Your Honor, I'm going to refer you to the

10   *AJ* case in the D.C. Circuit from 2020, 964 F.3d 1230, because,

11   Your Honor, I'd like to say we close the day on a very

12   positive note.  When things are intertwined and the merits are

13   melded with a jurisdictional question, you skip the

14   jurisdictional bar and you go right to the merits.

15        So, Your Honor, we've got one step based on his

16   concession today that makes it easy for you to go to the

17   merits.  If you don't believe that, though, Your Honor, we

18   still win because it's clear that whatever you think about

19   what he says we're challenging, we are not challenging the

20   selection decision under Subsection B.  We are challenging the

21   publication of the list under Subsection A and specifically

22   the idea that there are ten negotiation-eligible drugs, not

23   15, or whatever number the government wants to make up.

24   Subsection A is not covered by the judicial review bar.  If

25   you take a look at the *American Clinical Laboratories*

1    *Association* case in the D.C. Circuit --

2         THE COURT:  Mr. Parrish, just so I'm not confused,

3    because there's a lot of statutory language, but here in

4    Subsection B, doesn't it begin with him in carrying out

5    Subsection A?  Isn't that the first line of Subsection B?

6         MR. PARRISH:  Absolutely, Your Honor.  What I say is

7    when you look at judicial review bars, because of the fact

8    that if there's any interpretation that's reasonably

9    susceptible, what they often do is apply these formalisms

10   where they say if it's in one section but not another, that's

11   significant.  So all I'm saying, Your Honor, is that the ten

12   negotiation-eligible drugs in A is not covered by the bar.

13   And, Your Honor, you are absolutely right that you look, then,

14   and say, well, what's going on in B?

15        What is interesting -- this goes to my point -- my two

16   points -- one is look at the letters, and the second one is

17   look at the verbs.  If you go into B, the agency has not been

18   given discretion to redefine.  It's been given discretion to

19   select based on high spend.  And then the other provision is

20   to make determinations based on high spend or low spend.

21        So what Congress was clearly doing is it was saying --

22   this is always the case -- it gives the parameters by which

23   the agency gets to act.  In this case, ten must be the types

24   of things that FDA has licensed or approved only 7 or 11

25   years, and then within that, agency has discretion to

1    determine which one of those things are high spend and low

2    spend to select.

3         On the question of which drugs, they get the discretion

4    no judicial review, but they can't in the way to do that

5    rewrite the plain statutory mandates.

6         THE COURT:  Mr. Sverdlov is saying, look, this is

7    kind of a toothless tiger, this whole thing, if we have all

8    these different modifications of basically the same drug, and

9    you all want them to be considered separate and independent

10   drugs.  So you have one drug, it's within the IRA.  You have a

11   very similar drug, some modification, and that one you were

12   selling outside of this program.  Is that really the intent of

13   Congress that it would be circumvented that way where you

14   could have different ideations of the same product?  I keep

15   using "drug," but I'm going to get corrected by somebody.  The

16   same product, and then doesn't that circumvent the whole

17   purpose of what Congress was intending with the IRA here?

18        MR. PARRISH:  No, Your Honor.  I'm so glad you asked

19   that because there's three things that really explain what

20   Congress wanted.  So, first, what Congress was saying was that

21   we want this to phase in, and this gets to the most common

22   argument, but it didn't give the agency any rulemaking

23   authority for three years.  After three years, it has

24   rulemaking authority.  Now, if there was a product-hopping

25   problem, the agency could address that through proper

1  rulemaking through notice and comment.  So the agency would

2  have an ability to do that.

3       Second, Your Honor, remember the deference here is not

4  to the inexperience CMS that has never regulated these things

5  before.  It's to FDA's determination of what our individual

6  product to be approved and licensed.  Product hopping can't

7  happen that quickly because it has to go through the FDA

8  approval process.  Of course, what we're talking about is

9  products that have been on the market for 7 or 11 years.

10      Remember, Your Honor, when you and I were talking

11  earlier, Congress didn't want to blow up the system.  It

12  wanted to move in.  So what it does it goes ahead and says,

13  There will be some products that are priced subject to price

14  controls.  The idea that several years down the road --

15          THE COURT:  Baby steps.

16          MR. PARRISH:  Baby steps.  The idea that there might

17  be product hopping will give the agency rulemaking authority

18  in three years' time.

19      Finally, Your Honor, whatever I think about probably

20  doesn't matter because I'll just return to my friend, who I

21  agree with.  It is Congress's prerogative, and nowhere in the

22  statute does it say product hopping.  That, of course, if you

23  looked at the legislative history, too, they talk about it all

24  the time, but they didn't address it here because Congress --

25  as you said -- baby stepping, not going ahead and sweeping

1   everything in.

2         Your Honor, I think the judicial review bar,

3   notwithstanding concession, the question is can this Court

4   reasonably read that provision as being related to which

5   products meet the high spend, low spend, and other

6   determinations that were within the agency's discretion but

7   doesn't give the agency the ability to redefine and to change

8   10 to 15, and the answer is clearly yes there.

9         So, Your Honor, that takes us to the notice and comment

10  point.  I'm just going to highlight this.  This is one of the

11  most extraordinary things in this case that really highlights

12  the constitutional problems.  I mean, usually everybody knows

13  that a guidance doctrine is supposed to only be nonbinding.

14  It's supposed to be, at most, an expression of the agency's

15  views to be done later.  But they've conceded in their brief

16  that this is binding substantive, and yet they also tell you

17  that they didn't have to go through APA notice and common

18  rulemaking proceedings, and there's no judicial review.  Your

19  Honor, it's extraordinary revolution since 1946 that they can

20  wipe out the APA like this, and all the cases they talk about

21  where the APA doesn't apply, it's because Congress has imposed

22  similarly constitutionally required procedures to displace the

23  APA, but they're very similar.  There's a chance to be heard.

24  There's an opportunity to make sure the agency is just not

25  making it all up.  But their position here, Your Honor, is

```
 1   that for purposes of all these things, the amount of data

 2   we've had to turn over, that has nothing to do with the

 3   statute itself.  All of the things they've done to add to the

 4   agreement, their redefinition of what type of manufacturers

 5   have to provide materials, all of these things that they say

 6   they can make up is completely -- you know, courts -- get

 7   away, courts.  We get to do this on our own.  There's no check

 8   from Congress.  There's no check from courts.  Everybody is

 9   just at our mercy.  Your Honor, that can't be the law.

10        That takes me to the merits, Your Honor, which is just

11   a few points.  Your Honor, I hope you noticed -- because I did

12   -- the twist that I was trying to warn you about.  The word

13   "drug" is not the operative term because the word "drug" means

14   lots of different things in different contexts.  He's

15   absolutely right.  There's no doubt about it.

16        He cites cases all day long that talks about drugs and

17   refers to the drug substance.  In fact, that's often what you

18   see in the patent context, but we're not talking about drug in

19   the abstract.  We're talking about it in two specific places.

20   One is how is it defined by Congress in the statute here?  And

21   there it specifically refers to the approval and licensing

22   decisions by FDA.

23        And we know from the Supreme Court for the last 35

24   years that in that context, not in the patent context, not in

25   another context, but in the approval and licensing process, it
```

 1    is a product-by-product decision.  And, you know, he even

 2    admits that in his brief.

 3         So, Your Honor, the idea that there are distant

 4    definitions of drugs makes this statute a little confusing

 5    because it does refer to drug, but it isn't confusing what it

 6    means when it talks about a negotiation-eligible drug.

 7         And, Your Honor, I've never been accused of

 8    daisy-chaining before, but it's not particularly difficult

 9    because, remember, he stood up and he said, Your Honor, I

10    don't know -- it's so disoriented, I don't understand where

11    they came up with this idea that it's product.

12         And, Your Honor, the question is do you believe my

13    friend or do you believe the text of the statute?  You take a

14    look at page 7, qualifying single-source drug, and what is the

15    definition?  It says drug products, a drug that is approved by

16    FDA for seven years on the market and is not a listed drug.

17         Every one of those things only applies to products.

18    There is no FDA approval process here that says if you've got

19    an active ingredient, you can just go ahead, put it in any

20    form that you want, and sell it.  You have to get it approved

21    and licensed if it's something new.

22         So, Your Honor, the daisy-chaining, it may take a

23    little while to go through two or three statutory provisions,

24    but all you have to do is look at what the text says, and the

25    idea that we're coming up with something crazy with products

*206*

1    is belied by the fact that it says it there in the statute.

2        Your Honor, also he went on about those provisions.  I

3    told you he would, and he's absolutely right.  There are

4    aggregation provisions, and remember, he focused on strengths

5    and dosage forms.

6        But, Your Honor, you remember -- let's take a look at

7    the NovoLog products.  We have Fiasp and we have NovoLog.

8    Those are two products, separately approved, different

9    clinical uses.  Those are not different strengths and dosage

10   forms.  Those are totally different products.

11       And then, Your Honor, you remember that within those

12   products, we have three of them.  Again, we have the

13   injection, we have the Epipen, and we have the pump.  Those

14   are not dosage forms and strength.

15       And all three provisions that he referred you to, the

16   ones that he says, well, that means we must -- "drug" must

17   mean something else than what negotiation-eligible drug is

18   defined.  None of them go beyond dosage form and strength, and

19   the problem is that our products, which are differentiating by

20   device presentation, different things all together,

21   innovations that go from putting it in your arm to having a

22   very high-tech pump that has just been recently approved as of

23   2023.  Those are different things.

24       So, Your Honor, let me just close up because I think I

25   speak on behalf of all the plaintiffs of thanking the Court

```
 1    for taking the exception of having oral argument.  We are very
 2    grateful for that.
 3          I would just say, Your Honor, that the government
 4    challenge here is that this statute is unprecedented.  There
 5    has never been a statute like this that combines so many
 6    attempts to get around basic constitutional protections,
 7    whether it's a forced sale, whether it's a forced compelled
 8    speech, whether it's a $2 billion fine or even larger.
 9          There has never been anything like that combined with
10    the idea that there's no principle from Congress, and on top
11    of no principle from Congress, there's no judicial review and
12    no procedures.
13          But if you disagree with us on that, Your Honor, and I
14    really hope you don't because it's very important that we
15    uphold the Constitution, I, at least, urge you to agree with
16    us on the idea that CMS has gone completely off of what the
17    statute is.  It does not have authority to rewrite the
18    statute, and it's trying to do that, and we would urge you, at
19    least, Your Honor, to hold the agency to the language that
20    Congress imposed and the statute Congress chose to write.
21          And with that, unless you have questions, I'm grateful
22    for the Court's time.
23              THE COURT:  I don't.  Thank you, Mr. Parrish.
24              MR. PARRISH:  Thank you, sir.
25              THE COURT:  Is there anything further on behalf of
```

1    the plaintiffs first?  Is there anything further we had to

2    address today?

3        It looks like we covered all the issues.  I know it's

4    been a long day.

5        Mr. Chiesa, anything on behalf of this team on my right

6    over here?

7            MR. CHIESA:  No, nothing, Your Honor.  Thank you.

8            THE COURT:  All right.  Mr. Netter, who's speaking

9    for the government here?  Do you have anything further?

10           MR. NETTER:  We have nothing further, Your Honor.

11           THE COURT:  All right.  I will be brief because

12   you've been here for a long time, but I think it's worth

13   mentioning this on the record.

14       I will tell you that today I witnessed absolutely

15   outstanding lawyering from the attorneys here in this

16   courtroom, and I say that from both sides.

17       I think it's worth mentioning on the record -- I think

18   it's mentioning even for the public who are still here:

19   Mr. Chiesa, Mr. Roth, Mr. Deger-Sen, Mr. King, Mr. Parrish,

20   Mr. Netter, Mr. Gaffney, Mr. Sverdlov, I say this because -- I

21   think I mentioned this off the record before, and I think it's

22   worth mentioning now.

23       This district is not known to be generous in offering

24   oral argument on particular motions or applications, at least

25   not in civil matters, and I am not one personally who is

*United States District Court*
*District of New Jersey*
**Appx535**

```
 1   generous offering oral argument.

 2         I find that many times it's redundant, and it's a waste

 3   of time, and I will tell you absolutely that was not the case

 4   today.

 5         We've had this discussion with the federal bar, and

 6   that's a discussion we'll continue to have with members of our

 7   bar about encouraging oral argument when it can be informative

 8   to the Court, but here -- two things I think are worth

 9   mentioning:

10         One, I found that the oral argument was absolutely

11   informative to the Court.  These are complex issues.  Many of

12   these issues, I don't have clear-cut law before me.  So I

13   appreciate the written submissions but also the oral argument.

14         But I also want to say I think you all did a bit more

15   today.  You also offered a unique educational opportunity for

16   the newer attorneys that are in my courthouse.  We have

17   judicial law clerks.  We have judicial interns that have been

18   sitting here observing your advocacy today from this courtroom

19   and in an overflow courtroom across the way in Judge Kirsch's

20   courtroom, and he was gracious to offer that to us.  I think

21   that is an important opportunity for them to witness effective

22   advocacy and professionalism.

23         So I do want to thank the lawyers for your preparation,

24   and with that, this matter is adjourned.  Thank you.

25              THE DEPUTY COURT CLERK:  All rise.
```

1          (Court concludes at 4:03 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2        - - - - - - - - - - - - - - - - - - - - - -

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8        I

9

10

11    /S/ Megan McKay-Soule, RDR, CRR    March 7, 2024

12              Court Reporter                          Date

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [2] - 78:22, 168:11
**$125** [1] - 32:25
**$250** - 17:17
**$250,000** [1] - 168:10
**$300** - 145:2
**$400** - 145:2
**$90** [3] - 46:13, 153:3, 153:24
**$93** [1] - 131:20
**$95** [4] - 17:9, 46:7, 46:8, 144:22

## /

**/S** [1] - 211:11

## 0

**07069** [1] - 1:16
**07102** [1] - 2:3
**08608** [1] - 1:11

## 1

**1** [5] - 82:21, 83:24, 84:19, 97:15, 152:17
**1)(D** [1] - 195:9
**1,900%** [7] - 45:23, 46:8, 46:9, 130:22, 130:25, 146:1
**10** [9] - 36:13, 38:25, 154:17, 177:9, 177:10, 179:6, 179:7, 179:10, 203:8
**10020** [1] - 2:15
**105** [1] - 1:16
**1056** [1] - 38:10
**1065** [1] - 138:4
**1067** [1] - 138:4
**11** [14] - 43:12, 43:20, 44:13, 61:17, 61:25, 63:21, 82:23, 145:11, 180:12, 182:17, 188:10, 200:24, 202:9
**1100** [1] - 2:21
**1192** - 184:22
**1192(a** [2] - 179:3, 179:4
**1192(b** [2] - 184:24, 190:17
**1192(d** [3] - 179:11, 184:25, 190:18
**1192(e** [3] - 179:24, 180:1, 190:20
**1192(e)** [1] - 185:2
**1193** [1] - 110:10
**1197** [1] - 59:18

**1198** [2] - 184:17, 190:14
**11:20** [2] - 1:12, 3:3
**12** [1] - 197:23
**120** [5] - 36:24, 36:25, 40:13, 47:12, 52:10
**1230** [1] - 199:10
**1258** [1] - 149:12
**1271** [1] - 2:15
**12:27** [1] - 180:17
**12:37** [1] - 88:21
**13** [2] - 142:9, 190:14
**132** [1] - 197:6
**1320f-1** [1] - 179:3
**1320f-1(d)(3)(b** [1] - 194:21
**1320f-2** [1] - 59:23
**1320f-2(a)(1** [1] - 16:7
**1320f-3(e** [1] - 195:9
**1320f-5(a)(2)** [1] - 195:22
**1320f-6** [1] - 59:17
**1320f-7(2)** [1] - 190:15
**1395W-114(a)(b** [1] - 44:3
**15** [6] - 10:21, 154:17, 177:11, 179:9, 199:23, 203:8
**150** [1] - 170:2
**166** [1] - 143:2
**1700** [1] - 2:10
**174** [1] - 52:22
**18** [1] - 177:13
**186** [1] - 81:15
**186%** [2] - 45:23, 130:21
**19** [5] - 46:9, 127:10, 144:23, 153:23, 184:18
**1935** [3] - 163:12, 166:6, 168:20
**1944** [1] - 144:14
**1946** [3] - 163:17, 166:8, 203:19
**1980s** [1] - 42:14
**1987** [1] - 109:6
**1:17** [1] - 88:22

## 2

**2** [7] - 65:5, 127:21, 131:20, 153:3, 187:15, 187:17, 207:8
**2.6** [1] - 39:11
**20** [2] - 145:14, 179:9
**200** [1] - 135:6
**20001** [2] - 1:20, 2:7
**20005** [1] - 2:22
**20006** [1] - 2:11

**2001** [1] - 197:7
**2012** [1] - 192:4
**2016** [1] - 51:15
**2017** [1] - 100:13
**2020** [2] - 197:1, 199:10
**2022** [7] - 44:19, 84:2, 84:8, 84:11, 84:15, 84:22, 193:1
**2023** [1] - 206:23
**2024** [4] - 1:11, 3:2, 84:24, 211:11
**2025** [4] - 62:4, 84:2, 84:16, 84:24
**2026** [2] - 84:19, 179:5
**20530** [2] - 2:18, 2:25
**21** [4] - 135:22, 157:7, 180:22, 196:11
**217** [1] - 51:15
**225** [1] - 139:2
**23** [7] - 43:12, 43:20, 44:14, 61:17, 62:1, 63:21, 82:23
**23-14221** [1] - 3:12
**23-20814** [1] - 3:13
**23-3335** [1] - 3:9
**23-3818** [1] - 3:10
**24** [1] - 142:9
**25** [1] - 19:13
**26** [5] - 45:19, 128:5, 151:9, 151:17, 151:19
**271** [1] - 144:18
**276** [1] - 130:21
**280** [1] - 142:10
**29** [2] - 183:1, 196:10
**296** [1] - 142:10
**2d** [1] - 197:7

## 3

**3** [2] - 85:16, 144:1
**30** [13] - 36:13, 38:25, 43:20, 44:16, 61:18, 83:3, 83:6, 88:14, 88:16, 142:15, 181:4, 182:25, 197:7
**30-10** [1] - 46:11
**30-day** [1] - 62:14
**302** [1] - 52:22
**30th** [1] - 62:4
**336** [1] - 150:17
**3402344** [1] - 197:1
**35** [1] - 204:23
**351(a** [1] - 180:11
**355** [1] - 195:13
**365** [1] - 123:20
**3:23-cv-03335-ZNQ-JBD** [1] - 1:5
**3:23-cv-03818-ZNQ-**

**JBD** [1] - 1:4
**3:23-cv-14221-ZNQ-JBD** [1] - 1:5
**3:23-cv-20814-ZNQ-JBD** [1] - 1:6

## 4

**4** [1] - 111:12
**4(b)(i** [1] - 44:3
**40** [2] - 145:12, 145:13
**400** [2] - 41:11, 145:4
**402** [2] - 1:10, 192:4
**41** [1] - 195:21
**42** [7] - 44:3, 59:17, 172:22, 179:3, 190:15, 194:21, 195:8
**45** [1] - 88:14
**461** [1] - 109:7
**481** [1] - 109:7
**49** [2] - 55:13, 151:9
**493rd** [1] - 143:2
**4941** [1] - 151:17
**4975** [1] - 151:19
**4:03** [1] - 210:1
**4F** [1] - 125:18

## 5

**5** [10] - 46:7, 46:8, 144:22, 144:23, 152:17, 175:15, 179:12, 187:15, 187:18
**50** [5] - 79:17, 145:12, 145:13, 151:8, 161:16
**500** [1] - 145:4
**5000D** [4] - 45:19, 128:5, 138:13, 138:16
**505C** [1] - 180:9
**51** [1] - 2:6
**516** [1] - 143:25
**52** [2] - 140:13, 140:14
**524** [1] - 150:16
**544** [1] - 138:7
**56** [3] - 142:9, 193:2
**567** [2] - 138:7, 149:18
**568** [1] - 149:18
**57** [1] - 140:11
**591** [1] - 143:4
**593** [1] - 139:2

## 6

**6** [1] - 144:18
**60** [1] - 8:16
**609** [1] - 1:24

**JBD** [1] - 1:4

**65** [2] - 19:14, 144:19
**681** [1] - 192:4

## 7

**7** [9] - 1:11, 3:2, 179:25, 180:12, 184:14, 200:24, 202:9, 205:14, 211:11
**75** [1] - 144:19
**780** [1] - 149:15
**786** [1] - 143:4

## 8

**8** [1] - 145:11
**81** [1] - 149:12
**815-2319** [1] - 1:24
**85%** [1] - 144:19
**850** [1] - 1:20

## 9

**9** [3] - 193:2, 197:2
**900** [1] - 2:11
**921** [1] - 51:15
**93** [1] - 135:5
**93.1** [1] - 127:12
**94** [1] - 144:17
**94%** [1] - 144:16
**95** [2] - 17:10, 144:22
**95%** [4] - 45:25, 46:5, 131:2, 144:19
**950** [2] - 2:18, 2:24
**964** [1] - 199:10
**977** [1] - 138:3
**99** [1] - 123:25
**99.98** [3] - 39:12, 48:3, 48:23

## A

**a)(3)** [1] - 16:7
**a.m** [2] - 1:12, 3:3
**abandon** [2] - 32:7, 32:21
**abandoning** [1] - 32:23
**abide** [2] - 108:7
**ability** [12] - 14:16, 39:2, 39:9, 47:10, 50:5, 50:6, 75:19, 85:9, 117:5, 134:7, 202:2, 203:7
**able** [17] - 16:16, 37:15, 38:6, 49:3, 49:11, 74:20, 82:7, 123:9, 134:20, 135:14, 151:15,

153:16, 160:24, 168:12, 169:10, 172:9, 190:1
**above-entitled** [1] - 211:5
**absence** [2] - 93:21, 169:12
**absent** [3] - 124:3, 149:7, 158:18
**absolute** [2] - 34:15, 153:2
**absolutely** [20] - 14:4, 48:20, 93:24, 109:2, 116:8, 116:10, 122:18, 122:25, 131:3, 157:25, 159:4, 200:6, 200:13, 204:15, 206:3, 208:14, 209:3, 209:10
**abstract** [1] - 204:19
**absurdly** [1] - 128:9
**abuse** [1] - 73:7
**academic** [1] - 47:2
**Academic** [2] - 106:18, 113:2
**accented** [1] - 130:6
**accept** [8] - 31:16, 57:9, 61:13, 73:21, 127:20, 135:19, 153:19, 158:15
**acceptable** [1] - 32:21
**accepted** [1] - 7:3
**accepts** [1] - 173:24
**access** [35] - 16:5, 16:9, 17:24, 18:7, 18:11, 18:25, 19:2, 19:6, 19:7, 19:9, 19:12, 19:17, 21:22, 22:1, 22:5, 59:9, 59:10, 59:25, 65:15, 79:5, 79:16, 79:21, 80:6, 80:11, 80:19, 80:22, 80:23, 94:23, 95:5, 95:7, 113:19, 126:23
**accident** [1] - 80:12
**accommodate** [2] - 55:5, 88:18
**according** [1] - 150:22
**account** [2] - 47:18, 68:10
**accountability** [3] - 7:8, 188:16, 188:18
**accountable** [4] - 104:5, 162:12, 162:14, 166:15
**accrue** [1] - 135:10
**accurate** [4] - 46:5, 67:16, 84:17, 162:14

**accurately** [1] - 61:25
**accused** [1] - 205:7
**achieving** [1] - 82:5
**acknowledged** [1] - 67:22
**acknowledges** [1] - 51:19
**acquiesce** [1] - 36:1
**act** [5] - 127:22, 129:5, 149:23, 150:1, 200:23
**Act** [28] - 6:19, 50:24, 59:18, 76:9, 89:10, 129:22, 129:23, 132:16, 132:23, 137:25, 138:2, 138:5, 138:15, 139:9, 141:6, 141:8, 141:14, 141:20, 141:23, 145:16, 147:21, 151:22, 152:4, 163:23, 180:10, 180:11, 197:3, 197:13
**acting** [7] - 34:9, 53:16, 85:17, 169:19, 183:18, 183:20
**action** [9] - 132:19, 135:4, 152:19, 152:21, 153:1, 153:9, 153:13, 156:22, 193:20
**ACTION** [1] - 1:3
**actions** [1] - 9:13
**active** [9] - 181:19, 181:21, 181:22, 183:23, 186:21, 198:6, 205:19
**activist** [1] - 134:10
**activities** [1] - 115:19
**acts** [3] - 86:5, 166:11, 169:6
**actual** [9] - 24:8, 32:14, 59:13, 60:16, 100:7, 139:23, 146:3, 151:25, 152:6
**add** [4] - 85:11, 135:22, 156:9, 204:3
**added** [1] - 174:8
**addition** [3] - 32:22, 71:25, 80:19
**additional** [3] - 4:16, 107:3, 119:1
**Address** [1] - 96:5
**address** [45] - 3:15, 4:1, 5:19, 7:20, 8:2, 8:4, 8:13, 8:18, 9:1, 9:5, 9:12, 9:14, 12:25, 14:4, 18:6,

25:13, 27:22, 27:25, 29:9, 38:17, 40:24, 40:25, 41:10, 41:21, 42:25, 50:22, 89:14, 89:19, 93:25, 103:16, 108:25, 109:1, 109:3, 119:1, 122:23, 127:17, 157:13, 171:1, 184:10, 191:16, 198:18, 201:25, 202:24, 208:2
**addressed** [7] - 13:12, 77:11, 93:12, 93:21, 120:12, 163:19, 165:15
**addresses** [3] - 8:14, 124:12, 159:23
**addressing** [7] - 10:19, 28:24, 29:1, 35:11, 109:5, 159:20, 192:6
**adequately** [1] - 175:3
**adjourned** [2] - 88:19, 209:24
**administration** [1] - 153:18
**Administration** [1] - 195:12
**Administrative** [1] - 163:22
**administrative** [6] - 192:11, 193:3, 193:18, 195:19, 195:21, 195:22
**admits** [1] - 205:2
**admitted** [1] - 4:11
**adopt** [4] - 99:6, 101:5, 123:22, 197:3
**advance** [3] - 36:9, 96:6, 189:14
**advanced** [1] - 6:25
**adversary** [1] - 43:17
**advertisements** [2] - 49:7, 116:24
**advertising** [1] - 38:1
**advocacy** [2] - 209:18, 209:22
**advocate** [1] - 45:15
**affected** [3] - 90:20, 91:2, 91:12
**affects** [2] - 10:20, 183:18
**affirm** [1] - 102:4
**affix** [1] - 108:2
**affixed** [1] - 109:10
**Affordable** [1] - 50:24
**afoul** [1] - 57:25
**afternoon** [20] - 7:18, 8:18, 29:14, 57:12,

76:20, 85:1, 87:24, 89:1, 89:17, 93:25, 116:12, 127:7, 137:9, 137:10, 159:17, 159:18, 170:17, 170:18, 196:23, 196:25
**agencies** [5] - 140:5, 162:13, 163:23, 166:13, 197:18
**Agency** [4] - 113:2, 114:24, 115:1, 117:10
**agency** [35] - 60:17, 62:21, 63:17, 63:20, 110:10, 163:5, 163:14, 164:12, 164:23, 166:9, 166:11, 166:17, 167:2, 167:23, 169:6, 169:18, 175:16, 176:25, 184:4, 185:23, 188:22, 188:24, 193:7, 193:20, 197:17, 200:17, 200:23, 200:25, 201:22, 201:25, 202:1, 202:17, 203:7, 203:24, 207:19
**agency's** [3] - 164:13, 203:6, 203:14
**agenda** [1] - 88:25
**aggregated** [2] - 187:10, 194:25
**aggregation** [3] - 178:9, 186:24, 206:4
**ago** [3] - 50:9, 181:4, 196:17
**agree** [57] - 15:8, 16:5, 16:9, 17:23, 19:1, 31:3, 46:25, 48:16, 49:14, 58:10, 63:1, 63:3, 65:12, 69:25, 78:17, 79:5, 80:22, 81:24, 85:10, 89:21, 91:5, 91:7, 92:22, 93:6, 95:7, 95:12, 95:24, 95:25, 96:13, 96:17, 96:24, 97:15, 98:9, 98:14, 99:2, 99:7, 99:18, 101:9, 107:8, 107:9, 107:11, 116:6, 122:1, 122:11, 122:16, 123:19, 125:15, 126:13, 126:22, 126:23, 127:22, 134:12,

142:17, 150:6, 202:21, 207:15
**agreed** [2] - 25:8, 28:8
**agreeing** [6] - 15:5, 80:19, 83:5, 97:22, 108:7, 129:6
**agreement** [56] - 15:6, 16:5, 53:25, 57:2, 59:23, 62:2, 84:9, 95:9, 95:12, 95:20, 95:23, 97:2, 97:5, 97:8, 97:19, 98:5, 99:13, 100:10, 102:23, 103:3, 103:12, 103:13, 106:23, 107:3, 107:17, 107:23, 108:1, 109:25, 110:2, 110:9, 110:17, 110:23, 111:13, 111:14, 111:18, 111:21, 118:2, 118:21, 123:17, 123:18, 123:21, 123:23, 124:1, 124:6, 124:22, 124:24, 125:9, 125:15, 126:1, 126:13, 126:18, 126:20, 127:9, 150:6, 195:18, 204:4
**agreements** [17] - 44:21, 56:18, 97:4, 97:13, 103:5, 106:13, 106:24, 110:13, 112:9, 115:24, 117:23, 120:9, 120:17, 121:23, 121:24, 130:2, 134:22
**agrees** [1] - 98:13
**agricultural** [1] - 22:1
**ahead** [12] - 6:8, 42:4, 55:9, 94:7, 98:25, 165:8, 166:17, 179:25, 183:24, 202:12, 202:25, 205:19
**AIA** [17] - 132:3, 133:20, 134:5, 134:10, 136:14, 138:8, 139:2, 139:4, 139:16, 140:23, 141:1, 141:12, 142:21, 152:18, 154:22
**aided** [1] - 1:25
**aims** [1] - 149:24
**aisle** [1] - 136:8

**AJ** [1] - 199:10
**akin** [1] - 26:5
**al** [5] - 1:8, 3:9, 3:10, 3:11, 3:12
**Alexander** [2] - 5:13, 104:17
**ALEXANDER** [1] - 2:21
**alignment** [1] - 146:2
**alleged** [1] - 91:12
**allegiance** [1] - 114:11
**alleging** [1] - 17:1
**Alliance** [1] - 192:3
**allocated** [1] - 8:16
**allow** [7] - 19:3, 83:2, 114:20, 160:3, 166:2, 178:9, 188:22
**allowed** [10] - 104:2, 114:14, 114:15, 114:22, 125:21, 156:24, 158:13, 161:19, 184:2, 187:5
**allowing** [1] - 114:15
**allows** [1] - 97:1
**allude** [1] - 83:9
**alluded** [3] - 19:20, 53:16, 83:10
**alluding** [1] - 38:21
**almost** [5] - 107:15, 110:15, 169:4, 169:20
**alone** [1] - 103:3
**altering** [1] - 75:20
**alternative** [2] - 35:14, 169:5
**amenable** [1] - 12:21
**amend** [2] - 53:24, 147:13
**amendment** [3] - 101:2, 113:18, 122:18
**Amendment** [53] - 9:1, 57:25, 70:21, 85:1, 90:3, 90:14, 90:17, 90:18, 92:25, 94:1, 94:2, 94:5, 98:23, 99:7, 100:16, 101:23, 102:8, 102:9, 102:18, 103:21, 106:4, 106:11, 106:14, 110:5, 112:9, 113:6, 113:13, 113:16, 114:8, 115:23, 116:18, 117:1, 117:17, 118:6, 118:19, 120:3, 120:4, 122:7, 122:10, 122:22, 123:10, 123:13,

123:20, 124:9, 124:20, 126:14, 129:24, 131:25, 139:12, 141:10, 172:2, 174:16, 188:16
**American** [5] - 48:10, 51:14, 103:19, 158:6, 199:25
**Americans** [12] - 22:12, 37:23, 38:7, 38:14, 38:19, 39:3, 40:15, 47:15, 48:13, 49:12, 74:1, 81:18
**Americas** [1] - 2:15
**Amici** [1] - 109:8
**amount** [16] - 17:15, 23:11, 23:19, 39:21, 48:14, 60:19, 80:7, 80:14, 91:17, 121:7, 146:3, 150:22, 151:25, 155:4, 156:7, 204:1
**amounts** [2] - 24:8, 171:4
**ample** [2] - 38:23, 63:22
**analogies** [1] - 75:5
**analogize** [2] - 67:10, 72:18
**analogizes** [1] - 27:5
**analogous** [3] - 73:10, 73:25, 123:15
**analogy** [7] - 37:10, 46:6, 73:23, 74:6, 122:18, 126:14, 196:20
**analysis** [20] - 13:17, 14:14, 21:14, 26:4, 29:7, 32:2, 32:23, 41:22, 43:6, 53:1, 69:11, 70:22, 71:15, 86:4, 93:10, 105:20, 122:7, 129:4, 137:18, 155:6
**analytical** [2] - 14:18, 118:14
**analytically** [3] - 13:17, 14:5, 29:5
**analyze** [3] - 32:18, 154:21, 174:21
**analyzed** [1] - 25:20
**analyzing** [2] - 113:10, 120:20
**Angeles** [1] - 129:24
**angle** [1] - 173:2
**angles** [1] - 172:1
**ANN** [1] - 2:6
**Ann** [1] - 4:12
**announced** [1] -

142:7, 149:13
**announcing** [1] - 96:8
**annual** [1] - 129:7
**anomalies** [1] - 149:6
**anomalous** [1] - 148:19
**answer** [23] - 14:11, 35:19, 38:19, 40:20, 49:23, 50:9, 50:10, 50:23, 52:4, 52:8, 54:15, 71:4, 95:14, 105:13, 121:22, 125:19, 137:11, 140:19, 142:20, 157:5, 157:16, 197:25, 203:8
**answered** [5] - 56:10, 71:20, 105:9, 119:7, 119:8
**Anti** [14] - 132:16, 132:23, 137:25, 138:2, 138:5, 138:15, 139:9, 141:6, 141:8, 141:20, 145:16, 147:21, 151:22, 152:4
**anti** [3] - 147:14, 147:16, 147:17
**Anti-Injunction** [14] - 132:16, 132:23, 137:25, 138:2, 138:5, 138:15, 139:9, 141:6, 141:8, 141:20, 145:16, 147:21, 151:22, 152:4
**anti-injunction** [2] - 147:16, 147:17
**anti-IRS** [1] - 147:14
**anticipate** [1] - 6:21
**anticipated** [2] - 66:13, 176:4
**antitrust** [3] - 54:4, 54:8, 54:10
**anyway** [2] - 91:19, 189:22
**APA** [11] - 163:22, 164:1, 169:5, 191:13, 191:17, 192:7, 192:9, 203:17, 203:20, 203:21, 203:23
**apart** [2] - 74:3, 74:6
**apologize** [4] - 3:17, 3:20, 104:16, 105:11
**appeals** [1] - 129:19
**appear** [4] - 3:22, 83:14, 152:7, 186:21
**appearances** [3] -

3:14, 4:4, 4:16
**appendages** [1] - 37:12
**appendix** [1] - 178:14
**applicability** [1] - 59:24
**applicable** [2] - 57:19, 76:11
**application** [2] - 58:3, 195:16
**applications** [4] - 195:11, 195:13, 195:14, 208:24
**applied** [4] - 36:14, 72:21, 73:15, 181:4
**applies** [29] - 33:1, 51:17, 54:15, 82:23, 83:18, 100:3, 102:16, 105:13, 105:24, 105:25, 129:23, 129:24, 130:9, 135:2, 141:9, 141:12, 142:21, 142:22, 147:16, 147:17, 147:21, 152:18, 153:21, 161:6, 167:25, 182:2, 191:19, 205:17
**apply** [29] - 8:8, 26:11, 46:17, 71:14, 77:23, 86:19, 87:1, 87:11, 99:20, 105:25, 118:5, 129:10, 129:20, 134:25, 139:9, 141:1, 143:1, 149:14, 161:6, 164:1, 168:16, 178:3, 178:10, 187:21, 188:14, 191:18, 195:23, 200:9, 203:21
**applying** [3] - 52:25, 98:18, 198:2
**appointments** [2] - 166:25, 173:10
**appreciate** [24] - 5:18, 10:14, 41:17, 48:5, 54:21, 91:21, 92:15, 93:19, 94:15, 106:1, 132:7, 136:7, 152:11, 158:17, 160:16, 170:8, 170:15, 175:4, 175:23, 178:21, 189:6, 189:23, 198:19, 209:13
**appreciated** [1] - 191:15
**approach** [2] - 14:5,

76:1
**approaches** [1] - 14:6
**appropriate** [6] - 31:4, 60:19, 63:18, 81:21, 108:25, 150:17
**appropriately** [1] - 57:7
**appropriating** [1] - 57:15
**appropriation** [2] - 58:8, 72:1
**approval** [7] - 72:23, 181:12, 181:13, 202:8, 204:21, 204:25, 205:18
**approvals** [2] - 195:13, 195:15
**approve** [1] - 73:6
**approved** [14] - 180:9, 180:12, 182:13, 182:20, 183:23, 183:24, 195:11, 196:13, 200:24, 202:6, 205:15, 205:20, 206:8, 206:22
**approves** [2] - 76:1, 180:23
**arbitrary** [3] - 163:15, 166:10, 170:4
**Arbitration** [1] - 76:9
**Area** [2] - 10:3, 58:23
**area** [1] - 189:14
**areas** [1] - 38:3
**arena** [1] - 9:23
**argue** [8] - 8:9, 9:3, 9:7, 9:13, 12:5, 20:23, 91:20, 99:19
**argued** [1] - 167:19
**arguing** [7] - 4:13, 14:8, 42:2, 56:17, 69:21, 69:23, 70:8
**argument** [71] - 3:13, 5:18, 8:21, 8:22, 16:24, 18:6, 25:11, 28:4, 30:18, 31:10, 35:25, 37:2, 37:20, 38:5, 58:9, 65:1, 65:2, 65:6, 70:2, 70:10, 76:7, 78:12, 85:1, 90:12, 93:23, 97:9, 102:9, 103:4, 108:18, 123:5, 124:18, 129:12, 129:14, 129:15, 132:16, 136:14, 139:21, 140:1, 140:3, 141:20, 142:3, 144:12, 158:12, 158:20,

