# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Docket Nos. 24-2510

NOVO NODISK, INC. and NOVO NORDISK PHARMA, INC.,

*Plaintiffs-Appellants*,

v.

SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES ; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES ; ADMINISDTRATOR, CENTERS FOR MEDICARE & MEDICAID
SERVICES ; CENTERS FOR MEDICARE & MEDICAID SERVICES,

*Defendants-Appellees.*

On appeal from the United States District Court for the District of New Jersey,
No. 3:23-cv-20814, Honorable Zahid N. Quraishi

**BRIEF OF AMICI CURIAE, SENATORS AMY KLOBUCHAR, PETER
WELCH, TAMMY BALDWIN, RICHARD BLUMENTHAL, SHERROD
BROWN, CATHERINE CORTEZ MASTRO, RICHARD DURBIN, JOHN
FETTERMAN, JOHN HICKENLOOPER, JACKY ROSEN, JEANNE
SHAHEEN, CHRIS VAN HOLLEN, AND ELIZABETH WARREN, IN
SUPPORT OF APPELLEES**

Charles L. Becker
**Kline & Specter, PC**
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
*Attorney for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

STATEMENT OF IDENTITY .......................................................................... 1

ARGUMENT........................................................................................... 9

I. Appellants' opposition to the Program should be considered in light of the history of Medicare's prescription drug benefit ...................................................................................... 11

II. Congress carefully considered the competing interests at stake in the Program and struck an appropriate balance........ 15

III. Appellants misrepresent the Program's operation and the unsustainable status quo it reformed ........................................ 27

IV. Adopting Appellants' position would disable Congress' control of Medicare prescription drug outlays ......................... 28

CONCLUSION ................................................................................... 29

COMBINED CERTIFICATIONS

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Statutes:**

Inflation Reduction Act of 2022 (IRA), Pub. L. 117-169.................................10

**Other Authorities:**

Andrew W. Mulcahy et al.,
   *International Prescription Drug Price Comparisons* vii (2021) ....................3

ASPE, *Fact Sheet* (2023) .......................................................................................18

ASPE, *Issue Brief: Observations and Trends in Prescription Drug Spending*
   (2016) ..............................................................................................................21

ASPE, *Report to Congress: Prescription Drugs: Innovation, Spending,*
   *and Patient Access* (2016) ..............................................................................21

Bds. of Trs. of Fed. Hosp. Ins. Tr. Fund & Fed. Supplementary
   Med. Ins. Tr. Fund, *2017 Annual Report* (2017) ........................................21

Bob Herman, *The U.S. is the drug industry's gold mine*, Axios
   (Sept. 30, 2021) ..............................................................................................9

Burton A. Abrams et al., *The Political Economy of Wage and Price Controls:*
   *Evidence from the Nixon Tapes*, 170 Pub. Choice 63 (2017) .....................13

CMS, *Medicare Drug Price Negotiation Program: Initial Memorandum,*
*Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price*
*Applicability Year 2026*, at 7 (2023) ...................................................................26

CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial*
   *Price Applicability Year 2026* (2023) ...........................................................28

Cong. Budget Office, *A Comparison of Brand-Name Drug Prices Among Selected Federal Programs* (2021) ...............................................25

Cong. Budget Office, *Cost Estimate* (2022) .....................................................18

Cong. Budget Office, *How CBO Estimated the Budgetary Impact of Key Prescription Drug Provisions in the 2022 Reconciliation Act* 2023) ..................19

Cong. Research Serv.,
*Negotiation of Drug Prices in Medicare Part D* (2019) ......................................16

Cong. Research Serv., *The 21st Century Cures Act (Division A of P.L. 114-255)* (2016) ..........................................................22

*Examining Reforms to Improve the Medicare Part B Drug Program for Seniors, Hearing before the H. Energy & Commerce Comm.*, 113th Cong. (2013) .........................................................................................................21

Fred D. Ledly, M.D. et al., *Profitability of Large Pharmaceutical Companies Compared with Other Large Public Companies*, 323(9) JAMA 834-43 (2020) .........................................................................................................9

GAO, *Brand-Name Prescription Drug Pricing* (2009) ......................................20

Henry A. Waxman et al.,
*Getting to Lower Prescription Drug Prices* (2020) ........................................17, 23

Juliette Cubanski & Tricia Neuman, *What to Know About Medicare Spending and Financing*, KFF (Jan. 19, 2023) ...........................................16

MedPAC, *Chapter 3: Medicare Payment Strategies to Improve Price Competition and Value for Part B Drugs*, in Report to the Congress: Medicare and the Health Care Delivery System (2019) .......................11

OpEd Chart, N.Y. Times (Mar. 7, 2010) ..........................................................19