159:22, 161:23, 165:15, 168:19, 170:9, 170:20, 171:12, 175:10, 175:22, 176:17, 177:17, 177:24, 178:6, 178:18, 179:1, 186:19, 199:4, 201:22, 207:1, 208:24, 209:1, 209:7, 209:10, 209:13

**ARGUMENT** [1] - 1:7

**arguments** [26] - 6:15, 6:16, 7:17, 8:3, 8:13, 9:15, 10:9, 14:7, 25:16, 27:22, 28:8, 28:13, 40:12, 40:21, 70:15, 90:5, 103:24, 133:10, 159:19, 159:20, 162:7, 168:3, 177:24, 184:10, 191:12, 198:22

**arise** [5] - 66:25, 75:12, 89:9, 104:24, 166:25

**arises** [3] - 67:23, 73:14, 75:23

**arising** [1] - 105:3

**arm** [5] - 37:4, 37:5, 37:11, 62:10, 206:21

**arm's** [1] - 68:22

**arm's-length** [1] - 68:22

**arrangement** [1] - 118:6

**arrangements** [2] - 54:8, 113:5

**art** [5] - 107:25, 108:23, 112:23, 118:20, 125:2

**Article** [2] - 90:23, 91:10

**articulate** [2] - 194:4

**articulated** [2] - 174:8, 193:15

**Artway** [1] - 149:12

**ascent** [1] - 97:21

**Ashley** [3] - 5:5, 9:11, 159:15

**ASHLEY** [1] - 2:9

**aside** [8] - 14:9, 14:19, 14:21, 21:20, 70:11, 90:13, 143:19, 181:16

**aspects** [3] - 6:20, 72:3, 195:6

**asserted** [1] - 51:9

**assertion** [1] - 8:5

**asserts** [1] - 36:19

**assessed** [3] - 133:4, 133:5, 133:7

**assessment** [7] - 132:24, 133:1, 133:19, 134:16, 139:16, 141:22, 150:25

**assets** [1] - 67:2

**assist** [1] - 37:23

**ASSISTANT** [1] - 2:17

**association** [3] - 50:18, 105:15, 105:16

**Association** [3] - 10:1, 51:14, 200:1

**assuming** [2] - 104:2, 143:19

**AstraZeneca** [14] - 10:5, 42:10, 58:23, 59:1, 91:1, 91:5, 91:14, 91:24, 163:19, 165:2, 171:14, 172:16, 172:19, 176:17

**astronomical** [2] - 16:16, 47:9

**attach** [1] - 115:17

**attaches** [1] - 150:2

**attempt** [1] - 167:11

**attempts** [2] - 196:18, 207:6

**attention** [5] - 6:12, 51:13, 55:7, 171:14, 185:3

**ATTORNEY** [1] - 2:17

**attorneys** [4] - 3:21, 73:2, 208:15, 209:16

**attribute** [1] - 76:13

**attune** [1] - 170:3

**augmented** [1] - 86:3

**August** [1] - 43:10

**Austin** [5] - 128:17, 129:13, 129:15, 129:16, 149:14

**authorities** [1] - 75:17

**authority** [15] - 7:21, 67:2, 67:20, 72:23, 75:13, 85:18, 166:18, 167:2, 169:6, 169:15, 186:10, 201:23, 201:24, 202:17, 207:17

**authorized** [1] - 116:20

**authorizes** [1] - 188:4

**availability** [2] - 75:14, 171:11

**available** [5] - 14:13,

35:24, 55:25, 60:20, 142:3

**Avenue** [5] - 2:6, 2:10, 2:15, 2:18, 2:24

**average** [2] - 24:2, 39:11

**avoid** [9] - 25:22, 30:8, 35:2, 44:11, 44:20, 84:6, 84:8, 136:23, 166:9

**avoidance** [4] - 26:13, 26:14, 35:5, 63:16

**awarded** [1] - 192:16

**awarding** [4] - 192:12, 192:15, 192:20, 192:21

**aware** [14] - 6:18, 20:17, 20:19, 50:11, 50:14, 51:13, 56:2, 58:21, 122:2, 135:24, 139:7, 139:13, 149:1

**Azar** [1] - 197:1

## B

**baby** [3] - 202:15, 202:16, 202:25

**back-and-forth** [3] - 61:9, 121:5, 148:8

**back-end** [1] - 13:19

**backed** [8] - 25:19, 25:21, 27:9, 33:19, 34:1, 53:21, 84:8, 85:3

**background** [3] - 133:10, 133:11, 135:10

**backing** [1] - 137:2

**backs** [1] - 34:7

**backwards** [1] - 100:1

**bad** [6] - 76:19, 81:18, 81:20, 81:22, 124:19

**bait** [1] - 158:2

**Bajakajian** [2] - 148:12, 150:16

**Baker** [1] - 197:6

**balance** [1] - 143:25

**ball** [1] - 45:16

**ballot** [1] - 167:6

**banc** [1] - 130:6

**band** [1] - 16:20

**Bankers** [1] - 138:3

**banking** [1] - 74:15

**bar** [11] - 146:19, 150:11, 190:9, 192:21, 192:24, 199:14, 199:24, 200:12, 203:2, 209:5, 209:7

**barely** [1] - 133:12

**barred** [2] - 104:23, 177:25

**barrier** [1] - 63:14

**bars** [5] - 178:1, 184:13, 186:12, 193:21, 200:7

**base** [1] - 26:25

**based** [15] - 8:5, 20:9, 49:2, 64:8, 101:21, 103:2, 108:20, 180:25, 194:16, 194:17, 195:3, 195:25, 199:15, 200:19, 200:20

**baseline** [1] - 87:10

**basic** [3] - 51:20, 194:3, 207:6

**basis** [9] - 4:1, 26:14, 35:14, 71:20, 86:15, 89:11, 140:15, 156:21, 180:24

**bear** [2] - 11:11, 66:4

**bears** [1] - 143:3

**beat** [1] - 37:9

**Becerra** [8] - 3:9, 3:10, 3:11, 3:12, 10:1, 10:3, 10:5, 193:1

**BECERRA** [1] - 1:19

**become** [1] - 14:20

**becomes** [7] - 14:12, 24:20, 30:6, 174:3, 198:9, 198:10

**begin** [2] - 104:19, 200:4

**beginning** [3] - 4:4, 130:21, 151:18

**behalf** [9] - 4:18, 5:5, 6:11, 10:17, 58:7, 127:6, 206:25, 207:25, 208:5

**behavior** [1] - 136:17

**belied** [1] - 206:1

**belief** [1] - 115:13

**beliefs** [1] - 115:6

**belong** [1] - 150:18

**belongs** [1] - 76:23

**below** [2] - 60:10, 77:20

**belts** [1] - 108:14

**benchmark** [1] - 24:1

**beneficiaries** [10] - 11:8, 18:25, 19:3, 21:12, 22:17, 46:18, 55:16, 59:2, 70:16, 94:19

**beneficiary** [1] - 22:14

**benefit** [13] - 7:2, 22:12, 22:16, 22:20, 22:23, 32:16, 38:19,

38:20, 63:12, 63:13, 65:21, 102:13, 116:17

**benefits** [7] - 14:17, 21:18, 22:10, 40:9, 55:14, 102:23, 161:17

**Bergamasco** [1] - 4:21

**best** [12] - 21:24, 28:16, 38:21, 41:18, 71:7, 94:14, 102:21, 116:7, 116:9, 133:21, 138:10, 170:7

**bet** [1] - 146:1

**bets** [1] - 66:20

**better** [5] - 77:9, 103:21, 190:1

**between** [25] - 12:22, 13:14, 15:3, 21:9, 26:13, 31:21, 45:12, 52:7, 57:20, 61:16, 68:18, 70:23, 75:21, 117:24, 139:3, 143:6, 143:10, 143:17, 144:3, 146:9, 151:8, 183:3, 184:5

**beyond** [9] - 6:23, 59:5, 111:17, 116:19, 150:3, 150:7, 154:19, 171:2, 206:18

**bidder** [1] - 192:17

**bids** [2] - 74:11, 74:21

**big** [6] - 41:16, 43:1, 44:25, 95:22, 165:15, 178:16

**big-ticket** [1] - 44:25

**bigger** [1] - 65:23

**bill** [1] - 46:6

**billion** [12] - 39:11, 46:13, 79:18, 127:12, 127:21, 131:20, 135:6, 153:3, 153:24, 207:8

**billions** [3] - 33:25

**bind** [1] - 69:2

**binding** [2] - 161:11, 203:16

**biologic** [1] - 198:7

**biological** [3] - 177:11, 180:6, 180:8

**Biopharmaceuticals** [1] - 197:1

**biosimilar** [1] - 180:14

**bit** [8] - 30:4, 87:21, 92:5, 100:20, 151:10, 160:13,

165:8, 209:14
**blanche** [1] - 27:16
**blank** [1] - 51:25
**blanks** [1] - 39:10
**bleeds** [1] - 165:24
**blow** [1] - 202:11
**blown** [1] - 177:7
**blue** [2] - 46:22, 185:19
**board** [1] - 95:22
**boat** [1] - 64:24
**bogged** [1] - 127:18
**book** [2] - 15:23, 32:17
**books** [1] - 32:6
**borne** [1] - 11:1
**bottle** [1] - 78:22
**bottom** [8] - 21:4, 34:12, 37:13, 90:17, 138:20, 161:18, 179:12, 184:19
**bound** [2] - 38:13, 103:9
**bounds** [4] - 154:19, 163:15, 164:21, 188:15
**box** [1] - 167:6
**bracket** [2] - 13:14, 144:15
**brain** [1] - 16:21
**branch** [2] - 96:3, 174:2
**BRANCH** [1] - 2:20
**Brasi** [1] - 16:19
**breadth** [1] - 76:5
**break** [11] - 41:8, 55:3, 55:5, 82:16, 82:18, 82:20, 87:19, 88:8, 159:1, 159:8
**breaking** [1] - 29:10
**breaks** [1] - 82:17
**breath** [1] - 102:5
**BRIAN** [1] - 2:17
**Brian** [3] - 5:11, 55:11, 106:8
**brief** [19] - 6:14, 18:9, 32:4, 49:23, 62:17, 111:13, 118:5, 123:3, 140:7, 173:18, 177:12, 180:22, 191:16, 191:22, 193:16, 194:18, 203:15, 205:2, 208:11
**briefed** [3] - 91:20, 165:19, 170:21
**briefing** [10] - 51:13, 87:3, 89:3, 92:10, 118:17, 140:11, 149:9, 170:20,

181:15, 182:14
**briefly** [3] - 3:14, 87:22, 89:1
**briefs** [10] - 11:23, 16:15, 34:17, 38:24, 127:17, 171:3, 172:7, 175:2, 189:25, 198:13
**bring** [12] - 44:17, 50:20, 121:4, 142:16, 143:6, 143:11, 146:24, 155:14, 156:21, 171:10, 172:1, 172:9
**bringing** [3] - 90:9, 119:6, 156:12
**brings** [3] - 27:11, 51:22, 154:7
**Bristol** [6] - 2:7, 3:8, 4:7, 7:23, 8:2, 10:17
**broad** [5] - 95:17, 95:18, 166:6, 178:5, 197:17
**broader** [3] - 51:1, 115:13, 165:22
**broadly** [2] - 83:18, 181:5
**broke** [1] - 29:25
**broken** [1] - 29:2
**brought** [4] - 68:24, 151:23, 165:2, 171:4
**brunt** [1] - 11:11
**bucket** [1] - 30:3
**bucks** [4] - 144:17, 145:2, 145:4
**Budget** [4] - 47:3, 47:7, 128:10, 133:3
**budgetary** [1] - 121:11
**build** [3] - 132:11, 148:1, 199:2
**building** [1] - 154:11
**Building** [1] - 1:10
**built** [2] - 103:3, 161:2
**bulk** [1] - 21:11
**bullet** [1] - 96:7
**bulletins** [1] - 114:4
**bunch** [2] - 37:24, 163:6
**burden** [1] - 143:4
**burdens** [1] - 120:6
**BURLING** [1] - 1:18
**Burling** [1] - 4:20
**Burwell** [1] - 51:14
**business** [3] - 38:6, 59:6, 133:6
**businesses** [2] - 48:7, 48:12
**busy** [1] - 41:16
**but..** [1] - 165:16
**Butler** [2] - 51:5, 51:8

**buy** [8] - 22:21, 64:21, 64:23, 65:3, 65:7, 69:3, 79:7, 126:5
**buyback** [1] - 49:7
**buybacks** [1] - 38:3
**buyer** [1] - 97:24
**buyers** [2] - 24:15, 64:14
**buying** [2] - 126:5, 150:2
**BY** [9] - 1:15, 1:18, 2:2, 2:5, 2:9, 2:13, 2:17, 2:21, 2:24

---

**C**

**calculate** [2] - 17:6, 162:25
**calculating** [2] - 169:23, 187:5
**calculation** [1] - 169:23
**calculations** [1] - 186:17
**California** [1] - 21:25
**Canada** [1] - 109:12
**cancer** [2] - 36:25, 39:4
**candid** [1] - 13:9
**candidly** [1] - 171:2
**cannot** [7] - 53:24, 69:2, 128:18, 134:2, 134:3, 183:15
**cap** [3] - 33:10, 33:18, 120:20
**capacious** [2] - 62:17, 83:17
**capacity** [4] - 1:7, 34:9, 85:23, 94:4
**capital** [1] - 127:4
**capricious** [2] - 163:15, 166:10
**caps** [1] - 23:25
**card** [1] - 161:21
**Care** [2] - 50:24, 51:14
**care** [2] - 168:11, 183:16
**careful** [1] - 9:16
**carriers** [1] - 130:2
**carry** [1] - 123:9
**carrying** [1] - 200:4
**carte** [1] - 27:16
**Carter** [1] - 51:5
**case** [143] - 4:7, 5:13, 10:1, 12:8, 12:14, 13:16, 15:17, 15:22, 17:10, 20:16, 25:24, 26:3, 26:8, 28:21, 30:17, 31:10, 31:19, 32:1, 32:2, 34:3,

36:14, 38:11, 40:23, 42:9, 42:10, 45:7, 45:24, 46:11, 46:12, 51:12, 52:25, 60:23, 61:13, 67:4, 67:21, 69:6, 69:7, 69:11, 71:14, 75:12, 76:6, 76:7, 76:10, 82:2, 86:21, 86:22, 86:23, 86:25, 88:2, 89:16, 90:8, 90:24, 91:6, 91:14, 92:5, 92:8, 92:12, 93:7, 94:6, 99:3, 100:13, 101:1, 101:2, 101:20, 101:24, 102:2, 102:21, 105:5, 105:6, 105:9, 105:14, 105:20, 109:9, 110:6, 113:1, 113:2, 113:3, 113:17, 114:18, 114:24, 114:25, 115:2, 115:8, 115:11, 117:10, 117:11, 117:13, 119:12, 119:14, 123:2, 126:15, 129:24, 130:4, 135:13, 135:24, 138:3, 139:6, 139:13, 140:21, 140:24, 141:4, 141:20, 142:9, 144:15, 147:2, 147:20, 148:16, 148:18, 150:13, 151:7, 153:20, 155:15, 155:17, 162:4, 163:19, 165:19, 168:20, 169:8, 171:21, 173:21, 176:17, 181:4, 186:12, 187:23, 192:5, 192:11, 192:25, 193:21, 197:6, 197:9, 197:11, 197:25, 199:10, 200:1, 200:22, 200:23, 203:11, 209:3
**cases** [72] - 6:13, 6:18, 6:23, 9:25, 25:24, 25:25, 26:2, 26:5, 29:6, 30:14, 30:15, 38:24, 41:11, 41:16, 41:18, 42:11, 42:13, 42:17, 50:3, 51:2, 51:4, 51:7, 53:5, 60:25, 66:22, 67:25,

72:19, 74:14, 75:7, 76:4, 85:14, 88:3, 93:22, 98:20, 99:5, 109:8, 112:25, 117:12, 117:14, 119:10, 120:3, 120:7, 129:12, 129:19, 142:12, 144:24, 146:15, 147:21, 148:11, 150:16, 151:3, 151:7, 154:10, 155:20, 162:10, 165:25, 166:24, 169:13, 169:19, 170:22, 173:9, 186:16, 191:21, 191:23, 192:1, 193:15, 194:10, 196:24, 203:20, 204:16
**cast** [1] - 147:19
**category** [2] - 107:22
**causal** [1] - 140:18
**Cavanaugh** [1] - 133:19
**CDC** [1] - 197:7
**CDO** [1] - 142:11
**Cedar** [2] - 21:25, 86:24
**ceiling** [2] - 163:5, 163:9
**Center** [3] - 1:19, 2:3, 9:25
**certain** [10] - 7:15, 7:24, 23:17, 24:15, 74:10, 109:11, 121:7, 174:24, 179:19, 197:10
**certainly** [15] - 23:7, 44:16, 76:11, 76:20, 76:24, 77:3, 91:6, 92:10, 118:24, 131:18, 143:7, 147:19, 187:12, 188:6, 188:15
**certainty** [7] - 146:7, 146:8, 146:11, 146:13, 146:16, 146:17
**CERTIFICATE** [1] - 211:1
**certify** [1] - 211:4
**cetera** [4] - 60:20, 146:18, 146:19, 149:8
**chain** [2] - 196:20, 197:5
**chaining** [3] - 194:11, 205:8, 205:22

**challenge** [33] - 6:18, 25:17, 57:15, 63:9, 71:24, 78:23, 93:3, 94:3, 110:14, 112:5, 132:19, 132:20, 135:1, 135:5, 135:9, 135:16, 135:18, 138:5, 138:7, 139:10, 142:15, 151:23, 153:11, 153:16, 156:24, 165:23, 170:23, 192:13, 193:6, 193:7, 193:13, 207:4

**challenged** [6] - 6:20, 46:15, 90:14, 109:10, 148:21, 192:6

**challenger** [1] - 138:25

**challenges** [8] - 26:1, 50:17, 58:22, 93:1, 139:12, 140:25, 147:22, 172:3

**challenging** [15] - 63:8, 91:13, 92:13, 133:17, 141:9, 153:13, 156:21, 190:21, 190:24, 190:25, 192:22, 199:19, 199:20

**Chamber** [3] - 10:3, 58:23, 172:15

**chance** [2] - 58:15, 203:23

**change** [12] - 14:14, 18:17, 23:20, 52:14, 82:6, 121:8, 135:1, 140:18, 185:14, 186:9, 196:11, 203:7

**changes** [2] - 86:4, 136:19

**channeled** [1] - 90:9

**channeling** [1] - 90:5

**characteristics** [2] - 75:21, 149:6

**characterization** [2] - 25:14, 138:19

**characterizes** [1] - 31:9

**charge** [9] - 17:8, 18:12, 60:10, 61:5, 80:20, 97:24, 119:19, 119:22, 119:23

**charged** [1] - 97:23

**charges** [1] - 96:19

**charging** [2] - 80:16, 96:20

**check** [10] - 19:14,

23:5, 51:25, 164:14, 164:22, 166:4, 166:13, 175:16, 204:7, 204:8

**checks** [2] - 164:22, 167:24

**chew** [1] - 94:12

**Chief** [1] - 65:13

**chief** [1] - 58:25

**CHIESA** [15] - 1:15, 1:15, 4:17, 5:22, 6:3, 6:9, 9:20, 10:10, 10:13, 10:15, 28:15, 33:9, 88:9, 88:15, 208:7

**Chiesa** [14] - 4:18, 4:23, 5:21, 6:4, 6:8, 9:18, 9:23, 28:7, 28:18, 47:3, 78:7, 208:5, 208:19

**choice** [8] - 14:13, 36:1, 37:5, 51:10, 59:7, 70:1, 164:9, 177:25

**choose** [5] - 61:5, 90:22, 143:20, 143:21, 185:13

**chooses** [1] - 150:4

**chose** [3] - 120:25, 138:6, 207:20

**chosen** [1] - 11:4

**Christina** [1] - 5:2

**CHRISTINA** [1] - 2:14

**CIC** [4] - 133:20, 138:24, 139:1, 141:2

**circle** [1] - 119:13

**circuit** [3] - 12:8, 52:21, 130:8

**Circuit** [23] - 15:21, 15:25, 32:12, 50:8, 52:20, 52:22, 54:7, 59:5, 69:8, 74:23, 76:12, 101:16, 117:19, 130:4, 138:3, 142:25, 143:3, 192:4, 192:13, 193:1, 193:11, 199:10, 200:1

**Circuit's** [3] - 52:21, 113:9, 149:12

**circuitous** [1] - 95:10

**circuits** [2] - 129:22, 130:5

**circumstance** [4] - 63:15, 69:9, 74:9, 77:23

**circumstances** [7] - 26:8, 71:10, 90:23, 143:2, 158:19,

178:9, 191:24

**circumvent** [1] - 201:16

**circumvented** [1] - 201:13

**citations** [1] - 151:14

**cite** [14] - 109:7, 123:3, 139:6, 140:24, 142:8, 142:12, 147:5, 150:16, 153:20, 169:10, 173:9, 173:17, 187:25, 196:24

**cited** [8] - 61:1, 66:22, 76:6, 101:20, 109:7, 111:13, 191:22, 194:18

**Citera** [1] - 4:12

**CITERA** [1] - 2:6

**cites** [1] - 204:16

**citizens** [1] - 11:5

**City** [2] - 1:19, 129:23

**civil** [11] - 15:14, 53:22, 59:16, 60:4, 128:17, 129:17, 129:20, 129:23, 130:1, 148:12, 208:25

**CIVIL** [3] - 1:3, 2:17, 2:20

**claim** [58] - 8:5, 9:6, 40:24, 41:1, 41:7, 41:9, 41:10, 41:22, 54:19, 62:3, 66:9, 89:9, 89:11, 89:24, 89:25, 90:14, 92:2, 92:17, 92:20, 93:8, 109:13, 110:19, 124:4, 126:19, 137:19, 139:7, 139:12, 139:14, 140:25, 141:10, 143:10, 143:14, 143:24, 145:19, 156:11, 156:18, 156:23, 157:9, 160:14, 161:10, 164:1, 165:18, 170:13, 170:25, 171:4, 172:10, 173:12, 174:16, 189:19, 191:5, 191:8, 191:9, 191:14, 191:18, 192:9, 193:23

**claimed** [1] - 54:1

**claiming** [6] - 16:15, 16:23, 45:12, 45:13, 61:18

**Claims** [2] - 129:22, 129:23

**claims** [47] - 8:19, 9:12, 13:10, 14:1, 27:22, 29:13, 29:14, 34:25, 35:14, 42:6, 42:17, 42:20, 68:24, 76:21, 87:24, 90:4, 90:8, 90:15, 90:18, 91:9, 91:11, 92:7, 92:25, 93:6, 104:24, 105:3, 105:4, 106:14, 110:5, 137:17, 154:22, 159:23, 160:3, 167:18, 171:25, 173:11, 174:12, 176:5, 176:12, 176:15, 189:18, 190:4, 190:10

**clarifies** [1] - 106:1

**clarify** [2] - 144:9, 144:12

**clarity** [2] - 89:24, 91:4

**Clarkson** [1] - 1:10

**classic** [1] - 33:17

**classifying** [1] - 51:24

**clause** [27] - 7:24, 10:22, 11:22, 23:9, 24:16, 34:3, 67:2, 67:20, 67:24, 68:8, 78:23, 85:17, 86:2, 86:3, 128:13, 128:14, 141:12, 147:2, 147:5, 148:17, 148:22, 149:3, 149:5, 156:3, 170:23, 172:15

**clauses** [1] - 173:10

**clear** [49] - 3:19, 9:22, 26:6, 26:16, 27:15, 28:22, 29:5, 30:16, 34:20, 41:19, 43:16, 55:2, 59:5, 62:7, 67:8, 83:22, 87:10, 89:4, 103:1, 105:2, 105:10, 105:11, 106:19, 108:1, 108:6, 109:24, 112:11, 112:12, 112:14, 112:15, 112:16, 113:4, 113:9, 134:5, 138:21, 154:21, 154:24, 157:5, 160:24, 161:1, 173:12, 177:8, 177:21, 186:12, 189:16, 189:19, 193:18, 199:18,

209:12

**clear-cut** [1] - 209:12

**clearest** [1] - 26:18

**clearly** [13] - 21:5, 33:2, 128:25, 130:7, 132:5, 149:24, 153:6, 157:12, 174:4, 186:8, 198:12, 200:21, 203:8

**clerk** [4] - 83:25, 162:22, 163:3, 164:6

**CLERK** [5] - 3:4, 88:20, 159:10, 159:12, 209:25

**clerks** [4] - 177:20, 178:19, 199:3, 209:17

**client** [1] - 66:14

**clients** [4] - 13:25, 48:8, 49:5, 176:21

**clients'** [1] - 122:21

**Clinical** [1] - 199:25

**clinical** [4] - 182:7, 183:3, 183:4, 206:9

**close** [5] - 32:2, 81:17, 127:24, 199:11, 206:24

**closely** [1] - 142:14

**CMS** [53] - 7:21, 11:24, 21:10, 43:9, 52:16, 54:1, 60:23, 62:19, 81:9, 82:25, 94:23, 100:23, 111:25, 112:1, 112:6, 112:7, 112:8, 120:23, 121:2, 126:25, 134:2, 136:18, 140:8, 140:9, 140:13, 140:16, 140:17, 140:20, 141:18, 142:8, 156:16, 163:1, 167:6, 176:25, 177:7, 177:21, 179:23, 183:2, 184:4, 184:6, 185:12, 188:14, 190:25, 191:1, 192:23, 194:16, 197:23, 197:25, 198:12, 202:4, 207:16

**CMS's** [3] - 9:9, 9:13, 111:16

**co** [4] - 22:18, 24:23, 42:24, 104:5

**co-counsel** [2] - 24:23, 42:24

**co-opting** [1] - 104:5

**co-pays** [1] - 22:18
**Code** [4] - 110:11, 121:24, 121:25, 122:1
**code** [1] - 178:19
**codified** [1] - 190:14
**codify** [4] - 117:23, 121:23, 121:24, 121:25
**coerce** [7] - 15:15, 17:20, 34:6, 72:12, 104:2, 133:8, 156:16
**coerced** [2] - 52:24, 76:18
**coercion** [9] - 36:4, 50:21, 51:1, 51:4, 51:9, 52:25, 58:6, 75:6, 76:14
**coercive** [5] - 25:15, 37:21, 56:15, 86:10, 158:8
**cognizable** [1] - 172:17
**collateral** [1] - 126:6
**colleague** [4] - 4:21, 25:13, 42:24, 106:7
**colleagues** [3] - 4:20, 5:5, 57:12
**collect** [3] - 134:7, 140:5, 143:25
**collected** [6] - 133:4, 133:5, 133:7, 136:10, 136:13, 139:20
**collecting** [2] - 133:1, 134:9
**collection** [8] - 132:24, 133:1, 133:19, 134:16, 135:1, 139:15, 141:22, 151:1
**colloquial** [4] - 111:24, 125:6, 125:10, 125:11
**combine** [1] - 180:4
**combined** [1] - 207:9
**combines** [1] - 207:5
**coming** [10] - 20:15, 21:13, 48:15, 78:2, 87:17, 104:11, 108:23, 137:8, 154:5, 205:25
**Commencing** [1] - 1:12
**comment** [7] - 141:15, 191:14, 191:18, 192:9, 198:25, 202:1, 203:9
**comments** [2] - 193:8, 198:22

**commerce** [3] - 70:13, 77:19, 120:5
**Commerce** [1] - 10:3
**commercial** [11] - 57:20, 57:21, 59:13, 70:22, 77:22, 106:10, 106:13, 106:19, 113:14, 116:8, 118:21
**Commission** [1] - 130:1
**common** [4] - 178:12, 191:8, 201:21, 203:17
**commonly** [1] - 174:20
**commonsense** [1] - 155:10
**communicate** [2] - 100:15, 119:23
**communicated** [1] - 119:16
**companies** [24] - 37:11, 39:20, 40:17, 47:20, 47:24, 48:6, 48:20, 48:21, 48:22, 49:5, 49:10, 49:18, 64:12, 65:15, 65:21, 66:2, 66:11, 66:21, 74:9, 74:18, 77:7, 90:19, 90:21, 95:18
**companies'** [1] - 37:22
**company** [20] - 20:9, 20:17, 36:10, 36:16, 50:13, 50:14, 50:15, 62:3, 66:16, 69:3, 71:11, 74:4, 74:14, 77:13, 91:25, 116:7, 131:10, 133:5, 135:7, 135:10
**company's** [3] - 47:11, 154:16, 154:18
**compel** [2] - 135:15, 136:17
**Compelled** [2] - 98:19, 126:25
**compelled** [19] - 18:2, 21:18, 69:24, 94:15, 97:17, 98:10, 98:20, 101:1, 101:16, 101:21, 102:1, 102:12, 102:20, 123:1, 124:12, 125:19, 131:13, 131:16, 207:7
**compelling** [4] - 100:18, 103:4, 114:9, 122:15

**compensation** [7] - 23:10, 23:19, 24:6, 38:2, 49:6, 49:19, 105:24
**compete** [1] - 39:2
**complain** [1] - 141:4
**complained** [1] - 65:17
**complaint** [1] - 147:19
**complete** [3] - 139:20, 152:20, 178:18
**completely** [18] - 16:24, 59:7, 78:17, 80:1, 126:6, 128:1, 135:8, 135:25, 147:7, 154:17, 154:18, 155:22, 156:4, 164:9, 176:10, 197:18, 204:6, 207:16
**complex** [3] - 45:9, 45:18, 209:11
**compliance** [10] - 52:11, 90:21, 128:25, 131:13, 133:8, 135:15, 154:8, 155:10, 155:15, 195:20
**complicated** [1] - 24:3
**complied** [1] - 37:4
**comply** [8] - 47:4, 53:21, 53:22, 111:17, 128:8, 152:23, 152:24, 163:24
**complying** [4] - 19:16, 80:24, 80:25, 81:1
**component** [2] - 43:8, 158:8
**comprehension** [1] - 20:4
**compulsion** [16] - 43:9, 44:14, 44:23, 45:1, 58:24, 70:9, 70:11, 70:19, 82:22, 85:5, 85:6, 85:7, 85:8, 86:12, 86:13, 99:21
**compute** [1] - 195:23
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concede** [1] - 107:15
**conceded** [2] - 82:22, 203:15
**concedes** [5] - 12:2, 128:1, 129:2, 129:6, 180:23
**concept** [4] - 62:17, 83:15, 83:18, 149:22

**concern** [3] - 75:17, 135:23, 156:9
**concerns** [6] - 77:2, 106:11, 112:9, 113:6, 113:16, 177:1
**concession** [3] - 64:11, 199:16, 203:3
**conclude** [1] - 104:1
**concludes** [1] - 210:1
**concrete** [2] - 36:11, 46:10
**concurs** [1] - 133:20
**condition** [27] - 14:9, 14:17, 25:12, 25:15, 25:18, 26:4, 26:18, 27:4, 32:14, 32:18, 41:4, 51:3, 51:24, 52:1, 82:4, 87:6, 87:12, 102:13, 102:23, 115:3, 115:10, 115:13, 115:16, 116:17, 116:25, 126:8
**conditioned** [1] - 87:4
**conditions** [26] - 14:7, 14:15, 32:12, 35:13, 36:25, 39:3, 42:12, 42:15, 51:23, 56:22, 65:9, 69:24, 72:10, 80:4, 80:5, 86:25, 87:10, 102:10, 102:15, 115:9, 115:18, 115:20, 116:13, 116:14, 117:1, 125:20
**Conditions** [12] - 8:12, 20:21, 41:1, 43:6, 51:23, 52:5, 54:15, 58:2, 72:11, 72:21, 86:17, 102:19
**conduct** [26] - 100:4, 100:7, 100:11, 106:19, 113:12, 113:14, 114:1, 114:7, 117:20, 119:11, 120:5, 120:22, 124:13, 124:18, 128:2, 129:6, 147:3, 148:13, 154:17, 154:18, 155:23, 155:24, 156:4
**conferred** [1] - 39:18
**confess** [1] - 170:19
**confines** [3] - 115:22, 116:18, 117:17
**confirmation** [1] - 191:20
**confirms** [1] - 19:19
**confiscatory** [2] -

9:10, 170:5
**conflict** [1] - 130:7
**confront** [1] - 41:7
**confused** [2] - 13:22, 200:2
**confusing** [3] - 29:18, 205:4, 205:5
**confusion** [2] - 93:7, 154:24
**congeal** [2] - 171:7, 171:8
**congeals** [1] - 171:6
**Congress** [103] - 15:24, 18:17, 18:24, 19:1, 19:20, 19:24, 20:1, 32:6, 36:6, 36:9, 50:24, 51:3, 57:6, 76:23, 77:1, 82:7, 82:8, 94:18, 95:1, 95:20, 102:4, 104:2, 109:18, 109:21, 109:24, 110:16, 110:18, 110:23, 112:12, 115:17, 115:19, 116:20, 120:15, 120:19, 120:22, 121:6, 121:19, 122:3, 122:5, 128:9, 138:1, 138:5, 138:8, 138:10, 138:21, 139:4, 142:6, 150:15, 150:21, 150:24, 151:1, 151:3, 151:24, 154:1, 154:14, 162:12, 162:15, 164:11, 166:4, 166:14, 167:5, 167:25, 169:15, 174:1, 177:3, 177:8, 179:8, 179:17, 179:22, 180:18, 180:19, 181:11, 182:17, 182:21, 184:3, 185:7, 185:9, 185:11, 185:14, 186:8, 186:9, 188:14, 188:15, 195:5, 195:7, 198:12, 200:21, 201:13, 201:17, 201:20, 202:11, 202:24, 203:21, 204:8, 204:20, 207:10, 207:11, 207:20
**Congress's** [9] - 67:15, 67:20, 109:20, 138:9,

138:11, 154:24, 186:22, 198:13, 202:21

**Congressional** [7] - 45:21, 47:2, 47:7, 128:10, 133:3, 142:5, 142:14

**congressional** [5] - 81:23, 125:8, 142:11, 142:20, 180:16

**Conley** [2] - 58:25, 65:13

**Connecticut** [1] - 50:13

**connection** [2] - 130:3, 147:3

**cons** [1] - 68:23

**consent** [3] - 54:1, 100:22, 161:7

**consequence** [1] - 100:1

**consequences** [3] - 133:23, 150:2, 150:7

**consider** [12] - 109:23, 121:3, 163:6, 167:14, 167:18, 168:8, 168:12, 168:16, 174:21, 182:2, 195:8, 195:11

**consideration** [2] - 9:17, 92:9

**considerations** [2] - 26:11, 26:12

**considered** [4] - 58:22, 176:16, 196:6, 201:9

**considering** [1] - 176:23

**consistency** [1] - 43:17

**consistent** [4] - 6:21, 7:16, 134:7, 186:2

**constitute** [2] - 62:21, 63:5

**Constitution** [4] - 55:21, 71:5, 169:18, 207:15

**constitution** [1] - 161:20

**constitutional** [59] - 7:1, 7:4, 7:6, 7:9, 7:20, 8:19, 14:17, 24:20, 27:18, 41:3, 42:6, 50:17, 58:3, 58:22, 63:14, 63:16, 64:19, 66:9, 66:19, 68:23, 71:19, 72:13, 72:16, 76:8, 82:6, 82:9, 87:14, 90:2,

90:15, 92:7, 93:3, 106:21, 115:2, 120:21, 135:16, 137:15, 154:23, 156:18, 156:21, 156:23, 157:24, 158:10, 158:11, 158:13, 159:20, 161:19, 162:1, 163:15, 164:21, 165:23, 166:3, 170:4, 173:11, 176:12, 188:12, 188:13, 189:18, 203:12, 207:6

**constitutionality** [5] - 139:8, 139:13, 140:25, 150:14, 158:14

**constitutionalization** [1] - 70:22

**constitutionalize** [1] - 76:2

**constitutionally** [3] - 9:5, 14:10, 203:22

**constrain** [1] - 9:9

**constraint** [2] - 121:11, 163:21

**constraints** [2] - 158:20, 161:20

**construction** [2] - 92:14, 192:9

**construed** [1] - 155:7

**contain** [1] - 181:22

**contained** [1] - 107:4

**container** [1] - 198:11

**content** [6] - 28:6, 67:24, 75:23, 102:18, 108:3, 181:10

**contested** [3] - 38:24, 100:23, 119:5

**contesting** [1] - 110:15

**context** [33] - 50:22, 50:23, 61:2, 62:18, 66:10, 66:25, 67:10, 67:12, 71:12, 71:19, 72:19, 72:22, 72:25, 73:4, 73:13, 73:14, 73:15, 74:23, 75:12, 76:21, 86:20, 96:14, 115:3, 116:13, 166:25, 169:19, 191:17, 194:12, 197:16, 204:18, 204:24, 204:25