*Parliamentary weakens Democrats' drug plan in Inflation Reduction Act, as Senate prepares to vote*, CBS News (Aug. 6, 2022) ...............................19

*Prescription Drug Price Inflation: Hearing on H.R. 5376 Before the S. Finance Comm.*, 117th Cong. (2022) 2022 WL 3221004 (Mar. 16, 2022) .......25, 26

Press Release, Ctrs. for Medicare & Medicaid Servs., CMS Office of the Actuary Releases 2021-2030 Projections of National Health Expenditures (Mar. 28, 2022) ......................................................16

*Ten Years Later: A Look at the Medicare Prescription Drug Program, Hearing Before the S. Special Comm. on Aging*, 113th Cong. (2013) .......21

Thomas R. Oliver et al., *A Political History of Medicare and Prescription Drug Coverage*, 82 Milbank Q. 283 (2004) ..........................................11, 13

U.S. Dept. of Veterans Affairs, *FY2023 Congressional Submission, Medical Programs and Information Technology Programs* at VHA-21 (2022) ..........................................................................................24

## Constitutional Provisions:

U.S. Const. Art. I, § 1 ...........................................................................26

U.S. Const. Art. I, § 8 ..........................................................................26

# STATEMENT OF IDENTITY[1]

*Amici curiae* are United States Senators who have spearheaded legislative efforts to reduce drug prices. *Amici* have a unique interest in the constitutionality of laws enacted by Congress to permit Medicare price negotiations. They have relied on Congress's right under the Constitution to review current laws and make improvements in order to bring down drug prices in federal programs. The individual *amici* include:

Senator **Amy Klobuchar** has represented the State of Minnesota in the United States Senate since 2007. She is Chairwoman of the Senate Rules Committee and Democratic Steering Committee. She serves on the Senate Judiciary Committee (where she is Chairwoman of the Subcommittee on Competition Policy, Antitrust, and Consumer Rights); the Commerce, Science, and Transportation Committee; the Agricultural, Nutrition, and Forestry Committee; and the Joint Economic Committee. Senator Klobuchar has been a leading advocate for reducing the cost of prescription drugs. For years until the passage of a Medicare drug price negotiation

---

[1] All parties have consented to the filing of this *amicus* brief.

program, Senator Klobuchar sponsored a bill in the U.S. Senate to lift the ban on Medicare negotiating the price of prescription drugs.

Senator **Peter Welch** has represented the State of Vermont in the United States Senate since 2023. He serves on the Judiciary Committee; the Commerce, Science, and Transportation Committee; the Joint Economic Committee; and the Agriculture, Nutrition, and Forestry Committee, where he chairs the Subcommittee on Rural Development and Energy. Prior to serving as Vermont's junior Senator, he represented the Green Mountain State in the House of Representatives for eight terms. Senator Welch has been a longtime champion of policies to hold pharmaceutical companies accountable for skyrocketing drug costs and price-gouging, and he has worked across the aisle to lower the cost of health care for seniors, families, and patients.

Senator **Tammy Baldwin** has represented the State of Wisconsin in the United States Senate since 2013 and represented the 2nd Congressional District of Wisconsin in the House of Representatives from 1999 to 2012. She currently serves on the Senate Committee on Health, Education, Labor and Pensions, the Senate Committee on Commerce, Science and

Transportation, and the Senate Appropriations Committee. Senator Baldwin has long championed efforts to provide quality health care for all Americans, including through policies to hold drug companies accountable and reduce out-of-pocket costs for families and taxpayers.

Senator **Richard Blumenthal** has represented the State of Connecticut in the United States Senate since 2011. He currently serves as a member of the Committee on the Judiciary; Committee on Homeland Security and Governmental Affairs; Committee on Armed Services; Committee on Veterans' Affairs; and Special Committee on Aging. Prior to becoming a United States Senator, he served an unprecedented five terms as Connecticut's Attorney General, fighting for the people against large and powerful special interests. Senator Blumenthal has long been a champion for consumer rights and a staunch advocate for affordable health care.

Senator **Sherrod Brown** has represented the State of Ohio in the United States Senate since 2007. He serves as the Chair of the Senate Banking, Housing and Urban Affairs Committee and is a member of the Senate Finance, Agriculture, and Veterans' Affairs Committees. For

decades, Senator Brown has led efforts to allow Medicare to negotiate directly with pharmaceutical companies and take on Big Pharma to lower health care and prescription drug costs for Ohioans.

Senator **Catherine Cortez Mastro** has represented the State of Nevada in the United States Senate since 2017. She currently serves on the Committee on Finance, the Committee on Banking, Housing, and Urban Affairs, the Committee on Energy and Natural Resources, and the Committee on Indian Affairs. Sen. Cortez Masto currently serves as the chair of the Energy and Natural Resources Committee's Public Lands, Forests, and Mining Subcommittee. Prior to serving in the Senate, she served two terms as Attorney General of Nevada. Senator Cortez Masto has fought to lower drug costs for Nevada seniors, and worked hard to pass the Medicare drug price negotiation program, allowing Medicare to get the best deal for seniors.