**contexts** [6] - 51:2, 67:21, 68:8, 75:11, 93:22, 204:14

**continue** [5] - 39:9, 72:16, 81:14, 83:24, 209:6

**continuing** [1] - 20:4

**contours** [2] - 90:24, 125:22

**contract** [34] - 16:22, 66:19, 74:4, 74:15, 75:1, 80:24, 80:25, 81:2, 96:24, 97:7, 100:25, 101:3, 101:8, 101:10, 101:13, 107:5, 108:23, 110:19, 112:13, 112:17, 112:19, 115:11, 115:22, 115:24, 116:4, 117:3, 117:4, 118:9, 118:22, 123:16, 124:25, 126:7, 192:16

**contracting** [2] - 76:3, 108:7

**contractor** [5] - 74:14, 75:4, 79:15, 124:2, 192:7

**contractors** [4] - 66:11, 66:15, 70:24, 118:10

**contracts** [16] - 25:9, 73:24, 74:21, 74:24, 97:25, 103:25, 106:14, 118:7, 120:9, 121:10, 174:3, 192:12, 192:15, 192:20, 192:21

**contractual** [4] - 101:2, 117:24, 120:18, 124:24

**contrary** [3] - 63:13, 116:2, 184:8

**contrived** [1] - 138:1

**control** [4] - 6:19, 154:25, 170:1, 187:19

**controls** [10] - 9:4, 23:14, 95:13, 95:19, 177:9, 181:18, 182:18, 182:22, 187:16, 202:14

**conventionally** [1] - 172:10

**convert** [1] - 110:11

**convey** [2] - 102:24, 103:5

**conveyance** [1] - 103:2

**conviction** [1] - 149:8

**convictions** [1] -

147:8

**convince** [3] - 75:14, 81:21, 81:22

**copies** [2] - 15:24, 69:16

**copyright** [10] - 32:8, 32:9, 32:10, 32:11, 32:15, 32:21, 32:23, 69:7, 69:13, 69:15

**core** [5] - 34:15, 40:5, 40:16, 114:7, 116:14

**corners** [2] - 49:25, 112:19, 117:6

**corporate** [2] - 76:17, 96:15

**Corporation** [1] - 2:16

**correct** [18] - 19:19, 22:9, 25:14, 42:7, 46:2, 73:12, 92:4, 97:11, 105:1, 105:21, 130:19, 130:23, 131:1, 161:9, 161:13, 197:15, 211:4

**corrected** [2] - 100:13, 201:15

**correctly** [2] - 92:12, 172:16

**Cosmetic** [1] - 180:10

**cost** [7] - 22:23, 32:25, 39:11, 39:21, 47:5, 47:6, 47:18

**costless** [5] - 32:22, 32:24, 33:2, 86:15

**costs** [6] - 10:25, 11:5, 11:9, 90:22, 162:21, 163:7

**counsel** [26] - 3:18, 4:4, 4:15, 4:23, 5:13, 8:2, 8:8, 8:12, 8:21, 8:23, 9:11, 13:12, 24:23, 35:10, 42:24, 43:19, 46:23, 50:12, 55:2, 55:6, 56:17, 57:11, 70:2, 80:15, 137:23, 157:16

**Counsel** [1] - 87:21

**counsel's** [1] - 199:4

**count** [4] - 20:22, 168:18, 181:24, 181:25

**counteroffer** [2] - 57:3, 96:10

**counterpart** [1] - 57:21

**counterparts** [1] - 191:23

**counterparty** [1] - 53:20

**countless** [1] - 48:2

**country** [1] - 130:10

**counts** [2] - 20:24, 88:6

**couple** [5] - 140:2, 140:10, 142:12, 150:16, 179:25

**course** [20] - 9:20, 23:23, 56:7, 56:21, 65:6, 71:22, 89:25, 98:14, 124:5, 139:10, 150:21, 154:12, 155:13, 155:16, 157:22, 168:5, 168:23, 169:17, 202:8, 202:22

**Court** [158] - 1:23, 4:1, 4:10, 6:10, 10:16, 14:6, 15:16, 15:19, 22:3, 23:14, 23:18, 24:10, 30:13, 30:16, 31:4, 31:25, 36:3, 37:19, 37:20, 38:9, 43:2, 49:4, 50:2, 51:19, 52:2, 54:11, 54:19, 56:2, 58:21, 58:23, 59:16, 63:19, 69:11, 69:17, 71:13, 71:18, 72:24, 73:3, 75:10, 75:16, 77:24, 81:21, 81:22, 89:5, 89:7, 89:13, 89:19, 90:17, 90:25, 91:5, 91:7, 91:17, 92:8, 92:12, 93:5, 97:9, 98:18, 98:22, 98:24, 99:17, 100:12, 101:1, 102:3, 102:22, 104:24, 106:16, 109:16, 109:23, 110:11, 110:18, 112:25, 113:10, 113:25, 114:6, 115:14, 117:13, 119:14, 119:17, 119:21, 120:1, 120:4, 120:14, 123:2, 124:14, 128:17, 129:14, 129:25, 131:24, 132:6, 132:10, 134:6, 136:4, 136:6, 137:16, 138:7, 138:23, 138:24, 139:1, 141:11, 147:13, 147:14, 149:10, 149:12, 149:15, 149:17, 149:19, 149:21,

150:9, 151:7, 152:8, 152:9, 153:18, 154:23, 155:3, 156:8, 156:22, 157:1, 158:15, 159:2, 160:14, 161:24, 162:9, 166:1, 167:25, 168:24, 171:8, 171:14, 171:20, 171:21, 172:19, 173:17, 173:24, 174:8, 174:16, 175:1, 175:16, 177:15, 177:18, 181:4, 184:11, 188:13, 191:3, 192:18, 193:24, 196:24, 197:2, 197:9, 197:14, 197:22, 203:3, 204:23, 206:25, 209:8, 209:11, 210:1, 211:12

**COURT** [215] - 1:1, 3:4, 3:5, 4:14, 4:23, 5:3, 5:7, 5:15, 5:23, 6:2, 6:4, 9:18, 9:21, 10:11, 10:14, 10:18, 11:12, 12:4, 12:13, 13:21, 16:13, 20:6, 20:8, 20:14, 20:22, 22:7, 22:9, 22:15, 24:25, 25:5, 26:6, 27:19, 28:18, 28:24, 29:8, 29:16, 33:3, 33:8, 34:24, 35:4, 35:7, 35:9, 35:18, 37:9, 39:16, 41:8, 41:19, 41:24, 42:16, 42:20, 42:23, 43:16, 44:1, 45:11, 46:1, 48:5, 48:25, 49:17, 50:10, 54:21, 55:1, 56:10, 61:15, 62:24, 63:1, 63:4, 64:21, 67:8, 67:18, 69:21, 69:23, 70:4, 73:9, 73:22, 78:1, 78:4, 78:6, 79:22, 81:24, 82:14, 82:17, 83:1, 83:25, 84:14, 84:23, 87:15, 87:17, 87:19, 88:10, 88:13, 88:16, 88:20, 88:23, 89:21, 91:19, 92:2, 92:15, 92:21, 93:14, 93:19, 94:2, 94:7, 94:9, 94:12, 96:22, 97:4, 97:12, 98:8, 98:21, 99:12, 103:1, 103:9,

104:8, 104:10, 104:18, 105:2, 105:19, 105:22, 106:1, 106:6, 106:22, 107:8, 107:20, 108:10, 108:12, 108:16, 109:24, 111:4, 111:10, 112:14, 113:21, 113:24, 114:14, 116:1, 116:9, 121:16, 122:4, 122:12, 123:14, 124:3, 127:2, 127:7, 130:11, 130:17, 130:24, 131:6, 131:15, 132:7, 134:22, 136:1, 137:7, 137:10, 137:20, 137:22, 138:20, 139:17, 142:1, 144:11, 146:11, 146:14, 147:25, 148:4, 151:10, 151:13, 152:10, 156:10, 157:20, 157:23, 158:1, 158:17, 159:4, 159:7, 159:10, 159:12, 159:13, 159:17, 159:25, 160:2, 160:8, 160:15, 160:18, 165:1, 165:6, 165:14, 167:14, 170:11, 170:18, 171:16, 171:18, 175:4, 175:7, 175:11, 176:1, 178:21, 181:24, 183:7, 184:20, 189:4, 189:8, 189:12, 194:1, 196:20, 196:22, 198:19, 199:2, 199:5, 200:2, 201:6, 202:15, 207:23, 207:25, 208:8, 208:11, 209:25, 211:1

**court** [16] - 3:1, 4:2, 10:6, 27:12, 50:17, 51:16, 68:3, 68:24, 86:14, 98:23, 99:1, 101:14, 135:18, 136:5, 146:22, 176:15

**Court's** [9] - 21:24, 51:8, 109:6, 129:13, 155:6, 160:11,

173:15, 185:3, 207:22

**courthouse** [3] - 3:21, 3:22, 209:16

**Courthouse** [1] - 1:10

**courtroom** [8] - 4:22, 12:7, 94:13, 183:8, 208:16, 209:18, 209:19, 209:20

**courts** [23] - 58:21, 68:1, 68:7, 71:16, 74:13, 74:18, 74:25, 119:8, 129:19, 129:20, 133:21, 142:10, 147:24, 164:15, 169:25, 173:10, 174:20, 186:4, 193:18, 196:17, 204:6, 204:7, 204:8

**cover** [5] - 11:4, 36:25, 39:13, 48:22, 78:19

**coverage** [4] - 27:4, 40:15, 47:16, 79:2

**covered** [9] - 72:2, 72:9, 77:10, 102:14, 192:20, 193:21, 199:24, 200:12, 208:3

**covering** [1] - 72:1

**covers** [2] - 63:24, 192:13

**Covington** [1] - 4:20

**COVINGTON** [1] - 1:18

**crazy** [2] - 188:19, 205:25

**create** [4] - 60:18, 114:8, 172:24, 196:12

**created** [2] - 67:7, 151:24

**creates** [6] - 58:9, 63:14, 95:4, 106:13, 124:8, 138:8

**creating** [2] - 60:9, 65:22

**creation** [1] - 138:9

**creative** [1] - 69:14

**creatively** [1] - 77:23

**Creatures** [1] - 138:9

**credible** [1] - 100:20

**criminal** [10] - 15:14, 129:11, 129:17, 130:3, 130:10, 147:3, 147:8, 148:11, 148:13, 149:7

**crippling** [2] - 36:9, 53:19

**criteria** [4] - 120:25, 187:9, 192:7, 194:23

**critical** [2] - 75:25, 182:21

**critically** [1] - 97:15

**criticize** [1] - 117:5

**cross** [1] - 187:25

**crowded** [1] - 5:9

**CRR** [1] - 211:11

**CRS** [3] - 142:11, 142:17, 142:19

**crux** [4] - 27:8, 33:20, 34:1, 34:12

**CUMMINS** [1] - 2:1

**Cummins** [1] - 4:8

**cure** [2] - 38:7, 101:16

**cured** [1] - 142:4

**curing** [2] - 37:16, 37:23

**curious** [2] - 20:10, 63:7

**customer** [2] - 144:20, 145:7

**cut** [6] - 56:15, 82:5, 130:13, 165:9, 189:12, 209:12

**cutoff** [1] - 84:3

**cutoffs** [1] - 84:5

**cuts** [2] - 51:1, 51:2

**cutting** [2] - 139:25, 158:19

**cycle** [3] - 39:7, 39:9

---

**D**

**D.C** [15] - 2:7, 2:11, 2:22, 2:25, 15:21, 15:25, 32:12, 69:8, 113:9, 117:19, 138:3, 192:4, 192:13, 199:10, 200:1

**Dahan** [1] - 5:4

**DAHAN** [2] - 2:9, 5:4

**daily** [3] - 4:1, 40:16, 47:17

**daisy** [5] - 194:11, 196:20, 197:5, 205:8, 205:22

**daisy-chaining** [3] - 194:11, 205:8, 205:22

**damages** [2] - 23:6, 24:11

**danger** [2] - 58:4, 82:3

**dangerous** [1] - 153:17

**dangers** [1] - 4:1

**DANIEL** [1] - 2:14

**Daniel** [1] - 5:1

**data** [10] - 178:8, 187:2, 187:4, 187:9, 187:17, 194:22, 194:24, 195:10, 195:11, 204:1

**Date** [1] - 211:12

**DAY** [1] - 2:5

**daylight** [1] - 127:4

**days** [9] - 43:20, 44:16, 61:18, 83:3, 83:6, 130:21, 144:18, 163:4, 164:7

**Dayton** [3] - 10:3, 42:9, 58:23

**DC** [2] - 1:20, 2:18

**deadline** [2] - 84:3, 96:9

**deal** [9] - 5:20, 16:20, 20:11, 38:12, 47:19, 53:3, 53:5, 80:3, 124:2

**dealing** [4] - 36:18, 173:9, 174:25, 198:7

**dealings** [1] - 52:17

**dealt** [3] - 91:23, 175:3, 191:10

**debate** [3] - 45:23, 47:1, 167:8

**debating** [1] - 99:16

**debilitating** [2] - 39:1, 39:8

**decade** [1] - 98:19

**decades** [5] - 67:21, 70:25, 96:21, 102:4, 125:16

**decide** [9] - 68:10, 74:19, 78:13, 78:18, 79:1, 87:13, 94:23, 125:21, 125:24

**decided** [6] - 42:14, 69:8, 120:16, 120:22, 122:5, 123:2

**decides** [1] - 98:24

**deciding** [1] - 73:5

**decision** [38] - 10:5, 15:16, 15:21, 21:25, 23:14, 50:8, 51:8, 52:21, 89:8, 91:1, 91:6, 91:23, 109:6, 113:9, 129:13, 149:12, 164:5, 164:13, 165:2, 165:4, 165:10, 165:11, 165:12, 166:19, 167:5, 167:6, 171:15, 171:18, 172:16, 172:22, 173:16, 182:21, 199:20, 205:1

decisions [14] - 9:10, 9:23, 10:8, 66:18, 106:16, 162:15, 181:12, 181:13, 184:3, 185:12, 186:15, 193:18, 193:19, 204:22
declaration [15] - 24:7, 36:13, 38:10, 38:25, 39:6, 46:12, 47:4, 49:15, 136:15, 136:17, 136:18, 145:11, 182:24, 183:1, 196:10
declarations [2] - 46:14, 196:9
Declaratory [2] - 141:14, 141:23
declaratory [8] - 134:1, 141:17, 141:19, 141:24, 142:2, 156:17, 156:22
declare [2] - 141:11, 149:25
declined [1] - 155:5
dedicate [1] - 56:25
dedicated [1] - 55:16
deduct [1] - 23:7
deducted [1] - 8:16
deems [1] - 72:8
defeat [1] - 77:4
defeats [1] - 106:14
defect [2] - 66:24, 91:10
defects [1] - 91:11
defend [5] - 18:16, 127:13, 158:3, 158:5, 158:7
Defendants [4] - 1:9, 2:19, 2:22, 2:25
defendants [6] - 5:12, 55:12, 137:25, 139:7, 141:18, 149:1
defendants' [1] - 8:4
defense [21] - 5:24, 6:1, 8:4, 13:10, 25:7, 35:12, 35:22, 35:24, 44:10, 53:12, 53:13, 66:11, 66:15, 74:14, 75:4, 79:15, 85:13, 85:15, 118:10, 124:2, 147:11
defenses [3] - 53:4, 54:13, 149:7
deference [1] - 202:3
define [3] - 109:21, 115:18, 117:15
defined [5] - 108:5, 109:17, 148:9,

204:20, 206:18
defines [1] - 179:15
defining [2] - 109:21, 192:19
definitely [5] - 143:7, 143:10, 146:20, 147:17, 165:21
definition [18] - 11:13, 109:18, 125:3, 125:4, 125:5, 154:25, 179:17, 179:21, 180:1, 180:3, 180:7, 181:3, 181:5, 181:11, 186:9, 191:3, 194:16, 205:15
definitions [4] - 178:7, 186:18, 186:22, 205:4
definitive [1] - 142:20
DEGEN [1] - 25:6
DEGEN-SEN [1] - 25:6
Deger [13] - 5:1, 8:8, 9:5, 25:3, 28:11, 35:21, 40:19, 127:6, 130:14, 137:7, 137:11, 158:18, 208:19
DEGER [27] - 2:13, 4:25, 25:2, 26:9, 28:22, 29:1, 29:12, 29:18, 29:22, 33:6, 35:1, 35:5, 127:5, 127:8, 130:15, 130:23, 131:3, 131:8, 131:18, 132:12, 134:24, 136:12, 152:13, 156:11, 157:22, 157:25, 158:3
Deger-Sen [12] - 5:1, 8:8, 9:5, 25:3, 28:11, 35:21, 40:19, 127:6, 130:14, 137:7, 158:18, 208:19
DEGER-SEN [27] - 2:13, 4:25, 25:2, 26:9, 28:22, 29:1, 29:12, 29:18, 29:22, 33:6, 35:1, 35:5, 127:5, 127:8, 130:15, 130:23, 131:3, 131:8, 131:18, 132:12, 134:24, 136:12, 152:13, 156:11, 157:22, 157:25, 158:3
Deger-Sen's [1] - 137:11

degree [1] - 131:9
Delaware [6] - 10:6, 42:11, 90:25, 91:23, 93:7, 165:3
delay [3] - 3:16, 3:18, 82:23
delegate [1] - 174:1
delegated [2] - 164:11, 169:6
delegation [2] - 170:6, 177:2
delegations [1] - 173:16
delta [1] - 80:21
demanded [1] - 19:25
demonstrate [1] - 118:2
denial [2] - 130:6, 144:1
Department [3] - 5:12, 55:11, 136:2
department [1] - 139:24
DEPARTMENT [3] - 2:17, 2:20, 2:23
deposit [1] - 32:17
depositing [1] - 32:6
deprive [1] - 93:4
depth [1] - 183:2
DEPUTY [6] - 2:17, 3:4, 88:20, 159:10, 159:12, 209:25
described [5] - 27:9, 61:25, 136:22, 154:7, 194:23
describes [1] - 133:20
describing [2] - 25:25, 76:14
design [1] - 103:14
Design [3] - 106:17, 113:1, 119:12
designated [2] - 128:6, 128:23
designed [7] - 11:7, 21:18, 36:6, 77:4, 155:9, 157:7, 162:10
desire [5] - 82:4, 82:5, 172:20, 172:22, 194:4
despite [1] - 76:16
destroy [2] - 37:22, 38:5
destroying [4] - 30:12, 34:8, 133:14, 137:2
detail [3] - 172:19, 174:2, 198:14
detailed [1] - 173:14
deter [2] - 128:4, 128:24
determination [10] -

63:20, 77:1, 184:24, 185:1, 190:17, 190:19, 191:5, 191:6, 193:14, 202:5
determinations [8] - 174:24, 179:23, 185:24, 190:8, 190:20, 192:23, 200:20, 203:6
determine [9] - 61:8, 116:20, 125:22, 168:7, 185:17, 191:2, 192:16, 201:1
determined [4] - 60:11, 62:21, 179:19, 191:1
determines [1] - 57:7
determining [7] - 64:11, 71:6, 71:21, 187:8, 190:8, 193:4, 194:22
deterrence [1] - 16:16
deterrent [7] - 128:12, 128:20, 128:23, 148:15, 149:10, 149:14, 149:16
devalues [1] - 40:2
develop [9] - 37:22, 38:6, 39:12, 39:22, 47:25, 48:2, 49:11, 74:19, 77:8
developed [1] - 74:10
developing [5] - 37:16, 39:2, 48:9, 48:13, 112:2
development [4] - 39:21, 49:11, 162:21, 163:7
Development [4] - 113:3, 114:25, 115:1, 117:11
device [2] - 182:8, 187:12, 187:25, 188:3, 196:11, 206:20
dictate [3] - 55:22, 63:17, 78:15
dictated [5] - 7:25, 18:20, 21:6, 24:15, 33:24
dictating [1] - 7:14
difference [7] - 17:5, 31:21, 52:19, 61:16, 101:11, 145:1, 184:5
differences [4] - 51:20, 182:7, 183:3, 183:4
different [78] - 6:20, 12:15, 16:24, 18:3, 22:19, 23:23, 24:4,

24:16, 25:24, 29:7, 30:4, 32:24, 43:21, 44:6, 44:7, 45:11, 52:18, 61:14, 68:20, 69:12, 73:4, 75:11, 84:2, 84:5, 91:22, 92:5, 93:22, 95:16, 97:13, 97:15, 105:23, 107:16, 113:4, 118:13, 118:15, 120:21, 122:24, 124:13, 134:4, 144:9, 147:7, 147:9, 159:23, 167:3, 176:11, 176:16, 181:10, 182:3, 182:4, 182:6, 182:8, 182:12, 183:17, 183:21, 187:13, 188:5, 194:7, 194:8, 195:24, 196:4, 196:14, 196:15, 197:18, 201:8, 201:14, 204:14, 206:8, 206:9, 206:10, 206:20, 206:23
differentiating [1] - 206:19
differently [8] - 12:12, 15:20, 86:5, 86:9, 90:10, 105:24, 188:3, 188:8
difficult [2] - 186:5, 205:8
diligent [1] - 164:6
direct [4] - 18:4, 94:20, 108:9, 178:24
directed [1] - 120:5
directing [1] - 133:21
directions [1] - 185:23
directive [1] - 100:7
directly [10] - 13:12, 13:18, 14:23, 22:14, 30:24, 50:18, 50:25, 63:9, 140:25, 176:19
directs [2] - 179:5, 195:7
disabled [2] - 160:25, 175:20
disagree [8] - 48:18, 54:14, 87:8, 103:7, 122:20, 123:6, 123:10, 207:13
disclaimer [11] - 101:12, 101:15, 101:21, 108:10, 108:12, 108:21, 108:24, 111:2,

111:6, 112:14, 125:13
**disclaimers** [1] - 101:16
**discount** [8] - 19:13, 19:17, 23:24, 24:16, 80:11, 94:20, 104:3, 119:20
**discounts** [1] - 21:18
**discourse** [1] - 125:12
**discrepancy** [1] - 61:19
**discretion** [8] - 73:5, 163:10, 185:13, 200:18, 200:25, 201:3, 203:6
**discuss** [2] - 6:22, 76:20
**discussed** [4] - 67:22, 126:7, 127:24, 143:24
**discussing** [2] - 29:15, 72:15
**discussion** [9] - 54:22, 70:5, 81:17, 88:6, 92:11, 106:2, 148:7, 209:5, 209:6
**discussions** [1] - 57:12
**disease** [3] - 37:1, 37:23, 39:4
**diseases** [2] - 37:16, 38:7
**disoriented** [2] - 170:21, 205:10
**dispense** [1] - 60:8
**dispensed** [2] - 60:3, 60:7
**displace** [1] - 203:22
**disposal** [1] - 31:16
**dispose** [1] - 137:19
**disproportionate** [2] - 128:15, 129:1
**dispute** [11] - 16:12, 17:14, 67:9, 67:16, 128:3, 138:13, 144:22, 144:23, 155:24, 155:25, 173:22
**disputed** [2] - 138:18, 157:12
**disputes** [2] - 68:1, 142:18
**dissent** [2] - 31:9, 31:10
**distant** [1] - 205:3
**distinct** [2] - 170:22, 196:15
**distinction** [15] - 13:9, 13:11, 15:3, 15:7,

18:5, 18:18, 21:10, 22:6, 23:2, 26:13, 60:25, 61:22, 61:25, 110:21, 139:3
**distinctions** [3] - 12:22, 13:13, 21:9
**distinguish** [1] - 120:8
**distinguishable** [4] - 88:2, 105:4, 105:5, 191:24
**distinguishes** [1] - 124:24
**distinguishing** [2] - 149:20
**distribute** [2] - 60:15, 115:12
**distributed** [1] - 115:11
**District** [7] - 3:2, 10:2, 10:4, 10:6, 50:13, 59:3, 76:11
**district** [5] - 41:11, 51:16, 129:20, 136:5, 208:23
**DISTRICT** [3] - 1:1, 1:1, 1:13
**districts** [1] - 88:4
**divest** [8] - 64:1, 64:7, 64:16, 64:22, 66:6, 72:5, 81:10, 85:9
**divestiture** [3] - 85:9, 85:11, 85:13
**divisible** [1] - 143:17
**DIVISION** [2] - 2:17, 2:20
**Docket** [4] - 3:9, 3:10, 3:11, 3:12
**docket** [1] - 41:16
**doctor** [2] - 183:5, 183:7
**doctor's** [1] - 183:12
**doctors** [1] - 198:8
**doctrinal** [3] - 26:10, 26:12, 30:3
**doctrinally** [1] - 171:8
**Doctrine** [16] - 8:8, 8:12, 20:21, 41:1, 43:6, 51:24, 52:5, 54:15, 58:2, 72:11, 72:20, 72:21, 86:18, 98:19, 102:19, 126:25
**doctrine** [9] - 29:23, 29:24, 41:2, 50:1, 50:2, 72:14, 129:10, 171:9, 203:13
**documents** [6] - 38:11, 96:1, 111:5, 167:10, 167:15, 167:22

**DOD** [1] - 118:9
**Dolan** [3] - 72:20, 86:21, 87:9
**dollars** [14] - 17:8, 17:13, 33:25, 46:7, 53:22, 79:13, 79:18, 81:1, 98:17, 116:19, 116:21, 124:8, 144:20, 144:21
**dominant** [1] - 37:8
**dominating** [1] - 50:7
**done** [7] - 29:10, 34:14, 41:18, 154:20, 166:14, 203:15, 204:3
**door** [2] - 19:14, 34:21
**dosage** [13] - 187:10, 187:11, 187:21, 188:4, 194:25, 195:25, 196:4, 196:11, 198:3, 206:5, 206:9, 206:14, 206:18
**doses** [1] - 70:13
**dotted** [1] - 96:25
**double** [1] - 18:10
**doubt** [2] - 186:11, 204:15
**dovetails** [1] - 171:12
**down** [15] - 18:10, 58:25, 91:5, 95:18, 101:13, 127:18, 135:10, 141:5, 145:4, 154:5, 165:9, 168:21, 182:11, 189:3, 202:14
**downstream** [1] - 133:22
**dozens** [3] - 103:12, 129:19
**Dr** [2] - 182:25, 183:13
**dramatically** [1] - 156:2
**draw** [3] - 23:2, 113:16, 192:19
**drawn** [1] - 130:5
**Draws** [1] - 139:2
**dress** [1] - 172:11
**dressed** [1] - 95:21
**drew** [1] - 86:21
**driveway** [1] - 168:13
**drop** [3] - 13:7, 82:7, 135:22
**Drug** [5] - 56:3, 59:11, 180:10, 195:12, 197:13
**drug** [109] - 6:18, 6:24, 18:8, 18:19, 20:3, 24:3, 24:9, 26:21, 33:12, 47:20, 55:14,

55:18, 55:22, 56:2, 58:5, 58:11, 58:12, 59:22, 59:25, 60:2, 60:3, 60:7, 60:8, 60:20, 61:4, 61:9, 62:13, 64:1, 64:3, 64:8, 65:18, 65:20, 66:3, 66:6, 66:10, 70:17, 78:19, 81:10, 81:13, 82:8, 95:17, 111:19, 127:11, 144:20, 145:5, 147:7, 154:5, 179:16, 179:18, 180:2, 180:3, 180:5, 180:8, 180:13, 181:5, 181:6, 181:7, 185:1, 186:1, 186:6, 187:6, 187:8, 187:10, 188:19, 190:22, 191:2, 191:4, 191:6, 194:5, 194:6, 194:16, 194:23, 195:1, 195:2, 195:4, 195:6, 195:14, 195:15, 195:25, 196:2, 196:6, 196:15, 196:16, 197:9, 197:10, 197:12, 198:1, 198:5, 198:7, 198:8, 201:8, 201:10, 201:11, 201:15, 204:13, 204:17, 204:18, 205:5, 205:6, 205:14, 205:15, 205:16, 206:16, 206:17
**drug's** [1] - 130:24
**drugs** [91] - 7:15, 11:5, 11:25, 12:23, 13:6, 16:9, 19:4, 21:11, 23:5, 25:9, 26:25, 33:13, 33:22, 36:21, 36:22, 36:24, 36:25, 37:17, 37:23, 38:6, 39:2, 39:11, 39:12, 39:22, 40:13, 40:15, 43:10, 45:3, 47:11, 47:12, 47:16, 48:9, 48:13, 48:23, 49:11, 50:16, 52:10, 52:12, 55:17, 55:19, 59:2, 60:10, 60:15, 61:4, 64:7, 64:13, 64:16, 64:21, 65:23, 65:24, 70:18, 72:16, 85:9, 93:2, 93:13, 94:19, 96:8, 104:3, 121:2, 126:4, 126:5, 128:6,

145:3, 153:24, 160:24, 169:24, 172:23, 175:19, 177:10, 177:11, 179:6, 184:23, 184:25, 185:20, 185:21, 190:16, 190:18, 190:19, 190:22, 190:25, 194:8, 194:21, 199:22, 200:12, 201:3, 201:10, 204:16, 205:4
**duck** [1] - 157:14
**due** [22] - 9:8, 26:1, 30:15, 42:16, 42:20, 92:2, 93:8, 93:10, 116:13, 159:21, 163:18, 163:20, 165:17, 165:18, 165:21, 170:23, 171:12, 171:13, 172:2, 172:15, 173:6, 174:11
**dues** [1] - 98:20
**during** [7] - 38:18, 59:24, 60:3, 76:7, 128:6, 144:10, 170:6
**duties** [3] - 195:19, 195:21, 195:22
**duty** [2] - 19:16, 44:20
**Dye** [4] - 144:24, 145:3, 147:6, 149:6
**dynamic** [1] - 100:17

**E**

**early** [3] - 82:2, 162:19, 173:5
**earning** [1] - 154:18
**earnings** [3] - 127:25, 129:7, 154:17
**ears** [1] - 199:7
**easier** [4] - 98:6, 102:17, 141:19, 141:23
**easiest** [1] - 94:20
**easily** [2] - 52:24, 156:9
**East** [1] - 1:10
**easy** [6] - 26:17, 73:6, 179:10, 185:7, 198:4, 199:16
**ECF** [9] - 36:13, 38:10, 38:25, 46:11, 140:11, 142:8, 182:25, 183:1, 196:10
**echo** [1] - 163:20
**economic** [5] - 44:25,

51:9, 71:8, 85:8, 86:13
**economically** [4] - 18:18, 68:1, 94:24, 95:15
**educational** [1] - 209:15
**effect** [13] - 37:20, 39:1, 40:2, 47:15, 63:8, 63:23, 76:13, 84:18, 84:19, 99:13, 107:2, 112:22
**effective** [1] - 209:21
**effectively** [2] - 38:14, 96:18
**effects** [2] - 39:8, 76:15
**effectuate** [1] - 100:5
**effectuated** [1] - 101:7
**efforts** [3] - 37:22, 171:10, 194:11
**eight** [2] - 123:19, 140:12
**Eighth** [5] - 90:3, 90:14, 129:24, 139:12, 141:10
**Eisenhower** [1] - 1:16
**Either** [1] - 16:21
**either** [18] - 5:24, 17:12, 18:1, 21:14, 33:16, 37:3, 40:23, 43:12, 50:18, 53:8, 74:21, 84:21, 84:24, 85:15, 89:5, 128:20, 167:24, 177:11
**elapsed** [1] - 180:12
**elderly** [2] - 160:24, 175:19
**elected** [1] - 7:1
**electricity** [2] - 71:15, 71:17
**elements** [2] - 92:11, 112:10
**elephant** [1] - 133:12
**eligibilities** [1] - 197:11
**eligibility** [2] - 192:6, 192:19
**eligible** [17] - 16:6, 55:13, 60:2, 94:22, 115:4, 177:10, 179:6, 179:16, 180:3, 184:25, 185:21, 190:18, 194:21, 199:22, 200:12, 205:6, 206:17
**eliminate** [2] - 42:6, 185:9
**Eliquis** [1] - 78:21,

78:22
**emails** [2] - 114:5, 114:10
**embedded** [3] - 98:1, 124:23, 126:24
**embedding** [1] - 125:1
**embeds** [1] - 97:19
**emboldened** [1] - 167:12
**emotional** [1] - 109:14
**emphasize** [4] - 57:13, 162:8, 176:10, 176:14
**emphasized** [1] - 92:6
**employers** [1] - 114:21
**employment** [1] - 86:23
**EMS** [1] - 78:20
**en** [1] - 130:6
**enables** [1] - 103:23
**enacted** [2] - 44:20, 84:12
**encapsulated** [1] - 189:25
**encourage** [1] - 169:8
**encouraging** [1] - 209:7
**end** [25] - 13:19, 23:19, 34:25, 40:21, 43:4, 46:25, 54:12, 54:17, 61:11, 69:1, 71:5, 75:2, 75:6, 75:19, 80:22, 93:15, 110:4, 118:7, 121:6, 121:8, 143:4, 152:23, 153:14, 164:8, 179:5
**ending** [1] - 151:19
**endorsing** [1] - 111:16
**ends** [1] - 171:5
**enforce** [5] - 40:8, 75:16, 140:6, 145:18, 147:12
**enforcement** [4] - 140:8, 140:9, 140:13, 140:22
**enforcing** [4] - 16:2, 140:18, 140:21, 141:12
**engage** [2] - 131:19, 131:21
**engineers** [1] - 74:20
**enjoin** [1] - 139:15
**enjoined** [2] - 139:19, 140:16
**enjoyed** [1] - 172:24
**enormous** [2] - 65:15, 153:8
**ensure** [3] - 162:12,

163:14, 169:5
**ensuring** [2] - 3:20, 7:7
**enter** [5] - 16:4, 110:12, 124:5, 124:6, 150:5
**entered** [2] - 57:20, 59:22
**entering** [2] - 128:25, 131:13
**enterprise** [6] - 30:12, 34:7, 133:14, 137:2, 165:25, 166:23
**enterprise-destroying** [2] - 133:14, 137:2
**Enterprises** [1] - 54:11
**entertain** [1] - 193:13
**entire** [8] - 41:2, 110:6, 135:10, 177:25, 187:13, 188:7, 197:3, 198:9
**entirely** [7] - 24:21, 62:7, 63:24, 72:4, 81:11, 87:5, 163:9
**entirety** [1] - 31:6
**entities** [2] - 52:23, 147:12
**entitle** [1] - 55:22
**entitled** [6] - 23:12, 24:9, 64:12, 64:15, 66:6, 211:5
**entitlement** [1] - 32:9
**entitles** [1] - 62:15
**entity** [1] - 115:21
**entries** [1] - 70:25
**envelope** [1] - 123:4
**Epipen** [2] - 182:10, 206:13
**equal** [2] - 60:1, 113:20
**equally** [1] - 95:14
**equals** [2] - 196:16
**equate** [1] - 194:5
**equipment** [1] - 192:6
**error** [3] - 100:12, 107:22
**escaped** [1] - 69:10
**escaping** [1] - 9:4
**especially** [5] - 63:15, 87:3, 93:21, 102:19, 136:8
**espouse** [1] - 115:5
**ESQUIRE** [15] - 1:15, 1:18, 1:19, 2:2, 2:2, 2:5, 2:6, 2:9, 2:9, 2:10, 2:13, 2:14, 2:14, 2:21, 2:24
**essence** [1] - 70:5

**essential** [5] - 7:7, 39:15, 73:3, 162:5, 182:17
**essentially** [8] - 11:24, 14:7, 37:2, 40:12, 102:22, 117:24, 129:2, 198:5
**establish** [3] - 30:2, 105:18, 132:4
**established** [4] - 59:4, 118:25, 198:2, 198:11
**establishes** [1] - 197:10
**establishing** [1] - 120:23
**establishment** [1] - 195:23
**estimate** [2] - 193:4, 193:14
**estimates** [1] - 193:9
**et** [9] - 1:8, 3:9, 3:10, 3:11, 3:12, 60:20, 146:18, 146:19, 149:8
**evaluated** [2] - 57:23, 196:13
**event** [2] - 32:15, 145:22
**eventually** [1] - 157:15
**evidence** [2] - 138:10, 142:11
**exact** [3] - 64:24, 126:1, 129:15
**exacted** [1] - 70:20
**exactly** [26] - 14:20, 29:12, 31:25, 32:3, 32:5, 33:9, 34:15, 35:5, 36:5, 43:13, 49:16, 51:17, 94:21, 94:24, 99:25, 100:8, 100:12, 100:16, 119:4, 125:12, 126:8, 140:1, 140:23, 142:18, 150:22, 151:2
**examine** [1] - 158:13
**example** [5] - 7:12, 15:16, 21:24, 36:11, 45:3, 46:10, 50:3, 53:9, 68:2, 77:5, 78:21, 84:8, 84:25, 123:3, 129:23
**examples** [3] - 140:12, 155:20, 173:16
**exceeded** [1] - 7:21
**except** [2] - 27:2, 163:24
**exception** [10] - 33:1, 134:14, 134:17,

141:23, 142:22, 142:25, 146:23, 207:1
**exceptions** [2] - 46:20, 143:1
**excerpts** [1] - 178:17
**excessive** [22] - 9:5, 128:13, 128:14, 129:10, 141:11, 147:2, 147:4, 148:17, 148:22, 149:3, 149:5, 152:3, 152:7, 153:15, 154:11, 155:17, 155:21, 155:22, 156:2, 156:3
**excessiveness** [2] - 150:10, 151:5
**exchange** [3] - 69:15, 164:19, 168:10
**excise** [25] - 36:8, 45:7, 45:8, 45:22, 46:16, 46:17, 47:2, 53:19, 84:9, 85:4, 85:25, 97:16, 124:7, 130:20, 130:25, 131:2, 131:6, 135:3, 137:12, 140:14, 140:16, 140:18, 148:23, 151:7
**excised** [1] - 43:15
**exclusive** [1] - 43:23
**exclusivities** [1] - 197:11
**exclusivity** [6] - 39:18, 40:3, 40:9, 77:7, 182:22, 195:12
**excuses** [1] - 27:13
**execute** [1] - 56:18
**executed** [1] - 103:5
**executing** [1] - 123:21
**executive** [5] - 38:2, 49:6, 49:19, 96:3, 174:2
**exempt** [2] - 164:1, 166:21
**exercise** [7] - 67:20, 68:13, 117:16, 121:14, 134:23, 134:25, 166:13
**exercises** [2] - 54:5, 166:17
**exercising** [1] - 53:17
**Exhibit** [1] - 47:3
**exist** [4] - 45:5, 56:22, 60:24, 61:2
**existence** [1] - 23:20
**exists** [1] - 76:14
**exit** [1] - 63:22
**exiting** [3] - 25:23,