Senator **Richard J. Durbin** has represented the State of Illinois in the United States Senate since 1997. He is the Senate Majority Whip and Chair of the Senate Judiciary Committee. He also serves on the Senate Committee on Agriculture, Nutrition, and Forestry and the Senate Committee on

Appropriations. Senator Durbin has been a leading advocate for lowering the cost of prescription drugs borne by patients and lowering overall Medicare spending. Senator Durbin previously introduced legislation to recoup certain amounts of reimbursements made to manufacturers for excess medication in single-use vials that is discarded, create a public plan option, and empower patients by enhancing transparency in advertisements about the cost of prescription drugs covered by Medicare.

Senator **John Fetterman** has represented the Commonwealth of Pennsylvania in the United States Senate since 2023. He serves on the Senate Committee on Banking, Housing, and Urban Affairs; the Agriculture, Nutrition, and Forestry Committee, where he chairs the Subcommittee on Food and Nutrition; the Environment and Public Works Committee; the Joint Economic Committee; and the Special Committee on Aging. Prior to serving as Pennsylvania's junior Senator, he served as Pennsylvania's Lieutenant Governor and as Mayor of Braddock. Senator Fetterman believes that every Pennsylvanian must have affordable access to the medicines they need to maintain and restore their health.

Senator **John Hickenlooper** took an unconventional path to public office. After starting out as a geologist, John took a chance by opening the first brewpub in Colorado. As a small business owner, he gained a deep understanding of the local community and the value of collaboration. John entered public service because he knew he could listen to the diverse array of Colorado voices and get things done. As Colorado's U.S. Senator, he is committed to bringing people together to solve our country's toughest problems. John is focused on bringing costs down for patients and lowering prescription drug prices as part of his work on the Committee on Health, Education, Labor and Pensions.

Senator **Jacky Rosen** has represented the State of Nevada in the United States Senate since 2019. She serves on the Senate Armed Services Committee; the Homeland Security and Governmental Affairs Committee; the Commerce, Science, and Transportation Committee; and the Small Businesses Committee. Senator Rosen has been a champion for lowering prescription drug prices for Nevada's seniors, including through legislation to allow Medicare to negotiate the costs of prescription drugs. Throughout her time in the Senate, she has also introduced bipartisan

legislation to lower drug prices by advancing medicine produced by nonprofit companies.

Senator **Jeanne Shaheen** has represented the State of New Hampshire in the United States Senate since 2009. She serves on the Senate Appropriations Committee; Armed Services Committee; Foreign Relations Committee; and the Small Business and Entrepreneurship Committee. Prior to her time in the Senate, Senator Shaheen served as Governor of New Hampshire from 1997 to 2003, as well as two terms in the New Hampshire State Senate. Senator Shaheen is a tireless champion for access to pharmaceuticals, including spearheading legislation to comprehensively lower the cost of insulin and supporting several pieces of legislation to address the skyrocketing costs of prescription drugs.

Senator **Chris Van Hollen** has represented the State of Maryland in the United States Senate since 2017 and represented the 8th Congressional District of Maryland in the House of Representatives from 2003 to 2016. He currently serves on the Senate Budget Committee and Senate Appropriations Committee, and in the House of Representatives he was Ranking Member of the House Budget Committee and served on the

House Committee on Ways and Means. Senator Van Hollen has supported a number of bills to allow Medicare price negotiation and has introduced legislation to address the high cost of prescription drugs developed using taxpayer funded medical research and clinical trials.

Senator **Elizabeth Warren** has represented the State of Massachusetts in the United States Senate since 2013. She currently serves on the Committee on Finance; the Committee on Banking, Housing, and Urban Affairs; the Committee on Armed Services; and the Special Committee on Aging. Senator Warren has consistently defended Medicare's constitutional right to negotiate prescription drug prices with pharmaceutical companies, who have engaged in a litany of anti-competitive tactics to stifle competition and keep prescription drug costs sky-high.[2]

---

[2] No party or party's counsel authored any portion of this brief or contributed money for the preparation or submission this brief.  No person other than the *amici curiae* or their law firm contributed money to fund preparing or submitting the brief.

# ARGUMENT

Appellants complain of legislation that resulted from a policy debate over which industry participants and the public have been afforded, and availed themselves of, a full and fair opportunity to be heard. Congress carefully weighed the competing interests at stake. The Court should respect the policy decisions Congress made here and turn away Appellants' efforts to nullify them.