63:24, 72:4
**expand** [2] - 75:14, 98:22
**expanded** [1] - 73:15
**expect** [6] - 8:21, 62:11, 68:17, 128:22, 145:23, 186:3
**expectation** [2] - 172:20
**expectations** [1] - 172:23
**expense** [1] - 48:23
**expenses** [1] - 23:17
**expensive** [1] - 11:6
**experience** [1] - 170:2
**expert** [1] - 184:4
**expertise** [3] - 74:10, 74:19, 184:4
**explain** [16] - 8:7, 8:10, 8:24, 12:17, 12:18, 33:2, 45:6, 45:9, 48:10, 90:16, 108:18, 114:12, 178:4, 191:25, 193:12, 201:19
**explained** [15] - 62:16, 72:24, 73:3, 93:11, 106:8, 119:17, 128:19, 149:15, 149:17, 149:21, 158:10, 172:7, 172:13, 172:19, 198:12
**explaining** [2] - 118:14, 119:4
**explains** [3] - 138:8, 197:14, 197:23
**explanation** [1] - 129:5
**explicitly** [1] - 192:23
**express** [4] - 9:14, 97:21, 99:6, 100:22
**expressed** [1] - 56:14
**expression** [2] - 119:24, 203:14
**Expressions** [6] - 100:13, 106:16, 113:1, 113:8, 119:12
**expressive** [6] - 97:5, 100:19, 108:3, 113:12, 113:13, 118:20
**expressly** [2] - 128:7, 128:11
**extend** [1] - 98:24
**extended** [2] - 195:3, 196:5
**extended-release** [2] - 195:3, 196:5

**extending** [1] - 77:7
**extent** [1] - 169:22
**extra** [2] - 95:4
**extraneous** [1] - 167:15
**extraordinary** [9] - 7:4, 127:25, 143:1, 154:15, 158:19, 161:10, 161:25, 203:11, 203:19
**extreme** [2] - 6:25, 135:17
**extremely** [2] - 43:21, 146:19

**F**

**F.2d** [2] - 143:2, 143:4
**F.3d** [5] - 52:22, 138:3, 149:12, 192:4, 199:10
**F.Supp.3d** [1] - 142:10
**F.Supp.3rd** [1] - 51:15
**F4th** [1] - 193:2
**fabric** [1] - 48:1
**face** [3] - 21:5, 41:24, 104:14
**facial** [1] - 71:24, 172:10
**facilitate** [1] - 114:3
**facilities** [2] - 22:1, 30:7
**facing** [1] - 121:15
**fact** [57] - 7:13, 23:20, 23:25, 27:13, 34:21, 35:2, 36:2, 36:7, 49:12, 50:5, 50:6, 50:15, 53:25, 70:11, 72:1, 72:9, 74:16, 75:23, 78:24, 80:21, 83:2, 86:8, 87:3, 90:20, 91:12, 92:1, 92:11, 96:6, 96:7, 101:10, 103:15, 109:21, 110:8, 110:15, 110:21, 116:11, 120:19, 121:6, 121:9, 122:14, 124:9, 124:11, 131:12, 135:1, 147:20, 157:14, 157:15, 157:16, 172:21, 174:20, 191:18, 191:20, 193:19, 200:7, 204:17, 206:1
**factories** [1] - 11:25
**factors** [9] - 121:2, 163:6, 168:8, 168:16, 168:18,

193:5, 195:7, 195:9
**factory** [5] - 12:23, 13:6, 24:18, 34:16, 34:21
**facts** [2] - 19:17, 38:22
**fail** [3] - 35:25, 41:24, 54:13
**failing** [3] - 127:22, 154:6, 154:9
**fails** [2] - 74:7, 178:2
**failure** [3] - 127:9, 128:8, 150:1
**failures** [1] - 7:20
**FAIR** [10] - 113:7, 113:8, 113:17, 117:9, 117:10, 119:10, 122:23, 124:12, 124:14, 124:24
**Fair** [1] - 59:21
**fair** [64] - 16:6, 18:11, 19:6, 23:8, 23:22, 23:25, 29:16, 41:14, 55:8, 60:1, 60:2, 60:11, 62:6, 62:13, 63:23, 64:9, 77:20, 80:16, 80:19, 84:18, 94:23, 95:5, 95:7, 95:25, 96:12, 96:17, 97:1, 97:3, 97:20, 97:22, 98:13, 98:15, 100:24, 103:6, 103:19, 107:1, 107:9, 107:14, 107:15, 107:24, 110:24, 111:20, 116:3, 122:16, 124:17, 124:19, 124:20, 125:3, 125:5, 125:9, 125:16, 126:7, 126:22, 126:23, 127:10, 127:23, 150:6, 157:3, 176:5, 176:6, 195:24, 198:10
**fairly** [6] - 59:12, 60:21, 75:5, 107:14, 128:18, 189:15
**fall** [1] - 156:20
**falls** [2] - 150:15, 184:12
**False** [2] - 129:22
**familiar** [1] - 163:12
**families** [1] - 182:5
**family** [3] - 181:21, 187:13, 188:7
**far** [10] - 47:5, 47:10, 51:11, 51:13, 58:22, 76:1, 110:14, 178:4,

188:9
**farm** [1] - 53:11
**farmer's** [1] - 164:19
**farmers** [2] - 15:18, 23:15
**Farms** [1] - 197:6
**fashion** [1] - 56:4
**fast** [2] - 183:18, 183:20
**favor** [3] - 87:22, 146:17, 186:11
**favorable** [3] - 63:8, 145:22, 146:18
**FDA** [21] - 39:18, 180:9, 180:10, 180:12, 180:23, 181:13, 182:13, 182:20, 183:22, 184:3, 184:4, 184:7, 188:8, 190:22, 196:13, 197:6, 200:24, 202:7, 204:22, 205:16, 205:18
**FDA's** [4] - 194:12, 197:8, 197:14, 202:5
**FDCA** [2] - 195:14, 196:18, 197:3
**feature** [2] - 133:13, 174:23
**Federal** [2] - 74:23, 76:9
**federal** [19] - 7:2, 24:2, 51:16, 52:25, 55:15, 55:19, 56:7, 59:1, 65:4, 75:9, 75:13, 75:21, 89:13, 113:19, 116:19, 141:25, 142:1, 161:3, 209:5
**FEDERAL** [2] - 2:20, 211:1
**federalism** [2] - 50:22, 50:24
**federally** [5] - 27:17, 30:22, 31:2, 31:7, 31:23
**fee** [1] - 69:18
**felt** [1] - 93:20
**few** [12] - 11:2, 37:6, 50:8, 53:3, 54:25, 152:13, 168:3, 178:12, 189:11, 190:3, 196:17, 204:11
**Fiasp** [8] - 182:7, 182:9, 182:15, 183:12, 183:15, 188:7, 188:9, 206:7
**fidelity** [1] - 162:14

**Fifth** [6] - 57:25, 70:21, 90:18, 106:11, 172:2, 174:16
**fighter** [5] - 66:14, 73:24, 74:5, 79:11, 79:13
**figure** [6] - 45:20, 46:5, 71:17, 122:4, 148:10, 178:20
**figures** [2] - 55:15, 135:6
**figuring** [1] - 190:8
**file** [5] - 62:4, 143:19, 143:22, 143:24, 144:2
**filed** [3] - 38:11, 38:23, 126:19
**filing** [1] - 144:3
**fill** [1] - 39:10
**filtering** [1] - 125:11
**final** [4] - 102:9, 135:20, 156:6, 159:22
**finally** [10] - 9:13, 53:14, 54:3, 86:17, 126:16, 162:6, 169:11, 179:24, 195:16, 202:19
**financial** [4] - 131:4, 131:8, 134:19, 192:14
**fine** [57] - 15:19, 15:24, 15:25, 30:12, 30:14, 115:15, 126:5, 127:10, 127:21, 127:23, 127:24, 127:25, 128:15, 128:16, 128:20, 128:25, 131:13, 132:5, 132:18, 133:11, 140:20, 146:22, 147:3, 147:4, 148:9, 148:17, 149:2, 149:5, 149:11, 150:14, 150:15, 150:20, 150:23, 153:9, 153:10, 154:12, 154:25, 155:1, 155:10, 155:13, 155:20, 156:1, 156:13, 156:14, 156:15, 156:16, 156:19, 156:24, 157:17, 158:7, 159:6, 165:6, 207:8
**finer** [1] - 47:1
**fines** [14] - 9:3,

128:13, 128:14, 129:10, 129:25, 141:11, 147:2, 147:5, 148:17, 148:22, 149:3, 149:5, 155:17, 156:3
**finish** [1] - 168:2
**finishing** [1] - 177:18
**fire** [1] - 64:6
**firms** [1] - 114:21
**first** [61] - 6:23, 7:19, 8:7, 8:24, 14:8, 14:19, 15:3, 18:9, 18:13, 23:13, 23:21, 25:17, 26:16, 28:9, 28:11, 30:2, 43:8, 47:14, 50:16, 57:14, 59:14, 62:5, 62:20, 80:6, 89:14, 96:7, 99:23, 107:21, 115:10, 115:15, 123:14, 123:24, 132:8, 132:11, 132:12, 132:22, 138:14, 138:15, 150:18, 159:19, 161:25, 162:17, 165:12, 166:5, 168:6, 176:9, 177:8, 177:18, 178:17, 184:12, 185:4, 192:3, 194:13, 194:20, 196:21, 196:25, 199:4, 200:5, 201:20, 208:1
**First** [43] - 9:1, 32:12, 84:25, 90:17, 92:25, 94:1, 94:2, 94:5, 98:23, 99:7, 100:16, 101:23, 102:8, 102:9, 102:18, 103:21, 106:4, 106:14, 110:5, 112:9, 113:6, 113:13, 113:16, 114:8, 115:23, 116:18, 117:1, 117:17, 118:6, 118:19, 120:3, 120:4, 122:7, 122:10, 122:22, 123:10, 123:13, 123:20, 124:9, 124:20, 126:14, 131:25, 188:16
**Fisher** [1] - 1:10
**fit** [2] - 90:24, 142:23
**fits** [2] - 12:19, 99:4
**five** [12] - 55:6, 82:21, 103:13, 144:25,

145:3, 145:6, 145:8, 157:16, 159:1, 159:5, 159:6, 159:7
**five-minute** [2] - 55:6, 159:1
**five-page** [1] - 103:13
**fixed** [1] - 126:24
**flagged** [1] - 119:12
**flip** [1] - 79:7
**floating** [1] - 146:4
**Florida** [1] - 138:3
**Flynn** [1] - 143:4
**focus** [7] - 7:19, 13:13, 94:16, 179:10, 185:3
**focused** [5] - 80:5, 83:10, 177:2, 184:22, 206:4
**fold** [2] - 79:18, 80:7
**folding** [1] - 170:25
**folks** [12] - 3:5, 3:14, 3:17, 3:20, 16:15, 37:10, 54:23, 64:25, 65:8, 67:14, 88:24, 136:8
**following** [3] - 82:3, 130:17, 130:18
**follows** [1] - 117:19
**Fontane** [1] - 16:19
**food** [2] - 161:14, 164:20
**Food** [2] - 180:10, 195:12
**FOR** [1] - 1:1
**for-profit** [2] - 48:21, 48:22
**forbearance** [2] - 134:23, 134:25
**force** [7] - 14:11, 14:12, 50:7, 79:13, 82:10, 99:6, 102:4
**forced** [10] - 8:11, 56:17, 72:1, 72:7, 79:8, 123:8, 124:19, 175:15, 207:7
**forces** [3] - 7:24, 8:24, 79:5
**forcibly** [1] - 57:15
**forcing** [11] - 7:14, 14:13, 22:4, 96:16, 112:18, 114:11, 114:12, 123:11, 123:19, 123:22, 125:10
**foregoing** [1] - 211:4
**foreshadowed** [1] - 75:8
**forfeiture** [3] - 129:17, 148:12, 148:13
**forgetting** [1] - 82:3

**fork** [1] - 144:17
**form** [13] - 22:21, 58:6, 74:17, 76:14, 82:1, 99:11, 106:9, 173:25, 187:15, 196:11, 198:3, 205:20, 206:18
**formalism** [1] - 152:20
**formalisms** [1] - 200:9
**formalistic** [2] - 135:25, 157:8
**format** [1] - 27:21
**formidable** [1] - 52:23
**forms** [10] - 187:10, 187:11, 187:21, 188:5, 194:25, 195:25, 196:4, 206:5, 206:10, 206:14
**formula** [1] - 45:18
**formularies** [2] - 65:19, 65:22
**formulary** [1] - 33:23
**formulating** [1] - 195:8
**formulation** [3] - 195:3, 195:4, 196:1
**formulations** [5] - 195:2, 196:4, 196:5, 196:14
**forth** [8] - 28:12, 61:9, 121:5, 148:8, 180:20, 183:16, 185:15, 185:22
**Fortner** [1] - 54:10
**Forum** [2] - 106:18, 113:1
**forward** [2] - 16:10, 35:14
**four** [15] - 3:8, 6:11, 12:21, 36:21, 36:23, 41:16, 49:25, 52:12, 56:9, 57:14, 117:6, 129:22, 144:25, 145:6, 145:7
**fourth** [2] - 12:25, 58:5
**fraction** [2] - 24:1, 145:8
**framework** [13] - 32:13, 35:13, 61:3, 66:25, 69:10, 69:19, 95:9, 95:20, 105:23, 106:13, 109:4, 109:5, 118:14
**frankly** [1] - 17:15
**free** [12] - 48:9, 115:17, 119:22, 122:17, 122:21, 161:20, 165:25, 166:23, 167:23,

178:24, 189:21, 194:1
**freedom** [1] - 114:19
**freestanding** [1] - 116:15
**friend** [5] - 106:17, 180:18, 198:14, 202:20, 205:13
**friends** [19] - 61:24, 110:4, 110:20, 114:25, 115:7, 119:2, 136:2, 136:4, 136:7, 167:9, 168:5, 170:10, 170:24, 173:22, 174:6, 187:24, 191:15, 191:23, 194:14
**Front** [1] - 2:3
**front** [3] - 80:22, 135:18, 157:13
**FTC** [1] - 71:14
**full** [4] - 46:20, 64:24, 142:16, 146:1
**fully** [2] - 165:14, 191:10
**function** [3] - 57:16, 68:13, 174:2
**functioning** [1] - 57:5
**fund** [1] - 37:15
**fundamental** [4] - 52:19, 75:20, 121:9, 166:22
**fundamentally** [11] - 52:18, 65:12, 68:12, 75:8, 77:12, 86:4, 106:9, 120:18, 134:4, 136:13, 190:25
**funds** [4] - 57:24, 68:20, 113:19, 115:10
**funneled** [2] - 95:8, 124:21
**funneling** [1] - 98:5
**futile** [1] - 147:15
**future** [1] - 182:24
**fuzzy** [2] - 17:2, 93:13

**G**

**Gaffney** [4] - 5:14, 138:20, 152:10, 208:20
**GAFFNEY** [15] - 2:24, 137:9, 137:13, 137:21, 137:23, 138:23, 139:25, 142:2, 144:14, 146:13, 146:15, 148:3, 151:12,

151:17, 152:12
**gaining** [1] - 154:9
**gallery** [1] - 3:15
**game** [1] - 136:19
**gas** [2] - 161:14, 164:20
**GAY** [1] - 2:14
**Gay** [1] - 5:2
**gearing** [1] - 112:5
**gears** [2] - 45:1, 50:1
**general** [2] - 59:4, 90:13
**GENERAL** [1] - 2:17
**generally** [3] - 53:7, 94:25, 111:10
**generate** [2] - 114:3, 142:7
**generic** [1] - 180:14
**generics** [1] - 181:4
**generous** [2] - 208:23, 209:1
**get-out-of-the-constitution** [1] - 161:20
**GIANTOMASI** [1] - 1:15
**Giantomasi** [1] - 4:18
**give-and-take** [1] - 121:3
**given** [11] - 40:16, 50:6, 82:24, 87:2, 111:22, 121:11, 150:12, 177:20, 178:15, 200:18
**glad** [1] - 35:19, 201:18
**goal** [1] - 48:7
**Godfather** [2] - 16:18, 16:21
**goodness** [2] - 144:11, 144:15
**Gorsuch** [1] - 130:6
**gouging** [3] - 96:15, 96:19, 125:16
**governed** [2] - 26:11, 30:3
**government** [242] - 5:10, 6:24, 7:10, 7:12, 7:13, 8:1, 8:14, 8:22, 10:23, 11:3, 11:8, 11:21, 11:23, 12:2, 13:18, 14:8, 14:10, 14:21, 15:5, 15:10, 15:14, 16:23, 17:13, 18:20, 19:5, 20:14, 21:1, 21:6, 21:11, 21:15, 21:16, 21:17, 21:22, 22:4, 22:10, 22:20, 23:16, 24:11, 24:15, 24:17,

25:11, 26:15, 27:5, 27:6, 27:16, 27:17, 27:23, 28:6, 28:10, 28:20, 29:8, 30:18, 31:5, 31:13, 31:18, 32:10, 33:10, 33:24, 34:2, 34:4, 34:9, 34:22, 35:17, 36:19, 38:22, 42:13, 43:19, 45:2, 45:14, 45:15, 46:5, 46:17, 46:22, 47:17, 48:15, 48:19, 49:21, 50:21, 51:25, 52:9, 52:25, 53:5, 53:15, 53:17, 54:5, 55:19, 55:23, 55:25, 56:1, 56:7, 56:18, 57:8, 57:15, 57:21, 57:24, 61:6, 61:8, 61:12, 62:14, 64:11, 64:17, 64:19, 65:4, 65:14, 65:25, 66:1, 66:7, 66:13, 66:14, 66:20, 67:1, 67:5, 68:9, 68:10, 68:16, 68:19, 69:1, 69:4, 69:25, 70:20, 70:23, 71:2, 71:16, 72:12, 72:17, 72:22, 73:5, 73:10, 73:18, 73:20, 73:23, 74:2, 74:4, 74:11, 74:23, 75:9, 75:13, 75:18, 75:24, 76:3, 77:25, 78:12, 81:3, 85:16, 85:19, 85:21, 85:22, 86:5, 86:7, 86:8, 88:11, 89:18, 92:22, 96:2, 97:2, 98:4, 98:11, 99:10, 100:3, 101:20, 102:13, 103:4, 103:22, 104:11, 106:9, 107:10, 107:14, 109:12, 115:4, 115:10, 116:16, 117:5, 117:14, 117:25, 121:10, 122:20, 125:20, 127:9, 127:13, 127:14, 127:22, 128:1, 128:3, 128:21, 129:1, 129:6, 129:9, 129:11, 129:18, 129:21, 130:9, 131:18, 132:13, 133:2, 133:11, 134:8, 135:11, 135:24, 136:23, 136:24, 137:5,

144:17, 145:9, 146:17, 152:15, 153:17, 157:11, 157:14, 157:15, 157:19, 161:11, 161:15, 162:4, 162:24, 163:21, 163:25, 164:8, 164:17, 164:19, 165:11, 167:21, 168:3, 169:12, 170:11, 172:21, 172:23, 174:3, 175:20, 177:20, 180:22, 181:16, 181:17, 189:8, 199:23, 207:3, 208:9
**government's** [44] - 8:25, 13:10, 14:16, 18:6, 18:14, 20:3, 25:7, 28:2, 31:9, 32:4, 32:7, 33:3, 35:12, 35:24, 37:2, 40:12, 44:10, 45:12, 46:1, 52:8, 53:4, 54:13, 56:21, 68:13, 74:12, 75:17, 78:12, 87:6, 102:24, 115:18, 121:14, 127:20, 130:5, 132:15, 132:17, 132:21, 134:7, 154:10, 158:23, 161:9, 177:23, 178:4, 180:22, 184:12
**government-dictated** [4] - 18:20, 21:6, 24:15, 33:24
**governmental** [1] - 31:14
**governments** [2] - 75:22, 154:19
**governs** [1] - 162:18
**grab** [1] - 30:11
**gracious** [1] - 209:20
**grant** [2] - 78:7, 101:8
**granted** [2] - 78:8, 78:9
**granting** [1] - 72:23
**grants** [1] - 101:5
**grapes** [3] - 30:23, 30:24, 53:11
**grapples** [1] - 21:2
**grateful** [4] - 6:12, 176:22, 207:2, 207:21
**great** [9] - 29:22, 34:14, 94:8, 98:12, 103:18, 107:12,

132:12, 174:1, 179:1
**greed** [1] - 96:15
**GREENBAUM** [2] - 2:2, 4:6
**Greenbaum** [2] - 4:7, 4:15
**gross** [1] - 17:10
**Gross** [1] - 4:8
**GROSS** [1] - 2:1
**ground** [3] - 44:18, 102:14, 137:18
**grounds** [5] - 76:8, 93:3, 168:21, 176:18, 193:8
**group** [2] - 105:15, 181:21
**grow** [1] - 30:23
**guarantee** [1] - 24:6
**guaranteed** [1] - 23:22
**guess** [8] - 43:1, 46:25, 51:22, 52:20, 97:12, 120:15, 170:19, 189:13
**guessing** [1] - 186:5
**guidance** [24] - 54:2, 60:13, 60:23, 62:19, 81:4, 81:6, 81:8, 81:12, 81:15, 83:3, 83:10, 83:21, 112:1, 112:2, 112:3, 127:14, 153:5, 167:10, 167:15, 167:22, 193:7, 197:23, 203:13
**guide** [2] - 163:1, 164:12
**guided** [1] - 148:11
**guise** [1] - 66:18
**gum** [1] - 94:12
**gun** [2] - 16:20, 116:5
**Gundy** [2] - 173:14, 173:16
**gunpoint** [1] - 56:18
**guys** [10] - 16:23, 16:25, 27:25, 38:11, 61:18, 83:4, 88:16, 89:6, 156:10, 171:16

## H

**hac** [1] - 4:11
**Hair** [6] - 100:13, 106:16, 113:1, 113:8, 119:12
**half** [4] - 23:5, 28:4, 28:20, 161:15
**Halper** [1] - 3:14
**hammer** [1] - 147:17
**hammering** [1] - 96:12
**hand** [7] - 15:12, 18:1,

21:5, 25:19, 33:23, 34:7, 35:16
**handed** [2] - 15:12, 160:7
**handing** [1] - 85:25
**handle** [1] - 79:25
**handling** [2] - 42:18, 57:10
**handout** [1] - 160:8
**hands** [1] - 153:17
**happy** [12] - 55:5, 90:16, 92:19, 109:3, 111:8, 111:12, 148:24, 174:18, 175:2, 191:8, 193:24, 198:17
**hard** [3] - 70:8, 157:15, 178:20
**hard-pressed** [1] - 70:8
**harm** [13] - 101:23, 130:11, 131:1, 131:2, 131:7, 131:11, 131:25, 132:2, 143:6, 143:12, 144:2, 144:4, 146:9
**Hauda** [1] - 196:10
**haul** [2] - 13:6, 23:4
**hauling** [1] - 11:25, 12:23
**Haven** [1] - 192:25
**head** [4] - 16:20, 40:24, 116:6, 190:2
**head-on** [1] - 40:24
**heading** [1] - 44:7
**Health** [3] - 1:8, 51:14, 180:11
**health** [3] - 77:9, 149:24, 150:3
**hear** [27] - 13:21, 27:23, 28:1, 28:5, 28:9, 28:10, 28:11, 28:19, 28:20, 35:16, 54:23, 80:10, 82:18, 89:14, 89:21, 93:5, 103:17, 106:6, 120:24, 138:13, 146:22, 158:21, 158:23, 168:5, 170:11, 191:7
**heard** [11] - 81:3, 121:21, 121:22, 122:2, 136:6, 141:15, 152:15, 167:7, 180:17, 188:12, 203:23
**hearing** [1] - 162:22
**heart** [2] - 37:1, 39:4
**heightened** [1] - 99:11

**held** [12] - 3:1, 51:16, 71:13, 74:24, 141:1, 147:4, 147:6, 148:17, 148:25, 149:2, 149:4, 155:18
**help** [6] - 37:23, 43:2, 48:13, 49:12, 72:14, 125:4
**helpful** [6] - 27:24, 28:3, 28:14, 132:10, 178:21, 184:11
**helping** [1] - 38:15
**helps** [1] - 62:8
**HERLINSKY** [1] - 2:2
**Herlinsky** [1] - 4:9
**HHS** [1] - 134:1, 136:9, 136:18, 139:19, 140:21, 141:18, 142:8, 156:16
**hide** [1] - 13:16
**high** [32] - 26:2, 72:12, 77:13, 78:11, 79:8, 82:8, 127:12, 128:9, 131:4, 132:18, 145:5, 146:19, 148:14, 149:16, 150:11, 152:23, 153:12, 154:7, 155:4, 155:8, 179:19, 185:21, 185:25, 186:6, 187:6, 187:9, 198:15, 200:19, 200:20, 201:1, 203:5, 206:22
**high-spend** [3] - 187:6, 187:9, 198:15
**high-standard** [1] - 179:19
**high-tech** [1] - 206:22
**higher** [5] - 17:11, 65:3, 65:8, 78:15, 172:23
**highest** [1] - 39:1
**highlight** [6] - 59:14, 110:4, 162:3, 184:14, 192:2, 203:10
**highlighted** [1] - 119:3, 179:14, 185:19
**highlighting** [2] - 187:1, 187:2
**highlights** [1] - 203:11
**himself** [1] - 104:13
**hinted** [1] - 18:9
**hip** [1] - 182:11
**hire** [2] - 74:20, 199:6
**historically** [1] - 66:8

**history** [1] - 202:23
**hit** [2] - 98:16, 105:22
**hits** [1] - 42:13
**HIV** [2] - 37:1, 39:4
**hold** [7] - 6:6, 20:15, 97:8, 153:4, 169:8, 207:19
**holding** [1] - 98:20
**holdings** [1] - 75:11
**holds** [1] - 12:9
**Holmes** [1] - 82:1
**home** [3] - 44:4, 68:5, 147:17
**Homecare** [1] - 192:3
**homes** [1] - 68:3
**homework** [2] - 10:12, 54:18
**honest** [4] - 37:18, 54:18, 103:22, 104:5
**Honor** [258] - 4:6, 4:17, 4:25, 5:11, 5:22, 6:1, 6:9, 6:11, 6:18, 6:21, 9:16, 9:20, 10:10, 10:22, 11:16, 12:11, 12:20, 14:2, 14:4, 15:3, 16:3, 17:4, 19:20, 20:7, 21:4, 23:1, 25:2, 25:6, 25:25, 28:15, 29:12, 29:19, 33:7, 35:6, 35:8, 36:24, 38:16, 39:11, 41:6, 41:15, 42:7, 44:17, 44:25, 46:4, 48:19, 49:21, 54:3, 54:14, 55:10, 56:19, 61:22, 65:13, 67:17, 74:8, 77:10, 78:5, 78:10, 78:11, 81:17, 82:13, 82:15, 82:21, 85:10, 87:16, 88:9, 88:12, 89:17, 89:23, 92:20, 93:17, 93:24, 94:14, 99:2, 99:18, 99:25, 102:1, 104:1, 104:16, 105:1, 106:5, 106:7, 107:7, 107:18, 108:14, 108:15, 109:2, 110:3, 111:2, 111:7, 111:25, 112:24, 116:8, 121:18, 122:11, 123:24, 124:11, 125:19, 126:16, 127:6, 135:13, 136:12, 137:6, 143:15, 147:10, 152:12, 152:13, 153:19, 157:13, 157:25,

158:16, 159:2, 159:15, 159:18, 159:22, 160:10, 160:16, 160:22, 161:4, 161:8, 161:11, 161:13, 161:18, 161:22, 161:25, 162:3, 162:6, 162:8, 162:17, 162:19, 162:22, 163:3, 163:11, 163:17, 163:21, 163:24, 164:3, 164:6, 164:16, 164:25, 165:5, 165:10, 165:18, 165:22, 166:22, 167:7, 167:17, 168:2, 168:9, 168:19, 168:22, 168:25, 169:7, 169:11, 169:17, 169:19, 170:6, 170:8, 170:15, 170:17, 171:17, 173:20, 174:10, 175:6, 175:8, 175:12, 175:17, 175:22, 176:6, 176:9, 176:14, 176:22, 176:24, 177:1, 177:12, 177:16, 177:23, 178:2, 178:11, 178:14, 178:25, 179:1, 179:5, 179:10, 179:11, 179:14, 179:24, 180:4, 180:21, 181:2, 181:15, 182:1, 182:14, 182:23, 183:4, 183:6, 183:11, 183:22, 184:1, 184:3, 184:9, 184:12, 185:3, 185:5, 185:18, 186:4, 186:7, 186:10, 186:16, 186:19, 186:25, 187:7, 187:11, 187:23, 188:6, 188:11, 188:19, 188:25, 189:2, 189:6, 189:10, 189:23, 191:7, 193:22, 194:2, 194:17, 198:23, 199:9, 199:11, 199:15, 199:17, 200:6, 200:11,

200:13, 201:18, 202:3, 202:10, 202:19, 203:2, 203:9, 203:19, 203:25, 204:9, 204:10, 204:11, 205:3, 205:7, 205:9, 205:12, 205:22, 206:2, 206:6, 206:11, 206:24, 207:3, 207:13, 207:19, 208:7, 208:10
**Honor's** [3] - 13:1, 24:24, 175:24
**Honorable** [1] - 3:1
**HONORABLE** [1] - 1:13
**hope** [8] - 3:24, 46:12, 93:11, 171:6, 183:7, 199:3, 204:11, 207:14
**hopefully** [2] - 61:11, 190:13
**hoping** [2] - 10:20, 78:5
**hopping** [5] - 77:5, 201:24, 202:6, 202:17, 202:22
**Horne** [17] - 15:16, 17:24, 21:8, 23:14, 26:5, 26:12, 30:4, 30:16, 30:18, 32:1, 34:19, 42:14, 53:9, 53:12, 67:4, 85:13
**Horne's** [1] - 31:12
**hospice** [2] - 68:2, 68:5
**Hospital** [1] - 193:1
**host** [4] - 112:6, 120:24, 142:12, 151:19
**hot** [1] - 42:23
**hours** [4] - 28:3, 28:4, 28:20, 163:3
**House** [1] - 96:6
**house** [7] - 15:11, 164:18, 168:10, 168:11, 168:13, 175:14, 175:15
**housekeeping** [2] - 5:19, 5:24
**housing** [1] - 161:13
**huge** [5] - 16:11, 16:12, 17:15, 80:7, 158:7
**human** [1] - 47:19
**Human** [1] - 1:8
**hundred** [11] - 17:8, 17:10, 46:7, 79:12,

144:16, 144:20, 145:2, 145:3, 148:24, 151:8
**hundreds** [4] - 17:12, 38:23, 98:17, 124:7
**hurt** [1] - 38:14
**hypothetical** [14] - 12:22, 13:5, 13:14, 15:4, 19:11, 21:10, 23:1, 30:5, 34:16, 34:17, 34:18, 42:4, 79:11, 80:10

---

**I**

**idea** [24] - 13:2, 51:23, 53:14, 102:10, 105:8, 117:23, 119:8, 130:9, 152:25, 153:8, 163:19, 174:1, 175:14, 182:19, 183:22, 195:5, 199:22, 202:14, 202:16, 205:3, 205:11, 205:25, 207:10, 207:16
**ideas** [2] - 102:7, 104:6
**ideations** [1] - 201:14
**identical** [1] - 95:16
**identified** [5] - 92:13, 104:13, 149:2, 162:6, 172:17
**identifies** [2] - 60:5, 162:4
**identify** [4] - 6:16, 70:8, 118:18, 173:6
**identifying** [1] - 174:13
**IDs** [1] - 19:14
**if-then** [1] - 60:9
**ignore** [1] - 143:15
**ignoring** [1] - 183:3
**II** [3] - 144:10, 144:13, 144:14
**III** [2] - 90:23, 91:11
**illegal** [1] - 54:10
**illusory** [2] - 51:10
**imagine** [3] - 60:16, 66:10, 68:4
**imagined** [1] - 19:11
**immediately** [2] - 44:15, 82:25
**immune** [1] - 153:11
**immunized** [1] - 41:3
**impact** [2] - 47:19, 105:6
**impacted** [1] - 176:19
**impacts** [1] - 37:14

**impaired** [1] - 93:10
**impairs** [1] - 123:13
**impeded** [2] - 122:22, 123:21
**impinged** [1] - 116:16
**implement** [2] - 63:17, 136:5
**implementation** [2] - 60:17, 62:20
**implementing** [1] - 162:15
**implicate** [2] - 100:16, 106:20
**implicated** [1] - 160:21
**implication** [1] - 72:14
**implicit** [3] - 97:19, 98:14, 120:11
**import** [1] - 196:18
**importance** [1] - 3:25
**important** [21] - 6:12, 9:17, 13:16, 14:3, 15:22, 25:16, 34:11, 49:12, 60:25, 76:22, 88:1, 93:23, 137:4, 144:8, 150:12, 170:9, 176:9, 176:20, 189:18, 207:14, 209:21
**importantly** [2] - 96:14, 100:25
**impose** [7] - 14:22, 50:25, 53:19, 54:8, 65:19, 79:17, 140:15
**imposed** [5] - 120:19, 162:18, 164:5, 203:21, 207:20
**imposes** [4] - 9:4, 15:8, 58:16, 58:18
**imposing** [4] - 85:25, 86:1, 115:20, 120:6
**impossible** [1] - 132:20
**improper** [1] - 193:10
**improperly** [1] - 193:10
**improve** [2] - 47:25, 82:4
**imputed** [1] - 34:19
**inability** [1] - 86:14
**inaccurate** [1] - 130:19
**inapplicable** [1] - 140:17
**inapposite** [1] - 77:24
**Inc** [2] - 1:21, 2:12
**INC** [1] - 1:4
**incentive** [1] - 149:25
**incidental** [8] - 99:14, 99:24, 100:1, 100:8,

114:6, 120:6, 124:16, 124:20
**include** [4] - 65:22, 123:5, 195:21, 195:22
**included** [1] - 65:19
**includes** [1] - 9:9
**including** [5] - 3:18, 101:15, 106:20, 129:13, 195:1
**income** [1] - 145:5
**incompatible** [1] - 43:23
**incredibly** [1] - 45:9
**incremental** [1] - 32:16
**incur** [3] - 16:10, 36:10, 94:24
**indeed** [2] - 36:5, 41:2
**independent** [2] - 165:20, 201:9
**indict** [1] - 96:19
**indirectly** [1] - 51:3
**indispensable** [3] - 192:15, 193:16, 193:19
**individual** [17] - 21:13, 58:19, 60:3, 60:7, 64:1, 70:17, 74:21, 77:16, 77:19, 149:23, 155:3, 163:18, 167:18, 181:2, 181:18, 181:22, 202:5
**individuals** [3] - 16:6, 68:21, 94:22
**induce** [2] - 15:15, 149:24
**indulge** [1] - 160:14
**indulgence** [2] - 159:24, 175:24
**industries** [1] - 68:2
**industry** [1] - 76:25
**inexperience** [1] - 202:4
**inexplicably** [1] - 186:15
**inextricably** [2] - 193:16, 193:20
**infer** [1] - 59:12
**Inflation** [2] - 6:19, 59:18
**information** [5] - 49:4, 49:13, 61:9, 86:1, 168:17
**informative** [2] - 209:7, 209:11
**infringes** [1] - 116:21
**Infusion** [1] - 9:25
**ingredient** [3] -

183:23, 198:6, 205:19
**ingredients** [4] - 180:25, 181:19, 181:23, 186:22
**initial** [3] - 83:5, 112:1, 112:2
**initiate** [1] - 62:12
**initiated** [2] - 62:11, 83:23
**inject** [1] - 182:10
**injection** [2] - 188:2, 206:13
**Injunction** [14] - 132:16, 132:23, 137:25, 138:2, 138:5, 138:15, 139:9, 141:6, 141:8, 141:20, 145:16, 147:21, 151:22, 152:4
**injunction** [3] - 141:17, 147:16, 147:17
**injury** [8] - 130:12, 131:4, 131:9, 131:25, 134:18, 134:19, 136:16
**innocent** [8] - 128:1, 129:6, 149:7, 154:17, 154:18, 155:22, 155:24, 156:5
**innovate** [1] - 39:2, 77:8
**innovation** [6] - 39:7, 39:9, 77:6, 81:19, 184:5, 188:21
**innovations** [2] - 182:12, 206:21
**innovative** [1] - 47:25
**inquire** [1] - 109:20
**insert** [1] - 123:7
**insight** [1] - 106:12
**insists** [1] - 45:2
**insofar** [1] - 31:12
**instance** [2] - 150:18, 166:5
**instead** [14] - 11:9, 15:25, 21:10, 31:16, 57:23, 69:17, 95:5, 95:11, 98:9, 121:20, 127:13, 137:24, 155:9, 168:10
**institution** [1] - 114:21
**institutional** [1] - 52:23
**Institutional** [2] - 106:18, 113:2
**institutions** [1] -