Drug prices in the United States are the highest in the developed world.[3] In an effort to lower these prices, the Inflation Reduction Act of

---

[3] Andrew W. Mulcahy et al., *International Prescription Drug Price Comparisons* vii (2021), tps://aspe.hhs.gov/sites/default/files/documents/ca08ebf0d93dbc0faf27 0f35bbecf28b/international-prescription-drug-price-comparisons.pdf ("U.S. prices for drugs in 2018 were 256 percent of those in the 32 OECD comparison countries combined."). Unsurprisingly, pharmaceutical profits have followed suit. *See* Bob Herman, *The U.S. is the drug industry's gold mine*, Axios (Sept. 30, 2021), https://www.axios.com/2021/09/30/drug-prices-pharma-revenue-usa-international; Fred D. Ledly, M.D. et al., *Profitability of Large Pharmaceutical Companies Compared With Other Large Public Companies*, 323(9) JAMA 834-43 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7054843/ ("[T]he profitability of a set of large, fully integrated pharmaceutical companies, which generate revenue primarily from the sale of pharmaceutical products, was shown to be significantly greater than that of other large, nonpharmaceutical companies in the S&P 500 Index from 2000 to 2018.").

2022 (IRA), Pub. L. 117-169, authorizes Appellee Centers for Medicare & Medicaid Services (CMS) to do what CMS does with doctors and other providers as a matter of course: negotiate the prices of certain costly drugs directly with drug manufacturers (the "Medicare Drug Price Negotiation Program" or "Program"). Other federal payers such as the Department of Veterans Affairs and the Department of Defense do this as well. CMS has been prohibited from doing this since 2003.

The pharmaceutical industry and its allies have tried to prevent this legislative result. Appellants now attempt to accomplish through judicial action what they could not through the legislative process. Appellants' position in this litigation boils down to the argument that the United States Constitution prohibits the federal government from negotiating the prices of the products it purchases. Appellants seek to prevent reform of a purchasing process that Congress itself made. They argue that Congress, having created this process, now cannot unmake the process or even amend it for the benefit of the American public and the American taxpayer.

As the Appellees' brief ably explains, the Appellants' position is wrong as a matter of constitutional law. Congress improves laws all the

time. Congress has the right and indeed the duty to do so. The Program takes nothing from the pharmaceutical industry—not its drugs and not its patents. The Program does not coerce industry participants to do or say anything. Like every other market participant, manufacturers may sell their products at prices buyers think is fair (or not fair) and buyers may make market choices in turn. Against that backdrop, *amici* respectfully offer relevant historical and legislative background against which to evaluate the parties' respective arguments.

## I. Appellants' opposition to the Program should be considered in light of the history of Medicare's prescription drug benefit.

Today, Medicare is the largest payer for pharmaceuticals in the United States when measured by total spending. MedPAC, *Chapter 3: Medicare Payment Strategies to Improve Price Competition and Value for Part B Drugs*, in Report to the Congress: Medicare and the Health Care Delivery System (2019), *available at* https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun19_ch3_medpac_reporttocongress_sec.pdf.

When Medicare was originally enacted in 1965, it did not provide an outpatient prescription drug benefit. Thomas R. Oliver et al., *A Political*

*History of Medicare and Prescription Drug Coverage*, 82 Milbank Q. 283, 291

(2004). The journey from 1965 to the current prescription drug benefit

provided by Medicare Part D, enacted as part of the Medicare

Modernization Act of 2003, is characterized by the competing pressures of

ensuring adequate coverage for Medicare beneficiaries' most expensive

and potentially catastrophic outlays, on the one hand, and the fiscal

necessity of lowering the Program's costs, on the other.

    As originally enacted, Medicare covered the cost of prescription

drugs dispensed in a physician's office. This served primarily to

disincentivize physicians from recommending hospitalization (with its

frequently unpredictable costs) simply to ensure coverage. *Id.* at 292. A

universal outpatient benefit was rejected in 1965 "on the grounds of

unpredictable and potentially high costs." *Id.* at 291. Over the next four

decades, Congress continued to expand outpatient prescription drug

coverage piecemeal. It did so without enacting a comprehensive solution.

President Johnson convened a Task Force on Prescription Drugs in 1967,

which reported to President Nixon in 1969 that "a drug insurance program

under Medicare is needed . . . and would be both economically and

medically feasible." *Id.* at 294. The urgency for such coverage was occasioned by the upward spiral drugs beginning in the 1950s and also by the limitations imposed by private insurers on outpatient prescription coverage. *Id.* at 293. But the Task Force's recommendation was not adopted.