113:19
**instructive** [3] - 109:9, 112:24, 119:13
**insulating** [1] - 167:2, 167:4
**insulin** [2] - 183:19, 183:23
**insurance** [3] - 149:24, 150:3, 155:5
**insurer** [2] - 21:16, 78:19
**integral** [3] - 140:17, 193:16, 193:19
**intelligent** [1] - 83:25
**intelligible** [6] - 166:7, 168:17, 169:2, 174:7, 177:3, 177:4
**intend** [2] - 6:15, 100:2
**intended** [5] - 57:6, 111:1, 179:8, 189:14, 198:12
**intending** [1] - 201:17
**intends** [1] - 152:24
**intent** [7] - 56:5, 56:14, 138:11, 142:12, 142:20, 186:8, 201:12
**intention** [3] - 111:17, 111:22, 134:9
**interacting** [1] - 68:21
**interchangeable** [2] - 183:14, 183:17
**interconnection** [1] - 130:2
**interest** [19] - 7:8, 39:24, 52:8, 89:23, 90:16, 91:2, 91:4, 93:9, 98:4, 98:5, 160:11, 160:23, 161:1, 161:2, 171:22, 172:18, 173:7, 174:13, 175:17
**interesting** [7] - 114:17, 115:7, 118:4, 139:18, 155:15, 184:21, 200:15
**interestingly** [1] - 167:7
**interests** [1] - 160:20
**interfere** [1] - 52:17
**interim** [1] - 144:1
**International** [4] - 113:3, 114:25, 115:1, 117:11
**interns** [1] - 209:17
**interpret** [1] - 63:17
**interpretation** [14] -

21:2, 46:23, 63:8, 63:12, 63:13, 91:13, 118:22, 146:2, 191:13, 194:9, 194:15, 197:24, 198:13, 200:8
**interpretations** [2] - 145:22, 196:8
**interpreted** [1] - 186:13
**interrupt** [4] - 27:20, 28:18, 108:17
**intertwined** [6] - 186:16, 190:7, 193:17, 193:20, 199:8, 199:12
**intervene** [1] - 74:13
**intervention** [1] - 31:14
**introduce** [3] - 4:10, 70:13, 77:18
**intuitively** [1] - 109:15
**involuntariness** [1] - 43:8
**involuntary** [2] - 35:3, 35:4
**involve** [12] - 42:11, 42:14, 51:6, 53:6, 61:1, 66:24, 68:1, 147:7, 147:8, 147:22, 149:5
**involved** [7] - 56:4, 71:6, 90:7, 115:8, 120:10, 140:9, 140:21
**involving** [1] - 21:25
**Ipsen** [1] - 196:25
**IRA** [18] - 15:8, 20:10, 37:21, 40:2, 49:2, 58:9, 58:22, 59:1, 65:8, 77:3, 95:3, 106:8, 116:24, 194:5, 194:9, 197:20, 201:10, 201:17
**irrelevant** [2] - 26:7, 26:9
**irreparable** [16] - 130:11, 130:12, 131:1, 131:2, 131:7, 131:11, 131:25, 132:2, 134:18, 134:19, 143:6, 143:12, 144:2, 144:4, 146:9
**IRS** [21] - 127:14, 136:1, 139:23, 140:4, 140:15, 141:3, 143:24, 143:25, 145:18,

145:20, 146:2, 147:11, 147:14, 147:18, 147:22, 150:3, 150:8, 150:24, 153:4, 167:10
**ISRAEL** [1] - 2:9
**Israel** [1] - 5:4
**issue** [40] - 7:5, 8:9, 13:15, 13:16, 13:22, 13:23, 14:3, 14:15, 24:11, 28:1, 28:11, 53:20, 67:9, 70:14, 73:12, 89:4, 89:5, 89:15, 89:22, 90:6, 92:16, 99:16, 101:25, 103:15, 104:19, 114:17, 115:15, 122:7, 122:9, 122:24, 123:16, 124:14, 132:14, 138:4, 139:23, 156:12, 170:12, 192:5
**issued** [2] - 60:23, 62:19
**issues** [24] - 6:12, 6:23, 7:22, 8:14, 9:2, 9:17, 20:9, 35:16, 35:20, 67:9, 67:25, 77:25, 81:18, 118:17, 138:12, 163:18, 174:19, 175:2, 176:23, 193:7, 199:8, 208:3, 209:11, 209:12
**item** [1] - 44:25
**itinerary** [1] - 88:25
**itself** [19] - 26:1, 97:19, 102:7, 110:10, 115:21, 117:18, 123:13, 126:18, 128:1, 128:5, 128:9, 129:1, 138:12, 142:7, 161:12, 163:2, 163:11, 193:14, 204:3

---

**J**

---

**jail** [1] - 15:11
**JANSSEN** [1] - 1:3
**Janssen** [9] - 1:21, 3:9, 4:19, 7:23, 8:13, 13:12, 35:10, 36:13, 36:15
**Janssen's** [1] - 36:16
**January** [8] - 44:19, 62:4, 84:2, 84:8,

84:11, 84:19, 84:21
**JEFFREY** [2] - 1:15, 2:2
**Jeffrey** [2] - 4:7, 4:18
**Jehovah's** [1] - 114:12
**JERSEY** [1] - 1:1
**Jersey** [1] - 1:11
**jet** [4] - 74:17, 79:11, 79:13, 79:16
**jets** [3] - 66:14, 73:24, 74:5
**job** [2] - 34:14, 171:20
**JOHN** [1] - 2:10
**John** [1] - 5:5
**Johnny** [1] - 16:19
**join** [2] - 156:7, 157:1
**joined** [4] - 4:20, 5:1, 5:13, 136:9
**JONES** [1] - 2:5
**Jones** [1] - 4:11
**judge** [3] - 41:11, 59:3, 156:3
**Judge** [5] - 3:2, 10:15, 58:25, 65:13, 209:19
**JUDGE** [1] - 1:13
**judgment** [12] - 24:7, 81:23, 97:20, 98:1, 120:11, 124:23, 134:1, 141:17, 142:3, 156:17, 156:22, 166:5
**Judgment** [2] - 141:14, 141:23
**Judgments** [1] - 150:17
**judgments** [4] - 141:24, 162:13, 180:16
**judicial** [43] - 76:24, 104:23, 138:1, 164:4, 164:10, 164:22, 166:11, 166:21, 168:1, 169:4, 169:9, 169:12, 169:14, 169:21, 170:5, 171:11, 174:5, 174:9, 174:17, 174:24, 175:15, 177:25, 184:13, 184:18, 185:7, 185:10, 186:3, 186:12, 190:9, 190:12, 191:17, 192:11, 192:20, 192:24, 193:3, 199:24, 200:7, 201:4, 203:2, 203:18, 207:11, 209:17

**judicially** [1] - 142:22
**juice** [1] - 53:10
**jump** [4] - 137:24, 144:19, 179:25, 188:15
**juncture** [1] - 71:22
**jurisdiction** [12] - 87:25, 89:3, 89:7, 89:20, 90:3, 90:15, 91:3, 93:5, 93:18, 104:21, 132:9, 198:24
**jurisdictional** [13] - 89:25, 90:2, 90:4, 90:19, 91:8, 92:23, 130:15, 132:1, 132:14, 193:21, 199:8, 199:13, 199:14
**Justice** [6] - 5:12, 31:8, 55:11, 82:1, 130:6, 133:19
**JUSTICE** [3] - 2:17, 2:20, 2:23

### K

**Keene** [2] - 109:6, 119:7
**keep** [11] - 10:20, 34:2, 66:7, 84:2, 136:10, 139:19, 139:25, 166:4, 169:25, 189:10, 201:14
**keeping** [1] - 44:4
**keeps** [1] - 144:8
**kept** [1] - 119:5
**KEVIN** [1] - 1:18
**Kevin** [3] - 4:21, 8:12, 35:10
**key** [9] - 61:25, 153:25, 164:5, 180:16, 180:21, 181:3, 182:15, 183:12, 187:11
**keys** [2] - 15:12
**kicked** [1] - 157:9
**kicks** [1] - 97:17
**kind** [14] - 52:18, 52:19, 54:9, 131:9, 131:24, 153:8, 157:5, 157:8, 170:21, 171:4, 171:6, 194:11, 197:23, 201:7
**kinds** [3] - 29:6, 39:3, 173:16
**king** [6] - 25:13, 33:1, 33:15, 41:14, 43:16,

48:5
**KING** [29] - 1:18, 2:8, 35:8, 35:10, 35:19, 38:16, 39:25, 41:15, 41:23, 42:7, 42:19, 42:21, 43:1, 43:23, 44:2, 45:14, 46:3, 48:18, 49:15, 49:21, 50:12, 82:15, 82:20, 83:9, 84:4, 84:15, 84:24, 87:16, 87:18, 208:19
**King** [6] - 4:21, 5:4, 8:12, 35:10, 37:18, 208:19
**king's** [1] - 75:6
**Kirsch's** [1] - 209:19
**knowing** [1] - 64:24
**knowledge** [2] - 20:13, 20:16
**known** [5] - 72:19, 163:17, 170:1, 176:7, 208:23
**knows** [3] - 133:2, 135:11, 203:12
**Koontz** [2] - 72:24, 73:3
**Koslow** [1] - 52:22
**Kurth** [9] - 144:24, 145:1, 147:6, 148:14, 148:15, 149:6, 149:13, 149:15, 155:16

### L

**label** [2] - 132:17, 138:12
**labeled** [2] - 41:4, 138:14
**Laboratories** [1] - 199:25
**lack** [7] - 52:23, 108:4, 171:11, 174:5, 174:9, 174:14, 174:17
**lacks** [1] - 147:2
**laid** [2] - 173:13, 174:16
**land** [11] - 72:19, 72:23, 73:4, 73:6, 73:8, 73:14, 73:17, 74:6, 86:19, 86:22, 86:25
**Laney** [2] - 182:25, 183:13
**language** [16] - 103:2, 103:6, 107:3, 107:6, 107:13, 108:22, 109:25, 110:2, 110:8, 118:10,

123:17, 123:22, 125:6, 146:12, 200:3, 207:19
**large** [5] - 18:2, 22:20, 43:15, 47:22, 55:14
**larger** [1] - 207:8
**last** [16] - 15:21, 35:15, 43:10, 44:21, 69:8, 82:15, 84:9, 96:20, 98:19, 136:20, 140:16, 141:15, 151:6, 159:20, 186:19, 204:23
**late** [2] - 87:21, 196:23
**later-stage** [1] - 24:11
**LATHAM** [1] - 2:13
**Latham** [1] - 5:1
**law** [34] - 6:20, 7:4, 12:8, 22:1, 36:2, 54:8, 59:1, 59:4, 76:3, 83:25, 90:8, 91:6, 99:3, 110:11, 112:5, 114:2, 114:9, 114:14, 114:16, 114:18, 114:19, 114:20, 118:23, 118:24, 118:25, 150:2, 162:14, 165:25, 166:13, 166:24, 186:12, 204:9, 209:12, 209:17
**laws** [2] - 54:4, 54:10
**lawsuit** [2] - 135:4, 135:11
**lawyer** [2] - 35:15, 183:5
**lawyering** [1] - 208:15
**lawyers** [3] - 4:10, 6:16, 209:23
**lay** [2] - 121:1, 198:13
**layered** [1] - 163:13
**layers** [1] - 166:2
**lead** [3] - 141:5, 157:8
**leader** [1] - 16:20
**leads** [3] - 127:10, 171:12, 184:6
**least** [25] - 24:1, 42:5, 54:23, 62:10, 87:23, 88:5, 89:8, 89:15, 93:20, 93:21, 93:23, 104:4, 106:2, 114:22, 118:16, 127:21, 134:20, 149:1, 164:20, 188:14, 189:15, 191:16, 207:15, 207:19, 208:24
**leave** [7] - 23:5, 27:13,

30:9, 31:6, 33:4, 34:22, 123:4
**leaves** [2] - 12:14, 139:5
**leaving** [1] - 40:14
**leeway** [1] - 109:23
**left** [5] - 14:1, 35:21, 70:14, 151:15, 163:9
**leg** [1] - 37:5
**legal** [20] - 43:9, 44:14, 44:22, 61:3, 66:24, 69:10, 69:19, 70:8, 70:19, 82:22, 85:4, 85:6, 85:7, 86:12, 139:7, 139:14, 140:25, 150:2, 153:11
**Legal** [1] - 2:3
**legality** [2] - 139:8, 141:3
**legally** [3] - 17:6, 18:3, 157:21
**legislation** [2] - 34:3, 109:19
**legislative** [5] - 96:3, 162:13, 164:11, 166:5, 202:23
**legislature** [1] - 150:19
**legitimate** [1] - 98:4
**legs** [1] - 159:9
**length** [3] - 68:22, 172:7, 175:3
**lengths** [2] - 7:10, 81:6
**less** [13] - 10:12, 22:21, 23:17, 48:16, 60:1, 110:20, 121:13, 145:8, 150:23, 188:10, 188:18, 197:17
**lesser** [1] - 151:1
**letter** [2] - 171:16, 185:4
**letters** [2] - 185:4, 200:16
**letting** [1] - 124:15
**level** [6] - 72:12, 77:13, 78:11, 128:9, 154:7, 155:4
**levels** [1] - 96:3
**leverage** [2] - 18:21, 56:20
**levied** [3] - 156:13, 156:14, 156:15
**liable** [1] - 60:4
**Library** [2] - 15:24, 32:6
**license** [3] - 180:25, 181:12, 181:13

**licensed** [6] - 180:10, 180:13, 196:13, 200:24, 202:6, 205:21
**licenses** [1] - 180:23
**licensing** [2] - 204:21, 204:25
**light** [3] - 10:8, 146:18, 152:3
**likelihood** [1] - 146:11
**likely** [1] - 192:18
**likewise** [1] - 67:7
**limit** [3] - 82:8, 126:10, 158:24
**limitations** [3] - 75:16, 75:18, 75:20
**limited** [4] - 50:21, 50:23, 86:19, 178:9
**limiting** [1] - 118:18
**limits** [6] - 51:25, 52:3, 52:5, 115:18, 117:15, 119:23
**line** [16] - 21:4, 37:13, 90:17, 91:5, 96:25, 107:21, 108:17, 117:12, 117:14, 120:7, 130:5, 138:20, 161:18, 182:9, 182:15, 200:5
**link** [1] - 13:19
**lip** [1] - 116:2
**list** [4] - 173:15, 177:13, 177:14, 199:21
**listed** [2] - 180:13, 205:16
**listen** [1] - 94:9
**listening** [3] - 82:19, 94:7, 196:22
**literally** [1] - 190:24
**litigation** [5] - 46:23, 56:4, 90:6, 90:7, 104:22
**lives** [4] - 40:16, 47:17, 47:25, 49:12
**LLP** [3] - 1:18, 2:8, 2:13
**lobby** [1] - 77:1
**local** [2] - 105:15, 105:16
**logic** [2] - 118:5, 152:16
**LONG** [1] - 1:19
**long-settled** [1] - 7:3
**look** [68] - 5:16, 11:24, 13:2, 13:22, 24:3, 29:5, 32:4, 36:12, 37:9, 38:21, 46:16, 46:19, 52:6, 67:15, 78:13, 79:11, 79:25,

81:9, 86:9, 86:21, 86:24, 95:21, 96:11, 99:3, 99:4, 103:21, 107:11, 109:13, 111:5, 118:5, 119:10, 119:17, 125:15, 125:17, 126:21, 133:13, 133:21, 144:25, 147:6, 147:8, 163:3, 165:25, 166:18, 166:23, 179:11, 179:21, 179:22, 180:22, 182:24, 185:16, 185:19, 186:16, 187:7, 187:17, 194:6, 196:9, 199:25, 200:7, 200:13, 200:16, 200:17, 201:6, 205:14, 205:24, 206:6
**Look** [3] - 18:22, 30:19, 78:21
**looked** [5] - 101:15, 109:16, 142:14, 169:14, 202:23
**looking** [9] - 38:12, 67:14, 74:25, 119:21, 145:10, 146:18, 164:7, 165:23, 197:10
**looks** [14] - 30:4, 33:21, 113:10, 113:25, 115:2, 115:3, 115:14, 119:24, 144:23, 155:20, 168:13, 169:3, 181:2, 208:3
**looming** [2] - 133:10, 134:3
**loop** [1] - 141:14
**loose** [1] - 167:23
**Loretto** [1] - 85:14
**Los** [1] - 129:24
**lose** [5] - 18:25, 40:11, 47:16, 127:4, 135:5
**Louisiana** [1] - 2:6
**love** [4] - 66:12, 91:16, 189:1, 189:10
**low** [6] - 79:8, 185:25, 186:6, 200:20, 201:1, 203:5
**lower** [5] - 22:18, 31:17, 65:7, 127:14, 156:2
**Luca** [1] - 16:19
**ludicrous** [1] - 184:1
**ludicrously** [1] - 127:12

**lump** [1] - 182:3
**lumping** [1] - 185:8
**lunch** [2] - 55:4, 87:20
**luncheon** [1] - 88:21

**M**

**machine** [1] - 82:17
**Mahon** [1] - 82:1
**main** [7] - 47:13, 77:11, 85:21, 99:23, 162:7, 177:24
**maintainable** [1] - 133:25
**maintained** [1] - 132:25
**manage** [1] - 20:18
**management** [1] - 65:21
**mandate** [6] - 13:18, 71:11, 95:2, 98:7, 121:20, 149:23
**mandates** [7] - 9:14, 44:11, 69:24, 95:6, 95:19, 100:9, 201:5
**mandating** [3] - 95:5, 96:16, 109:24
**mandatory** [2] - 36:7, 87:13
**manipulate** [1] - 104:6
**manipulates** [1] - 102:7
**manner** [2] - 56:4, 60:15, 68:21
**manufacture** [4] - 60:14, 66:2, 74:10, 74:11
**manufacturer** [40] - 15:8, 16:4, 18:19, 18:21, 20:2, 21:5, 24:2, 24:14, 26:19, 44:8, 44:9, 44:10, 44:12, 44:13, 44:21, 46:20, 56:2, 59:22, 62:1, 62:16, 62:22, 64:3, 70:12, 72:8, 77:18, 82:23, 83:15, 84:9, 90:20, 92:6, 111:15, 121:21, 126:22, 144:21, 150:4, 156:14, 181:22, 195:10, 196:12, 198:4
**manufacturer's** [2] - 55:25, 60:19
**manufacturer-specific** [1] - 195:10
**manufacturers** [73] - 7:15, 7:25, 8:25, 9:4, 11:10, 15:5, 18:1,

19:1, 22:25, 23:12, 24:21, 25:8, 47:4, 55:18, 55:22, 55:23, 56:5, 56:9, 56:23, 57:1, 57:8, 58:5, 59:10, 60:14, 61:4, 61:10, 61:13, 61:14, 63:22, 63:25, 65:20, 78:14, 79:20, 81:7, 83:23, 84:6, 85:3, 90:10, 94:19, 94:22, 95:6, 95:23, 96:8, 96:11, 96:16, 96:18, 96:24, 98:14, 100:21, 104:2, 108:6, 110:12, 110:16, 110:19, 112:1, 112:5, 112:8, 115:25, 116:5, 116:23, 117:25, 118:10, 119:18, 120:24, 120:25, 121:4, 124:22, 133:15, 154:4, 166:20, 172:1, 172:3, 204:4
**Manufacturers** [1] - 125:15
**manufacturing** [1] - 74:4
**March** [3] - 1:11, 3:2, 211:11
**margin** [1] - 48:14
**marginal** [1] - 144:15
**marijuana** [1] - 145:1
**market** [61] - 11:9, 11:13, 11:15, 11:16, 11:17, 11:19, 11:20, 23:8, 23:22, 24:1, 25:23, 26:25, 27:13, 30:20, 30:21, 30:22, 30:24, 31:2, 31:7, 31:13, 31:23, 32:8, 34:10, 39:13, 39:18, 48:4, 48:24, 50:7, 52:17, 53:6, 53:15, 53:16, 53:18, 53:20, 53:24, 54:3, 54:6, 54:9, 64:6, 64:13, 65:15, 65:23, 66:3, 67:3, 67:5, 67:6, 82:11, 85:17, 106:10, 161:16, 166:21, 180:15, 182:16, 183:25, 188:9, 188:20, 202:9, 205:16
**marketplace** [2] - 102:7, 104:6
**markets** [2] - 31:20,

161:14
**mask** [1] - 34:13
**massive** [4] - 27:3, 52:14, 145:18
**material** [2] - 17:6, 123:5
**materialize** [1] - 146:5
**materials** [3] - 109:11, 177:19, 204:5
**math** [7] - 16:13, 16:14, 17:2, 45:21, 144:7, 144:12, 145:12
**matter** [37] - 10:9, 15:1, 17:16, 21:14, 21:21, 25:22, 36:2, 40:7, 40:19, 47:8, 53:6, 58:14, 59:4, 59:6, 70:1, 76:24, 83:12, 85:2, 87:24, 89:3, 90:13, 90:15, 92:12, 92:14, 92:23, 100:25, 104:21, 120:16, 122:4, 123:8, 152:18, 169:13, 202:20, 209:24, 211:5
**matters** [9] - 3:8, 3:25, 23:6, 84:25, 104:24, 138:13, 208:25
**maximize** [1] - 55:20
**Maximum** [1] - 59:21
**maximum** [36] - 16:6, 18:11, 19:6, 23:8, 23:25, 60:1, 60:2, 60:10, 62:6, 62:13, 63:23, 64:9, 77:20, 80:16, 84:17, 94:23, 95:5, 95:7, 95:25, 96:17, 96:25, 97:20, 97:22, 98:15, 100:24, 107:24, 110:24, 111:20, 125:5, 126:22, 126:23, 127:10, 127:23, 150:6, 195:24, 198:10
**McKay** [2] - 1:23, 211:11
**McKay-Soule** [1] - 1:23, 211:11
**mealtimes** [2] - 183:19, 183:20
**mean** [51] - 16:24, 17:17, 18:7, 20:10, 23:13, 27:19, 29:2, 34:22, 37:13, 37:14, 38:9, 39:17, 39:23, 46:1, 48:8, 48:10, 60:6, 64:22, 65:1,

74:5, 74:8, 97:7, 98:23, 99:15, 101:14, 101:19, 105:6, 108:16, 121:25, 123:16, 123:23, 124:5, 125:2, 125:18, 128:13, 131:8, 136:1, 137:11, 144:11, 153:2, 157:20, 165:6, 165:8, 168:9, 176:2, 181:6, 183:4, 197:9, 203:12, 206:17

**meaning** [3] - 62:18, 111:22, 111:24

**meaningful** [1] - 182:7

**means** [26] - 18:12, 18:15, 19:3, 44:14, 71:9, 90:11, 97:21, 100:1, 125:5, 125:23, 132:15, 132:16, 135:3, 135:13, 145:10, 149:22, 154:4, 154:6, 190:22, 194:6, 197:13, 197:14, 204:13, 205:6, 206:16

**meant** [1] - 128:24

**measure** [1] - 155:11

**mechanical** [1] - 1:25

**mechanism** [4] - 45:10, 58:1, 138:6, 149:25

**mechanisms** [1] - 39:16

**Medicaid** [25] - 13:7, 19:22, 24:22, 25:10, 27:10, 30:9, 31:20, 34:22, 36:23, 37:7, 39:14, 40:14, 45:4, 47:13, 50:7, 50:25, 52:15, 55:14, 68:6, 75:14, 80:2, 87:5, 174:23, 197:3

**medical** [3] - 36:25, 183:16, 192:5

**Medicare** [84] - 11:4, 11:8, 12:9, 12:18, 12:19, 13:3, 13:7, 13:15, 13:20, 15:1, 18:8, 18:23, 18:24, 19:3, 19:22, 20:3, 20:9, 21:12, 21:19, 22:17, 23:24, 24:21, 25:9, 27:10, 30:9, 31:19, 34:22, 36:22, 37:7, 39:14, 40:14, 45:4, 46:18, 46:21,

47:13, 47:16, 50:7, 55:14, 56:3, 56:6, 57:18, 59:2, 59:6, 61:5, 62:2, 62:5, 62:8, 62:16, 63:22, 67:22, 68:4, 68:6, 68:8, 70:16, 70:17, 72:4, 73:25, 77:14, 77:15, 78:13, 80:2, 81:11, 82:9, 85:20, 87:4, 89:10, 94:19, 97:24, 102:12, 104:25, 105:4, 105:7, 143:20, 143:21, 145:15, 150:5, 169:19, 174:19, 192:7, 194:12, 196:19

**Medicare/Medicaid** [1] - 26:23

**medication** [2] - 61:24, 74:2

**medications** [5] - 11:7, 15:6, 18:25, 58:19, 70:13

**medicine** [1] - 183:9

**medicines** [1] - 18:1

**Meese** [2] - 109:6, 119:7

**meet** [3] - 179:17, 179:18, 203:5

**meeting** [4] - 71:7, 74:22, 75:2, 118:3

**Megan** [3] - 1:23, 151:14, 211:11

**Megan's** [1] - 151:17

**Megan_McKay** [1] - 1:23

**Megan_McKay-Soule@njd.uscourts.gov** [1] - 1:23

**melded** [1] - 199:13

**members** [3] - 3:17, 3:22, 209:6

**mention** [5] - 76:22, 115:8, 155:1, 155:16, 175:13

**mentioned** [8] - 47:20, 106:17, 112:25, 114:24, 115:1, 133:12, 140:24, 208:21

**mentioning** [5] - 208:13, 208:17, 208:18, 208:22, 209:9

**mercy** [1] - 204:9

**mere** [2] - 82:20, 110:15

**merely** [3] - 41:3, 99:13, 148:14

**merge** [1] - 188:8

**merits** [24] - 41:7, 91:2, 132:4, 134:18, 137:24, 146:8, 146:9, 147:1, 147:24, 148:1, 153:16, 167:19, 176:16, 190:4, 190:6, 191:5, 191:13, 193:25, 199:1, 199:8, 199:12, 199:14, 199:17, 204:10

**Meron** [1] - 5:2

**MERON** [1] - 2:14

**message** [8] - 8:25, 102:24, 103:2, 103:5, 115:12, 120:11, 120:13, 123:9, 123:10, 125:2, 157:5

**messaging** [1] - 96:15

**messing** [1] - 184:16

**met** [1] - 174:15

**methodologies** [1] - 191:1

**methodology** [1] - 192:22

**methods** [1] - 71:20

**MFP** [4] - 26:20, 84:18, 84:20, 156:1

**MICHAEL** [1] - 2:24

**Michael** [1] - 5:14

**might** [10] - 23:19, 32:23, 33:12, 122:13, 131:21, 141:7, 178:11, 181:9, 186:3, 202:16

**military** [4] - 113:20, 114:10, 114:16, 114:20

**milligram** [4] - 187:15, 187:17, 187:18

**million** [7] - 53:22, 55:13, 79:12, 79:17, 81:1, 135:6, 161:16

**millions** [10] - 11:5, 17:13, 40:14, 47:15, 74:1, 98:17, 124:7

**mind** [3] - 66:11, 89:16, 120:15

**mindful** [1] - 88:5

**minds** [4] - 71:7, 74:22, 75:2, 118:3

**minimum** [4] - 43:12, 44:13, 153:2, 164:20

**minute** [5] - 14:21, 55:6, 132:4, 159:1,

194:10

**minutes** [12] - 8:15, 8:16, 10:21, 25:4, 88:13, 88:14, 88:16, 159:5, 159:6, 159:7, 196:17

**miscalculations** [1] - 152:7

**miss** [1] - 26:17

**mission** [5] - 40:17, 47:24, 48:6, 48:12, 116:9

**Mississippi** [1] - 76:11

**misspoke** [1] - 186:25

**mistake** [1] - 157:2

**mixed** [1] - 91:6

**model** [2] - 59:6, 120:17

**modification** [1] - 201:11

**modifications** [1] - 201:8

**moieties** [1] - 181:19

**moiety** [1] - 198:6

**molecular** [1] - 181:1

**molecules** [1] - 48:2

**moment** [2] - 151:21, 171:23

**monetary** [4] - 53:22, 59:17, 60:4, 80:16

**monetize** [1] - 64:13

**money** [27] - 21:19, 22:21, 37:25, 49:1, 49:6, 49:9, 49:17, 49:19, 55:15, 56:24, 68:11, 69:2, 69:3, 70:15, 76:25, 85:19, 125:21, 125:24, 125:25, 126:2, 126:3, 126:9, 126:10, 128:11, 128:22, 162:20

**monies** [1] - 68:6

**monitoring** [1] - 195:20

**monopoly** [3] - 11:14, 11:15, 11:16

**Monsanto** [1] - 86:24

**monstrously** [1] - 43:15

**month** [3] - 62:1, 63:21, 82:23

**months** [5] - 43:12, 43:20, 44:14, 44:19, 61:17

**moot** [1] - 94:6

**morning** [38] - 3:15, 3:16, 4:6, 4:17, 5:3, 5:7, 5:11, 5:15, 6:9, 6:14, 7:17, 7:22,

8:17, 10:18, 25:5, 25:6, 35:8, 35:9, 54:23, 55:10, 57:10, 57:13, 77:12, 88:19, 93:12, 102:11, 102:15, 104:4, 106:7, 116:12, 121:12, 137:17, 162:19, 167:7, 167:19, 172:7, 177:1, 188:12

**mortals** [1] - 82:20

**most** [16] - 10:24, 72:3, 89:18, 94:20, 97:25, 123:25, 124:20, 135:21, 146:18, 163:17, 173:14, 177:7, 201:21, 203:11, 203:14

**mostly** [1] - 42:20

**Mother** [2] - 48:9, 48:20

**motions** [1] - 208:24

**motivates** [1] - 75:18

**motives** [1] - 109:20

**motto** [1] - 114:12

**mouth** [2] - 101:18, 112:21

**move** [11] - 72:10, 92:19, 160:4, 160:11, 168:3, 175:9, 184:9, 188:22, 190:6, 196:16, 202:12

**moving** [2] - 18:5, 188:24

**MR** [211] - 4:6, 4:17, 4:25, 5:4, 5:11, 5:22, 6:1, 6:3, 6:9, 9:20, 10:10, 10:13, 10:15, 10:16, 10:19, 11:15, 12:11, 12:16, 14:2, 17:4, 20:7, 20:13, 20:19, 20:25, 22:8, 22:13, 22:17, 25:1, 25:2, 26:9, 28:15, 28:22, 29:1, 29:11, 29:12, 29:18, 29:21, 29:22, 33:6, 33:9, 35:1, 35:5, 35:8, 35:10, 35:19, 38:16, 39:25, 41:15, 41:23, 42:7, 42:19, 42:21, 43:1, 43:23, 44:2, 45:14, 46:3, 48:18, 49:15, 49:21, 50:12, 54:25, 55:10, 56:19, 61:22, 62:25, 63:2, 63:5, 65:12, 67:17,

67:19, 69:22, 70:3, 70:7, 73:13, 74:8, 78:3, 78:5, 78:9, 79:24, 81:25, 82:15, 82:20, 83:9, 84:4, 84:15, 84:24, 87:16, 87:18, 88:9, 88:12, 88:15, 89:17, 89:23, 92:1, 92:4, 92:19, 92:22, 93:15, 93:24, 94:3, 94:8, 94:11, 94:14, 96:23, 97:11, 97:14, 98:9, 99:2, 99:18, 103:8, 103:11, 104:9, 104:16, 105:1, 105:11, 105:21, 105:23, 106:5, 106:7, 107:7, 107:18, 107:21, 108:11, 108:14, 109:2, 110:1, 111:7, 111:12, 112:16, 113:23, 113:25, 114:23, 116:8, 116:10, 121:18, 122:11, 122:23, 123:24, 124:5, 127:5, 127:8, 130:15, 130:23, 131:3, 131:8, 131:18, 132:12, 134:24, 136:12, 137:9, 137:13, 137:21, 137:23, 138:23, 139:25, 142:2, 144:14, 146:13, 146:15, 148:3, 148:6, 151:12, 151:17, 152:12, 152:13, 156:11, 157:22, 157:25, 158:3, 159:2, 159:6, 159:15, 159:18, 160:1, 160:6, 160:9, 160:16, 160:22, 165:5, 165:9, 165:17, 167:17, 170:15, 170:17, 170:19, 171:17, 171:20, 175:6, 175:8, 175:12, 176:6, 178:25, 181:25, 183:10, 184:21, 189:6, 189:10, 189:23, 194:2, 196:21, 196:24, 198:23, 199:3, 199:7, 200:6, 201:18, 202:16,

207:24, 208:7, 208:10
**MS** [1] - 25:6
**multiple** [5] - 145:9, 166:2, 195:6, 195:15, 196:3
**municipal** [1] - 129:25
**Municipal** [1] - 129:25
**must** [20] - 54:19, 138:14, 163:5, 166:7, 169:1, 176:13, 179:17, 179:18, 180:7, 180:9, 180:12, 180:19, 193:12, 194:7, 196:13, 200:23, 206:16
**mutually** [1] - 43:23
**Myers** [6] - 2:7, 3:9, 4:7, 7:23, 8:2, 10:17

### N

**name** [4] - 100:21, 104:14, 104:16, 147:18
**named** [3] - 90:19, 105:16, 107:22
**names** [1] - 104:14
**narrative** [2] - 100:23, 119:5
**narrow** [3] - 142:25, 146:23, 178:3
**narrowly** [1] - 186:13
**Nathan** [1] - 182:25
**National** [1] - 9:25
**national** [4] - 76:23, 127:11, 130:24, 153:23
**nature** [6] - 37:21, 50:19, 56:16, 135:17, 156:11, 158:8
**neatly** [1] - 99:4
**necessarily** [3] - 66:17, 107:4
**necessary** [2] - 72:25, 140:13
**necessity** [1] - 190:10
**need** [39] - 5:19, 15:23, 19:3, 39:19, 40:24, 40:25, 41:7, 48:22, 51:11, 55:4, 55:5, 59:13, 61:6, 77:8, 79:1, 80:13, 86:12, 88:17, 89:6, 99:9, 108:20, 122:7, 122:8, 134:16, 136:8, 137:2, 137:12, 137:14,

137:18, 149:25, 151:15, 157:18, 158:22, 158:24, 165:10, 178:24, 179:2, 183:8, 188:21
**needed** [2] - 74:15, 84:7
**needle** [1] - 188:2
**needles** [1] - 188:2
**needs** [11] - 25:19, 39:13, 55:2, 55:6, 74:12, 104:4, 121:2, 143:17, 149:10, 158:25, 159:8
**negative** [2] - 150:2, 169:15
**negotiate** [3] - 95:6, 95:23, 107:11
**negotiated** [6] - 103:7, 107:1, 107:14, 116:3, 195:18, 198:1
**negotiates** [1] - 121:10
**negotiating** [3] - 95:17, 96:9, 96:12
**Negotiation** [2] - 56:3, 59:11
**negotiation** [36] - 7:13, 57:2, 57:5, 57:22, 60:11, 61:7, 62:20, 64:2, 64:7, 65:18, 65:23, 75:5, 95:9, 95:20, 95:22, 103:12, 106:8, 131:14, 131:17, 131:19, 131:22, 134:2, 150:5, 177:10, 179:6, 179:16, 180:3, 184:25, 185:21, 190:18, 194:21, 195:6, 199:22, 200:12, 205:6, 206:17
**negotiation-eligible** [12] - 177:10, 179:6, 179:16, 180:3, 184:25, 185:21, 190:18, 194:21, 199:22, 200:12, 205:6, 206:17
**negotiations** [1] - 18:21
**nested** [1] - 27:10
**NETTER** [23] - 2:17, 5:11, 6:1, 29:11, 29:21, 54:25, 55:10, 56:19, 61:22, 62:25, 63:2, 63:5, 65:12, 67:17, 67:19, 69:22,

70:3, 70:7, 73:13, 74:8, 88:12, 148:6, 208:10
**netter** [1] - 85:16
**Netter** [15] - 5:11, 55:11, 78:1, 82:22, 83:17, 84:16, 85:6, 85:8, 86:5, 86:18, 88:10, 104:12, 106:8, 208:8, 208:20
**never** [22] - 21:2, 39:12, 47:19, 48:23, 54:4, 81:12, 83:15, 84:20, 132:20, 142:7, 146:4, 148:25, 153:15, 153:16, 154:14, 168:20, 176:2, 184:2, 202:4, 205:7, 207:5, 207:9
**nevertheless** [1] - 51:20
**NEW** [1] - 1:1
**new** [22] - 37:17, 37:23, 38:7, 39:2, 39:11, 49:11, 51:12, 66:13, 74:17, 76:6, 77:6, 77:8, 167:10, 184:5, 184:6, 195:1, 196:4, 196:12, 198:8, 205:21
**New** [4] - 1:11, 2:15, 119:15, 192:25
**Newark** [1] - 2:3
**newer** [1] - 209:16
**Newman** [1] - 59:3
**next** [16] - 8:4, 12:13, 20:20, 24:24, 84:22, 87:24, 92:16, 92:20, 102:5, 127:3, 134:13, 168:19, 170:9, 175:10, 175:22
**nexus** [3] - 52:6, 73:1, 87:8
**NFIB** [23] - 50:3, 50:20, 50:21, 51:11, 51:16, 52:19, 53:1, 75:7, 75:9, 75:12, 75:18, 76:1, 76:4, 76:13, 138:7, 138:23, 148:16, 149:17, 150:7, 154:24, 155:1, 155:3
**Nica** [2] - 42:10, 113:9
**Nicopure** [1] - 117:19
**nine** [1] - 55:15
**nineteen** [1] - 130:24
**NJ** [2] - 1:16, 2:3
**no-deterrent** [1] -