A major barrier to the enactment of full outpatient coverage was the resistance of the pharmaceutical industry to any form of price regulations. Such regulations were first instituted across the national economy in peacetime by President Nixon in 1971. Burton A. Abrams et al., *The Political Economy of Wage and Price Controls: Evidence from the Nixon Tapes¸*170 Pub. Choice 63, 63 (2017). From those price regulations, the pharmaceutical industry (whose political power was still largely nascent) "drew . . . the lesson that price controls would likely accompany any federal sponsorship of prescription drug coverage." Oliver, *A Political History of Medicare and Prescription Drug Coverage*, *supra*, at 296.

In 1988, Congress enacted the Medicare Catastrophic Coverage Act (MCAA), which covered outpatient prescriptions only in "catastrophic" situations. *Id.* at 300. The MCAA was deeply unpopular. Its defenders

"alleged, but never proved conclusively, that the pharmaceutical industry helped organize and fund the campaign for repeal." *Id.* The campaign was successful, and the MCAA was largely repealed a year after its passage, even though it represented the first major Medicare expansion in two decades. *Id.* at 301.

In 1994, the next opportunity for extending prescription drug coverage met a swift end under "withering attack" from the pharmaceutical industry, which argued that proposals to require drug manufacturers to sign rebate agreements with the federal government, to authorize the government to negotiate rebates for new drugs, and to encourage the use of generics would impose unnecessary layers of complex bureaucracy and lead to rationing. *Id.* at 302; *see also id.* at 331. In the late 1990s, by contrast, when Congress showed greater interest in subsidizing private health insurance than it had previously, the pharmaceutical industry softened its stance on expansion of Medicare prescription drug benefits. *Id.* at 306. The industry believed it would have "stronger negotiating power vis-à-vis private organizations" such as private insurers

and pharmacy benefit managers "than it would if it had to deal directly with the federal government." *Id.* at 339–40.

This conditional support for expanded prescription drug benefits (conditioned, in other words, on the proposition that federal money would be paid without a centralized federal role) bore fruit for the pharmaceutical industry in 2003 with the passage of the Medicare Modernization Act (MMA). Known today as Medicare Part D, the Medicare expansion implemented by the MMA greatly expanded prescription drug coverage. But it did so at a steep cost: the government was prohibited from directly negotiating the prices it paid to drug manufacturers. *Id.* at 318. In this respect (together with the MMA's maintenance of a ban on reimporting prescription drugs from other countries), the pharmaceutical industry came out a "clear winner" because it prevailed on its "priority issue" of avoiding "direct administration of benefits by the federal government." *Id.*

## II.  Congress carefully considered the competing interests at stake in the Program and struck an appropriate balance.

Over the next two decades, it became clear that the status quo created by the MMA was unsustainable. In 2019, the Congressional Research Service observed that "the Medicare Trustees indicate that Part D spending

is growing rapidly." Cong. Research Serv., *Negotiation of Drug Prices in Medicare Part D* at 1 (2019), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11318/2. In 2021, Medicare accounted for 10 percent of the nearly $7 trillion national budget, more than one fifth (21 percent) of all national health expenditures, and nearly one third (32 percent) of all retail prescription drug sales. Juliette Cubanski & Tricia Neuman, *What to Know About Medicare Spending and Financing*, KFF (Jan. 19, 2023), https://www.kff.org/medicare/issue-brief/what-to-know-about-medicare-spending-and-financing/.

In 2022, CMS estimated that from 2021 to 2030, Medicare would see the fastest cost growth rates among major federal payers. Press Release, Ctrs. for Medicare & Medicaid Servs., CMS Office of the Actuary Releases 2021-2030 Projections of National Health Expenditures (Mar. 28, 2022), https://www.cms.gov/newsroom/press-releases/cms-office-actuary-releases-2021-2030-projections-national-health-expenditures. As CMS found, Medicare spending alone was projected to exceed $1 trillion annually for the first time in 2023. *Id.* While prescription drug costs were

not the sole factor driving this projected growth, they were a substantial driver with an average growth rate of 5 percent from 2021 to 2030. *Id.*

The growth in Medicare drug spending mirrors broader trends in the national economy that affect every American. For example, "[n]early 80 percent of Americans said prescription drug prices were unreasonable in 2019." Henry A. Waxman et al., *Getting to Lower Prescription Drug Prices* at 6 (2020), https://www.commonwealthfund.org/sites/default/files/2020-10/Waxman_GettingtoLowerRxPrices_report_v3.pdf. Underscoring this point, nearly *one third* of Americans have taken their prescription drugs otherwise than as prescribed by their physicians due to cost concerns. *Id.*

Congress designed both the Inflation Reduction Act of 2022 and the Medicare Price Negotiation Program to give negotiation authority to the Secretary of the Department of Health and Human Services (HHS). Such negotiation authority helps the Secretary contain these ballooning costs and preserve the health of the Medicare program for future generations of American seniors.