149:14
**noble** [2] - 10:24, 48:5
**nobody** [6] - 19:16, 20:13, 79:13, 122:15, 142:19, 158:25
**Nollan** [2] - 72:20, 87:9
**Nollan-Dolan** [1] - 72:20
**non** [2] - 24:2, 48:21
**non-federal** [1] - 24:2
**non-profits** [1] - 48:21
**nonbinding** [3] - 153:4, 167:22, 203:13
**noncompliance** [6] - 16:11, 128:5, 128:7, 128:24, 135:2, 155:14
**noncompliant** [1] - 154:5
**nondelegation** [3] - 163:11, 168:21, 171:9
**none** [13] - 6:1, 6:2, 6:3, 33:20, 53:11, 53:12, 56:5, 60:21, 60:22, 60:25, 182:16, 196:7, 206:18
**nonetheless** [3] - 68:7, 102:3, 190:11
**noninterference** [1] - 52:16
**Nordisk** [3] - 2:12, 3:12, 5:6, 9:7, 9:11, 9:13, 91:12, 159:16, 176:19, 177:15, 182:2, 187:23, 190:21
**Nordisk's** [1] - 194:3
**Northern** [1] - 76:10
**Norton** [1] - 197:6
**note** [13] - 6:21, 71:10, 110:3, 118:4, 142:9, 142:14, 148:4, 163:24, 181:15, 191:7, 199:12
**noted** [3] - 120:1, 149:19, 182:14
**notes** [1] - 133:22
**nothing** [20] - 23:4, 60:13, 81:4, 86:7, 119:17, 125:25, 126:3, 130:2, 139:22, 155:25, 164:24, 169:2, 169:7, 180:14, 187:24, 188:3,

188:6, 204:2, 208:7, 208:10
**notice** [20] - 54:1, 62:4, 76:24, 141:3, 145:20, 146:2, 157:3, 157:12, 179:15, 185:5, 187:6, 191:8, 191:13, 191:17, 192:9, 193:8, 198:25, 202:1, 203:9, 203:17
**noticed** [2] - 177:12, 204:11
**noting** [2] - 89:2, 191:11
**notion** [2] - 119:6, 194:5
**notwithstanding** [1] - 203:3
**Novartis** [17] - 2:16, 3:11, 7:23, 8:9, 9:3, 13:12, 25:3, 46:12, 127:6, 127:11, 137:24, 139:6, 139:18, 143:17, 144:5, 149:2, 149:9
**Novartis's** [2] - 127:25, 150:22
**novel** [2] - 33:21, 154:15
**Novo** [17] - 2:12, 3:12, 5:6, 9:7, 9:11, 9:13, 91:12, 159:15, 171:4, 176:19, 177:15, 182:2, 187:23, 190:21, 194:3, 196:8, 197:24
**Novo's** [1] - 197:20
**NovoLog** [6] - 182:6, 183:15, 183:19, 188:8, 206:7
**nowhere** [3] - 185:6, 186:7, 202:21
**nullity** [1] - 198:10
**Number** [7] - 3:9, 3:10, 3:11, 3:12, 38:10, 140:11, 142:9
**number** [20] - 17:11, 38:10, 61:14, 82:21, 83:24, 85:16, 90:10, 97:15, 97:18, 97:19, 98:2, 123:19, 123:20, 127:15, 145:13, 162:10, 192:1, 195:17, 199:23
**NUMBER** [1] - 1:3
**numbers** [8] - 24:4, 45:11, 84:2, 127:20,

144:9, 145:18, 146:4, 152:6
**numerical** [1] - 179:7
**numerous** [1] - 111:8
**nursing** [2] - 68:3, 68:55
**NW** [6] - 1:20, 2:6, 2:10, 2:18, 2:21, 2:24
**NY** [1] - 2:15

---

## O

**object** [1] - 115:16
**objecting** [2] - 107:23, 110:8
**objection** [4] - 90:19, 90:23, 124:12, 132:2
**objectionable** [1] - 118:11
**objections** [5] - 56:8, 90:1, 90:2, 90:4, 106:15, 112:6
**objective** [1] - 133:22
**obligate** [3] - 69:2, 70:12, 79:3
**obligated** [2] - 77:13, 100:21
**obligates** [1] - 77:18
**obligation** [8] - 16:2, 17:23, 43:11, 58:10, 60:8, 100:11, 103:24, 126:22
**obligations** [3] - 76:17, 111:17, 121:25
**obligatory** [5] - 61:3, 66:24, 69:10, 69:19, 79:21
**obscure** [1] - 7:10
**observation** [1] - 173:20
**observing** [1] - 209:18
**obtain** [1] - 55:21
**obvious** [5] - 73:16, 94:20, 95:9, 95:14, 172:5
**obviously** [18] - 15:13, 81:20, 90:25, 110:1, 127:23, 128:23, 134:4, 135:6, 135:24, 152:20, 162:25, 165:11, 166:24, 167:17, 171:13, 185:5, 188:11, 190:7
**occurred** [1] - 159:11
**occurs** [1] - 23:12
**October** [2] - 44:21, 84:10

**odds** [1] - 171:5
**OF** [4] - 1:1, 2:17, 2:20, 2:23
**offended** [1] - 123:11
**offends** [1] - 102:8
**offense** [4] - 128:17, 129:3, 148:10, 150:18
**offenses** [1] - 129:11
**offer** [5] - 68:15, 73:20, 99:10, 195:8, 209:20
**offered** [2] - 121:22, 209:15
**Offering** [1] - 59:20
**offering** [3] - 56:8, 208:23, 209:1
**Office** [4] - 47:3, 47:7, 128:10, 133:3
**Official** [1] - 1:23
**official** [1] - 1:7
**OFFICIAL** [1] - 211:1
**officials** [1] - 103:22
**often** [2] - 200:9, 204:17
**Ohio** [2] - 10:4, 59:3
**old** [1] - 64:16
**older** [1] - 19:14
**omission** [1] - 149:23
**once** [10] - 43:9, 70:11, 70:14, 74:25, 90:19, 134:25, 152:6, 172:24, 193:2, 195:16
**one's** [1] - 64:21
**one-sided** [1] - 54:22
**onerous** [1] - 63:14
**ones** [4] - 97:10, 138:1, 142:23, 206:16
**open** [3] - 3:1, 67:5, 67:6
**opened** [1] - 111:8
**opening** [2] - 5:20, 191:25
**operate** [3] - 67:3, 68:20, 86:7
**operates** [7] - 12:11, 12:18, 14:24, 16:3, 85:20, 104:7, 126:21
**operation** [1] - 61:7
**operative** [1] - 204:13
**opinion** [1] - 65:14
**opportunity** [11] - 38:16, 38:23, 41:17, 49:22, 63:25, 65:16, 78:6, 84:4, 203:24, 209:15, 209:21
**oppose** [3] - 19:9, 122:19, 126:13
**opposed** [5] - 38:14, 67:3, 119:24,

135:11, 137:19, 137:20, 137:21, 138:12, 138:15, 139:7, 140:16, 142:23, 143:22, 143:23, 144:5, 146:23, 148:7, 148:21, 152:21, 152:25, 155:4, 155:8, 160:19, 161:4, 161:14, 162:12, 165:1, 168:6, 169:10, 172:14, 173:20, 174:10, 175:9, 177:2, 177:14, 177:16, 177:24, 178:17, 178:18, 181:24, 181:25, 182:3, 182:6, 183:18, 183:25, 184:12, 185:22, 187:15, 191:7, 191:19, 194:14, 194:16, 195:5, 196:6, 197:9, 198:3, 198:25, 199:15, 200:10, 200:16, 201:1, 201:10, 201:11, 203:10, 204:20, 205:17, 208:25, 209:10
**one's** [1] - 64:21
**one-sided** [1] - 54:22
**onerous** [1] - 63:14
**ones** [4] - 97:10, 138:1, 142:23, 206:16
**open** [3] - 3:1, 67:5, 67:6
**opened** [1] - 111:8
**opening** [2] - 5:20, 191:25
**operate** [3] - 67:3, 68:20, 86:7
**operates** [7] - 12:11, 12:18, 14:24, 16:3, 85:20, 104:7, 126:21
**operation** [1] - 61:7
**operative** [1] - 204:13
**opinion** [1] - 65:14
**opportunity** [11] - 38:16, 38:23, 41:17, 49:22, 63:25, 65:16, 78:6, 84:4, 203:24, 209:15, 209:21
**oppose** [3] - 19:9, 122:19, 126:13
**opposed** [5] - 38:14, 67:3, 119:24,

138:19, 183:19
**opposing** [3] - 70:2, 101:6, 199:4
**opposite** [1] - 100:9
**opposition** [1] - 66:23
**opt** [11] - 13:20, 14:9, 14:20, 14:21, 41:25, 58:1, 72:2, 72:4, 79:22, 79:24, 107:12
**opt-out** [3] - 41:25, 58:1, 79:24
**opting** [1] - 104:5
**option** [4] - 47:13, 63:25, 86:16, 135:8
**optional** [1] - 37:3
**options** [7] - 45:2, 45:4, 45:5, 61:14, 61:16, 81:7, 81:10
**oral** [11] - 3:13, 5:18, 93:23, 144:12, 158:20, 207:1, 208:24, 209:1, 209:7, 209:10, 209:13
**ORAL** [1] - 1:7
**order** [10] - 20:1, 31:14, 44:20, 66:20, 73:18, 95:11, 100:4, 124:22, 137:18, 176:25
**ordered** [3] - 95:23, 95:24
**ordering** [1] - 95:11
**ordinance** [2] - 119:15, 119:18
**ordinarily** [1] - 63:11
**ordinary** [5] - 93:5, 106:20, 119:24, 120:1, 124:25
**organization** [1] - 115:13
**organizers** [1] - 22:2
**orient** [1] - 178:15
**orienting** [1] - 171:24
**orphan** [1] - 197:10
**Orphan** [1] - 197:13
**otherwise** [4] - 28:13, 112:11, 123:12, 161:7
**ought** [1] - 63:19
**outcomes** [3] - 76:16, 77:2, 77:9
**outs** [1] - 58:17
**outset** [2] - 71:16, 71:25
**outside** [12] - 61:5, 66:10, 73:15, 97:24, 112:19, 115:22, 116:18, 118:1, 124:12, 167:15,

201:12
**outstanding** [1] - 208:15
**outstrips** [1] - 47:5
**overarching** [3] - 113:7, 119:8, 173:21
**overflow** [1] - 209:19
**overinclusive** [1] - 157:2
**overlap** [2] - 190:9, 199:9
**overlapping** [1] - 42:17
**overlay** [2] - 74:24, 86:10
**oversight** [1] - 167:2
**overstep** [1] - 75:24
**owe** [1] - 145:9
**owed** [2] - 23:19, 145:2
**own** [11] - 48:20, 57:24, 67:2, 68:10, 68:20, 102:6, 138:9, 150:23, 154:10, 168:18, 204:7
**owner** [1] - 69:14
**owners** [1] - 149:7

**P**

**p.m** [3] - 88:21, 88:22, 210:1
**Pacific** [1] - 51:5
**package** [3] - 195:4, 196:1, 198:3
**packet** [2] - 179:13, 190:13
**Packing** [6] - 134:13, 134:14, 142:24, 144:4, 146:7
**page** [18] - 103:13, 111:12, 140:13, 140:14, 142:9, 142:15, 172:22, 177:13, 179:12, 179:13, 179:25, 180:22, 184:13, 184:14, 184:18, 197:2, 197:23, 205:14
**pages** [4] - 38:23, 81:15, 149:19, 180:1
**paid** [3] - 11:20, 66:8, 144:16
**painted** [1] - 168:13
**palliative** [1] - 168:23
**paper** [5] - 45:5, 98:12, 101:25, 117:6, 136:9
**papers** [3] - 43:17,

178:13, 191:9
**paragraph** [3] - 123:19, 123:20, 196:10
**paragraphs** [2] - 145:11, 194:24
**parallel** [2] - 180:6, 192:18
**parameters** [3] - 185:13, 185:14, 200:22
**paraphrase** [1] - 130:18
**paraphrasing** [3] - 70:4, 107:2, 120:13
**parent** [1] - 36:16
**parking** [1] - 129:25
**Parkway** [1] - 1:16
**Parrish** [13] - 5:5, 9:11, 9:14, 159:15, 159:17, 165:1, 170:14, 175:7, 189:22, 198:21, 200:2, 207:23, 208:19
**PARRISH** [28] - 2:9, 159:15, 159:18, 160:1, 160:6, 160:9, 160:16, 160:22, 165:5, 165:9, 165:17, 167:17, 170:15, 175:8, 175:12, 176:6, 178:25, 181:25, 183:10, 184:21, 189:6, 198:23, 199:3, 199:7, 200:6, 201:18, 202:16, 207:24
**part** [38] - 10:21, 13:2, 24:14, 26:22, 28:23, 28:25, 29:2, 29:23, 29:24, 30:23, 31:2, 31:19, 31:22, 39:15, 46:21, 48:14, 57:3, 59:10, 72:17, 80:6, 84:6, 84:15, 93:7, 102:12, 124:3, 131:17, 132:8, 132:11, 132:12, 142:17, 145:17, 155:6, 165:12, 177:2, 177:17, 185:21, 192:10, 196:6
**Part** [1] - 22:18
**participant** [9] - 34:10, 53:15, 53:16, 53:18, 53:19, 53:20, 53:24, 54:4, 85:17

**participate** [11] - 7:2, 13:3, 13:7, 43:11, 57:2, 62:22, 77:14, 90:22, 117:7, 121:1
**participating** [2] - 13:2, 116:25
**participation** [12] - 8:6, 12:9, 12:19, 13:15, 25:12, 26:18, 36:4, 41:4, 47:6, 51:24, 59:5, 87:3
**particular** [14] - 6:24, 29:9, 60:14, 60:15, 73:6, 73:13, 74:12, 83:10, 89:16, 97:5, 105:8, 115:5, 189:14, 208:24
**particularly** [2] - 164:4, 205:8
**parties** [14] - 3:21, 5:16, 16:13, 21:12, 21:22, 22:5, 51:6, 51:18, 61:11, 69:2, 93:19, 104:6, 108:2, 156:7
**parties'** [3] - 53:25, 111:22, 111:23
**partner** [1] - 4:8
**parts** [2] - 165:11, 185:18
**party** [6] - 7:1, 25:22, 50:4, 123:4, 135:21, 135:22
**party's** [1] - 53:25
**passed** [1] - 177:19
**passes** [1] - 85:11
**patent** [4] - 39:17, 195:11, 204:18, 204:24
**patents** [3] - 40:3, 40:8, 163:7
**path** [2] - 141:5, 151:24
**patience** [1] - 127:5
**patient** [3] - 40:11, 76:16, 77:2
**patients** [5] - 47:15, 76:16, 76:19, 166:20, 188:20
**pattern** [1] - 99:4
**Patty** [1] - 4:21
**pausing** [1] - 151:21
**pay** [48] - 10:24, 11:9, 11:22, 15:19, 15:24, 15:25, 17:18, 18:2, 21:6, 27:6, 30:11, 33:4, 33:11, 57:8, 60:6, 61:10, 61:12, 64:12, 64:17, 65:25, 66:1, 69:5, 71:2,

78:14, 78:21, 79:2, 79:12, 79:13, 80:7, 80:15, 81:11, 82:9, 82:11, 121:7, 131:10, 131:20, 135:5, 135:7, 142:16, 143:22, 145:5, 152:25, 154:4, 155:5, 155:8, 155:9, 156:1, 161:17
**paying** [11] - 22:21, 26:25, 27:2, 43:14, 66:7, 66:13, 69:18, 82:6, 141:6, 144:5, 153:8
**payment** [6] - 22:6, 23:3, 128:16, 150:3, 150:8, 152:2
**payor** [1] - 21:15
**pays** [3] - 22:18, 144:20, 145:7
**PC** [1] - 1:15
**PDFs** [1] - 111:8
**pen** [1] - 182:10
**penalize** [1] - 80:20
**penalized** [1] - 123:25
**penalizing** [1] - 155:14
**penalties** [19] - 15:8, 15:14, 16:12, 16:15, 16:25, 18:2, 53:23, 59:17, 60:4, 80:1, 94:24, 98:17, 120:10, 129:20, 129:23, 130:3, 130:10, 135:9, 149:21
**penalty** [32] - 14:23, 16:10, 17:15, 17:16, 17:20, 17:23, 19:21, 19:23, 20:1, 21:7, 25:19, 25:22, 27:3, 27:9, 30:12, 32:25, 33:19, 36:9, 60:6, 79:20, 80:16, 80:18, 80:21, 81:1, 81:11, 97:16, 124:3, 129:8, 130:1, 137:2, 149:22, 152:22
**penciled** [1] - 46:22
**pending** [1] - 195:11
**Penkowski** [1] - 38:25
**Pennsylvania** [3] - 2:10, 2:18, 2:24
**Pentagon** [2] - 79:12, 121:10
**people** [20] - 11:1, 22:24, 30:23, 48:10, 55:13, 68:18, 72:12, 86:6, 103:19,

109:15, 115:4, 123:8, 125:8, 154:8, 155:5, 155:9, 158:6, 160:25, 161:16, 175:20
**people's** [1] - 47:25
**per** [2] - 46:13, 54:9
**percent** [7] - 19:13, 39:12, 48:3, 48:23, 123:25, 148:24, 151:8
**percentage** [2] - 17:6, 45:24
**percolate** [1] - 148:21
**perfect** [1] - 15:16
**perfectly** [2] - 20:2, 31:9
**performing** [1] - 183:8
**performs** [1] - 140:8
**perhaps** [2] - 69:11, 160:10
**period** [9] - 43:12, 53:7, 59:24, 61:17, 61:20, 62:1, 62:14, 85:2
**periods** [5] - 16:11, 77:7, 128:7, 128:24, 135:2
**perked** [1] - 199:7
**permission** [2] - 24:24, 82:16
**Perry** [1] - 86:21
**person** [3] - 19:9, 34:21, 45:8
**personal** [1] - 55:3
**personally** [1] - 208:25
**perspective** [2] - 24:16, 183:13
**persuade** [1] - 83:11
**pertain** [1] - 105:15
**Pharma** [1] - 105:15
**pharmaceutical** [16] - 20:8, 37:11, 37:22, 38:5, 39:19, 48:6, 49:5, 49:10, 49:18, 56:23, 64:12, 65:21, 76:25, 77:6, 91:24, 91:25
**Pharmaceutical** [2] - 1:21, 2:16
**pharmaceuticals** [2] - 36:17, 74:2
**Pharmaceuticals** [4] - 3:10, 3:11, 35:11, 36:15
**PHARMACEUTICALS** [1] - 1:3
**phase** [3] - 179:9, 188:21, 201:21

**phenomenon** [1] - 77:5
**phrase** [2] - 19:6, 97:20
**phrased** [1] - 165:7
**physical** [25] - 10:20, 12:3, 15:22, 21:7, 22:3, 25:21, 26:3, 26:10, 27:8, 27:12, 27:14, 29:7, 29:25, 30:2, 31:5, 32:5, 32:20, 33:19, 34:1, 35:2, 40:6, 57:17, 58:8, 85:14, 172:11
**physically** [3] - 33:23, 58:11, 58:12
**pick** [3] - 35:21, 181:21, 187:15
**picked** [4] - 143:16, 161:8, 199:3, 199:5
**picking** [1] - 21:11
**picture** [1] - 43:1
**piece** [9] - 16:8, 45:6, 142:18, 150:12, 171:13, 190:4, 190:6, 191:12
**pieces** [2] - 29:9, 147:8
**pile** [1] - 146:15
**pill** [4] - 17:9, 78:22, 187:14, 198:11
**pills** [4] - 21:13, 40:7, 58:11, 77:19
**Pinnacle** [1] - 82:1
**place** [14] - 18:13, 23:13, 23:21, 27:13, 38:21, 39:17, 39:20, 39:23, 50:1, 59:13, 73:17, 163:14, 182:22, 195:5
**placed** [2] - 109:25, 171:5
**places** [1] - 204:19
**plain** [1] - 201:5
**plainly** [2] - 67:20, 140:13
**Plaintiff** [6] - 1:5, 1:21, 2:4, 2:7, 2:12, 2:16
**plaintiff** [4] - 28:4, 53:9, 109:10, 138:4
**plaintiff's** [1] - 5:8
**Plaintiffs** [1] - 1:17
**plaintiffs** [76] - 4:5, 5:24, 6:2, 6:11, 6:15, 6:20, 7:16, 7:19, 7:20, 8:6, 8:7, 8:10, 8:14, 8:17, 8:22, 8:24, 10:8, 13:25, 28:9, 35:13, 35:25, 36:8, 36:20, 36:23,

37:3, 37:14, 40:4, 40:13, 43:10, 44:18, 45:2, 47:21, 52:15, 58:7, 61:1, 61:17, 62:8, 63:7, 65:17, 66:5, 66:22, 67:11, 67:12, 69:6, 69:21, 72:15, 73:18, 73:20, 76:5, 76:13, 76:15, 77:11, 77:23, 82:24, 85:24, 88:7, 89:10, 89:19, 92:13, 93:1, 105:17, 118:12, 118:19, 119:22, 120:8, 171:5, 172:9, 190:10, 193:5, 193:12, 194:2, 194:11, 197:5, 197:11, 206:25, 208:1
**plaintiffs'** [16] - 8:23, 28:1, 35:15, 39:1, 43:10, 56:16, 57:11, 57:14, 59:8, 64:5, 68:15, 70:15, 72:18, 76:1, 106:14, 119:9
**plan** [3] - 7:22, 8:18, 22:18
**plants** [1] - 30:7
**plausible** [1] - 98:4
**play** [2] - 50:7, 151:22
**plays** [1] - 11:19
**Plaza** [1] - 2:3
**plead** [2] - 173:4, 173:5
**pleading** [1] - 91:1
**pledge** [1] - 114:11
**plenty** [4] - 37:12, 148:22, 148:23
**plot** [1] - 73:8
**plural** [6] - 194:25, 195:1, 195:2, 195:13, 195:24, 195:25
**plurality** [1] - 173:14
**plus** [5] - 40:13, 47:12, 153:3, 169:14
**podium** [3] - 104:13, 104:22, 192:2
**Point** [2] - 21:25, 86:24
**point** [77] - 10:22, 17:5, 17:19, 21:1, 21:20, 22:11, 23:7, 23:15, 23:24, 24:5, 26:16, 27:11, 41:2, 41:19, 48:19, 49:22, 51:14, 55:3, 57:1, 65:13, 72:9, 75:6, 75:25, 79:3, 82:7,

83:24, 84:16, 85:8, 104:1, 108:19, 110:4, 118:8, 119:5, 120:8, 125:6, 128:4, 131:12, 133:4, 133:7, 136:9, 138:22, 139:18, 140:10, 141:16, 142:6, 142:24, 143:9, 143:12, 143:16, 145:16, 145:17, 146:19, 146:25, 147:2, 151:6, 151:24, 152:2, 164:25, 165:17, 165:21, 165:24, 166:22, 166:23, 175:13, 175:21, 175:23, 181:3, 183:11, 192:25, 193:24, 196:25, 197:21, 198:25, 199:1, 200:15, 203:10
**pointed** [4] - 80:15, 85:22, 148:16, 169:3
**pointing** [2] - 142:4, 191:3
**points** [19] - 42:13, 47:1, 57:14, 77:11, 82:21, 86:11, 103:17, 108:3, 119:1, 152:14, 157:21, 163:25, 174:10, 198:14, 198:24, 198:25, 200:16, 204:11
**poison** [1] - 168:24
**policy** [13] - 40:7, 40:10, 76:23, 77:1, 81:18, 81:20, 81:22, 101:6, 120:16, 120:21, 143:24, 157:18
**policy-related** [1] - 81:18
**political** [10] - 96:4, 96:15, 97:20, 100:23, 109:11, 109:13, 109:17, 110:2, 116:24, 119:5
**politically** [1] - 95:16
**ported** [1] - 108:5
**portion** [2] - 31:15, 145:6
**poses** [1] - 130:19
**posit** [1] - 110:18
**positing** [1] - 196:8, 197:5, 197:24
**position** [22] - 6:25,

26:6, 33:3, 42:5, 43:18, 46:1, 54:12, 62:9, 64:15, 72:2, 73:9, 79:9, 83:6, 130:22, 131:1, 131:16, 135:12, 161:9, 168:24, 186:5, 197:21, 203:25
**positions** [2] - 189:15, 189:25
**positive** [1] - 199:12
**possibility** [1] - 62:21
**possible** [1] - 17:3
**possibly** [2] - 146:21, 193:13
**post** [1] - 162:24
**posture** [2] - 150:12, 172:11
**potentially** [1] - 118:21
**power** [10] - 34:6, 51:9, 53:17, 54:1, 54:6, 54:9, 73:7, 86:3, 121:14, 164:12
**powerful** [1] - 173:18
**powerfully** [1] - 19:18
**PowerPoint** [2] - 160:5, 160:6
**powers** [9] - 9:8, 67:15, 159:21, 160:12, 161:5, 161:23, 162:9, 163:20, 166:1, 166:24, 167:20, 170:12, 170:25, 171:3, 171:25, 173:1, 173:8, 173:12, 188:17
**practical** [3] - 44:17, 70:11, 70:20
**practice** [6] - 100:5, 183:9, 194:12, 197:8, 197:14, 197:17
**precedent** [4] - 52:21, 76:12, 99:3, 118:25
**precedents** [1] - 76:4
**precise** [1] - 179:6
**precisely** [1] - 157:7
**preclude** [2] - 141:7, 174:23
**precluded** [3] - 190:20, 191:6, 193:14
**precludes** [1] - 140:23
**preclusion** [8] - 190:4, 190:6, 190:12, 191:11, 191:12, 191:17, 191:20,

192:10
**predicate** [1] - 24:19
**predict** [3] - 98:21, 118:24, 154:2
**predictably** [1] - 112:4
**prefaced** [1] - 132:14
**prefer** [1] - 28:10
**preferable** [1] - 122:6
**preferred** [2] - 8:25, 102:24
**premise** [6] - 18:15, 25:17, 57:14, 58:9, 135:19, 158:15
**preparation** [1] - 209:23
**prerogative** [4] - 76:22, 78:16, 180:20, 202:21
**prerogatives** [2] - 180:18, 180:19
**prescribe** [1] - 198:8
**prescribed** [5] - 150:15, 150:21, 150:24, 151:3, 179:22
**prescription** [4] - 11:5, 55:14, 55:17, 58:19
**present** [4] - 6:15, 8:22, 8:23, 92:8
**presentation** [9] - 38:18, 56:21, 75:7, 108:19, 160:4, 188:1, 196:12, 198:3, 206:20
**presentations** [5] - 57:11, 182:8, 187:12, 188:3, 196:15
**presented** [5] - 6:13, 57:11, 58:7, 176:15, 197:16
**president** [1] - 167:2
**press** [2] - 101:25, 125:7
**pressed** [1] - 70:8
**pressure** [2] - 51:9, 70:20
**presume** [6] - 48:17, 50:10, 73:9, 92:15, 131:1, 137:12
**presumed** [1] - 78:8
**presumes** [1] - 66:7
**presumption** [2] - 150:13, 151:4
**pretty** [6] - 27:15, 64:10, 144:8, 148:6, 173:12, 197:22
**prevent** [5] - 9:4, 37:16, 120:5,

141:12, 157:8
**previewed** [1] - 196:17
**previously** [3] - 26:25, 27:1, 97:23
**price** [155] - 6:19, 7:14, 9:4, 9:9, 11:9, 11:13, 11:14, 11:15, 11:17, 11:20, 11:22, 14:22, 15:6, 16:6, 17:7, 18:11, 18:20, 18:22, 19:6, 19:7, 19:10, 22:16, 23:8, 23:25, 24:2, 27:5, 27:7, 30:20, 30:21, 31:14, 31:16, 31:17, 31:21, 31:22, 33:10, 33:17, 33:24, 57:7, 58:10, 58:13, 59:10, 59:14, 59:24, 59:25, 60:1, 60:2, 60:11, 61:10, 61:12, 62:6, 62:13, 62:20, 63:1, 63:3, 64:9, 65:2, 65:3, 65:7, 65:8, 65:25, 66:1, 71:1, 71:3, 71:6, 71:7, 71:8, 71:17, 72:7, 73:20, 73:21, 77:20, 78:15, 79:4, 79:6, 79:8, 79:9, 79:21, 80:17, 80:19, 80:23, 81:13, 84:18, 94:23, 95:6, 95:7, 95:19, 95:24, 95:25, 96:12, 96:15, 96:19, 97:21, 97:22, 98:15, 100:23, 100:24, 106:20, 107:1, 107:8, 107:11, 107:16, 107:24, 110:24, 111:20, 119:15, 119:16, 119:25, 120:1, 120:19, 120:20, 124:17, 125:5, 126:8, 126:23, 126:24, 127:10, 127:23, 136:24, 145:7, 150:6, 162:18, 162:23, 162:24, 163:5, 163:8, 163:9, 164:5, 164:8, 164:9, 164:13, 164:18, 164:19, 164:20, 164:21, 168:7, 170:1, 177:3, 177:9, 181:17, 182:18, 182:22, 187:16, 187:19, 195:7, 195:16, 195:18,

195:24, 198:2, 198:10, 202:13
**Price** [3] - 56:3, 59:11, 59:21
**priced** [1] - 202:13
**prices** [25] - 6:24, 9:11, 24:4, 26:25, 60:10, 61:5, 63:23, 64:16, 64:19, 66:3, 74:12, 82:8, 95:17, 96:17, 96:20, 97:1, 103:19, 120:23, 125:16, 154:5, 161:13, 161:14, 166:16, 172:24
**pricing** [7] - 11:18, 24:3, 64:16, 73:11, 100:11, 100:14, 100:15
**primary** [3] - 8:4, 25:7, 90:19
**principal** [1] - 22:13
**principle** [25] - 7:2, 7:3, 50:21, 51:1, 51:4, 113:7, 118:18, 153:11, 153:17, 153:19, 163:1, 164:7, 164:12, 166:7, 166:15, 167:24, 168:15, 168:17, 169:2, 171:24, 173:10, 174:7, 207:10, 207:11
**principles** [1] - 63:16
**private** [8] - 7:7, 10:23, 51:6, 51:18, 52:17, 52:23, 114:20, 114:21
**pro** [1] - 4:11
**problem** [31] - 21:2, 22:22, 33:5, 33:7, 49:13, 50:19, 81:15, 85:12, 94:15, 98:10, 99:7, 114:8, 115:23, 117:1, 124:7, 124:9, 124:10, 124:20, 125:14, 125:19, 126:6, 126:10, 126:17, 157:6, 157:7, 163:11, 172:14, 174:8, 174:15, 201:25, 206:19
**problems** [4] - 7:9, 77:3, 173:3, 203:12
**procedural** [3] - 166:12, 192:8, 193:23
**procedurally** [1] -

193:10
**Procedure** [1] - 163:23
**procedures** [12] - 9:10, 163:13, 163:25, 166:9, 166:18, 169:5, 169:9, 174:14, 187:21, 195:23, 203:22, 207:12
**proceed** [4] - 5:17, 5:25, 6:4, 92:21
**proceedings** [3] - 65:18, 203:18, 211:5
**Proceedings** [1] - 1:25
**PROCEEDINGS** [1] - 3:1
**proceeds** [1] - 24:12
**process** [37] - 7:13, 9:8, 26:1, 30:15, 42:16, 42:20, 61:21, 62:12, 66:17, 69:12, 92:2, 93:8, 93:10, 95:5, 116:13, 121:8, 131:14, 157:10, 159:21, 163:18, 163:20, 165:17, 165:18, 165:21, 170:23, 171:12, 171:13, 172:2, 172:15, 173:6, 174:11, 195:17, 198:1, 202:8, 204:25, 205:18
**procurement** [6] - 106:9, 120:18, 121:14, 161:10, 173:25, 174:3
**procurements** [1] - 121:10
**procuring** [1] - 68:9
**produced** [1] - 1:25
**product** [48] - 15:9, 18:3, 19:7, 19:9, 21:6, 55:23, 55:24, 58:11, 64:1, 64:3, 64:23, 67:15, 77:5, 93:13, 95:25, 96:17, 97:1, 97:23, 100:24, 177:16, 180:8, 180:14, 180:24, 181:6, 184:5, 184:6, 187:13, 194:6, 196:12, 196:16, 196:17, 198:7, 198:9, 201:14, 201:16, 201:24, 202:6, 202:17, 202:22, 205:1,

205:11
**product's** [1] - 196:11
**product-by-product** [1] - 205:1
**product-hopping** [1] - 201:24
**product-specific** [1] - 180:24
**production** [1] - 198:4
**products** [56] - 11:20, 19:22, 19:25, 20:5, 21:16, 22:21, 24:15, 36:16, 47:25, 56:1, 57:9, 58:12, 64:23, 66:6, 69:4, 74:10, 77:7, 77:8, 78:14, 80:1, 177:10, 177:11, 180:5, 180:6, 180:7, 180:23, 181:1, 181:2, 181:14, 181:18, 181:21, 182:3, 182:8, 182:9, 182:15, 182:20, 183:3, 183:14, 185:8, 185:13, 188:9, 188:20, 190:23, 194:7, 202:9, 202:13, 203:5, 205:15, 205:17, 205:25, 206:7, 206:8, 206:10, 206:12, 206:19
**profess** [1] - 115:13
**professionalism** [1] - 209:22
**profiles** [1] - 183:21
**profit** [6] - 48:7, 48:14, 48:16, 48:21, 48:22, 73:11
**profits** [2] - 48:21, 66:19
**program** [141] - 7:2, 10:19, 11:4, 11:7, 11:10, 11:21, 12:4, 12:11, 12:17, 12:24, 13:14, 13:24, 15:4, 16:3, 16:17, 21:9, 23:2, 23:22, 24:5, 24:6, 25:14, 25:17, 26:7, 26:23, 26:24, 27:8, 27:17, 30:20, 33:21, 34:12, 34:20, 34:24, 36:3, 36:5, 36:6, 36:19, 37:3, 37:21, 38:13, 38:14, 38:19, 39:1, 39:8, 40:1, 40:23, 41:5, 41:20, 41:25, 43:3,

43:11, 44:11, 44:12, 44:15, 44:19, 44:24, 45:5, 47:5, 50:4, 50:16, 52:3, 52:6, 52:7, 52:14, 52:18, 56:15, 56:23, 57:3, 57:5, 57:18, 57:19, 57:22, 57:23, 58:18, 58:20, 60:12, 60:13, 60:17, 60:22, 61:1, 61:7, 62:9, 62:10, 62:20, 62:23, 64:4, 67:10, 67:11, 67:13, 67:23, 68:9, 68:12, 68:14, 72:5, 72:6, 72:17, 73:25, 75:5, 77:12, 82:25, 84:7, 84:13, 85:4, 85:20, 87:2, 87:5, 90:20, 90:22, 94:15, 94:16, 94:25, 95:19, 96:18, 100:17, 101:5, 104:7, 105:7, 106:8, 106:13, 112:10, 113:5, 115:3, 115:5, 116:18, 116:25, 117:8, 117:18, 120:16, 125:23, 127:8, 130:19, 133:13, 133:14, 136:22, 160:21, 173:25, 174:23, 175:20, 177:8, 201:12
**Program** [2] - 56:4, 59:11
**program's** [2] - 36:1, 37:4
**programming** [1] - 117:15
**PROGRAMS** [1] - 2:20
**programs** [13] - 11:1, 20:1, 25:10, 27:5, 33:20, 39:14, 39:23, 39:25, 53:8, 86:9, 93:2, 115:19, 161:3
**prohibit** [3] - 94:12, 95:2, 116:4
**promise** [4] - 11:10, 79:21, 80:6, 111:17
**promised** [2] - 11:4, 71:25
**promulgated** [5] - 110:9, 112:1, 112:2, 120:15, 193:10
**prongs** [1] - 188:17
**propaganda** [3] - 109:11, 109:17, 110:2
**proper** [1] - 201:25

property [29] - 7:25, 10:20, 10:23, 15:15, 16:1, 16:2, 17:18, 17:20, 21:7, 22:2, 22:4, 22:5, 24:17, 25:19, 34:23, 57:16, 72:22, 82:11, 91:2, 93:9, 93:16, 160:20, 160:23, 161:1, 172:17, 172:25, 173:7, 174:13, 175:17
proportional [2] - 87:2, 87:7
proportionality [9] - 52:7, 52:9, 52:13, 73:1, 86:18, 87:1, 87:9, 129:4, 150:11
proposal [1] - 5:17
proposals [2] - 112:7
proprietary [2] - 68:13, 75:23
proprietor [3] - 57:24, 67:2, 68:20
pros [1] - 68:22
prostitution [4] - 101:6, 101:9, 126:9, 126:13
protect [4] - 9:10, 39:20, 39:24, 134:7
protected [4] - 32:8, 171:22, 173:7, 174:13
protecting [1] - 7:7
protection [3] - 32:15, 69:15, 120:3
protections [8] - 39:19, 40:1, 69:13, 161:6, 162:1, 162:5, 166:3, 207:6
protective [1] - 172:24
protest [2] - 114:15, 114:22
provide [38] - 6:14, 15:6, 16:5, 16:9, 17:24, 18:7, 18:11, 18:19, 18:20, 19:12, 19:17, 19:20, 22:1, 22:4, 23:3, 59:10, 59:25, 69:16, 71:3, 71:11, 79:5, 79:16, 80:6, 80:19, 80:22, 80:23, 81:5, 94:19, 94:22, 95:7, 96:10, 104:3, 113:19, 117:7, 118:14, 126:23, 161:17, 204:5
provided [4] - 19:1, 120:24, 164:14,