The financial implications of this negotiation authority are significant. In 2026, the first year of effective negotiated pricing under the Program, the

non-partisan and independent Congressional Budget Office estimates that the Program will result in nearly $5 billion in federal savings, nearly $10 billion the following year, and a total savings of more than *1 trillion* between 2022 and 2031. Cong. Budget Office, *Cost Estimate* (2022), https://www.cbo.gov/system/files/2022-08/hr5376_IR_Act_8-3-22.pdf. The rapid growth of savings reflects that nine million American seniors and Medicare beneficiaries use the first ten drugs selected by Appellee Secretary for price negotiation under the Program. ASPE, *Fact Sheet* (2023), https://aspe.hhs.gov/sites/default/files/documents/9a34d00483a47aee03703bfc565ffee9/ASPE-IRA-Drug-Negotiation-Fact-Sheet-9-13-2023.pdf.

     As Appellees add drugs under the Program in coming years, more of America's 64 million Medicare enrollees will benefit. CMS, *CMS Program Statistics - Medicare Part D Enrollment* (2021), https://data.cms.gov/summary-statistics-on-beneficiary-enrollment/medicare-and-medicaid-reports/cms-program-statistics-medicare-part-d-enrollment. Further, because Medicare is the largest pharmaceuticals payer in the country, *See Chapter 3: Medicare Payment Strategies to Improve Price Competition and Value for Part B Drugs*, *supra*,

reductions in the prices paid by Medicare are anticipated to lower prices across the economy, Cong. Budget Office, *How CBO Estimated the Budgetary Impact of Key Prescription Drug Provisions in the 2022 Reconciliation Act*, at 10–11 (2023), *available at* https://www.cbo.gov/system/files/2023-02/58850-IRA-Drug-Provs.pdf.

Like the Inflation Reduction Act as a whole,[4] the Program is the result of careful congressional fact-finding, interest-balancing, and deliberation through a process in which the industry has been able to participate fully and fairly. Following the introduction of the provisions that would become the IRA as part of H.R. 5376, 117th Cong. (2021), in

---

[4] The IRA was passed according to the Senate's rules of reconciliation and after consideration by the Senate Parliamentarian (originally appointed by a Republican-majority Senate), who reviewed and approved the Program. *See Parliamentarian weakens Democrats' drug plan in Inflation Reduction Act, as Senate prepares to vote*, CBS News (Aug. 6, 2022), https://www.cbsnews.com/news/inflation-reduction-act-senate-prepares-to-vote/. There is nothing remarkable about the IRA's passage through reconciliation; it is the process by which many other Medicare-related bills have been enacted, including without limitation Omnibus and Budget Reconciliation Acts enacted in 1986, 1987, 1990, and 1993; the Affordable Care Act of 2010; and the Tax Equity and Fiscal Responsibility Act of 1982. *See* OpEd Chart, N.Y. Times (Mar. 7, 2010), https://archive.nytimes.com/www.nytimes.com/imagepages/2010/03/07/opinion/07opedchart_graphic.html.

September 2021, Congress heard from numerous experts and stakeholders who testified in favor of the negotiation principle embodied by the Program.

Further, the Program was the culmination of ten years' work examining the Medicare Part D system and escalating drug costs across the national economy. In December 2009, the U.S. Government Accountability Office sent a letter to Vice Chairman of the Joint Economic Committee Senator Charles Schumer and Committee Member and *amicus* Senator Amy Klobuchar. Responding to the Senators' request for information, and looking back to the year 2000, the letter advised that "the growing cost of brand name prescription drugs can be a burden on patients, payers, and providers of health care—particularly when price increases are large and occur suddenly." GAO, *Brand-Name Prescription Drug Pricing* at 1 (2009), https://www.gao.gov/assets/gao-10-201.pdf. That trend of increasing costs continued. In 2012, both the launch prices of medicines, as well as the annual cost increases of prescription drugs already on the market, started to grow. Medicare Part D reinsurance cost started to climb at a faster annual pace than before. Bds. of Trs. of Fed. Hosp. Ins. Tr. Fund & Fed.

Supplementary Med. Ins. Tr. Fund, *2017 Annual Report* (2017),

https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/Downloads/TR2017.pdf.

Ten years after the Medicare Part D program was enacted, committees in both legislative chambers began to hold hearings. *Ten Years Later: A Look at the Medicare Prescription Drug Program, Hearing Before the S. Special Comm. on Aging*, 113th Cong. (2013); *Examining Reforms to Improve the Medicare Part B Drug Program For Seniors, Hearing Before the H. Energy & Commerce Comm.*, 113th Cong. (2013). In 2016, at the direction of the Committee on Appropriations of the House of Representatives and the Senate, the Assistant Secretary for Planning and Evaluation at HHS issued a report to Congress explaining that growth in prescription drug spending was rising faster than overall health spending. ASPE, *Issue Brief: Observations and Trends in Prescription Drug Spending* (2016); ASPE, *Report to Congress: Prescription Drugs: Innovation, Spending, and Patient Access* (2016). During the 2016 presidential election, the front-runners debated proposals to lower the price of prescription drugs. Public and policymaker clearly had focused on prescription drug prices and the Medicare Part D program.