181:11
provider [1] - 68:5
provider's [1] - 90:8
providers [6] - 68:2, 90:7, 105:14, 105:16, 105:19, 105:25
provides [3] - 72:11, 110:12, 191:24
providing [2] - 55:16, 65:14
provision [38] - 44:6, 52:16, 58:16, 58:17, 59:16, 59:19, 62:15, 77:17, 79:23, 79:24, 80:15, 80:18, 83:14, 83:15, 93:4, 101:7, 124:3, 128:6, 140:6, 178:8, 186:2, 186:3, 187:3, 187:4, 187:17, 187:20, 187:24, 190:16, 192:10, 192:13, 193:2, 194:15, 194:17, 195:16, 200:19, 203:4
provisions [16] - 6:19, 61:23, 112:4, 112:6, 177:21, 178:9, 178:19, 185:22, 186:23, 191:21, 196:7, 197:15, 205:23, 206:2, 206:4, 206:15
PSE&G [1] - 123:15
PSG&E [1] - 123:2
public [21] - 3:17, 3:22, 7:8, 10:23, 57:16, 71:12, 82:4, 86:22, 95:17, 95:18, 96:1, 101:24, 102:7, 102:23, 103:24, 107:16, 110:10, 122:25, 125:12, 208:18
Public [2] - 130:1, 180:11
publication [1] - 199:21
publicly [1] - 114:22
publish [1] - 15:23
published [1] - 177:13
publisher [1] - 69:13
pull [2] - 76:7, 81:10
pulled [2] - 140:2, 186:4
pulling [2] - 80:1, 133:15
pump [4] - 182:11, 188:3, 206:13,

206:22
punishment [8] - 128:16, 129:18, 147:6, 148:9, 149:4, 149:22, 150:18, 155:18
purchase [2] - 55:23, 149:24
purchaser [1] - 67:1
purchasers [1] - 67:6
purple [3] - 184:15, 187:1, 187:2
purpose [34] - 11:21, 17:16, 73:8, 108:12, 128:11, 128:12, 128:19, 128:21, 128:23, 132:24, 132:25, 133:23, 133:24, 134:5, 134:6, 134:15, 139:5, 139:14, 141:10, 141:21, 148:15, 149:11, 149:14, 149:16, 149:18, 154:11, 156:18, 157:11, 194:9, 197:20, 197:21, 201:17
purposes [23] - 21:21, 23:6, 53:11, 57:13, 62:3, 70:5, 70:21, 92:24, 93:10, 93:12, 96:4, 128:20, 139:4, 151:17, 153:22, 154:23, 156:17, 161:5, 167:17, 167:20, 193:4, 197:13, 204:1
pursued [1] - 172:4
pursuing [1] - 173:2
pursuit [2] - 66:17, 66:18
push [1] - 181:16
pushing [2] - 129:12, 133:14
put [33] - 3:8, 14:9, 14:19, 14:21, 15:11, 17:22, 33:22, 35:13, 39:20, 42:23, 49:19, 87:23, 96:6, 101:12, 102:5, 111:25, 112:20, 114:4, 123:7, 143:13, 143:19, 144:5, 152:8, 168:23, 181:17, 181:18, 182:1, 182:11, 182:17, 183:24, 186:9, 189:24, 205:19

puts [1] - 30:3
putting [6] - 21:20, 45:16, 93:20, 182:19, 187:19, 206:21

**Q**

qualifies [1] - 187:6
qualifying [10] - 179:17, 180:2, 185:1, 190:19, 191:2, 191:4, 191:6, 194:15, 194:22, 205:14
quantity [1] - 60:14
Quest [1] - 129:25
questions [30] - 35:20, 40:18, 49:24, 54:16, 71:4, 71:19, 87:15, 93:17, 113:13, 130:16, 132:7, 132:8, 132:9, 138:14, 148:1, 150:10, 152:9, 160:2, 162:19, 170:10, 171:10, 175:1, 175:25, 176:2, 176:4, 189:2, 189:13, 193:24, 198:18, 207:21
quick [4] - 160:18, 165:1, 196:23, 198:24
quicker [1] - 160:4
quickly [15] - 37:6, 51:7, 119:2, 148:6, 150:10, 160:12, 161:24, 162:2, 168:4, 177:19, 184:9, 188:23, 188:24, 197:22, 202:7
quite [3] - 15:17, 110:7, 161:25
quote [17] - 51:7, 82:1, 111:14, 111:20, 129:15, 138:9, 139:2, 140:17, 141:25, 143:1, 143:3, 143:4, 149:13, 150:17, 172:21, 192:14, 197:2
quotes [1] - 140:2
quoting [1] - 149:20
QURAISHI [2] - 1:13, 3:2

**R**

R&D [5] - 37:15, 39:13, 48:22, 49:3, 49:20
racking [1] - 135:3
raise [9] - 6:23, 28:8, 89:7, 113:6, 114:17, 141:8, 154:1, 154:2, 154:3
raised [9] - 7:22, 20:10, 49:22, 56:9, 89:5, 90:5, 91:1, 112:5, 141:6
raises [2] - 113:13, 154:4
raisin [2] - 15:17, 23:15
raising [7] - 50:17, 89:22, 90:12, 128:11, 139:1, 139:3, 153:22
raisins [10] - 15:18, 23:16, 30:20, 30:21, 30:24, 31:2, 31:13, 31:16, 67:4, 67:5
ramifications [1] - 7:4
Ranch [9] - 144:24, 145:1, 147:6, 148:14, 148:16, 149:6, 149:13, 149:15, 155:16
range [4] - 150:15, 150:21, 150:24, 151:2
ransoming [1] - 52:10
rate [8] - 26:1, 26:2, 66:6, 66:12, 145:14, 148:14, 148:24, 149:16
rates [7] - 27:1, 66:8, 69:4, 71:20, 71:21, 71:23, 151:8
rather [7] - 25:18, 56:25, 63:7, 128:19, 129:18, 133:22, 198:9
ratio [1] - 45:19
rattle [1] - 148:25
RDR [1] - 211:11
reach [4] - 61:12, 88:17, 127:9, 191:12
reached [1] - 97:2, 125:15
reaches [2] - 124:2, 130:21
read [16] - 16:14, 31:8, 59:12, 59:19, 81:25, 94:9, 111:12, 133:21, 149:25,

165:10, 173:19, 184:22, 189:17, 191:16, 197:15, 203:4
**reading** [6] - 12:14, 19:19, 150:23, 178:3, 178:4
**ready** [1] - 87:19
**real** [7] - 4:1, 24:8, 37:13, 38:12, 45:5, 47:19, 101:22
**realistic** [2] - 131:10, 140:14
**realistically** [2] - 132:19, 153:7
**reality** [3] - 44:17, 54:18, 108:22
**realize** [1] - 186:17
**really** [76] - 13:10, 17:5, 18:10, 19:8, 21:1, 26:11, 40:10, 44:22, 47:17, 47:19, 53:4, 63:19, 69:25, 70:16, 73:14, 74:15, 74:24, 78:25, 90:24, 92:6, 93:13, 99:4, 99:9, 99:20, 101:14, 101:19, 117:22, 118:7, 118:17, 119:2, 121:21, 125:1, 125:18, 126:17, 127:16, 128:3, 129:3, 129:10, 131:4, 132:13, 132:15, 132:16, 133:20, 139:1, 147:11, 147:19, 150:12, 152:16, 155:19, 157:5, 161:10, 161:24, 165:14, 165:23, 167:8, 168:11, 168:24, 170:8, 170:9, 171:2, 171:22, 172:9, 173:6, 173:22, 174:12, 177:16, 177:18, 180:21, 182:15, 183:25, 189:23, 190:22, 201:12, 201:19, 203:11, 207:14
**reaping** [1] - 21:18
**reason** [33] - 10:25, 15:7, 27:15, 29:4, 32:10, 38:20, 50:24, 51:2, 55:2, 55:6, 85:15, 93:4, 95:15, 98:2, 99:9, 99:10, 103:14, 103:23,

104:23, 106:10, 120:12, 121:19, 122:3, 153:21, 154:13, 156:25, 157:13, 167:12, 168:25, 172:5, 182:1, 184:2, 189:13
**reasonable** [5] - 127:15, 155:2, 155:7, 163:16, 166:19
**reasonably** [2] - 200:8, 203:4
**reasons** [19] - 10:24, 33:15, 35:22, 37:6, 37:7, 43:3, 47:14, 52:3, 73:16, 87:2, 90:7, 91:8, 91:11, 99:22, 110:7, 132:22, 158:10, 172:12, 178:10
**rebuttal** [14] - 8:15, 8:16, 8:23, 78:4, 82:19, 82:21, 121:17, 122:13, 123:12, 158:24, 160:13, 189:2, 189:5, 189:22
**rebuttals** [1] - 158:19
**receipt** [1] - 61:8
**receive** [4] - 20:4, 55:13, 81:14, 113:19
**recent** [2] - 101:1, 162:10
**recently** [5] - 10:7, 91:23, 96:9, 173:14, 206:22
**recess** [7] - 55:6, 87:20, 88:11, 88:21, 159:4, 159:7, 159:11
**recipient's** [1] - 102:23
**recognized** [3] - 36:10, 142:22, 195:12
**recognizes** [1] - 162:10
**reconcile** [1] - 73:22
**record** [25] - 3:7, 3:8, 9:22, 87:22, 87:23, 88:2, 88:24, 89:2, 89:15, 93:20, 93:23, 105:3, 125:8, 130:19, 132:11, 148:1, 151:7, 162:20, 182:23, 189:21, 199:2, 208:13, 208:17, 208:21, 211:5
**recorded** [1] - 1:25

**recourse** [1] - 56:1
**recover** [1] - 23:12
**recruit** [2] - 114:16, 114:20
**recruiter** [1] - 114:10
**recruiters** [1] - 113:20
**redefine** [3] - 186:22, 200:18, 203:7
**redefinition** [1] - 204:4
**redressability** [6] - 140:1, 140:3, 140:20, 141:16, 142:3
**reduction** [2] - 22:16, 37:21
**Reduction** [2] - 6:19, 59:18
**redundant** [1] - 209:2
**refer** [7] - 40:1, 59:16, 72:20, 179:2, 197:22, 199:9, 205:5
**reference** [1] - 86:11, 182:24
**referenced** [3] - 73:1, 75:7, 180:13
**references** [2] - 195:5, 196:3
**referred** [3] - 84:16, 167:10, 206:15
**referring** [3] - 47:14, 67:12, 83:21
**refers** [8] - 7:12, 44:2, 44:7, 46:19, 86:24, 187:4, 204:17, 204:21
**refile** [1] - 157:9
**reflect** [1] - 111:23
**reflection** [1] - 116:11
**reflects** [2] - 71:7, 111:21
**refund** [23] - 132:19, 135:4, 138:6, 139:10, 142:17, 143:7, 143:11, 143:18, 143:24, 144:2, 144:3, 145:19, 145:23, 146:1, 146:3, 146:10, 146:24, 151:23, 152:19, 152:21, 153:1, 153:9, 153:13
**refuse** [1] - 19:8
**regard** [1] - 52:13
**regarding** [2] - 111:15, 111:24
**regardless** [2] - 41:20, 161:7
**regime** [5] - 8:11,

26:17, 119:21, 174:23, 198:9
**regulate** [4] - 75:19, 75:25, 80:13, 177:9
**regulated** [18] - 27:17, 30:22, 31:2, 31:7, 31:13, 31:23, 67:4, 104:5, 113:11, 113:15, 114:1, 114:7, 119:9, 119:11, 119:15, 177:5, 202:4
**regulates** [2] - 79:5, 95:1
**regulating** [4] - 67:3, 85:22, 175:21
**regulation** [11] - 51:6, 53:6, 106:19, 106:20, 117:20, 117:21, 119:24, 119:25, 120:1, 192:6, 192:19
**regulations** [3] - 53:20, 86:1, 113:5
**regulatory** [18] - 25:25, 29:6, 30:14, 34:8, 57:23, 67:11, 67:13, 68:14, 75:17, 75:20, 77:17, 120:20, 138:19, 139:3, 149:18, 155:8, 172:10, 173:5
**rehearing** [1] - 130:6
**reimbursed** [2] - 23:16, 27:1
**reimbursement** [4] - 20:4, 81:14, 89:12, 105:14
**reinforced** [1] - 7:9
**reiterate** [1] - 198:16
**reject** [2] - 73:21, 197:4
**rejected** [8] - 31:11, 31:25, 129:14, 130:10, 176:11, 176:17, 194:10, 196:18
**rejects** [2] - 26:20, 172:16
**relate** [1] - 138:10
**related** [5] - 81:18, 88:3, 186:1, 195:19, 203:4
**relates** [2] - 180:5
**Relating** [1] - 59:20
**relating** [2] - 100:11, 185:24
**relation** [2] - 154:11, 156:4
**relationship** [2] - 60:9,

117:24
**relationships** [2] - 75:21, 120:18
**relatively** [1] - 160:12
**release** [3] - 101:25, 195:3, 196:5
**releases** [1] - 125:7
**relevant** [10] - 25:23, 27:13, 40:20, 40:21, 91:8, 114:18, 171:24, 194:24, 197:8
**reliance** [2] - 142:5, 161:2
**relief** [2] - 139:20, 141:19
**relies** [1] - 36:4
**relieve** [2] - 41:12, 91:17
**rely** [5] - 15:17, 15:22, 30:14, 145:21, 188:20
**relying** [2] - 62:14, 85:17
**remain** [2] - 143:20, 159:13
**remainder** [1] - 35:11
**remaining** [3] - 24:19, 86:11, 159:19
**remarks** [1] - 5:20
**remedial** [3] - 128:12, 128:18, 128:21
**remedy** [1] - 124:9
**remember** [8] - 28:5, 113:21, 202:3, 202:10, 205:9, 206:4, 206:6, 206:11
**remind** [1] - 151:3
**reminder** [1] - 3:24
**remotely** [2] - 16:25, 32:2
**remove** [1] - 62:15
**removed** [1] - 164:9
**renouncing** [1] - 69:13
**repeatedly** [1] - 7:12
**reply** [2] - 18:10, 191:16
**report** [2] - 142:15, 142:19
**Reporter** [2] - 1:23, 211:12
**REPORTER'S** [1] - 211:1
**representations** [1] - 111:16
**request** [1] - 8:15
**requested** [1] - 78:7
**require** [7] - 21:5, 74:17, 80:9, 94:18,

103:22, 124:22, 139:9

**required** [18] - 19:12, 22:1, 60:18, 85:3, 114:3, 114:4, 114:20, 116:23, 117:16, 144:4, 149:8, 150:11, 151:1, 151:23, 157:21, 182:16, 203:22

**requirement** [17] - 25:18, 27:9, 32:17, 44:23, 53:21, 58:16, 58:18, 60:16, 65:20, 84:8, 100:4, 101:4, 102:6, 109:10, 113:18, 115:2, 146:23

**requirements** [11] - 7:11, 36:1, 37:4, 60:24, 64:4, 65:10, 113:17, 128:8, 179:19, 192:8, 198:15

**requires** [7] - 21:21, 31:15, 59:1, 60:14, 96:24, 124:14, 152:5

**requiring** [7] - 24:14, 79:20, 85:24, 85:25, 96:18, 150:3, 150:7

**research** [7] - 47:21, 47:24, 48:2, 49:11, 142:19, 162:21, 163:6

**Research** [3] - 45:21, 142:5, 142:15

**reserve** [2] - 8:15, 189:4

**residual** [1] - 171:5

**resold** [1] - 23:16

**resolve** [6] - 40:25, 41:7, 54:19, 70:14, 93:5, 110:5

**resolved** [1] - 176:13

**resonance** [1] - 109:14

**resonated** [1] - 165:19

**resources** [2] - 52:24, 56:25

**respect** [14] - 29:13, 29:14, 39:21, 53:2, 59:24, 59:25, 70:17, 77:6, 77:16, 90:15, 111:18, 141:25, 180:19

**respectfully** [4] - 8:15, 15:7, 18:14, 99:25

**respects** [1] - 90:11

**respond** [6] - 8:23,

92:19, 125:14, 162:6, 177:23, 198:21

**responded** [1] - 34:17

**responding** [1] - 102:6

**response** [9] - 28:2, 54:24, 64:5, 68:15, 80:10, 92:18, 107:21, 122:14, 153:7

**responses** [5] - 8:6, 54:25, 56:8, 107:18, 198:14

**rest** [7] - 38:3, 39:22, 49:1, 49:5, 175:2, 178:13, 191:9

**restart** [1] - 157:9

**restrain** [3] - 133:18, 139:15, 141:22

**restraining** [5] - 132:24, 132:25, 133:1, 133:24, 134:15

**restrict** [3] - 80:14, 116:17, 119:19

**restriction** [3] - 100:4, 100:14

**restrictions** [3] - 14:16, 80:4, 120:5

**restricts** [1] - 119:18

**result** [11] - 26:21, 26:22, 26:24, 62:9, 63:3, 77:9, 77:19, 77:24, 131:6, 131:11, 131:21

**results** [1] - 157:8

**retain** [4] - 144:17, 144:21, 145:8

**retained** [1] - 23:15

**retread** [1] - 102:14

**retributive** [1] - 128:20

**return** [2] - 143:22, 202:20

**revenue** [16] - 127:11, 128:11, 130:25, 134:8, 134:9, 139:1, 139:3, 142:7, 153:22, 153:23, 154:1, 154:2, 154:3, 154:4, 154:9, 154:11

**revenue-building** [1] - 154:11

**revenue-raising** [2] - 139:3, 153:22

**revenues** [6] - 39:14, 47:22, 47:24, 52:10, 55:20, 186:1

**review** [42] - 104:23, 138:1, 151:13,

151:14, 164:4, 164:10, 166:11, 166:21, 168:1, 169:5, 169:9, 169:12, 169:14, 169:21, 170:6, 171:11, 174:6, 174:9, 174:17, 174:24, 175:15, 178:1, 184:13, 184:18, 184:23, 185:8, 185:10, 186:3, 186:12, 190:9, 190:12, 191:17, 192:12, 192:21, 192:24, 193:3, 199:24, 200:7, 201:4, 203:2, 203:18, 207:11

**reviewed** [1] - 169:16

**reviewing** [1] - 193:13

**revised** [4] - 54:2, 62:19, 112:2, 197:23

**revolution** [1] - 203:19

**rewrite** [6] - 127:16, 167:11, 167:21, 178:6, 201:5, 207:17

**rewriting** [2] - 177:22, 186:18

**rewritten** [1] - 157:15

**Rights** [2] - 106:18, 113:2

**rights** [12] - 7:7, 14:17, 27:18, 40:3, 72:13, 73:19, 117:17, 122:22, 123:13, 123:20, 163:18, 180:20

**ripped** [1] - 167:13

**rise** [6] - 3:4, 88:20, 100:10, 159:10, 159:12, 209:25

**risk** [3] - 18:24, 153:8, 153:13

**risks** [2] - 4:2, 66:17

**River** [1] - 2:3

**road** [1] - 202:14

**roadmap** [1] - 6:14

**Robert** [1] - 4:21

**ROBERT** [1] - 1:19

**robust** [1] - 102:19

**role** [7] - 6:14, 35:23, 37:8, 50:6, 74:13, 74:18, 140:18

**roll** [1] - 135:10

**room** [3] - 103:18, 121:4, 133:12

**Roseland** [1] - 1:16

**Roth** [31] - 4:11, 4:13, 8:2, 9:1, 10:16,

11:12, 12:5, 13:21, 20:15, 22:7, 24:25, 27:9, 30:6, 36:8, 46:25, 52:4, 53:16, 58:7, 78:2, 82:14, 85:1, 85:22, 92:16, 94:10, 97:4, 103:1, 104:10, 106:23, 121:17, 127:2, 208:19

**ROTH** [43] - 2:5, 10:16, 10:19, 11:15, 12:11, 12:16, 14:2, 17:4, 20:7, 20:13, 20:19, 20:25, 22:8, 22:13, 22:17, 25:1, 78:3, 78:5, 78:9, 79:24, 81:25, 92:19, 92:22, 93:15, 93:24, 94:3, 94:8, 94:11, 94:14, 96:23, 97:11, 97:14, 98:9, 99:2, 99:18, 103:8, 103:11, 104:9, 121:18, 122:11, 122:23, 123:24, 124:5

**Roth's** [2] - 38:18, 50:11

**Rule** [2] - 135:22, 157:7

**rule** [6] - 77:25, 105:13, 105:24, 149:14, 178:12, 186:11

**rulemaking** [5] - 201:22, 201:24, 202:1, 202:17, 203:18

**rules** [1] - 139:3

**ruling** [2] - 91:9, 148:21

**Rumsfeld** [3] - 113:1, 113:8, 113:17

**Rumsfield** [1] - 106:18

**run** [6] - 57:25, 75:19, 78:13, 137:18, 148:4, 161:3

**running** [1] - 94:5

**runs** [2] - 117:9, 117:10

**Rust** [1] - 117:12

---

**S**

**safeguarding** [1] - 7:8

**safeguards** [1] - 7:6

**safety** [1] - 3:20

**sale** [10] - 8:11, 46:7, 64:6, 143:23, 144:5,

145:7, 152:2, 152:3, 207:7

**sales** [17] - 46:18, 46:20, 58:19, 62:5, 67:4, 67:5, 67:6, 72:6, 72:7, 77:16, 127:11, 143:21, 145:15, 145:25, 153:23

**SAMIR** [1] - 2:13

**Samir** [4] - 5:1, 8:8, 25:3, 127:6

**sanction** [1] - 128:18

**Sanofi** [2] - 50:8, 54:7

**satisfied** [2] - 138:16, 187:8

**satisfies** [1] - 194:23

**satisfy** [2] - 99:11, 174:12

**save** [6] - 21:19, 49:12, 54:18, 94:4, 147:25, 189:1

**savings** [1] - 47:18

**saw** [2] - 112:8, 163:19

**scene** [1] - 16:18

**Schechter** [1] - 168:20

**scheduling** [1] - 114:10

**scheme** [4] - 138:1, 155:9, 158:5, 184:7

**school** [2] - 114:9, 114:16

**schools** [3] - 114:2, 114:15, 114:19

**scope** [3] - 76:9, 112:19, 190:9

**scrubbed** [1] - 118:9

**scrutiny** [6] - 41:3, 99:11, 99:12, 99:15, 99:20, 118:6

**se** [1] - 54:9

**seamless** [2] - 32:23, 32:25

**seat** [1] - 42:24

**seated** [3] - 3:5, 88:23, 159:13

**Sebelius** [2] - 75:7, 192:3

**second** [34] - 7:5, 8:10, 9:3, 16:8, 18:5, 21:10, 21:20, 25:21, 27:11, 28:24, 57:22, 63:25, 85:8, 115:12, 115:16, 120:8, 138:17, 139:5, 147:1, 162:3, 164:25, 165:24, 177:23, 178:6, 178:18, 179:13,

179:22, 184:17, 185:11, 186:5, 192:25, 195:5, 200:16, 202:3
**Second** [2] - 193:1, 193:11
**second-guessing** [1] - 186:5
**secondly** [1] - 167:6
**Secretary** [15] - 1:8, 16:4, 44:3, 44:5, 62:15, 83:13, 83:20, 83:23, 179:20, 187:9, 193:4, 194:24, 195:7, 195:10, 195:19
**secretary's** [1] - 195:22
**section** [4] - 148:2, 184:22, 192:12, 200:10
**Section** [17] - 59:17, 59:18, 59:23, 110:10, 125:18, 179:4, 179:11, 180:9, 180:11, 184:17, 184:24, 185:1, 190:14, 190:17, 190:18, 190:19, 195:13
**sections** [1] - 29:3
**secure** [2] - 36:4, 52:11
**see** [22] - 4:14, 4:23, 22:18, 22:20, 26:18, 34:11, 51:4, 68:17, 122:8, 125:7, 136:10, 146:3, 151:19, 162:9, 178:15, 179:13, 180:5, 180:19, 184:14, 185:11, 187:2, 204:18
**seeking** [2] - 141:16, 141:19
**seem** [4] - 63:18, 76:8, 110:15, 165:15
**sees** [2] - 119:21, 192:18
**segment** [1] - 159:19
**Seila** [2] - 165:25, 166:24
**seize** [2] - 24:17, 34:23
**seized** [1] - 96:3
**seizure** [1] - 18:4
**select** [4] - 11:2, 185:16, 200:19, 201:2
**selected** [12] - 11:11,

20:3, 36:21, 43:9, 47:11, 52:11, 52:12, 56:3, 59:22, 111:18, 191:1, 195:25
**selecting** [1] - 198:1
**selection** [6] - 184:23, 185:20, 190:16, 190:24, 194:20, 199:20
**sell** [48] - 7:15, 7:25, 14:22, 18:8, 18:12, 18:13, 18:22, 19:9, 24:15, 26:21, 26:24, 30:24, 30:25, 31:13, 31:15, 33:11, 33:13, 48:9, 53:7, 53:10, 53:11, 55:19, 55:24, 59:1, 60:9, 61:4, 61:6, 62:13, 65:2, 65:7, 73:18, 79:3, 79:8, 81:5, 124:17, 144:9, 144:19, 145:1, 145:3, 145:5, 160:24, 164:18, 168:11, 172:20, 172:23, 175:15, 175:19, 205:20
**seller** [1] - 11:14
**selling** [3] - 56:1, 72:16, 201:12
**Sen** [12] - 5:1, 8:8, 9:5, 25:3, 28:11, 35:21, 40:19, 127:6, 130:14, 137:7, 158:18, 208:19
**SEN** [28] - 2:13, 4:25, 25:2, 25:6, 26:9, 28:22, 29:1, 29:12, 29:18, 29:22, 33:6, 35:1, 35:5, 127:5, 127:8, 130:15, 130:23, 131:3, 131:8, 131:18, 132:12, 134:24, 136:12, 152:13, 156:11, 157:22, 157:25, 158:3
**Sen's** [1] - 137:11
**send** [4] - 15:23, 114:4, 114:10, 157:4
**sending** [2] - 11:24, 24:17
**senior's** [3] - 19:12, 19:17, 80:11
**sense** [20] - 19:8, 19:24, 29:17, 55:18, 55:20, 62:18, 89:18, 92:6, 109:19, 110:24, 110:25, 111:11, 127:16,

127:17, 129:3, 134:20, 174:22, 190:7, 190:11, 196:8
**sentence** [1] - 175:9
**separate** [13] - 14:18, 60:8, 74:3, 74:6, 79:24, 87:5, 89:24, 116:22, 132:1, 176:12, 182:20, 190:5, 201:9
**separately** [4] - 44:6, 122:23, 182:13, 206:8
**separation** [18] - 9:8, 159:20, 160:12, 161:5, 161:23, 162:9, 163:20, 166:1, 166:24, 167:20, 170:12, 170:25, 171:3, 171:25, 173:1, 173:7, 173:12, 188:17
**sequential** [1] - 166:20
**serious** [2] - 36:25, 60:21
**seriously** [2] - 173:11, 174:7
**serve** [4] - 57:16, 74:12, 128:18, 135:23
**serves** [3] - 3:24, 128:21, 128:22
**service** [2] - 71:12, 116:3
**Service** [4] - 45:22, 142:6, 142:15, 180:11
**Services** [6] - 1:8, 133:20, 138:24, 139:2, 141:2, 192:3
**services** [2] - 68:9, 71:3
**serving** [2] - 4:2, 128:19
**session** [1] - 8:17
**sessions** [1] - 7:17
**set** [19] - 56:22, 61:7, 66:14, 70:11, 76:22, 79:2, 99:19, 109:4, 115:5, 154:6, 155:4, 155:7, 161:16, 170:20, 178:18, 179:17, 180:20, 185:14, 185:15
**setting** [3] - 9:9, 136:24, 164:13
**settled** [1] - 7:3
**seven** [2] - 148:20,

205:16
**several** [6] - 108:3, 110:7, 171:1, 174:10, 180:17, 202:14
**sex** [3] - 101:6, 101:9
**Shahinian** [1] - 4:18
**SHAHINIAN** [1] - 1:15
**SHAKOW** [1] - 2:10
**Shakow** [1] - 5:5
**shall** [7] - 16:4, 60:3, 187:9, 192:11, 193:3, 194:24, 195:10
**share** [1] - 15:18
**shareholders** [1] - 76:18
**sheet** [3] - 96:6, 96:7, 103:15
**shield** [1] - 134:10
**shift** [3] - 45:1, 50:1, 198:4
**shifting** [1] - 11:9
**short** [6] - 105:13, 142:10, 159:11, 189:11, 197:25, 199:1
**shortcuts** [1] - 82:10
**shorter** [1] - 82:5
**shortly** [2] - 82:18, 165:19
**shot** [1] - 29:9
**show** [9] - 13:6, 13:8, 23:4, 35:23, 87:6, 132:2, 143:5, 146:6, 146:7
**showing** [1] - 12:23
**shows** [2] - 36:14, 38:25
**shy** [1] - 98:18
**side** [21] - 5:8, 28:1, 28:14, 35:15, 40:10, 40:11, 56:11, 61:24, 73:2, 106:17, 110:5, 110:20, 115:1, 119:2, 136:3, 136:8, 167:9, 170:24, 173:22, 180:18, 191:15
**sided** [1] - 54:22
**sides** [3] - 101:18, 158:21, 208:16
**sign** [16] - 44:21, 84:9, 96:25, 97:17, 97:21, 100:21, 106:25, 107:13, 110:16, 110:19, 115:25, 123:18, 124:1, 124:8, 167:23, 195:18

**signaled** [1] - 56:5
**signaling** [1] - 56:16
**signals** [1] - 57:5
**signatories** [1] - 112:17
**signature** [2] - 16:21, 103:3
**signatures** [2] - 108:2, 108:4
**signed** [4] - 52:15, 57:2, 98:12, 103:10
**significant** [7] - 18:18, 48:14, 50:6, 54:6, 68:1, 86:3, 200:11
**signing** [7] - 103:25, 107:17, 111:14, 112:21, 112:22, 117:6, 118:2
**signs** [1] - 123:17
**SILLIS** [1] - 2:1
**Sills** [1] - 4:8
**similar** [8] - 30:17, 30:19, 74:6, 75:5, 125:14, 196:18, 201:11, 203:23
**similarly** [1] - 203:22
**simple** [6] - 10:11, 24:5, 80:15, 97:12, 127:21, 129:5
**simpler** [2] - 78:25, 121:20
**simplifying** [1] - 70:4
**simply** [9] - 41:24, 56:16, 60:23, 65:2, 66:8, 73:11, 114:10, 140:14, 161:15
**Sindermann** [1] - 86:22
**single** [23] - 20:8, 20:17, 62:13, 101:20, 123:1, 135:11, 139:6, 140:24, 143:23, 152:2, 152:3, 153:20, 161:14, 179:18, 180:2, 185:1, 190:19, 191:2, 191:4, 191:6, 194:16, 194:23, 205:14
**single-source** [10] - 179:18, 180:2, 185:1, 190:19, 191:2, 191:4, 191:6, 194:16, 194:23, 205:14
**singular** [2] - 195:1, 195:14, 195:15
**sister** [1] - 10:6
**sit** [1] - 189:2

**sitting** [2] - 64:25, 209:18
**situated** [1] - 90:10
**situation** [7] - 69:19, 122:2, 133:6, 139:23, 151:4, 152:22, 167:1
**situations** [1] - 149:15
**six** [2] - 177:14, 182:3
**Sixth** [1] - 59:5
**size** [4] - 36:17, 50:19, 195:4, 196:1
**skip** [1] - 144:18, 199:13
**slew** [1] - 151:18
**slice** [2] - 47:8, 85:2
**slower** [1] - 151:10
**slowly** [1] - 188:22
**smaller** [1] - 150:25
**smarter** [1] - 199:6
**smuggle** [1] - 174:11
**so-called** [1] - 128:4
**social** [1] - 10:25
**softball** [2] - 165:7, 165:8
**sold** [2] - 145:8, 163:21
**solely** [1] - 128:18
**solve** [2] - 172:14, 173:3
**solvent** [1] - 113:18
**someone** [7] - 16:13, 34:6, 85:12, 95:1, 123:9, 153:12, 155:14
**sometimes** [5] - 148:18, 181:5, 181:6, 194:3, 194:4
**somewhat** [2] - 127:15, 176:16
**somewhere** [3] - 31:24, 55:15, 145:12
**Sorrell** [1] - 120:3
**sorry** [11] - 10:13, 19:15, 29:13, 29:18, 54:17, 67:12, 70:7, 139:25, 151:12, 184:15, 188:2
**sort** [46] - 12:18, 13:14, 13:19, 14:6, 17:11, 18:9, 19:11, 24:13, 25:11, 26:10, 27:10, 29:23, 29:24, 30:5, 33:17, 34:13, 34:14, 58:9, 64:18, 66:24, 70:20, 71:8, 71:24, 90:16, 93:15, 109:15, 109:23, 118:5, 118:19, 135:17, 136:14,

136:21, 165:20, 165:24, 170:24, 171:11, 172:5, 172:11, 173:2, 173:4, 173:10, 174:1, 177:6, 178:16, 186:15, 190:1
**sorts** [2] - 66:11, 74:19
**Sotomayor's** [1] - 31:8
**sought** [1] - 105:18
**Soule** [2] - 1:23, 211:11
**Soule@njd.uscourts .gov** [1] - 1:23
**sound** [1] - 34:14
**source** [10] - 179:18, 180:2, 185:1, 190:19, 191:2, 191:4, 191:6, 194:16, 194:23, 205:14
**Southern** [2] - 10:4, 59:3
**sovereign** [8] - 34:6, 34:9, 53:17, 68:16, 85:23, 86:3, 122:18, 128:16
**sovereignty** [1] - 75:9
**space** [1] - 123:4
**Spalding** [1] - 5:4
**SPALDING** [1] - 2:8
**speaker** [1] - 115:21
**speaking** [2] - 176:5, 208:8
**special** [6] - 26:10, 30:3, 72:25, 86:25, 93:4, 183:16
**specific** [16] - 6:16, 11:18, 12:6, 27:7, 66:12, 106:15, 177:4, 178:10, 179:7, 180:24, 181:14, 185:23, 195:3, 195:10, 196:1, 204:19
**specifically** [9] - 111:2, 119:14, 155:3, 177:7, 181:12, 182:2, 197:2, 199:21, 204:21
**specified** [1] - 111:23
**specify** [1] - 115:19
**speculate** [2] - 98:25, 122:8
**speech** [29] - 94:15, 98:10, 99:13, 99:20, 100:8, 100:10,

100:19, 101:2, 101:17, 101:21, 102:1, 102:12, 102:20, 113:12, 113:15, 113:16, 114:3, 114:19, 116:18, 117:21, 120:6, 123:2, 124:12, 124:13, 124:15, 125:19, 125:22, 207:8
**Speech** [2] - 98:19, 126:25
**spend** [29] - 34:5, 68:11, 69:3, 78:18, 116:20, 125:21, 125:24, 126:9, 126:10, 164:6, 169:24, 185:21, 185:24, 185:25, 186:6, 187:6, 187:9, 198:15, 200:19, 200:20, 201:1, 201:2, 203:5
**spending** [25] - 34:3, 37:25, 38:1, 38:2, 49:5, 57:19, 67:2, 67:15, 67:20, 67:22, 67:23, 68:8, 68:12, 69:2, 75:13, 85:17, 85:19, 86:2, 115:3, 115:18, 117:15, 125:23
**spent** [7] - 69:6, 76:25, 102:10, 116:21, 126:2, 126:3, 126:4
**spin** [1] - 45:16
**split** [1] - 7:16
**splitting** [1] - 57:12
**spoken** [2] - 158:23, 186:8
**sponsored** [1] - 109:12
**spotlight** [1] - 147:20
**spots** [1] - 140:10
**spread** [1] - 22:23
**squarely** [4] - 129:14, 139:12, 141:13, 147:21
**Squibb** [4] - 2:7, 3:9, 4:7, 10:17
**stabilized** [1] - 30:19
**stage** [1] - 24:11
**stake** [1] - 171:22
**stand** [1] - 125:17
**standalone** [1] - 165:20
**standard** [17] - 23:9, 57:19, 63:21, 73:4,

120:2, 149:4, 162:18, 163:8, 167:25, 168:7, 169:20, 170:3, 170:4, 173:13, 179:19, 193:15, 193:17
**standards** [7] - 9:9, 60:18, 120:21, 169:10, 174:13, 192:14, 192:15
**standing** [8] - 49:23, 63:10, 63:11, 89:11, 93:1, 118:16, 165:13, 176:18
**standpoint** [4] - 90:11, 91:15, 93:16, 99:8
**star** [1] - 197:2
**staring** [1] - 65:4
**stark** [1] - 174:4
**start** [10] - 12:1, 14:19, 115:20, 151:9, 179:4, 183:11, 185:4, 190:5, 190:11, 190:12
**started** [5] - 22:22, 87:21, 98:3, 121:18, 161:22
**starting** [4] - 7:22, 43:8, 45:7, 45:22
**starts** [1] - 137:24
**State** [4] - 1:10, 96:5, 96:7, 103:16
**state** [2] - 75:22, 133:21
**statement** [4] - 103:9, 111:15, 122:16, 143:25
**statements** [3] - 102:6, 103:23, 128:8
**States** [5] - 3:2, 69:3, 74:5, 129:16, 137:8
**STATES** [2] - 1:1, 1:13
**states** [7] - 50:25, 51:6, 52:24, 75:14, 75:15, 127:8, 190:16
**statute** [116] - 6:24, 7:5, 7:23, 8:24, 9:3, 9:7, 14:23, 16:4, 16:8, 17:22, 18:6, 18:15, 18:16, 19:2, 19:11, 19:18, 21:3, 21:4, 21:21, 23:25, 35:25, 43:13, 44:2, 44:20, 45:17, 45:18, 46:19, 58:14, 59:9, 60:4, 60:8, 60:13, 60:22, 70:12, 79:3, 79:4, 79:10, 79:19, 80:9, 80:12, 80:18,