Against this backdrop, Congress started passing a number of bills focused on fixing the prescription drug market. These started with the 21st Century Cures Act of 2016, which sought to reduce overpayments for infusion drugs among other cost-saving steps. *See* Cong. Research Serv., *The 21st Century Cures Act (Division A of P.L. 114-255)* (2016), https://sgp.fas.org/crs/misc/R44720.pdf.

Congress started conducting hearings on these issues as well. In 2017, the Senate Committee on Health Education Labor and Pensions (HELP) held a two-part hearing on "The Cost of Prescription Drugs: How the Drug Delivery System Affects What Patients Pay." In 2018, the House Energy and Commerce Committee, the Senate Judiciary Committee, Senate HELP, and the Senate Finance Committee all held hearings examining the pharmaceutical market and consumer costs. In 2019, the Senate Finance Committee held a three-part hearing on "Drug Pricing in America." This was followed by the House Oversight Committee, under Chairman Elijah Cummings, holding several hearings and conducting a years-long investigation on the behavior of pharmaceutical companies and the price of prescription drugs for consumers. Overall, between 2015 and 2022, over

two dozen hearings were held in the Senate and the House on prescription drug pricing. Between 2018 and 2020, five pieces of enacted legislation sought to address the problem. *See* Waxman, *Getting to Lower Prescription Drug Prices*, *supra*, at Appendix B, 38–39.

The Congressional Budget Office, the Government Accountability Office, and the Congressional Research Service produced reports and analyses at Congress's request on the topics of prescription drug pricing generally and negotiation of prescription drug prices specifically. Committees, both those mentioned above and the Joint Economic Committee, also did their own investigations and released reports on prescription drug pricing.

In view of all the foregoing, on December 12, 2019, the House passed the Elijah Cummings Lower Drug Costs Now Act by a vote of 230 to 192. This bill included a provision to allow Medicare to negotiate prescription drugs on seniors' behalf.

Outside the Medicare context, other federal payers have long had price negotiation authority without appearing to harm the vitality and innovativeness of the pharmaceutical industry. For example, the Veterans

Health Care Act of 1992, P.L.102-585, established contractual pricing mechanisms (on which the Program's "Maximum Fair Price" was consciously modeled) that set price ceilings for certain federal agencies, including the Veterans Health Administration, which operates the nation's largest public direct health care system. U.S. Dept. of Veterans Affairs, *FY2023 Congressional Submission, Medical Programs and Information Technology Programs* at VHA-21 (2022), *cited at* https://sgp.fas.org/crs/misc/R47423.pdf. The Veterans Health Care Act requires drug manufacturers to sell covered drugs to four agencies—the Department of Veterans Affairs, the Department of Defense, the Public Health Service (including the Indian Health Service), and the Coast Guard—at no more than 76 percent of the nonfederal average manufacturer's price ("non-FAMP"). Noncompliant manufacturers are barred from accessing Medicaid and Medicare Part B funds. Significantly, these pricing mechanisms are not limited to a certain set of drugs and are available for new pharmaceuticals coming into the market, thus covering a far broader range of drugs than the Program's narrowly tailored interventions. The benefits of this legislation are clear. The Congressional

Budget Office, in a 2021 study of 176 brand-name drugs, found that the Department of Veterans Affairs and the Department of Defense pays lower prices than does Medicare Part D. Cong. Budget Office, *A Comparison of Brand-Name Drug Prices Among Selected Federal Programs* (2021), https://www.cbo.gov/publication/56978.

With the benefit of this long history, Congress was prepared in 2021 to weigh and debate the negotiation provisions that would eventually win passage as part of the IRA. For example, in March 2022, the Senate Finance Committee heard the testimony of Prof. Rena M. Conti, a health economist at Boston University, that the Program would help renew the "social compact between the American public and pharmaceutical companies": taxpayer investment to fund innovation in exchange for affordable drugs. *Prescription Drug Price Inflation: Hearing on H.R. 5376 Before the S. Finance Comm.*, 117th Cong. (2022) (statement of Prof. Rena M. Conti), 2022 WL 3221004 (Mar. 16, 2022). According to Professor Conti, that compact had been undermined by the industry's setting of prices "so high they impose financial toxicity on the American public." *Id.* And this result was fair to the pharmaceutical companies: "Empirical evidence suggests even many of

the most expensive drugs" recoup "the full costs of research and development within 5 years post-launch," and the Program targets only drugs that have been on the United States market for over five years. *Id.*[5] According to Professor Conti, this timeframe obviated the industry's argument that "companies will refrain from launching their products in the U.S. if they are subject to negotiation." *Prescription Drug Price Inflation: Hearing on H.R. 5376 Before the S. Finance Comm.*, 2022 WL 3221004.