84:11, 85:3, 93:1, 93:3, 95:6, 96:23, 100:9, 108:5, 108:24, 109:17, 110:10, 110:15, 111:1, 111:23, 124:14, 124:16, 126:18, 126:20, 126:21, 126:24, 128:5, 128:8, 129:17, 132:23, 134:6, 134:9, 134:25, 135:1, 152:24, 154:7, 155:17, 161:25, 162:5, 163:1, 163:4, 163:25, 164:24, 167:11, 167:13, 167:16, 167:22, 168:20, 168:25, 169:3, 169:9, 170:1, 174:19, 176:25, 177:22, 181:11, 181:20, 184:8, 186:9, 186:21, 187:20, 188:12, 188:13, 190:13, 190:22, 192:14, 196:3, 202:22, 204:3, 204:20, 205:4, 205:13, 206:1, 207:4, 207:5, 207:17, 207:18, 207:20
**statute's** [2] - 8:10, 187:8
**statutes** [5] - 7:11, 63:9, 63:18, 169:4, 170:2
**statutes'** [1] - 7:19
**statutory** [67] - 7:21, 8:19, 9:14, 19:5, 43:11, 44:23, 46:23, 58:10, 58:16, 58:17, 59:15, 60:17, 61:23, 76:9, 76:21, 77:17, 90:3, 90:4, 91:9, 91:11, 92:6, 92:11, 92:13, 100:7, 103:24, 105:23, 107:24, 109:10, 111:21, 112:12, 112:23, 120:25, 125:2, 125:3, 125:4, 125:5, 138:11, 140:8, 154:22, 159:23, 160:3, 160:14, 170:13, 174:18, 175:23, 176:5, 176:12, 176:20, 177:19,

178:7, 178:14, 178:18, 186:18, 190:3, 191:5, 191:13, 191:20, 192:8, 192:10, 193:5, 194:17, 196:7, 197:15, 200:3, 201:5, 205:23
**stay** [4] - 26:24, 38:13, 72:5, 150:5
**stays** [1] - 27:2
**stealth** [1] - 74:17
**stenography** [1] - 1:25
**step** [8] - 13:17, 27:20, 71:16, 95:4, 120:14, 144:1, 171:23, 199:15
**stepping** [6] - 45:17, 73:10, 132:15, 135:12, 135:25, 202:25
**steps** [4] - 14:18, 95:4, 202:15, 202:16
**stifled** [1] - 77:6
**still** [30] - 16:1, 17:19, 21:23, 25:14, 28:24, 29:1, 40:25, 41:21, 42:4, 48:16, 51:20, 57:25, 62:12, 63:21, 68:8, 69:1, 82:19, 87:10, 101:22, 114:22, 127:21, 127:23, 141:16, 149:18, 156:2, 184:13, 196:22, 196:23, 199:18, 208:18
**sting** [1] - 158:18
**stock** [2] - 38:3, 49:7
**stood** [2] - 82:22, 205:9
**stop** [6] - 46:20, 56:1, 82:15, 123:23, 136:12, 140:22
**Store** [1] - 19:12
**store** [1] - 19:13
**story** [4] - 23:23, 71:5, 75:3, 142:10
**straight** [2] - 117:9, 117:10
**straightforward** [3] - 69:12, 128:15, 135:21
**strange** [2] - 95:13, 121:23
**stream** [2] - 77:18, 134:8
**streamlined** [1] - 122:6
**Street** [3] - 1:10, 1:20,

2:21
**street** [7] - 58:25, 68:18, 68:22, 68:25, 86:6, 150:11, 155:12
**strength** [6] - 187:10, 187:12, 187:22, 188:5, 206:14, 206:18
**strengths** [4] - 194:25, 195:24, 206:4, 206:9
**stressed** [1] - 30:6
**stretch** [1] - 159:9
**stricken** [1] - 126:14
**strict** [1] - 99:15
**strike** [1] - 124:9
**stripped** [3] - 162:5, 164:13, 166:14
**strips** [2] - 7:6, 162:1
**strong** [4] - 82:4, 145:24, 150:13, 151:4
**stronger** [1] - 53:1
**struck** [1] - 168:21
**structural** [6] - 21:1, 161:6, 163:18, 163:20, 166:12, 173:11
**structurally** [1] - 30:17
**structure** [6] - 19:18, 76:17, 181:1, 194:8, 197:20, 197:21
**structured** [5] - 94:17, 95:3, 100:17, 121:3, 121:4
**structuring** [1] - 95:19
**students** [1] - 114:11
**stuff** [5] - 30:7, 30:11, 123:15, 136:25, 143:20
**subheading** [1] - 59:21
**subject** [32] - 27:2, 31:20, 50:4, 50:16, 58:5, 62:6, 62:13, 64:2, 64:7, 64:13, 65:9, 65:18, 65:23, 84:20, 87:24, 89:3, 90:14, 92:22, 93:2, 104:21, 120:2, 120:3, 152:22, 161:19, 166:11, 167:24, 169:4, 173:12, 177:5, 177:9, 184:23, 202:13
**subjects** [1] - 36:8
**submission** [1] - 7:16
**submissions** [4] - 97:10, 189:16, 189:20, 209:13

**submitted** [4] - 5:17, 171:16, 172:8, 196:10
**subparagraph** [1] - 111:14
**subscribe** [1] - 124:23
**subscription** [1] - 62:2
**Subsection** [9] - 179:18, 185:6, 185:10, 185:20, 199:20, 199:21, 200:4, 200:5
**subsection** [1] - 199:24
**subsidize** [6] - 78:19, 115:20, 117:16, 125:22, 126:11, 126:12
**subsidized** [1] - 30:22
**subsidy** [1] - 101:4
**substance** [4] - 181:7, 193:6, 193:22, 204:17
**substantial** [1] - 143:4
**substantive** [6] - 89:11, 95:8, 157:7, 163:7, 192:7, 203:16
**substantively** [2] - 154:25, 156:23
**succeed** [1] - 143:8
**success** [2] - 146:7, 146:9
**sue** [1] - 140:4
**sued** [3] - 81:8, 135:20, 147:11
**suffer** [3] - 66:23, 143:11, 144:2
**suffers** [1] - 172:6
**sufficient** [4] - 26:14, 62:24, 88:13, 164:4
**suggest** [3] - 12:21, 76:12, 76:15
**suggested** [3] - 69:11, 76:5, 149:9
**suggesting** [1] - 76:4
**suggestion** [1] - 126:17
**suggests** [1] - 186:7
**suit** [24] - 132:23, 132:25, 133:18, 133:24, 133:25, 134:4, 134:15, 139:6, 139:10, 139:15, 141:21, 142:17, 143:8, 143:11, 143:18, 144:2, 144:3, 145:19, 145:23, 146:1, 146:3,

146:10, 146:24, 151:23
**suit'** [1] - 143:7
**suit's** [1] - 133:24
**Suite** [1] - 2:11
**suits** [3] - 133:22, 138:6
**sum** [2] - 24:14, 68:6
**sum-up** [1] - 24:14
**summarized** [1] - 197:22
**summary** [1] - 140:1
**summer** [1] - 43:10
**sums** [1] - 55:15
**Supp** [1] - 197:7
**suppliers** [1] - 192:5
**support** [3] - 95:17, 95:18, 139:22
**supported** [1] - 31:14
**supporting** [1] - 116:24
**supports** [2] - 194:9, 197:20
**suppose** [1] - 46:6
**supposed** [7] - 125:17, 145:25, 146:1, 146:20, 155:8, 203:13, 203:14
**Supreme** [51] - 14:6, 15:16, 15:19, 21:24, 23:14, 23:18, 30:13, 30:16, 31:4, 31:25, 36:3, 50:2, 51:8, 54:11, 71:13, 72:24, 75:10, 98:18, 98:22, 98:24, 100:12, 101:1, 102:3, 102:22, 106:16, 109:6, 109:16, 112:25, 113:10, 115:14, 117:13, 120:4, 123:2, 124:14, 128:17, 129:13, 129:14, 131:24, 132:5, 134:6, 136:4, 136:6, 154:23, 162:9, 166:1, 171:8, 173:17, 174:8, 174:16, 181:4, 204:23
**surcharge** [1] - 119:20
**surely** [3] - 56:22, 68:19, 89:19
**surprise** [1] - 137:23
**surprising** [1] - 156:7
**survive** [2] - 34:25, 38:7
**susceptible** [2] -

178:2, 200:9
**suspect** [1] - 103:16
**suspend** [3] - 19:21, 19:23, 20:1
**suspenders** [1] - 108:14
**suspicion** [1] - 145:24
**sustained** [1] - 173:17
**SVERDLOV** [39] - 2:21, 89:17, 89:23, 92:1, 92:4, 104:16, 105:1, 105:11, 105:21, 105:23, 106:5, 106:7, 107:7, 107:18, 107:21, 108:11, 108:14, 109:2, 110:1, 111:7, 111:12, 112:16, 113:23, 113:25, 114:23, 116:8, 116:10, 159:2, 159:6, 170:17, 170:19, 171:17, 171:20, 175:6, 189:10, 189:23, 194:2, 196:21, 196:24
**Sverdlov** [10] - 5:13, 104:17, 104:18, 121:16, 175:5, 189:9, 196:22, 198:20, 201:6, 208:20
**Sverdlov's** [1] - 136:3
**swaths** [1] - 197:17
**sweep** [1] - 188:10
**sweeping** [2] - 164:11, 202:25
**sworn** [3] - 39:6, 46:14, 49:15
**sympathize** [1] - 41:15
**syncs** [1] - 136:14
**syringes** [1] - 58:11
**system** [8] - 12:9, 33:18, 39:17, 64:16, 69:18, 154:6, 161:16, 202:11

---

**T**

**tab** [1] - 184:17
**table** [3] - 5:13, 96:9, 96:12
**tabs** [1] - 178:16
**tag** [1] - 27:6
**tailored** [1] - 132:8
**takings** [43] - 7:24, 8:5, 10:22, 15:23, 21:21, 23:9, 24:16, 25:25, 28:11, 28:23,

28:25, 29:1, 29:2, 29:6, 29:7, 29:23, 29:24, 30:15, 31:5, 35:2, 35:16, 40:6, 40:24, 41:1, 41:7, 41:22, 54:19, 57:14, 57:19, 70:21, 71:14, 74:24, 78:12, 78:23, 82:2, 85:11, 85:14, 92:25, 93:12, 172:5, 172:10
**talk-down** [1] - 95:18
**talks** [2] - 204:16, 205:6
**tax** [131] - 16:10, 17:7, 17:9, 17:20, 19:21, 33:25, 34:8, 36:9, 36:11, 36:14, 43:15, 45:7, 45:8, 45:19, 45:22, 46:7, 46:16, 46:17, 47:2, 47:9, 84:9, 97:17, 124:7, 128:4, 130:20, 130:25, 131:2, 131:6, 132:17, 132:24, 133:2, 133:3, 133:4, 133:8, 133:11, 133:14, 133:19, 133:25, 134:11, 134:16, 135:3, 135:16, 135:19, 136:10, 136:12, 136:15, 136:16, 136:20, 136:23, 137:1, 137:12, 137:14, 138:5, 138:13, 138:14, 138:16, 138:19, 138:21, 138:25, 139:3, 139:4, 139:8, 139:10, 139:11, 139:13, 139:16, 139:20, 139:23, 140:5, 140:6, 140:8, 140:14, 140:16, 140:18, 140:21, 140:22, 141:1, 141:6, 141:8, 141:9, 141:21, 141:23, 142:7, 142:16, 143:16, 143:17, 143:22, 144:5, 144:15, 144:22, 145:2, 145:5, 145:6, 145:25, 147:4, 148:14, 148:15, 148:16, 148:21, 148:25, 149:16, 149:18, 151:7, 151:25, 152:2,

152:16, 153:12, 153:21, 153:22, 154:1, 154:4, 154:6, 154:10, 154:16, 154:20, 154:21, 155:2, 155:7, 155:13, 156:19, 158:14
**taxed** [1] - 97:16
**taxes** [22] - 47:8, 53:19, 79:17, 85:4, 85:25, 138:7, 138:8, 141:22, 141:25, 142:1, 147:5, 147:7, 147:22, 148:18, 148:20, 148:22, 148:23, 149:3, 149:21, 153:22, 154:14
**taxing** [1] - 147:4
**taxpayer** [3] - 139:9, 143:3, 143:5
**taxpayers** [3] - 138:6, 145:21, 146:20
**tea** [1] - 12:14
**team** [1] - 208:5
**tech** [1] - 206:22
**technical** [8] - 108:8, 109:19, 109:22, 110:23, 110:25, 118:20, 135:25, 169:23
**teeth** [1] - 169:18
**telephone** [1] - 130:2
**template** [6] - 103:13, 108:1, 110:9, 111:13, 126:18, 126:19
**ten** [13] - 8:15, 11:10, 22:24, 25:4, 50:16, 80:20, 96:8, 98:6, 159:5, 185:9, 199:22, 200:11, 200:23
**tended** [1] - 157:2
**tens** [1] - 17:12
**Tenth** [1] - 1:20
**term** [14] - 108:23, 109:11, 109:13, 109:17, 109:18, 109:21, 110:23, 110:24, 111:20, 125:2, 148:9, 194:5, 197:8, 204:13
**terminate** [2] - 25:8, 62:2
**terms** [29] - 7:25, 19:4, 20:4, 21:6, 55:22, 55:24, 69:25, 75:1, 79:2, 97:12, 107:23,

107:24, 108:4, 108:8, 109:22, 110:25, 111:18, 111:21, 111:22, 111:24, 112:12, 112:23, 113:20, 118:20, 177:22, 185:19
**terrible** [1] - 183:5
**test** [6] - 72:25, 73:1, 86:18, 87:11, 174:7, 174:15
**Texas** [7] - 10:2, 14:23, 42:10, 89:9, 90:6, 104:22, 192:3
**text** [11] - 59:15, 132:22, 138:11, 190:13, 190:14, 194:8, 194:13, 194:14, 197:19, 205:13, 205:24
**thanking** [1] - 206:25
**THE** [215] - 1:1, 1:13, 3:4, 3:5, 4:14, 4:23, 5:3, 5:7, 5:15, 5:23, 6:2, 6:4, 9:18, 9:21, 10:11, 10:14, 10:18, 11:12, 12:4, 12:13, 13:21, 16:13, 20:6, 20:8, 20:14, 20:22, 22:7, 22:9, 22:15, 24:25, 25:5, 26:6, 27:19, 28:18, 28:24, 29:8, 29:16, 33:3, 33:8, 34:24, 35:4, 35:7, 35:9, 35:18, 37:9, 39:16, 41:8, 41:19, 41:24, 42:16, 42:20, 42:23, 43:16, 44:1, 45:11, 46:1, 48:5, 48:25, 49:17, 50:10, 54:21, 55:1, 56:10, 61:15, 62:24, 63:1, 63:4, 64:21, 67:8, 67:18, 69:21, 69:23, 70:4, 73:9, 73:22, 78:1, 78:4, 78:6, 79:22, 81:24, 82:14, 82:17, 83:1, 83:25, 84:14, 84:23, 87:15, 87:17, 87:19, 88:10, 88:13, 88:16, 88:20, 88:23, 89:21, 91:19, 92:2, 92:15, 92:21, 93:14, 93:19, 94:2, 94:7, 94:9, 94:12, 96:22, 97:4, 97:12, 98:8, 98:21, 99:12, 103:1, 103:9, 104:8, 104:10,

104:18, 105:2, 105:19, 105:22, 106:1, 106:6, 106:22, 107:8, 107:20, 108:10, 108:12, 108:16, 109:24, 111:4, 111:10, 112:14, 113:21, 113:24, 114:14, 116:1, 116:9, 121:16, 122:4, 122:12, 123:14, 124:3, 127:2, 127:7, 130:11, 130:17, 130:24, 131:6, 131:15, 132:7, 134:22, 136:1, 137:7, 137:10, 137:20, 137:22, 138:20, 139:17, 142:1, 144:11, 146:11, 146:14, 147:25, 148:4, 151:10, 151:13, 152:10, 156:10, 157:20, 157:23, 158:1, 158:17, 159:4, 159:7, 159:10, 159:12, 159:13, 159:17, 159:25, 160:2, 160:8, 160:15, 160:18, 165:1, 165:6, 165:14, 167:14, 170:11, 170:18, 171:16, 171:18, 175:4, 175:7, 175:11, 176:1, 178:21, 181:24, 183:7, 184:20, 189:4, 189:8, 189:12, 194:1, 196:20, 196:22, 198:19, 199:2, 199:5, 200:2, 201:6, 202:15, 207:23, 207:25, 208:8, 208:11, 209:25
**theirs** [1] - 167:1
**theme** [1] - 173:21
**themes** [1] - 6:21
**themselves** [3] - 40:7, 64:22, 96:19
**theoretically** [2] - 35:24, 36:20
**theories** [2] - 77:22, 171:6
**theory** [12] - 36:6,

50:5, 59:8, 66:23, 72:18, 116:14, 132:17, 132:21, 153:10, 172:2, 172:3, 172:6
**therefore** [8] - 13:4, 25:24, 38:8, 71:15, 100:15, 123:20, 183:24, 194:7
**thereof** [2] - 108:4, 171:11
**Theresa** [2] - 48:9, 48:20
**thesis** [1] - 194:3
**they've** [10] - 34:13, 37:11, 65:3, 125:16, 167:19, 172:14, 175:2, 182:13, 203:15, 204:3
**thin** [1] - 59:12
**thinking** [3] - 9:24, 32:19, 132:3
**thinks** [3] - 142:19, 156:8, 157:1
**Third** [11] - 50:8, 52:20, 52:21, 52:22, 54:7, 76:12, 101:16, 130:4, 142:25, 143:2, 149:11
**third** [12] - 7:9, 9:7, 21:12, 21:22, 22:5, 22:6, 23:2, 58:2, 127:24, 129:7, 154:16, 164:3
**thirty** [1] - 88:13
**Thompson** [1] - 51:5
**Thornton** [1] - 143:2
**thorough** [1] - 92:8
**threat** [4] - 17:19, 37:14, 79:20, 134:3
**three** [27] - 5:15, 6:22, 12:25, 13:13, 29:3, 36:15, 72:6, 94:13, 97:14, 98:2, 107:18, 119:1, 120:10, 140:12, 161:24, 177:18, 193:4, 194:18, 198:24, 198:25, 201:19, 201:23, 202:18, 205:23, 206:12, 206:15
**threshold** [8] - 13:23, 14:3, 25:16, 71:23, 137:15, 174:12, 174:15, 179:7
**throughout** [3] - 111:21, 136:22, 196:3
**throwing** [1] - 144:9

**thrust** [4] - 13:10, 70:10, 79:9, 92:10
**tick** [1] - 37:6
**ticket** [1] - 44:25
**tie** [1] - 194:12
**tied** [5] - 52:20, 148:13, 181:12, 181:13, 184:3
**tiger** [1] - 201:7
**timelines** [1] - 43:21
**timing** [1] - 43:13
**title** [1] - 59:23
**titled** [1] - 128:6
**today** [26] - 3:25, 4:13, 5:17, 27:21, 36:22, 36:24, 41:9, 41:17, 44:9, 52:12, 56:7, 64:25, 65:10, 98:24, 118:16, 133:10, 144:15, 162:23, 165:16, 187:25, 199:16, 208:2, 208:14, 209:4, 209:15, 209:18
**together** [11] - 17:22, 19:23, 41:18, 80:2, 103:18, 180:4, 182:3, 182:19, 185:8, 188:8, 206:20
**tomorrow** [2] - 164:17, 168:9
**tongue** [2] - 6:6, 6:7
**Toni** [1] - 4:12
**TONI** [1] - 2:6
**TONI-ANN** [1] - 2:6
**Toni-Ann** [1] - 4:12
**tonight** [2] - 96:5, 103:17
**took** [1] - 81:9
**tool** [3] - 133:8, 134:2, 134:10
**toothless** [1] - 201:7
**top** [9] - 46:7, 85:11, 119:13, 130:4, 144:14, 163:13, 190:1, 197:19, 207:10
**total** [2] - 130:24, 186:1
**totaling** [1] - 55:15
**totally** [3] - 149:7, 188:5, 206:10
**touch** [1] - 150:10
**touched** [2] - 100:19, 195:20
**toward** [1] - 56:25
**towards** [2] - 128:23, 144:22
**track** [2] - 40:11, 44:4
**tracking** [1] - 171:19

**trade** [1] - 105:15
**traditional** [1] - 174:2
**trafficking** [2] - 101:6, 101:9
**trampled** [1] - 58:4
**transaction** [6] - 68:17, 68:22, 68:25, 69:15, 77:20, 77:22
**transactions** [4] - 57:20, 59:13, 70:23, 71:1
**transcript** [2] - 1:25, 211:4
**transcription** [1] - 1:25
**transfer** [3] - 15:15, 17:20, 18:3
**transgresses** [2] - 52:3, 52:4
**transitioning** [1] - 183:16
**translates** [1] - 177:10
**transmit** [1] - 58:12
**transport** [1] - 58:12
**Treasury** [8] - 136:1, 139:24, 140:4, 140:15, 147:12, 147:15, 147:18, 147:23
**treat** [1] - 39:3
**treated** [1] - 188:7
**Trenton** [1] - 1:11
**trial** [1] - 98:23
**trick** [1] - 141:18
**trickled** [1] - 114:12
**tricky** [1] - 93:11
**tried** [14] - 25:12, 34:13, 64:7, 76:7, 76:15, 77:23, 99:10, 99:11, 120:8, 127:13, 127:14, 136:22, 154:14, 172:14
**tries** [1] - 72:22
**trigger** [3] - 140:8, 141:8, 176:3
**triggered** [2] - 87:1, 128:7
**triggering** [2] - 176:7, 183:10
**triggers** [1] - 106:10
**trillion** [2] - 152:17
**trivially** [1] - 79:17
**trouble** [1] - 80:25
**truck** [4] - 12:22, 21:10, 21:11, 23:1
**trucks** [7] - 11:25, 13:5, 13:8, 15:4, 23:4, 24:17, 34:16
**true** [28] - 12:1, 19:5,

40:7, 53:8, 68:19, 80:17, 83:9, 85:19, 86:6, 86:20, 102:1, 110:7, 121:9, 122:25, 123:1, 125:23, 131:15, 138:17, 138:18, 138:24, 140:7, 142:8, 149:11, 154:21, 169:18, 193:22, 194:17
**truly** [2] - 61:1, 68:4
**trust** [1] - 78:12
**truth** [1] - 103:20
**try** [19] - 45:9, 59:19, 72:18, 75:13, 81:21, 81:22, 83:11, 98:25, 99:19, 120:14, 127:3, 142:23, 167:11, 172:1, 172:15, 173:3, 173:6, 186:14, 193:8
**trying** [26] - 16:19, 18:17, 24:13, 28:18, 42:21, 49:9, 63:9, 75:16, 75:24, 76:13, 76:25, 112:20, 129:12, 138:22, 140:22, 155:14, 157:14, 165:9, 167:21, 174:12, 177:22, 184:7, 188:18, 192:18, 204:12, 207:18
**turn** [17] - 8:19, 15:9, 15:18, 16:2, 17:18, 24:24, 59:8, 66:20, 76:8, 79:15, 79:18, 82:10, 178:14, 184:17, 193:25, 194:13, 204:2
**turning** [2] - 117:22, 117:23
**turns** [2] - 58:17, 127:19
**twice** [1] - 56:11
**twist** [1] - 204:12
**two** [50] - 4:10, 7:17, 8:6, 13:17, 14:18, 15:24, 17:22, 21:9, 25:16, 28:3, 28:19, 47:13, 61:23, 68:18, 68:21, 86:11, 93:22, 95:4, 97:19, 110:22, 115:8, 120:10, 132:22, 135:5, 138:14, 142:22, 143:5, 143:7, 159:19, 162:7, 165:11, 167:5,

174:17, 177:24, 178:16, 179:16, 179:21, 181:10, 182:4, 184:10, 190:7, 192:2, 196:24, 197:17, 200:15, 204:19, 205:23, 206:8, 209:8
**two-step** [1] - 13:17
**tying** [1] - 54:8
**type** [17] - 90:5, 90:8, 97:25, 107:13, 118:7, 118:21, 151:15, 164:14, 176:16, 185:24, 195:4, 196:1, 197:4, 198:3, 204:4
**types** [9] - 109:11, 113:5, 120:17, 121:9, 169:24, 174:24, 190:10, 197:10, 200:23
**typical** [4] - 71:14, 74:3, 106:24, 107:4
**typically** [1] - 72:19
**tyranny** [1] - 166:10

## U

**U.S** [13] - 1:10, 2:17, 2:20, 2:23, 54:10, 109:7, 110:11, 121:24, 121:25, 138:7, 139:22, 150:17
**U.S.C** [12] - 44:3, 45:19, 59:17, 128:5, 151:9, 151:17, 151:19, 179:3, 190:15, 194:21, 195:8, 195:21
**ultimate** [2] - 158:12, 166:19
**ultimately** [9] - 32:20, 56:20, 77:2, 132:13, 133:16, 156:8, 157:16, 179:9, 180:2
**ultra** [1] - 183:18
**umbrella** [1] - 116:19
**unacceptable** [3] - 34:19, 34:20
**uncertainty** [2] - 66:18, 93:8
**unchallengeable** [1] - 135:17
**uncommon** [1] - 174:19
**Unconstitutional** [12] - 8:12, 20:21, 41:1, 43:6, 51:23, 52:5, 54:14, 58:2, 72:11,

72:21, 86:17, 102:19
**unconstitutional** [13] - 14:15, 25:15, 35:13, 42:12, 42:15, 51:22, 58:6, 72:10, 87:10, 102:15, 116:13, 116:14, 117:1
**uncontested** [2] - 38:22, 39:6
**under** [16] - 16:5, 20:10, 23:9, 25:9, 41:1, 44:12, 52:5, 53:7, 54:4, 54:10, 55:14, 56:22, 58:19, 59:23, 62:1, 62:10, 63:21, 64:4, 64:16, 65:11, 66:18, 79:20, 89:10, 90:8, 90:23, 101:5, 104:24, 105:3, 111:18, 120:20, 121:11, 126:14, 129:17, 132:5, 132:16, 134:9, 135:22, 138:2, 138:5, 138:15, 141:11, 144:4, 144:6, 146:6, 147:4, 148:17, 148:22, 149:2, 149:4, 152:16, 156:2, 162:8, 176:25, 180:9, 180:10, 184:24, 184:25, 185:1, 190:17, 190:18, 190:19, 192:7, 192:12, 195:13, 196:8, 199:20, 199:21
**Under** [1] - 192:14
**undercut** [1] - 77:3
**underlying** [3] - 113:15, 132:4, 183:23
**undermined** [1] - 40:1
**undermines** [1] - 40:3
**underscores** [2] - 152:16, 155:19
**understood** [2] - 25:18, 75:11
**undertaking** [2] - 60:21, 61:2
**undesirable** [1] - 72:8
**undo** [2] - 193:9
**unduly** [1] - 25:15
**unequivocally** [1] - 44:13
**unfair** [3] - 64:9, 96:20, 97:25

**uniformly** [1] - 50:17
**unilaterally** [2] - 7:14, 53:24
**unimportant** [1] - 189:18
**Union** [4] - 51:5, 96:5, 96:7, 103:16
**union** [2] - 22:2, 98:20
**unique** [4] - 97:6, 133:13, 139:21, 209:15
**United** [5] - 3:2, 69:3, 74:5, 129:16, 137:8
**UNITED** [2] - 1:1, 1:13
**universe** [1] - 42:4
**unlawful** [3] - 136:15, 149:23, 150:1
**unless** [8] - 83:19, 93:17, 103:15, 131:19, 152:9, 170:9, 189:2, 207:21
**unlicensed** [1] - 183:9
**unlike** [2] - 23:1, 124:2
**unlikely** [1] - 145:23
**unnecessary** [1] - 137:3
**unprecedented** [3] - 7:5, 33:21, 207:4
**unrealistic** [1] - 135:8
**unreasonable** [2] - 166:10, 170:5
**unrelated** [1] - 88:3
**unreviewable** [1] - 193:20
**unusual** [4] - 94:16, 95:3, 124:1, 174:22
**up** [79] - 12:23, 13:6, 13:8, 17:10, 21:11, 23:4, 24:14, 29:2, 29:10, 29:25, 31:15, 32:8, 32:11, 35:21, 37:9, 37:11, 45:9, 45:15, 45:23, 52:15, 53:14, 54:3, 61:7, 62:10, 72:13, 73:19, 74:20, 76:7, 82:22, 87:17, 95:21, 97:8, 104:11, 104:22, 112:5, 112:22, 114:4, 119:6, 122:13, 125:17, 135:3, 137:4, 138:10, 143:16, 148:21, 159:2, 161:2, 161:8, 161:16, 163:2, 163:9, 163:23, 165:2, 168:2, 169:9, 170:20, 172:11, 173:15, 175:7,

177:18, 177:19, 184:16, 187:21, 189:8, 195:17, 195:18, 196:23, 198:17, 199:4, 199:5, 199:7, 199:23, 202:11, 203:25, 204:6, 205:9, 205:11, 205:25, 206:24
**upheld** [2] - 101:21, 162:4
**uphold** [2] - 174:21, 207:15
**upstream** [1] - 141:4
**urge** [4] - 182:24, 188:13, 207:15, 207:18
**urgent** [1] - 158:22
**USAID** [4] - 101:1, 102:21, 125:20, 126:8
**useful** [1] - 59:14
**uses** [4] - 19:2, 46:6, 194:16, 206:9
**usual** [1] - 167:24
**utilities** [2] - 71:13, 71:19
**Utilities** [1] - 130:1
**utility** [1] - 123:4

---

**V**

**Valancourt** [9] - 15:21, 17:17, 17:25, 21:8, 26:5, 32:2, 67:7, 69:7, 86:14
**valiance** [3] - 109:14, 118:20
**validated** [1] - 71:8
**valuable** [1] - 158:5
**value** [10] - 23:8, 23:22, 24:1, 24:9, 64:8, 82:11, 97:20, 97:25, 98:14, 120:11
**various** [6] - 56:8, 57:11, 64:7, 112:6, 112:7, 172:1
**vast** [1] - 68:5
**verbalizing** [1] - 122:20
**verbatim** [1] - 59:20
**verbs** [3] - 185:4, 185:16, 200:17
**Verizon** [2] - 71:13, 71:18
**versus** [3] - 122:5, 124:13, 197:6
**vessel** [1] - 171:5
**vested** [1] - 64:18

**vial** [2] - 182:9, 188:2
**vice** [1] - 4:11
**VICTOR** [1] - 2:2
**Victor** [1] - 4:8
**view** [4] - 45:15, 65:15, 75:8, 196:14
**views** [3] - 111:16, 111:24, 203:15
**vigorously** [1] - 157:12
**Vineis** [1] - 46:11
**violate** [1] - 27:18
**violated** [1] - 176:25
**violates** [6] - 7:24, 8:11, 9:8, 9:14, 126:25, 139:11
**violating** [1] - 182:19
**violation** [3] - 7:1, 9:1, 122:10
**Violations** [1] - 59:20
**violations** [2] - 8:20, 176:20
**vital** [1] - 59:6
**vitiated** [1] - 198:10
**voice** [1] - 65:10
**voluntarily** [2] - 124:6
**voluntariness** [14] - 13:22, 26:13, 30:4, 35:12, 35:22, 35:23, 40:12, 40:19, 42:13, 54:13, 66:23, 77:25, 143:19, 161:6
**Voluntariness** [1] - 8:7
**voluntary** [38] - 8:6, 8:11, 12:4, 12:10, 13:24, 26:7, 32:7, 34:15, 34:24, 35:5, 36:4, 36:6, 36:20, 40:16, 40:23, 40:25, 41:5, 41:21, 42:1, 43:4, 43:5, 50:4, 51:24, 57:18, 57:20, 58:20, 59:7, 61:2, 67:23, 68:4, 77:12, 77:13, 77:16, 77:21, 81:9, 95:22, 121:13
**vulnerable** [1] - 118:22

---

**W**

**wait** [3] - 6:6, 28:19, 135:9
**waive** [1] - 98:11
**waiver** [1] - 14:17
**waiving** [1] - 10:9
**walk** [15] - 16:14, 17:1, 43:2, 61:15, 61:20, 98:11, 136:25,

160:20, 161:24, 162:2, 168:4, 177:18, 178:22, 189:11, 192:1
**walking** [2] - 178:22, 194:19
**walks** [1] - 193:11
**wants** [9] - 10:23, 34:4, 89:14, 115:19, 120:17, 136:24, 151:7, 181:16, 199:23
**War** [3] - 144:10, 144:13, 144:14
**war** [2] - 74:16, 170:6
**warn** [1] - 204:12
**warrant** [3] - 66:9, 82:5, 129:7
**Washington** [6] - 1:20, 2:7, 2:11, 2:18, 2:22, 2:25
**waste** [1] - 209:2
**watching** [1] - 16:18
**Watkins** [1] - 5:1
**WATKINS** [1] - 2:13
**ways** [6] - 20:23, 22:19, 72:6, 167:5, 171:1, 191:19
**weak** [1] - 168:4
**weaknesses** [1] - 172:6
**wealth** [1] - 191:21
**weigh** [1] - 191:4
**weighty** [1] - 110:21
**welcome** [1] - 117:25
**welfare** [1] - 11:1
**Western** [1] - 10:1
**Westlaw** [1] - 197:1
**White** [1] - 96:6
**whole** [25] - 11:1, 15:1, 22:24, 23:24, 37:24, 58:18, 117:12, 117:14, 120:6, 120:24, 128:4, 129:9, 133:4, 135:4, 151:18, 151:19, 157:9, 157:18, 171:2, 175:21, 182:15, 184:7, 184:22, 201:7, 201:16
**wholesale** [2] - 19:25, 197:4
**wholly** [1] - 182:4
**Williams** [6] - 134:13, 134:14, 142:24, 144:4, 146:6
**willing** [18] - 33:4, 57:8, 57:9, 57:21, 61:10, 61:12, 61:13,

64:12, 64:14, 64:17, 64:20, 65:25, 66:1, 66:2, 71:2, 71:3, 80:14, 82:9
**win** [3] - 143:13, 143:14, 199:18
**wine** [2] - 30:25, 53:10
**winemaker** [1] - 30:25
**winner** [1] - 143:10
**winning** [1] - 135:11
**wipe** [2] - 184:7, 203:20
**wish** [4] - 31:12, 55:24, 63:23, 77:14
**withdraw** [19] - 13:25, 16:17, 19:21, 20:18, 24:21, 36:20, 40:13, 45:3, 47:10, 56:5, 56:14, 56:17, 61:19, 61:20, 61:23, 82:23, 84:21, 86:15, 87:4
**withdrawal** [14] - 19:25, 43:22, 44:2, 44:4, 44:7, 44:8, 44:12, 61:16, 79:23, 83:13, 83:14, 83:19, 83:22, 86:15
**withdrawals** [1] - 57:4
**withdrawing** [3] - 10:9, 44:11, 50:11
**withdrawn** [9] - 20:6, 20:9, 20:13, 44:19, 50:14, 56:12, 56:13, 84:7
**withheld** [1] - 147:3
**withhold** [2] - 81:13, 176:2
**withholding** [1] - 20:2
**withstanding** [1] - 174:7
**Witness** [1] - 114:12
**witness** [1] - 209:21
**witnessed** [1] - 208:14
**word** [13] - 19:2, 22:2, 31:18, 59:9, 80:11, 81:15, 119:9, 133:23, 136:3, 197:12, 204:12, 204:13
**words** [12] - 17:9, 87:12, 107:2, 112:20, 117:4, 119:6, 119:11, 123:22, 140:9, 140:19, 178:12, 186:21
**works** [12] - 14:20, 22:18, 45:10, 46:24, 47:2, 51:16, 92:20, 124:16, 124:21,

165:21, 178:20, 191:21

**World** [3] - 144:10, 144:13, 144:14

**world** [4] - 45:6, 144:18, 148:20, 152:21

**worry** [1] - 13:4

**worse** [2] - 101:17, 103:21

**worth** [14] - 40:8, 56:24, 89:2, 90:12, 119:3, 121:2, 151:21, 191:11, 194:19, 208:12, 208:17, 208:22, 209:8

**woven** [1] - 48:1

**wrap** [2] - 53:14, 54:3

**write** [3] - 101:24, 181:20, 207:20

**written** [7] - 96:1, 96:24, 97:10, 173:19, 189:16, 189:20, 209:13

**wrote** [3] - 18:17, 59:3, 65:13

### X

**XAVIER** [1] - 1:7

### Y

**Yaakov** [3] - 4:11, 8:2, 10:16

**YAAKOV** [1] - 2:5

**Yale** [1] - 192:25

**year** [16] - 15:21, 46:13, 59:24, 60:2, 60:3, 69:8, 84:22, 127:12, 127:21, 127:25, 153:3, 153:4, 153:24, 177:8, 179:9, 179:10

**years** [16] - 50:9, 135:5, 161:3, 170:2, 173:17, 180:12, 181:4, 182:17, 188:10, 200:25, 201:23, 202:9, 202:14, 204:24, 205:16

**years'** [1] - 202:18

**yellow** [1] - 179:14

**yesterday** [1] - 96:6

**York** [2] - 2:15, 119:15

**yourself** [1] - 31:20

### Z

**ZAHID** [2] - 1:13, 3:1

**zero** [1] - 163:8

**zoning** [2] - 72:23, 73:17

**United States District Court**
**District of New Jersey**

Appx573

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system, thereby serving all registered counsel of record.

_/s/ Ashley C. Parrish_
Ashley C. Parrish

_Counsel for Appellants_