Congress heard from the Program's opponents and found their evidence and arguments to be unpersuasive. For example, Douglas Holtz-Eakin, the president of the American Action Forum, testified before the Finance Committee that the Program's "negotiations" were illusory and that the Program instead "would empower the HHS secretary to dictate prices to manufacturers who would have little to no leverage." *Id.* Dr. Holtz-Eakin also testified against the "unique and punitive" excise tax that

---

[5] While the IRA as enacted mandates a minimum of seven years on the market rather than ten for a drug to be eligible for negotiation, Prof. Conti's point stands. *See* CMS, *Medicare Drug Price Negotiation Program: Initial Memorandum, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026*, at 7 (2023).

the Program would impose on nonparticipating manufacturers. *Id.* These hyperbolic arguments did not respond to the actual Program.

These unpersuasive and rejected arguments are typical of the pharmaceutical industry's categorical opposition to attempts by Congress to control the explosion of federal health care spending. Appellants now advocate the same arguments in the form of constitutional law. This litigation is nothing less than the continuation of a failed legislative campaign by other means.

### III. Appellants misrepresent the Program's operation and the unsustainable status quo it reformed.

In their brief, Appellees ably dispatches the Appellants' incorrect characterizations of the Program's operation. *Amici* offer one additional point on this score: Appellants assert that Medicare historically relied on market-based pricing, but that is misleading, as explained in part I above. But there is nothing market based about *prohibiting* price negotiation between buyers and sellers. Appellants skip over the essential characteristics of the drugs that CMS may subject to negotiation under the Program. These drugs are exceptionally costly, "single source" drugs that lack generic or biosimilar competition that have been on the market for a

period likely sufficient for the manufacturer to recoup (and more) its initial research and development outlays. *See* CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026* (2023), *available at* https://www.cms.gov/files/document/fact-sheet-medicare-selected-drug-negotiation-list-ipay-2026.pdf. The Court should reject Appellants' arguments for this reason as well.

## IV. Adopting Appellants' position would disable Congress's control of Medicare prescription drug outlays.

As explained above, the fiscal bind in which the federal government found itself between 2003 and 2022 was in large part a result of Congress's own creation. Pursuant to its unequivocal and proper constitutional role, *see* U.S. Const. Art. I, § 8, cl. 1, Congress settled on an appropriate legislative solution to the legislative problem it helped create. That is not a constitutional violation. That is how the exercise of legislative Powers is supposed to work. *Id.* § 1.

Appellants ask this Court to forever freeze in place a legislative regime that the legislature has found to be detrimental to the "general Welfare" that it *and Congress alone* is entrusted with protecting. *Id.* § 8. Appellants are wrong. *Cf. id.* § 8, cl. 18 (granting Congress power to make

"all Laws which shall be necessary and proper for carrying into Execution" is previously vested authorities). According to Appellants, what Congress has done, it cannot undo so long as it profits the pharmaceutical industry. Adopting Appellants' position would turn the constitutional scheme on its head. The Court should decline the invitation.

## CONCLUSION

The Court should affirm the orders of district courts.

Respectfully submitted,

By:    /s/ Charles L. Becker
         Charles L. Becker
         **Kline & Specter, PC**
         1525 Locust Street
         Philadelphia, PA 19102
         (215) 772-1000
         *Attorney for Amici Curiae*

# COMBINED CERTIFICATIONS

*Bar membership*. I am a member of the bar of the United States Court of Appeals for the Third Circuit.

*Word limit*. This brief includes 5,108 words using the word-counting feature of Microsoft Word, focusing on the portions of the brief specified in Fed. R. App. P. 32.

*Typeface and typestyle*. This brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32.  It has been prepared with Microsoft Word using 14-point Book Antiqua font, which is a proportionally-spaced typeface.

*Filing*. I electronically filed this brief with the Court in "pdf" format and caused an original and six paper copies to be delivered to the Clerk's Office.  The brief as provided to the Court in pdf format is identical to the paper copies filed with the Court.

*Virus check*. The pdf version of this brief has been scanned for viruses with Bitdefender Endpoint Security Tools.  The software confirmed that the pdf file contained no viruses.

                                           ___/s/ Charles L. Becker_____

Dated:  December 23, 2024          Charles L. Becker

## CERTIFICATE OF SERVICE

On this day, I served the foregoing on all counsel of record through the

Court's electronic case management and electronic filing system.


                                       /s/ Charles L. Becker
                                        Charles L. Becker

Dated:  December 23, 2024